# Confidential Report

**Provided to**

**Joel B. Rudin**
Attorneys At Law

**by**

**Brayer Handwriting International**

# Brayer Handwriting International
Detecting Forgery and Reducing Fraud Losses since 1986

Date:    December 10, 2010

To:     Joel B. Rudin
      Attorney at Law
      200 West 57th Street, Suite 900
      New York, New York 10019

From:    Ruth Brayer, Forensic Document Examiner
      Brayer Handwriting International
      249 East 48th Street
      New York, NY 10017

Re:     Signature Verification

**Documents Submitted and Examined** (all photocopies)

**Known documents with signatures by Michael Vecchione**

  <u>Exhibits</u>
  K1/M   Page 3 of letter from Michael Vecchione to Juan Fiol, *People v. Cisero Murphy*, dated July 6, 1993
  K2/M   Page 2 of letter from Michael Vecchione to Probation Officer J. LaViness, dated March 17, 1995
  K3/M   Page 8 of Michael Vecchione's affirmation in Answer to Motion, *People v. LaVonne Smith*, Ind. No. 14862/94, dated January 17, 1995
  K4/M   Page 8 of Michael Vecchione's affirmation in Answer to Motion, *People v. Demetrius Bennett*, Ind. No. 14862/94, dated January 20, 1995
  K5/M   Letter of Michael Vecchione to Michael Harrison, dated May 10, 1994
  K6/M   Page 2 of letter from Michael Vecchione to Probation Officer John Dawson, dated June 26, 1995

# Brayer Handwriting International

Detecting Forgery and Reducing Fraud Losses since 1986

## Known documents with handwriting by Liza Noonan

| <u>Exhibits</u> | |
|---|---|
| K7/L | Fax Cover Sheet from Liza Noonan to Michael Vecchione, dated February 27, 1995 |
| K8/L | Letter from Liza Noonan to Adrian Diaz, dated April 1, 1994 |
| K9/L | "Comm. Journal" transmission from Liza Noonan, dated March 6, 1995 |
| K10/L | Fax Cover Sheet from Liza Noonan to Dir. Robert Pendoras, dated January 26, 1995 |
| K11/L | Request for Housing of State Inmate or Other Jurisdiction, by Liza Noonan, undated |

## Known documents with signatures by Charles Posner

| <u>Exhibits</u> | |
|---|---|
| K12/C | Letter of Charles Posner to Judge Francis X. Egitto, *People v. Frank Rodriguez*, Ind. No. 9893/92, dated November 3, 1993 |
| K13/C | Letter of Charles Posner to Michael Vecchione, dated February 27, 1995 |
| K14/C | Letter of Charles Posner to Judge Francis X. Egitto, *People v. Johnny Williams*, Ind. No. 7829/93, dated June 7, 1994 |

## Questioned documents with signatures attributed to "Michael Vecchione"

| <u>Exhibits</u> | |
|---|---|
| Q1 | Page 3 of *Damiani* Affirmation of Michael Vecchione, dated January 26, 1995 |
| Q2 | Page 2 of Affirmation of Michael Vecchione in support of motion for material witness order, dated February 23, 1995 |
| Q3 | Page 2 of Affidavit of Michael Vecchione on application for certificate pursuant to CPL §§640.20 and 650.20, dated February 24, 1995 |

Page 2 of 4

# Brayer Handwriting International

Detecting Forgery and Reducing Fraud Losses since 1986

*Questioned documents with signatures attributed to "Michael Vecchione"*

| | |
|---|---|
| Q4 | Page 2 of Affidavit of Michael Vecchione in support of material witness order, *People v. Helbrans*, dated October 21, 1994 |
| Q5 | Affirmation of Michael Vecchione in support of order to produce, *People v. Johnny Williams*, dated March 8, 1994 |
| Q6 | Affirmation of Michael Vecchione in support of order to produce, *People v. Saponaro and Stasio*, dated March 27, 1996 |
| Q7 | Affirmation of Michael Vecchione in support of order to produce, *People v. Saponaro and Stasio*, dated June 29, 1995 |
| Q8 | Page 2 of Damiani Affirmation of Michael Vecchione, People *v. Joseph Stacione*, dated May 25, 1995 |

## Questioned documents with signatures attributed to "Charles Posner"

Exhibits

| | |
|---|---|
| Q9 | Affirmation of Charles Posner in support of order to produce, dated March 3, 1995 |
| Q10 | Page 3 of Damiani Affirmation of Charles Posner, dated March 3, 1995 |

## Problems Presented by Client

I. Determine whether the signatures attributed to "Michael Vecchione" on Exhibits Q1 through Q8 and the known signatures by the same name on Exhibits K1/M through K6/M were executed by the same individual.

II. Determine whether the signatures attributed to "Charles Posner" on Exhibits Q9 and Q10 and the known signatures by the same name on Exhibits K12/C through K14/C were executed by the same individual.

III. Determine whether the signatures attributed to "Michael Vecchione" and "Charles Posner" on Exhibits Q1 through Q10 and the known handwriting by Liza Noonan on Exhibits K7/L through K11/L were executed by the same individual.

Page 3 of 4

# Brayer Handwriting International

Detecting Forgery and Reducing Fraud Losses since 1986

**Conclusions**

I.  With the data available for examination, it is my expert opinion with a reasonable degree of certainty that the signatures attributed to "Michael Vecchione" on Exhibits Q1 through Q8 and the known signatures by the same name on Exhibits K1/M through K6/M, were <u>not</u> executed by the same individual.

II.  With the data available for examination, it is my expert opinion with a reasonable degree of certainty that the signatures attributed to "Charles Posner" on Exhibits Q9 and Q10, and the known signatures by the same name on Exhibits K12/C through K14/C were <u>not</u> executed by the same individual.

III.  Significant similarities in terms of basic shapes and writing habits were found between the questioned signatures on Exhibits Q1 through Q8, and the known handwriting on Exhibits K7/L through K11/L. Due to insufficient data for comparison it is not possible to render an expert opinion without examining additional exemplars by Liza Noonan.

This report represents a preliminary opinion with a reasonable degree of certainty which can be upgraded to a high degree of certainty when presented with the original documents and additional exemplars by Liza Noonan done in my presence. Please see "Terminology for Handwriting Verification" attached herewith.

In the event testimony is required with regard to my findings, the evidence described above must be returned to Brayer Handwriting International at least ten working days prior to such testimony in order to prepare court illustrations.

Ruth Brayer, Forensic Document Examiner

December 10, 2010

Page 4 of 4

# Brayer Handwriting International

Detecting Forgery and Reducing Fraud Losses since 1986

## Degrees of Certainty
Terminology for Handwriting Verification

### I.    Written by the Same Individual

| | |
|---|---|
| Identification* | Definite identification beyond any doubt. Highest degree of confidence in one's opinion that the handwriting belongs to the identified party. |
| A high degree of certainty | Critical evidence confirms the "questioned" and "known" documents were written by the same person. |
| A reasonable degree of certainty | Significant indicators suggest the handwriting samples compared were written by the same person; more data is needed to support a higher degree of certainty. |
| Inconclusive | Due to insufficient evidence, it is not possible to reach a conclusion. |
| No Opinion | |

### II.    Not Written by the Same Individual

| | |
|---|---|
| Elimination | Definite conclusion that the "questioned" and "known" writing are not executed by the same party. Beyond any doubt. |
| A high degree of certainty | Critical evidence confirms the "questioned" and "known" documents were not written by the same person. |
| A reasonable degree of certainty | Significant indicators suggest the handwriting samples compared were not written by the same person; more date is needed to support a higher degree of certainty. |
| Inconclusive | Due to insufficient evidence, it is not possible to reach a conclusion. |

* * *

### Identification*
This opinion can be reached only in ideal situations: when you have all the originals, perfect pre-and post-incident samples, parallel wording in all documents and an eyewitness. In most cases one of these elements is missing, so this opinion is rarely given. For all practical purposes, "a high degree of certainty" is the most desirable opinion, in the absence of "beyond any doubt".

# Brayer Handwriting International

Detecting Forgery and Reducing Fraud Losses since 1986

## Curriculum Vitae - Ruth Brayer

*Experience and areas of expertise:*

Qualified as an Expert Witness by the Supreme Court of the State of New York, Ruth Brayer is certified by the National Bureau of Document Examiners, specializing in handwriting authentication of disputed documents. Ms. Brayer has testified for the Plaintiff as well as the Defendant in Federal, criminal and civil courts. Ms. Brayer is the author of *Detecting Forgery in Fraud Investigations*, and a seasoned presenter with over twenty years of speaking experience.

*Representative clients:*

Ms. Brayer has provided expert testimony to the U.S. Securities and Exchange Commission, the National Association of Securities Dealers, the Department of Investigation of the City of New York, the New York City Law Department and the office of the District Attorney. She has provided services for major law firms, Fortune 500 companies such as Prudential Securities, Inc., MetLife, New York Life, Guardian, Verizon, JPMorgan Chase and American Express, as well as The United Nations.

*Expert Testimony:*

- National Association of Securities Dealers
- U.S. Securities and Exchange Commission
- Central London County Court, United Kingdom
- United States Federal Court, Southern District of New York
- Supreme Court of the County of New York
- Supreme Court of the State of New York, Troy, NY

*Professional Affiliations:*

- American College of Forensic Examiners
- New York Women in Communications
- National Bureau of Document Examiners of New York, former Vice Present
- National Speakers Association, Metro New York chapter, former President

*Education:*

- National Bureau of Document Examiners (Awarded Certificate)
- National Association of Document Examiners
- American Academy of Forensic Scientists
- Jewish Theological Seminary: Masters Degree in the Humanities

*Publications:*

- Detecting Forgery in Fraud Investigations: The Insider's Guide, ASIS Sept. 2000
- When Evidence is on the Line, *Security Management*, Feb. 1998
- Demystifying Handwriting: Legal & Behavioral Aspects, *ALA*, June 1999

*Educational Programs Presented by Ruth Brayer:*

- Detecting Forgery: Effective Strategies to Win Your Case, a CLE program accredited by New York State Continuing Legal Education Board
- Detecting Forgery in Fraud Investigations, a program designed for the investigators
- Demystifying Handwriting: Legal and Behavioral Aspects

Re: <u>People v. Cisero Murphy</u>
    Indictment No's. 12156/92
    and 1365/93
    July 6, 1993

    Page 3


                                        Sincerely,

                                        CHARLES J. HYNES
                                        District Attorney
                                        Kings County

                              By: *Michael F. Vecchione*

                                        MICHAEL F. VECCHIONE
                                        Assistant District Attorney
                                        Chief, Trial Cadre
                                        Trial Division


Agreed and consented to:

*Cisero Murphy*
CISERO MURPHY

Dated: 8/13/93


Approved:

*Juan R. Fiol*
JUAN FIOL, Esq.
Attorney for Cisero Murphy

Dated: 8/13/93


EXHIBIT
kl/m

RE:   **ADRIAN DIAZ**                    -2-              March 17, 1995


        Any failure to report to probation by Mr. Diaz is
directly related to his fear in testifying in this case.

        If you need additional information please feel free to
contact me.

                                Very truly yours,

MFV:ca                          MICHAEL F. VECCHIONE


i2

EXHIBIT
K2/M

together with any written, recorded or
oral statement made by any witness to the
incidents alleged, known to defense
counsel, whether or not defendant intends
to call such witness at trial [C.P.L.
Section 240.40).

    2.   The discovery requested by the People herein is
material to the preparation of their case and their request is
reasonable in light of the material requested by and provided to
defendant.

    **WHEREFORE**, the Court should grant the People the relief
set forth herein.

DATED:   Brooklyn, New York
           January 17, 1995

                               MICHAEL F. VECCHIONE
                               Deputy District Attorney

8

3

EXHIBIT
23/m

whom defendant intends to call at trial,
together with any written, recorded or
oral statement made by any witness to the
incidents alleged, known to defense
counsel, whether or not defendant intends
to call such witness at trial [C.P.L.
Section 240.40).

2.   The discovery requested by the People herein is
material to the preparation of their case and their request is
reasonable in light of the material requested by and provided to
defendant.

WHEREFORE, the Court should grant the People the relief
set forth herein.

DATED:     Brooklyn, New York
           January 20, 1995

MICHAEL F. VECCHIONE
Deputy District Attorney

8

EXHIBIT
K4/m



**DISTRICT ATTORNEY OF KINGS COUNTY**
**MUNICIPAL  BUILDING**
**BROOKLYN, N.Y. 11201**
(718) 802-2000

**CHARLES J. HYNES**
DISTRICT ATTORNEY

May 10, 1994

Michael Harrison, Esq.
401 Broadway
Suite 1808
New York, N.Y. 10013

Re:  Discovery - People v. Collins
<u>Indictment Number 2884/94</u>

Dear Mr. Harrison:

Enclosed please find the following items of discovery:

1.  DD5's #1 - #71
2.  Crime Scene report
3.  911 Printout
4.  Sprint report
5.  Voucher -289955-61
6.  Line-up Reports
7.  Latent Print reports
8.  M.E. follow-up report - wound chart
9.  Aided report
10. Miscellaneous police documents
11. Miscellaneous police documents re: living victim
12. Photo arrays marked A-F
13. Death certificate, police identification of deceased; Family identification of deceased.

Very truly yours,

MICHAEL F. VECCHIONE
Executive Assistant District
Attorney
Trial Cadre

Encls.
MFV:cam

I hereby acknowledge receipt of the
above items of discovery

MICHAEL HARRISON, Attorney for
JABBAR COLLINS

5-10-94
DATE

5

EXHIBIT
KS/m

296

RE:  ADRIAN DIAZ                    -2-                    JUNE 26, 1995


       If you need additional information please feel free to
contact me.

                              Very truly yours,

MFV:ca                        MICHAEL F. VECCHIONE
                              DEPUTY DISTRICT ATTORNEY


6

162

EXHIBIT
K8/m


DISTRICT ATTORNEY OF KINGS COUNTY
MUNICIPAL BUILDING
BROOKLYN, N.Y. 11201
(718) 802-2000

**CHARLES J. HYNES**
DISTRICT ATTORNEY

## FAX COVER SHEET

**TO:** Michael Vecchione

**FAX NUMBER:** (809) 253-0079

**FROM:** LIZA NOONAN - Brooklyn DA's Office

**DATE:** Feb 27 1995   **TIME:** 5:20 PM

**NUMBER OF PAGES (including this cover):** 6 pages

**MESSAGE:**

The original order will be mailed
by American Airlines Priority Parcel
Leaving N.Y. at 11$^{30}_{AM}$
Arriving San Juan at 4$^{12}_{PM}$

**HOMICIDE BUREAU:** (718) 802-2110

**FAX:** (718) 802-2366

17

**149**



EXHIBIT
K7/L



**DISTRICT ATTORNEY OF KINGS COUNTY**
MUNICIPAL BUILDING
BROOKLYN, N.Y. 11201
(718) 802-2000

CHARLES J. HYNES
DISTRICT ATTORNEY

DATE _April 1, 1994_

(MR) (MRS) (MS) _MR. Adrian Diaz_ RE:  PEOPLE OF THE STATE OF NEW YORK

v. _Jabbar Collins_

Indictment No. _2884-94_ PART _39_

Dear Sir or Madam:

I am writing to you in connection with your future appearance in court as a witness regarding the above-named case.  In order not to cause any inconvenience to you by making unnecessary appearances in court, we request that you furnish this office with the following information.  You will be notified <u>only</u> when the case is actually ready for trial.

If you moved, new address _____ Apt. _____

Your telephone number _____

Your Date of Birth _____

Neighbor or relative's telephone number _____

Employer's Name _____

Employer's Address _____ Tel. _____

Name of Supervisor _____

Any other information you may give which will help us in communicating with you will be greatly appreciated.

Enclosed herewith is a self-addressed, stamped envelope for your reply.

Very truly yours,

BY: _Lisa Noonan_
INVESTIGATOR (TEL. (718) 802- _2541_

SC 36-Rev. 1-99

`8

EXHIBIT
_K2/2_

MODE = TRANSMISSION START-MAR-06 09:40 END-MAR-06 09:42

NO.    COM   ABBR/NTWK   STATION NAME/      PAGES   PRG.NO.   PROGRAM NAME
                        TELEPHONE NO.

001    OK    ✳          912122661511       003

                              -DISTRICT ATT.OFFICE
*************************************************** -   718 802 2366- ************

FROM: LIZA NOONAN

DATE: 3·6·95 _____ TIME: 9:35 _____

NUMBER OF PAGES (including this cover) : 3 pages

MESSAGE: _____

If there are any questions or further
instructions please call Liza at (718)
802-2541

_____

_____

_____


HOMICIDE BUREAU: (718) 802-2110

FAX: (718) 802-2366

EXHIBIT
K9/L

WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Correction of the City of New York to
produce  Elvin Oliva             , above-named, in Part  19  at the Supreme Court,
☒ 360 Adams Street   ☐ 120 Schermerhorn Street, Brooklyn, NY, at
9:30 a.m. for the above-noted purpose, after which said prisoner is to await the
further order of this court.

Dated:   Brooklyn, New York
         March 3          , 19 95      Charles Posner
                                       Assistant District Attorney

                    :81                ADM 20 - Rev. 10/93

9



**DISTRICT ATTORNEY OF KINGS COUNTY**
MUNICIPAL BUILDING
BROOKLYN, N.Y. 11201
(718) 802-2000

CHARLES J. HYNES
DISTRICT ATTORNEY

## FAX COVER SHEET

TO: Dir. Robert Pendovas

FAX NUMBER: 452-3004

FROM: Liza Noonan - Bklyn D.A. Office

DATE: Jan. 26 1995   TIME: 3:20 PM

NUMBER OF PAGES (including this cover) : 6 pages

MESSAGE:

This order will be executed on Monday January 30 1995.

If there is a problem I may be contacted at (718) 802-2541

TRIAL CADRE: (718) 802 - 2110

FAX: (718) 802 - 2366

**10**


EXHIBIT
K10/L

REQUEST FOR HOUSING OF STATE INMATE OR OTHER JURISDICTION

DATE OF REQUEST:

FACILITY/AGENCY REQUESTING ACCOMMODATION:
Brooklyn District Attorneys

NAME OF CALLER: Liza Noonan

TITLE: Paralegal  TELEPHONE NUMBER: (718) 802-2541

CONTACT PERSON FOR RETURN OF INMATE:
NAME: Liza Noonan  TELEPHONE NUMBER: (718) 802-2541

INMATE INFORMATION

INMATE'S FACILITY NAME: Ulster Correctional Facility

LAST NAME: Oliva  FIRST: Edwin  DOB: ~~~~

N.Y.S.I.D.: ~~~~

CHARGES: Att Rob 2°  SENTENCE: 18mos - 3yrs

STATE CLASSIFICATION: GEN. POP ( )  STATE CMC ( )  OTHER ( )

IF STATE C.M.C./OTHER SPECIFY REASON(S) _____

ACCOMPANYING DOCUMENTATION:

DETAINER/WARRANT: _____

✓ ORDER TO PRODUCE: _____

INTERSTATE AGREEMENT ON DETAINER: _____

OTHER DOCUMENTS: _____

SPECIAL INSTRUCTIONS: Edwin Oliva to be kept
separate from inmate
Bobby Collins NYSID# 668266022  GMDC

HOUSING ACCOMMODATION:

INMATE TO ARRIVE ON: 3-6-95  TIME: ? (afternoon)

INMATE TO DEPART ON: _____  TIME: _____

ESCORT OFFICERS:  NAME: _____  SHIELD NO.: _____

Det.'s from
Bklyn DA's
office

NAME: _____  SHIELD NO.: _____

NOTIFICATION TO: _____

DATE: _____  TIME: _____

NOTIFICATION TO O.S.U. AT: _____  _____
(TIME)  (NAME)

PLEASE CHECK APPROPRIATE BOX

FORMER C.M.C. STATUS: ( ) NO  ( ) YES _____
(SPECIFY)

PREPARED BY: _____

83

011

EXHIBIT
K11/L



DISTRICT ATTORNEY OF KINGS COUNTY
MUNICIPAL BUILDING
BROOKLYN, N.Y. 11201-3745
(718) 802-2214

CHARLES J. HYNES
DISTRICT ATTORNEY

CHARLES A. POSNER
DEPUTY DISTRICT ATTORNEY

November 3, 1993

Honorable Francis X. Egitto,
Justice of the Supreme Court
360 Adams Street
Brooklyn, New York 11201

Re:  Frank Rodriguez
     Indictment No. 9893/92

Dear Justice Egitto:

   Pursuant to Section 380.50 of the Criminal Procedure Law, we are hereby requesting that Rochelle Feldman, the wife of the deceased, Tiberiu Feldman, be permitted to make a statement with regard to the question of sentence at the time of sentencing on November 16, 1993.

                    Very truly yours,

                    Charles A. Posner

CAP:DMM


cc:  John B. Avanzino, Esq.



20



DISTRICT ATTORNEY OF KINGS COUNTY
MUNICIPAL BUILDING
BROOKLYN, N.Y. 11201-3745
(718) 802-2214

...NES
...ORNEY

CHARLES A. POSNER
DEPUTY DISTRICT ATTORNEY

February 27, 1995

Michael Vecchione, Esq.,
Deputy District Attorney
Holiday Inn Crown Plaza  -  Room 918
Highway 187  -  KM 1.5
San Juan, Puerto Rico

Re:  People of the State of New York vs. Jabber Collins
     Indictment No. 2884/1994

Dear Mr. Vecchione:

Enclosed is a copy of the Interstate Material Witness Order signed by Justice Francis X.Egitto, compelling the appearance of Mr. Adrian Diaz before Part 39 of the New York State Supreme Court for Kings County.

I hereby represent to you that an original, exemplified copy will be messengered to you tomorrow morning and should be in your hands by tomorrow afternoon.

Sincerely yours,

Charles A. Posner

CAP:DMN
ENC.

150

021



EXHIBIT
k13/c



**DISTRICT ATTORNEY OF KINGS COUNTY**
**MUNICIPAL BUILDING**
BROOKLYN, N.Y. 11201-3745
(718) 802-2214

CHARLES J. HYNES
DISTRICT ATTORNEY

CHARLES A. POSNER
DEPUTY DISTRICT ATTORNEY

June 7, 1994

Honorable Francis X. Egitto,
Justice of the Supreme Court
360 Adams Street
Brooklyn, New York 11201

Re:  Johnny Williams
Indictment No. 7829/93

Dear Justice Egitto:

Pursuant to Section 380.50 of the Criminal Procedure Law, we are hereby requesting that Joyce Johnson, the mother of the deceased, P. O. Rudolph Thomas, be permitted to make a statement with regard to the question of sentence at the time of sentencing on June 13, 1994.

Very truly yours,

Charles A. Posner

CAP:DMM

cc:  Michael Colihan, Esq.

22



EXHIBIT
K14/C

Questioned Documents

WHEREFORE, it is respectfully requested that the Court
sign the attached Order.

Michael Vecchione
Assistant District Attorney

Dated: January 26 1995
Brooklyn, New York

112

Q1

Mr. Santos articulated to the detectives as well as Michael Vecchione that he would not testify at trial. Nor would he avail himself to be served a subpoena directing him to testify.

The said Angel Santos is a material witness in this matter pending before the Supreme Court Part 39, County of Kings, and that he possesses information material to the determination of the pending proceeding before Supreme Court, Part 39 and has not, and will not testify voluntarily nor will he comply with any subpoena seeking his attendance in this proceeding. Any further service of process upon this witness will be futile. That the past failure of Angel Santos to respond voluntarily to subpoena, demonstrates that he will not respond to an order compelling his appearance to proceedings adjudicating him a material witness.

WHEREFORE YOUR DEPONENT RESPECTFULLY PRAYS for an order of this court in pursuance to section 620.20 and 620.30 of the Criminal Procedure Law for an order adjudicating Angel Santos a material witness in this action and fixing bail to secure future attendance herein,

AND FURTHER for the issuance of a warrant to a police officer of the City of New York directing such police to take Angel Santos into custody within the State and to bring him before the Court forthwith.

_Michael Vecchione_

**MICHAEL VECCHIONE**
Assistant District Attorney

Dated:   February 23, 1995
         Brooklyn, New York

Sworn to before me thi
23 day of February 1995.
_Lou C. Katz_
Notary Public State of New
York  No. 02KA5023046
Qualified in NY County

2

That the presence of Adrian Diaz is required at the prosecution of the above-mentioned case for two weeks after commencement of the above-mentioned trial.

It is believed that Adrian Diaz has been threatened in New York State which caused his relocation to Puerto Rico. There is reason to believe that because of these threats, Adrian Diaz will not voluntarily submit to service of process and return to New York to testify in the above-mentioned case.

That the Commonwealth of Puerto Rico has provided by law for commanding the presence of a witness that is slated to attend and testify at a criminal prosecution in the United States, a provision similar to that enacted by this State through the Criminal Procedure Law.

WHEREFORE, your deponent requests that this Court issue a Certificate pursuant to the law of the State of New York requesting that a court of record of the Commonwealth of Puerto Rico, issue an order directing that the witness attend and testify at the above-mentioned criminal prosecution in the Supreme Court, Kings County, Part 39, State of New York, upon such terms and conditions as may be prescribed by said Court.

MICHAEL F. VECCHIONE
Deputy District Attorney

Sworn to before me this
24th day of February, 1995.

MARGARITA COLON
Notary Public State of New York
No. 24-4161241015
Qualified in Kings County
Commission Expires July 1996

014                    158                    Q3

The said  Nissim Mizrachi

is a material witness in the matter pending before the Supreme Court

Part  38  , County of Kings and possesses information material to the

determination of the pending proceeding before Supreme Court, Part  38

and has not, and will not voluntarily be amenable or responsive to

a subpoena seeking attendance in this proceeding and therefore any

further service of process upon the said witness will be futile.

That the past failure of   Nissim Mizrachi

to respond voluntarily to subpoena demonstrates that he will not

respond to an order compelling   his   appearance to proceedings

adjudicating   him   a material witness.

WHEREFORE YOUR DEPONENT RESPECTFULLY PRAYS for an order

of this court in pursuance to section 620.20 and 620.30 of the

Criminal Procedure Law for an order adjudicating  Nissim Mizrachi

a material witness in this action and fixing bail to secure

future attendance herein, _____

AND FURTHER for the issuance of a warrant to a police officer of

the City of New York directing such police officer to take the

said   Nissim Mizrachi

into custody within the State and to bring  him   before the Court

forthwith.

*Michael Vecchione*

Sworn to before me this

31st  day of  October  1994

*Sheila D Hoke*

SHEILA D HOKE
Notary Public, State of New York
31-5008800
Qualified in New York County
Commission Expires March 1, 1996

SC 50-11/74

015                                          Q4

At a Criminal Term, Part _____ of the
Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Centre,
Montague Street, Brooklyn, New York on
_____, 19__.

PRESENT:   HON. ___Francis X. Egitto_____
                              Justice.
----------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

                              Plaintiff,

          - against -

          Johnny Williams

                              Defendant.

          Dana Everett

               re: Witness
----------------------------------------------X

**ORDER TO PRODUCE**

☐ defendant (CPL § 560.10)

☒ witness (CPL § 630.10)

Indictment # _7829-93_____
Institution# _____
Inmate # ____94A0296_____

NYSID # __7392628M_____
D.O.B.  __7-23-66_____

          UPON reading and filing the below affirmation of the Assistant
District Attorney, it is

          ORDERED, that the Superintendent of the institution or whosoever shall
have the supervision and control of __Dana Everett_____, shall deliver the said
___Dana Everett____, in civilian clothes _into the custody of the_
_Commissioner of Correction of the City of New York, and it is further_

          ORDERED, that the Commissioner of Correction of the City of New York
receive the said __Dana Everett____ from the said Warden and produce him in
Part _39__ of this Court on __March 21,1994__ at 9:30 a.m. of that day at the
Courthouse located at

     ☒ 360 Adams Street          ☐ 120 Schermerhorn Street
and on all adjourned dates, and it is further

          ORDERED, that upon completion, the prisoner shall be returned to the
custody whence he/she came.

                         E N T E R,

                         _____
                         HON. Francis X. Egitto
                              F. X. EGITTO
                                 J.S.C.

                                           COUNTY CLERK
                                           WILBUR A. LEVIN
                                           K.J.S.C.
                                           ENTERED

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF KINGS   )

          Michael Vecchione_____, an attorney-at-law, duly licensed to practice
in the Courts of the State of New York, affirms under the penalty of perjury:

          That I am on the staff of the District Attorney of Kings County and
am familiar with the within proceedings.

          That one __Dana Everett_____ is presently confined in __Oneida__
__Correctional Facility__. That said prisoner's attendance is required in the
Supreme Court of the State of New York, County of Kings on __March 21,1994___,
19___ for the reason that said prisoner

     ☐    has been charged in this County with the crime of _____
          _____, and said case has been scheduled on the Court calendar.

     ☒    is required to be present in said Supreme Court Kings County to be a
witness in the above-entitled matter.

          WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Corrections of the City of New York to
produce __Dana Everett__, above-named, in Part _39_ at the Supreme Court,

     ☒ 360 Adams Street      ☐ 120 Schermerhorn Street, Brooklyn, NY, at
9:30 a.m. for the above-noted purpose, after which said prisoner is to await the
further of this Court.

Dated:    Brooklyn, New York
          __March 8,1994___, 19__         __Mike Vecchione_____
                                          Assistant District Attorney

016

ADM 20 - Rev. 9/93

4/2

At a Criminal Term, Part __8__, of the
Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Centre,
Montague Street, Brooklyn, New York on
March 27 _____, 19_96_.

PRESENT: HON. _Michael Pesce_____
_____ Justice.
-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

                              Plaintiff,

              - against -

              Saponaro & Stasio
                              Defendant.

              Marco Ingrao
                   re:  Witness.
-----------------------------------------X

ORDER TO PRODUCE

_____ defendant (CPL § 560.10)
__X__ witness (CPL § 630.10)

Indictment #    5902-95

Institution #    Rikers/OBCC

Inmate #    141-95-14926

NYSID #    7431434L

D.O.B.    7-8-73

UPON reading and filing the below affirmation of the Assistant
District Attorney, it is

ORDERED, that the Superintendent of the institution, or whosoever
shall have the supervision and control of _Marco Ingrao____, shall deliver
the said __Marco Ingrao_____ in civilian clothes into the custody of the
Commissioner of Correction of the City of New York, and it is further

ORDERED, that the Commissioner of Correction of the City of New York
receive the said _Marco Ingrao_____ from the said Warden and produce him in
Part __8__ of this Court on _March 29,1996____ at 9:30 a.m. of that day at the
Courthouse located at

[X] 360 Adams Street          [  ] 120 Schermerhorn Street
and on all adjourned dates, and it is further

ORDERED, that upon completion, the prisoner shall be returned to the
custody whence he/she ENTERED T E R,

MAR 29 1996
WILBUR A. LEVIN
ss. Cou...

HON. Michael Pesce          J.S.C.

STATE OF NEW YORK
                        )
                        ) ss.
COUNTY OF KINGS          )

_Michael Vecchione____, an attorney-at-law, duly licensed to practice
in the Courts of the State of New York, affirms under the penalty of perjury:

That I am on the staff of the District Attorney of Kings County and
am familiar with the within proceedings.

That one _Marco Ingrao_____ is presently confined in _Rikers/OBCC_
_____. That said prisoner's attendance is required in the
Supreme Court of the State of New York, County of Kings, on _March 29___,
19_96_ for the reason that said prisoner

[  ] has been charged in this County with the crime of
_____, and said case has been scheduled on the Court calendar.

[X] is required to be present in said Supreme Court, Kings County, to be a
witness in the above-entitled matter.

WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Correction of the City of New York to
produce _Marco Ingrao_____, above-named, in Part __8__ at the Supreme Court,
[X] 360 Adams Street          [  ] 120 Schermerhorn Street, Brooklyn, NY, at
9:30 a.m. for the above-noted purpose, after which said prisoner is to await the
further order of this Court.

Dated:    Brooklyn, New York
          March 27_____, 19_96_

Michael Vecchione

Assistant District Attorney

Q6

Q17

Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Centre,
Montague Street, Brooklyn, New York on
June 29                      , 19 95 .

PRESENT:   HON.  Thaddeus Owens

                                    Justice.

----------------------------------------------x   ORDER TO PRODUCE

THE PEOPLE OF THE STATE OF NEW YORK,               [ X ] defendant (CPL § 560.10)

                              Plaintiff,

        - against -                                [   ] witness (CPL § 630.10)

        Saponaro & Satsio                          Indictment #   5902-95
                              Defendant.           Institution    Sing Sing Corr.
                                                   Inmate #       95A0938

        re:  Witness                               NYSID #    61156250
                                                   D.O.B.     6-5-78
----------------------------------------------x

        UPON reading and filing the below affirmation of the Assistant
District Attorney, it is

        ORDERED, that the Superintendent of the institution or whosoever shall
have the supervision and control of   Joseph Stasio   , shall deliver the said
  Joseph Stasio         in civilian clothes  into  the  custody  of  the
Commissioner of Correction of the City of New York, and it is further

        ORDERED, that the Commissioner of Correction of the City of New York
receive the said   Joseph Stasio   from the said Warden and produce him in
Part   38   of this Court on   August 14, 1995  at 9:30 a.m. of that day at the
Courthouse located at

        [ X ] 360 Adams Street              [   ] 120 Schermerhorn Street
and on all adjourned dates, and it is further

        ORDERED, that upon completion, the prisoner shall be returned to the
custody whence he came from.

                    ENTERED                        E N T E R.

                    JUL 6 1995                      _Thaddeus Ec Owens_
                                                    HON. Thaddeus Owens     J.S.C.
                                                                  THADDEUS E. OWENS
STATE OF NEW YORK,
COUNTY OF KINGS

        Michael Vecchione  , an attorney-at-law, duly licensed to practice
in the Courts of the State of New York, affirms under the penalty of perjury:

        That I am on the staff of the District Attorney of Kings County and
am familiar with the within proceedings.

        That one   Joseph Stasio   is presently confined in   Sing Sing
Correctional Facility.  That said prisoner's attendance is required in the
Supreme Court of the State of New York, County of Kings on   August 14     ,
19 95  for the reason that said prisoner

        [ X ]        has been charged in this County with the crime of   Murder 2
                    , and said case has been scheduled on the Court calendar.

        [   ]        is required to be present in said Supreme Court Kings County to be a
witness in the above-entitled matter.

        WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Corrections of the City of New York to
produce   Joseph Stasio   , above-named, in Part  38  at the Supreme Court,

        [ X ] 360 Adams Street      [   ] 120 Schermerhorn Street, Brooklyn, NY, at
9:30 a.m. for the above-noted purpose, after which said prisoner is to await the
further of this Court.

Dated:   Brooklyn, New York
         June 29           , 1995        _Michael Vecchione_
                                         Assistant District Attorney
                                         Michael Vecchione

                                                             ADM 20 — Rev. 9/93

Q7

918

3.   The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

4.   Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

5.   No prior such application has been made.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

ENTERED

MAY 25 1995

WILBUR A. LEVIN
COUNTY CLERK

Michael Vecchione
Assistant District Attorney

Dated:   Brooklyn, New York
         May 25, 1995

019

Q8

At a Criminal Term, Part 20 of the
Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Centre,
Montague Street, Brooklyn, New York on
March 3 , 19 95

PRESENT:   HON. Francis X. Egitto

_____ Justice.

_____x

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

- against -

Xaber Collins

Defendant.

Edwin Oliva

re:  Witness

_____x

**ORDER TO PRODUCE**

[ ] defendant (CPL § 560.10)

[ X ] witness (CPL § 630.10)

Indictment # 3884-94

Institution: Ulster Cor. Fac.

Inmate #

NYSID #

D.O.B.:

UPON reading and filing the below affirmation of the Assistant
District Attorney, it is

ORDERED, that the Superintendent of the institution or whosoever shall
have the supervision and control of   Edwin Oliva   shall deliver the said
Edwin Oliva   in civilian clothes  into  the  custody  of  the
Commissioner of Correction of the City of New York; and it is further

ORDERED, that the Commissioner of Correction of the City of New York
receive the said   Edwin Oliva   from the said Warden and produce him in
Part  39  of this court on   March 9,1995   at 9:30 a.m. of that day at the
Courthouse located at

[ X ] 360 Adams Street          [ ] 120 Schermerhorn Street
and on all adjourned dates, and it is further ordered until satisfaction of this
order Edwin Oliva will be housed with the Dept. of New York City Corrections.
ORDERED, that upon completion, the prisoner shall be returned to the
custody whence he/she came.

E N T E R,

_____
HON. Francis X. Egitto         J.S.C.

WILBUR A. LEVIN

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF KINGS      )

Charles Posner   an attorney-at-law, duly licensed to practice
in the Courts of the State of New York, Affirms under the penalty of perjury:

That I am on the staff of the District Attorney of Kings County and
am familiar with the within proceedings.

That one   Edwin Oliva   is presently confined in
Ulster Cor. Fac.  . That said prisoner's attendance is required in the
Supreme Court of the State of New York, County of Kings on  March 9,
19 95  for the reason that said prisoner

[ ]  has been charged in this County with the crime of
_____, and said case has been scheduled on the Court calendar.

[ X ]  is required to be present in said Supreme Court Kings County to be a
witness in the above-entitled matter.

WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Correction of the City of New York to
produce   Edwin Oliva   , above-named, in Part  39  at the Supreme Court,

[ X ] 360 Adams Street        [ ] 120 Schermerhorn Street, Brooklyn, NY, at
9:30 a.m. for the above-noted purpose, after which said prisoner is to await the
further order of this Court.

Dated:   Brooklyn, New York
         March 3 _____, 19 95

_____
Charles Posner
Assistant District Attorney

AER 20 - Rev. 10/93

023

84

Q9



WHEREFORE, it is respectfully requested that the Court sign the attached Order.

Assistant District Attorney

Dated: March 3, 1975
Brooklyn, New York

024                    Q10



The City of New York
Department of Investigation

ROSE GILL HEARN
COMMISSIONER

80 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release #130-2009
nyc.gov/html/doi

**FOR IMMEDIATE RELEASE**
**TUESDAY, DECEMBER 15, 2009**

**CONTACT: DIANE STRUZZI**
**(212) 825-5931**

### DOI ARRESTS TWO EXPEDITORS CHARGED WITH FILING A FALSE APPLICATION
### FOR A DEPARTMENT OF BUILDINGS WORK PERMIT FOR A BROOKLYN CONSTRUCTION PROJECT

ROSE GILL HEARN, Commissioner of the New York City Department of Investigation ("DOI"), announced today the arrests of two expeditors, also called "Filing Representatives," registered with the City Department of Buildings ("DOB"), on charges of filing a false work permit application with DOB to illegally obtain approval for construction work at a Brooklyn work site. One expeditor is charged with causing the forged signature of a construction superintendent, who had no connection to the project, to be added to the application, and the second defendant is charged with notarizing the superintendent's supposed signature without having witnessed it. DOI's investigation began after it was notified about irregularities on a work permit filed with DOB in connection with the site. The office of Kings County District Attorney Charles J. Hynes is prosecuting the cases.

DOI Commissioner Rose Gill Hearn said, "These arrests bring into sharp focus the serious consequences for individuals who fraudulently file false documents with the Buildings Department — arrest and prosecution. Professionals in the industry, especially, should know that this information is vital to the City, which relies on it to make crucial decisions."

A DOB Filing Representative, or "expeditor," is registered with DOB to submit documents on behalf of contractors and registered professionals, such as engineers, plumbers and architects.

The following two individuals were arrested today:

THADDEUS STROUD, 40, of Brooklyn, N.Y., who is a Filing Representative, is charged with three counts of Forgery in the Second Degree and one count of Criminal Possession of a Forged Instrument in the Second Degree, which are class D felonies; one count of Offering a False Instrument for Filing in the First Degree, a class E felony; and one count each of Offering a False Instrument For Filing in the Second Degree, Falsifying Business Records in the Second Degree and Fraud by Notary Public or Commissioner of Deeds, which are class A misdemeanors. Upon conviction, a class D felony is punishable by up to seven years in prison, a class E felony by up to four years in prison, and a class A misdemeanor by up to a year's incarceration.

GISELLE TORRES, 24, of Brooklyn, N.Y., who is a Filing Representative and was a Commissioner of Deeds, is charged with Offering a False Instrument for Filing in the First Degree, a class E felony; Offering a False Instrument For Filing in the Second Degree, Falsifying Business Records in the Second Degree, and Fraud by Notary Public or Commissioner of Deeds, which are class A misdemeanors.

more

According to the criminal complaints, STROUD filed a "Work Permit Application" form with DOB in May 2008 for construction work at a site in Brooklyn. The Work Permit Application was purportedly signed by a construction superintendent and was notarized by TORRES, in her capacity as Commissioner of Deeds. DOI's investigation found that, in fact, the named construction superintendent had never applied or agreed to be the construction superintendent for the project or given his permission to anyone else to sign his name to the application. In addition, STROUD, before filing the application, had caused the construction superintendent's supposed signature to be added to the application. The investigation found that TORRES was a Commissioner of Deeds from about August 2007 until September 2009 and that a Commissioner of Deeds may not notarize a signature unless the signatory is present.

Commissioner Gill Hearn thanked DOB Commissioner Robert D. LiMandri and Kings County District Attorney Charles J. Hynes and their staffs for their assistance on this investigation.

The investigation was conducted by DOI's Inspector General for DOB Michael Carroll and members of his staff, including Investigator Robert Miller, Deputy Inspector General Michael Healy and Chief Investigator James McElligott, under the direction of DOI Assistant Deputy Commissioner John B. Kantor.  Additional assistance was provided by John Egnatios-Beene, an attorney with DOB's Legal Division.

Assistant District Attorney Joseph DiBenedetto, Deputy Chief of the Kings County District Attorney's Rackets Bureau, has been assigned to the prosecution of the case.

Criminal complaints are accusations. Defendants are presumed innocent until proven guilty.

*DOI is one of the oldest law-enforcement agencies in the country. The agency investigates and refers for prosecution City employees and contractors engaged in corrupt or fraudulent activities or unethical conduct. Investigations may involve any agency, officer, elected official or employee of the City, as well as those who do business with or receive benefits from the City.*

**DOI's press releases can also be found at twitter.com/doinews**
**Get the worms out of the Big Apple. To report someone ripping off the City, call DOI at (212) 825-5959.**

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR  COUNTY OF KINGS

------------------------------------------------------------X

The People of the State of New York

       v.

Thaddeus Stroud,

                Defendant

 2009KN099449 ___ony Complaint

------------------------------------------------------------X

    Investigator Robert Miller, Shield Number 108 of the New York City Department of Buildings states that on about May 13, 2008 at various locations, including 210 Joralemon Street, County of Kings, State of New York,

**THE DEFENDANT COMMITTED THE OFFENSES OF:**

| | |
|---|---|
| P.L. § 170.10(1) | Forgery in the Second Degree |
| P.L. § 170.10(2) | Forgery in the Second Degree |
| P.L. § 170.10(3) | Forgery in the Second Degree |
| P.L. § 170.25. | Criminal Possession of a Forged Instrument in the Second Degree |
| P.L. §175.35. | Offering a False Instrument for filing in the First Degree |
| P.L. §175.30. | Offering a False Instrument For Filling in the Second Degree |
| P.L. §175.05(1) | Falsifying Business Records in the Second Degree |
| Exec §135-a(2) | Fraud by Notary Public or Commissioner of Deeds |

**IN THAT THE DEFENDANT DID:**

with intent to defraud, deceive or injure another, he falsely made, completed or altered a written instrument which is or purported to be, or which is calculated to become or to represent if completed an instrument which did evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status;  with intent to defraud, deceive or injure another, he falsely made completed or altered a written instrument which is or purported to be, or which is calculated to become or to represent if completed a public record, or an instrument filed or required or authorized by law to be filed in or with a public office or public servant; with intent to defraud, deceive or injure another, he falsely make, completed or altered a written instrument which is or purported to be, or which is calculated to become or to represent if completed a written instrument officially issued or created by a public office, public servant or governmental instrumentality; with knowledge that it was forged and with intent to defraud, deceive or injure another, he utters or possesses any forged written instrument which was an  instrument which did or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; or which was a public record, or an instrument filed or required or authorized by law to be filed in or with a public office or public servant; or which was officially issued or created by a public office, public servant or governmental instrumentality; knowing that a written instrument contains a false statement or false information, and with intent to defraud the state or any political subdivision, public authority or public benefit corporation of the state, he offered and presented said written instrument to a public office, public servant, public authority or public benefit corporation with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation; knowing that a written instrument contains a false statement or false information, he offered or presented it to a public office or public servant with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office or public servant;  made or caused a false entry in the business records of an enterprise;  In the exercise of the powers, or in the performance of the duties of the office of a Notary Public or Commissioner of Deeds, practiced fraud and deceit.

Page 1

Continued from previous page.                    Defendant is Thaddeus Stroud

**THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S BELIEF ARE AS FOLLOWS:**

The deponent states that he retrieved from the official records of the New York City Department of Buildings (the "DOB"), at DOB's office located at 210 Joralemon Street, County of Kings, State of New York, a *Work Permit Application* form (a "PW-2"), which, according to the official records of the DOB, had been filed in support of an application for permits for construction at 322 Lincoln Road, Brooklyn, New York on or about May 13, 2008.

The deponent further states that he reviewed said PW-2 and discovered that John Rivieccio (license number 21917) is listed upon said PW-2 to be the Construction Superintendent for the above-referenced construction project; that the purported signature of John Rivieccio appears on the PW-2, in the area indicating whom the Construction Superintendent would be; that it is dated May 13, 2008; and that Giselle Torres, in her capacity as Commissioner of Deeds notarized this purported signature.

The deponent is informed by John Rivieccio that he never applied or agreed to be the Construction Superintendent for the project at 322 Lincoln Road; that he did not sign the above referenced PW-2; and that he never gave the defendant, or anyone else permission to sign the PW-2 on his behalf.

The deponent further states that Thaddeus Stroud is listed on the PW-2 as the Filing Representative.

The deponent further states that Thaddeus Stroud admitted to the informant that, without the knowledge, consent, permission or authority of John Rivieccio, the Thaddeus Stroud: (1) directed an unapprehended other, Robert Johnson, to sign the name of John Rivieccio on the above-referenced PW-2, in the ostensible capacity of the Construction Superintendent and (2) filed the PW-2 with the Department of Buildings.

The deponent is informed by John Egnatios-Beene, Esq., that the informant is an attorney assigned to the Legal Division of the DOB and that he has training in the policies and procedures of the DOB, which according to the informant, is charged with monitoring construction projects in New York City.

The deponent is further informed by John Egnatios-Beene that in order for DOB to issue the above-referenced permits, it was necessary for: (1) the PW-2 to have been filed with the DOB; (2) a person holding the title of a Construction Superintendent to have taken responsibility to be the Superintendent of Construction for this project; and (3) the Superintendent of Construction sign the PW-2, in the presence of a notary or Commissioner of Deeds, indicating that the Superintendent of Construction would be a Construction Superintendent for the particular project.

The deponent is further informed by John Egnatios-Beene, that he is informed by the official records of the DOB that the above-referenced PW-2 had been filed with the Department of Buildings, and that in reliance upon the information contained in the PW-2, particularly that a licensed professional such as John Rivieccio, would be acting as a Superintendent of Construction, DOB issued permits to do construction at 322 Lincoln Road.

The deponent is further informed by John Egnatios-Beene that he is a custodian of the records for the DOB, and is familiar with, and has training in, the practices of DOB including those relating to the maintenance of records and the filing of documentation with the DOB; that trained employees of the DOB maintain these records in the ordinary course of business and make complete, accurate and contemporaneous entries therein; that DOB employees maintain documents such as PW-2 Forms in the ordinary course of business and do not make any additions or deletions

Continued from previous page.                          Defendant is Thaddeus Stroud

to these documents once filed; and that DOB relies on the information contained in their records when administering their business and making official decisions.

The deponent is informed by Zakiya Lee, College Aide for the Licensing Unit of the DOB that she is a custodian of the records for the DOB, and has training in, the practices of DOB including those relating to the maintenance of records and the filing of documentation with the DOB; that trained employees of the DOB maintain these records in the ordinary course of business and make complete, accurate and contemporaneous entries therein; that DOB employees maintain their records in the ordinary course of business and do not make any additions or deletions to these documents once filed; and that DOB relies on the information contained in their records when administering their business and making official decisions.

The deponent is further informed by Zakiya Lee of the DOB that she is informed by the official records of the DOB that as of May 13, 2008, the DOB licensed both Giselle Torres and Thaddeus Stroud as Filing Representatives.

The deponent states that his duties as investigator for the DOB include investigating crimes and misconduct by individuals licensed and registered by the DOB, including Filing Representatives; that he has training in the duties, practices of Filing Representatives, and the policies and regulations that Filing Representatives are required to follow; that their duties include filing documentation with the DOB on behalf of contractors and licensed professional; and that they have a duty to not file documentation which they know to contain false information.

The deponent is informed by Patrick Synmonie, Counsel to the New York City Office of the City Clerk; that as such he is a custodian of the records for the New York City Office of the City Clerk, and is familiar with, and has training in, the practices of New York City Office of the City Clerk, which regulates individuals authorized to practice as Commissioner of Deeds, including those relating to the duties, rights and obligations of a Commissioner of Deeds; that trained employees of the New York City Office of the City Clerk maintain records indicating whether one is a Commissioner of Deeds in the ordinary course of business and make complete, accurate and contemporaneous entries therein; and that the New York City Office of the City Clerk relies on the information contained in their records when administering their business and making official decisions.

The deponent is further informed by Patrick Synmonie that the informant is informed by the official records of the New York City Office of the City Clerk, that from approximately August 14, 2007, until September 1, 2009, Giselle Torres was continuously registered as a Commissioner of Deeds for New York City.

The deponent is further informed by 51 RCNY §2-08, that a Commissioner of Deeds may not notarize one's signature unless that person is present.

False statements made in this document are punishable as a class a misdemeanor pursuant to Section 210.45 of the Penal Law.

12/15/2009
Date                     Signature

Page 3

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR  COUNTY OF KINGS

--------------------------------------------------------X

The People of the State of New York

**2009KN099450**   ny Complaint

v.

Giselle Torres,

           **Defendant**

--------------------------------------------------------X

      Investigator Robert Miller, Shield Number 108 of the New York City Department of Buildings states that on about May 13, 2008 at various locations, including 210 Joralemon Street, County of Kings, State of New York,

**THE DEFENDANT COMMITTED THE OFFENSES OF:**

| | |
|---|---|
| P.L. §175.35. | Offering a False Instrument for filing in the First Degree |
| P.L. §175.30. | Offering a False Instrument For Filling in the Second Degree |
| P.L. §175.05(1) | Falsifying Business Records in the Second Degree |
| Exec §135-a(2) | Fraud by Notary Public or Commissioner of Deeds |

**IN THAT THE DEFENDANT DID:**
knowing that a written instrument contains a false statement or false information, and with intent to defraud the state or any political subdivision, public authority or public benefit corporation of the state, he offered and presented said written instrument to a public office, public servant, public authority or public benefit corporation with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation;  knowing that a written instrument contains a false statement or false information, he offered or presented it to a public office or public servant with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office or public servant;  made or caused a false entry in the business records of an enterprise;  In the exercise of the powers, or in the performance of the duties of the office of a Notary Public or Commissioner of Deeds, practiced fraud and deceit.

**THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S BELIEF ARE AS FOLLOWS:**

      The deponent states that he retrieved from the official records of the New York City Department of Buildings (the "DOB"), at DOB's office located at 210 Joralemon Street, County of Kings, State of New York, a *Work Permit Application* form (a "PW-2"), which, according to the official records of the DOB, had been filed in support of an application for permits for construction at 322 Lincoln Road, Brooklyn, New York on or about May 13, 2008.

      The deponent further states that he reviewed said PW-2 and discovered that John Rivieccio (license number 21917) is listed upon said PW-2 to be the Construction Superintendent for the above-referenced construction project; that the purported signature of John Rivieccio appears on the PW-2, in the area indicating whom the Construction Superintendent would be; that it is dated May 13, 2008; and that Giselle Torres, in her capacity as Commissioner of Deeds notarized this purported signature.

      The deponent is further informed by the admissions of Giselle Torres that she is a Commissioner of Deeds and a Filing Representative, and that she notarized the ostensible signature of John Rivieccio on the above reverenced PW-2 at the request of Thaddeus Stroud, even though John Rivieccio was not present at the time.

**Page 1**

Continued from previous page.                              Defendant Giselle Torres

The deponent is informed by John Rivieccio that he never applied or agreed to be the Construction Superintendent for the project at 322 Lincoln Road; that he did not sign the above referenced PW-2; and that he never gave the defendant, or anyone else permission to sign the PW-2 on his behalf.

The deponent further states that Thaddeus Stroud is listed on the PW-2 as the Filing Representative.

The deponent is informed by John Egnatios-Beene, Esq., that the informant is an attorney assigned to the Legal Division of the DOB and that he has training in the policies and procedures of the DOB, which according to the informant, is charged with monitoring construction projects in New York City.

The deponent is further informed by John Egnatios-Beene that in order for DOB to issue the above-referenced permits, it was necessary for: (1) the PW-2 to have been filed with the DOB; (2) a person holding the title of a Construction Superintendent to have taken responsibility to be the Superintendent of Construction for this project; and (3) the Superintendent of Construction sign the PW-2, in the presence of a notary or Commissioner of Deeds, indicating that the Superintendent of Construction would be a Construction Superintendent for the particular project.

The deponent is further informed by John Egnatios-Beene, that he is informed by the official records of the DOB that the above-referenced PW-2 had been filed with the Department of Buildings, and that in reliance upon the information contained in the PW-2, particularly that a licensed professional such as John Rivieccio, would be acting as a Superintendent of Construction, DOB issued permits to do construction at 322 Lincoln Road.

The deponent is further informed by John Egnatios-Beene that he is a custodian of the records for the DOB, and is familiar with, and has training in, the practices of DOB including those relating to the maintenance of records and the filing of documentation with the DOB; that trained employees of the DOB maintain these records in the ordinary course of business and make complete, accurate and contemporaneous entries therein; that DOB employees maintain documents such as PW-2 Forms in the ordinary course of business and do not make any additions or deletions to these documents once filed; and that DOB relies on the information contained in their records when administering their business and making official decisions.

The deponent is informed by Zakiya Lee, College Aide for the Licensing Unit of the DOB that she is a custodian of the records for the DOB, and has training in, the practices of DOB including those relating to the maintenance of records and the filing of documentation with the DOB; that trained employees of the DOB maintain these records in the ordinary course of business and make complete, accurate and contemporaneous entries therein; that DOB employees maintain their records in the ordinary course of business and do not make any additions or deletions to these documents once filed; and that DOB relies on the information contained in their records when administering their business and making official decisions.

The deponent is further informed by Zakiya Lee of the DOB that she is informed by the official records of the DOB that as of May 13, 2008, the DOB licensed both Giselle Torres and Thaddeus Stroud as Filing Representatives.

The deponent states that his duties as investigator for the DOB include investigating crimes and misconduct by individuals licensed and registered by the DOB, including Filing Representatives; that he has training in the duties, practices of Filing Representatives, and the policies and regulations that Filing Representatives are required to follow; that their duties include filing documentation with the DOB on behalf of contractors and licensed professional; and that they have a duty to not file documentation which they know to contain false information.

Continued from previous page.                                      Defendant Giselle Torres

The deponent is informed by Patrick Synmonie, Counsel to the New York City Office of the City Clerk; that as such he is a custodian of the records for the New York City Office of the City Clerk, and is familiar with, and has training in, the practices of New York City Office of the City Clerk, which regulates individuals authorized to practice as Commissioner of Deeds, including those relating to the duties, rights and obligations of a Commissioner of Deeds; that trained employees of the New York City Office of the City Clerk maintain records indicating whether one is a Commissioner of Deeds in the ordinary course of business and make complete, accurate and contemporaneous entries therein; and that the New York City Office of the City Clerk relies on the information contained in their records when administering their business and making official decisions.

The deponent is further informed by Patrick Synmonie that the informant is informed by the official records of the New York City Office of the City Clerk, that from approximately August 14, 2007, until September 1, 2009, Giselle Torres was continuously registered as a Commissioner of Deeds for New York City.

The deponent is further informed by 51 RCNY §2-08, that a Commissioner of Deeds may not notarize one's signature unless that person is present.

False statements made in this document are punishable as a class a misdemeanor pursuant to Section 210.45 of the Penal Law.

12|15|2009

Date                    Signature

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 7
------------------------------------------------------------- X

THE PEOPLE OF THE STATE OF NEW YORK,          :

                                              :

              - against -                     :          Indictment. No.  55588/2003
                                              :          DISCOVERY/ ROSARIO
                                              :

CLARENCE NORMAN, JR.,                         :

                            Defendant         :
------------------------------------------------------------- X

     MICHAEL VECCHIONE, an attorney-at-law and an Assistant District Attorney in Kings County, affirms under penalties of perjury that:

    1.    I am an Assistant District Attorney in the County of Kings, City and State of New York. I am familiar with the facts and circumstances of this case.

    2.    The following items are being provided to defense counsel at this time as part of the discovery and Rosario material:

| | |
|---|---|
| A. | Bank Records of Branford Communications –year 1999 |
| B. | Bank Records of Branford Communications –year 2000 |
| C. | Bank Records of Branford Communications –year 2001 |
| D. | Bank Records of Branford Communications –year 2002 |
| E. | Interview notes- M & T Packaging- 1 page |
| F. | Materials provided by M & T Packaging- 13 pages |
| G. | Memo of Interview- Ernest Lendler – 2 pages |
| H. | Interview Notes – William McCann- 6 pages |
| I. | Letter of Understanding- Carmen Martinez – 5 pages |
| J. | Branford Communications- Account receivable statement – 1 page |
| K. | Note from Carmen Martinez to Ernest Lendler – 1 page |
| L. | Branford Communication copy of check 619 - 1 page |
| M. | Notes created by Carmen Martinez –2 pages |
| N. | Proffer agreement- Carmen Martinez - 2 pages |
| O. | Interview notes- Ernest Lendler – 6 pages |
| P. | Invoice – Prestige Printing – 2 pages |
| Q. | Interview notes and material from M & T Packaging – 9 pages |
| R. | Proffer agreement- Ralph Bombardire – 2 |
| S. | Interview Notes- Ralph Bombardire- 11 pages |
| T. | New York City Board of Elections records –33 pages |
| U. | Interview notes- Ernest Lendler – 6 pages |
| V. | Interview notes- Carmen Martinez – 22 pages |
| W. | Grand Jury Minutes-  Nancy Ramos * - 9 pages |

    3.    Each of the attached photocopies are exact reproductions of the original documents except to the extent that the address, telephone numbers and other personal information of the witness has been redacted.

1

\* The Grand Jury Minutes of Nancy Ramos were originally provided on
July 21, 2005 but were omitted from the inventory receipt.  An
additional copy is being provided at this time.


Dated: Brooklyn, New York
      July 22, 2005

                                  *Michael F. Vecchione*

                                  Michael Vecchione
                                  Assistant District Attorney
                                  Rackets Division
                                  (718) 250-2239


RECEIVED BY:

*Eleanor Franklin*  7/22/05
Attorney for Defendant       date

FLAMHAFT LEVY KAMINS HIRSCH & RENDEIRO
16 COURT STREET SUITE 3301
BROOKLYN, N.Y. 11241

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
---------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,    :

      - against -              :

                            :    **AFFIRMATION IN SUPPORT**
                              **OF THE PEOPLE'S MOTION**
JABBAR COLLINS,             :    **FOR A MATERIAL WITNESS**
            Defendant        **ORDER**

                            :

RE:  ANGEL SANTOS,                      :

          Material Witness:       :
---------------------------------------X

STATE OF NEW YORK)

COUNTY OF KINGS  )

    MICHAEL VECCHIONE, being duly sworn, deposes and says:
the courts affirms the truth of the following under penalty of
perjury:

    1.   That he is an Assistant District Attorney; that the
above named Jabbar Collins has been charged with the crime of
Murder in the Second Degree and that a criminal proceeding has
been commenced and is presently pending before the Supreme Court,
Part 39, County of Kings; that on February 21, 22 and 23, 1995
Detectives from the Brooklyn District Attorney's Office,
attempted to contact Angel Santos, at his residence and various
family members residences.  Detectives would ascertain Mr. Santos
whereabouts from family members but upon arrival to those
locations Mr. Santos would have just left.

    On February 23, 1995 Detectives Bondor and Maher located Mr.
Santos and brought him to the District Attorney's Office where

Mr. Santos articulated to the detectives as well as Michael Vecchione that he would not testify at trial. Nor would he avail himself to be served a subpoena directing him to testify.

The said Angel Santos is a material witness in this matter pending before the Supreme Court Part 39, County of Kings, and that he possesses information material to the determination of the pending proceeding before Supreme Court, Part 39 and has not, and will not testify voluntarily nor will he comply with any subpoena seeking his attendance in this proceeding.  Any further service of process upon this witness will be futile.  That the past failure of Angel Santos to respond voluntarily to subpoena, demonstrates that he will not respond to an order compelling his appearance to proceedings adjudicating him a material witness.

WHEREFORE YOUR DEPONENT RESPECTFULLY PRAYS for an order of this court in pursuance to section 620.20 and 620.30 of the Criminal Procedure Law for an order adjudicating Angel Santos a material witness in this action and fixing bail to secure future attendance herein,

AND FURTHER for the issuance of a warrant to a police officer of the City of New York directing such police to take Angel Santos into custody within the State and to bring him before the Court forthwith.

_Michael Vecchione_
MICHAEL VECCHIONE
Assistant District Attorney

Dated:   February 23, 1995
          Brooklyn, New York

Sworn to before me this
23 day of february 1995.
_Lou E. Katz_
Notary Public State of New
York No. 02KA5023046
Qualified in NY County
Commission Expires Jul 31 1996

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

JABBAR COLLINS,

                    Petitioner,

   -against-

ROBERT ERCOLE,

                    Respondent.

--------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUN 09 2010 ★

BROOKLYN OFFICE

**FINAL JUDGMENT ORDER**

08-CV-1359 (DLI) (CLP)

**DORA L. IRIZARRY, U.S. District Judge:**

      Upon all of the documents and proceedings before this court, and pursuant to the agreement and consent of the parties, it is hereby ORDERED, ADJUDGED and DECREED that the application of the petitioner, Jabbar Colliins, for a writ of habeas corpus is GRANTED in all respects as set forth in greater detail below.

      The parties have stipulated and agreed to the following:

   1.  That, if the hearing on the amended petition were continued to its conclusion, the following facts, among others, would be established by a preponderance of the evidence:

      a.  Detective Gerecitano made a statement to the King's County District Attorney's Office in May 2010, revealed thereafter to petitioner, that, prior to petitioner's trial, there was a recantation by witness Edwin Oliva of his statements implicating the petitioner in the crimes charged in underlying indictment; and

      b.  The defense was not made aware of the recantation described by Detective Gerecitano, either prior to or during the criminal trial of the petitioner;

2. That the State's failure to disclose the recantation described by Detective Gerecitano to the defense constitutes a violation of petitioner's federal constitutional right to due process and a fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963), as such non-disclosure was material to the outcome of the trial, and thus necessitates vacating petitioner's conviction and sentence; and

3. That respondent, having reviewed the evidence as it now stands, has concluded that there is insufficient evidence with which to meet the State's burden of proving petitioner's guilt beyond a reasonable doubt at any re-trial.

WHEREFORE, based on the foregoing, it is hereby ORDERED, ADJUDGED and DECREED, that the amended petition is GRANTED.

Accordingly, it is further hereby ORDERED that (1) petitioner's conviction and sentence are vacated and the underlying indictment (No. 2884/1994) is dismissed WITH PREJUDICE; (2) respondent is FOREVER prohibited from re-trying petitioner; and (3) petitioner is UNCONDITIONALLY RELEASED and, as agreed to by the parties, the New York State Department of Corrections is hereby directed to transport petitioner to Green Haven Correctional Facility forthwith, to be promptly released from said facility.

SO ORDERED.

DATED:     Brooklyn, New York
           June 8, 2010

                                              S/DLI

                                              _____
                                              DORA L. IRIZARRY
                                              United States District Judge

101

1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF NEW YORK

3       - - - - - - - - - - - - - - X
                                     :
4       COLLINS,

                                              08-CV-1359
5            Plaintiff,

6                 -against-           :

7                                         United States Courthouse

8       ERCOLE,                           Brooklyn, New York

9            Defendant.         :
        - - - - - - - - - - - - - X        June 8, 2010
10                                          10:30  o'clock a.m.

11                TRANSCRIPT OF CIVIL CAUSE FOR HEARING
                 BEFORE THE HONORABLE DORA L. IRIZARRY
12                    UNITED STATES DISTRICT JUDGE

13      APPEARANCES:

14      For the Petitioner:        JOEL RUDIN, ESQ.
                                   TERRI ROSENBLATT, ESQ.
15                                 BEN FISHMAN, ESQ.
                                   200 West 57th Street
16                                 Suite 900
                                   New York, New York 10019

17

18
        For the Respondent:        KINGS COUNTY DISTRICT
19                                 ATTORNEYS OFFICE - GENERIC
                                   350 Jay Street, 17th Floor
20                                 Brooklyn, New York 11201
                                   BY;   KEVIN SCOTT RICHARDSON
21                                       LEONARD JOBLOVE
                                         VICTOR BARALL
22                                       Assistant District Attorneys

23      Court Reporter:
        Marsha Diamond
24      225 Cadman Plaza East
        Brooklyn, New York
25      TEL: (718) 613-2489
        FAX: (718) 613-2369

                          MARSHA DIAMOND, C.S.R.
                          OFFICIAL COURT REPORTER

102

1          Proceedings recorded by mechanical stenography,
2   transcript produced by computer.

3          THE COURT:  Come to order.  You may be seated.

4          THE CLERK: Docket No. 08-CV-1359.

5          State your appearances, please.

6          MR. RUDIN:  For petitioner, Joel Rudin, and with me

7   id Terri Rosenblatt and Ben Fishman.  Good morning.

8          THE COURT:  Good morning to you all.

9          Good morning, Mr. Collins.

10          THE DEFENDANT:  Good morning, Judge Irizarry.

11          THE COURT: For respondent.

12          MR. RICHARDSON:  From the Office of the Kings County

13   District Attorney respondent attorneys, Kevin Scott

14   Richardson, Leonard Joblove, and Victor Barell.

15          Good morning, Your Honor.

16          THE COURT: Good morning.  Good morning to you all.

17   Good morning to all of the people in the audience.

18          All right. We are here today originally to continue

19   the hearing on the petition for writ of habeas corpus that was

20   filed by Mr. Collins. The last time you were here we did, in

21   fact, take testimony of Mr. Angel Santos and then it was

22   continued until this week. Late yesterday afternoon through a

23   conference call with both parties represented, but Mr. Collins

24   was not present for that conference call, the parties had

25   advised the Court that they had reached an agreement towards a

103

1    resolution of petitioner's application and my understanding is

2    that that resolution encompasses an unconditional release with

3    commitment from respondent that petitioner will not be retried

4    on this matter. That is my understanding.

5              Mr. Rudin, is that correct?

6              MR. RUDIN:  Yes, Your Honor.

7              Did you receive the letter that we filed through

8    ECF?

9              THE COURT: I did receive the letter that was filed

10   with some proposed language. I did have some questions about

11   that but perhaps, it would be best if, Mr. Rudin, you put on

12   the record what your understanding of the agreement is, and

13   I'll give respondent an opportunity as well to address the

14   Court.

15             MR. RUDIN: Yes, Your Honor.  My understanding of the

16   agreement is that -- well, it's really set forth in the

17   letter. The District Attorney has acknowledged based upon the

18   statement that it received from Detective Gerecitano about

19   recantation by Edwin Oliva that my client's constitutional

20   rights were violated and that evidence was not turned over at

21   the trial and was not known to Mr. Collins or his attorney at

22   the time of the trial and wasn't discovered until well after

23   the trial; and that based upon that acknowledgment by the

24   respondent, the respondent has acknowledged that that was a

25   Brady violation, that that violation was material to the

MARSHA DIAMOND, C.S.R.
OFFICIAL COURT REPORTER

1  outcome of the trial, and that based upon that violation that

2  petitioner's conviction must be vacated; and that the

3  respondent has further agreed that there is based upon the

4  evidence that all the evidence that's now known to the state,

5  including the recantation, that there is now insufficient

6  evidence with which to meet the state's burden of proof beyond

7  a reasonable doubt at any retrial, and that for that reason

8  the respondent is agreeing to the relief that -- all the

9  relief that we requested in the petition, which is that

10  petitioner's conviction be vacated, that any retrial of

11  petitioner be prohibited and that the underlying indictment

12  No. 2884 of 1994 be ordered dismissed with prejudice.  And I

13  understand Your Honor has some questions about the language in

14  the letter, but we would request that in substance that the

15  elements that are set forth in the letter be included in Your

16  Honor's order.

17          THE COURT: Well, one of the issues that I have is

18  with respect to item number four that says:  Upon respondent's

19  agreement, that there is now insufficient evidence with which

20  to meet the state's burden of proof beyond a reasonable doubt

21  at any retrial.  Doesn't really encompass in quite the same

22  way what you had just set forth on the record.  I mean this

23  recantation of this witness was known before we started the

24  hearing and the original proposition that was made by or

25  proposal, I should say, that was made by the respondent was to

105

1    concede error and consent to a granting of the petition but

2    with a retrial.  When we had the original oral arguments on

3    this case respondent was adamant that they were going to retry

4    the case, and that they had sufficient evidence to retry the

5    case, and so, in essence, what has been agreed to here is

6    nothing more than where we were to begin with, except that

7    it's not clear that respondent is saying that just based on

8    that recantation there's insufficient evidence or whether it's

9    based on all of the other information that has surfaced during

10   the course of the litigation of this petition and perhaps,

11   maybe I can let Mr. Richardson  address that or anyone from

12   respondent's team there.

13            MR. RICHARDSON:  Yes, Your Honor, if I may be heard.

14   I had a statement that I am prepared to deliver to this Court

15   on behalf of my office that I think will both explain and

16   address the concerns just raised by Your Honor. I have

17   discussed the subject and content to a degree with Mr. Rudin

18   and I would like to state before I begin the statement that

19   the letter that was sent to the Court is language that both

20   Mr. Rudin and I worked on until late into the evening

21   yesterday and agreed upon before he sent the communication to

22   you.  So it is not just Mr. Rudin's language; it is our

23   language as well.

24            THE COURT:  I understood that to be the case. That

25   is clear from the letter.

106

1          MR. RUDIN:  Then if I may begin?

2          THE COURT:  Yes, sir.

3          MR. RICHARDSON:  Your Honor, on February 6, 1994,

4    Rabbi Abraham Pollak was robbed of rent monies he was

5    collecting at a building that he owned at 126 Grand Avenue

6    here in Kings County. During the robbery Rabbi Pollak was shot

7    multiple times and Paul Avery, handyman in the building who

8    came to Rabbi Pollak's aid, was shot in the leg and the chest.

9    Mr. Avery was fortunate enough to have survived his injuries

10   that day.  Rabbi Pollak shot no less than six times in the

11   chest, leg and back did not survive.

12          The police investigation began immediately and on

13   the very next day, February 7, 1994, the same day Rabbi Pollak

14   was laid to rest, leaving wife and nine children to mourn his

15   untimely passing, the police received information that the

16   defendant, the petitioner, Jabbar Collins, was involved in the

17   shooting. The police in conjunction with the District

18   Attorney's Office conducted an investigation that lasted over

19   30 days. They interviewed numerous witnesses and located two

20   witnesses -- Angel Santos and Adrienne Diaz -- who identified

21   the defendant as being at or near the scene of the robbery

22   homicide. A third witness, Edwin Oliva, was also located and

23   he both identified Jabbar Collins to police and told them that

24   he had heard Collins plan the robbery, that he knew him to

25   carry the type of weapon that was used in the killing and that

1  he had information that Collins had disposed of his weapons

2  after the homicide.

3    Based on those witnesses the police department

4  placed Jabbar Collins under arrest for the robbery and murder

5  of Rabbi Pollak, and the attempted murder of Paul Avery. The

6  Kings County District Attorney's Office authorized and

7  approved of the arrest of the defendant then and we stand by

8  that decision as correctly made in light of the information

9  and evidence that existed at that time which provided ample

10  probable cause to charge the defendant with these crimes. The

11  defendant was represented at his arraignment and for all of

12  the remainder of the prosecution by attorney Michael Harrison.

13  The defendant was indicted by a Kings County grand jury after

14  they were presented with evidence of the defendant's guilt,

15  including the testimony of Adrienne Diaz and Angel Santos, and

16  the case proceeded to trial in March of 1995.

17    That trial was held before Justice Frank Egitto, now

18  retired, of the Supreme Court of Kings County, and was

19  prosecuted by former ADA, the late Honorable Charles Posnor,

20  former ADA Stacey Frascogna and ADA Michael F.  Vecchione,

21  currently the Chief of the Rackets Division of Kings County

22  District Attorney's Office.

23    The trial lasted less than two weeks, after which

24  the defendant was convicted of each and every count that was

25  submitted to the jury. In the years following the trial

108

1    numerous allegations have been leveled against the police, the

2    District Attorney's Office, and the individual prosecutors who

3    conducted the trial, and even attorney Michael Harrison, the

4    defense attorney, who represented the defendant at trial was

5    accused.

6              This Office stands behind the conduct of former

7    Assistant District Attorney Posnor and Fisconia and current

8    Assistant District Attorney Vecchione, who prosecuted the

9    defendant at his trial, along with the Office's staff and

10   detective investigators who assisted them, and we deny each

11   and every one of the allegations leveled against them, and

12   against the trial court that conducted the trial, and the

13   police officers who investigated the homicide, and who

14   testified against the defendant.

15             Following a series of foiled requests made by the

16   defendant to the Kings County District Attorney's Office in

17   2006, the defendant filed a motion in the state court pursuant

18   to CPL Section 440, wherein the defendant again raised

19   numerous claims against the Kings County District Attorney's

20   Office, the individual prosecutors who prosecuted him at the

21   state trial and the Kings County judiciary -- excuse me -- and

22   the Kings County Judiciary.  The Appeals Bureau, more

23   specifically ADA Monique Ferrell, was assigned to investigate

24   and respond to these allegations. This office, again, stands

25   by the conduct of the trial team who conducted the initial

1   trial and stands by the post conviction investigation into the

2   claims raised by the defendant headed by ADA Ferrell.  We deny

3   any claim that our responses filed to the defendant's motions

4   were anything less than truthful. Our answers to his claims,

5   which resulted in the denial of the defendant's 440 motion,

6   were the product of a thorough investigation of each one of

7   the defendant's allegations, and were based upon information

8   and belief as it existed at the time the answers were

9   submitted.

10          Then, in 2008 the defendant filed petition in

11  federal court for a writ of habeas corpus, and this court

12  granted a hearing. It was in April of 2010 during the course

13  of preparation for this hearing that the defendant first

14  raised the name Detective Vincent Gerecitano.  And when

15  Detective Vincent Gerecitano arrived at my office to receive a

16  subpoena in May 2010 he revealed to me and ADA Ferrell

17  something that no living member of the Kings County District

18  Attorney's Office, including former ADA Fisconia and ADA

19  Vecchione knew.  Detective Gerecitano revealed something that

20  was unknown to all present or former staff members who were in

21  any way involved in the prosecution of Jabbar Collins. He

22  revealed a piece of information that was also unknown to any

23  member of New York City Police Department who was assigned to

24  Rabbi Pollak's murder and is contained in no records that are

25  maintained by the police department or by the Kings County

110

1   District Attorney.

2          Detective Gerecitano revealed to ADA Ferrell and to

3   myself in May of 2010 that back in 1995, prior to the

4   defendant's testimony, that Edwin Oliva had recanted his

5   statement against Jabbar Collins. When we learned of this

6   alleged recantation we immediately informed the defense via

7   telephone, followed up in writing to this Court.  We also,

8   following a review of the transcript and record of

9   Jabbar Collins' trial, found no record of this alleged

10  recantation having been revealed to the defense prior to or

11  during the trial.

12         At that point we informed both the Court, and the

13  defense that we, the Kings County District Attorney's Office,

14  in the interest of justice and in giving every defendant a

15  fair trial, were conceding to the defendant's request to

16  vacate his conviction because it was the opinion of my office

17  that, assuming the recantation information from

18  Detective Gerecitano was true, that the defendant had not been

19  made aware of it, and that his conviction would not have been

20  fairly and lawfully obtained. We sought to -- excuse me, Your

21  Honor. We sought leave from this Court to be allowed to retry

22  the defendant, which then became the subject of an amendment

23  to the habeas petition and the reason why we are here today.

24         When Detective Gerecitano's information was

25  revealed, the Kings County District Attorney's Office began a

1   reevaluation of the evidence against the defendant in

2   preparation for a new trial, evaluation that would include

3   members of the Office of the Homicide Bureau and several of

4   the heads of the Appeals Bureau.  We began evaluating the

5   strength of the case against the defendant with the evidence

6   as it now exists, more than 16 years from the date of the

7   murder and some 15 years after it was presented at the

8   defendant's previous trial.

9          It is the opinion of the Office based upon the

10  weaknesses that now exist with the witnesses and the

11  unavailability of portions of the physical evidence that to

12  retry the defendant is no longer a viable option, and that we

13  can no longer secure against him a conviction by proof of his

14  guilt beyond a reasonable doubt.

15         Therefore, solely based upon the reasons stated, the

16  People have previously asked this Court to vacate the

17  defendant's conviction under New York State Indictment No.

18  2884 of 1994.

19         We announce today to this Court, as we have

20  previously informed the defendant through his counsel, that

21  based upon the status of the evidence against Mr. Collins as

22  it now exists, 16 plus years after the commission of the

23  crime, with the loss of Edwin Oliva, the key witness against

24  Collins to prove that he planned the robbery, possessed a

25  firearm of the type used in the homicide, coupled with the

112

1  reevaluation of Angel Santos, the key witness to his

2  observation of the defendant, though 16 years ago, while

3  perhaps under the influence of drugs then, and most certainly

4  presently suffering the long term effects of drug abuse, and

5  finally, with the destruction of key pieces of physical

6  evidence from the crime scene, we can no longer prove our case

7  against the defendant beyond a reasonable doubt at retrial.

8          We are, therefore, unable to oppose this Court

9  granting a relief sought by this petitioner, and therefore,

10  for those reasons, withdraw our opposition to this Court's

11  granting of unconditional writ of habeas corpus for the

12  defendant petitioner as to Kings County Indictment No. 2884 of

13  1994, and we withdraw our opposition to that court's

14  concluding language in that order that the Kings County

15  District Attorney's Office is forever barred from retrying the

16  defendant on these crimes.

17          Thank you, Your Honor.

18          MR. RUDIN:  May I respond?

19          THE COURT:  Yes.

20          MR. RUDIN:  Your Honor, first of all I just want to

21  make clear that my understanding of the law is that petitioner

22  in habeas corpus petition is only entitled to the relief

23  requested in the petition here as amended.  The relief that we

24  requested was the relief that the respondent is now consenting

25  to and that is the reason that we worked out the language that

113

1    would be acceptable to the respondent to resolve this matter,

2    and that is why we are agreeing to this resolution without

3    asking the Court to continue the evidentiary hearing, since I

4    have great doubt that the Court would even have the authority

5    to continue the hearing now that the respondent has agreed to

6    all the relief that we are seeking.

7            The District Attorney has consented, as I just said,

8    to all the relief that Jabbar Collins could possibly have

9    achieved at the end of this proceeding:  His false murder

10   conviction is being vacated.  This case is being dismissed for

11   good.  He will be soon free.  This is an astounding outcome

12   for a man who spent more than ten years with no legal

13   assistance reinvestigating his case from his prison cell.  It

14   is an astounding outcome considering Jabbar Collins' claims

15   when first presented in Brooklyn four years ago were ridiculed

16   by the District Attorney and dismissed by a state judge and

17   the state appellate division wouldn't even hear an appeal.

18   The District Attorney concedes that critical recantation

19   evidence was unlawfully withheld.  This is evidence, by the

20   way, that, according to the detective -- former

21   Detective Gerecitano was elicited at the District Attorney's

22   Office in the presence of, at least, one and possibly more

23   than one assistant district attorneys, although in the

24   statement that he made that was conveyed by Mr. Richardson he

25   claimed that he did not remember who that ADA or ADAs were and

114

1   that, of course, that was something that we would have

2   explored at the hearing.

3           Regrettably, the District Attorney's Office

4   continues to deny the remaining allegations in our petition.

5   These allegations are so well documented that this Court

6   granted an extraordinary hearing, even after the District

7   Attorney conceded there should be a new trial, into whether

8   retrial should be barred for pervasive and egregious

9   prosecutorial misconduct.  Such a hearing is incredibly rare.

10  There may never have been another one in this courthouse.

11  This decision by this Court resoundingly contradicts the

12  District Attorney's self-serving statement this morning

13  denying the evidence that is in the court record for all to

14  see.

15          Federal courts are often overwhelmed with complex

16  criminal and civil case loads, and habeas corpus petitions by

17  state prisoners often are given short shrift but not in this

18  courtroom.  This Court's mastery of the complexity of this

19  case, its willingness to make it a priority despite its other,

20  pressing burdens, today results in correcting a terrible

21  injustice:  The wrongful conviction, through perversion of

22  legal process, of a brilliant, kind, and considerate young

23  man.  I believe Jabbar Collins is innocent of the terrible

24  crimes of which he was accused and convicted 15 years ago, but

25  what I think as his lawyer doesn't matter.  What matters is

1   that a jury should have been able to make that decision based

2   upon all relevant evidence.  Unfortunately, the District

3   Attorney's Office did not trust Mr. Collins' jury to make the

4   right decision. Today the District Attorney acknowledges that

5   based on the very evidence that the Office concealed that it

6   cannot meet its burden of proof. The tragedy is that it did

7   not reach that conclusion or allow a jury to 15 long years

8   ago.

9           Thank you, Your Honor.

10          THE COURT: Thank you.

11          Is there anything else that the respondent would

12  like to say?

13          MR. RICHARDSON:  Your Honor, respondent thanks this

14  Court for the opportunity to be heard during this proceeding

15  and during this hearing and during this morning's session, and

16  while I disagree with many of the characterizations Mr. Rudin

17  has just described the District Attorney's Office in, I don't

18  think at this juncture Mr. Rudin and I neither want to or need

19  to engage in a back and forth record making. I think that the

20  import of this occasion speaks for itself and it is enough to

21  let the record stand as it is.

22          The District Attorney has responded in this matter,

23  has identified information, has provided that information to

24  the defense and to the Court that acted upon that information

25  in the manner that we believe is both lawful and just in light

116

1    of the information itself and the status of the defendant in

2    this case.

3          While we continue to deny wrongdoing by our staff

4    members, our ADAs individually, our office as an entity, we do

5    acknowledge that the information that Detective Gerecitano

6    purports to have should have been revealed to the defendant at

7    the time of his trial, and for that reason we concede the

8    conviction without any prodding from the defense or any

9    requests from the Court.  This Office sought to do that in the

10   interest of justice because, as Your Honor described it in the

11   very first day of this hearing, it is our mission, it is our

12   obligation as Assistant District Attorneys and as a District

13   Attorney's Office, to seek justice and fairness hand in hand.

14         We have never been an agency that has sought a

15   conviction by any means possible. We did not do so in this

16   case. There was information that should have been disclosed

17   that was not disclosed. Based upon that, we conceded the

18   conviction, and based upon the passage of time and the

19   opportunity to reevaluate Mr. Santos given to us by his own

20   testimony here in this courtroom, we made a decision, coupled

21   with other information, that we cannot retry this defendant

22   and therefore, in the interests of justice and fairness, we

23   concede this hearing, we concede to the defendants's relief

24   because it would be unfair otherwise to put this defendant

25   through this hearing and to potentially put him through

```
 1   another retrial or through a retrial that we do not foresee
 2   being able to maintain.
 3              Your Honor, I, again, thank you, for the opportunity
 4   for allowing me, this office as respondent, to come into this
 5   courtroom and to acknowledge what has happened in the past,
 6   and to take corrective steps to make sure that any wrongs that
 7   were committed were righted here today.
 8              THE COURT: Since this is the petition of
 9   Mr. Collins, I don't know, Mr. Rudin, if there's anything else
10   that you wish to add, and certainly, if Mr. Collins would like
11   to be heard, I would give him that opportunity as well.
12              THE DEFENDANT:  Judge Irizarry, first I would like
13   to thank you and your staff for taking the time to carefully
14   evaluate my petition, and finally, give me the day in court
15   that I have been denied for the last 15 years of my life. The
16   suffering my family and I have suffered at the hands of the
17   District Attorney's Office is simply unthinkable. The last
18   16 years of my life have been spent in prison for a crime I
19   did not commit.  My children lost their father for 16 years.
20   My mother lost her son.  We took 11 years for me working from
21   my prison cell to accumulate the evidence I needed to
22   initially challenge my conviction only to be met with now from
23   the District Attorney's Office that nothing had been done
24   wrong, and despite their claims at this point, I believe you
25   all know exactly why they consented to granting the relief in
```

118

1  my case. So I just want to thank the Court for its time, for

2  finally giving me a day in court, and for finally bringing the

3  suffering of my family to an end.

4          Thank you.

5          THE COURT: Thank you, all.

6          Let me just start off by saying that in terms of the

7  result that has been achieved here, either short of continuing

8  and concluding the hearing, that I certainly was prepared to

9  hold in this matter because I believe the only just and fair

10  result under all of the circumstances and to the extent that

11  the parties have been able to reach that resolution in the

12  manner in which they have, saving the expenditure of the

13  additional resources of the justice system, and I want to use

14  that in the expansive term because the District Attorney's

15  Office handles hundreds and hundreds of cases everyday and

16  Mr. Rudin has devoted his time pro bono, and we have a lot of

17  interns that are here today, and for all of the intents that

18  are here, it is good for them to see how important it is once

19  they become lawyers to devote some of their time to pro bono

20  work because it certainly was an important task to do, and

21  while Mr. Collins certainly gave himself a very good education

22  in the 16 years that he was incarcerated, there really can be

23  no substitute for the formal preparation and experience that

24  Mr. Rudin and his staff brought to bear on this case.

25          I am, however, disappointed in many ways that we did

120

1  petition that additional evidence was uncovered, specifically

2  the actual documentation of material witness order for

3  Mr. Santos that had also not been turned over to the defense.

4       Mr. Santos came here and testified before the Court

5  and yet, additional information came to light that had not

6  been turned over to the defense and that was, as he said it,

7  he was strung out.  He was using drugs 24/7, and in all

8  likelihood, was high the day he made the observations that

9  ultimately assisted in providing the evidence against

10  Mr. Collins that led to his arrest.

11       In fact, what's pretty dramatic about what he said

12  about that is that he said he was using just about every kind

13  of drug that there was except for heroin because he had

14  stopped using that some years before, but he was using just

15  about every other kind of drug that you can imagine, and what

16  he said was he was picked up off the street, in all likelihood

17  high, and the D.A.'s  Office proceeded to question him. No

18  indication as to whether or not he might have been going

19  through withdrawal. No indication whether he was given medical

20  attention.  Nothing.

21       And what he testified to was that he was

22  threatened, he was threatened with jail, he was threatened

23  with physical abuse, and frankly, he was cross examined by

24  respondent, and I found his testimony to be quite credible.

25  Nowhere in the record does there appear to be any proceeding

122

1   some of the other members of the D.A.'s staff professing that

2   they did nothing wrong, that they weren't aware of any

3   material witness orders, that they weren't aware of any

4   violation of probation order and so on, it is, indeed, beyond

5   disappointing. It is really sad that the D.A.'s Office

6   persists in standing firm and saying they did nothing wrong

7   here.   It is, indeed, sad.

8           It is, indeed, sad that there is nothing in what has

9   been said in the statement of the D.A.'s  Office that says we

10  see there were a number of things that were done here that

11  were, perhaps, done incorrectly, and we are going to take

12  steps to make sure that none of this ever happens again. We

13  are going to make sure to train our assistants to make sure

14  they understand that.  Yes, there may be sometimes when you

15  will have a reluctant witness.  In fact, it happens quite

16  often that you have a reluctant witness, and you take

17  witnesses as they come. You can't help that. And sometimes

18  they have long criminal records and sometimes they are drug

19  addicts and sometimes they are just not nice people, but they

20  have that valuable information that you need and so, sometimes

21  material witnesses are necessary, but there is a procedure to

22  be followed. Those procedures are there to safeguard the

23  rights of the witness, as well as to provide the resources

24  that a prosecutor needs to do his or her job effectively.

25           While it can be said that justice is served today to

1    the extent that Mr. Collins will not have to continue to serve

2    a sentence that was obtained in violation of his

3    constitutional rights and I think that in all likelihood if

4    all of the witnesses -- if all of the evidence came out the

5    way that it was represented by the petitioner, in all

6    likelihood I don't think that the Court would have needed the

7    D.A.'s Office to review their evidence.  It seems to me, given

8    all the challenges to the credibility of the main witnesses

9    and given the passage of time, that there could have been no

10   reasonable juror who would have been able to find Mr. Collins

11   guilty beyond a reasonable doubt.

12           The issue before the Court is not whether or not

13   Mr. Collins is guilty. That's not the issue before the Court.

14   The only issue before the Court is whether or not his

15   conviction was obtained in an unconstitutional manner, and as

16   Mr. Rudin said, the whole problem here is that the initial

17   jury who had the case was not given the opportunity to, and

18   indeed, was not trusted to do its job as factfinder, and to

19   apply those facts to the laws the Court were given by

20   providing all of the information that was available and to

21   provide the defense with the information that it was

22   rightfully entitled to.

23           At the oral argument here, the first day of what was

24   to be the hearing, Respondent argued that the Office had

25   conducted a very thorough investigation of the allegations

124

1   made by Mr. Collins back when he had collaterally attacked his

2   conviction in state court, but the key thing to have done in

3   that investigation would have been to have brought in the

4   police officers who are involved and perhaps back then they

5   would have "discovered" that Mr. Oliva had recanted the

6   testimony, and frankly, defies credulity to believe that

7   Mr. Vecchione who in an affidavit said that there was nothing

8   that happened in the trial that he did not know, no decision

9   that was not made that did not go through him.  It defies

10  credulity to believe that he did not know about the recanted

11  witness; and as a more senior prosecutor he, certainly, should

12  have been aware of all of the obligations to disclose a

13  witness' addiction, material witness order, and to follow all

14  of the appropriate procedures.

15         At the end, because I agree with Mr. Rudin and with,

16  ultimately, the Respondent I am sure joins the Court based

17  upon the agreement that the parties have reached, it is

18  without jurisdiction to continue with the hearing because the

19  petitioner has obtained the relief that he sought and indeed,

20  relief that was sought as pursuant to the amended petition is

21  the most comprehensive relief that could ever be granted in

22  any petition for a writ of habeas corpus, which is an

23  unconditional release and prohibition against being retried.

24         MR. RICHARDSON:  Apologize for interrupting the

25  Court, but you have just said several things that --

125

1      THE COURT:  I really don't want to hear any more

2  denials.

3      MR. RICHARDSON:  Your Honor, I was not offering

4  denials. If I may?

5      THE COURT:  Yes.

6      MR. RICHARDSON: The one thing you did not hear from

7  the prepared statement that I read to this Court was a single

8  excuse. I did not make any excuses then and I do not make

9  excuses now. My Office's position then and now was that we

10  believe in this defendant's guilt. However, Your Honor is

11  correct in that through the passage of time, through a

12  reevaluation, through the right analysis of evidence of

13  witnesses that were both before the trial court and were

14  either before this hearing court or were to come before this

15  hearing court, we have reevaluated that position with you, but

16  one thing that Your Honor has said is that the record of this

17  court -- of the defendant's trial doesn't reveal that certain

18  things were revealed, whether or not we revealed that there

19  was MWO, material witness order -- excuse me, whether or not

20  we revealed anything about Mr. Oliva or Mr. Diaz, about what

21  you, the Court, knows.  And what the record should reflect is

22  that we are both, Mr. Rudin and myself, and this Court, are

23  dealing with a transcript that is incomplete and there are

24  approximately 50 pages of transcripts that are missing, and

25  while Your Honor describes a diligent search to investigate

126

1    the defendant's claims, one of those diligent searches was to

2    attempt to find those missing pages of the transcript, and

3    that was done.

4            (Continued on next page)

1          MR. RICHARDSON:  One court reporter is dead.  The

2    other court reporter is mentally incapacitated to the point

3    that she cannot be interviewed, and both of their notes are

4    missing.  So, as the respondent, as the District Attorney's

5    office, I am left with a record that is incomplete.  A record

6    that is incomplete, the afternoon, after opening statements

7    were given, and then a record that's incomplete the morning

8    before Edwin Oliva testified.

9          I do not know what was revealed to the Court that

10   morning.  I do not know if anyone revealed to the Court that

11   morning that Oliva had potentially recanted and then come

12   back.  I do not know if anyone said that Angel Santos had a

13   drug habit.  I do not know what is in that missing portion of

14   the minutes.  It is my burden to know, it is my responsibility

15   to explain what's there, and I cannot, because it's missing.

16          So, I don't make any excuses for the position that

17   the respondent finds themselves in today, and I do not make

18   any excuses for conduct that occurred fifteen years ago in the

19   petitioner's trial.  But what I do know is this:  The

20   material-witness order for Angel Santos was done in front of a

21   judge.  The order that's before this Court is signed by Judge

22   Egitto.  We know that the prosecutor's office, on their own,

23   cannot commit someone to civil jail custody.  I do not have

24   that authority.  No member of my office has that authority.

25          THE COURT:  But it's one thing to shove an order

1   under a judge's nose and ask him to just sign it, and it's

2   another thing to have a whole proceeding before the judge

3   where the material witness is brought and the judge explains

4   what a material-witness order is, provides counsel to the

5   potential witness, okay, especially in a situation with

6   Mr. Santos, where he was a drug user, where he might have been

7   subjecting himself to possible prosecution.

8            He was scared stiff about the prospect.  He was

9   being told that he might be prosecuted for perjury, and he was

10  even concerned about that when he came before this Court, and

11  that was the reason why this Court assigned him counsel at no

12  cost, to advise him of that.

13           MR. RICHARDSON:  Your Honor --

14           THE COURT:  And the bottom line is that no

15  self-respecting defense attorney -- and Mr. Harrison was an

16  experienced defense attorney.  He handled many, many cases --

17  no self-respecting defense attorney, having in-hand knowledge

18  that a witness recanted testimony, would forego

19  cross-examination of that witness based on that.  And while

20  there may be fifty pages of transcript missing, the bottom

21  line was that there was no discussion whatsoever about the

22  material-witness order anywhere.  There was no questioning by

23  Mr. Harrison about any material-witness order.  And

24  Mr. Vecchione's summation was that the witnesses came there

25  voluntarily.  And there is more that's in the record that has

1  been discussed and more that has not been discussed.  And, no,

2  I didn't hear excuses, but I also didn't hear at all any kind

3  of acknowledgment that things were done that should not have

4  been done other than with respect to the recanting.

5         MR. RICHARDSON:  Your Honor mentions with

6  specificity witness Santos, who testified in this court, and

7  as your Honor was a Supreme Court judge in Kings County, Judge

8  Egitto was a Supreme Court judge in Kings County for many

9  years, as well, and I have never met a Supreme Court judge in

10  Kings County or anywhere else who would accept a

11  material-witness order as something that would be shoved under

12  their nose without reading, inspecting and interviewing the

13  witness who is the subject of that order.

14         It has been my experience in Kings County that every

15  judge does that, that no judge touches those orders lightly,

16  because at that moment, a judge is faced with a decision

17  whether or not to imprison a person who, other than refusing

18  to testify --

19         THE COURT:  You know what?  I'm just going to stop

20  it here at this point in time, because we've not been able to

21  pursue any kind of hearing.

22         We've not been able to bring Justice Egitto, now

23  retired, here to discuss what was or was not done.  And I'm

24  not here to cast aspersions on any of my colleagues, who I

25  still respect and admire, but human beings are human beings,

130

1    and just as there are prosecutors who don't do the right thing

2    and defense lawyers who don't necessarily do the right thing

3    and defense lawyers who maybe are not so careful about what

4    they do, there are also, in the same vein, police officers and

5    judges who don't do necessarily what they should do and follow

6    procedures that should be followed.

7              But that's not necessarily what is here before me,

8    and I'm not going to get sucked into some discussion about

9    what the caliber of the judiciary is in Kings County, because

10   that's really not what's at issue here --

11             MR. RICHARDSON:  I agree.

12             THE COURT:  -- because what is at issue, very often,

13   a judge can't do more if the judge is not provided with the

14   appropriate information.  The judge relies on the

15   representations that are made by the parties and the facts

16   that are presented to the judge.  We're not the investigators.

17   We're not the defense attorneys, and our job is to make sure

18   that the constitutional rights of all sides are protected:

19   Prosecution, who represents the victims in the case, and the

20   defense and the defendants, and ultimately to make sure that

21   the process, while maybe not perfect, is a fair one.

22             MR. RICHARDSON:  I agree with your Honor 100

23   percent, and I have no doubt that that's what Judge Egitto did

24   in handling the MWO, the material-witness order that was

25   presented to him regarding Angel Santos.

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

1          Angel Santos, by the way, who testified here that he

2    may have been high on drugs during the observation and he may

3    have been high on drugs many times before and during that --

4    and I agree with your Honor, we take our witnesses as we find

5    them, and we find witnesses in the highest levels and the

6    lowest levels, and we have to use them, because they are the

7    witnesses to crimes -- but the fact that he was addicted to

8    drugs or might have been addicted to drugs at the time does

9    not make him any less valuable as a witness, as you have

10   described.

11          THE COURT:  I'm not talking about that.  I'm not

12   talking about that.

13          But the bottom line is, no, the bottom line is that

14   that is a fact that needed to be turned over to the defense,

15   so that the defense can then challenge him on the stand in

16   front of the jury and let the jury decide, and let the jury

17   decide with all of the facts that it should have.  And that

18   didn't happen here, and certainly, by the time he testified,

19   he had had a chance to dry out, because he said he wasn't on

20   drugs when he testified.

21          But that's not the issue.  The issue is not whether

22   or not he should have used as a witness or not.  That's the

23   choice of the judge, and it's not the choice of the defense.

24   That's the government's choice.  That's the People's choice.

25          MR. RICHARDSON:  Your Honor, never has it been my

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

132

1   understanding of the Brady rule that I would be required to

2   turn over a witness's status as a person who uses drugs or

3   uses alcohol, unless that drug use or alcohol use was in some

4   way relative to what that witness witnessed.

5          THE COURT:  Precisely.  You know what,

6   Mr. Richardson?  I'm going to stop you here, okay, because the

7   bottom line was, he said right here that he was probably high,

8   because he was always high, at the time that he made the 911

9   call, which also wasn't turned over -- the tape of which also

10  wasn't turned over to the defense, and he was high when he

11  when he went in for his first interview.  The fact is that

12  whether or not a person is intoxicated or under the influence

13  of drugs at the time that he or she makes the observations

14  that are at issue, okay, is relevant to credibility.

15         The young man in the wheelchair, we have a spot in

16  the front there where you can fit comfortably, so you can be

17  out of the way of the aisle.

18         A VOICE:  Thank you.

19         THE COURT:  You are welcome.

20         But I don't want to belabor this and go into a

21  back-and-forth about this.

22         The bottom line is that it was Giglio material that

23  affected -- potentially could affect the impeachment or the

24  credibility of the witness, and that wasn't turned over, among

25  the other things that happened here.  And the bottom line is

133

1   that while, yes, respondent is not making any outward excuses,

2   but by standing by everything that you did, and not

3   acknowledging that there were documents that should have been

4   turned over that weren't turned over, acknowledging that there

5   was information -- not acknowledging that there was

6   information that should have been given that wasn't given, you

7   stand by all of that, I think that that's shameful.  I think

8   that that's shameful, and what I hope will come out of this is

9   that there will be some more significant training in this area

10  with respect to the trial assistants, so that something like

11  this just doesn't happen again.

12          MR. RICHARDSON:  Your Honor, I can say that while I

13  am not in any way attempting to excuse or justify things that

14  I know that my office may have done incorrectly, I am not

15  admitting things that I do not know that we did.

16          And your Honor has asked something very important,

17  which is whether or not there is training in my office for the

18  trial assistants.  Well, there is training for our trial

19  assistants, and I think it's some of the best training that is

20  offered in this state, both in the office and through the

21  State Prosecutors Association, and our assistants attend those

22  trainings on a regular basis.

23          As your Honor knows, this type of appeal that's

24  before your Honor is an extremely rare occurrence.  It's rare

25  in this federal court, and it's rare in state court, because

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   it's not the practice of the District Attorney's office to

2   withhold information from any defendant, not just

3   Jabbar Collins, not just murder defendants, but offenses for

4   drugs or rapes or any other type of case we have.  We believe

5   in full disclosure.  We engage in full disclosure.

6           Is it clear on this record that there were problems

7   in the Jabbar Collins prosecution?  Your Honor, I can only say

8   in one word, yes, it is clear.  Has the office taken steps

9   since then to address concerns that were raised by what our

10  conduct might have been in his case?  Absolutely, your Honor.

11  It is the office's policy now, as it was then, to completely

12  disclose such information in 911 tapes.  Any type of Brady

13  material, we are aware that that's our obligation to turn it

14  over, and we do turn it over, just as we did in this hearing.

15  When we became aware of something, we turned it over.

16          Gerecitano's information, your Honor, I cannot prove

17  that that happened, but I can't disprove it happened, but

18  that's not my measuring rod, my duty is, when I learn of this

19  information, to turn it over.  I can then investigate it all

20  the live-long day, which I did, and I still cannot prove that

21  it happened.  But it's information that, if Gerecitano said it

22  and knew it, it should have been provided to Mr. Harrison for

23  Mr. Collins at his trial, and it wasn't.  And because we

24  acknowledge that that was an error, we conceded this

25  conviction, and that's not an easy thing for a state

135

1   prosecution to do -- for a state prosecutor to do, and it's

2   not an easy thing for me to do personally, but we have done

3   it, because it was the right thing to do.

4           Your Honor, without announcing to the Court all the

5   steps that my office has taken to insure that these things

6   don't happen, you can be certain that we have taken steps and

7   will continue to take steps to make sure that each and every

8   defendant tried in our county courts receives a fair trial,

9   with full knowledge of all the information possessed of the

10  People against him.

11          MR. RUDIN:  Your Honor, may I make one comment?

12          THE COURT:  Yes.

13          MR. RUDIN:  The Gerecitano statement to

14  Mr. Richardson and Ms. Ferrel did not happen in a vacuum.

15          In our 440 motion that we filed in 2006, we included

16  a sworn affidavit by Edwin Oliva that disclosed that he had

17  made a full recantation, and then had been brow-beaten by

18  Mr. Vecchione, and he said to Mr. Vecchione and Mr. Posnor was

19  brow-beaten into testifying, his work release was rescinded,

20  and he was threatened, and that's why he testified the way he

21  did.

22          For four years, the District Attorney was on notice

23  of the sworn recantation of its principal witness, that he had

24  fully recanted and then been coerced into testifying.  Only

25  because your Honor ordered an evidentiary hearing did we have

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

136

1  the ability to subpoena the retired detective Gerecitano, who

2  was the principal detective who handled Edwin Oliva initially,

3  and took his initial statement.  It was because of that that

4  Detective Gerecitano was interviewed by Mr. Richardson in

5  preparation for the hearing, and made his disclosure at that

6  time, which obviously is a disclosure that he would have

7  repeated in court.

8         I'm not suggesting that Mr. Richardson would not

9  disclose it, anyway.  It was only because of that sequence of

10 events that the information was finally acknowledged by the

11 District Attorney.  And, as your Honor has pointed out, had

12 there been a proper investigation beginning in 2006, had there

13 not been more than a dozen sworn statements by Monique Ferrel

14 and Michael Vecchione, the Chief of the Rackets Bureau,

15 definitively denying that anyone in the District Attorney's

16 office had been present for any recantation, if not for those,

17 Mr. Collins would have been or should have been released four

18 years ago.

19         To say that a New York City -- to imply that a

20 New York City police detective may somehow be mistaken in

21 recalling years later that there was a recantation -- which,

22 by the way, happens to corroborate the witness's own

23 affidavit -- after the District Attorney's office admitted,

24 two weeks ago, as a matter of fact, that there was a

25 recantation and there was a Brady violation and that's why

137

1   they were consenting to vacate the conviction -- is

2   disappointing, to say the least, that that's the position that

3   they are taking.

4        THE COURT:  That's exactly my point.  I'm not going

5   to belabor this any further, because along the way, along the

6   way, there were many steps that could have been taken.  And

7   that's absolutely right, Mr. Rudin.  But for the fact that

8   this Court ordered a hearing, there would not have been such a

9   close examination, and but for the fact that the Court pressed

10  respondent to make sure that we had a complete record that

11  forced a more thorough search of the record here, that granted

12  petitioner leave to expand the record in this case, but for

13  all of those things, I'm not so sure that we would be here

14  reaching this decision necessarily, which is the right and

15  proper decision.  And we talk about justice.  It's very

16  difficult to talk about justice in the situation that we're

17  confronted with now, sixteen years later.

18        There is a man who is dead, whose family was

19  deprived of his presence and his support, a witness who was

20  injured.  By the same token, there is Mr. Collins and his

21  family, who suffered what they suffered through.

22        As I said earlier, whether or not Mr. Collins is

23  guilty or not guilty is not really the issue here, because

24  what is the issue is whether or not he was deprived of his

25  constitutional rights during that trial, and it should have

138

1    been up to that trial jury to make the determination of the

2    facts based on everything that it should have considered, and

3    it was not given that opportunity.  It was not given that

4    opportunity.

5           So, there are two tragedies here.  There's the

6    tragedy of Rabbi Pollack and his family, and there's the

7    tragedy of the Collins family, and perhaps a third tragedy,

8    the tragedy of a justice system that, at least in this case,

9    was not transparent and did not follow the procedures and the

10   safeguards that have been developed, both through the

11   legislature and in case law, to insure that these kinds of

12   things don't happen.

13          And as I said, I can only hope that what the DA's

14   office has represented here today is in fact what it will do,

15   which is to emphasize to the prosecutors in that office the

16   importance of Brady.  The habeas petition should not be taken

17   lightly.  There isn't a single judge in this courthouse that

18   takes a habeas petition lightly.  We get many of them.  Why?

19   Because there's always that possibility that you might have

20   that one or two persons who are in fact innocent, or who may

21   have had an injustice done to them during the course of their

22   cases that deprived them of their constitutional rights, and

23   at the minimum, they deserve to have those rights vindicated,

24   because when we don't have the Constitution adhered to, when

25   we don't have the procedural safeguards that are in place and

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

1    that have been put in place by Congress and by the state

2    legislature, then we as a society are doomed to failure.

3            This is the Constitution that is emulated and copied

4    in countries around the world.  There are countries around the

5    world who want to fashion themselves after us, and at the

6    foundation of their new systems is their constitution, very

7    much like ours.  Great praise for such a young country as

8    ours.  These can't be just meaningless words.  This is a

9    living, breathing document that has to mean something.  We, as

10   lawyers and as judges, take an oath to uphold the

11   Constitution.  It is a sacred duty that we have.

12           I am glad that at least at this point in time, we

13   have reached, as I said before, the proper resolution in this

14   case.

15           The only thing that is left is to resolve a

16   practical issue that we also discussed yesterday during the

17   conference call.  It was how to effectuate the release of

18   Mr. Collins, because he did have a violation of probation from

19   his youthful-offender adjudication imposed consecutively, in

20   which case that would still technically have a hold on him.  I

21   did allow the parties to come in later this morning to give

22   respondent an opportunity to investigate, with Corrections and

23   any other appropriate agencies, how to effectuate that

24   release.

25           MR. RICHARDSON:  Your Honor, Mr. Rudin and I both

1  made phone calls to the Greenhaven Correctional Facility, and

2  we are both armed with the same information, as Mr. Rudin will

3  be following up on the information, I would be glad to let Mr.

4  Rudin inform the Court what he was told by Greenhaven.

5          THE COURT:  Yes.

6          MR. RUDIN:  We need an order from the Court granting

7  relief that we need taken in a certified form.  Once that

8  order is received at Greenhaven, they will conduct the process

9  of crediting Mr. Collins with time served, and then he'll be

10  released.

11          He could be released either from New York or from

12  Greenhaven, I'm told.  I think this process will take a couple

13  of days.  I think Mr. Collins will just as soon be released

14  from Greenhaven, and I would ask your Honor to direct the

15  authorities, I guess it's the marshals, more than the

16  marshals, I understand it's the state correctional

17  authorities, to try to move Mr. Collins back to Greenhaven as

18  expeditiously as possible, so he's not somehow caught in

19  transit in some interim facility.  He should be moved as soon

20  as possible back to Greenhaven, and Greenhaven will process

21  this, and he'll be released from Greenhaven.

22          Mr. Collins's youthful-offender adjudication was

23  converted to a conviction, because of his conviction in this

24  case.  He does need to be credited with time served on that

25  sentence.  At an appropriate time, we will move to vacate that

141

1   conviction, as well.  That matter is not before your Honor.

2         THE COURT:  That would have to be done before an

3   appropriate state court judge or justice.

4         MR. RUDIN:  Your Honor, just one other thing to

5   complete the record.  There are no fifty missing pages.

6   There's a fifty-page gap in pagination due to the convenience

7   of the court reporters.  I think we all know it's common, at

8   least in state court it's common, that sometimes a gap will be

9   left in the pagination while one reporter finishes

10  transcribing the minutes and another reporter picks up the

11  next day.  There's no evidence of any missing proceedings.

12  It's a seamless transition, so there are no missing pages.

13        MR. RICHARDSON:  That is incorrect, Mr. Rudin,

14  particularly with the second segment of the missing

15  transcript, that begins with no introduction and just the

16  witness on the stand.  So, it's not a seamless transition.

17        That might just be the solution, of perhaps a page

18  or two, what it appears to be.  And this was verified by the

19  court reporter that it was daily copy, and in daily copy, as

20  the Court is well aware, the reporters concentrate on

21  delivering the testimonial portion of the transcript, and that

22  contains the witness testimony, and would leave out the

23  sidebars or the bench conferences that might have been held.

24        And it is the opinion of the court reporters -- the

25  head of the court reporters that that is what happened on the

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   March 6 missing date and on the March 7 missing date, but

2   because no certified transcript was ever ordered, and now with

3   the incapacitation of one court reporter and the passing of

4   the other, it is impossible to get a certified transcript at

5   this time.

6          MR. RUDIN:  Your Honor, Ms. Ferrel represented to

7   this Court, when your Honor was asking this very issue, that

8   this was a complete transcript, and it was only a question of

9   pagination.

10         And I would also point out that there was a direct

11  appeal in this case, and this is the record that went up on

12  appeal.  So, for the District Attorney now to suggest that

13  it's failure to disclose certain information as a result of a

14  missing transcript, that it may have been disclosed in the

15  missing transcript, is almost somewhat lamentable.

16         THE COURT:  I'm not buying that argument.

17         MR. RICHARDSON:  I don't believe I made that

18  argument.

19         THE COURT:  To the extent that it can be inferred

20  that there perhaps might have been disclosures made in those

21  missing fifty pages, I'm not buying that.

22         MR. RICHARDSON:  Your Honor, I did not --

23         THE COURT:  I'll done with this back-and-forth.  At

24  the end of the day, whatever we say here doesn't impact the

25  end result.  I can only, as I said, only hope that I do not

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

143

1   see another case such as this one before me on another writ of

2   habeas corpus, and that what's happened here will not be

3   repeated again.

4           What I will do is this.  In the first instance, the

5   Court grants the petition for writ of habeas corpus in its

6   entirety.  Mr. Collins is unconditionally released.  The

7   respondent District Attorney of Kings County is prohibited

8   forever more from prosecuting Mr. Collins for the charges that

9   were contained in Indictment Number 2884 of 1984 --

10          MR. RICHARDSON:  1994, your Honor.

11          THE COURT:  -- 1994.  I'm so sorry.  Thank you.

12   That's Indictment Number 2884 of 1994.  Those are charges

13   stemming from the robbery and murder of Rabbi Pollack, and

14   the -- I believe it was attempted murder of Mr. Avery.  That

15   indictment is to be dismissed with prejudice.

16          The minutes of these proceedings will be the order

17   of the Court.  However, the Court will issue a separate

18   judgment, which will be what will be forwarded to Greenhaven.

19   It will just take us maybe about an hour to put that together,

20   and it will just be a modified version of incorporating what

21   the parties agreed to and submitted in Mr. Rudin's June 7

22   letter.

23          And then you can get -- we'll give you a call,

24   Mr. Rudin.  I guess you're going to follow up with Greenhaven,

25   so that you can get a certification of that, and however many

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

144

1   copies you need for Corrections.

2        MR. RUDIN:  Thank you, your Honor.

3        THE COURT:  Thank you all very much.

4        MR. COLLINS:  Thank you, your Honor.

5             ooooo0ooooo