UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JABBAR COLLINS,

               Plaintiff,                             MEMORANDUM
                                                    AND ORDER
   -against-

THE CITY OF NEW YORK, *et al.*,                11 CV 766 (FB)(RML)

               Defendants.
------------------------------------------------------------X

LEVY, United States Magistrate Judge:

      Defendants move to compel the production of documents, and plaintiff moves for a protective order. I heard oral argument on May 24, 2012. (See Transcript of Oral Argument, dated May 24, 2012 ("Tr.").) For the reasons stated below, defendants' motion is granted in part and denied in part.[1]

## BACKGROUND

      Plaintiff Jabbar Collins ("plaintiff" or "Collins") commenced this civil action in February 2011. The 106-page complaint seeks damages for wrongful arrest, prosecution, conviction, and imprisonment. (See generally Complaint, dated Feb. 15, 2011 ("Compl.").)

      On June 8, 2010, the Honorable Dora L. Irizarry, United States District Judge, with the consent of all parties, vacated plaintiff's 1995 murder conviction and ordered the indictment dismissed with prejudice, based on evidence that prosecutors in the Brooklyn District Attorney's office had wrongfully withheld a key witness's recantation. (See Final Judgment

---

[1] Defendants have submitted for in camera review a detailed summary of IAB complaints with respect to defendant Detective Jose Hernandez. I will address that submission in a separate order. I also note that defendants' motion to dismiss is pending before Judge Block, and as a consequence, I have stayed discovery concerning the District Attorney and employees of the District Attorney's office, as well as Monell discovery. (See Order, dated Mar. 5, 2012.)

Order in 08 CV 1359 (DLI)(CLP), dated June 8, 2010 ("Final Judgment Order").)  The criminal case against Collins arose out of the February 1994 shooting death of Abraham Pollack, a rabbi and the landlord of a residential building in Williamsburg, Brooklyn.  The recanting witness was Edwin Oliva, who made a statement to police[2] in March 1994 (when he was arrested for an armed robbery that had occurred two days earlier, in the building Pollack owned and where he was shot and killed) and later testified before the grand jury and at Collins's criminal trial.  The police used Oliva's March 1994 statement to arrest plaintiff and initiate criminal proceedings against him.  According to plaintiff, Oliva's statement was coerced, and his cooperation earned him protective custody, low bail, and a lenient plea bargain.  (See Compl. ¶¶ 60, 62.)

It is undisputed that approximately two months prior to Collins's criminal trial, defendant Vincent Gerecitano, an N.Y.P.D. detective, received a telephone call from someone in the Brooklyn District Attorney's office advising that Oliva was denying making the March 1994 statement to police and was denying the truth of the statement.  (See Final Judgment Order.)  Because Oliva's pre-trial statements constituted Brady material that had not been disclosed to Collins, the City consented to granting the writ of habeas corpus before Judge Irizarry.  According to defendants, Detective Gerecitano later met with Oliva at the D.A.'s office, after which Oliva admitted that he made the statement and that it was true.  (See Letter of Arthur G. Larkin, Esq., dated Mar. 27, 2012 ("Larkin Ltr."), at 2, Ex. D.)

The other witness who figures in defendants' motion is Angel Santos, who also

---

[2] In the statement, Oliva said that he had overheard Collins (whom he had known for at least ten years) planning to rob Pollack with a man named Charlie Glover, who lived with Oliva's wife's sister in Pollack's building.  (See Letter of Arthur G. Larkin, Esq., dated Mar. 27, 2012, Ex. E.)

testified at Collins's trial and who has never recanted his testimony. (Tr. at 40-41.) Santos did not claim to have seen the shooting, but he identified Collins as the man he saw running past the furniture store where Santos worked immediately after the shooting. (See Letter of Arthur G. Larkin, Esq., dated Apr. 9, 2012, at 5.) According to plaintiff, both Santos and Oliva were heavy drug users whose credibility should have been called into question from the outset. Plaintiff also maintains that Oliva was going through withdrawal during his police interrogation and was coerced into testifying against Collins. (See Compl. ¶¶ 126, 149.)

Oliva recanted his prior statements in an affidavit that he signed on January 20, 2006 while in custody on Rikers' Island, in the presence of lawyers Roland Acevedo and Joel Rudin. (Larkin Ltr., Ex. I.)[3] Defendants claim that "plaintiff, with the assistance of his attorneys, may have colluded with" Oliva to create this affidavit. (Larkin Ltr. at 2.)[4]

Defendants now seek three categories of documents: (1) documents plaintiff claims are privileged or protected by the attorney work product doctrine, (2) contact information for Oliva, Santos, and other relevant witnesses, and (3) unredacted attorney time records for Roland Acevedo and Joel Rudin. I will address each category in turn.

---

[3] In the January 2006 affidavit, Oliva states that he was "tired, hungry, disoriented, strung out" when he was questioned by police on March 1, 1994, and that he signed the statement they gave him without reading it. (See Larkin Ltr., Ex. I.) He further states that, because he felt "trapped and desperate," he "falsely accused Jabbar Collins of planning the robbery and of discarding the weapon," and that "[t]he ADAs knew that I told them this was untrue." (Id. ¶¶ 15–16.) It bears noting that Judge Irizarry's Final Judgment Order vacating Collins's conviction makes no mention of Oliva's January 2006 affidavit. (See Final Judgment Order.)

[4] Defendants also argue that the statement is false and misleading, since Oliva stated: "This is the first time I met or spoke with Mr. Rudin or any attorney or investigator for Jabbar [Collins]," yet it seems clear that Oliva had been in touch with Acevedo (who, as explained below, had represented Collins) as early as June 2004, eighteen months earlier.

1. <u>Documents Plaintiff Claims Are Privileged or Work Product</u>

Defendants seek to compel production of documents that reflect communications between (1) plaintiff's current attorney, Joel Rudin, and certain non-parties (including Oliva and Santos), and (2) plaintiff or his agents and Roland Acevedo, an attorney who represents or represented Oliva.

After his conviction, Collins retained Rudin and Acevedo[5] to represent him, and in this lawsuit he seeks to recover his legal fees as part of his damages. Acevedo performed work for Collins from April 2004 to September 2005; in January 2006 he became an attorney for Oliva, and the affidavit Oliva signed on January 20, 2006 identifies Acevedo as Oliva's lawyer. It is undisputed that, at some point, Collins paid Acevedo $300 for representing Oliva.

According to defendants, this arrangement – whereby Acevedo represented both Collins and Oliva, and Collins paid Acevedo to represent a witness who had testified against him at trial – violated the Rules of Professional Conduct[6] concerning conflicts of interest "and suggests improper collusion among them to create Oliva's affidavit." Defendants argue that this makes all of plaintiff's communications with Acevedo, and all of Rudin's communications with Acevedo, Oliva, and any non-party witness, discoverable. Specifically, defendants seek

---

[5] Defendants describe Acevedo as an "attorney with a checkered past" and a "convicted felon" who has served prison terms for robbery and attempted robbery. (Larkin Ltr. at 3.) He was admitted to the New York bar in 1997. (<u>Id.</u>)

[6] Plaintiff's counsel correctly points out that, for communications that took place in 2006, the former Code of Professional Responsibility applies (rather than the Rules of Professional Conduct). However, there is no relevant difference between the two.

Plaintiff's counsel also avers that both Collins and Oliva fully understood and consented to this arrangement and knowingly waived any conflict. (Tr. at 26, 32.)

unredacted copies of the following documents on plaintiff's privilege log:

> ● All documents listed on pages 1–2 of the privilege log (with the exception of the last two on page 2), reflecting communications between Acevedo and Collins in 2004 and 2005. (Larkin Ltr., Ex. L.)
>
> ● Oliva's draft witness statement, dated January 17, 2011, which was authored by Rudin.[7]
>
> ● Documents entitled "Memorandum of Interview" and "Handwritten Notes of Witness Interview," authored by Rudin.[8]
>
> ● Document entitled "Draft Witness Statement" authored by Rudin. This is an earlier draft of the statement Rudin obtained from Oliva on January 17, 2011, and counsel claims that it is work product.
>
> ● Correspondence from Collins to Acevedo and Rudin dated November 22, 2005 (about two months before Oliva signed the recanting witness affidavit).[9]
>
> ● Three e-mails between Rudin and Acevedo, dated March 17 and 22, 2006. (March 17, 2006, when 2 of those e-mails were exchanged, is the date Acevedo wrote to the DA's office stating that he represented

---

[7] This document is P-19970. Plaintiff's counsel has withheld it as attorney work product.

[8] These are four documents. P-19885-87 are undated notes of Rudin's interview with Oliva, taken around the time of his January 17, 2011 affidavit. P-19889 is a memorandum of an interview with an unnamed prospective witness. The identity of this witness has been disclosed to defendants in interrogatory responses, but plaintiff argues that counsel's decision to interview this particular witness reveals litigation strategy, as does the memo itself. P-19978 are notes of Rudin's telephone conversation with Santos on May 13, 2010, in preparation for the habeas hearing. Santos later testified at the hearing. Finally, P-19979 is Rudin's August 24, 2010 memo of an interview with another unnamed witness whose identity was disclosed in interrogatory responses. Again, plaintiff argues that these documents are attorney work product because the decision to interview certain witnesses, and the information counsel chose to elicit from them and record, reveal litigation strategy.

[9] This is a 3-page letter written by Collins apparently discussing legal strategy. The letter is addressed to Acevedo and copied to Rudin, whom Collins had recently retained to prepare his section 440 motion in state court.

Oliva and demanding that Oliva not be interviewed outside his presence).[10]

In support of its motion, defendants rely on the doctrine of "at issue" or "implied" waiver, which holds that the attorney–client privilege "may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991). See also In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000) (explaining that "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party").[11]

Obviously, the attorney-client privilege is one of the "oldest recognized privileges for confidential communications." Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998). Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." Id. (internal quotation marks omitted). Therefore, "rules which result in the waiver of this privilege and thus possess the potential to weaken attorney–client trust, should be formulated with caution." In re County of Erie, 546 F.3d 222, 228 (2d Cir. 2008).

---

[10] Although plaintiff concedes that Acevedo was no longer Collins's attorney when these e-mails were exchanged, he claims that the e-mails contain requests from Rudin for information Acevedo obtained for Collins when he was Collins's lawyer, and for Acevedo's comments on certain litigation strategy. Since there was apparently no attorney-client relationship between Collins and Acevedo at the time, these e-mails are not protected by the attorney-client privilege, but they could constitute Rudin's work product if they reveal his thought processes.

[11] Defendants cite no authority for the proposition that an attorney's violation of the Rules of Professional Conduct concerning conflicts of interest causes a waiver of the attorney-client privilege, and this court's research uncovered none. Thus, even if Acevedo violated the rules of ethics by representing both a criminal defendant and a trial witness, that does not automatically mean that none of Acevedo's communications with Collins are privileged.

Generally, "[c]ourts have found waiver by implication when a client testifies concerning portions of the attorney–client communication, . . . when a client places the attorney–client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense. . . ." Id. (quoting Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)). Underlying any determination that a privilege should be forfeited is the notion of unfairness. This notion implicates only "'the type of unfairness to the adversary that results in litigation circumstances when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'" Id. at 229 (quoting John Doe Co. v. United States, 350 F.3d 399, 306 (2d Cir. 2003)). The Second Circuit has made it clear that "[w]hether fairness requires disclosure has been decided . . . on a case–by–case basis, and depends primarily on the specific context in which the privilege is asserted." In re Grand Jury, 219 F.3d at 183.

Defendants Gerecitano and Hernandez claim to need these documents in order to defend against allegations that they coerced Oliva into testifying against Collins. (See Tr. at 13.) According to defendants' counsel, defendants "need to explore all of the communications between Mr. Oliva and representatives of Mr. Collins . . . before or after Mr. Collins was released, . . . so that we can get the picture as to how this alleged recantation came about, what brought it about, what statements were made to Mr. Oliva, what promises, if any, were made to him." (Id.)

As an initial matter, defendants have failed to explain how Collins waived the attorney-client privilege for communications he had with Acevedo while Acevedo was acting as his attorney. Whatever Acevedo may have done after his representation of Collins ended has no

bearing on the privileged nature of those communications. Moreover, plaintiff has not waived his privilege with respect to those communications, as he has not testified concerning any portion of those communications or asserted reliance on Acevedo's advice as an element of a claim or defense. Accordingly, any document reflecting a communication between Collins and Acevedo prior to January 2006 is privileged and not discoverable.

As for Mr. Rudin's draft witness statements and his notes and memoranda from witness interviews, it is clear that those documents constitute core attorney work product.[12] As this court has recognized:

> "an attorney's mental processes are revealed to a certain extent even when the attorney's memorandum is factual in nature, merely summarizing what the witness said in response to the attorney's questions. The attorney exercises judgment in determining which witnesses to interview, what subject areas to cover (and not cover), how to frame specific questions and in what order, and how much time to devote to particular topics. Further, the attorney exercises selective judgment in determining what is worthy of being written down (or remembered) during the interview. As a result, when opposing counsel is giving access to the attorney's notes or memoranda from a witness interview, the attorney's mental processes necessarily are revealed."

S.E.C. v. Nadel, No. 11–CV–215, 2012 WL 1268297, at *7-8 (E.D.N.Y. Apr. 16, 2012)

---

[12] The work product doctrine, codified in Fed. R. Civ. P. 26(b)(3), states:

> a party may obtain discovery of documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation.

(quoting S.E.C. v. Sentinel Mgm't Group, Inc., No. 07–CV–4684, 2010 WL 4977220, at *9 (N.D. Ill. Dec. 2, 2010)).  See also Upjohn Co. v. United States, 449 U.S. 383, 399 (1981) ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal an attorney's mental process."); Institute for Dev. of Earth Awareness v. People for Ethical Treatment of Animals, 272 F.R.D. 124, 125 (S.D.N.Y. 2011) ( "[a] lawyer's notes of an interview of a non-party witness is classic work product and may contain both facts and mental impressions of the lawyer").  Because those documents consist of core or opinion work product, defendants must make a heightened showing in order to compel disclosure.  Nadel, 2012 WL 1268297, at *8.  Since defendants have not demonstrated that Oliva is unavailable to testify at a deposition, they have failed to make the requisite heightened showing.[13]

        Finally, I cannot determine at this time whether the correspondence from Collins to Acevedo and Rudin dated November 22, 2005 or the three e-mails between Rudin and Acevedo dated March 17 and 22, 2006 are privileged or constitute protected attorney work product.  Plaintiff's counsel is therefore directed to submit these documents for in camera inspection, by the end of business on Friday, July 27, 2012.

        2.  Identities of, and Contact Information for, Relevant Witnesses

        Defendants have served an interrogatory requesting that Collins provide a sworn statement concerning his knowledge of witness contact information.  Plaintiff has responded that he has no current information for Oliva or Santos, and Mr. Rudin has agreed to provide whatever

---

[13] I find it unnecessary at this time to conduct an in camera inspection of these documents.  If Oliva does not appear for a deposition, or defendants can otherwise make a heightened showing of need, I will revisit this issue.

information he has, but only pursuant to a protective order, under which defendants would be limited to using the information to subpoena the witnesses for depositions. Plaintiff states that "[n]o contact information for any other witness has been or is being intentionally withheld." (Rudin Ltr. at 15.)

According to plaintiff, Santos was "physically threatened" by ADA Vecchione "and then was illegally imprisoned for two weeks in a jail and then a motel under armed guard in order to coerce him to testify" against Collins. (Letter of Joel Rudin, Esq., dated Apr. 4, 2012 ("Rudin Ltr."), at 15.) Plaintiff claims that it was "clear at the habeas hearing that he had been traumatized." (Id.) As for Oliva, plaintiff contends that he was "illegally imprisoned upstate when he would not cooperate with the District Attorney, and was then illegally forced to meet with Mr. Vecchione after refusing to go voluntarily with the D.A.'s detective-investigators." (Id.) Since Santos and Oliva are both allegedly former drug users with criminal records, plaintiff argues that they "are uniquely vulnerable to pressure by the authorities." (Id. at 16.) Plaintiff's counsel is willing to disclose whatever contact information he has, but only on the condition that a protective order is issued "to protect Oliva and Santos from 'annoyance' or 'oppression' by directing [defendants] to do no more than subpoena these witnesses to testify." (Id.)

Plaintiff has failed to show that he has standing to request a protective order on behalf of Santos and Oliva, or that there is any likelihood that the Corporation Counsel's office would attempt to harass or intimidate them. In addition, at oral argument, defendants' counsel agreed to inform all non-party witnesses that they are not required to speak to either party privately, and that if they have any questions concerning their rights, the court will explain their rights to them. (Tr. at 50-51.) In sum, defendants are entitled to disclosure of all contact

-10-

information in plaintiff's or his attorney's possession, with no protective order.

### 3. Unredacted Attorney Time Records

Defendants seek to compel production of Acevedo's and Rudin's unredacted time records on the grounds that (1) plaintiff claims as damages in this lawsuit fees paid to Acevedo, and over $500,000 in fees and expenses incurred by Rudin in the criminal case (most of which Collins has not yet paid); and (2) the records may shed light on whether Collins, Rudin and Acevedo "colluded" with Oliva to create his recanting affidavit. (Larkin Ltr. at 8–9.) Plaintiff has produced redacted time records for Rudin and Acevedo. (See id., Exs. R & S.) There is no authority for the proposition that a client waives his attorney-client privilege by seeking to recover attorney's fees, and usually the reasonableness of fees is determined by the court after liability and damages have been fully litigated. If the fees are inflated, the court can make that determination later, by reviewing the records in camera after a finding of liability. In short, plaintiff's request for attorney's fees is not adequate justification for demanding unredacted time records at this stage of the litigation.

As for the argument that the time records might reveal something about collusion with Oliva, that argument is wholly speculative. Defendants should attempt to depose Oliva and Collins before they can claim that they need access to attorney time records. Accordingly, defendants' motion to compel production of the unredacted time records is denied at this time.

SO ORDERED.

/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
July 23, 2012

-11-