UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------
x
JABBAR COLLINS,

                         Plaintiff,          **MEMORANDUM AND ORDER**

       -against-                   Case No. 11-CV-766 (FB) (RML)

THE CITY OF NEW YORK, MICHAEL F.
VECCHIONE, BRIAN MAHER,
STEPHEN BONDOR, SHOLOM
TWERSKY, ANTHONY D'ANGELO,
MELANIE MARMER, MORGAN J.
DENNEHY, VIRGINIA C. MODEST, and
JODI MANDEL, as employees of the
Kings County District Attorney's Office
and Individually, and VINCENT
GERECITANO and JOSE R.
HERNANDEZ, Individually and as
Members of the New York City Police
Department,

                         Defendants.

-------------------------------------------------------
x

*Appearances*:
*For the Plaintiff*:                 *For the Defendants*:
JOEL B. RUDIN, ESQ.           MICHAEL A. CARDOZO, ESQ.
200 West 57th Street, Suite 900    Corporation Counsel
New York, New York 10019       100 Church Street
                              New York, New York 10007

                              By:   ARTHUR G. LARKIN, ESQ.
                                    ELIZABETH N. KRASNOW, ESQ.

**BLOCK, Senior District Judge:**

          Jabbar Collins was incarcerated by state authorities for more than 16 years.

On June 9, 2010, Judge Irizarry of this Court issued a writ of *habeas corpus* ordering the

dismissal of the indictment and his immediate release.

Collins now seeks damages stemming from the wrongful deprivation of his liberty.  Proceeding under 28 U.S.C. § 1983 and New York law, he sues two members of the New York City Police Department ("NYPD"), nine members of the Kings County District Attorney's Office ("KCDA"), and the City of New York ("the City").

The KCDA defendants and the City move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The KCDA defendants argue that they are entitled to absolute immunity and that certain claims are not viable under the governing law.  The City argues that Collins has not alleged a plausible case for municipal liability under either federal or state law.  For the following reasons, the motion is granted in part and denied in part.

## I

The facts are drawn from Collins's complaint.  The Court must accept them as true and draw all inferences in Collins's favor.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).

### A.  Pre-Indictment Events

Shortly before noon on February 6, 1994, Abraham Pollack of Williamsburg was shot and killed during a robbery.  Witnesses described the perpetrator as a young black man suffering a stab wound inflicted by a bystander who had come to Pollack's aid.

Police received an anonymous phone call blaming Collins for the crime.  Notwithstanding alibis from his mother and girlfriend, police sought Collins for questioning.  He voluntarily appeared at the 90th Precinct on February 18, 1994, whereupon he was immediately handcuffed and arrested by police officers Vincent

Gerecitano and José R. Hernandez.

These two officers found no evidence of a knife wound on Collins's body. Moreover, Collins was presented to four eyewitnesses in lineups; none recognized him. After several hours of detention, Gerecitano and Hernandez released Collins.

A few days later, Edwin Oliva was booked in the precinct on an unrelated charge of attempted robbery. After several hours of interrogation, Gerecitano and Hernandez "coerced [Oliva] into signing a written statement" that, among other things, falsely accused Collins of planning to rob Pollack at gunpoint. Compl. ¶ 60. The officers offered Oliva, a heroin addict going through withdrawal, methadone treatment and possible leniency on his own charges. Oliva eventually pleaded guilty to a relatively minor charge and, after a few months' incarceration, was placed in a work-release program.

Gerecitano and Hernandez used Oliva's false statement to initiate a criminal complaint. In the complaint, Hernandez falsely stated that he had been "informed by a witness that [Collins] had robbed Pollack at gunpoint and shot him to death." Compl. ¶ 71. Hernandez further stated that a second witness "had identified [Collins] as the assailant." *Id.* In fact, this second witness, Paul Avery, had told police "he did *not* recognize [Collins] when he viewed [Collins] at a lineup." Compl. ¶ 73. Based on the complaint, Collins was picked up, arraigned on charges of murder, attempted murder and robbery, and denied bail.

Two witnesses testified before the grand jury. Angel Santos testified that he had seen Collins "running past the window of a furniture store, opposite the building where the shooting had occurred, while he was inside the store reporting the shooting by

telephone to a police 911 operator." Compl. ¶ 80. Adrian Diaz claimed to have made a "fleeting observation of an individual, whom he identified as [Collins], leaving the building where shots had been fired." Compl. ¶ 82. The grand jury returned an indictment.

**B. Post-Indictment/Pre-Trial Events**

The case against Collins quickly began to unravel. First, Oliva told defendant Michael F. Vecchione—the assistant district attorney assigned to the case—as well as two KCDA investigators, defendants Brian Maher and Stephen Bondor, that his prior statement had been coerced, and that he had no knowledge of Collins's involvement in the robbery or shooting. Vecchione obtained a court order to take Oliva into custody for questioning by falsely stating that Oliva had asked to cooperate. Oliva made no such request and continued to insist that his prior statement had been coerced. Vecchione then enlisted Gerecitano, who had by then retired from the force, to help pressure Oliva into standing by his prior statement. The two threatened to prosecute Oliva for perjury and get his work release revoked "unless he adopted the false 'sworn' statement contained in GERECITANO's report." Compl. ¶ 102. They made good on their threat after Oliva refused to cooperate. Vecchione then obtained an order transferring Oliva from state prison to KCDA custody. When Oliva refused to consent to the transfer—upon which the transfer order was expressly conditioned—Maher and Bondor "took custody of Oliva anyway and brought him involuntarily to VECCHIONE's [o]ffice." Compl. ¶ 116.

When Oliva arrived in Vecchione's office, he was threatened with prosecution, imprisonment, and bodily harm unless he agreed to stand by his prior statement accusing Collins of the robbery and shooting. Oliva at last complied. Vecchione

4

had Oliva released one week later.

With respect to Santos, the ostensible 911 caller, Vecchione issued an illegal "office" subpoena requiring Santos to appear for questioning.  When, like Oliva, Santos refused to appear, Maher and Bondor "found Santos and forcibly transported him to VECCHIONE's office."  Compl. ¶ 124.  Vecchione told Santos that if he did not cooperate, Vecchione would "hit Santos over the head with a coffee table, immediately send him to jail, keep him in prison for a long time, and prosecute him for perjury."  Compl. ¶ 127.  Vecchione then detained Santos under a material witness warrant he obtained under false pretenses.  Santos was held in the Bronx House of Detention for a week, after which he was somehow released into KCDA custody without a court order.  Santos ultimately agreed to stand by his false testimony.  To cover his tracks, Vecchione manufactured false evidence that Santos had been unwilling to testify because of threats he received from Collins and his family.  Santos later told authorities that the only threats he had received were from Vecchione.

Finally, Vecchione took steps to return Diaz—the other alleged witness to the perpetrator's flight—from Puerto Rico to New York.  He falsely represented to a New York judge that Diaz was unlikely to return to New York voluntarily because he had been threatened.  He further promised to allow Diaz to return to Puerto Rico once his testimony had been secured.   Vecchione thereby obtained an order authorizing Diaz to be involuntarily returned to the state.

Vecchione also promised to "take care" of the probation violation that had caused Diaz to leave New York in the first place.  Compl. ¶ 183.  To do this, he told Diaz's

probation officer that Diaz had fled because of threats from Collins's family and friends. Diaz later denied having received any threats. After some initial hesitancy, Diaz's probation officer agreed not to pursue the violation.

## C. The Trial

Oliva, Santos and Diaz testified at Collins's trial. As alleged in the complaint, Vecchione did not disclose that Oliva had recanted the written statement inculpating Collins, and that the testimony of all three witnesses had been coerced. On March 13, 1995, Collins was convicted of murder, attempted murder, robbery, assault and criminal possession of a weapon; he was sentenced principally to 33-1/3 years to life in prison. The Second Department affirmed, *see People v. Collins*, 688 N.Y.S.2d 175 (2d Dep't 1999), and leave to appeal to the Court of Appeals was denied, *see People v. Collins*, 93 N.Y.2d 1016 (1999).

## D. FOIL Requests

Beginning shortly after he was convicted, Collins made several requests under New York's Freedom of Information Law ("FOIL"), N.Y. Pub. Off. Law §§ 84-90. In 1995, he sought from KCDA "all statements made by Oliva, Santos, and Diaz, agreements with or promises to those witnesses, any letters the D.A.'s office wrote to the Probation Department regarding Diaz, information regarding Angel Santos' drug abuse, all witness subpoenas, all material witness applications and orders, and other materials" related to his case. Compl. ¶ 244. Defendants Anthony D'Angelo and Melanie Marmer, acting as KCDA FOIL officers, denied Collins's request on the ground that no such documents were in the office's possession.

6

In 1996, Collins made another request seeking "all cooperation agreements with, and promises of leniency to, Oliva, Santos, and Diaz." *Id.* ¶ 259. Defendants Virginia C. Modest and Sholom Twersky, also acting as FOIL officers, again represented that KCDA did not possess any such records.

In 2002, Collins made a third request, this time seeking "all subpoenas, and court and material witness orders, along with their supporting affidavits, to secure the attendance of any out of state or incarcerated witness." *Id.* ¶ 271 (internal quotation marks omitted). Defendant Morgan J. Dennehy repeated the office's mantra.

Finally, in 2005, Collins requested "the subpoena Vecchione obtained to have Diaz returned from Puerto Rico, the supporting affidavit, records regarding Diaz's failure to comply with the terms of his probation, and all letters between the D.A.'s Office and the Department of Probation." *Id.* ¶ 277 (internal quotation marks and footnote omitted). Dennehy and defendant Jodi Mandel represented that no records could be located "after an exhaustive search." *Id.* ¶¶ 278, 280.

Collins alleges that each of the FOIL responses he received were prepared with Vecchione's knowledge and at his direction.

**E. State Collateral Proceedings**

In March 2006, Collins, represented by his counsel in this action, moved to vacate his conviction and sentence.[1] In an affirmation submitted in opposition to the motion, Vecchione denied that any witness had recanted, that any witness had been

---

[1]A prior motion to vacate that Collins had prepared *pro se* was denied a decade earlier.

7

coerced, and that any exculpatory material had been withheld.  The state court denied the motion without a hearing, and the Appellate Division denied leave to appeal.

**F.  Federal *Habeas* Proceedings**

Collins filed his federal *habeas* petition in 2008.  KCDA submitted Vecchione's state-court affirmation in opposition.  Judge Irizarry allowed Collins to proceed with discovery and scheduled an evidentiary hearing.

In the course of discovery, KCDA produced numerous documents—including the applications Vecchione had made to secure the presence of Oliva, Santos and Diaz—the existence of which it had denied for the previous 15 years.  In addition, the office conceded that Oliva had recanted his inculpatory testimony, and that Vecchione had violated *Brady v. Maryland*, 373 U.S. 83 (1963), in failing to disclose the recantation.  Based on this revelation, KCDA consented to an order granting Collins's *habeas* petition, with the proviso that it be allowed to retry him.  Judge Irizarry demurred, stating that "the remaining allegations were 'extremely troubling,'" and that the hearing was necessary "to determine whether the violations of [Collins]'s rights had been so pervasive that she should prohibit a retrial."  Compl. ¶ 331.

At the hearing, Santos revealed the circumstances leading to his trial testimony.  He acknowledged that the voice on the 911 call was not his, but that Vecchione had coerced him into claiming that he was the caller through illegal confinement and threats of further prosecution and physical violence.

Santos's revelations proved to be the last straw.  KCDA consented to an order vacating Collins's conviction and dismissing the charges against him with prejudice.

Although it stipulated that the failure to disclose Oliva's recantation violated *Brady*, and that Santos's testimony placing Collins at the crime scene was no longer credible, it denied that anyone had intentionally violated Collins's rights, and "stood behind" Gerecitano, Hernandez and Vecchione, as well as those who had represented the office on appeal and in post-conviction proceedings.

In oral findings accompanying her order granting *habeas* relief, Judge Irizarry lambasted KCDA, calling the office's conduct—and, in particular its continued denials of wrongdoing—"shameful" and "a tragedy."  Compl. ¶ 358.  Shortly thereafter, District Attorney Charles Hynes announced to the news media that Vecchione would not face disciplinary action and that there would be no investigation into his office's conduct. Hynes called Vecchione a "very principled lawyer" who "was not guilty of any misconduct."  *Id.* ¶ 360.

## II

Collins's complaint contains nine claims.  Taken out of order, they fall into four categories:

First, Collins makes two claims that individuals acting under color of state law deprived him of his federal constitutional rights, in violation of 28 U.S.C. § 1983. Second, he makes two claims that the City is liable for those violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Third, he claims that some or all of the individual defendants committed three state-law torts: malicious prosecution, intentional

infliction of emotional distress and fraud.[2]   Fourth, he claims that the City is either vicariously liable for those torts or, alternatively, liable for the negligent hiring, training and supervision of the individual defendants.   The Court will address the claims in that order.

## A. § 1983 Claims Against Individual Defendants (Sixth and Seventh Causes of Action)

In his Sixth Cause of Action, Collins alleges that Gerecitano and Hernandez violated his Fourth Amendment right to be free from unreasonable seizures, as well as his Fourteenth Amendment right to a fair trial.[3]   Gerecitano and Hernandez have not moved to dismiss this cause of action.

In his Seventh Cause of Action, Collins alleges that KCDA employees violated his Fourteenth Amendment rights.   His claim is twofold:   First, he alleges that Vecchione, in concert with Maher and Bondor, deprived him of his right to a fair trail by coercing Oliva, Santos and Diaz into giving false testimony, presenting that testimony at trial, and failing to disclose the circumstances of their testimony during trial and in opposition to Collins's attempt at collateral relief.   Second, he alleges that Twersky, D'Angelo, Marmer, Dennehy, Modest and Mandel ("the FOIL Defendants") violated his

---

[2]Collins has voluntarily withdrawn state-law claims for negligent misrepresentation and abuse of process.

[3]Because Gerecitano and Hernandez are municipal officials, both aspects of Collins's claim against them arise under the Fourteenth Amendment. *See Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949) ("The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society.   It is therefore implicit in the concept of ordered liberty and as such enforceable against the States through the Due Process Clause [of the Fourteenth Amendment]." (internal quotation marks omitted)).

constitutional rights by withholding the same exculpatory evidence in response to his FOIL requests.

### 1. *Vecchione, Maher and Bondor*

Vecchione, Maher and Bondor do not dispute that the intentional creation and presentation of false testimony violates the criminal defendant's right to a fair trial. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). It is equally clear that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process." *Brady*, 373 U.S. at 87; *see also Giglio*, 405 U.S. at 154 ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule [of *Brady*]." (internal quotation marks omitted)). Those defendants argue, however, that they are entitled to absolute immunity for their actions.

"[A]bsolute immunity protects a prosecutor from . . . liability for virtually all acts, regardless of motivation, associated with his function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 93 (2d Cir. 1994). In *Imbler v. Pachtman*, 424 U.S. 409 (1976), the Supreme Court defined the scope of prosecutorial immunity "not by the identity of the actor, but by reference to the 'function' performed." *Warney v. Monroe County*, 587 F.3d 113, 121 (2d Cir. 2009) (quoting *Imbler*, 424 U.S. at 430). Under this functional approach, prosecutors are immune from liability for acts that are "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. By contrast, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for

the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). For example, when a prosecutor gives false evidence to obtain an arrest, she is not entitled to absolute immunity because "the only function that she performs in giving sworn testimony is that of a [complaining] witness." *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997).

In *Warney*, the Second Circuit stressed the importance of context to the functional approach. *See* 587 F.3d at 123 ("Unless the DNA testing is considered with reference to context, it is impossible to classify functionally."). It concluded that "it is unhelpful to ascertain the prosecutors' functional role by isolating each specific act done or not done." *Id.* Rather, "a prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Id.*

The Second Circuit recently elaborated further on the functional approach in *Giraldo v. Kessler*, 694 F.3d 161 (2d Cir. 2012), which involved allegations that prosecutors had coerced the plaintiff into making accusations against her boyfriend, former state senator Hiram Monserrate. *See id.* at 165. The district court denied the prosecutors' claim of absolute immunity on the ground that the "conduct in this case [was] more closely linked to the prosecutor[s'] investigative duties [rather] than to [their] role as government litigator[s]." *Id.* at 165 (alternations in original).

The Second Circuit reversed. It observed that "questioning an important witness may accurately be described as investigative," *id.* at 167, but that "not every interview, interrogation, or other act by a prosecutor with the potential of revealing new

12

information is an investigative act" not entitled to absolute immunity.  *Id.* at 166.  It concluded that the "relevant question . . . is whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor."  *Id.*  Investigative acts aimed at "gathering and piecing together . . . evidence for indications of criminal activities and determination of the perpetrators" are not entitled to absolute immunity, the circuit court said, while "investigative acts reasonably related to decisions whether or not to begin or to carry on a particular criminal prosecution, or to defend a conviction" are.  *Id.* at 166.

Citing *Giraldo*, Collins argues that Vecchione's actions towards Oliva, Santos and Diaz were not reasonably—or even colorably—those of an advocate for the state.  *See also Doe v. Phillips*, 81 F.3d 1204, 1211 (2d Cir. 1996) ("[The prosecutor's] conduct was not protected by absolute immunity because his demand that Doe swear to her innocence on a bible in church was manifestly beyond his authority."); *Schloss v. Bouse*, 876 F.2d 287, 291 (2d Cir. 1989) ("A government official does not have absolute immunity for acts that are manifestly or palpably beyond his authority, or performed in the clear absence of all jurisdiction." (citations and internal quotation marks omitted)).  But to the extent he means to argue that the Court must examine whether a reasonable prosecutor could have reasonably thought Vecchione's actions were proper, legally or otherwise, he misreads *Giraldo*.

The Second Circuit has observed that many heinous acts are entitled to absolute immunity:

[T]he falsification of evidence and the coercion of witnesses

13

> . . . have been held to be prosecutorial activities for which
> absolute immunity applies.  Similarly, because a prosecutor is
> acting as an advocate in a judicial proceeding, the solicitation
> and subornation of perjured testimony, the withholding of
> evidence, or the introduction of illegally-seized evidence at
> trial does not create liability in damages.  The rationale for this
> approach is sound, for these protected activities, while
> deplorable, involve decisions of judgment affecting the course
> of a prosecution.

*Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citations omitted).  No reasonable

prosecutor could think it acceptable to submit false evidence or suborn perjury, yet

prosecutorial immunity attaches to such acts.  *Giraldo* explicitly restates the rule that

"absolutely immunity applies to protect the prosecutor even in the face of a complaint's

allegations of malicious or corrupt intent behind the acts."  694 F.3d at 166.

Instead, what *Giraldo* requires is an examination of how a reasonable

prosecutor would view the "generic acts" alleged to have caused the constitutional

violation.  *Id.*  If the acts were undertaken for "a court proceeding in which the prosecutor

acts as an advocate," *Warney*, 587 F.3d at 123, then they are protected by absolute

immunity.

On that inquiry, the only plausible reading of the complaint is that Vecchione

took *all* of the actions he is alleged to have taken to ensure his success at trial.  His conduct

is, therefore, indistinguishable from that set forth in *Taylor*: deplorable (if true), but

nonetheless "intimately associated with the judicial phase of the criminal process." *Imbler*,

424 U.S. at 430; *see also Dory v. Ryan*, 25 F.3d at 83 ("As much as the idea of a prosecutor

conspiring to falsify evidence disturbs us . . . we recognize that there is a greater societal

goal in protecting the judicial process by preventing perpetual suits against prosecutors for

the performance of their duties."); *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995) ("As to [the prosecutor's] failure to turn over Brady material . . . , this omission occurred after the prosecutorial phase of the case had begun and therefore is protected as a discretionary advocacy function.").

Collins argues that another recent Second Circuit case, *Flagler v. Trainor*, 663 F.3d 543 (2d Cir. 2011), shows that at least some of Vecchione's alleged conduct did not serve a prosecutorial function.  In *Flagler*, the circuit court upheld a claim of absolute immunity by a prosecutor who had allegedly made false statements to obtain a material witness warrant, but had "no trouble concluding that [a prosecutor] is not absolutely immune from allegedly accessing, or ordering someone to access, [the material witness's] voicemail without her consent, or from persuading [the defendant's] ex-wife to record telephone calls with [her.]"  *Id.* at 549-50.  It described the latter actions as "akin to investigatory acts."  *Id.* at 550.  As *Giraldo* subsequently made clear, such acts are not shielded by absolute immunity if they involve "gathering and piecing together . . . evidence for indications of criminal activities and determination of the perpetrators."  695 F.3d at 166.  The conduct alleged here did not involve investigating whether a crime had been committed or who had perpetrated it; rather, it involved prosecuting a crime for which Collins had already been indicted.

In sum, the Court must reluctantly conclude that Vecchione is entitled to absolute immunity for his pre-trial and trial conduct.  Maher and Bondor are entitled "to the same degree of immunity . . . for their activities while assisting with the investigation and prosecution of the case."  *Hill,* 45 F.3d at 660.

Collins points to Vecchione's post-trial conduct—namely, his denial of any wrongdoing in the affirmation submitted in opposition to Collins's state and federal collateral attacks—as an alternative basis for denying him absolute immunity. In *Warney*, the Second Circuit addressed the "vex[ing]" question of prosecutorial immunity in the post-conviction context. The circuit court concluded that "absolute immunity shields work performed during a post-conviction collateral attack, at least insofar as the challenged actions are part of the prosecutor's role as an advocate for the state." 587 F.3d at 123.

Collins argues that *Warney* is confined by its facts to prosecutors who are personally representing the state in collateral proceedings. The Court need not decide how broadly *Warney* should be read because Vecchione's status as a testifying witness in the collateral proceedings also clothes him with absolute immunity under *Briscoe v. LaHue*, 460 U.S. 325 (1983) ("The principles set forth . . . to protect judges and . . . to protect prosecutors also apply to witnesses, who perform a somewhat different function in the trial process but whose participation in bringing the litigation to a just—or possibly unjust—conclusion is equally indispensable."). Collins argues that Vecchione was effectively a *complaining* witness, to whom absolute immunity does not apply. *See Malley v. Briggs*, 475 U.S. 335, 340-41 (1986) (holding that complaining witnesses are not absolutely immune from § 1983 liability because they "were not absolutely immune at common law"). But the Second Circuit rejected an analogous argument in *Sykes v. James*, 13 F.3d 515 (2d Cir. 1993). In *Sykes*, the plaintiff attempted to characterize his parole officer as the complaining witness who had instituted a revocation proceeding. The Second Circuit accepted that characterization, but noted that "the basis of the claim before us today is the affidavit

16

sworn to by [the defendant] in opposition to the amended application for relief in the *habeas* proceeding instituted by [the plaintiff]." *Id.* at 520.   Like the defendant in *Sykes*, Vecchione's affirmation "did not serve to institute" either the state or federal post-conviction proceedings.   He is not, therefore, a "complaining" witness and enjoys absolute immunity for his testimony, even if it was—as it is alleged to have been—perjurious.

### b.  FOIL Defendants

A violation of New York's FOIL does not, standing alone, support a § 1983 claim.   *See P.C. v. McLaughlin*, 913 F.2d 1033, 1045 (2d Cir. 1990) ("[L]iability . . . under § 1983 must be based on a violation of federal constitutional or statutory law, not state law.").[4]   Thus, Collins argues that the FOIL defendants' conduct violated not only FOIL, but his rights under *Brady*.

The FOIL defendants respond that the duty to disclose exculpatory evidence under *Brady* ends at the conclusion of the criminal trial.   Since they first became involved after that point, they argue that Collins has failed to allege a violation of his federal rights.

In support of their argument, the FOIL defendants cite *Ricciuti v. New York City Transit Authority*, 124 F.3d 123 (2d Cir. 1997), for the proposition that the right to a fair trial is implicated only insofar as false inculpatory evidence or undisclosed exculpatory evidence is "likely to influence a jury's decision." *Id.* at 130.   Of course, that is precisely

---

[4]Nor does a violation of FOIL give rise to a private right of action for damages under state law.   *See Burtis v. New York City Police Dep't*, 742 N.Y.S.2d 545, 545 (1st Dep't 2002) ("[M]oney damages are not available for an agency's failure to comply with a FOIL request, relief being limited to an administrative appeal and a CPLR article 78 proceeding.").

what Collins alleges: that disclosure of the circumstances of Oliva's, Santos's and Diaz's testimony would have led to his acquittal.  The defendant in *Ricciuti* was a police officer who had manufactured false evidence;  the circuit court had no occasion to address the liability of those who cover up such conduct following a conviction.

Indeed, it appears that the Second Circuit has not addressed when the duty to disclose preexisting exculpatory evidence under *Brady* ends.  The Seventh Circuit has held, however, that "[f]or evidence known to the state at the time of the trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings."  *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007).  In so doing, it rejected the position "that *Brady* leaves state officials free to conceal evidence from reviewing courts or post-conviction courts with impunity, even if that concealment results in the wrongful conviction of an innocent person."  *Id*.  It noted that *Brady* itself involved a piece of exculpatory evidence that "was withheld by the prosecution and did not come to petitioner's notice until *after he had been tried, convicted, and sentenced, and after his conviction had been affirmed*."  494 F.3d at 638 (quoting *Brady*, 373 U.S. at 84) (emphasis in *Steidl*).

Thus, *Brady* itself refutes the FOIL defendants' claim that the duty it imposes ends with the trial.  *District Attorney's Office v. Osborne*, 557 U.S. 52 (2009), is not to the contrary.  In *Osborne*, the Supreme Court held that *Brady* does not require disclosure of exculpatory evidence—such as DNA testing—that was or could be created after trial.  *See id.* at 68-69.  Since Collins's *Brady* claim involves nondisclosure of evidence in existence at the time of trial, *Osborne* does not apply.  *Cf. Steidl*, 494 F.3d at 629 ("The [pre-*Osborne*] cases

18

on which the [defendants] rely also primarily address the question whether the state has the duty to disclose exculpatory evidence that is discovered after the trial is concluded. For that reason, we see no need to discuss them. Steidl's case is different.") .

The FOIL defendants argue that even if Collins has stated a § 1983 claim against them, they are entitled to absolute immunity. As noted, a prosecutor is entitled to immunity for actions "associated with his function as an advocate." *Dory*, 25 F.3d at 93. Responding to FOIL requests is a task handled by many agencies and is not, therefore, a uniquely prosecutorial function. *See Yarris v. County of Delaware*, 465 F.3d 129, 138 (3d Cir. 2006) ("[A] prosecutor acting merely as a custodian of evidence . . . serves the same non-adversarial function as police officers, medical examiners, and other clerical state employees.").

As noted, however, there can be no § 1983 claim for the alleged FOIL violations unless they also violated the defendants' obligations under *Brady*.[5] In *Van de Camp v. Goldstein*, 555 U.S. 335 (2009), the Supreme Court intimated that tasks that might

---

[5]While the duty imposed by *Brady* is often described as extending to "the government" as a whole, *see, e.g., Youngblood v. West Va.*, 547 U.S. 867, 869 (2006), the information to be disclosed is usually channeled to the prosecutor assigned to a particular case. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ( "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("An individual prosecutor is presumed, however, to have knowledge of all information gathered in connection with his office's investigation of the case."). The Court solicited supplemental briefing as to whether others in a prosecutor's office can be personally liable for *Brady* violations under § 1983; the parties' responses were unhelpful. The Court assumes, without deciding, that *any* prosecutor who has knowledge of material exculpatory evidence is obliged to disclose it on request.

fairly be described as "administrative" in the abstract could become "prosecutorial" – and,

therefore, protected by absolute immunity – if undertaken in connection with *Brady* and

*Giglio* obligations.  The plaintiff in *Goldstein* claimed that the Los Angeles district attorney

and his chief deputy had violated his right to *Giglio* information.  Although those

defendants had not personally prosecuted the plaintiff, they had allegedly failed "to

adequately train and supervise deputy district attorneys on that subject," and "to create

any system" for information sharing.  *Id.* at 344 (internal quotation marks omitted).

The Supreme Court agreed that the plaintiff was "attack[ing] the office's

administrative procedures," *id.*, and assumed *arguendo* that "*Giglio* imposes certain

obligations as to training, supervision, or information-system management."  *Id.*  It

nevertheless held that "prosecutors involved in such supervision or training or

information-system management enjoy absolute immunity from the kind of legal claims

at issue here."  *Id.*  It reasoned as follows:

> [Goldstein's] claims focus upon a certain kind of
> administrative obligation—a kind that itself is directly
> connected with the conduct of a trial.  Here, unlike with other
> claims related to administrative decisions, an individual
> prosecutor's error in the plaintiff's specific criminal trial
> constitutes an essential element of the plaintiff's claim.  The
> administrative obligations at issue here are thus unlike
> administrative duties concerning, for example, workplace
> hiring, payroll administration, the maintenance of physical
> facilities, and the like.  Moreover, the types of activities on
> which Goldstein's claims focus necessarily require legal
> knowledge and the exercise of related discretion, e.g., in
> determining what information should be included in the
> training or the supervision or the information-system
> management.  And in that sense also Goldstein's claims are
> unlike claims of, say, unlawful discrimination in hiring
> employees.  Given these features of the case before us, we

believe absolute immunity must follow.

*Id.*

The Second Circuit followed *Goldstein* in *Warney*: "The Supreme Court recently taught us that a prosecutor enjoys absolute immunity even when doing an administrative act if the act is done in the performance of an advocacy function." 587 F.3d at 124. The circuit court held the challenged act—delay in the disclosure of exculpatory DNA testing conducted during a collateral proceeding—"could be seen as administrative or investigative," but was "also integral to the overarching advocacy function of dealing with post-trial initiatives challenging an underlying criminal conviction." *Id.*

What the Supreme Court and Second Circuit have implied, the Seventh Circuit has recently made explicit: "*Brady* and *Giglio* duties are functionally prosecutorial—they are intimately related to the judicial phase of the criminal process." *Fields v. Wharrie*, 672 F.3d 505, 513 (7th Cir. 2012). Thus, "[o]nce a defendant is indicted, the disclosure obligation and the due process in question correspond to his trial rights, and a prosecutor's failure to uphold that obligation, in the form of suppression, coincides with his prosecutorial function." *Id.*

The Court finds that reasoning persuasive here. The FOIL defendants' duty to respond to requests might correctly be called "administrative" in some general sense, but Collins seeks to elevate that duty—as he must for a § 1983 claim—to a federal constitutional obligation under *Brady*. *That* duty entails a uniquely prosecutorial function

and, therefore, must be protected by absolute immunity.[6]

## B. *Monell* Claims Against the City (Eighth and Ninth Causes of Action)

Section 1983 does not make municipalities vicariously liable for the constitutional violations of their employees. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993) (citing *Monell*, 436 U.S. at 691). Thus, "a municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury." *Id.*

A municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (internal quotation marks omitted). Thus, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). "The operative inquiry is whether [the] facts

---

[6]It is true, of course, that police officers are under a constitutional obligation to disclose exculpatory evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 56–58 (1988). But that duty requires disclosure to the prosecutor, *see Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992), who then becomes "the final arbiter[] of the government's obligation to ensure fair trials," *Kyles*, 514 U.S. at 438, by responding to a defendant's request for such evidence. Thus, while police officers may be complicit in *Brady* and *Giglio* violations, the disclosure of exculpatory evidence *to the defendant* is, ultimately, unique to prosecutors. *See Wharrie*, 672 F.3d at 514 ("Allowing a police officer to be sued for his role in eventually causing the prosecutor to violate *Brady* or *Giglio* does not alter the nature of the violation.").

demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Amnesty Am.*, 361 F.3d at 128).

   A claim of deliberate indifference—and, hence, municipal liability—is often characterized as a "failure to train" claim. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (describing the requirements of the claim). But "[a]nother method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty Am.*, 361 F.3d at 126; *see also Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("[D]eliberate indifference may be inferred if the complaints [of wrongdoing] are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.").

   Collins contends that the City is liable under *Monell* in two distinct ways. First, he argues that Hynes, as head of the KDCA, ratified Vecchione's illicit tactics. Second, he argues that the NYPD failed to train its officers regarding their *Brady* obligations and the impropriety of coercing witnesses to provide false inculpatory evidence. The Court addresses each in turn.

### 1. *Hynes*

With respect to Hynes, Collins focuses on a ratification theory. He alleges that Hynes took no disciplinary action against Vecchione—and, indeed, continued to praise him—even after Judge Irizarry granted *habeas* relief. While the City does not dispute that Hynes is a municipal policymaker for matters concerning the KCDA, it argues that after-the-fact events shed no light on the existence of a prior policy of acquiescence. The Second Circuit has never addressed that argument, but several circuits have expressly held that a policymaker's response to constitutional violations can support an inference that the violation conformed to a preexisting policy.

In the seminal case of *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985), the Fifth Circuit held that "[t]he disposition of the policymaker may be inferred from his conduct after the events [giving rise to the constitutional violation]." *Id.* at 171. It reasoned as follows:

> Following this incompetent and catastrophic performance [by police officers], there were no reprimands, no discharges, and no admissions of error. . . . If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do . . . was not acceptable to the police chief, changes would have been made. . . . This reaction to so gross an abuse of the use of deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force.

*Id.* The First and Ninth Circuit have followed *Grandstaff*'s logic. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that

post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").

The Court is likewise persuaded. Subsequent events may, as the City argues, reflect only Hynes's support for a subordinate accused of wrongdoing. But the lack of any corrective action might also reflect a tacit policy on Hynes's part to condone whatever his subordinates deemed necessary to secure a conviction. Collins is, for now, entitled to the latter inference. *See Amnesty Am.*, 361 F.3d at 113 (noting the difference between plaintiff's burden at the pleading stage and the burden after an opportunity for discovery).

In any event, Collins's theory does not hinge solely on Hynes's response to an isolated incident. He further alleges that despite scores of cases involving *Brady* violations and other prosecutorial misconduct, Hynes has never disciplined an assistant for such misconduct, even after the violations were confirmed by court decisions. The City claims that the prior instances of misconduct were not precisely the same as those alleged by Collins. Those differences might lead a jury to agree that there was no underlying policy connecting each incident. But the Court's role at this stage is to determine whether Collins has alleged facts that support a plausible theory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The Court concludes that Collins's allegations regarding Hynes's response—or lack thereof—to misconduct by Vecchione and other assistants make plausible his theory that Hynes was so deliberately indifferent to the underhanded tactics

that his subordinates employed as to effectively encourage them to do so.[7]

## 2. *NYPD*

With respect to the NYPD, Collins advances a failure to train claim under *City of Canton*. He alleges that at the time of his arrest, the department "provided *no* training concerning proper interrogation methods with cooperating witnesses and officers' *Brady* obligations." Compl. ¶ 429. He also cites a list of court decisions and settlements that should have put the department on notice that officers were failing to disclose *Brady* material and engaging in other misconduct. *Id.*, Ex. G & H. In particular, he cites *Zahrey v. City of New York*, 2009 WL 54495 (S.D.N.Y. Jan. 7, 2009), in which Judge Pogue denied summary judgment to officers in NYPD's Internal Affairs Bureau who were alleged to have used coercive tactics to secure inculpatory testimony of "at best . . . questionable veracity." *Id.* at *10. Finally, Collins relies on the "Mollen Report," a 1994 report on corruption in the NYPD that updated the findings of the "Knapp Report" of 1972.

Like this case, *Walker* dealt with allegations that the NYPD failed to adequately train its officers "not to commit perjury or aid in the prosecution of the innocent." 974 F.2d 293, 299. The Second Circuit observed a potential problem with that theory:

> Walker's argument misses a crucial step. It is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens. . . . *City of Canton* [*v. Harris*, 489 U.S. 378 (1989),] also requires a likelihood that the failure to train or supervise will result in the

---

[7]Hynes himself is not named as a defendant and would, in any event, be entitled to the same absolute immunity that protects Vecchione.

26

> officer making the wrong decision.   Where the proper
> response — to follow one's oath, not to commit the crime of
> perjury, and to avoid prosecuting the innocent — is obvious to
> all without training or supervision, then the failure to train or
> supervise is generally not so likely to produce a wrong
> decision as to support an inference of deliberate indifference by
> city policymakers to the need to train or supervise.

*Id.* at 299-300 (internal quotation marks omitted).  It held, however, that a failure to train would amount to deliberate indifference if policymakers continued to assume that their employees would exercise common sense "where there is a history of conduct rendering this assumption untenable."  *Id.* at 300.  Although the plaintiff had not "expressly alleged a history of police perjury," the circuit court reinstated his complaint because it did "not appear beyond doubt that Walker cannot prove this set of facts in support of his claim which would entitle him to relief."  *Id.* (internal quotation marks omitted).

Since Collins's complaint is governed by *Iqbal*, it is subject to a higher standard than the Second Circuit applied in *Walker*.  He must allege, not only a viable theory, but facts that render the theory plausible.  In that regard, allegations of *Brady* violations are unhelpful.  Better training as to what *Brady* requires might increase officer awareness of what information must be disclosed to prosecutors, but it could not plausibly have prevented the egregious conduct alleged here because Vecchione, according to the allegations, was well aware of what Gerecitano and Hernandez had done to secure Oliva's testimony.

Further, the Court agrees with the City that the litany of other police-misconduct cases are insufficient to make a plausible case for *Monell* liability.  The cases either involve *Brady* violations, post-date Collins's conviction, or involve something less

(settlements without admissions of liability and unproven allegations) than evidence of misconduct.

Zahrey, by contrast, involves actual evidence of analogous misconduct during the relevant time frame.  But the wrongdoing in Zahrey occurred, as noted, in the Internal Affairs Bureau.  Without more, the Court would be hard-pressed to conclude that two incidents in two completely separate units within the NYPD were sufficient to plausibly establish the City's deliberate indifference.

The Mollen Report, however, establishes — at least for present purposes — that the misconduct underlying this case and Zahrey was sufficiently widespread to support an inference of deliberate indifference.  An entire section of the Report is devoted to "Perjury and Falsifying Documents," which is described as "a serious problem facing the Department."   Mollen Report at 36.[8]   It describes testimonial and documentary perjury — "as when an officer swears falsely under oath in an affidavit or criminal complaint" — as "probably the most common form of police corruption facing the criminal justice system today, particularly in connection with arrests for possession of narcotics and guns."  Id.  Finally, it notes that "[s]everal officers . . . told us that the practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: 'testilying.'" Id.

Of course, the Report's findings are not conclusive.  But they at least make

_____

[8]The full text of the report is available at http://www.parc.info/client_files/ Special%20Reports/4%20-%Mollen%20Commission%20-%NYPD.pdf         (last visited Feb. 14, 2013).

it plausible that the type of misconduct that led to Collins's arrest and prosecution was endemic within the NYPD. A jury could reasonably infer from that circumstance, if proven, that the department's policymakers were aware of a serious risk of constitutional violations, and that the failure to take any action in response to the problem—whether through training or otherwise—was the result of deliberate indifference.

## C. State-Law Claims Against the Individual Defendants (First, Second and Fourth Causes of Action)

Prosecutors' immunity under state law is identical to their immunity under § 1983: "District Attorneys are immune from civil liability for activities 'intimately associated with the judicial phase of the criminal process,' meaning 'initiating a prosecution and in presenting the State's case.'" *Johnson v. Kings County District Attorney's Office*, 763 N.Y.S.2d 635, 640 (2d Dep't 2003) (quoting *Imbler*, 424 U.S. at 430–31). Thus, for the reasons stated above, Vecchione, Maher, Bondor and the FOIL defendants are entitled to immunity from all of Collins's state-law claims.

Hernandez and Gerecitano have not invoked immunity. Nor do they argue that Collins has failed to state claims for malicious prosecution, intentional infliction of emotional distress and, with respect to Hernandez, fraud.

## D. State-Law Claims Against the City (First, Second, Fourth and Tenth Causes of Action)

### 1. Vicarious Liability

Unlike § 1983, New York law makes a municipality vicariously liable for the torts of its employees. Because its liability is vicarious, however, a municipality is not liable if the employee directly responsible for the tort is entitled to absolute immunity. *See,*

*e.g.*, *Calderon v. County of Westchester*, 489 N.Y.S.2d 242, 243 (2d Dep't 1985) ("Since the Assistant District Attorney is not subject to suit, neither is the County of Westchester."). Therefore, the City cannot be held vicariously liable for the actions of Vecchione, Bondor, Maher or the FOIL defendants.

In addition, New York public policy "bars claims sounding in intentional infliction of emotional distress against a governmental entity." *Lauer v. City of New York*, 659 N.Y.S.2d 57, 58 (2d Dep't 1997). Thus, as far as vicarious liability is concerned, the only vicarious liability the City faces is for the malicious prosecution claim against Gerecitano and Hernandez and the fraud claim against Hernandez.

## 2. *Negligence*

In addition to vicarious liability, however, Collins alleges that the City is liable for its own negligence in the hiring, training and supervision of those responsible for his wrongful conviction and imprisonment. The City cites *Newton v. City of New York*, 681 F. Supp. 2d 473 (S.D.N.Y. 2010), for the proposition that "a claim for negligent hiring or supervision can only proceed against an employee acting outside the scope of her employment." *Id.* at 488 (citations and internal quotation marks omitted). The rationale for the rule is that a cause of action for negligent hiring is superfluous because an employer will be vicariously liable for employees acting within the scope of their employment.

Because the case is before the Court on a pre-answer motion to dismiss, it is not yet established whether the City will take the position that the various individual defendants were acting within or outside the scope of their employment. *Cf. Rossetti v. Board of Educ.*, 716 N.Y.S.2d 460, 461-62 (3d Dep't 2000) (affirming dismissal because "the

School District [had] stipulated that Marshall was acting within the scope of her employment").  Therefore, dismissal of Collins's negligence theory as superfluous to his vicarious liability theory would be premature.

### III

To summarize:

On Collins's federal claims, the motion to dismiss the § 1983 claim is granted as to all individual defendants except Hernandez and Gerecitano.  The motion to dismiss the *Monell* claims against the City is denied, as to both the theory that Hynes was deliberately indifferent to Vecchione's conduct, and the theory that the NYPD's lack of training amounted to deliberate indifference to the actions of Gerecitano and Hernandez.

On Collins's state-law claims, the motion to dismiss is granted as to all individual defendants except Hernandez and Gerecitano.  It is further granted as to the intentional infliction of emotional distress claim against the City, but denied as to the negligent hiring, training and supervision claim against the City.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
February 15, 2013