1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3    ----------------------------------X
                                       :
4    JABBAR COLLINS,                   :   11-CV-766 (FB)
                                       :
5                   Plaintiff,         :
                                       :
6              v.                      :
                                       :   Brooklyn, New York
7    THE CITY OF NEW YORK, et al.,     :   March 21, 2013
                                       :
8                   Defendants.        :
     ----------------------------------X
9

10            TRANSCRIPT OF CIVIL CAUSE FOR HEARING
             BEFORE THE HONORABLE ROBERT M. LEVY
11               UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13

     For the Plaintiff:        JOEL B. RUDIN, ESQ.
14                             Law Offices of Joel B. Rudin
                               200 West 57th Street
15                             New York, New York 10019

16

     For the Defendants:       ARTHUR G. LARKIN, ESQ.
17                             New York City Law Department
                               100 Church Street
18                             New York, New York 10077

19

20
     Court Transcriber:        SHARI RIEMER
21                             TypeWrite Word Processing Service
                               211 N. Milton Road
22                             Saratoga Springs, New York  12866

23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1   (Proceedings began at 12:13 p.m.)

2   (Conference recorded via telephone - some inaudibility.)

3            THE COURT: Hello.  Thank you for waiting.  We're

4   here on Docket Number 11-CV-766, <u>Collins v. City of New York,</u>

5   <u>et al.</u>

6            Will counsel please state their appearances for the

7   record?

8            MR. RUDIN:  Plaintiff Joel Rudin and Terri

9   Rosenblatt.  Good afternoon, Your Honor.

10           THE COURT: Good afternoon.

11           MR. LARKIN:  Your Honor, for the defendants Arthur

12   Larkin, L-A-R-K-I-N, for the City of New York.  My co-counsel

13   Elizabeth Krasnow normally would be joining us but she's not

14   available.  So it's just me.

15           THE COURT: Thank you.  I just completed a hearing in

16   another case so I just want to make sure that the record is --

17   is everything picking up right now?

18           THE CLERK: Yes.

19           THE COURT: Great.  Good.  So let's just get an

20   agenda for this conference.  The primary focus of this

21   conference from my perspective is on the privilege log and the

22   motion to compel documents that the defendants asserted

23   privilege for.  So anything else that we need to deal with?

24

25   Yes, Your Honor.  There are a number of issues that relate to

1   the document requests that the two sides have exchanged and

2   concerning some initial depositions that we'd like to take and

3   also the issue of -- there's a sealing issue that's arisen and

4   also the question about whether or not we could take a

5   deposition of Mr. Hines.  So we just wanted to -- I just

6   wanted to bring to your attention these issues at some point

7   during this conference so that Your Honor could either decide

8   or give us some guidance on how you think they should be

9   handled.

10          THE COURT: Okay.  Mr. Rudin?

11          MR. RUDIN: Should I begin?

12          MR. LARKIN:  Yes, Your Honor, I'm sorry.  I was

13  saying we've -- this is Arthur Larkin speaking.  Mr. Rudin and

14  I have conferred and Ms. Krasnow and Mr. Rosenblatt as well.

15  All four of us have conferred at some length over the last

16  couple of days and I think we've isolated a few issues that

17  have come up and we've also -- I think we needed a schedule

18  to -- we the City -- I need to confer with the DA's office

19  about some of the document requests before I can take a firm

20  position on some of them and since I'm going to be out all

21  next week I was going to suggest getting back to Mr. Rudin at

22  some point the week of April 1st so that if there are open

23  issues we could have briefing prior to the April 17th

24  conference and we were discussing some dates, some interim

25  deadlines and I believe that plaintiff wanted a quicker

4

1  schedule than we were going to suggest.  So maybe that would

2  one sort of one area to consult about with the court as well

3  today.

4          THE COURT: So, Mr. Larkin, sealing issues, Hines

5  deposition and scheduling?

6          MR. LARKIN: Yes, that's pretty much it.  The

7  deposition I don't think we have a dispute.  I think we --

8  plaintiffs have said he wanted to take four witnesses before

9  April 30th and subject to those witnesses schedules -- we need

10  to confer with those witnesses so subject to their schedules

11  we'd agree -- we'd certainly agree to do that, make every

12  effort to meet the -- to get them produced by that day.  We

13  represent three of them.  We don't represent one.  So whatever

14  that witness' availability is it is but we'll make ourselves

15  available for an April 30th cutoff for those four deps.

16          THE COURT: Mr. Rudin, does that solve your problems

17  about your depositions?

18          MR. RUDIN: Yes, I could make a record of who they

19  are or if you don't think that's necessary then I can rely on

20  Mr. Larkin's position which he just stated.

21          THE COURT: You can tell me who they are if you have

22  it off the top of your head.  If not I'm sure the two of you

23  will agree.

24          MR. RUDIN: Isua Franconia [Ph.], the trial original

25  prosecutors and Basunda [Ph.] who is ADA who was involved in

5

1   the earlier stages of the investigation, the prosecution,

2   Monique Ferrell [Ph.] who handled the 440 motion and the

3   habeas proceedings from 2006 until at some point in 2010.

4   Isen Newman who was a paralegal in the DA's Office during the

5   investigation and prosecution of the Collins case.

6           MR. LARKIN: And -- I'm sorry.

7           MR. RUDIN: I just add that Mr. Larkin will be

8   representing all but Isua Franconia who already has separate

9   counsel and we noticed her deposition previously and I'll be

10  in touch with her attorney just to work out dates that are

11  acceptable to everybody.

12          MR. LARKIN: And, Your Honor, forgive me for

13  interjecting one thing.  I do know that Mr. Basunda and

14  Monique Ferrell still work at the DA's Office and we will

15  represent those witnesses at the deposition.  I'm not sure

16  about Ms. Newman.  I just don't know if she still works there.

17  If she does then it will be easy.  We'll represent her and if

18  she doesn't we'll certainly make every effort to find her.

19          MR. RUDIN: I have some information of where she

20  resides.  I think it's in New Jersey but I'll provide that to

21  Mr. Larkin.  Mr. Larkin, can I assume that -- should I deal

22  with her through you?

23          MR. LARKIN: I'd appreciate that, yes.

24          MR. RUDIN: All right.  But you'll make her available

25  on a date that works for everybody?

6

1          MR. LARKIN: I'll reach out to her and let her know

2    what the situation is and if she feels that she needs her own

3    lawyer then we'll have to deal with that but assuming that she

4    is willing to accept representation from us then that's fine

5    with me.

6          THE COURT: So does that take care of the deposition

7    issue?  I assume that takes care of the deposition issue;

8    correct?

9          MR. LARKIN: I believe so.

10          MR. RUDIN: Your Honor, this is Joel Rudin.  I agree

11   with that, yes.

12          THE COURT: Okay.  Now the Hines deposition.  He's a

13   pretty major player here.  Mr. Larkin, what would be the

14   reason not to depose him?

15          MR. LARKIN: I think generally what the case law

16   says, Your Honor, is that in cases like this where a policy

17   maker's decisions are at issue the plaintiff has to depose

18   others in the office to get whatever information is needed

19   before you get to the question even whether to depose the

20   policy maker.  If plaintiff were to depose one or more high

21   ranking witnesses in the office, maybe the chief assistant,

22   the first assistant -- it could be others.  I'm not sure.  And

23   if you exhaust those areas, those avenues rather and you still

24   have open questions that only the policy maker can answer then

25   you might have to produce the policy maker but I believe that

7

1   in cases like this commissioners, DA's and the heads of

2   agencies normally are not produced unless there's no other way

3   to get the information that's needed for the case.

4           THE COURT: Aren't there factual issues involving the

5   district attorney here in this case as to -- well, there were

6   some allegations made in Mr. Rudin's letter about specific

7   conduct by Mr. Hines with respect to investigations of some of

8   the conduct of his ADA's and his -- well, specifically how he

9   handled this case, that he was personally involved at least

10  after a certain point.  Does that -- first of all, am I

11  correct in my recollection and secondly, if so, does that

12  affect your view of the case law?

13          MR. LARKIN: I don't specifically recall what is

14  alleged but assuming for the purposes of argument that that's

15  what the allegation is I would still say that testimony by

16  others could establish whether Mr. Hines was involved and what

17  he said and what he did and whether a deposition of him would

18  be necessary to shed further light on the issues in the case.

19  In cases like this when, for example -- I mean we've had cases

20  involving the DOC where the commissioner's deposition is

21  sought, we have cases where Commissioner Kelly's deposition is

22  sought, cases where DA Johnson, his deposition is sought and I

23  believe that Mr. Rudin actually in one case did take DA

24  Johnson's deposition if I'm not mistaken.  But typically in

25  those cases we always leave that deposition until the very end

8

1   until all the others are done and even though -- even if the

2   policy maker may have had some involvement if others can shed

3   light on what was said and done and you don't need the -- you

4   may not need the policy maker himself to put aside duties and

5   come in and be deposed.

6           So ordinarily we revisit that issue toward the end

7   of discovery and I would just suggest that plaintiff ought to

8   exhaust whatever other witnesses there are and he can then

9   take another look at Hines' deposition if that's needed.

10          MR. RUDIN: Your Honor, may I be heard?

11          THE COURT: Of course

12          MR. RUDIN: This is an extraordinarily unusual case

13  where we already know that Mr. Hines was personally involved

14  in the Jabbar Collins case.  When we filed our 440 motion in

15  2006 we moved to disqualify the entire District Attorney's

16  Office because Mr. Vecchione was the most powerful prosecutor

17  in the office and we allege that nobody could objectively

18  investigate him and also he was investigating the entire

19  Brooklyn judiciary on allegations of buying judgeships and

20  that the case should be moved out of Brooklyn.

21          So not only did the District Attorney's Office

22  oppose both of those applications successfully Mr. Hines never

23  signed Monique Ferrell who was the deputy of Mr. Vecchione.

24  She was counsel to the Rackets Bureau, counsel to Mr.

25  Vecchione, and had been involved in a number of high profile

1    cases [inaudible] co-counsel.  That's who Mr. Hines assigned

2    to investigate our allegations and then when Judge Irizarry

3    told her that she had to get off the case because she was

4    going to have to testify about an alleged coverup of the

5    misconduct then Mr. Hines assigned Kevin Richardson who also

6    was a subordinate of Mr. Vecchione's in the Civil Rights

7    Bureau and she reported directly to Mr. Vecchione and had also

8    been co-counsel with Monique Ferrell and Vecchione in a number

9    of high profile cases.

10            Following the habeas proceedings Mr. Hines -- during

11   the habeas proceedings we know that Mr. Hines is personally

12   involved in determining what to do in the Jabbar Collins case.

13   He directed Mr. Richardson to relay [inaudible] statement on

14   the date that the case was dismissed defending Mr. Vecchione

15   and the office for doing nothing wrong and then Mr. Hines made

16   a number of public statements which Judge Block alluded to and

17   argued ratification of the misconduct and evidence that he had

18   an unlawful policy all along.

19            So there's personal involvement in the Collins

20   matter but in addition we've alleged in the complaint that we

21   intend to prove that he was personally involved in approving

22   or ratifying this conduct that occurred in a number of other

23   Brady violation cases, one of them the Leda case where he

24   wrote letters to various political figures who had asked him

25   about whether or not Leda had been wrongfully convicted and he

1   said that he personally went to the scene of the crime, he

2   personally reviewed the case and there were no Brady

3   violations and there was no other misconduct and he should

4   serve every day of his sentence and a number of years later

5   the Second Circuit granted a habeas based on the series of

6   Brady violations and called the argument by the District

7   Attorney ridiculous.

8           In addition to that, I deposed counsel to Mr. Hines,

9   Dino Amaroso, in another lawsuit, Zari v. City of New York.  I

10  took the deposition in 2005 and I asked Mr. Amaroso and I

11  believe we provided copy of this to Mr. Larkin.  I don't

12  know -- it was just yesterday so you may not have had a chance

13  to review it yet but I asked Mr. Amaroso what was the

14  procedure at the Brooklyn District Attorney's Office to

15  investigate prosecutors who had been -- who likely were

16  engaged in this conduct and to discipline them if ever, and

17  his testimony was that the procedure, there was nothing

18  written, there was nothing formal, there was no manual.  The

19  informal procedure was that where there was a possible

20  inference of prosecutorial misconduct that Mr. Hines would

21  personally decide whether or not to have the office conduct an

22  investigation and at the end of the investigation he would

23  personally decide whether or not to impose any discipline.

24          So meanwhile in our complaint we attached a list of

25  more than 50 cases, 10 of which we've decided not to use, and

1   we've informed Mr. Larkin of that but there are 40 cases plus

2   another handful of cases that we also uncovered that we

3   provided notice to the City of.  So total of about 45 or 50

4   cases where courts found misconduct by Assistant District

5   Attorneys in which we believe there was no discipline imposed.

6   Since Mr. Hines was the one who personally made the decision

7   in every case whether or not to investigate or to impose

8   discipline then we believe we're entitled to question him

9   about what he did in each case and why.  And it's not

10  sufficient to put up some other subordinate who does not have

11  that authority when we already know what the system was and

12  that the buck stopped with Mr. Hines in every case and where

13  we know that he was so deeply involved in the Jabbar Collins

14  case and in other cases where there were Brady violations.

15  So --

16          THE COURT: Let me just tell you what I'm thinking at

17  this point and if we need to brief it we will.  But I'm going

18  back to Judge Block's decision because it is the law of the

19  case and he starts with looking at Monell and obviously we all

20  agree and understand that a municipality is -- can only be

21  held liable if there's a municipal policy or custom that

22  caused the constitutional injury.  In Connick v. Thompson, the

23  case where the court did not find, the Supreme Court did not

24  find there was a municipal policy, the court did say that

25  where a policy making individual exhibits deliberate

1   indifference to constitutional deprivations caused by

2   subordinates such that the official's inaction causes a

3   deliberate choice that acquiescence may be properly thought of

4   as a city policy or custom that's actionable under Section

5   1983, and they cite the Amnesty America case.  Then this court

6   said the operative inquiry is whether the policy maker's

7   inaction was a result of conscious choice and not mere

8   negligence.

9           So Judge Block in making his ruling on the summary

10  judgment motion said that there were two possible ways in

11  which the City could be liable under Monell, and the first one

12  is the one that's relevant here although District Attorney

13  Hines is immune himself personally from liability as the

14  theory -- the plaintiff's theory is that as District Attorney

15  he ratified Vecchione's elicit tactic and that's on Page 23 of

16  Judge Block's decision.

17          MR. LARKIN:  Page 23, I'm sorry.  I'm just pulling

18  it up, Your Honor.  I'm just trying to follow.

19          THE COURT: And the court ruled that after the fact

20  evidence is relevant as well as evidence -- well, after the

21  fact evidence is relevant and he cites a Fifth Circuit

22  decision Granstaff that the failure to reprimand, fire, admit

23  error, et cetera after gross violations sheds light on or

24  reflects a tacit policy on the part of the policy maker to

25  condone whatever his subordinates deemed necessary to secure

1   conviction.

2          The City obviously says -- disputes that.  What

3   Judge Block said was yes, we've got on one hand the plaintiff

4   saying that DA Hines was actively involved, deliberately

5   indifferent rather than negligent in what he was doing and the

6   City says no, absolutely not.  It's just a [inaudible] set

7   forth for a subordinate accused of wrongdoing among other

8   things.  What Judge Block said was the jury is going to have

9   to decide this unless another motion is filed and there's a

10  clear answer [inaudible].  What he specifically said was that

11  the plaintiff is entitled to develop this theory after the

12  fact evidence.  And on emphasis on both, entitled to develop a

13  theory and after the fact evidence.

14         So as I read that decision and as I read the Supreme

15  Court cases I think it would be very difficult not to allow

16  the plaintiff to depose the District Attorney in this case.

17  There's just too much -- there are too many facts that have

18  been alleged in this case that Judge Block believes are

19  critical to both sides developing the case not to permit him

20  to be deposed.

21         Now, I assume, Mr. Rudin, that you would depose him

22  after you depose the others, the people who are subordinates.

23  Is that right?

24         MR. RUDIN: Basically, yes.

25         THE COURT: So after you have deposed these others if

1   you still want to depose him, which I assume you will, I'll

2   give Mr. Larkin an opportunity to say why it's not necessary

3   but I think it's going to be very difficult -- that's going to

4   be a hard position for the City to take in view of the facts

5   of this case and of Judge Block's decision in the summary

6   judgment motion.

7         MR. LARKIN:  I'm not intending -- I don't know that

8   I will be deposing his -- other members of his executive staff

9   who would the City might prefer that I depose because my

10  experience in other cases like this is it's just a waste

11  because everyone defers to the District Attorney.

12        THE COURT: Well, I'm not telling you you have to.

13  What I'm -- and I'm not making a ruling here, Mr. Larkin. I 'm

14  just giving you my reason at this point of where I'm intending

15  to go in case that might help you.

16        MR. LARKIN: I understand.  The only thing I suggest

17  is that -- I realize there are facts alleged in the complaint,

18  questions whether the allegations have any real grounding,

19  whether they have any basis in fact.  For example, I believe

20  counsel just stated that Mr. Hines assigned Monique Ferrell to

21  handle the -- to handle the habeas petition and that his

22  office opposed the motion to disqualify the DA and the entire

23  Kings County judiciary.  The DA opposing a motion like that is

24  no surprise and I can't imagine that DA Hines had to be

25  consulted for any length of time in connection with opposing a

1  motion like that.  So the suggestion that somehow that motion

2  which was made by Mr. Collins warrants a deposition of the

3  District Attorney in this case, an elected official, it just

4  doesn't hold any water.  There's nothing to it.

5          THE COURT: I hear what you're saying but Judge Block

6  did say that the failure to reprimand, fire or admit error

7  after gross violations sheds light on a policy and based on

8  the facts that were before him in the summary judgment motion

9  he felt that this claim, the Monell claim should go forward

10  and specifically that the District Attorney's involvement was

11  critical there.  So that's what I'm saying.  I think we should

12  not get lost in the trees and we should look at the forest

13  here.

14          I'm not going to make a final decision until after

15  Mr. Rudin says he's taken all the depositions he needs to take

16  but I'm just telling you at this point based on what I've seen

17  and Judge Block's decision I do believe that it's going to be

18  necessary to depose -- to permit the plaintiff to depose the

19  District Attorney.

20          MR. LARKIN: I understand, Your Honor.  We of

21  course -- I'll report back to my client about all this and we

22  can -- we will have an opportunity though as I understand it

23  to put papers in to make an appropriate argument when we get

24  there.

25          MR. RUDIN: Of course.  But it will be expedited.  I

1   don't want this to delay the case too much.

2          MR. LARKIN: I understand.  That's why I raise this

3   now because --

4          THE COURT: Sure.

5          MR. LARKIN:  -- I'm hoping that we can resolve this

6   not too far in the future so that it doesn't end up delaying

7   the case.

8          THE COURT: Right.  That's why I'm raising it now too

9   so that both sides understand where I'm headed and I believe

10  that it's very consistent with Judge Block's ruling.

11         Now getting into the privilege log and the privilege

12  issues.  There are -- obviously I haven't had a chance to go

13  through all these documents yet.

14         MR. LARKIN: Yes, Your Honor, there are a great many

15  of them.

16         THE COURT: So let me tell you how I handle privilege

17  issues and specifically why I asked you to submit everything.

18  First, I wanted to just see the scope of the review and the

19  kinds of evidence or documents that would be produced.  But

20  the other thing I want to do is I need to know a few things

21  before I can resolve this privilege issue.  The first is, and

22  I know that this is -- you didn't have a lot of time to

23  prepare this but the documents that were presented aren't

24  numbered in any particular way to correspond to the privilege

25  log.  Now I assume that by going through them which -- I've

17

1   looked at some them -- I could figure out what's what but

2   that's -- I want to be sure that I'm looking at the document

3   that corresponds to the privilege log.

4          MR. LARKIN: Your Honor, each of the documents has

5   got, I believe should have a Bates number on it and our

6   privilege log -- for example, I don't have it in front of me

7   but Document Number 1 there's a description of documents and

8   then there's a series of Bates numbers and an assertion of

9   privilege and that the Bates numbers -- the documents are in

10  Bates number order.  So if the document -- if Item 1 on the

11  privilege log happens to be Bates Number 3400 if you would

12  look throughout the documents we submitted and you come to

13  number 3400 that's the document that we're -- that's

14  identified in that entry of the privilege log.

15          Now, if it's easier for the court, if you want me to

16  have a paralegal go through the log again and make sure -- and

17  create a --

18          THE COURT: No, not yet.

19          MR. LARKIN:  -- documents that's in order --

20          THE COURT: No.

21          MR. LARKIN: In order of the log, would that be

22  easier?

23          THE COURT: Well, I'm assuming right now that it is

24  in order with the privilege log.  Is that correct or are these

25  documents not in the order of the privilege log?

18

1          MR. LARKIN: No, they're not in order of the log.

2     They're in Bates number order so they start with the lowest

3     Bates number.

4          THE COURT: Let me just ask you a question before you

5     say that.  I'm holding them in my hand now and I have your

6     privilege log in front of me.

7          MR. LARKIN: Okay.

8          THE COURT: Number 1, undated handwritten notes by

9     Kings County DA, Assistant DA and then in front it says Doc ID

10    Numbers 3, 157 and 693, et cetera, et cetera.  So the first

11    one actually is Number 3.  That's the one --

12         MR. LARKIN: Right.  That's because that happens to

13    be the lowest Bates number and that's the first -- that's the

14    first document.  So the Doc ID number is really the Bates

15    numbers.  The same thing.  Sorry that wasn't clear, Your

16    Honor.  So all those Doc ID numbers are the same numbers that

17    are on the log are on the documents, identify the documents.

18    So let me just pull up the log here.

19         THE COURT: So Number 1 and Number 2 are the lowest

20    and Number 1 and Number 2 correspond to the first two

21    documents you gave me but the third document is actually

22    Number 4 on the privilege log.  Then it's going to be a

23    little bit confusing to figure out what's what I think.

24         MR. LARKIN: Would it be easier -- I will absolutely

25    be happy to have our paralegals put together a set in the

19

1   order of -- in the order in which they appear in the privilege

2   log if that would be easier.

3        THE COURT: Let's go through some of the other issues

4   and then we'll figure out where to go on this.

5        The next thing is that -- and I know you didn't have

6   a lot of time for this but my request was that the documents

7   be produced with highlighting the parts of the documents that

8   you believe are privileged.  I'm assuming that you don't think

9   that all of -- each one of these documents is privileged and

10  because you know the documents better than I do it's -- I'm

11  not going to be the one who's going to figure out what you

12  think is privileged in these documents.  Am I missing

13  something here?

14       MR. LARKIN: I think that --

15       THE COURT: I mean --

16       MR. LARKIN: If there's actually handwritten notes on

17  habeas motion I thought that the log would be clear enough to

18  indicate what was privileged.  If that's not the case, Your

19  Honor, then we will go through these again and highlight what

20  needs to be highlighted.  I think -- if it says undated

21  handwritten notes and there's a full page of notes the

22  privilege would apply to the entire document.  I think if the

23  log entry said handwritten notes on copy of transcript or

24  whatever then the handwritten portions would be what's

25  privileged.

1          THE COURT: Okay.  So, in other words, when I get the

2    complaint for <u>Collins v. Miller</u> in the habeas petition I guess

3    before Judge Garaufis it's only the handwritten --

4          MR. LARKIN: It will only be the handwritten -- sure.

5    It will only be the handwritten portions.  A public document

6    clearly there's no privilege if that attaches --

7          THE COURT: Yes.

8          MR. LARKIN: But there are the handwritten notes that

9    reflect the mental impressions of the Assistant DA working on

10   the case that would be this assertion of privilege.

11         THE COURT: Okay.  Then there are also some

12   duplicates in there too.  I mean --

13         MR. LARKIN: There may be duplicates, Your Honor.

14   I'm sorry if there are.  There might be some non identical

15   copies with different handwriting on them [inaudible] assert

16   privilege but it says duplicate.  I will administer 40 lashes

17   to my paralegal.

18         THE COURT: I don't want to be complicit in that.

19         MR. LARKIN: That's right.

20         THE COURT: So are you saying that each one of the

21   documents that you are submitting contains an attorney's

22   mental impression rather than factual matters?

23         MR. LARKIN: I believe that most if not all of them

24   do and some of them also may be pre-decisional.  I don't know

25   if the log reflects that but I'm -- in general if there are

1 drafts of materials that were eventually submitted I think --

2 we would qualify them to be on the same privilege, the work

3 product privilege as well as the pre-decisional privilege.

4 It's mainly work product because we're talking about lawyers.

5          THE COURT: Have you identified them on a privilege

6 log, each person who is the author of the document?

7          MR. LARKIN: To the extent we could we did.  To the

8 extent that there were notes in the DA's file that we could

9 definitely see were not created by a police officer.  For

10 example, we would assert the privilege on behalf of an

11 Assistant District Attorney for an agent for the DA's office.

12          THE COURT: Do you which files -- do you know if they

13 were taken from individual's files?  Can you be certain where

14 you don't identify who the person is that it was an ADA for

15 example who made the statements?

16          MR. LARKIN: I can't say which files they came from.

17 I can -- because the files were kept -- at this point it's an

18 old case and all the files, everything that they had, that any

19 individual had was with the main case file.  That much I did

20 nail down with the client.  To the extent there were any notes

21 -- in good faith, Your Honor, I can assert that they were

22 created by an Assistant DA because we did isolate the

23 detective's notes from the folder, from the case file and

24 produce those.  So I can't identify by name every -- the

25 author of every document.  I can assert in good faith that I

22

1   believe them to all be Assistant DA's.  If the court wants

2   more information I would go back to my client and I would -- I

3   guess I'd have to go through item by item anything that we

4   couldn't identify [inaudible] and ask them to tell me -- do

5   you recognize this handwriting or who wrote it but I believe

6   it all [inaudible] the DA's.  I draw that inference after

7   speaking to my clients and after going through the documents

8   myself.

9           THE COURT: One of the questions I had if you in good

10  faith can say that these are ADA's who made those notes or

11  whatever wrote those memos, the next question I have is

12  assuming they are attorney's mental impressions how would I be

13  able to ascertain or even plaintiff be able to ascertain

14  whether the information contained in them is available from

15  another source if you don't even know what that source was?

16          MR. LARKIN: I'm not sure I'm following.  I'm sorry.

17          THE COURT: Well, for the attorney's mental

18  impressions, what kind of privilege -- obviously it comes in

19  two brands and the most protected is the attorney's mental

20  impressions but it's not an absolute protection because if the

21  information is essential or necessary to the plaintiff's case

22  and it's unavailable from other sources then the court can

23  order that it be disclosed.  It's not -- the privilege is not

24  absolute.  So if I -- let's say I find a document that I think

25  is highly relevant to the plaintiff, the plaintiff needs to

23

1  know about even though it is an attorney's mental impression,

2  how am I going to know whether it's available from another

3  source if I don't even know what that source was?  For

4  example, if I knew who the author of the note was possibly

5  deposing that person you'd be able to elicit the information.

6           MR. LARKIN: Right.

7           THE COURT: Without knowing who that ADA was or

8  whether that ADA -- what year the ADA left the office, how am

9  I going to be able to make that evaluation?  Don't I have to

10  in effect make an assumption that it's not available from

11  another source because we can't even identify this source?

12           MR. LARKIN: That's actually a good point.  Could I

13  ask for an opportunity, Your Honor, to make -- with respect to

14  any such document that comes up could I make a further

15  submission in camera perhaps to explain whether we -- well, to

16  either assess whether we can continue to assert the privilege

17  or -- and if so what the basis of it would be?  In other

18  words, maybe if there is such a document, a handful of such

19  documents among those that Your Honor reviews if we could then

20  isolate those documents and I would certainly go back to my

21  client if I had to and ask for more information if it's

22  needed.  If it's clear that there are certain documents that

23  contain mental impressions and it's clear that they ought to

24  be protected then we might not have to undertake that analysis

25  for those documents.  I'm not sure if I'm -- I hope I'm being

1  responsive.

2          THE COURT: Well, it sounds though we have to do two

3  camera reviews then and then you would have an opportunity to

4  try to find more information.  I think that what really needs

5  to be done is that you need to look at these documents very

6  closely and let me know the ones that you think are really

7  critical to you and really --

8          MR. LARKIN: Okay.

9          THE COURT: Because if I don't know who it was I

10  don't see how I can say that there's no substantial --

11          MR. LARKIN: I understand.  I understand.  Your

12  Honor, if we could have until -- today is March 21st.  I'm out

13  as I said all of next week.  Can we have until Wednesday,

14  April 3rd, to further submit to the court the documents that we

15  truly believe are critical to making this privilege and then

16  the other documents that we decide are not privileged

17  [inaudible] produce to Mr. Rudin.

18          MR. RUDIN: Your Honor, may I just be heard just for

19  a moment?

20          THE COURT: Yes.  I'm not done with my analysis yet

21  but go ahead.

22          MR. RUDIN: I just wanted to point out that in the

23  City's response to our papers they did not assert that this

24  opinion work product.  They asserted it was fact work product.

25  That's the first thing.

1          The second thing is that we raised this objection

2     early on to the absence of identification either of the dates

3     of a lot of the materials as well as the name of the author

4     and the City's response was we don't want to go -- we don't

5     want to have to do that, that's too troublesome.  I just don't

6     -- our overriding concern is just to get this done as quickly

7     as possible so we have the documents for the depositions and

8     the reason we have to schedule four depositions even though we

9     don't have these documents is just about getting everything

10    done by the deadline if -- that's our concern.  I just wanted

11    to put that out there and then Your Honor can --

12          THE COURT: I hear you on that.  It's true.  The

13    defendants don't actually argue that all these documents

14    constitute the core attorney work product.  What I really want

15    to do is I want to cull these down to what's absolutely

16    essential.  So --

17          MR. RUDIN: I believe, Your Honor, that a substantial

18    number of them do constitute core work product.  To the extent

19    some of them I guess we call it fact work product.  We've

20    got -- you've got both sides making assertions about fact work

21    product.  We've made an assertion and I think it's a very

22    important thing concerning an affidavit that the plaintiff has

23    for a key witness in this case.  In fact, the key witness, the

24    most important witness in the case has met with plaintiff's

25    counsel and has signed an affidavit.  It's purely fact work

1  product and we attempted to get it and Your Honor's view is

2  that it was fact work product and it couldn't -- we could

3  depose the witness and that would be sufficient for us.  If

4  it's sufficient for us it should be sufficient from both sides

5  with respect to fact type work product.

6           THE COURT: But there you could have deposed the

7  witness.  One of the big -- the big distinction here that I'm

8  seeing is that it's hard to know which witness to depose.

9           MR. RUDIN: That can easily be determined with

10 respect to a specific document if there are -- if there's

11 information there that Your Honor believes is critical to the

12 case and that might not or could not or possibly might not be

13 available from another source.

14          THE COURT: And also I looked at some of the

15 documents -- when I look at the documents I can make the

16 determination of whether there's substantial need and if

17 there's substantial need then we look to see whether they're

18 available from another source.

19          So what I'm asking you to do, and I'm cognizant of

20 both sides' concerns here, we need to do this quickly.  It

21 needs to be done fairly so the rulings are consistent with

22 both sides but I think that the defendants are right in

23 suggesting that it would make sense for them to go back

24 through this privilege log and the proposed privileged

25 documents and cull out the ones that you think don't really

1    meet the standard and let me look at those.  Then if you could

2    order them in the order of the privilege log and give me as

3    much specificity if possible and then on those documents if

4    there are sections that are privileged and other sections that

5    aren't, just highlight the parts that are privileged.

6                MR. LARKIN: Okay.  I think, Your Honor, in good

7    faith that we did designate documents that met the test.  I'm

8    not --

9                THE COURT: Okay.

10               MR. LARKIN:  -- [inaudible - speaking over] that did

11   not meet the test but in order to ease the burden and to move

12   the case along I can understand that notes that recite -- that

13   reflect back that are known and that are well known -- I mean

14   I don't know that it's worth asserting and litigating a

15   privilege over documents like that in these circumstances.  So

16   I'm certainly willing to go back through the documents and to

17   make a further submission along the lines or exactly as Your

18   Honor suggested.

19               One question though I do have.  I'm thinking about

20   this and given the amount of material.  I think a realistic

21   date would be Friday the 5th of April for that further

22   submission.  Could that -- is that acceptable to the court?

23   And it's only -- I would do it a week from tomorrow but I'm

24   going to be out next week because my kids are off -- my

25   daughter is off from school and we're going away.

1            THE COURT: If you need the extra two days that's

2  fine.

3            MR. LARKIN: Thank you very much.

4            THE COURT: I'll try to turn it around quickly.

5            MR. LARKIN: Thank you, Your Honor.

6            THE COURT: The last thing I want to do is I would

7  like to have the defendants separate these documents into

8  groupings.  In other words, there are similar kinds of

9  documents that I could make template rulings on.

10            MR. LARKIN: Yes.

11            THE COURT: If you could just highlight which ones

12  you think are in which groups and either I'll agree with you

13  or not agree with you but it's likely I'll agree because I

14  think it's fairly clear.  I can then make those rulings and

15  then you all can either meet and confer afterwards or I'll

16  just issue a ruling.

17            MR. LARKIN: That makes sense, Your Honor.  We can do

18  that, yes.

19            THE COURT: Okay.

20            MR. RUDIN: Your Honor, may I make just one other

21  point?

22            THE COURT: Sure.

23            MR. RUDIN: It seems to me that -- given the nature

24  of the issues in this case where what's of concern is not only

25  what facts were known to the District Attorney's Office but

1  also why they did certain things.  It seems to me that the

2  distinction between opinion and fact work product may not be

3  always a valid distinction.  An opinion may be exactly what

4  the case about.  So I just wanted to make that point but maybe

5  it's already obvious.

6          THE COURT: Well, it may well be that there's not

7  going to be a big dispute about some of the documents that

8  we're talking about and that the numbers that are really in

9  dispute will be a fairly small number is my guess because some

10  of the things written on a brief for example are really of

11  little consequence to either side is my guess.

12          MR. RUDIN: We're not interested of course in why

13  certain jurors were selected or not selected or notes about

14  the trial testimony.  Things like that are -- obviously we're

15  not interested in.

16          THE COURT: Right.  I think Mr. Larkin can put those

17  in groups and to the extent he doesn't want to disclose those

18  but they fall into a category you don't care about that could

19  be disclosed fairly easily.

20          MR. RUDIN: Yes.

21          MR. LARKIN: I agree.

22          THE COURT: Anything else?

23          MR. RUDIN: Not on that issue.

24          THE COURT: So let me just go to my calendar here.

25          MR. RUDIN:  We were wondering if you could work back

1 from the August 17th date to figure out a schedule to deal with

2 open discovery issues.

3            THE COURT: Sure.  Go ahead.  Do you want to propose

4 one?

5            MR. RUDIN:  So the -- initially the defendants

6 refused most of what we requested.  Then we had a -- what

7 seemed like a very productive series of telephone discussions

8 the last few days where for the --

9            MR. LARKIN:  I just have to interject.  We didn't

10 refuse most of what was requested.  Every time counsel makes a

11 representation like that I'm trying hard to bite my tongue.

12            THE COURT: Mr. Larkin, --I actually have a filter on

13 my ears.  So I really don't listen to any of those comments.

14 All I listen to is what's your dispute now, not what happened

15 in the past.

16            MR. LARKIN: All right.

17            MR. RUDIN: Your Honor, we discussed a great number

18 of requests where it did not appear that defendants were

19 inclined to comply and as a result of that conversation

20 defense counsel indicated that it would consult with its

21 client, with their client and we don't know yet what the

22 result of that will be.  Until we know the result of that we

23 don't know whether we're going to have two or three basic

24 issues to address or 10 or 12 significant issues to address.

25 So I was hoping to build into the schedule enough time for us

1   to prepare our papers.  So I would propose where I thought Ms.

2   Krasnow was going to be in a position go give the answer of

3   the client next week, that may not be accurate.  In light of

4   what Mr. Larkin said before we had this conference -- I may

5   not be -- I may have misunderstood but I thought that they

6   would be in a position to get back to us next week so that we

7   could have our motion to compel done by let's say April 2nd and

8   go from there.

9          So I thought maybe we could be -- ours could be

10  April 2nd and theirs April 9th.  We'd have a few days to reply

11  and then the court would have five days or so to deal with the

12  papers if that's enough.  Obviously Your Honor will set the

13  schedule.  I just was hoping to have enough time so we can

14  frame the issues and brief them.  These are very significant

15  issues to the resolution of the case so that the court will

16  also have enough time to review the papers.

17          MR. LARKIN: Your Honor, if I can just briefly make a

18  suggestion.

19          THE COURT: Sure.

20          MR. LARKIN: What I suggested was that instead of

21  having motions due on April 2nd since I'm away all next week I

22  was going to suggest motions due on the 8th, opposition on the

23  12th, and that would give the court a couple of days, four or

24  five days and I realize it includes a weekend and forgive me

25  for implying that five -- the five days includes those days.

1    I don't mean to suggest that, to suggest more work for the

2    court but if we get motions in on the 8th for anything that's

3    outstanding, opposition on the 12th which is that Friday and

4    then to the extent the court needs to hear further argument

5    obviously either side would have an opportunity on the 17th,

6    the day of the conference to make whatever additional points

7    were necessary.  It builds in just a little more time to let

8    us confer with our client in detail about some of these

9    issues.  The plaintiff has asked for personnel records of

10   retired Assistant DA's.  I don't know what the burden is on

11   finding that stuff.   I'm not sure how much of it is there and

12   I'm not sure if the client -- the client may have strong views

13   about what ought to be produced and how if it's going to be

14   produced, how it should be protected.

15            So the -- I do -- I just think, Your Honor, that

16   giving us until April 8th to file what needs to be filed is

17   well within the schedule and I hope it would give the court

18   enough time.  If not then obviously whatever time the court

19   needs we're more than amenable to follow and it goes without

20   saying.  It's up to the court as to what and how much time

21   Your Honor needs to resolve these matters.

22            THE COURT: I can't tell you how much time I need

23   because I haven't seen the in camera submission privilege log

24   and I don't know how many documents you're going to have.  I

25   do know what my schedule is and I do have a number of other

33

1    cases.  I'm trying to give this case a priority.

2          If I adopt that schedule and I can't resolve

3    everything on the 17th which is possible then we'll just pick

4    another date very shortly afterwards.

5          MR. RUDIN:  Your Honor, the two problems with what

6    Mr. Larkin proposed.  The first thing is that I had assumed

7    that we would go first on the motion to compel after we

8    received their response and I don't know with this schedule

9    Mr. Larkin will be communicating to us their position and if

10   Mr. Larkin is going to go first by making a motion for

11   protective order then for us to only have four days to respond

12   to what may be a very great number of issues, all which have

13   great importance for the case is just not adequate.

14         So that's why I think the first thing is when will

15   they communicate their position to us.  Can we have a deadline

16   for that?  And then assuming that there's a deadline who goes

17   first.  Should this be a motion to compel or a motion for

18   protective order.

19         MR. LARKIN: Your Honor, I'm sorry.  This is Arthur

20   Larkin speaking.  I had assumed that this would be a motion to

21   compel by the plaintiff for any documents that the City

22   objected to and took the position was not discoverable or was

23   privileged or whatever and that we would put our opposition in

24   after we received the motion to compel.  I wasn't going to

25   move for a protective order.

34

1        MR. RUDIN: All right.

2        MR. LARKIN: I don't want to create more work.  I

3   think one set of papers is sufficient and I would say that

4   certainly during that week of April 1st we will have an

5   opportunity to have an in-depth discussion with plaintiff's

6   counsel about our position about what's out there, about what

7   issues remain so that by the 8th that following Monday a motion

8   for the -- it seems to me that that would be enough time to

9   have a motion filed on these discovery matters and we oppose

10  in a week and then appear and argue what we need to argue but

11  I --

12       MR. RUDIN: Your Honor, April 8th is a Monday.  April

13  5th is a Friday.  So under that proposal we may not know their

14  position until April 5th.  These are very significant issues

15  and we have disagreements about -- potential disagreements

16  about very fundamental issues.

17       THE COURT: Mr. Rudin, if you don't know their

18  position until the 5th when do you want to file your motion to

19  compel?

20       MR. RUDIN: I'd like a week from when we know their

21  position but I --

22       THE COURT: April 12th?  You get a choice.  You can

23  either have time to file the motion to compel or you can have

24  an expedited briefing schedule.  It sounds to me as though it

25  probably makes more sense to have a little more time to file

1  the motion to compel and I'll try to find you some time to

2  address that.

3          MR. RUDIN: I was trying to work within -- work

4  towards a date of April 17th but if Your Honor would then

5  schedule a different date then that's fine.  I'm just trying

6  to --

7          THE COURT: I have the 17th for the privilege issues

8  already.  Just give me a proposed schedule and I'll see what

9  Mr. Larkin says and I'll just order it one way or the other.

10         MR. RUDIN: Then I guess April -- if Mr. Larkin needs

11 all of the week of April 1st then one week from the 5th for our

12 papers.  So our papers would be due the 12th.

13         THE COURT: Okay.  Mr. Larkin, your --

14         MR. LARKIN: Opposition within a week, the 19th.

15         MR. RUDIN: We would like three days to reply.

16         THE COURT: You usually don't get replies on

17 discovery motions.  Do we need it in this?

18         MR. RUDIN: Well --

19         THE COURT: Would it be helpful?  In other words,

20 will it make it easier for me at the argument to hear your

21 reply?

22         MR. RUDIN: I do think it would -- I honestly think

23 they're going to -- given the discussions we've had up to now

24 that we're likely to have some very significant disagreements

25 and we would like the opportunity to reply in writing.

36

1          THE COURT: You may have that.  So when do you want

2    the reply?

3          MR. RUDIN: The 19th is a Friday.  Maybe Tuesday the

4    23rd.

5          THE COURT: Okay.  So let me find some time.

6          MR. RUDIN: Your Honor, I'm sorry.  We have an

7    evidentiary hearing on the 22nd.  That's probably going to take

8    the whole day and -- Wednesday the 24th.  Could we have

9    until -- we could -- we have the weekend and then we'd have

10   the 23rd.  If we could have the end of the 23rd.

11         THE COURT: Are you sure?

12         MR. RUDIN: Well, no.  I'm just trying to move the

13   case along.

14         THE COURT: Let me tell you what I'm going to do --

15   if you could it -- how about the 24th?

16         MR. RUDIN: Okay.  Thank you.

17         THE COURT: I'm sure I'm going to need at least -- so

18   May 1st --

19              [Pause in proceedings.]

20         THE COURT: Actually I can give you the most time on

21   May 3rd.  So that means you want to -- May 3rd, does that work?

22         MR. RUDIN: Yes.

23         MR. LARKIN: I believe -- let me just see.  Yes, it

24   does, Your Honor.

25         THE COURT: 2:30?

1          MR. LARKIN: 2:30, yes, Your Honor.

2          MR. RUDIN: That's fine.

3          THE COURT: Do you want to come in or do it by phone

4    again?

5          MR. RUDIN: This may [inaudible] as a discussion

6    [inaudible] today perhaps we should come in.

7          THE COURT: Doesn't matter.  It's working fine by

8    phone.  It's really up to you.  If I need to look at something

9    then we could do it in person but otherwise I'm happy to do it

10   by phone unless you feel uncomfortable with that.

11         MR. LARKIN:  I just assume come in just in case that

12   is the case.

13         MR. RUDIN: We can come in.  That's fine.  Whatever

14   the court -- whatever makes sense.

15         THE COURT: See you -- well, we'll be talking on the

16   17th but the next conference is the 2:30.

17         MR. RUDIN:  Your Honor, the other thing is as far as

18   the documents that the City defendants are willing to produce,

19   if we could have some sort of working understanding of when

20   they would be produced and perhaps if Your Honor can give them

21   some idea of [inaudible] likely produce whatever documents the

22   court orders on May 3rd.  We're just trying to avoid

23   [inaudible] delay and they may raise privilege issues about

24   some of these documents.  We're just trying to avoid having

25   everything delayed to the summer and then getting depositions

38

1   done.

2          THE COURT: Mr. Larkin, go ahead.

3          MR. LARKIN: I was just going to say I am -- to the

4   extent that we agree to produce documents I'm going to make it

5   clear to the DA's Office that we need to do it quickly.  This

6   is not going to be your typical 30 day or 45 day turnaround.

7   It will have to be as quickly as possible and I've got --

8   hopefully I've got a couple of paralegals who can help us

9   gather materials.  We might even be able over there and get

10  stuff.

11         So I think during our prior discussions plaintiff

12  had suggested three weeks for anything we agreed to --

13  everything we agreed to produce.  I'll make every effort to

14  meet that.  So --

15         THE COURT: So even if there's a document -- if

16  there's a dispute about the documents unless the dispute is

17  over burden the DA's Office should be providing you those

18  documents so that they're in your office and you can produce

19  them if the court orders.

20         MR. LARKIN:  Yes, I agree.

21         THE COURT: So rather than having the DA's Office

22  saying well, [inaudible].

23         MR. LARKIN:  Yes, Your Honor, I agree with that.

24         THE COURT: Mr. Rudin, does that work?

25         MR. RUDIN: Yes, Your Honor.

1          THE COURT: So I'll talk to you on the 17th.

2          MR. LARKIN: The 17th, was that in person or over the

3    phone, Your Honor?

4          THE COURT: It was over the phone because we're

5    dealing with the privileged documents.  If you want to come in

6    person you can.

7          MR. LARKIN: Telephone is fine.

8          MR. RUDIN:  Your Honor, I'm sorry.  There's one more

9    issue.  That is sealed documents.  We've asked for a number of

10   -- quite a few documents that relate to cases that were

11   prosecuted by the Brooklyn DA's Office that may have resulted

12   in a dismissal and a sealing under New York State law and

13   we've discussed some procedure where we can be notified which

14   cases the District Attorney's Office will decline to provide

15   because of sealing.  Otherwise we have no way of knowing many

16   of the cases where they rely on sealing to decline to provide

17   the documents.

18         Then the next question is whether or not the parties

19   are willing to submit this to Your Honor to issue an unsealing

20   order where the documents need -- otherwise should be produced

21   or whether we're going to have to go the state court which

22   could put us at the mercy of a state judge who may not have

23   the same concern about moving this case along that all of us

24   have.

25         MR. LARKIN: Your Honor, I think that what I said to

1  the plaintiff is if the documents are sealed under state law

2  and the DA can't give them to us without a court order.  So if

3  the plaintiff would want -- what I've said is I'll ask them

4  what's the easiest way to make them okay with turning the

5  stuff over, is it a state court order, should we go to -- is

6  it okay if one judge does it, do they have to go -- I mean

7  normally what you do is if you want records unsealed you go to

8  the presiding judge in the state court with an order to show

9  cause and if a court agrees they should be unsealed the court

10  will unseal them.  That's typically what's done.  I just -- I

11  want to have a discussion with them and give them an

12  opportunity to weigh in on how to deal with the issue.

13          Because the law is clear.  If the case, the criminal

14  case is dismissed, if the plaintiff can get a release from the

15  individual whose case it was then I think the DA is okay with

16  releasing the records but if he can't get a release then there

17  has to be another way to do it so that they're not giving

18  up -- disclosing things that they shouldn't be disclosing

19  under state law.

20          THE COURT: I think the proposal or the question is

21  whether or not the defendants will consent to having a

22  particular court rule on the motion and whether the defendants

23  will be objecting to the unsealing.

24          MR. LARKIN: That I will have to take up with them.

25  I just don't know.  Some DA's don't care.  Some DA's take a

1  position on it.  I'd have to ask them.  I absolutely will do

2  that and we'll have that discussion -- that may be a discrete

3  issue.  I might be able to talk to the plaintiff about that

4  tomorrow but if not certainly that week of April 1st as soon as

5  I'm back.

6          MR. RUDIN: We also need to know which cases this is

7  a problem for.

8          MR. LARKIN: Absolutely.

9          THE COURT: So can you identify before you leave, can

10 you identify by tomorrow which case that's a problem for or is

11 that too soon?

12         MR. LARKIN: I don't know.  I mean there's 50 or 60

13 cases.  I don't think I can do that before --

14         THE COURT: So why don't you identify and get a

15 position by April 3rd?

16         MR. LARKIN: Can we make that April 5th?

17         THE COURT: Yes.

18         MR. LARKIN: Just give me a little time.

19         THE COURT: April 5th.

20         MR. LARKIN:  Yes, Your Honor.

21         THE COURT: Okay.  So we have --

22         MR. LARKIN: That's all the issues.

23         THE COURT: Good.  We have a transcript of these

24 proceedings so that I'm not going to be running in a docket

25 entry for every single thing that was ruled on but you all

42

1  have notes.  Correct?  Is there anything that you have a

2  question about?

3          MR. LARKIN: No, Your Honor, not from the defendants.

4          THE COURT: Thank you.  I will speak to you next on

5  April 17th.

6          MR. RUDIN: Thank you very much.

7          MR. LARKIN: Thank you for your time, Your Honor.

8  Thank you.

9          THE COURT: Bye.

10  (Proceedings concluded at 1:12 p.m.)

11                      *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                              Shari Riemer

7   Dated:   April 21, 2013

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25