UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


JABBAR COLLINS,               *    Case No. 11-CV-00766(FB)
                              *
          Plaintiff,          *    Brooklyn, New York
                              *    May 3, 2013
     v.                       *
                              *
THE CITY OF NEW YORK, et al., *
                              *
          Defendants.         *
                              *
* * * * * * * * * * * * * * * *

     TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
         BEFORE THE HONORABLE ROBERT M. LEVY
            UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:            JOEL B. RUDIN, ESQ.
                              TERRY ROSENBLATT, ESQ.
                              Law Offices of Joel B. Rudin
                              200 West 57th Street
                              Suite 900
                              New York, NY 10019


For the Defendants:           ARTHUR LARKIN, ESQ.
                              ELIZABETH KRASNOW, ESQ.
                              NYC Office of Corporation
                              Counsel
                              100 Church Street, Rm 3-180
                              New York, NY   10007




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

```
1          (Proceedings commenced at 2:51 p.m.)

2                THE COURT:  Okay.  Great.  All right.  So this is

3     Docket No. 11-cv-766, Collins versus City of New York.

4                Will counsel please state their appearances for the

5     record?

6                MR. RUDIN:  For plaintiff, Joel Rudin.  And with me

7     is Terry Rosenblatt.  Good afternoon, Your Honor.

8                MS. ROSENBLATT:  Good afternoon.

9                THE COURT:  Okay.

10               MR. LARKIN:  And for the defendants, Arthur Larkin,

11    L-a-r-k-i-n, City Law Department.  With me is Elizabeth

12    Krasnow, K-r-a-s-n-o-w, also New York City Law Department.

13               THE COURT:  Okay.  Good afternoon.  All right.  So

14    I do have the in camera documents here.  I've gotten through

15    most of them.  And it's actually my second time for them, but

16    I'm just looking at them with the explanations.

17               I'm not ready to make a ruling yet, because I want

18    to -- I didn't have them as long as I thought I would have

19    them.  So hopefully a ruling will be coming on Monday.

20               And I may have some questions again for the City as

21    to what some of the documents are, because there are a few --

22    there are some I still don't quite understand, even though

23    you've done a pretty good job identifying them.

24               Mr. Larkin, have you -- since we last spoke, have

25    any additional documents been produced to Mr. Rudin?
```

3

1          MR. LARKIN:  Yes, Your Honor.  We've produced

2   actually a pretty substantial number of documents.  I can

3   permit my co-counsel to go through what we've done.

4          MS. KRASNOW:  Sure.  So we basically had followed

5   up on the discovery items that we agreed to produce to the

6   plaintiff, including various training manuals and internal

7   memos and personnel files since we last spoke.

8          THE COURT:  Okay.  And you received those?

9          MR. RUDIN:  Yes, Your Honor.  There's a good deal

10   more, but I think they're being delivered today or being sent

11   out today.

12          MS. KRASNOW:  There's another batch of personnel

13   files and some NYPD manuals that will be sent out this

14   afternoon.

15          And then there was one item that I wasn't able to

16   get done, which was the search for calendar entries, that I

17   already spoke to Mr. Rudin about for the defendants regarding

18   this case.

19          MR. RUDIN:  Okay.  Your Honor, I think there's

20   considerably more that the defendants agree to produce, but

21   when we receive whatever is being produced today, we'll match

22   that and bring to defendants' attention anything that hasn't

23   been produced.

24          I think there's some additional items, responses to

25   interrogatories and documents that the defendants agree to

4

1    produce more recently.  At least, clarify what their

2    intentions were.  We had understood that some of those

3    matters were in dispute.  Some of them may still be in

4    dispute and we'll bring them up today.

5             But in any event, there's some additional materials

6    that they've agreed to produce and I was wondering if we

7    could have some sort of deadline for those to be produced.

8             MS. KRASNOW:  I think we had discussed a two week

9    deadline prior to the conference starting.

10            THE COURT:  Well, that would be the --

11            MS. KRASNOW:  For those items.

12            MR. RUDIN:  No.  Two --

13            MS. KRASNOW:  That would be the parties had

14   discussed two weeks --

15            THE COURT:  The 17th?

16            MR. RUDIN:  Well, we discussed two weeks having for

17   -- the issue of whether or not the defendants will contend

18   that any ADAs were a subject to investigation, or discipline

19   for alleged misconduct, and Mr. Larkin had suggested two

20   weeks, and that's acceptable.

21            But I'm talking about quite a few additional

22   documents that have been agreed to be produced some time ago.

23            MR. LARKIN:  Well, Your Honor, let's -- I'll try to

24   be specific as possible.

25            There are documents requested in interrogatory --

5

1    I'm looking at interrogatory number seven, which concerns

2    witnesses for whom material witness warrants or orders were

3    issued.

4         Now, if these records are in a central location, in

5    a central place, we will have our client search for them.

6    And we'll have to have a discussion with them about

7    confidentiality here, because if witnesses -- if witnesses

8    were subject to warrants or orders or custody orders, it was

9    for their own safety.  And so I don't know if we can reveal

10   names.  We may be able to reveal the number of witnesses.  I

11   -- have we done that already?  We've already --

12        MS. KRASNOW:  (Indiscernible).

13        MR. LARKIN:  Not the number?  Okay.

14        But I need to have a further discussion with my

15   client about this.  I think that the relationship to the

16   case, you know, is somewhat tenuous, but we're willing to

17   look -- to look into it further.

18        I just -- it's difficult for me to agree to a firm

19   deadline today by which we're going to produce all these

20   files.  I need to speak with them about the issues that --

21   first of all, the way that they keep the records and whether

22   or not there is some confidentiality -- confidentiality

23   concerns here because of who these -- who these people are.

24        It is a long time ago.  It's 23 to -- 1990 to 1995

25   is 23 to -- 18 to 23 years ago, but they still may have some

6

1       concerns about that.

2               So I'm willing to certainly have that discussion to

3       reach out to Mr. Rudin in the next week.  I can do that in

4       the next week.  And if there are any issues, we can bring it

5       to the Court's attention.

6               MR. RUDIN:  Well, Your Honor, that's just one of

7       the items.  But I'm at a little bit of a disadvantage,

8       because I don't know exactly what we're getting later today,

9       and I haven't had a chance -- and once we have that, I can

10      try to figure out --

11              THE COURT:  Okay.

12              MR. RUDIN:  -- what hasn't been produced.  But I'm

13      just concerned that we're now getting pretty deeply into

14      depositions.  We have one coming up of one of the co-

15      prosecutors, Stacey Frascogna, on March -- on May 9th.  And

16      then we're doing Monique Ferrell on May 16th, who covers

17      really the whole gamut of --

18              THE COURT:  Right.

19              MR. RUDIN:  -- discovery.  So I'm just concerned

20      that anything -- I understand the difficulty with the

21      material witness issue and I don't think that's a problem in

22      terms of the deposition schedule.

23              But some of the other request -- and some of the

24      requests that go to really the Monell, like whether or not

25      any prosecutors were ever disciplined.

7

```
1              THE COURT:  Mm-hmm.

2              MR. RUDIN:  I don't think that's going to come up

3     in these depositions.  That would probably come up later of

4     the executives or Mr. Hynes himself.  So that's not a

5     problem.

6              But this other discovery -- and I guess, really,

7     the privilege materials go to the heart of it, but that's --

8     you know, that's in your hands.

9              THE COURT:  Well, hopefully by Monday you'll have

10    something.  I'm hopeful about that.

11             But, you know, the materials that we're talking

12    about -- well, finish what you're doing, and then we'll get

13    into the privilege materials.

14             MR. RUDIN:  Yeah.  I'm just -- I think there were

15    quite a few additional categories or documents that the

16    defendants agreed to produce that may not be produced today.

17    But I can't say specifically what they are, because I don't

18    know what is being produced and I don't have a checklist with

19    me.

20             So I guess what I'm asking is that there be some

21    general understanding about when whatever the defendants have

22    agreed to produce, or whatever Your Honor orders today be

23    produced,  that we have some understanding by the end of

24    today of when that -- they'll be complied with.

25             And if there's a particular category that's
```

```
1     problematic, such as the material witness issue, that can be

2     -- that can be discussed, but other than the ones that are

3     problematic, most of these requests were made back in

4     February and I just -- you know, we have an interest in

5     having the documents in time for the depositions.

6              THE COURT:  Right.  Is there a way to prioritize

7     the documents you need for the depositions as opposed to

8     those that you don't need quite so soon?  So if there are

9     limited resources of, you know, the Law Department can work

10    on those.

11             MR. RUDIN:  Well, we can certainly have a

12    discussion about that.

13             THE COURT:  I think that probably would make sense.

14    Because, you know, in the multi-document, the voluminous

15    document cases I've been involved in, that's usually the

16    thing that's worked the best.  You know, it's just part --

17    "This is what I need for these depositions.  I've got to have

18    these by this date."

19             MR. RUDIN:  You know, I think it's fair to say that

20    it's actually the documents that Your Honor is reviewing that

21    are probably most relevant to the Frascogna and the Ferrell

22    depositions that are coming up on the 9th and the 16th.

23             THE COURT:  Okay.  And specifically, which of those

24    documents are you most interested in for those depositions?

25             MR. RUDIN:  Well, the Frascogna deposition will
```

1    focus on documents that were available to her or were

2    produced through the trial back in 1995, since she was co-

3    counsel, although apparently working under the direction of,

4    for the most part, of Mr. Vecchione.

5            And with Monique Ferrell, I mean, all those

6    documents would certainly be relevant.  But in addition, she

7    was the one who was assigned in 2006 to deal with the 440

8    motion and thereafter the habeas litigation.  And at a

9    certain point in the habeas litigation, Judge Irizarry

10   directed the DA's Office to assign another attorney, because

11   Ms. Ferrell's role in possibly not turning over materials or

12   covering up mis -- the Brady violations or the misconduct had

13   come into play, and Judge Irizarry directed that she testify.

14           So -- and part of our complaint is that the Brady

15   violations and the coverup of Brady violations and coercion

16   of witnesses continued through the federal habeas

17   proceedings, and prolonged Mr. Collins' incarceration is

18   damages.

19           And also is evidence of the pattern and practice,

20   or the atmosphere in the office resulting from we allege the

21   failure to discipline or the indifference of the district

22   attorney.

23           So what I'm essentially saying is that -- I mean,

24   we've been trying to piece together from the materials that

25   we were provided what information Ms. Ferrell had available

1      to her, and certain other individuals who were working with

2      her from 2006 to 2010 in opposing Mr. Collins' collateral

3      attack on his conviction, and there appears to be a lot more

4      emails, notes that have not been turned over yet.

5              And some of those documents may not be signed off.

6      It may not be clear who the author is.

7              But, you know, we are in a position to try to

8      figure it out, based on everything else that we know.

9      Certain of the information it may be clear who the author is,

10     but the defendants may be claiming work produce privilege.

11             And, again, I would just point out that this entire

12     case is about what information they had at various times and

13     why they did or did not turn it over and why they did or did

14     not do certain things.

15             So it seems to me that everything should be turned

16     over.  And to the extent that there's information there that

17     it may be not relevant, and I think I acknowledged in our

18     last conference that there may be information that isn't

19     truly relevant, we have no way of knowing that because the

20     privilege log is not specific enough.

21             And if it was more -- if it was made notes -- if

22     the defendants think that certain information is truly not

23     relevant and shouldn't be disclosed on that basis, we're

24     willing to discuss that with them, but we don't -- we don't

25     have enough information to have that discussion.

1           MR. LARKIN:  Your Honor, maybe I can try to --

2           THE COURT:  Yeah.

3           MR. LARKIN:  -- sort of bore down on or, at least,

4      distill from what we have here.  What specific documents that

5      counsel is referring to.

6           There are emails.  We did do a search of archived

7      emails and we have them.  We -- what's the status?

8           (Indiscernible).

9           MR. LARKIN:  Okay.  We have them.  We need time to

10     just review them to see if any of that material is privileged

11     or not.  But I anticipate there will be a significant

12     production of emails probably -- next Wednesday?

13          UNIDENTIFIED MALE:  A week.

14          MR. LARKIN:  Okay.  A week.

15          Now, we have Ms. Frascogna's deposition on the 9th,

16     but permit me just one moment, Your Honor.  Okay.  Yeah.

17     None of the emails are from Ms. Frascogna or to Ms.

18     Frascogna.  So the emails don't really -- would not appear to

19     be relevant to that particular deposition.

20          THE COURT:  What about Monique Ferrell?  Would they

21     be relevant to her?

22          MR. LARKIN:  Yes.  They would be relevant to her

23     deposition.  Her deposition is scheduled for the 16th and

24     clearly, we would produce the responsive emails in advance of

25     that deposition.

1      And we're trying, as the Court knows, we're trying

2      to be conservative with regards to --

3            THE COURT:  Right.

4            MR. LARKIN:  -- assertions of the privilege.  I

5      think most -- but I know that we have produced some email

6      communications among the documents produced to counsel thus

7      far in the case.

8            But this most recent set of email communications,

9      yes, it does include stuff from Ms. Ferrell and we'll -- we

10     will, as I say, review that and get it out the door within a

11     week, and promptly file with the Court a similar submission

12     to the one we made here.  That is to say, perhaps if it's

13     acceptable to Your Honor, a short log with attaching any

14     documents that we are claiming are privileged.

15           And, again, we're trying to be conservative in that

16     respect so that we can, you know, kind of move discovery

17     forward.  And there are materials -- there are things in the

18     emails we may rely on.  Obviously, in that circumstance,

19     counsel would be entitled to them.

20           So there were emails.  There were notes.  I don't

21     hear that there's any other specific category of documents

22     that are needed, at least for the depositions in the next two

23     weeks.

24           MR. RUDIN:  Your Honor, I'm looking at the

25     privilege log that was filed on April 9th, and they're

1    already quite a few emails that I guess are before the Court.

2    Beginning at -- I think it's number 20 -- item number 25 and

3    continuing through it appears 47.  Almost all of those are

4    emails from 2006, which would be when the 440 motion was

5    received and was being responded to.

6            I assume there's much more that came after that,

7    but -- which may be what Mr. Larkin is referring to.  But --

8            THE COURT:  Some of them are just very procedural.

9    You know, like, "We need this by such and such a date," or

10   "This is relevant to us."

11           So you may be surprised at how ministerial some of

12   these privilege documents are.  But there are -- well, I'm

13   sorry.  Keep going.

14           MR. RUDIN:  Well, I mean, they may be ministerial,

15   but they may be part -- it may turn out that they're useless.

16   But it also -- it also is possible that they supply pieces to

17   the puzzle if who knew what when.  And unless we see them, we

18   can't -- we don't know.

19           But what's the harm to the other side of producing

20   them.  That's what I don't understand.  Particularly if

21   they're ministerial.

22           THE COURT:  Right.  No, I understand that.  It's --

23   some of them have very low probative value, and at the same

24   time, low prejudicial value.  So that's -- that's where we're

25   getting with a lot of this at this point.

1          MR. LARKIN:  You know, we wouldn't have -- if the

2     Court's view is that it may have a low probative value, but

3     the --

4          UNIDENTIFIED MALE:  No harm.

5          MR. LARKIN:  -- yes.  I mean, that it's not really

6     an earth shattering email.  I --

7          THE COURT:  I mean, for example, I will change the

8     name on this, but one of them says, "Remind me why blank is

9     being sued."  Okay.

10          I'm sure you're all dying to know who blank is, but

11     it's really not going to advance the case a whole lot.  And

12     there are things -- there's a lot of things like that.  There

13     are a lot of entries that are simply:  This is my to-do list

14     for tomorrow.  This is the data.  You know, that X is

15     happening.  This is what I have to do for tomorrow.  You

16     know, read this, read that, read this, read that.

17          MR. RUDIN:  But a to-do list might be relevant.

18          THE COURT:  It might be relevant.  And that's where

19     I'm having more difficulty, because I'm trying to put myself

20     in your shoes, because I don't know what pieces of the puzzle

21     you already have and what's missing.  Because for me, what

22     doesn't seem -- what might not seem relevant or important,

23     but which is clearly privilege, might be something that for

24     you is critical.

25          And one thought I had about this was -- and I want

1      to applaud the defendants for their more detailed

2      description, work product list.  It's very helpful --

3              MR. LARKIN:  Yes, Your Honor.

4              THE COURT:  -- you know when you did that.  And I'm

5      just wondering if some or all of that might be something that

6      you could disclose to Mr. Rudin and Ms. Rosenblatt, and

7      whether or not he can say, "I really don't need this, this,

8      this, or this," or "I really need this, because of A, B, C or

9      D."

10             And I think that would get me a lot closer to

11     knowing what the need is.

12             MR. LARKIN:  I would be happy to confer with my

13     client about that, because I would want to speak to them

14     first --

15             THE COURT:  Of course.

16             MR. LARKIN:  -- before I agree to turn anything

17     like that over, but I'm happy to talk to them.

18             THE COURT:  Okay.  So, for example, I'm just going

19     to ask you if you need something like this, there's a marked

20     copy of the complaint, or there's a marked copy of a pleading

21     which says, "Why did he say this?  When did this happen?"

22     That's not something you really need, is it?

23             MR. RUDIN:  Probably not.

24             THE COURT:  Although, I mean, I'm trying to figure

25     -- I'm trying to put myself in your shoes and understand when

1      and why you would need that.

2            MR. RUDIN:  Well, I mean, if it's -- let's say it's

3      by Ms. Ferrell -- and when you say a pleading, Your Honor, do

4      you mean the complaint, civil complaint or a document -- or a

5      motion paper from the collateral proceedings?

6            THE COURT:  Well, either one.  I mean, either one.

7      And sometimes it's very difficult to know whose handwriting

8      it is.  I don't know.  I'm not sure if you know whose

9      handwriting it is in each situation.  Do you have a guess?

10           MR. LARKIN:  From context, I think a lot of them

11     are Kevin Richardson's.  Some of them are going to be Ms.

12     Ferrell's, I'm pretty sure.  Because I think a lot of the

13     notes looks to me as though they're handwritten documents or

14     from the habeas time frame.

15           THE COURT:  Mm-hmm.

16           MR. LARKIN:  The 440 time frame.

17           THE COURT:  So all the habeas ones I should assume

18     are Ms. Ferrell's?

19           MR. LARKIN:  Most of them.  Or Kevin Richardson's.

20           MR. RUDIN:  Well, one way it might come up is let's

21     say that I'm deposing Ms. Ferrell and she says that she

22     didn't disclose something due to an oversight rather than

23     intentionally and she wasn't aware of it.

24           THE COURT:  Yes.

25           MR. RUDIN:  And then it turns out she was aware of

1        it based on her notation.

2                So it's really hard to say.  That's why I -- it

3        will be easier to say, "No, I don't need that," but maybe it

4        will turn out that I do.  So --

5                THE COURT:  Right.  And since one of the standards

6        is the potential need, it's difficult for me to know, if

7        you're not sure, for that's where we're getting into the

8        fine-tuning here.

9                MR. RUDIN:  But --

10               THE COURT:  And I thought that what might be

11       helpful is if, you know, if the City could simply turn over

12       as much of this, these papers as possible, and then you could

13       look and see and you can say, "Look, I really do need this,

14       and this is why I really need it."

15               MR. RUDIN:  You know, I guess what I'm having

16       problems with, with this whole process, given the nature of

17       this case, is that in a criminal prosecution, they already

18       have to turn over internal documents that contain witness

19       statements or summaries of witness statements.

20               MR. RUDIN:  Right.

21               THE COURT:  And they have to turn over so much

22       that's already considered work product, and some of what they

23       initially didn't turn over here, but then agreed to turn over

24       was of that nature, it turned out to be documents we already

25       had.  And sometimes -- maybe sometimes we had them, but they

```
 1        were redacted in a criminal case, and now they're unredacted.

 2                But it's at so much -- and we've already received

 3        notes, some notes, we've already received some emails that

 4        clearly could be considered work product.  Why some are being

 5        turned over and some are not, I don't know.  I'm sure Defense

 6        counsel has a reason.  But, you know --

 7                THE COURT:  You know, I'll tell you I think the

 8        reason some of them are being turned over is because we've

 9        had a discussion and the thought was that if it's something

10        that really isn't -- that is protected by work product, but

11        that really isn't prejudicial, and it doesn't cause any

12        problem for the defendants, I encourage the City to just turn

13        them -- the Law Department to turn it over.

14                MR. RUDIN:  But if they're prejudicial in the sense

15        that they contain information that's helpful to our side,

16        then is that what you --

17                THE COURT:  No.  I don't mean it that way.  I mean

18        that it's so clearly --

19                MR. LARKIN:  Innocuous maybe.

20                THE COURT:  Yes.

21                MR. LARKIN:  I mean, I didn't see any documents in

22        there suggesting that Monique Ferrell knew, for example, that

23        there were wit -- that there were warrants in the DA's file

24        and decided not to turn them over.  I mean, there was nothing

25        like that.  Certainly, I didn't see anything like that.
```

1           I mean, I assume when plaintiff was referring to

2      items that were withheld, we're talking about the material

3      witness warrants.  I don't -- anything concerning a

4      recantation by Oliva that was contemporaneous, 1994, or

5      something before 2010.  It would seem to me that that would

6      be the kind of information that you -- that plaintiff would

7      argue is -- couldn't -- they couldn't obtain elsewhere and

8      wouldn't want for the case.

9           But other than that sort of information, I don't

10     know who else would fit the criteria that you're referring

11     to.

12          THE COURT:  What I'm saying is prejudicial.  I

13     mean, for example, let's say they make a comment about your

14     legal strategy in doing A, B, C or D, and they think it's a

15     good idea or a bad idea, or we thought he would do that.

16          MR. LARKIN:  Or we think he's a jerk.

17          THE COURT:  Yes.  Or, you know, he took the bait,

18     or something like that.

19          UNIDENTIFIED FEMALE: (Indiscernible).

20          MR. LARKIN:  Like that.  Honestly.

21          THE COURT:  No.  But seriously, there are things

22     like that that go to legal strategy that's really the core of

23     the mental impressions, of the work product.  I don't think

24     it's going to help or hurt anybody in this case.

25          MR. LARKIN:  I agree.

1          THE COURT:  It's prejudicial in that sense.  And

2     that's what -- that's what I don't think they need to turn

3     over.

4          There's all kinds of summarizing of transcripts,

5     you know, which we all do when we get briefs.  You know, we

6     look at the transcripts.  We summarize it.

7          Now, you might argue that that would be useful to

8     see how one of the ADAs summarized the transcript.  But on

9     the other hand, you have access to those transcripts.  You

10    could have summarized them any way you wanted to and you

11    could assume that they saw those transcripts.

12         MR. RUDIN:  I think that if an ADA in 200' --

13    between 2006 to '10 is summarizing testimony from a prior

14    proceeding, the trial proceeding, probably we wouldn't need

15    that.

16         If they, however, commented upon that in relation

17    to information that wasn't disclosed or related it to the

18    claims we were making, then that might be a different story.

19         But --

20         THE COURT:  It's mostly factual.  Or, for example,

21    let's say there's other cases that you're interested in and

22    there's speculation as to what the judge is going to do in

23    those other cases, or speculation as to whether a legal

24    theory A will be stronger than legal theory B.  It seems to

25    me that that's really not going to be terribly probative for

1    you, but it would be something that should not be released.

2           I think that's, you know, inside the inner sanctum

3    of what attorneys consider to be their privilege.

4           But on the other hand, there may be things when

5    they discuss these other cases that could potentially be

6    useful to you and I'm -- that's why I'm still looking at

7    them.  But so far I --

8           MR. RUDIN:  I --

9           THE COURT:  -- haven't found it.

10          MR. RUDIN:  I'm sorry.  I think if it is a document

11   towards the end of the chronology where there is a thought

12   process about how the judge might rule, probably we don't

13   need it, but if it's -- if it's in any way indicative of why

14   information was or was not released at a prior point, or why

15   information is not going to be released at that point, that's

16   a different story.  Then we would very much would need it.

17          THE COURT:  But any -- I'm assuming that any -- any

18   comment about information that was released or wasn't

19   released, or whether a witness was available or not

20   available, that that's something that you would want.

21          MR. RUDIN:  Yes, or --

22          THE COURT:  Or you can get from other sources.

23          MR. RUDIN:  Or comment about whether or not

24   information was or was not <u>Brady</u> material.  Did or did not

25   have to be disclosed.  Did or did not have to be disclosed.

1           THE COURT:  Yes.

2           MR. RUDIN:  We would want --

3           THE COURT:  No.  I don't think there are any

4    surprises here.  But, again, the clearer you can be as to

5    what is critical for you that you can't get from other

6    sources the better.  So I would appreciate that.

7           MR. RUDIN:  I mean, anything that reflects a

8    contemporaneous knowledge or belief about the existence --

9    about the record or about why things were done or not done.

10   Contemporaneous meaning 1994, 1995, during the FOIA

11   litigation, which continued actually till 2010. And then the

12   -- the collateral attack beginning at 2006 and going through

13   the decision on the habeas of 2010, it would be very

14   relevant, which is why, I guess, this is so difficult.

15          But anything that -- and, again, I don't understand

16   why, given how much is going to have to be disclosed or

17   already has been disclosed, anyway, why there's such a

18   concern about whether somebody at some point exposed a

19   thought about what might happen in the litigation.

20          I mean, if it's not going to be useful to us, then

21   there's no harm in not disclosing it, but I don't understand

22   why there's such concern that something like that might be

23   disclosed when it -- if it's not useful and won't be used and

24   it's not telling us very much that isn't already obvious.

25          But it may have something that is very useful and

1    I'd hate to miss out on it in an effort to protect a thought

2    process that's already relatively exposed.

3            THE COURT:  Well, again, if there is the thought

4    process, it's protected by the privilege.  And the question

5    is whether there's a substantial need or it's available

6    through other sources.

7            And that's what I'm trying to puzzle through and

8    sometimes it's highly -- it's a very confidential thought

9    process, but it has no value.  And in that situation, I'm

10   probably going to turn that over and you'll wish I hadn't.

11   And, but there will be other situations where it will be a

12   slight different calculus.

13           MR. RUDIN:  But, I mean, certainly from 2006, 2007

14   through 2009 or so, where Ms. Ferrell is involved with others

15   in the office, and theoretically investigating what happened

16   years earlier and then deciding how to respond and taking

17   certain positions under oath.

18           Both Mr. Vecchione and Ms. Ferrell made

19   representations under oath that later turned out to be

20   untrue, why those representations were made, whether they

21   were made in good faith or bad faith is -- goes to the heart

22   of the litigation.

23           THE COURT:  And specifically with representations

24   do you want me to be looking for?

25           MR. RUDIN:  Well, the representation that --

1    certainly that no witness recanted.  That goes to what they -

2    - what they knew about Mr. Oliva.  What they knew about the

3    efforts that were made in 1995 to interview him and to have

4    him cooperate.

5            There were several months of efforts that were made

6    to have him in the office and to have him cooperate and

7    there's a dispute about when he was in the office and what

8    various ADAs knew at different times.  All this was

9    investigated I assume in 2006.

10           Then as to Santos, there's the question of what

11   different people in the office knew about the fact that he

12   was picked up on a material witness order and held in custody

13   for one week in jail and one week at a hotel.  What

14   investigation was made in 2006 about what happened with

15   Santos.

16           Whether or not there's any indication that between

17   2006 and 2010, when the office continued to deny that under

18   oath, both Mr. Vecchione and Ms. Ferrell denied under oath

19   that any witness had to be pressured or coerced into

20   testifying.  Whether anyone knew that, in fact, there had

21   been a material witness warrant and they had been in prison

22   for two weeks.

23           As to Oliva, there were representations -- I mean,

24   essentially was -- there was a denial that anybody

25   affirmatively caused him to be picked up on -- for -- to have

1    his work release rescinded and that there was any suggestion

2    to him or to him through the Parole Division that he would be

3    restored to work release if he cooperated at trial.

4           There was a suggestion at one point in Ms.

5    Ferrell's affidavit that there was an office practice or

6    custom that sometimes Parole would be contacted and Parole

7    would be informed if someone -- if they're having trouble

8    meeting with somebody, and then Parole on their own would do

9    whatever that they did to make the person available.  And

10   that that somehow resulted in Oliva having his work release

11   rescinded and being sent up state to serve the balance of his

12   sentence.

13          And then there was any denial that Oliva was

14   coerced and it only came out through habeas discovery in

15   2010, and this was a denial that was under oath, it only came

16   out in 2010 that Mr. Vecchione and Mr. Posner had obtained an

17   order from -- a demi-anni (phonetic) order from the Court

18   allowing them to take custody of Mr. Oliva to prepare him for

19   trial, based upon their representation that he wished to

20   cooperate, even though he had been sent up state because he

21   was refusing to cooperate.

22          And that he wouldn't be interviewed unless -- and

23   they wouldn't take custody of him unless he consented in

24   writing to going with them.  And then it turns out that he

25   actually wrote in, "I refuse to go with the detectives," and

1    they took him anyway.

2            None of that was disclosed in 200' -- at trial.

3    None of it was disclosed in 2006.  It wasn't disclosed until

4    Judge Irizarry directed habeas discovery to occur in 2010.

5            So, essentially, Mr. Vecchione in his affidavit

6    swore that no witness had to be pressured or coerced.  No

7    witness recanted and there was no undisclosed Brady material,

8    and Ms. Ferrell echoed that in her own affirmation and then

9    submitted an affidavit in the federal proceedings that said

10   the same thing, and resubmitted Mr. Vecchione's affidavit --

11   affirmation.

12           THE COURT:  I think it's pretty clear what you

13   want.  So I'm going to review everything one more time in

14   this folder with that in mind.

15           MR. RUDIN:  Okay.

16           THE COURT:  Okay.  Is there anything else we need

17   to discuss today, or should we just set another date for a

18   conference just to make sure everything moves along smoothly?

19           MR. RUDIN:  No.  There are a number of issues

20   involving discovery.

21           THE COURT:  That you want -- that you want to go

22   through?

23           MR. RUDIN:  Yes, Your Honor.

24           THE COURT:  Okay.

25           MR. RUDIN:  Well, we still, unfortunately, have

1       some significant disagreements.

2               THE COURT:  All right.  So if you can hold on one

3       minute.  Let me just take my -- this call.  You don't have to

4       move.

5       (Discussion between Court and Clerk on unrelated matter.)

6               THE COURT:  So we can take a break and relax for a

7       minute.

8       (Pause.)

9               THE COURT:  So while I'm waiting for this call to

10      come in.  When -- when do you think you'll know how much of

11      this discussion of the privilege material you can turn over

12      to the plaintiff?

13              MR. LARKIN:  Probably maybe Tuesday next week, Your

14      Honor.  I'll send it to -- I'll send it to my client when we

15      get back to the office and I'll ask -- ask them to take a

16      close look at it.

17              THE COURT:  Okay.  And I'll make my decision either

18      way.  We'll see whether -- that would just be another way for

19      you to be able to weigh in on it in case I miss something.

20              (Court recessed at 3:24 p.m. to 3:34 p.m.)

21              MR. RUDIN:  Your Honor, there's actually one other

22      thing I wanted to say about privilege.  There was a third

23      witness Diaz, who I didn't mention before.  He's the

24      individual who the DAs and detective investigators went down

25      to Puerto Rico to bring back to New York to testify.

1           And any information that tends to show an awareness

2     that he was violated -- he had violated his probation, and

3     which was not disclosed to the Defense at trial, or that --

4     there were things said to him to alleviate his concern that

5     he would be arrested when he came back to New York.

6           And I'm talking now about records that existed in

7     '94 and '95, as well as records that were created later on

8     where there was a discussion of what the prosecutors knew

9     earlier and why it wasn't turned over.

10          THE COURT:  And you think there might be something

11    -- and you think there might be some documents that were

12    created during the federal period that -- habeas period, and

13    the 440.10 period that might reflect some of that knowledge?

14          MR. RUDIN:  Yes, Your Honor.  They're -- I believe

15    it only came out during the habeas discovery that, in fact,

16    the District Attorney's Office did have correspondence from

17    the Probation Department in late '94, or early '95 that they

18    were intending to violate Mr. Diaz for having stopped

19    reporting and for having left the jurisdiction.  That was

20    never disclosed until that point in 2010.

21          What was disclosed is that when detective

22    investigators met with Mr. Diaz, or found Mr. Diaz in Puerto

23    Rico, initially he ran from them.  But then the claim was

24    that there was never any promise made to him or anything said

25    to him to make him think that he would receive assistance

1    once he came back to New York to not have his probation

2    violated.

3          And that -- and that it was disclosed that Mr.

4    Vecchione made a phone call for him to probation the day of

5    his testimony or the day after informing the Probation

6    Department that he had been -- he was being returned to

7    Puerto Rico and that Mr. Vecchione wrote several letters to

8    probation thereafter when he learned that probation was still

9    intending to violate Mr. Diaz and the result of that process

10    was that he was not violated.

11          So that was what I just described that Mr.

12    Vecchione's activities after Mr. Diaz testified was disclosed

13    in the 440.

14          What wasn't disclosed is that the DA's Office was

15    aware at the time of the criminal trial that Mr. Diaz -- that

16    the Probation Department was getting ready to violate Mr.

17    Diaz, and that he had fled from them in Puerto Rico because

18    he was afraid of being arrested.

19          The way he was presented at trial was that he was

20    someone who came back voluntarily to testify and there were

21    no promises made, and then -- except that he would be flown

22    back to Puerto Rico and that he was -- I believe that he was

23    in protective custody.  Or if not in custody, that he was

24    being housed in a hotel to -- for his protection.

25          THE COURT:  Okay.

1          MR. LARKIN:  Your Honor, if I can just say one or

2     two things about these allegations.  Obviously, these are

3     plaintiff's gloss or interpretation of the facts in the case.

4          The two witnesses, Santos and Diaz, I think it's

5     important to bear in mind, Santos at the habeas hearing

6     affirmed the truth of his trial testimony where he identified

7     Collins as the person he saw fleeing from the murder scene.

8     And Diaz likewise has never recanted.  He didn't -- I don't

9     believe Diaz has actually reaffirmed his trial testimony.

10          But he certainly never recanted it and he, too,

11     gave a contemporaneous statement to the police expressing

12     fear at the time of Collins, as did Mr. Santos express fear

13     of Collins at the habeas hearing in 2010 and at the trial in

14     1994, or 1995, or thereabouts.  And, you know, again, Santos

15     has recently as 2010, affirmed under oath that his trial

16     testimony was accurate.

17          As far as Oliva is concerned, the recantation we

18     think lacks the slightest credibility.  I mean, he gave a

19     detailed signed -- signed a detailed two page, single space

20     statement implicating Collins in the crime.

21          I realize there's a lot of -- seems to be a lot of

22     window dressing and complaints about the material witness

23     warrants, but the reluctance of those witnesses was disclosed

24     at the time of the trial to the Defense -- the reluctance of

25     the witnesses was disclosed, which is the reason why they had

1   to get the warrants in the first place, and the trial judge,

2   Judge Geo (sic), is the one who signed the warrants.

3          So, you know, at the end of the day is made to

4   appear a lot worse I think than it really is.  Much more is

5   being made of some of these facts than is warranted.  I only

6   put that on the record so the Court is aware that there's two

7   sides to this.  It's not as if we agree with the

8   characterizations.

9          THE COURT:  I fully understand and I'm making -- I

10  have -- my mind is totally open as to what happened, and I'm

11  looking forward with great interest to the trial.  And I've

12  enjoyed the beginning of your summations already.

13         MR. LARKIN:  Well --

14         THE COURT:  Okay.  So let's just get back to the

15  discovery material that you need.

16         MR. RUDIN:  Yes, Your Honor.

17         THE COURT:  But I do say that it's helpful, though,

18  for me to know from both sides what you think is really

19  relevant and what I should be looking for, focusing on here

20  in these documents.

21         Okay.  So there are some documents you need that

22  you don't have?

23         MR. RUDIN:  Yes, Your Honor.  The heart of our

24  Monell claim involving the DA's Office is the -- our

25  contention that District Attorney Hynes was deliberately

1    indifferent to misconduct by his staff by failing to

2    discipline or by promoting and rewarding ADAs who he knew or

3    should have known had been implicated in apparent improper

4    activity.

5            And so -- and this is the theory that Judge Block

6    specifically upheld in his decision.  He noted that we had

7    listed a great number of cases there.  The majority of them

8    are listed in Exhibit H to the complaint.  And then there's

9    some additional cases we've listed in our discovery request

10   where we sought the personnel records of the ADAs involved,

11   just as I've done in some other cases and other lawyers have

12   done.

13           The Ramos case involving the Bronx DA's Office, we

14   were given the personnel records.

15           The Zarri case in this courthouse.  Actually, it

16   was a more limited request.  We got the -- we received

17   information about the failure to discipline a case involving

18   the Queens DA's Office that Judge Pollak supervised

19   discovery.  We were given the personnel records of ADAs.

20           And the reason is that we would like to show first

21   of all that there was a failure to investigate or discipline

22   the ADAs, which I think the City has -- is acknowledges that

23   we're -- we're entitled to show the -- they may later on

24   argue that some of the cases that we're citing are too

25   dissimilar to this case to be relevant, although Judge Block

1      in his decision, said that that's a jury -- will be for the

2      jury.

3                  But at this point, we're entitled, and I don't

4      think the City disagrees, to information that establishes

5      whether or not the ADAs in the 50 or so cases that we've

6      enumerated were investigated for, or, in fact, disciplined

7      for the alleged misconduct.

8                  But where we disagree is whether or not we're

9      entitled to additional personnel records that relate to

10     whether or not the same ADAs received promotions, received

11     positive evaluations, received salary increases or bonuses.

12     At the time that the district attorney was aware, or should

13     have been aware, that they had been implicated -- that they

14     had been accused of improper activity, and that that had been

15     substantiated, at least to some extent, by court decisions.

16                 And if I can hand up to the Court a number of

17     documents that I think will help illustrate the importance of

18     what we're looking for.

19                 THE COURT:  Has Defense counsel seen these

20     documents?

21                 MR. LARKIN:  (Indiscernible).

22                 MR. RUDIN:  We just took the deposition of Jon

23     Besunder, who is the ADA, who the -- several of the -- a

24     couple of the documents on top refer to.  And this is an

25     interesting aside for the privileged discussion that we had.

34

1          Mr. Besunder is, according to the records, the ADA

2     who approved the arrest of Mr. Collins back in 1994, and his

3     name is in a number of notes that were provided, either from

4     the Oliva file or from the Collins file, and he testified

5     that he has absolutely no recollection of the case

6     whatsoever.

7          THE COURT:  Mm-hmm.

8          MR. RUDIN:  And so it gives an example of, with

9     certain of the witnesses anyway, it's so difficult now

10    assuming he's telling the truth to reconstruct what happened

11    almost 20 years ago.

12         But in any event, Mr. Besunder was involved in the

13    Waldbaum Fire case that received a great deal of notoriety,

14    first when the fire happened in 1979/1980 when six

15    firefighters died, and then an individual was prosecuted for

16    the arson murder and convicted.

17         And then in the late eighties into the early

18    nineties, there was 440 litigation in the state court

19    regarding Rosario and Brady violations and ultimately Justice

20    Slavin of the state Supreme Court in Brooklyn issued a

21    remarkable opinion in 1992 where he found just a huge number

22    of egregious Brady violations and essentially concluded that

23    this individual had been framed.  And Jon Besunder was the

24    prosecutor.

25         So when I questioned him at his deposition about

1      the sequence of the events in the litigation in comparison to

2      what happened to him with his -- the record, his personnel

3      records.

4                So when Mr. Hynes came in as district attorney in

5      1990, there already had been a finding of a very serious

6      Rosario violation, which was on appeal, and, ultimately, in

7      1991, the state Court of Appeals sent the case back for

8      further proceedings, because they found that the trial court

9      had not made the requisite finding of materiality.

10               And then there was a further hearing in 1992.  And

11     then there was a court decision -- a decision by Justice

12     Slavin in '92, published decision finding the -- that his

13     testimony had been evasive and disingenuous and finding a

14     series of Brady violations, and that was upheld by the

15     Appellate Division in 1993.

16               So you could see from this document that in

17     February of 1990 -- and Mr. Hynes I believe had personal

18     knowledge of this prosecution.  In 1990, he sends him a

19     letter, a very positive letter to go into his personnel file.

20               And then the second document indicates that in July

21     of 1990, which by the way was one month after the Appellate

22     Division affirmed the Rosario violation finding, Mr. Hynes

23     promoted Mr. Besunder to first deputy chief of the Homicide

24     Bureau July of 1990.

25               And while the evidentiary hearing was going on in

1   1992 concerning the Brady violations, Mr. Hynes promoted Mr.

2   Besunder March of 1992 to the trial cadre First Deputy Bureau

3   Chief Investigations Division.

4           And then several years after the Appellate Division

5   upheld the finding of the Brady violations and the vacature

6   of the conviction, Mr. Besunder was promoted in 1996 to

7   executive assistant district attorney.

8           So I think the sequence of the promotions is very

9   significant.  It's not only that he wasn't disciplined,

10  although he testified to that as well, but that he was being

11  promoted.

12          And we were not given his salary records, but I

13  imagine his salary records would show that during this period

14  he was receiving merit or stepping -- merit pay increases or

15  bonuses that would also tend to suggest to the ADA that

16  district attorney was not too concerned about the findings of

17  misconduct.

18          So then the next document shows the salary records

19  of a number of ADAs, and this was produced -- actually, I

20  think it was obtained through Freedom of Information Law

21  litigation, either by my client or by Newsday.

22          And it shows that the district attorney keeps

23  records of the progression of the salary of each individual

24  ADA and it seemed to be central records as well as the

25  promotions to more prestigious or responsible positions.

1          These records have not yet been turned over but I

2     think that's because they were not made available to Defense

3     counsel.  I know they're going to be looking for them, as far

4     as the five or six individuals where personnel records have

5     been produced.

6          But I'm submitting this to the Court just to

7     indicate that with respect to the 50 or so prosecutors, 45 or

8     50 prosecutors in the other cases, first of all, these

9     records are kept in a central database, so they can be easily

10    produced.

11         But second of all, it shows the promotional record

12    reflected in title, drop title, and salary increase, and that

13    can then be compared to when the court decisions came down

14    when the allegations were made of misconduct, and it becomes

15    highly significant.

16         The next page, the next document --

17         THE COURT:  So let me just ask you.  What is it

18    that there's a disagreement about?

19         MR. RUDIN:  Well, there appears to be a

20    disagreement about whether or not -- and just one other

21    thing, Your Honor.  Your Honor, I gave you a rather thick

22    series of memoranda as to Stacey Frascogna.

23         THE COURT:  Good.

24         MR. RUDIN:  These are evaluations that occurred

25    over a number of years.  They're very detailed and they have

1    to do with how she's handed various litigation

2    responsibilities.  And I'm not saying that she was accused of

3    misconduct in any of these cases.  It's just that it's an

4    example of the kinds of records that they kept.

5           So what I'm asking -- the disagreement is that

6    apparently the -- and I'm sure Mr. Larkin will correct me, or

7    Ms. Krasnow, if I'm misstating their position.

8           Apparently, their position is that we're entitled

9    to know whether or not the ADAs in these cases were

10   investigated by some disciplinary body within the DA's

11   office, or disciplined, and either they were or they weren't,

12   and if they were not, that's the end of it.  We don't need to

13   know anything more.

14          And what I'm suggesting is that we do need to know

15   more.  We need to know the promotional history.  The

16   evaluations that they received, because imagine that you're a

17   prosecutor who has just been excoriated by the Appellate

18   Division or by a federal judge for a serious Brady violation

19   that caused someone to be in prison for a number of years,

20   and then that prosecutor receives an evaluation that praises

21   him or her for his ability to get a conviction in weak cases.

22          I mean, I got that material in the Bronx in the

23   Ramos case, and it was remarkable the number of times that

24   prosecutors were praised for their ability to win convictions

25   in weak cases or to get pleas, and a total absence of any

1  critique that could be related to any of the 72 cases of

2  misconduct that we listed.

3          So I just think this is -- this is -- this is the

4  very center of our _Monell_ claim and it was upheld by Judge

5  Block.

6          THE COURT:  No.  I understand your position.  And

7  the City's position is it's not relevant or --

8          MR. LARKIN:  Your Honor, our position is as

9  follows.  Let's me try to break it down a little bit.

10         I mean, there are 40 to 50 to 60 some odd cases at

11 issue here.  We would have to -- the burden is that we would

12 have to identify each and every prosecutor involved in these

13 cases.

14         It appears that plaintiff wants every single

15 personnel file for every single assistant DA who was involved

16 -- involved, whatever that means, I guess, in these

17 prosecutions, the trial assistant perhaps, any appeals

18 attorneys.

19         But not every one of these cases is the same.

20 There are some cases where the Court of Appeals does issue a

21 stinging opinion, or in counsel's description, I think a

22 blistering opinion in one case.

23         You know, the issue here is notice, and I'm

24 starting to -- as I'm describing these issues, I guess I'm

25 sort of merging two, two different questions.

40

1          The first question is, you know, what's the -- what

2     ultimately -- what ultimately is relevant to the plaintiff's

3     claims?  What's relevant it seems to be -- it seems to me is

4     notice.

5          And if there's a difference of opinion between the

6     DA's Office and the Defense -- Defense attorneys at trial, as

7     to whether a particular item is Brady, or whether there's

8     a -- you know, let's say an assistant submits a particular

9     issue to the trial court for in camera review as to whether

10    it is Brady, and the trial court says, "It's not Brady.  You

11    don't have to turn it over."  And on appeal, the Second

12    Department disagrees, and says, "Look, this is Brady.  We

13    believe it should be turned over."

14         That's a disagreement about a legal principle that

15    happens in almost every single case.  And when the Appellate

16    Division issues its ruling, that is notice to the DA that, in

17    fact, in this case, or notice to the DA's Office that in this

18    particular case, in this circumstance, that item of evidence

19    is Brady, and in future cases, similar cases, it should be

20    turned over.

21         But there isn't any call for discipline in that

22    case.  There isn't any need to punish the assistant DA who

23    perhaps had a disagreement and he discussed that disagreement

24    with his supervisors.  And, you know, not all the cases are

25    the same.  Some of them may have stinging comments from an

1    appellate judge saying, "Well, this appears to us to be an

2    international violation of the Brady rule."  And it's a

3    clear --

4              THE COURT:  If I could just stop you for a second.

5              MR. LARKIN:  Yes, Your Honor.

6              THE COURT:  It seems what you're saying is there's

7    a difference between a Brady violation and misconduct.

8              MR. LARKIN:  Sure.  I think --

9              THE COURT:  And that misconduct would be what the

10   plaintiff is looking for.

11             But my sense is that both sides are not going to

12   agree on what should be sanctionable or what the DA's Office

13   should do, and that's what you're going to be fighting about

14   when you get into court ultimately.

15             You know, was this -- was this Brady violation

16   actual misconduct or was it a reasonable person's belief of

17   what they should have done.  Almost like a qualified immunity

18   analysis.  Right?

19             MR. LARKIN:  Something similar.  I mean, you know,

20   you look at -- you have to look at each case individually to

21   see --

22             THE COURT:  Yes.  I understand.

23             MR. LARKIN:  -- whether a reasonable law

24   enforcement official would take the decision as a rebuke of

25   the office or as a development in the law that should then be

1        communicated to the assistants.

2                    THE COURT:  Right.

3                    MR. LARKIN:  The latter would not really seem to

4        warrant discipline for an attorney who, you know, who took a

5        position at trial that perhaps the Appellate Court then --

6        then disagreed with.  But I think --

7                    THE COURT:  So let me just jump in here then.

8                    MR. LARKIN:  Yes, Your Honor.

9                    THE COURT:  It seems to me that the question --

10       that you're not going to agree about on the merits, and the

11       question is:  What's discoverable and when is the burden

12       going to be outweighed -- going to outweigh the benefit?

13                   And it seems that you're making a burden argument

14       that they're -- we've got a whole lot of cases.  Some of

15       which may involve violations but not misconduct, and that we

16       somehow need at this point to pare down the discovery that

17       the plaintiff is seeking.

18                   MR. LARKIN:  I mean --

19                   THE COURT:  Now, if we had the luxury of three

20       years to do discovery and didn't have a trial coming up and

21       didn't have motions coming up, then I think it would be

22       easier, you know, to sit back in a reflective way look at the

23       cases and try to pick out which case it makes sense to go at,

24       and then to stage this, you know, so that Mr. Rudin could

25       look at, you know, ten cases, and then you say, okay, I want

1      ten more cases like this, and just keep going.  Or -- or

2      something else.

3              The task before us today is given that we have

4      deadlines, that we have summary judgment motions, and we've

5      got depositions coming up, and you all have an awful lot of

6      work to do, what is the most efficient way to get at what is

7      misconduct in the situation that -- or not.

8              I mean, I suppose Mr. Rudin also could argue that

9      once the Appellate Division has done X, Y or Z, and made a

10     ruling as to what a <u>Brady</u> violation is, there is a duty to

11     train and a duty to supervise, and that that duty to train

12     and supervise is triggered at that point.

13             Now, where does this discovery fit in and how do we

14     -- do we start at, you know, year 1990 and say that certain

15     principals or -- principal is p-a-l-s -- certain individuals

16     were involved who should have been on notice and should have

17     been trained properly and supervised properly?  Is that the

18     way to organize this by individuals?

19             Is it by cases, you know, principals, you can't do

20     this anymore in this office?  What's the best way to organize

21     that?

22             I can't tell you that, but I think that that's the

23     question here.  And if you're telling me that -- I think

24     you're telling me that you can't go through every one of

25     these cases and identify all the ADAs and provide the

44

1    information.

2           Then I think the question is well, how can we get

3    the plaintiff the discovery that he needs into cases where he

4    can have a fair shot at showing whether or not there was a

5    failure to train and supervise?

6           So what's your proposal?

7           MR. LARKIN:  Maybe there's two ways.  First of all,

8    we've agreed to produce any training memoranda updates

9    concerning the developments in the law that the DA's Office

10   has that go back to all the relevant time frame here.  So

11   presumably, if there is a ruling on Brady from the Second

12   Department, the DA is going to circulate that decision, you

13   know, at some --

14          THE COURT:  Okay.  So we --

15          MR. LARKIN:  -- reasonable interval.  And we've

16   definitely agreed to produce that material.

17          THE COURT:  Okay.

18          MR. LARKIN:  There's no question that that's -- it

19   seems to me that's fair game.

20          The concern is in every single one of these cases,

21   to go back to the original file, some of which date --

22   counsel mentioned the Waldbaum case with Mr. Besunder.  That

23   was a 1978 crime, or I should say 19 -- the fire occurred in

24   1978.  The trial was 1979.  So, you know, to go back that far

25   --

```
 1              THE COURT:  When I ask you look at --
 2              MR. LARKIN:  Well, permit me to finish.  You know,
 3    that's an illustration of some of the burdens here, because
 4    if you've got 40 to 50 or 60 decisions to go back to pull
 5    each and every file, find out who every assistant was, and
 6    then to go pull all of those individual's personnel files,
 7    given the time allotted to us, does seem like a very heavy
 8    burden, particularly when a good number of these cases simply
 9    involve disagreements with a ruling by the trial court --
10              THE COURT:  Right.
11              MR. LARKIN:  -- which wouldn't warrant discipline.
12    So I --
13              THE COURT:  But what --
14              MR. RUDIN:  My -- my reply --
15              THE COURT:  -- let me just ask -- I'd like to hear
16    your proposal as to what would work.  You know, and I notice
17    even in some of these evaluations that it's mentioned who was
18    lead counsel, who was co-counsel, what their roles were.
19    Does it make sense to go by -- to just designated a certain
20    number of attorneys and just say, "These are the people we
21    want to see"?  Or is what you're looking for, who the
22    attorneys were, who were lead counsel or decision-making
23    counsel in some of these cases, and then follow up on what
24    happened to them?
25              MR. RUDIN:  Your Honor, please pardon me, but this
```

1    is very frustrating.

2              THE COURT:  Okay.

3              MR. RUDIN:  Our document request was made in

4    February.  As the Defense counsel well knows in the Zarri

5    case, which I handled for plaintiff, that disclosure was made

6    of quite -- of the lack of discipline of a number of ADAs

7    involved in the very same cases we're asking for now.  I

8    would say that the majority of the cases that are in our

9    Exhibit H were also in the Zarri case.

10             THE COURT:  Oh, so you think that this --

11             MR. RUDIN:  They know who the ADAs are.

12             THE COURT:  -- information is collected.  Okay.

13             MR. RUDIN:  They know.  They've already identified

14   who the ADAs are in the vast majority of cases.

15             THE COURT:  Okay.

16             MR. RUDIN:  And I'm sure that within one day they

17   can figure out from their records who the ADAs were in the

18   other cases.  And I assume that Mr. Larkin has the list that

19   was provided by Marilyn Richter of his office in the Rosario

20   case, and if he doesn't, I can fax -- I can email that to his

21   office this afternoon.

22             So as to the 56 cases, which I pare down to 40, and

23   then I added some additional cases that I learned about after

24   our initial document request in February, so the total now --

25   and there are a few more in that case that I added that were

1      not in the complaint.  So the total now is about -- I'd say

2      is about 50.

3              Of those cases, the vast majority, they know who

4      the ADAs are, and they can identify the additional ADAs very

5      easily.  So identifying the ADAs is not the problem.  The

6      problem might be going through their records and finding the

7      personnel records for each ADA who they've identified.  And I

8      imagine that will take another few days.

9              And then there's a question of copying.

10             MR. LARKIN:  A lot more than a few days.  I mean,

11     I'm sorry to interrupt.  A lot more than a few days.

12             MR. RUDIN:  Yeah.  But that's why I asked --

13             MR. LARKIN:  There's a whole --

14             MR. RUDIN:  -- I made this request in February.

15             MR. LARKIN:  Yeah.  But look --

16             MR. RUDIN:  And, Your Honor -- Your Honor, in -- at

17     our conference in early March directed that the City start

18     getting the documents together so that when you ultimately

19     made a ruling, if there was any disagreement, they would be

20     in a position to start producing, and Mr. Larkin agreed, "Of

21     course, Your Honor, we'll be doing that."

22             MR. LARKIN:  The whole point of a burdensomeness

23     objection --

24             MR. RUDIN:  And now -- now we --

25             MR. LARKIN:  -- the whole point of a burdensomeness

48

1    objection is that you aren't going to chase around looking

2    for things if the Court ends up agreeing that the burden of

3    the discovery outweighs its benefit in this particular case.

4              THE COURT:  No.  I understand.

5              MR. RUDIN:  At no point did when we started

6    briefing these issues did the City ever take the position

7    that any specific case from our list, at least the list from

8    Exhibit H, was not relevant.

9              And Judge Block specifically said that it's a jury

10   question whether or not the violations that we were

11   complaining about were sufficient to -- sufficiently

12   relevant.

13             THE COURT:  Okay.  Let me ask you.  How many ADAs

14   do you think we're talking about?

15             MR. RUDIN:  Probably about 35 or 40.  I don't know

16   how many repeat offenders there are.  But probably --

17   probably about 40.  But, and that's another thing.  There may

18   be repeat offenders and the failure to disappoint in one

19   case, then there's another case.  I mean, Mr. Vecchione from

20   our point of view is certainly a repeat offender, but --

21             THE COURT:  Right.

22             MR. RUDIN:  -- you know they would disagree.

23             THE COURT:  Let me see if I can cut through this.

24   I understand that there's a burden issue here.  How long will

25   it take you to just identify who the ADAs are?  Is it -- do

1       you disagree with Mr. Rudin that some of them have already

2       been identified?

3               MR. LARKIN:  I don't know that.  I have -- I would

4       have to look at the letters from Ms. Richter.  I do believe

5       that they were produced in discovery and that there was a --

6       I know that there was a recognition by our office, by the

7       DA's Office that none of the ADAs involved in the cases up

8       until about 2005 were disciplined.

9               I don't know that that exercise involved

10      identifying every individual ADA.  I think the question was

11      simply posed --

12              MR. RUDIN:  No, no.

13              MR. LARKIN:  -- was there -- just -- excuse me,

14      Counsel, please -- was there discipline?  I believe the

15      answer was no, there wasn't.  But, again, you know, that's

16      one subset of cases.

17              There are other cases that plaintiff evidently

18      wants now where convictions have not been overturned.  Where

19      there's been no judicial decision that there was ever a Brady

20      violation.  Where there's an allegation or a belief that

21      there might have been a -- some Brady issue that arose in the

22      case, but a conviction was never overturned.

23              And so in cases like that, and in other similar

24      type cases where the Appellate Division says, "Look, if there

25      was a non-disclosure here, it was harmless in the context of

1    this case, because of the facts of that case."  The evidence

2    of guilt was overwhelming for example.

3         You know, it's hard to justify discipline or

4    chasing around looking for personnel files in a case like

5    that.  In a case like that, you might expect or you would

6    expect, you would expect the decision to be circulated and

7    you would expect there to be perhaps some education of the

8    trial assistants that here's what the Appellate Division is

9    saying about Brady.

10        But to expect discipline in a case like that

11   doesn't seem reasonable.  And furthermore, the other newer

12   cases, where there has not been a reversal, where there has

13   not been any finding of a Brady violation, seems to me

14   there's no justification to try to chase down, track down the

15   ADAs involved in those cases and find their personnel files.

16   It's straying way far afield from what the issues in this

17   case are, which is the idea that that DA Hynes allegedly

18   ratified Mr. Vecchione's conduct.

19        So I think, you know, in fairness, there's got to

20   be some way to streamline this so that we can identify the

21   cases where there really was misconduct, and -- or where

22   there was at least some basis for the plaintiff to argue that

23   there was misconduct, and then, I mean, my view is that the

24   question really is discipline and the rest of it isn't all

25   that relevant, but I guess my -- my sense is Your Honor may

1   at least -- at least direct that some searches be made for

2   some -- some other ADA personnel records.  I don't know.

3          MR. RUDIN:  Your Honor, we had this conversation on

4   -- I believe it was March 22nd and 23rd we had our meet and

5   confer, and the City at that point declined to provide this

6   information.  And after -- for the last March, April, the

7   last month and a half, I've tried to have another meet and

8   confer, and the City hasn't responded.

9          So I really don't understand at this point

10  suggesting to Your Honor that an effort should be made to try

11  to somehow force us to pare down our list even further when

12  Judge Block has already explicitly held in his decision that

13  as to the cases that we've listed and the allegations we've

14  made, it's a jury question.

15          THE COURT:  Okay.

16          MR. LARKIN:  Your Honor, I'm sorry.  I'm sorry,

17  Your Honor.

18          THE COURT:  I think we've probably argued this

19  point enough, and I have some people from your office, and

20  perhaps some of your colleagues out there waiting for another

21  case.

22          It seems to me that clearly that it is relevant

23  what kind of discipline, supervision, and training was

24  provided.  The question really is what's burdensome and

25  what's not burdensome.

1          This issue, this kind of issue, I think, can't be

2     decided speculatively.  It can only be decided by specific

3     information.  So what I really -- what I really want to know

4     -- what I'm going to start by asking the City to do is to

5     identify who the ADAs are in these -- how many?  Forty plus

6     cases, end up being 50, 50 or so cases?

7               MR. RUDIN:  I can provide at least 30 of them.

8               THE COURT:  Okay.

9               MR. RUDIN:  I have the information from their

10     office already.  I thought Mr. Larkin had that letter, but --

11     and I know we provided it in discovery --

12               THE COURT:  All right.  So if you can identify

13     those.

14               MR. RUDIN:  -- but I'll send it again.

15               THE COURT:  If you identify those, and then as to

16     those cases, then there may -- then the work may be much

17     smaller.  Then what I want is I want to know, you know, as

18     soon as possible why, why it's so burdensome to find this

19     information.  It may be that some of it's automated.  You can

20     just get it right away, get these evaluation reports.

21               MR. LARKIN:  Your Honor, my understanding is that

22     from lengthy discussions with the client is that it would be

23     a very time consuming exercise to go back to old files and

24     identify assistant DAs.

25          Now, that was one discussion I had with them.  I am

1    happy to -- if there is additional information that plaintiff

2    has from other cases, I'm happy to go back to them and find

3    out, number one, is it possible to get the files, the

4    personnel files for the 30 individuals whose names we already

5    know?

6              And number two, now that the list, instead of being

7    50, let's say it's 20 cases, perhaps some of them more

8    recent, is there a way to identify just the ADAs?  The trial

9    assistants, I assume we want to know the name of the trial

10   assistant.

11             THE COURT:  Right.

12             MR. LARKIN:  For those cases, can that be done --

13             THE COURT:  Right.

14             MR. LARKIN:  -- quickly and --

15             THE COURT:  And I have to say, I don't think that -

16   - that would be so hard if it's narrowed down.  Plus, I mean,

17   I'm just imagining what would happen if that request were

18   made here in this court to figure out who the prosecutors

19   were in a particular case, even before we went to electronic

20   case filing.

21             You'd go to the files.  You'd figure out what the

22   names were, the prosecutors, they would be on the docket

23   sheet, or they would be somewhere else.  It should be fairly

24   easy to figure out.

25             And I need to know specifically why that -- I'm

```
 1     going to presume that that's not going to be so burdensome
 2     now that Mr. Rudin is going to help you out on that.
 3               MR. LARKIN:  Okay.
 4               THE COURT:  And then I need you to get back to me,
 5     you know, sometime -- well, get back to Mr. Rudin and
 6     hopefully work that out.  And if you don't work it out, get
 7     back to me sometime by the middle of next week.
 8               MR. RUDIN:  And the question --
 9               MR. LARKIN:  Your Honor --
10               MR. RUDIN:  -- the question will be -- the question
11     will be not just the names, the question is going to be --
12               THE COURT:  And files.
13               MR. RUDIN:  -- you know, how long will it take to
14     gather these files?  Where are they?  Are they stored in
15     archives?  If so, how quickly can we -- can we get them and -
16     -
17               THE COURT:  That's right.
18               MR. RUDIN:  -- and -- okay.
19               THE COURT:  Yes.
20               MR. RUDIN:  I understand.
21               THE COURT:  And I don't want someone to say, "Oh,
22     this is going to be a hard job, it will take a long time."
23               MR. LARKIN:  No, no.
24               THE COURT:  I want to know specifics.
25               MR. LARKIN:  Specifics.
```

```
 1              THE COURT:  Where they are, why.  And I think that
 2      will help you, too, because you're going to need this
 3      information.
 4              MR. LARKIN:  I understand, Your Honor.
 5              THE COURT:  Okay.
 6              MR. LARKIN:  It has to be some very specific --
 7      where the files are located --
 8              THE COURT:  Yes.
 9              MR. LARKIN:  -- you know, et cetera.  I understand.
10              THE COURT:  Okay.
11              MR. RUDIN:  Your Honor, I --
12              THE COURT:  I know you have a few more things in
13      here, and --
14              MR. RUDIN:  I'm willing to wait if you want to take
15      another case and have us come back.  I mean, this is very
16      significant material from our point of view.  So whatever
17      works for the Court.
18              THE COURT:  How much more do you have that you
19      haven't worked -- if you -- if I put you all in a room while
20      I do this settlement conference, do you think you'll do any -
21      - will it work, or will you just be tortured --
22              MR. LARKIN:  No.
23              THE COURT:  -- and suffocated?
24              MR. LARKIN:  I -- I think the latter.  Honestly,
25      Your Honor, you know, in a nutshell, what it appears
```

1    plaintiff wants are case files from a lot of these older

2    cases, where you already have a court decision setting forth

3    what the Court believes was done wrong in that case.  And so

4    the notice is there.  It's self-explanatory --

5            MR. RUDIN:  No, no.

6            MR. LARKIN:  -- it seems to me.  And it's clear,

7    for example, that if the Court of Appeals ruled that a

8    particular item was <u>Brady</u> and that the district attorney had

9    disputed that material was <u>Brady</u>, then the DA's position is

10   clear from the Court's opinion.  The brief, for example,

11   isn't going to add very much, it seems to me, to the

12   discovery in the case.

13           MR. RUDIN:  Your Honor, there are about five or six

14   cases that we begin to -- we actually list nine, but we're

15   willing to pare it down somewhat.  Beginning on page six of

16   my letter to the Court on April 11th, we go through in some

17   detail why the cases are important.

18           THE COURT:  Mm-hmm.

19           MR. RUDIN:  And I think it is pretty clear that

20   these are targeted requests, and since we made them, we've

21   been able to get some additional material on our own.

22           So there are about six or seven cases out of the

23   nine where -- and the majority of the courts did find

24   misconduct.

25           Where we need material from their file that would

1    reflect on what they knew about the misconduct and why the --

2    and the fact that the prosecutors had been involved in

3    misconduct and potentially should have been disciplined.

4            To some extent -- in a few cases, in some of the

5    case material, we have not been able to obtain, and so

6    they're targeted requests for the few items that we have not

7    been able to obtain.

8            And it seems that our fundamental disagreement is

9    over relevancy, and I think it will take about two minutes

10   with each case, one to two minutes for me to explain why

11   they're relevant and to explain the -- how we're making

12   targeted requests.

13           And then Your Honor can decide whether they should

14   be required -- I mean, I think the relevancy will be obvious.

15           THE COURT:  We can do that Monday morning.  Are you

16   available Monday morning?  And even do it by phone if you

17   have to.

18           UNIDENTIFIED MALE:  May I just check?

19           THE COURT:  You cannot?

20           MR. LARKIN:  Monday afternoon would work for us,

21   Your Honor.

22           THE COURT:  I have the same problem, a settlement

23   conference at the end of the day.  I have a lunch meeting.

24   Tuesday.

25           MR. LARKIN:  Tuesday morning?

58

1          THE COURT:  Tuesday.  Let me see just find

2     something out.

3          MR. LARKIN:  Wednesday any time.

4          THE COURT:  I can't do it on Wednesday.  I've got a

5     four hour hearing.  (Indiscernible)at 11:30, 3:30.

6     (Indiscernible).

7          THE CLERK:  (Indiscernible).

8          THE COURT:  Yes, (indiscernible).  I'm looking at

9     Wednesday the 8th, trying to find some time to do more of the

10    Collins (indiscernible).

11          (Proceedings concluded at 4:12 p.m.)

12          I, CHRISTINE FIORE, Certified Electronic Court

13    Reporter and Transcriber and court-approved transcriber,

14    certify that the foregoing is a correct transcript from the

15    official electronic sound recording of the proceedings in the

16    above-entitled matter.

17

18          *Christine Fiore*

19    _____          May 14, 2013

20         Christine Fiore, CERT

21

22

23

24