UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


JABBAR COLLINS,                  *    Case No. 11-CV-00766(FB)
                                 *
            Plaintiff,           *    Brooklyn, New York
                                 *    May 6, 2013
      v.                         *
                                 *
THE CITY OF NEW YORK, et al.,    *
                                 *
            Defendants.          *
                                 *
* * * * * * * * * * * * * * * *

      TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
          BEFORE THE HONORABLE ROBERT M. LEVY
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          JOEL B. RUDIN, ESQ.
                            Law Offices of Joel B. Rudin
                            200 West 57th Street
                            Suite 900
                            New York, NY 10019


For the Defendants:         ARTHUR LARKIN, ESQ.
                            ELIZABETH KRASNOW, ESQ.
                            NYC Office of Corporation
                            Counsel
                            100 Church Street, Rm 3-180
                            New York, NY   10007




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1        (Proceedings commenced at 10:05 a.m.)

2            THE COURT:  Good morning.  This is Judge Levy.  We

3    are here on Collins versus City of New York, 11-cv-766. Will

4    counsel please state their appearances for the record?

5            MR. RUDIN:  Joel Rudin.  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MR. LARKIN:  Your Honor, good morning.  Arthur

8    Larkin, L-a-r-k-i-n, for the defendant, and with me, of

9    course, is Elizabeth Krasnow, K-r-a-s-n-o-w.

10           THE COURT:  Good morning.  How is everybody today?

11           MR. LARKIN:  Good morning, Your Honor.

12           MR. RUDIN:  Fine.  Thank you.

13           THE COURT:  Good.  Okay.  Well, I finished the in

14   camera review, so when I'm done, I'll speak to Mr. Larkin and

15   Ms. Krasnow about the logistics, and we'll proceed from

16   there.

17           So --

18           MR. LARKIN:  Thank you very much for your

19   assistance in that respect, Your Honor, and I appreciate how

20   much time it took to look at all that stuff.

21           THE COURT:  I think it took all of you a lot of

22   time to look at all this stuff.

23           All right.  So, Mr. Rudin, you're in the middle of

24   some issues last Friday when we had to adjourn.  So if you

25   would like to continue from where you were.

3

1              MR. RUDIN:  I submitted a letter to the Court

2     actually it was filed yesterday that dealt with two issues.

3     One issue was the question of identifying the ADAs and we

4     have supplied Defense counsel with a list of the 50 cases and

5     the names of I believe it's 36 -- of the ADAs assigned to 36

6     of those cases.  So that assuming all that information is

7     correct, they only have to identify 14.

8              It seems to me that the process of identifying of

9     ADAs and to obtain the personnel records and to copy them is

10    not that big a deal, and it's just a question of assigning --

11    assigning one or two people to do it.  And that's all it

12    really is.

13             MR. LARKIN:  Your Honor, I believe the Court had

14    already directed us to inquire of our client as to, number

15    one, how difficult it would be to identify them, the ADAs

16    that is; and then number two, how difficult or burdensome

17    would it be to find the personnel files.  And we intend to do

18    that either today or tomorrow.

19             So I'm not sure why we're revisiting this issue.  I

20    thought Your Honor had ruled on it and this is what we intend

21    to do as soon as we possibly can.

22             MR. RUDIN:  That's fine.

23             THE COURT:  Yes.  I think Mr. Rudin was hoping that

24    he would make your job easier.

25             MR. LARKIN:  Yes.  I have to look at what was sent

4

1    to us.  I -- there was an attachment to an email that I can't

2    open.  It's in a program that for some reason I can't open.

3    So I just need it in Word or in PDF.

4              In addition, my memory is that those letters from -

5    - well, if you could send me that attachment in either Word

6    or PDF, it will advance the ball.

7              MR. RUDIN:  Yes.  Your Honor, I've sent in PDF the

8    correspondence that I received from another assistant

9    corporation counsel in the <u>Zarri</u> (phonetic) case some years

10   ago.

11             Where she had -- she had tracked down through the

12   DA's Office the name of the ADAs in about 20 or 25 of the

13   cases, and then I prepared a memorandum in WordPerfect.  I

14   guess that Mr. Larkin cannot open that.  I'll resend it in

15   Word.

16             THE COURT:  Okay.  Good.

17             MR. RUDIN:  Her memorandum listed the 50 cases and

18   the names of the ADAs in 36 of them.  So I'll resend that

19   document.

20             THE COURT:  Okay.  Good.  So I guess we need to go

21   to the second half of your letter, then.

22             MR. RUDIN:  Yes.  So the second half of the letter

23   deals with the question of whether the defendants have fully

24   complied with producing the documents and answering the

25   interrogatories that they had agreed to do by May 3rd, and,

1    you know, we went as best as we could, we went through the

2    discovery and compared it to the various items that they had

3    agreed to provide.

4          Some of this is piecemeal because, you know, they

5    have agreed, they agreed in our meet and confer back in March

6    to produce certain items.  We've sent them a letter

7    confirming our understanding.  And then we -- we moved to

8    compel the additional items.

9          Some of the additional items we moved to compel,

10   they responded by saying that they had already agreed to

11   provide them, which was welcome on our part.  We hadn't

12   understood that, but that's certainly welcome.

13         But of what they've agreed to provide, a lot of it

14   has not been provided, as far as I can tell.  And, you know,

15   part of  the problem is that when they're providing

16   information, they're generally not giving us the dates,

17   numbers, and correspondence to specific requests.  They're

18   just giving us discovery.

19         So that's been a problem.  But, anyway, I

20   understand Mr. Larkin has some disagreement with my letter.

21   So I gather he's going to express that now.

22         THE COURT:  Okay.  So, Mr. Larkin, it probably

23   makes sense just to go in order if that works for you of the

24   items that were identified.

25         MR. LARKIN:  Absolutely, Your Honor.  I'll be happy

1    to do that.  And the first issue -- I'm looking at counsel's

2    May 5th letter.  The first issue says the DA's various public

3    statements concerning Michael Vecchione.  Those were produced

4    on May 3rd on the CD-ROM.

5            I do not have the Bates numbers in front of me, but

6    we produced a stack about an inch thick of public statements,

7    press releases by the -- from the DA's Press Office.

8            So that request has been complied with in full.

9            THE COURT:  Okay.

10           MR. LARKIN:  The next one, Your Honor, the writing

11   logs, to the extent that the writing logs exist, they were

12   contained within the DA's file, which I grant counsel and the

13   Court was a very large file.  It was more than 30, 30,000

14   images, but we produced that -- all of that material way back

15   in I think it was -- I want to say October of 2011.  It might

16   have been sometime earlier than, earlier than that.  But all

17   of that material was produced a long time ago, and I've not

18   gone through the file to give counsel the Bates number, but

19   it's all there.

20           I've been informed by the client, you know,

21   unequivocally that all that material was in the file.  So

22   it's all there.  I don't know what else to say about that.

23           MR. RUDIN:  Well, Your Honor, if it was provided in

24   the 35,000 pages, if they can provide the Bates number, that

25   would be helpful.

7

1          MR. LARKIN:  (Indiscernible).

2          MR. RUDIN:  You know, (indiscernible) labeled and

3     we had asked for that in our document request number three of

4     about a month or so ago, and they didn't say that they had

5     provided it.  So if they have, that's great, and I'm sorry

6     that we missed it, but it would be helpful if they provided

7     some Bates numbers.

8          MR. LARKIN:  Your Honor, again, you know, this is

9     30,000 pages of materials.  It takes me as much time or one

10    of my paralegals as  much time as it would take plaintiff to

11    go through the documents and find them.  It's a needle in a

12    haystack sort of thing.

13         I believe the rules allow documents to be produced

14    either category by category or as they're kept in the regular

15    course of business.  And with a document production of that

16    size, we produced it in the regular course of -- as we keep

17    them, as the DA kept the files, in the regular course of

18    business.

19         THE COURT:  Let me ask a naive question.   Were

20    these documents produced in searchable form?

21         MR. LARKIN:  Yes, they were.

22         THE COURT:  So is there a search term that could be

23    put in that would easily disclose those documents?  If I --

24         MR. LARKIN:  Your Honor, the search term that we

25    used, it's an optical character recognition, which generally

8

1    works for typewritten documents.  But it may not work for

2    handwritten materials.  And some of these logs are, you know,

3    they're handwritten in.  Just fill in a name and a date and a

4    time.

5              THE COURT:  That's the problem then.

6              MR. LARKIN:  I -- gosh.

7              THE COURT:  Yes.  That's -- I was hoping there

8    would be an easy way to do this.  But it sounds as though --

9    it sounds like a lot of the documents I've been reviewing,

10   too, that when they're handwritten, it's hard to recognize

11   them.

12             MR. LARKIN:  It's hard to recognize them.  I -- you

13   could go through an entire database and code it, but you'd

14   need an army of paralegals working --

15             THE COURT:  Right.

16             MR. LARKIN:  -- you know, for a long -- long period

17   of time to do that.

18             MR. RUDIN:  Your Honor, we've continually provided

19   discovery where we've identified the documents that are

20   responsive to specific requests, and Mr. Larkin has had

21   various requests of us to supplement that, and we've always

22   complied to the best of our ability.  So here they -- they

23   have not done the same thing and we -- they're in a much

24   better position to identify the documents, since they know

25   what the documents are.  We just have 35,000 pages of

9

1    material just thrown at us.

2              THE COURT:  Is there any way -- if -- Mr. Larkin,

3    if I were trying to find those documents --

4              MR. LARKIN:  Yeah.

5              THE COURT:  -- would there be any way to narrow it

6    down?  What would I do rather than having to go through every

7    one of the 35,000 documents to see what's there?

8              MR. LARKIN:  You know what one would have to do,

9    Your Honor, is probably contact someone at the DA's Office

10   who knows what the records look like who could describe them

11   and maybe get a term, as the Court suggested, a search term

12   that might appear on say the cover of the log book or the top

13   of the page that's typewritten.

14             So if Your Honor believes that would be productive,

15   we're happy to at least try to do that, but I -- you know,

16   it's -- in a production of this size, I'm not sure what we're

17   successfully going to have.  I --

18             THE COURT:  Mm-hmm.  Well, I'm trying not to impose

19   a burden on one side or the other and see if there's a way to

20   get around it, because I understand Mr. Rudin's problem, and

21   he's got a huge number of documents to go through and it's

22   difficult for him to find it.  I understand your concern.

23   You're trying to produce as many documents as you can and

24   complete discovery.  It's burdensome on both sides.  I

25   recognize that.

1          So before going into what the rules would require

2     and imposing a greater burden on one side than the other, I'd

3     like to see if there's anything we can do.  And the second

4     thought would be if the DA's Office can easily segregate

5     that.  I mean, if they could easily put their hands on it,

6     that -- would that save both of you some time and trouble?

7          MR. LARKIN:  Your Honor, that may actually be a way

8     around it.  What I will do is when we speak to the DA's

9     Office about the identifying the ADAs, I will flag this as

10    another issue and see if they have some other ideas to how we

11    can go about extracting the doc -- the writing logs.

12          THE COURT:  Okay.

13          MR. LARKIN:  And there might be some other

14    documents that fall into the same category.  We'll have to --

15    perhaps as we go through them, we'll see some others.

16          THE COURT:  Right.  Because, ultimately, they will

17    probably understand that the burden might fall on them to do

18    this.  So if we can figure a way around it, it would be

19    helpful for them.

20          MR. RUDIN:  Your Honor, we've been joined by Ms.

21    Rosenblatt.

22          MS. ROSENBLATT:  Good morning.

23          THE COURT:  All right.

24          MR. RUDIN:  The next one?

25          THE COURT:  Mm-hmm.

1          MR. LARKIN:  I'm sorry, Your Honor.  The next one

2     was the identification of material witnesses held in hotel

3     custody.  This one we are working on.  We have not yet

4     compiled this list of material.  I need to get in touch with

5     the client again today.  This is one of the matters we did

6     talk about on Friday.  I will get in touch with the client

7     today to find out what records they still have from this time

8     period.

9          But, again, you've got some issues, some safety

10    issues that we did address this on Friday, and I intend to

11    raise it -- Elizabeth and I intend to raise this with our

12    client today.  So as soon as we have more information, we'll

13    get back to plaintiff's counsel on it.

14         THE COURT:  Okay.  So can you just give me a target

15    date by which you think you'll be able to get back to him?

16         MR. LARKIN:  Wednesday of this week.

17         THE COURT:  Okay.

18         MR. RUDIN:  And, Your Honor, just so it's clear,

19    what we've asked for are -- in an interrogatory -- is for the

20    defendants to identify witnesses who were held in their -- in

21    the DA's hotel custody program during the requisite time

22    period, and in particular, any witnesses who are held

23    forcibly or against their will, and for the records that are

24    associated with that custody.

25         And part of our case has to do with the district

1   attorney's -- we believe abusive process and holding material

2   witnesses against their will at hotels.  Some sort of a

3   program that the district attorney fashioned that we don't

4   think has any basis in law, and effects how -- and was used

5   in this case.

6          And obviously they're going to have a different

7   view about that issue.  But we're just trying to get the

8   facts out and I just want to be clear that we've asked for

9   answers, the answers to the interrogatory as well as the

10  documents.  I'm not totally clear what Mr. Larkin is planning

11  to produce.

12         MR. LARKIN:  We're not going to go through

13  documents and provide a list of names.  If the names are

14  evident from business records, the rules allow the responding

15  party to refer to business records if those records can be

16  consulted as easily by the receiving party as by the

17  producing party.  So that's the way we intend to handle this

18  issue.

19         To the extent that there are records, I don't know

20  if the District Attorney's Office had these files going back

21  to that time frame.

22         And if I can just interject, Your Honor, and I say

23  this with due respect, you know, Mr. Rudin had -- repeating

24  himself and constantly, you know, reiterating what's already

25  written down in his letter and what he said 15 times, and

13

1     what we've already discussed five times.

2              So part of the reason this is so time consuming is

3     that we're not cutting to the issues.  I'm trying very hard

4     to cut to the issues here.  I know exactly what he wants and

5     why he wants it.  I don't need a repetition.

6              And with respect, I don't think the Court does

7     either.  And every week, we get a series of multiple emails,

8     multiple letters, multiple requests modifying earlier

9     document requests, adding things to different -- to other

10    requests, and we're trying to follow it as best we can, and

11    we're trying to do the best we can, but it's just not that

12    easy.  It's not like Mr. Rudin has made it any easier for us.

13             Okay.  So --

14             MR. RUDIN:  Your Honor, I don't --

15             THE COURT:  All right.  All right.  I don't --

16             MR. LARKIN:  If I may, Your Honor.

17             THE COURT:  Yes.

18             MR. LARKIN:  If I may, Your Honor.  Attorney --

19             THE COURT:  Let me just --

20             MR. LARKIN:  -- (indiscernible) --

21             THE COURT:  Let me just --

22             MR. LARKIN:  -- the witness relocation file --

23             THE COURT:  Mr. Larkin, let me just say --

24             MR. LARKIN:  I'm sorry.

25             THE COURT:  -- I don't think, Mr. Rudin, you need

1    to respond to that, and I will do my best to try to make this

2    as efficient as possible, and I appreciate that it's a

3    difficult process for both sides.

4              MR. LARKIN:  Okay.

5              THE COURT:  So go ahead, Mr. Larkin.

6              MR. LARKIN:  All right.  The next -- the next

7    question, Your Honor.  The names of the executives with

8    responsibility for discipline.  We had a discussion about

9    this.  We served an objection to the documents, to the

10   interrogatories.  We did not agree to produce it.  Contrary

11   to the representation that Mr. Rudin made in his letter,

12   which is inaccurate, we -- we then had a --

13             MR. RUDIN:  I put it right in front of you.

14             MR. LARKIN:  -- then had a discussion on Friday,

15   Your Honor, and Mr. Rudin clarified exactly what he was

16   looking for, and I suggested to him that given the

17   clarification, I might be able to get some more information

18   for him and, again, we flagged that issue as one to discuss

19   with our client.

20             So I'm not sure why that particular item is in this

21   letter, but that's where it stands from our point of view.

22             MR. RUDIN:  Your Honor, I have in front of me Mr.

23   Larkin's letter to you, dated April 24th, 2013, at page 8,

24   interrogatory responses, and Mr. Larkin wrote, "Plaintiff's

25   motion to compel responses to various interrogatories is not

1    made in good faith.  Counsel for the parties conferred at

2    length regarding a multiple set of discovery demands that

3    plaintiff has served is the resolution of the defendants

4    partial motion to dismiss.  During these referrals,

5    defendants agreed to search for and identify documents

6    responsive to interrogatories 5, 7, 9, 10 and 15."

7              Well, the one that has to do with the names of

8    executives and responsibility for discipline at the DA's

9    Office in various areas for discipline, the DA's Office is

10   number 9.

11             MR. LARKIN:  Actually, Your Honor, what we agreed

12   to do, and I thought this was clear, was produce a very

13   specific list of names who are considered policy makers for

14   purposes of the conflict of interest board.  That is --

15             MR. RUDIN:  Different (indiscernible) --

16             MR. LARKIN:  -- people that --

17             MR. RUDIN:  -- (indiscernible) --

18             MR. LARKIN:  -- can weight -- people that can weigh

19   conflicts of interest.  Okay.  That's what we agreed to do.

20             A very narrow specific request, which, you know, is

21   somewhat different from what counsel is saying now.  And it

22   may be our letter wasn't clear, maybe there was a

23   miscommunication there, but we served an objection to the

24   interrogatory.  We had a further conversation to find out

25   exactly what counsel was looking for.

1          I mean, I was under -- we were under the mis-

2     impression perhaps that the response to that interrogatory

3     would satisfy -- that is the response to the request for the

4     policy makers for purposes of a conflict of interest board

5     would satisfy overall the request that was made for the

6     individuals that are responsible generally for managing the

7     office.  Okay.

8          So when I discussed this issue with Mr. Rudin on

9     Friday, I learned that it was a little bit -- there was more

10    nuance than that.  And, essentially, essentially I guess what

11    counsel wants to know is whether there is one person or two

12    people that are specifically responsible for discipline.  And

13    I explained to him that every lawyer, every executive in the

14    District Attorney's Office is responsible for discipline.

15         Anybody that reviews a file and sees that an

16    attorney has done something wrong consciously or

17    intentionally has an obligation to go to his or her

18    supervisor and to deal with it.  It's not like one person

19    says, okay, as -- it's not as DA Hynes says to one person,

20    "Okay, you're anointed.  You're the discipline person."  It

21    just doesn't work that way.

22         MR. RUDIN:  Your Honor --

23         MR. LARKIN:  We had this discussion and I said I

24    would go back to my client and try to find out a little bit

25    more information as to whether there's some -- whether there

17

1    is some sort of -- whether it's case by case, which is what I

2    suspect the answer is going to be, in which case you don't

3    have one person, or whether it's -- whether there is some

4    sort of committee.  I just don't know.

5              THE COURT:  All right.  Let me just suggest that we

6    wait and see what the answer is before arguing about whether

7    it's sufficient.

8              MR. RUDIN:  Your Honor, I just -- just so it's

9    understood.  This is a critical issue.  And there's two

10   issues here.  One is what did they agree to provide and their

11   -- their intent response to my document request saying that I

12   acted in bad faith unequivocally agreed to respond to this

13   interrogatory.

14             If Mr. Larkin did so out of a misunderstanding of

15   what we were looking for, then we can deal with it.  But I

16   just want to be clear why I raised this.

17             And the second thing is that policy -- the policy

18   makers for the Office for the Conflict of Interest Board is a

19   very different issues than who had responsibility to decide

20   whether or not to investigate a discipline in '88 for

21   misconduct.

22             The -- and that's a critical issue in this case.

23   On the one hand, apparently it seems to be the case that

24   there was no discipline imposed for all or most of the cases

25   that we've cited.  Mr. Larkin has already indicated that,

1    although I'm sure he's going to -- he'll supplement his

2    response if we find that there was discipline.

3         But the second thing is that, and we had a

4    discussion about this on Friday.  The second part of the

5    issue is if there was no discipline, why was there no

6    discipline.  There may have been no discipline, because

7    nobody looked into it.  There may have been no discipline

8    because someone at some executive level of the DA's Office,

9    who had responsibility for making these decisions, determined

10   that the situation did not warrant discipline, and that

11   person presumably would be the person to testify at trial.

12   And we don't know who these people are if there are any.

13        I mean, if it turns out that in these 50 cases

14   there was nobody at the office who had the responsibility at

15   any kind of executive level to decide whether or not to

16   discipline, that's fine.  But we're entitled to know that.

17   And if it turns out that there was someone who had that

18   responsibility who would be in a position to testify and

19   explain why the lack of -- why there was no discipline, then

20   we need to know who that person or those persons are.  That's

21   what this is aimed at getting at.  It's critical.

22        THE COURT:  All right.  I think -- I think both

23   sides understand what the other side is thinking at this

24   point; is that correct?  Is there any -- is there anything

25   that needs to be added?

19

1          MR. LARKIN:  I don't think there's anything that

2     needs to be added, Your Honor, except that what I expect to

3     find out from my client is that when a case comes up -- look,

4     a case goes to trial.  The judge makes a ruling.  All right.

5     Let's say it's a Brady issue and the DA appeals and the

6     Appellate Division reverses, they rule against the District

7     Attorney's Office.  There might not be a case for discipline.

8     There might not be a need for discipline.

9          Even if there's some sort of a blistering or

10    excoriating opinion, you know, the appeals attorney that

11    handled it is going to have responsibility, then, to go to

12    whomever they think they should go to to discuss the issues.

13    That's what I -- I expect I'm going to get an answer like

14    that.  I'm not -- in other words, it's going -- the issue is

15    probably going to be addressed on a case-by-case basis by the

16    lawyers who are responsible for handling the case.  That's

17    what I expect to find.

18          If that's the case, I won't have a specific name to

19    provide, but I may provide that description and we'll go from

20    there in discovery.  I just want the Court to be aware of

21    what, you know, practically speaking, how the office

22    functions.

23          THE COURT:  Yes.  I understand that.  And I think

24    that if that's the case, then depositions will flush this out

25    even more.

20

1          MR. LARKIN:  It will flush it out.  Okay.  The next

2     one, Your Honor, ADAs who were subject to discipline.

3     Counsel already knows that up to 2005 there was no discipline

4     imposed on assistant DAs in connection with, you know,

5     reversals or Brady issues that came up in cases.  I'm about

6     90 percent sure that since 2005, the answer is the same.  I

7     could confirm this.  I expect to be able to do it.

8          I had mentioned two more weeks during the Friday --

9     Friday's conference, but I suspect that I'll be able to do it

10    sooner than that.  Probably by the end of this week.

11         THE COURT:  Okay.

12         MR. LARKIN:  If there are any, I will advise

13    counsel.  If not, I'll confirm that there aren't.

14         Members of the NYPD who were subject to discipline.

15    Limited to instances that we're going to use in our defense

16    at trial.  I mean, that's -- look, you know, I'm not in a

17    position right now to tell counsel what cases, if any, we're

18    going to use at trial, and I'm not going to be in a position

19    until we get closer to trial and we sharpen our defenses.  So

20    I'm not going to be able to provide this information, you

21    know, today, tomorrow, or next week even.

22         And I don't know under Rule 26(a) I'd be

23    responsible to, I'd be responsible to obviously a reasonable

24    time before trial, so that if plaintiff needs more discovery

25    they can take more discovery.  But I can't provide that

1      information now.

2                   THE COURT:  Mr. Rudin.

3                   MR. RUDIN:  Your Honor, well, first of all, they

4      agreed to provide it before.  But I don't -- the discussion

5      I've had with Mr. Larkin is that there are certain cases

6      we've identified and we've provided them with those cases,

7      both regarding the DA's Office and the NYPD where courts or

8      sometimes there have been settlement of lawsuits, or results

9      of lawsuits where individual personnel have been identified

10     as possibly having violated the constitutional rights of

11     criminal suspects of defendants in ways that we think are

12     relevant to this case, and we've asked whether or not any of

13     the personnel involved with discipline.  That -- you know,

14     that we -- we seem to have an under -- the two sides I think

15     have an understanding about how we're going to deal with

16     that.

17                   But what we've also asked whether or not the City

18     is going to contend in defense of the Monell actions

19     involving the DA's Office and the NYPD whether any -- there

20     were any additional cases that we haven't cited where

21     personnel were disciplined, which they intend to use as

22     evidence that there was not a policy delivered indifference.

23                   And we have no way of knowing what those cases are

24     or to take -- or to take any discovery about them, unless

25     they're disclosed to us.

1          Now, we just talked about the DA's Office and Mr.

2     Larkin is on -- seems to be on top of that.  But with respect

3     to the NYPD, I don't know how to proceed with the <u>Monell</u> part

4     of the lawsuit if we're not given notice about any cases

5     where they contend that there was discipline so we can think

6     about how to take discovery on those cases.

7          THE COURT:  Mm-hmm.  Mr. --

8          MR. RUDIN:  And that can be done at some point --

9          THE COURT:  Yes.  I understand.  Mr. Larkin, how --

10    what do you think the best way to resolve that problem is?

11         MR. LARKIN:  I mean, we have to get to a stage in

12    the case where, you know, before trial it seems to me where

13    we know what cases and what other matters we might rely on to

14    demonstrate that there isn't a <u>Monell</u> claim here.

15         I mean, we're going to move for summary judgment at

16    the end of discovery and, honestly, we can't use as evidence

17    in our summary judgment motion anything that we haven't

18    turned over in the case.  So this is the kind of issue that

19    might even wait until after the motion gets resolved.  I

20    mean, I, you know, to the extent that we're going to rely on

21    things, to show the absence of a <u>Monell</u> claim, the <u>Monell</u>

22    claim, the plaintiff is entitled to it.  There's no question.

23

24         But I -- we may not even rely on specific cases.  I

25    may rely on the establishment of a new system.  I may rely on

23

1    beefing up IAB after the Mollen (phonetic) commission report.

2    I mean, I tend to doubt that this claim is going to go to

3    trial, but, you know, I've been certainly been wrong before.

4              So I just -- I don't -- I don't know.  I think -- I

5    think the guiding principle is honestly going to be to the

6    extent we're going to use anything, plaintiff has to have in

7    enough time so that they can analyze it, request further

8    discovery if they need it, take further depositions if they

9    need it, and deal with it in an appropriate way.

10             So let's say if our motion is due -- I forget what

11   date the summary judgment motion is due.  It's got to be

12   filed by -- I don't even know if we even have a date by which

13   it --

14             THE COURT:  I don't think so.

15             MR. LARKIN:  -- has to be filed.  So it would seem

16   to me that 30 days prior to any summary judgment motion that

17   the plaintiff is entitled to know what we're going to rely on

18   in defense of the <u>Monell</u> claim.  What non-public materials

19   we're going to rely on.

20             MR. RUDIN:  Your Honor, I mean, we had a meet and

21   confer and they agreed to respond to this, and now -- I mean,

22   that's the difficulty with this process.  I thought this was

23   resolved and it was supposed to be complied with by May 3rd.

24   So --

25             MR. LARKIN:  I don't -- I don't recall.  Your

1    Honor, wait, wait.  I never -- I don't think I ever said we

2    were going to provide all this information about everything

3    we're going to rely on at trial by May 3rd.  That's crazy.

4              MR. RUDIN:  We sent you -- our April 5th letter

5    memorialized what they had agreed to and on page two of the

6    letter, it's number 28 of document request two.

7              MR. LARKIN:  Well --

8              MR. RUDIN:  And we sent that letter on April 5th,

9    based on a good faith understanding of our meet and confer,

10   and Mr. Larkin never said we were wrong, and now he's coming

11   up --

12             THE COURT:  Okay.  Let me -- let me just jump in

13   here.

14             I think that the principles are principles we all

15   agree on and the question is really just a question of

16   timing.  It may be that the City will not rely on any

17   instances of discipline of the NYPD, or NYPD officers in

18   defense of the Monell claim.  If that's true, then you'd all

19   be wasting your time on discovery on that issue.

20             At the same time, it is clear and, you know, the

21   defendants recognize this, the plaintiff asserts it, and the

22   Court affirms it that there will be no instances of NYPD

23   discipline that can be used in defense of a Monell claim

24   either in a summary judgment motion or at trial that will not

25   be disclosed at a reasonable time before the City intends to

26   use them, either in a motion or at trial, and the Court will

25

1    guarantee that the plaintiff has sufficient time to take

2    discovery on it.

3             MR. RUDIN:  Well, Your Honor, I appreciate that --

4             MR. LARKIN:  That isn't appropriate.

5             MR. RUDIN:  The question is the timing.  And if we

6    don't get this, let's say, until, you know, two months from

7    now and then we have to follow -- or even a month from now,

8    and then we have to follow up with another discovery request,

9    and then there's a dispute about that request, and then we

10   have to try to figure out who to depose, it's going to delay

11   the case indefinitely.

12            So I would request that a hard deadline be set for

13   the defendants to take a position on this issue.

14            THE COURT:  Well, assuming that the summary

15   judgment motions are anticipated for the beginning of

16   September, I think we can count back from then.  Mr. Larkin,

17   does that work for you?

18            MR. LARKIN:  I guess if that's where we are, that's

19   where we are.  I mean -- you're talking about -- Your Honor

20   said the beginning of September?

21            THE COURT:  I think so.  That's my recollection.

22            MR. LARKIN:  All right.

23            THE COURT:  I could go back and look at my notes.

24   But -- but I think -- Mr. Rudin, I think the way that

25   probably makes the most sense on this is what discovery is

26

1    needed for the summary judgment motion and then depending on

2    what's left after the summary judgment motion, what further

3    discovery is needed.

4              I mean, if you win summary judgment, Mr. Rudin, you

5    may have narrowed the issues in a way that will define what's

6    needed and what's not needed.

7              MR. RUDIN:  Well, I mean, if they're going to

8    contend that there was discipline imposed on officers for

9    these kind of alleged constitutional violations, then there

10   seems to me that within a reasonable period of time, they

11   should -- they should provide notice of the specific cases.

12   It seems -- I mean, we took a 30(b)(6) deposition about a

13   similar issue in another case involving the -- the NYPD and

14   the Bronx DA's Office, Pobatude (phonetic) against City of

15   New York, and in that case, a 30(b)(6) witness testified that

16   he was not aware of any instances.  Had there been any, I

17   imagine it would have been disclosed.

18             But, so it's not like this has never been attempted

19   before.  I could provide the transcript to Mr. Larkin if

20   that's of any assistance.

21             THE COURT:  All right.  Let me just ask.  If you

22   get that information let's say by July 28th, is that -- I'm

23   sorry, June 28th, is that sufficient?  By July 1st?

24             MR. RUDIN:  I -- well --

25             THE COURT:  At least for the summary judgment

27

1      motion?

2             MR. RUDIN:  Your Honor, I would ask if we could

3      have it maybe by June 15th, because summer is going to be

4      sort of strange.  People are going to be on vacation.  Ms.

5      Rosenblatt is going to be on maternity leave for most of the

6      summer.  And June 15th will be six weeks from now.

7             MR. LARKIN:  That's too tight.  I think June 28th

8      is fair, Your Honor.  We'll do it -- we can do it by then.

9      If we have to do it by then, and maybe it's good to have a

10     deadline in mind so that we're thinking about --

11            THE COURT:  I think it is.

12            MR. LARKIN:  -- you know, what it is and what we

13     have to do.  I think June 28th is -- is certainly plenty of

14     time.

15            THE COURT:  And, Mr. Rudin, if -- I know that

16     you're working diligently on this case.  I know both sides

17     are working diligently on the case, and I would like to --

18     obviously, I'm committed to moving this case as quickly as

19     possible, and I think all of you are.

20            So you will have sufficient time to do discovery on

21     that issue, and at the same time, I will try to keep the case

22     moving as quickly as I can.  I think that's all I can do at

23     this point is to guarantee that.

24            And if you are -- if you're correct that there were

25     no instances of discipline in a prior case, it's more than

28

1    likely that the situation is not going to change, or that

2    there will be fewer instances than -- there won't be that

3    many instances and it won't require that much discovery.  At

4    least that's the hope.

5              MR. LARKIN:  Your Honor, I think if I could get

6    that transcript, it would help.  I did get the transcript of

7    Mr. Amarosso's (phonetic) deposition from the Zarri case,

8    that's a DA witness, and it was helpful for us.  And we've

9    actually offered counsel that, you know, we'd agree to use

10   that transcript.  Counsel can, of course, use it in this

11   case, and it would bind the City the same way it bound the

12   City in the Zarri case.  Would probably save a lot of time,

13   seems to me.

14             So we could maybe do the same thing with this

15   particular deposition from the Pobatude matter.  I don't

16   imagine that the testimony is going to be any different.  I

17   mean, if the questions were limited to the Bronx, it might be

18   a different subset of cases.  If on the other hand it was --

19   if the questions were city-wide, then it might be fine.

20             MR. RUDIN:  It was city-wide.

21             MR. LARKIN:  Well, then I think the transcript,

22   Your Honor, would be helpful.

23             MR. RUDIN:  I'm happy to provide it --

24             THE COURT:  Okay.

25             MR. RUDIN:  -- Arthur.

1          THE COURT: So maybe this won't be such a difficult

2   issue after all. But June 28th will the date to disclose

3   whether or not any instances of discipline of NYPD officers

4   will be used in defense of the <u>Monell</u> claim.

5          MR. LARKIN: Okay. Thank you. Thank you, Your

6   Honor.

7          The next one is the grand jury transcript and the

8   exhibits from the People against Collins. All the exhibits,

9   to the extent that we have them, were produced in the file.

10   The grand jury testimony, I do have some grand jury testimony

11   that may not have been produced in the criminal case and that

12   plaintiff may not have, but grand jury transcripts are

13   usually sealed.

14          If the Court were to issue an order that the grand

15   jury be disclosed, I think -- I would just have to explain to

16   my client that, you know, this is -- the Court has directed

17   it be turned over.

18          I will also tell the Court that some of the

19   witnesses who testified in the grand jury may be witnesses

20   for us at the civil trial in this case. So it seems to me

21   that the plaintiff -- excuse me -- both sides would want to

22   use --

23          THE COURT: Yes.

24          MR. LARKIN: -- the prior statement about -- about

25   what they know about this case.

30

1          THE COURT:  If you want to submit a proposed order,

2     I'll sign it.  Unless you think --

3          MR. LARKIN:  Okay.

4          THE COURT:  -- a docket entry would be sufficient.

5          MR. LARKIN:  A proposed order might be better.  Let

6     me speak to -- when I speak to the DA today, I'll write that

7     issue also.

8          THE COURT:  Okay.

9          MR. LARKIN:  Okay.  DA's Office training and policy

10    materials.  Your Honor, we produced a substantial amount of

11    training materials to plaintiff.  And we also produced, in

12    addition to the material, the actual materials lists of other

13    materials that the DA has, that if plaintiff wants any of

14    them, they should tell us.

15          So I'm waiting to hear from plaintiff if there is

16    anything on the second, on those two lists, any more training

17    materials that the plaintiff wants, that's the universe of

18    training.  I mean, we gave them about 450 pages of stuff.  We

19    also gave them the two lists.  I'm happy to hear whatever

20    else he wants.  But that's it.

21          I mean, to the extent -- to the extent we didn't

22    provide stuff or counsel thinks we didn't provide anything,

23    we don't have it.  It doesn't exist.

24          MR. RUDIN:  Your Honor, I'm aware of the documents

25    that Mr. Larkin is referring to.  We will have a follow-up

```
 1    request, but that doesn't respond to some of these

 2    categories.

 3            We've not only asked for training materials.  We've

 4    asked for policies and procedures having to do with executing

 5    material witness warrants and hotel custody of witnesses, of

 6    employing the subpoena power to compel witnesses to either

 7    come to court or come to appear at the ADA's office, which is

 8    a practice that we're challenging, to -- that's the main

 9    category.

10            MR. LARKIN:  Your Honor, I discussed this with --

11    discussed this with my client.  My understanding is they gave

12    us everything they had.

13            MR. RUDIN:  Well, if that -- if that's their

14    position  that they don't have anything, then they should

15    just state that in response to the interrogatories.  I mean,

16    I don't know that -- I just think we're entitled to that.

17    Let them answer the interrogatories and just say that there's

18    no, no materials.

19            MR. LARKIN:  I mean, I'm saying it on the record in

20    court.

21            MR. RUDIN:  No materials concerning --

22            MR. LARKIN:  To the best of my knowledge, after a

23    thorough search, we're unable to locate materials responsive

24    to -- what requests?

25            MR. RUDIN:  Five, 13 and 15.
```

32

1          MR. LARKIN:  Those are interrogatories, right?

2          MR. RUDIN:  Yeah.

3          MR. LARKIN:  Well, I can't -- I can't accept that

4    representation, because I don't have the interrogatories in

5    front of me.  Okay.  If you want a letter or something, I'll

6    send it to you.

7          THE COURT:  Okay.

8          MR. LARKIN:  All right.  Briefs and other

9    litigation -- I'm sorry, Your Honor.  Can I go to next one?

10         THE COURT:  Please.

11         MR. LARKIN:  Okay.  Briefs and other litigation

12   documents.  We've thought our position through on this and

13   these four cases are in the same category of cases as all the

14   other cases that we're arguing about, which I assume we're

15   going to get to at some point in this call or in another

16   call.

17         Essentially, Your Honor, number one, I don't know

18   if these cases are sealed, these four cases.  Number two,

19   there are decisions that lay out what the Court's rulings

20   were and the decision itself is notice.  I have no idea why

21   there is a need for briefs or for anything else.  What

22   specific need is there for the further submissions in those

23   cases?  It's not relevant to notices.  It's not relevant to

24   anything else.

25         And there is an enormous burden here associated

33

1    with going back to old files, looking for stuff, you know,

2    looking through dusty old archive boxes and finding material

3    like this when you already have the notice that you need,

4    which is the Court's decision.

5           And if the DA took up the -- I think I said this in

6    Court the other day.  If the DA took a position adverse to

7    the defendants, DA took a position that, for example, a

8    particular piece of evidence was not Brady and the Appellate

9    Division ruled against the district attorney, I think it's

10   self-evident that it represented a change in the law and it

11   could have represented a change in the law and it represents

12   a rejection of the DA's position.  What more needs to be --

13   needs to be discovered about that.

14           MR. RUDIN:  May I respond to that, Your Honor?

15           THE COURT:  Yes.

16           MR. RUDIN:  First of all, every case is not as Mr.

17   Larkin described that there is a change in the law.

18   Sometimes the district attorney he also takes a bad faith

19   position that's roundly rejected by the Court.  I mean, to

20   give you an example in the Leaker (phonetic) case, the Second

21   Circuit granted a habeas relief due to a Brady violation

22   where they termed the district attorney's arguments in

23   defense of its position ridiculous.

24           So in the Ramos case, which involves the Bronx,

25   obviously not a case here, but it's illustrative, the

1    Appellate Division in upholding our lawsuit, held that we

2    were entitled to show that the District Attorney's Office, by

3    taking an unreasonable position in arguing there was no Brady

4    violation, ratified or condoned the conduct.

5         When we -- in the 50 or so cases we've identified,

6    we have spent a tremendous amount of time and effort and

7    funds over the last number of months trying to get the briefs

8    ourselves.  The reason -- and we're only asking for a handful

9    of cases where we've been unable to get all the briefs.

10        The reason we're seeking the briefs is twofold.

11   One is to see whether or not the District Attorney's Office

12   took a position that we can argue exhibited a condoning or an

13   indifference to misconduct, and the second thing is that

14   because we anticipate -- I don't think Mr. Larkin would

15   disagree that the City made defendants' case in part by

16   contending that certain of the cases discipline was not

17   warranted based upon either of the -- what came out of the

18   Court's decision or additional knowledge that the office has

19   about the case, because court decisions are sometimes rather

20   brief and don't go into all the detail.

21        So the reason we're trying to get the briefing on

22   any case that appears significant, is so that we are prepared

23   to deal with that.  So, for example, People against Ramon

24   (phonetic) is one of the cases, I believe was a Brady case.

25   I don't remember offhand.  And if the District Attorney's

1     Office explains that the reason that an ADA was not

2     disciplined was because of additional information that

3     they're aware of, that may be reflected in the appellate

4     briefs, we need the appellate briefs to be able to respond.

5             So the four cases that are listed in my letter,

6     that they agreed to provide, and now I guess they're

7     rethinking it, but the number of cases that are involved are

8     a handful compared to the 50 or so where -- that are relevant

9     -- We think are relevant to this case.

10            And we've only made the request where we've

11    exhausted by going to Defense counsel, by going to court

12    files, by going to the Bar Association Library, we've

13    exhausted any opportunity that we might have to obtain these

14    on our own.

15            MR. LARKIN:  Your Honor, may I just address one

16    thing?  I think the question plaintiff raises here is similar

17    to the question we talked about earlier, with respect to

18    Monell -- with respect to cases of discipline --

19            THE COURT:  Right.

20            MR. LARKIN:  -- in the PD.  It's to the extent

21    we're going to rely on something that's in a brief, or that's

22    in a document someplace, then plaintiff is entitled to it in

23    enough time to use it appropriately in discovery and for

24    trial preparation.  There's no -- no dispute about that.

25            And so if we're going to rely on something that's

1      in a brief or in a motion, a set of motion papers, counsel is

2      entitled to the papers and then he's entitled to figure out

3      if he wants depositions after we give him that stuff.

4                But the way I see the case playing out right now,

5      you have, you know, you have a Court decision and the

6      decision falls on a spectrum.

7                Some of them involve questions of law, where the

8      Appellate Division just says, "Look, we're going to address

9      this issue this way in this case," and if we determine the

10     piece of evidence to be Brady, in which case you'd want to

11     disseminate it for the rest of the office.

12               And then you have other decisions at the other end

13     of the spectrum where the Court issues a blistering opinion

14     and says, "You know what?  This is horrible what happened

15     here.  This is a clear disregard of established precedent."

16     You know, those cases fall to different categories.

17               I suspect that in the cases that are closer to the

18     other end of the spectrum, we might have to go to the

19     underlining files and have somebody explain this is really

20     what happened, this is what we knew, et cetera, et cetera.

21               And in that case, the plaintiff is entitled to the

22     documents.  So how about we say June 28th for all that stuff.

23     Same thing.  Or maybe even June 15th for that stuff, because

24     there might be -- it's possible there might be more of it,

25     but it would be -- if the City is going to rely on any of

1       that material to justify a decision not to discipline or to

2       justify a position that it took in the -- in the pending

3       litigation, maybe that's a sensible way to resolve it.  I

4       just put it out there.

5               MR. RUDIN:  Your Honor, we're talking -- there are

6       two things here.  One is what they -- they may concede

7       they're relying on, and then there's what we would like to

8       have to prove our affirmative case.  And I just explained the

9       reason why some of these briefs we need -- let me give

10      another example.

11              People against Ranta, which is one of the cases

12      that will come up later.  That's the one where Mr. Hynes'

13      office recently agreed to vacate a 23 year old conviction.

14      Well, in 1994, the Second Department wrote in its decision,

15      "We do not condone the delay in providing a Rosario and Brady

16      material."  But they did not reverse the conviction because

17      the issue was not properly preserved by trial counsel for the

18      Defense.

19              So that decision does not explain what the Rosario

20      and the Brady violations are.  We need the briefs in order to

21      figure out exactly what the violations are.  That's just an

22      example.

23              But the -- the briefs of the defendants in some of

24      these cases lay out the violation in much more detail than

25      the Court decision is going to.  A lot of times the Court

1    decisions don't want to embarrass a specific prosecutor, so

2    they don't mention the names.  They don't -- the don't go

3    through a lot of detail and --

4              MR. LARKIN:  Maybe plaintiff wants to embarrass the

5    prosecutors.  Maybe that's what this is really about, Your

6    Honor.

7              THE COURT:  Well, gentlemen --

8              MR. RUDIN:  (Indiscernible).

9              THE COURT:  -- gentlemen, whoa, whoa, whoa --

10             MR. LARKIN:  I'm sorry.  I apologize.

11             THE COURT:  Okay.  Mr. --

12             MR. RUDIN:  There are four cases here that they

13   agreed to provide, so --

14             THE COURT:  Yes.  Mr. Rudin, let me just ask you.

15   On these four cases, did they meet those criteria though?

16   Are they just -- did the decisions not provide the names of

17   the prosecutors?

18             Is there information in there that you can -- that

19   you need that's not in the decision but would be in the

20   briefs?  Do you know -- do the -- do those cases meet those

21   criteria?

22             MR. RUDIN:  Yes, Your Honor.  As far as I

23   recollect.  I mean, these are cases they agreed to provide.

24   How difficult is it to get briefs in four cases?

25             THE COURT:  Well, but -- just let me ask, though.

1    I mean, if they decide not to use any information in those

2    four cases, are you at a disadvantage now because you don't

3    have sufficient information for your affirmative case --

4              MR. RUDIN:  Yes.

5              THE COURT:  -- with respect to those four cases?

6              MR. RUDIN:  Yes, Your Honor.

7              MR. LARKIN:  Well, Your Honor, I think -- the way

8    to go about -- let me just make a suggestion, if I may.

9              I think the way to go about this is to spell out

10   what specific information is needed for each specific case,

11   and why it is that briefs and other documents ought to be

12   searched for and produced in this case when you already have

13   a decision spelling out the basis for the Court's ruling?

14             I mean, that's exactly the problem here.  If he is

15   even just say off the top of your head, "Oh, we need to know

16   what's in those briefs, because it might -- it might

17   demonstrate this or that, or it might demonstrate much more

18   clearly what the violation is," but until we have specifics

19   as to why a brief, for example, is needed in a specific case,

20   or why -- a motion, a set of motion papers is needed in a

21   specific case -- you know, there's one case involving

22   material witness warrants where it's self -- or not material

23   witness warrants -- subpoenas where self-evidence from the

24   decision that a subpoena was served on a witness.

25             I believe it was a grand jury subpoena.  There was

1    no grand jury convened that day.  And the witness was brought

2    to the DA's Office, and the judge said, "Listen, you can't do

3    that."  And that was --

4                 MR. RUDIN:  And that -- that --

5                 MR. LARKIN:  Plaintiff demands the motion papers

6    for that case.  I mean, it's self-evident what happened.  The

7    DA is not going to take the position that the judge was wrong

8    about the facts.

9                 Whatever happened in the case, happened in the

10   cases there.

11                MR. RUDIN:  Your Honor, that's not one of these

12   cases.  That's a case where we are going to agree to withdraw

13   our request because we have been able to come up with the

14   motion paper that's at issue.  And these four -- I don't

15   understand this process.

16                In March, they agreed to provide this material.  If

17   he needed some additional information in order to respond to

18   our request, he could have asked for it in March.  Instead,

19   now it's May -- it's May 6th, and now we're being asked to

20   produce our thought process about specifically why this

21   information may augment our case.  We're entitled to have the

22   briefing in these cases.

23                THE COURT:  Yes.  I hear what you're saying.  Mr.

24   Larkin, do you agree or disagree that in March you agreed to

25   produce those briefs and motion papers?

1           MR. LARKIN:  We did not object to producing them at

2     that time, Your Honor, but -- and I do acknowledge this and

3     we've thought it through some more.

4           And, honestly, it just -- it isn't right to, it

5     seems to me, for me to ask the DA's Office to devote the

6     sources to looking through these old cases, unless some

7     showing can be made that there's a need for this stuff.

8           And I, you know, we were rushed in our response.

9     We produced a response much, much sooner than the rules would

10    have allowed us to.  You know, I did it before.  I really had

11    a chance before -- we really had a chance to confer in detail

12    with our clients about this, and, you know, we did it in the

13    interest to try to move the case along, and in hindsight, we

14    shouldn't have done that.  We should have taken the time

15    allowed by the rules and, you know, conferred in a little

16    more detail here.

17          I mean, there's just -- there's just no reason,

18    there's just no reason why the plaintiff says, "Well, I want

19    all the briefs and I want all the motion papers," when you

20    have a court decision that spelled out what happened in the

21    case.  And it's the decision that provides notice to the DA's

22    Office.

23          MR. RUDIN:  We've been through that.  This is --

24    pull the briefs in four cases will take him two hours.  Some

25    of these cases are from 2009.  And some of them might have

42

1      been sealed.  I don't even know if these are sealed.  I can't

2      -- we can't produce things that are sealed.

3              Four cases they agreed to provide us --

4              THE COURT:  All right.  All right.  Gentlemen, I

5      understand Mr. Rudin's position because he feels he had an

6      agreement and now that agreement is being backed away from.

7              I also understand that there may be more burden

8      than a benefit in some of these cases.  But I think that once

9      there's an agreement, the burden really is on the party that

10     agreed to show that the circumstances have changed, and the

11     agreement that you made doesn't make as much sense.

12             If those cases are sealed and it's burdensome to

13     provide that information, then I think you can come back and

14     say, "You know, we made that agreement, but we didn't realize

15     that this is putting such a burden on my client, and would

16     the Court please do a burden benefit analysis?"  Which I will

17     do.

18             But if hypothetically at this point, if that's only

19     a hypothetical, then I think that the defendants have to

20     abide by their agreement, unless they can show that somehow

21     the circumstances are different from what they thought they

22     were.

23             MR. LARKIN:  I'll find out, then, Your Honor.

24     Number one, whether the cases are sealed.  I suspect that

25     they probably are.  If these are reversible convictions, I

43

```
1    suspect that they're going to be sealed and these files are

2    put away someplace.

3              On the other hand, Your Honor, if the files can be

4    easily accessed and if we can get the stuff, then I

5    appreciate -- I appreciate what the Court is saying.  I'm

6    certainly not going to, you know, deny that originally when

7    we served our written responses, we did not object to

8    those -- to those four cases.  So --

9              THE COURT:  You can always blame me.

10             MR. LARKIN:  I mean, I want -- I want to go back

11   and just confirm that, but I think -- I think that's right.

12   I know there was some we object to.  I believe it's these

13   four.

14             THE COURT:  Okay.

15             MR. LARKIN:  So I'll have to -- I'll have to do --

16             THE COURT:  And in the end --

17             MR. LARKIN:  -- (indiscernible), but I will do

18   that.

19             THE COURT:  Okay.  In the end, it may be easier for

20   all of you just to come back.  Okay.  Next.

21             MR. LARKIN:  Your Honor, with respect to -- if I

22   can just raise one thing, one concern.  I mean, to use the

23   Ranta case as an example, and I'm only doing this, because I

24   know this issue is going to come up with other cases.

25             You know, Ranta, the Court did say that we don't
```

1    condone the late disclosure of material.  But what happened

2    in that case, I believe, is that there was an audiotape of a

3    lineup, which was not produced until just before summations,

4    and the trial court allowed the district attorney to make the

5    late disclosure.

6              You've got an issue there with at least one judge,

7    the presiding judge, agreeing with the district attorney's

8    position that the audio -- the audiotape for the lineup

9    didn't have to be disclosed until I guess later in the trial

10   than it ought to have been disclosed.

11             My understanding of this is that it probably should

12   have been turned over before the witness who made the

13   identification testified.

14             So a transcript was turned over, but the audiotape

15   was not turned over.  I don't know whether the Defense

16   accepted the transcript.  You know, I don't know whether --

17   what the judge ruled with respect to the -- I assume the

18   judge probably said the transcript was fine, and the

19   audiotape didn't have to be turned over.

20             So there it is.  I mean, a judge made a ruling in

21   that case.  What's the point of -- you know, Ranta is

22   definitely a sealed case.

23             THE COURT:  Which case is that?

24             MR. LARKIN:  This is Ranta, R-a-n-t-a.  It's in one

25   of the document requests that we haven't responded to yet,

1    Your Honor --

2              THE COURT:  Okay.

3              MR. LARKIN:  -- that was -- we're litigating about,

4    even though we haven't served a Rule 34 response yet, because

5    the 30(a) doesn't elapse until I think later this week.

6              THE COURT:  Okay.  But can we deal with that once -

7    - once we get through this list?

8              MR. LARKIN:  Yeah.  I'm sorry.  Okay.

9              THE COURT:  So I think we're up to the appointment

10   books of DA Hynes and the prosecutors.

11             MR. LARKIN:  I'm sorry.  Yes, Your Honor.  DA Hynes

12   has no point -- has nothing responsive to this request, and

13   my understanding is that to the extent the other prosecutors

14   may have had anything, it's in the file, the DA's file.  So

15   if there's nothing in the file, then there's nothing

16   responsive.

17             MR. RUDIN:  Well, if there's something in the

18   35,000 pages that's somebody's appointment book, we're not

19   aware of it.  I don't --

20             MR. LARKIN:  There's nothing to respond to.

21             THE COURT:  All right.  So are you -- Mr. Rudin,

22   are you going to be deposing these DAs?

23             MR. RUDIN:  Yes.  But I don't know how I'm going to

24   pin them down.  How do you ask a question?  "Mr. Vecchione,

25   did you have -- did you keep an employment book?"  "Yes."

1    "Did you have entries relating to Mr. Collins' case?"

2    "Perhaps."  "Has that been disclosed in discovery?"  "I don't

3    know.  You have to ask Mr. Larkin."  "Mr. Larkin, has it been

4    disclosed in discovery?"  "Well, you have the 35,000 pages,

5    you know as well as I do," and that's how it's going to die,

6    and that's not fair.

7             THE COURT:  Well, let me ask.   Is there a way to

8    separate out the documents for each deponent so that each

9    deponent will be expected to have in front of him or her

10   those documents before the deposition and at the deposition,

11   and you can ask them to go through it and see if they're

12   there?

13            I don't know how many documents there are for an

14   ADA at this point.

15            MR. RUDIN:  I just -- we're entitled to have an

16   answer whether or not there are appointment books.  And if

17   they -- if they're not, fine, and if there are, where -- we

18   should be told which appointment books correspond to the

19   individuals we've asked about.

20            THE COURT:  How many -- which individuals are you

21   talking about?

22            MR. RUDIN:  It was Mr. Hynes.  And then I have to

23   get out the document request.  It's --

24            THE COURT:  All right.  Well, we have an answer for

25   Hynes.

1              MR. RUDIN:  (Indiscernible).  We just had an answer

2       for Hynes.  There's Vecchione.  There's Frascogna.  There's

3       Posner, who I can't depose, because he's deceased.  There is

4       -- I'm trying to see what else we asked for, 8 and 11.

5              THE COURT:  Besunder?  Any of those others?

6              MR. RUDIN:  Yeah, Besunder.  That's right, Your

7       Honor.  Posner, Vecchione, Frascogna and Besunder.

8              THE COURT:  Okay.  Well, as you said, you can't ask

9       Posner.

10             MR. RUDIN:  Can't ask Posner.  And Besunder has

11      already been deposed, and we don't know if -- but I would

12      still like to know if we have any calendar entries, because

13      he testified he doesn't remember anything about anything.

14      About the Jabbar Collins case.

15             MR. LARKIN:  I can't recall if counsel asked Mr.

16      Besunder whether he kept calendar entries for every single

17      case he worked on.

18             I -- yeah, I mean, I described -- now, my co-

19      counsel seems to remember that he didn't.  And the reason he

20      doesn't remember anything about anything is because his

21      involvement was extremely limited in this case.  He was not

22      the prosecutor.  He approved the arrest, but given the number

23      of homicides at the time, it's not surprising that he

24      wouldn't remember much.

25             THE COURT:  All right.  So Vecchione is -- if you

1    asked Vecchione, what would Vecchione say?

2           MR. LARKIN:  He would probably tell me the same

3    thing that I've been told, which is that whatever he had was

4    in the file.  But I will ask him specifically.

5           Frascogna, I do not represent her, and I can't

6    speak to her without her attorney on the telephone, and he's

7    been pretty protective of sort of letting us talk to her.  So

8    I haven't had an opportunity, and I doubt that I'm going to

9    before her deposition.  So I'm just going to have to ask

10   other folks at the DA's Office.  And Posner is the same

11   thing, obviously, I, you know, he's gone.  So I --

12          THE COURT:  All right.

13          MR. LARKIN:  -- (indiscernible).

14          THE COURT:  Just going back to Vecchione, because

15   he's obviously a key player here.  There was -- he has files,

16   correct, and those files I assume are going to be provided to

17   him before his deposition so he can look at them.  One of the

18   things he could be asked to do let's say a week before his

19   deposition is to identify if he sees any -- any calendar

20   entries there.  Because he's probably the one that's going to

21   be best able to do that.

22          MR. LARKIN:  I can't ask them to look through --

23   well, I mean, is the Court directing me to ask them to look

24   through 30 some odd thousand pages?  I --

25          THE COURT:  Well, I mean, are his -- again, I don't

49

1     know how the production works.  I know what I've looked at in

2     camera, and I know that for some of the ADAs their production

3     is segregated, so you can actually see which -- which is

4     their file or their notes.

5          Is Vecchione's production segregated so you can

6     actually pull out Vecchione?

7          MR. LARKIN:  Not really, Your Honor.

8          THE COURT:  And --

9          MR. LARKIN:  I'll just -- I'll ask him -- I'll just

10    ask him directly about this.

11         THE COURT:  Okay.  Because --

12         MR. LARKIN:  And I'll just get an answer.

13         THE COURT:  I mean, because it seems to me you're -

14    -

15         MR. LARKIN:  (Indiscernible).  I'm sorry.

16         THE COURT:  I was just going to say.  It seems to

17    me you're being put in a difficult position here.  Because if

18    your client isn't willing to separate the documents for you,

19    and they're just giving you -- and, again, I'm not asking you

20    to answer anything about this, because I know you have a

21    client.

22         But if your client is simply saying, "Okay.  Here

23    are the documents.  You figure out, you know, what's

24    responsive and how to deal with it," that puts you in a

25    pretty tough position and I think both you and plaintiff's

50

1    counsel need to know the answers to some of these more

2    specific questions.

3            And if the Vecchione file, for example, is a

4    discrete file, and within that file, someone with knowledge

5    in the DA's Office can identify the documents that are being

6    sought, I think it would make all of your lives a lot easier.

7            MR. LARKIN:  I don't think that it's a segregated

8    file.  I think it's just everything related to the case is

9    kept in one place and it's kept in all these boxes.

10           THE COURT:  Okay.  So he didn't keep his own files?

11           MR. LARKIN:  No.  None of them did.

12           THE COURT:  And what -- so what is a calendar

13   entry, then?  That's not something that he himself personally

14   would have kept?  It's something that would have been part of

15   his general case file?

16           MR. LARKIN:  I -- plaintiff is assuming that the

17   assistant DAs had some sort of diary or record-keeping system

18   where they -- they make notes about what they were doing

19   every day, and there may be a time sheet someplace.  I'm not

20   sure.

21           But as far as an appointment calendar book, I

22   assume everybody keeps one of those, but I don't know.  If

23   apart from what's in the file, if there's anything related to

24   Collins, you're on trial, you're on trial.  I'll talk to him.

25           THE COURT:  Okay.  I mean, if he has a calendar

```
1    that says -- I think most of us know even 20 or 30 years ago

2    if we kept a calendar system.  And I would guess that

3    Vecchione, being a professional, probably knows if he kept

4    it, and then the question would be:  Where would it be?

5              MR. LARKIN:  I can do that this week, Your Honor.

6              THE COURT:  Okay.  Thank you.

7              MR. LARKIN:  Thank you very much.

8              All right.  The next one.  Misconduct.  Records of

9    misconduct.  My ADAs and the DIs, there's nothing -- there's

10   nothing here.  And, I mean, there's nothing responsive here.

11   DIs didn't do anything wrong.  They have good personnel

12   records.  We produced all that stuff.  We produced the

13   personnel files for the DAs that were involved in the case.

14   There's nothing further here.

15             THE COURT:  Okay.

16             MR. LARKIN:  As far as the next one, press or news

17   releases related to the case.  Again, we produced a stack of

18   news releases that's about an inch thick, including anything

19   related to the Collins case, and we gave -- we gave that on a

20   CD-ROM last week.

21             Same for the next one --

22             MR. RUDIN:  I --

23             UNIDENTIFIED FEMALE:  (Indiscernible).

24             MR. RUDIN:  I'm sorry.  Ms. Rosenblatt went through

25   and didn't see it.  We'll go through it again.
```

1          UNIDENTIFIED FEMALE:  (Indiscernible).

2          MR. LARKIN:  I'm sorry.

3          MR. RUDIN:  May Ms. Rosenblatt respond to that?

4          MS. ROSENBLATT:  Yeah.  We received a cover letter

5     saying the CD-ROM was in the mail, but we haven't received

6     the CD-ROM yet, as far as I'm aware.

7          MR. RUDIN:  It came in -- it came in in Saturday's

8     mail apparently.

9          MS. ROSENBLATT:  Oh, okay.  Well, I wasn't here on

10    Saturday.  But the cover letter that Ms. Krasnow sent only

11    identified that the CD-ROM contained -- if there are other

12    things in there, I didn't know it from the cover letter.

13         MR. RUDIN:  We -- I think the --

14         THE COURT:  I'm sorry.  I missed the last bit of

15    what Ms. Rosenblatt said.  Could you just repeat what you

16    said?

17         MR. RUDIN:  If there's anything else in the actual

18    -- on the actual CD-ROM that was not listed in the cover

19    letter, we weren't aware of it because we thought the cover

20    letter completely listed the categories of documents that

21    were provided.  We didn't have a CD -- actually have the CD-

22    ROM when we prepared this letter.

23         MR. LARKIN:  Well, I mean, the whole -- one of the

24    reasons that -- forgive me, Your Honor.  I mean, one of the

25    reasons I did somewhat respond a bit sharply is that I

53

```
1     thought counsel had gotten everything we produced, gone

2     through it, and despite seeing what we produced, sent this

3     letter anyway.  So if we had a misunderstanding about that, I

4     apologize to the Court.  I apologize to my adversary as well.

5             But -- but we produced a huge stack of press

6     releases.  I mean, it's about an inch thick and it, you know,

7     my client has indicated it includes everything concerning,

8     statements concerning Vecchione, statements concerning this

9     case.  Public statements.  So they should all be there.

10            MR. RUDIN:  All right.  Well, you know, we accept

11    that, and there was a misunderstanding, and I think we can

12    move on.  I mean, if the --

13            THE COURT:  Okay.

14            MR. RUDIN:  -- there's something that appears to be

15    missing, we'll raise it directly with Defense counsel.

16            THE COURT:  Good.  All right.  So --

17            MR. LARKIN:  I'm sorry.

18            THE COURT:  So we're at the last item, public

19    statements of the district attorney concerning the

20    prosecution relating to Vecchione.  Or is that included as

21    well?

22            MR. LARKIN:  Yes.  I believe, yes, Your Honor.

23    That's -- yes.

24            MR. RUDIN:  That is you put it on the CD-ROM?

25            MR. LARKIN:  It should be in there, yeah.
```

1           MR. RUDIN:  Okay.  All right.  Then I guess we can

2   now move on to the items in the -- my letter of April 11th,

3   which is where we were when we broke on Friday.

4           Your Honor, do you have -- do you have more time, I

5   hope?

6           THE COURT:  Do I have more time?  Well, it depends

7   whether you ask the 11 o'clock people who I've told to call

8   back, or the person who is opening the door and coming into

9   the courtroom.

10          Other than that, sure, let's do what we can.  I'm

11  actually feeling bad for all of you, because you have so much

12  work to do and I'd like to get it done so that you know what

13  to do and how to do it.

14          So go ahead.  Let me just pull that letter out

15  here, and I'm going to -- all right.  So I'm going to close

16  the May 5th letter.

17          MR. RUDIN:  Yes.

18          THE COURT:  We're done with the May 5th letter.

19  And we're going back to which letter?

20          MR. RUDIN:  April 11th letter, on page six,

21  actually.

22          THE COURT:  Okay.  Back to April 11th.  Okay.

23          MR. RUDIN:  All right.  So on -- Your Honor, do you

24  have it?

25          THE COURT:  I'm just opening it up.  Okay.

1          MR. RUDIN:  On page six, on category B, specific

2     case materials.

3          THE COURT:  It's coming slowly.  Okay.  Specific

4     case materials, I'm there.

5          MR. RUDIN:  All right.  Now, we're going to pare

6     this down somewhat.  I'm just going to try to hit the major

7     points that really matter, and I think there's probably like

8     five or six cases out of the nine.

9          The Jefferey Marshall is critical because that's

10    the case that is quite parallel to the Jabbar Collins case,

11    and it was one that was handled either directly or under the

12    supervision of Mr. Vecchione.

13          And in particular, that's the case where there was

14    a 440 motion made, based upon an alleged Brady violation,

15    where Mr. Vecchione gave an affidavit that was relied on by

16    the state judge to deny the motion without a hearing, just as

17    happened in Mr. Collins' case.

18          And then only because Judge Korman granted a

19    federal habeas hearing did the truth come out.  And the added

20    testimony in the habeas hearing, Mr. Vecchione acknowledged

21    that there were false representations in his affirmation, but

22    he said that someone else had prepared it for him and the

23    implication was that he had inadvertently signed it without

24    noticing the falsities.

25          I don't know what his explanation is going to be in

1    the Jabbar Collins case, but in the Jabbar Collins case, he

2    made a number of representations in his 440 affirmation that

3    proved to be untrue.  And we were going to go into that in

4    the habeas hearing when -- when the DA's Office conceded and

5    the hearing was aborted.

6            So we're not -- we have most of the court docs --

7    actually, at this point, we have all the relevant court

8    documents in the Jeffery Marshall case.  We've actually

9    provided them to the other side and we're in the process of

10   providing a few additional documents we've just obtained.

11           What we're looking for are the documents from their

12   file, and this is not a sealed file.  Documents from their

13   file that, for example, any drafts of the affirmation that

14   Mr. Vecchione ultimately signed that would reveal whether he

15   made handwritten corrections.

16           Any notes in their file concerning statements Mr.

17   Vecchione made about the facts that would bear upon whether

18   or not he consciously imparted false information or

19   misleading information.

20           Not only notes, but emails and memoranda that

21   related to the preparation of his affirmation and to the

22   underlying facts.  The internal records concerning the

23   handling and disposition of the habeas application.

24           This is a case where Judge Korman spoke to the

25   parties off the record after he finished the evidentiary

1        hearing and when he -- and before he issued his findings of

2        fact, and the result was that apparently a complication with

3        Mr. Hynes, or at least the executives with the DA's Office,

4        the attorney handling the case agreed to a -- what amounted

5        to basically a time served plea, where this individual who

6        had received the sentence of 12 and 1/2 to 25 years in prison

7        was someone who was -- would have been prosecuted on four

8        separate murders and was suspected of having committed about

9        12 to 15 murders, was essentially released with time served,

10       so that Judge Korman would not issue findings of fact

11       concerning the testimony and the role of Mr. Vecchione.  At

12       least that's our understanding of what happened in our

13       theory.

14              And so we would like any internal records that go

15       to why the case was resolved the way it was in the DA's

16       Office, and whether or not part of the reason it was resolved

17       the way it was was to protect Mr. Vecchione, just the way we

18       believe that Mr. Hynes protected him in the Jabbar Collins

19       case.

20              MR. LARKIN:  Well, Your Honor, may I --

21              THE COURT:  Yes.

22              MR. LARKIN:  -- respond briefly.  I think plaintiff

23       -- plaintiff, as I indicated in our letters the Court, Your

24       Honor, on April 24th, the plaintiff already gave us about

25       1400 pages of material, including all the transcripts and all

1    the affidavits.  He's given us a little bit more recently,

2    which I have not -- I have not had a chance to look at.

3           The plaintiff is asking to produce material that's

4    clearly privilege.  It's clearly privilege, there's no

5    question.

6           THE COURT:  Yes.

7           MR. LARKIN:  By subscription, it is privilege.  And

8    it seems to me that there's already -- whatever information

9    is needed for plaintiff to argue that somehow Mr. Vecchione

10   did not behave appropriate -- did not act appropriately in

11   this case, he's got the materials to make the argument.

12          I mean, what we're being asked now to go through

13   another old file.  It is not sealed.  I believe plaintiff is

14   correct, that Marshall was not -- the conviction was not

15   vacated.  You know, to look for what?  To produce a privilege

16   law?

17          And it seems to me that in cases like this, and I

18   don't have the authorities in front of me, but where -- where

19   the courts -- where a discovery demand would simply reply to

20   the other side to produce the privilege law, then the courts

21   usually just say, "Why are you asking them to do it at all?"

22          THE COURT:  Mm-hmm.

23          MR. RUDIN:  Your Honor, this isn't -- this case is

24   critical.  This case -- this prosecution -- the three

25   prosecutions that were handled by the Homicide Bureau, first

1    one personally by Mr. Vecchione, the next two by an ADA named

2    Daniel Holeman (phonetic), working under his supervision,

3    occurred prior to 1995.

4            Absolutely crucial time period where Mr. Vecchione

5    was in the Marshall case, in any event, presenting a false

6    testimony and withholding Brady material concerning the

7    negotiations that had occurred with the key cooperating

8    witness and --

9            THE COURT:  Let me just interrupt you for a second.

10   I'm -- I might have to just take my 11 o'clock conference and

11   put you on hold for a couple of minutes, and get right back

12   to you.

13           MR. RUDIN:  Okay.

14           THE COURT:  Okay.

15           MR. RUDIN:  Yeah.  All right.

16           MR. LARKIN:  We'll hold then, Your Honor.

17           THE COURT:  Is that better?  Okay.  Is that better

18   to put you on hold or to call you back?  It's probably better

19   to put you on hold, right?

20           MR. RUDIN:  We can do either.  Whatever the Court

21   prefers.

22           THE COURT:  Well, what works for you?

23           MR. RUDIN:  I -- we can stay on hold.

24           THE COURT:  You can just put it on speakerphone and

25   do whatever you have to do, and (indiscernible).  Okay.  So

1    I'll put you on hold then.

2              THE CLERK:  (Indiscernible).

3              THE COURT:  Yes.  And we'll go off the record.  Go

4    off the record.

5         (Court recessed at 11:18 a.m. to 11:25 a.m.)

6              THE COURT:  Hi.  I'm back.

7         MR. LARKIN:  Yes, Your Honor.

8              THE COURT:  Is everybody there?

9         MR. LARKIN:  Yes, we are, Your Honor.

10             MR. RUDIN:  Your Honor, on the Marshall case, this

11   is -- this is sort of -- it's been sort of ironic.  I mean,

12   we -- we asked initially for certain court documents, but we

13   ended up providing to the other side everything that they

14   have in their own file, which we obtained through different

15   sources.

16             So we turned over -- if Mr. Larkin says it was 1400

17   pages, I don't -- I'm accepting that's what it was -- all

18   documents that we painstakingly accumulated through various

19   court files and from Defense counsel.

20             And what we don't have are the most important

21   documents, which are their internal records hitting -- for

22   example, when Mr. Vecchione took the position that he

23   inadvertently signed an affirmation that had incorrect

24   information in it --

25             THE COURT:  Right.  I recall that now.

61

1           MR. RUDIN:  Yeah.  So if they have drafts that he

2     went over and made corrections, or they have notes from an

3     ADA who interviewed Mr. Vecchione about the historical

4     information, and if they have -- if they have internal

5     records that indicate that executives in the office,

6     including most importantly Mr. Hynes, agreed to this

7     disposition so that there would be no findings of fact that

8     might bear upon Mr. Vecchione's career, it's essential to our

9     case.

10          Because first of all, the Marshall case happened in

11    the early 1990s, the most important time period for the

12    Jabbar Collins trial, and the 440 motion was filed

13    immediately after the Jabbar Collins in 1996, and the habeas

14    occurred in 2001, I believe, so it occurred before the Jabbar

15    Collins habeas, and the cases are exactly parallel, so --

16    involving the same prosecutor who is at the heart of the

17    Jabbar Collins case.  So --

18          THE COURT:  Yes.  I understand why you want it.

19          MR. RUDIN:  It may be work product, but it's work

20    product that should be disclosed.

21          THE COURT:  Okay.  Mr. Larkin, anything you'd like

22    to add?

23          MR. LARKIN:  I think, Your Honor, that if we were

24    to go through the file and see anything like that, we would

25    certainly take the position that drafts are privileged.  I

62

1    don't know that there's anything in there.

2            The reason that I did ask Mr. -- I did ask

3    plaintiff to produce all that stuff is that he had it and he

4    was going to use it in his case to question Mike Vecchione,

5    so obviously I wanted to see it, and counsel agreed to

6    produce it.

7            So he had it already.  He agreed to produce it.

8    And he's gathering material that he thinks is going to

9    support his case, then we're entitled to it.  I don't know

10   that there's anything ironic about that.

11           I just -- I think the burden here of looking for

12   this sort of thing where we're certainly going to insert a

13   privilege is going to require then, at most, the Court would

14   do an in camera inspection, which is more time consuming for

15   the Court.

16           I don't see -- I think -- when you look at a

17   benefit burden analysis, considering what plaintiff already

18   has, the burdens outweigh the benefits here.

19           MR. RUDIN:  What we have is a self-serving

20   explanation by Mr. Vecchione about why he submitted a false

21   affirmation that prolonged the imprisonment of an individual

22   for five years until he obtained his habeas relief.

23           THE COURT:  All right.  Well, actually, I think

24   there is some material regarding the Marshall case in the in

25   camera documents that I have.  Isn't that correct?

1           MR. LARKIN:  There might be some, yes.

2           THE COURT:  Right.

3           MR. RUDIN:  That may be in their file from the

4    Collins case, because this issue came up in the habeas.  We

5    asked Judge Irizarry for permission on the 404(b) to go into

6    the Marshall case, and it may be that they collected some

7    information about the Marshall case.  But that doesn't mean

8    it's anything complete.

9           THE COURT:  Mm-hmm.  And the information about the

10   Marshall case that you're looking for, that's information

11   that would have been way back when the case was tried years

12   ago, or would it be information that would be in the habeas

13   file?

14          MR. RUDIN:  It would be in their four -- it would

15   be in -- well, I don't know they keep their files, but it

16   relates to the 440 proceeding and then the habeas proceeding.

17

18          THE COURT:  So it really relates -- the document

19   that you say was inaccurate or perjured, was that submitted

20   in the 440 proceeding or in the habeas proceeding, or both?

21          MR. RUDIN:  It was submitted in the 440 proceeding,

22   and I believe was then relied upon in the habeas proceeding

23   to deny -- in a request that a hearing be denied, that the

24   habeas be denied, just the way they did in the Collins case.

25          But Judge Korman granted the hearing anyway.

64

1          THE COURT:  And then at the hearing, there was some

2     testimony at which there seemed to be contradiction?

3          MR. RUDIN:  Yeah.  Vecchione had to disown his

4     affidavit.

5          MR. LARKIN:  Your Honor --

6          THE COURT:  Yeah.  Go ahead, Mr. Larkin.

7          MR. LARKIN:  I'm sorry.  I'm at somewhat of a

8     disadvantage, Your Honor, because Mr. Rudin has been

9     gathering this material for years, and I just haven't had a

10    chance to read all of it.  So I can't, you know, respond

11    effectively to the characterizations.

12         THE COURT:  Right.

13         MR. LARKIN:  But it sounds to me as though to the

14    extent counsel wants to confront the witness with what he

15    believes to have been inconsistent statements, he can do

16    that.  You know, he already has what he needs to do that.

17         THE COURT:  Right.  But I think with respect to the

18    Monell claims, he's looking for something more, and he's

19    looking for some knowledge by the office in general of

20    misconduct.

21         And he thinks that he'll be able to find that

22    through some documents that might be in one of the files, or

23    both of the files, or their office's review let's say at the

24    habeas proceeding of Vecchione's conduct.  I think that's

25    what he's looking for.

65

1          MR. RUDIN:  It also goes to 404(b) of prior similar

2     act.  It bears upon knowledge or intent and it bears directly

3     upon Mr. Vecchione's credibility as a witness.

4          THE COURT:  Right.  I know you're looking both

5     individually and for the Monell claim.

6          MR. RUDIN:  Yes.

7          MR. LARKIN:  Is the Court -- well, what should we

8     do, Your Honor?

9          THE COURT:  Well, I'm going to have to speak to you

10    about the in camera review anyway, after this conference.

11         MR. LARKIN:  Okay.

12         THE COURT:  And because at least one, and I think

13    perhaps more of those documents, did involve the habeas

14    proceeding before Judge Korman, we need to talk about that.

15         MR. LARKIN:  Okay.

16         THE COURT:  Okay.  I'm going to need an in camera

17    proffer from you.  I'll do it the same way I did it before,

18    which will be on the record --

19         MR. LARKIN:  Yes.

20         THE COURT:  -- sealed, and then we'll proceed from

21    there.

22         But I think Mr. Rudin is making a valid point,

23    which is to the extent that the Kings County District

24    Attorney's Office was aware that there might have been either

25    a mistake  or misconduct.  That would be relevant to his

66

```
1    Monell claim.  Either failure to supervise properly or

2    delivered indifference.  I think that's what he's looking at,

3    correct?

4              MR. LARKIN:  Well, I don't -- I don't disagree with

5    that principle, but I don't see how the materials that we're

6    talking about here are going to add -- are going to add to

7    that.

8              I mean, first of all, I don't even know if there's

9    anything there.

10             THE COURT:  I don't either.  That's why we're going

11   to --

12             MR. LARKIN:  I asked if they have any internal

13   records --

14             THE COURT:  Yes.

15             MR. LARKIN:  If the Court -- if the Court would ask

16   us direct -- excuse me -- if Your Honor were to direct us to

17   look through the file and find that material, I'm sure that

18   we would assert privilege and then we would have to submit it

19   for in camera anyway.

20             THE COURT:  Right.  Which is why I wanted to speak

21   to you in camera about this.

22             MR. LARKIN:  Okay.

23             THE COURT:  Because I believe that the materials I

24   have are clearly within the work product privilege and the

25   question is whether or not there's substantial need.  And
```

67

1    they're unavailable through other sources, A.  And B, I want

2    to go back and look at them again and make sure that

3    they're --

4                MR. LARKIN:  Okay.

5                THE COURT:  -- you know, that they're relevant.

6                MR. LARKIN:  Okay.

7                THE COURT:  You know, maybe that they're totally

8    relevant.  That they have nothing to do with what Mr. Rudin

9    is looking for.

10               MR. LARKIN:  I see.

11               THE COURT:  Okay.

12               MR. LARKIN:  All right.

13               THE COURT:  All right.  So, Mr. Rudin, I understand

14   your position on the Marshall case.

15               MR. RUDIN:  Okay.  The next one is the Delvecchio

16   case.

17               MR. LARKIN:  And, I'm sorry, excuse me.  Forgive

18   me.  I apologize.  Is there a ruling?  Does the Court want us

19   to go back to look through the Marshall file and extract out

20   any internal materials that might concern the affidavits that

21   were filed?

22               THE COURT:  Yes.  Mr. Rudin, is that how you would

23   describe what you're looking for?

24               MR. RUDIN:  It's any fact-finding that was

25   conducted by the office concerning the allegations made

1    against Mr. Vecchione for Brady violations. It's fact-

2    finding with -- in preparing a response to the 440. So that

3    would include notes and emails and memoranda.

4            Any drafts, any interview notes involving

5    statements made by Mr. Vecchione. Drafts of his affirmation.

6    And then with respect to the habeas proceeding that occurred

7    I believe in 2001, any emails or notes or memoranda

8    concerning the handling of that case. Awareness that Mr.

9    Vecchione had made false or inaccurate statements. Concern

10   about Judge Korman's potential rulings, and the reasons why

11   they agreed to the time served disposition in lieu of facts

12   or findings by the Court.

13           MR. LARKIN: All right. I do anticipate that at

14   least some of this, Your Honor, is going to be -- if it

15   exists --

16           THE COURT: Privilege.

17           MR. LARKIN: -- if there's anything in the file,

18   yes.

19           THE COURT: Yes. I would definitely think so and

20   then we'll have to do an in camera review.

21           MR. LARKIN: All right. Okay.

22           THE COURT: But, again, we'll discuss this, because

23   I want to discuss the document that I have here as well.

24           MR. LARKIN: Yes, Your Honor.

25           THE COURT: Okay.

69

1           MR. RUDIN:  All right.  So moving on to Delvecchio?

2           THE COURT:  Yes.  Go ahead.

3           MR. RUDIN:  And I've been in touch with counsel for

4      Mr. Delvecchio and I've been told that he's going to execute

5      a 160.50 release of that -- that the District Attorney's

6      Office or the City can release documents.  But I sent him --

7      I sent him a release, and apparently they want to make some

8      change in it, so I don't have it back yet.

9           So perhaps we can proceed on the assumption that

10      there will be a release and discuss what kind of documents we

11      should be entitled to and what documents we're not entitled

12      to.  Is that okay?

13           THE COURT:  Well -- go ahead.

14           MR. RUDIN:  I mean --

15           MR. LARKIN:  I guess I'd prefer to see the scope of

16      the release before I -- the Court makes any rulings on what

17      can be released.  But I -- I'm more than willing to hear

18      whatever the Court wants to do.

19           THE COURT:  No.  I'd rather have you look at it,

20      Mr. Larkin, and figure out what you think is acceptable, and

21      hopefully you'll both agree.  If you don't agree, then I'll

22      make a ruling.

23           MR. LARKIN:  All right.  Thank you, Your Honor.

24           THE COURT:  Mm-hmm.

25           MR. RUDIN:  All right.  Then People against Reddy

1        Facada (phonetic).  That's number three.  This is an

2     extremely relevant case in which the District Attorney's

3     Office took the position that a witness had testified

4     voluntarily at the original trial.  After the trial, the

5     witness gave an affidavit recanting her testimony and saying

6     she had been coerced.

7             There was a 440 hearing where she testified that

8     she had been locked up I believe in a hotel against her will

9     for a number of weeks, apparently pursuant to a material

10    witness order.

11            And the original trial prosecutor testified -- was

12    handling the case and presented testimony and argued that

13    this was fictitious.  That she had testified voluntarily.

14    That she had not been held in a hotel.  That there had not

15    been a material witness order.

16            And just like in the Collins case, where the

17    material witness order was denied for 15 years and then

18    turned up in federal habeas proceedings, in this case, the

19    Second Circuit granted a very rare relief of permitting a

20    second habeas petition.

21            And after the second habeas petition was granted,

22    there was discovery quite recently in the -- in the case that

23    turns out that the District Attorney's Office did have a

24    material witness warrant for this witness.  The witness had

25    been held involuntarily at a hotel and now the Court is

1    grappling with how to deal with the case.

2            But so the reason why this is important is because

3    it shows -- it shows the customer practice of the DA's Office

4    in holding witnesses involuntarily, coercing their testimony,

5    and then not disclosing any of that at trial, but, in fact,

6    covering it up, including through false testimony or false

7    representations to the Court by the prosecutors involved,

8    only to have it exposed in the rare case that the case gets

9    in front of a federal judge who grants discovery.

10            THE COURT:  But --

11            MR. RUDIN:  And so this is a critical case.  And we

12    have not asked for any of the court documents.  We have

13    access to them.  We've made a very narrow targeted request

14    asking for any discovery letters or discovery receipts from

15    the original case that would bear upon the misrepresentations

16    about Brady, and the witness security and relocation records,

17    detective investigator notes and logs, and the hotel and

18    disbursement records concerning the custody of the witness,

19    whose name is Sixsto DelSado (phonetic).

20            THE COURT:  Okay.  So let me just ask a question,

21    Mr. Rudin.  Let's assume that the DA's Office stipulated as

22    to all the facts that you just described, and I don't know if

23    the DA's Office will or will not.

24            But assuming they did stipulate, why would you need

25    this additional discovery?

1          MR. RUDIN:  Ahh --

2          THE COURT:  Or would you -- would you need it?

3          MR. RUDIN:  Maybe I wouldn't if they stipulate to

4    it.  But I am not sure -- I haven't heard that they're

5    willing to.

6          THE COURT:  Well, that's a question I'm then going

7    to ask Mr. Larkin whether these facts are in dispute.

8    Because if they're not in dispute, then I don't see why

9    people need to -- why either of you need to waste your time

10   on it.

11         If they're in -- if they are in dispute, then I

12   think we need to know what is in dispute and then see which

13   documents need to be provided.

14         MR. LARKIN:  I think Your Honor -- DelSada is

15   currently a pending case.  There's a hearing or there's a --

16   it's pending before Judge Matsumoto.

17          I do not know -- I think the plaintiff, the

18   petitioner made a motion for an evidentiary hearing, and the

19   judge has not yet ruled on that motion.  So I don't know what

20   position the DA has taken in that case.

21         But the conviction remains.  It's not a -- it

22   hasn't been reversed, so what I will do is inquire -- I will

23   take a close look at the file, the docket sheet, and the

24   documents the DA has filed, and also talk to the DA who is

25   handling that case and see what facts they can concede given

1    their review of the files, and what facts they would regard

2    in dispute.

3            And if there are matters in dispute, my sense is

4    that the Court is suggesting that we have to produce some

5    discovery here.  But, I mean, if Judge Matsumoto ultimately

6    were to deny the habeas petition, where would that leave us

7    in terms of relevance for this case?

8            THE COURT:  I guess the -- well, it depends on what

9    the ruling is.

10           If all Mr. Rudin wants to prove is that there were

11   material witnesses that were held in custody, for example,

12   and that that wasn't disclosed, whether or not that results

13   in granting a habeas petition, it might be -- it might be

14   evidence he wants to use here as to a pattern and practice.

15           MR. RUDIN:  Also knowledge.  Knowledge in the

16   office, including in the Appeals Bureau of the misconduct for

17   a long period of time, and it was covered up.  So, I mean, it

18   shows the practice that is directly relevant to the Collins

19   case.

20           I think there are people from the Appeals Bureau

21   who worked on that case for years and abetted the coverup.

22   This is systemic misconduct.  It goes to many different

23   levels of the DA's Office and it's very concerning.

24           And just because a federal judge may decide on the

25   habeas law, which is extremely exacting, that there's some

```
1    procedural problem or that there's a materiality issue that

2    bears upon that particular defendant, doesn't mean that we're

3    foreclosed from developing the fact pattern in Mr. Collins'

4    case --

5              THE COURT:  Yes.  I understand what you're saying.

6    A habeas proceeding has different standards from this

7    proceeding here, from a Monell claim, and it may still be

8    relevant to the Monell claim.

9              That's why I think we need to know what facts are

10   in dispute.

11             MR. LARKIN:  Your Honor, I will --

12             THE COURT:  In that case.

13             MR. LARKIN:  -- absolutely look into that.

14             THE COURT:  Okay.  Thank you.

15             MR. RUDIN:  All right.  Then number four is People

16   against Russ.  All we're asking for there is -- this is a

17   case where the New York Court of Appeals in a very strong

18   decision reversed a conviction because of its view that the

19   District Attorney's Office had coerced a witness into

20   testifying at trial in a way that was violative of the

21   defendant's right to due process.

22             And we have the -- we have the briefs.  All we're

23   asking for is for any internal records of the office

24   concerning any investigation that the office conducted into

25   the conduct in that case, or any directives that may have
```

1    gone out to the staff in the office to not repeat that kind

2    of behavior, or to change the procedures in the office.

3    Anything that was responsive to that decision.

4            MR. LARKIN:  Well, Your Honor, there's no objection

5    to producing anything in response to a court decision.  I

6    think we've made that clear and I believe that we've produced

7    everything we have in terms of ongoing memoranda the DA --

8    the DA's Office circulates to all its assistants when

9    decisions come down from time to time.  So there's no

10   objection to producing anything like that.

11           THE COURT:  Mm-hmm.

12           MR. LARKIN:  As far as the underlying facts go,

13   again, I -- maybe similar to what Your Honor mentioned

14   earlier, I do not see that we are going to dispute the facts

15   that the Court of Appeals describes in the case.  It is --

16   the facts are there.

17           THE COURT:  Right.

18           MR. LARKIN:  The Court of Appeals made findings

19   based on a record.

20           THE COURT:  Right.

21           MR. LARKIN:  We're not going to fight or argue

22   about what the Court of Appeals said in the case.

23           MR. RUDIN:  Your Honor, I think we're in agreement

24   about Russ.  Mr. Larkin just said that he'll produce anything

25   that was a response by the office to the decision.  I'm not

1      asking for anything else besides that.

2                  THE COURT:  Okay.  Good.  We'll move on.

3                  MR. LARKIN:  Maybe I misunderstood.  I'm sorry.

4                  THE COURT:  No.  Good.

5                  MR. RUDIN:  All right.  The same thing with <u>People</u>

6      <u>against Neptune</u>.  <u>People against Neptune</u>, we're withdrawing

7      our request for any motion papers.  We -- I think we have

8      everything that exists.  There wasn't much.  And most of it

9      happened on the record.

10                 THE COURT:  Okay.  So that -- that's off, then.

11     We'll cross that off.

12                 MR. RUDIN:  No.  The only thing we need again is

13     any material -- this is a case where a judge said, "You're

14     abusing the subpoena process.  You're subpoenaing -- you're

15     issuing office subpoenas to subpoena people to your office

16     rather than to testify in court.  That's improper.  Do not do

17     it anymore."

18                 And all we're asking for is any internal materials

19     that were circulated in the office in response to that

20     decision, if any.

21                 THE COURT:  Okay.

22                 MR. LARKIN:  Again, no objection to providing that

23     stuff, Your Honor.  And if plaintiff has motion papers that

24     he may use in the case, I would ask that they be produced to

25     us, if I could.

```
 1                 THE COURT:  Of course.

 2                 MR. RUDIN:  Yes.

 3                 MR. LARKIN:  All right.

 4                 MR. RUDIN:  All right.  The Jackson case was the

 5      Waldbaum Fire case.  We just took Mr. Besunder's deposition

 6      about that.  And I think that -- I don't know -- there was

 7      subsequent proceedings in which Mr. Vecchione played a role,

 8      but I'm prepared to defer this request for now.

 9                 THE COURT:  Okay.

10                 MR. RUDIN:  I don't want to withdraw it, but I'm

11      prepared to defer it.

12                 THE COURT:  Okay.

13                 MR. RUDIN:  The Ranta case is the case that Mr.

14      Larkin brought up before.

15                 THE COURT:  Mm-hmm.

16                 MR. RUDIN:  In the Ranta case, there was a decision

17      by Judge Korman denying habeas relief, and that's a good

18      example of -- of why -- as is the earlier Appellate Division

19      decision, about why the failure to reverse a conviction does

20      not necessarily dispose of issues that figure in our Monell

21      claim.

22                 In the Ranta case, the difference --

23                 THE COURT:  Yes.  I understand.  I actually read

24      your paragraph on that.  I agree with that point.

25                 MR. RUDIN:  All right.  So, you know, we are still
```

1     hopeful that we'll be able to get records in this case, court

2     papers from Mr. Ranta's counsel, and so I'm willing to defer

3     our request for --

4                    THE COURT:  Okay.

5                    MR. RUDIN:  -- court documents.  Just want to see

6     if there's anything else.

7     (Pause.)

8                    MR. RUDIN:  Yes.  My understanding is that Mr.

9     Hynes was personally involved in the original prosecution

10    where these Brady violations -- Rosario and Brady violations

11    occurred.

12                   The one that was most egregious was the district

13    attorney providing a transcript of an identification

14    procedure that covered up the fact that -- and inaccurately

15    withheld that the identification -- the key identification

16    witness who is the same witness who Mr. Hynes is relying upon

17    now, relied upon this year as a major reason why he agreed to

18    vacate the conviction.

19                   That that witness, in fact, at a lineup said, "It

20    looks like the guy," and did not make a positive

21    identification.  And the transcript omitted that.  The actual

22    tape.  The District Attorney's Office was ordered to provide

23    earlier in the trial, and contrary to the Court's order, did

24    not actually provide it until just before summations.

25                   For some reason, I don't know what -- see, I don't

1     have the trial transcript.  For some reason, the Appellate

2     Division later on held that the Defense counsel did not

3     properly preserve that issue.  I don't know why -- what that

4     was based on, because I don't have the briefs yet.

5              But that was a pretty egregious misconduct, and the

6     fact that the state court, and ultimately the federal court,

7     due to procedural bar, did not grant 440 or habeas relief or

8     relief on appeal doesn't mean that there wasn't misconduct

9     that occurred prior to Mr. Collins' trial that involved a

10    number of ADAs in which Mr. Hynes we believe was personally

11    involved in the prosecution and they have known about.

12             So we've asked for records concerning Mr. Hynes'

13    personal involvement in the original prosecution, and any

14    personnel or disciplinary records of the ADAs involved in the

15    original prosecution, and we've also asked for records of a

16    Detective Scarcella, who is the detective who is now being

17    basically blamed for the whole mess, and we do have a claim,

18    of course, against the NYPD under Monell, and so if there was

19    misconduct by Scarcella, that's relevant.

20             So we've asked for his police personnel and

21    disciplinary records and any complaints that the DA's Office

22    have ever made to the NYPD about his misconduct in this case.

23             MR. LARKIN:  Well, I did not understand that

24    plaintiff wants -- forgive me for not -- maybe I missed this,

25    Your Honor.  But we have not yet -- again, we have not yet

1    even responded to the document request yet, because it was

2    only served on April 8th.  And Ranta was let out after an

3    investigation by the DA's Office by DA Hynes' own conviction

4    and integrity unit.

5           So the DA consented to vacate the case after

6    witnesses -- I believe one or more witnesses describe

7    Detective Scarcella doing improper things.  Leaning on them

8    and sort of arm-twisting that went on in connection with the

9    identification process.

10          So there was certainly no allegation I'm aware of

11   that the DA's Office did anything -- did anything wrong here.

12          MR. RUDIN:  And that was a Brady --

13          MR. LARKIN:  I -- can I -- I don't know that

14   Scarcella's personnel file or personnel records are relevant

15   to this case.  Scarcella was not involved in this

16   investigation, the Collins' investigation.  He had nothing to

17   do with it.

18          You  know, whether he was disciplined or not in

19   connection with -- I mean, his disciplinary record, I

20   suppose, could be discoverable for the Monell claim, but

21   certainly not his entire personnel file.  That doesn't --

22   doesn't appear to be germane to me.

23          I -- maybe what we need to do, Your Honor, is serve

24   a written response to this request.  I don't know whether Mr.

25   Rudin is going to get a release from Mr. Ranta, because his

1    case is now -- his file is now sealed.  He was -- his

2    conviction was vacated.

3            I just -- I'm not quite sure if he wants the whole

4    transcript, all the transcripts, motion papers.  If he just

5    wants the portion of the transcript that relate to the

6    audiotape of the identification.  That's a discrete set of

7    documents.  But, again, I know the file is sealed, so that's

8    going to be an issue.

9            You know, I'm not sure what helps to say about it

10   here.  I mean, it's -- as a matter of law, Your Honor, a

11   judge allowed the tape to be turned over late in the game,

12   and did not set the conviction aside, nor did the Appellate

13   Division.  So in terms of notice, you know, it's hard to

14   argue that that case -- the Ranta case provides notice to the

15   DA's Office of misconduct.

16           MR. RUDIN:  This is going to be -- this is an

17   interesting issue Mr. Larkin raises, and I'm sure it's one

18   we're going to dispute.  That does a conviction have to be

19   reversed in order for the underlying behavior by an ADA to be

20   relevant in the Monell claim?

21           It seems to me that if the facts that I'm alleging

22   are true, which is that the judge pretrial directed that the

23   tape be turned over, that instead all that was turned over

24   was a transcript that was misleading and omitted the key

25   information, that the tape was finally turned over at the

82

1        last possible minute, and that Defense counsel under the

2        pressure of trial didn't properly preserve the objection so

3        that the conviction was not reversed, is that the kind of

4        behavior that the district attorney condones?

5              Yeah.  And it seems to me that that's an issue.

6        And we can -- we can't get at the issue without the

7        underlying documents.

8              Now, I have not -- I think I indicated before,

9        maybe I wasn't clear, but I am going to try to get the

10       transcript and all the underlying court papers from Mr.

11       Ranta's present counsel.  If I'm not able to do that, then

12       I'll raise the issue again with Mr. Larkin.

13             But what I'm really raising now to Your Honor are

14       internal records of Mr. Scarcella, his personnel and

15       disciplinary records, which may indicate that there was

16       history of misconduct by Mr. Scarcella that the police

17       department ignored, which led to this.  That's relevant to

18       the Monell claim.

19             And it may also -- I've also asked for information

20       that reflects upon Mr. Hynes' personal involvement in the

21       original underlying prosecution, because my understanding is

22       that all the information that Mr. -- or virtually all the

23       information that Mr. Hynes relied upon in 2013 to agree to

24       vacate the conviction was information that was known to the

25       DA's Office in the early 1990s.

83

1          I don't -- well, I can't speak to that, Your Honor.

2     I can only rely on what I've read in the papers about the

3     case.  I don't -- I don't -- I did not get that sense from

4     reading the news reports about the <u>Ranta</u> case.

5          But I think, you know, for example, it is an

6     interesting question, and maybe it's not one that we need to

7     resolve today, but the question -- if a piece of evidence is

8     ruled to be <u>Brady</u>, but the Appellate Division says, "Look,

9     the evidence of guilt was overwhelming.  And, therefore, we

10    are not going to reverse this conviction, set the conviction

11    aside."  You know, I'm sorry -- I'm sorry, Your Honor.

12          THE COURT:  Sure.

13          MR. LARKIN:  I was distracted for a minute.  You

14    know, the -- then -- then the evidence, whatever the evidence

15    is, it's not material to guilt.  And if it's not material to

16    guilt, then it's not really <u>Brady</u>.

17          And so it seems to me all those cases, the nose to

18    the DA is that in this particular case, this piece of

19    evidence in a perfect world might have been turned over, but

20    it's not material to guilt or punishment, and, therefore,

21    isn't <u>Brady</u> because the evidence of guilt was overwhelming.

22    And there are a number of cases like that.

23          So, I mean, that's not for this Court to decide,

24    but that's ultimately an important issue in this case, I

25    think.

84

```
 1              THE COURT:  Okay.

 2              MR. LARKIN:  And Ranta, this is another example of

 3     it.  You have one judge, a trial judge allowing the case to

 4     go the jury despite late disclosures, so the trial judge in

 5     the circumstances of that case agreed with the district

 6     attorney's position.  How can that be notice to the district

 7     attorney that, you know, that there is some sort of

 8     misconduct?

 9              Now, the Appellate Division did say, I think the

10     statement was, "We do not condone the People's delay in

11     meeting its Brady and Rosario obligations."

12              And so you clearly would circulate that decision to

13     the ADAs and say, "Listen, next time be careful about the

14     timing.  Make sure you comply with the rules when you turn

15     material over."  But you certainly wouldn't discipline

16     anybody for that sort of thing.

17              MR. RUDIN:  Well, that's -- that's something I

18     guess we're going to disagree about.

19              THE COURT:  I think there will be a lot of things

20     you're going to disagree about.

21              MR. RUDIN:  Yes.  But right now we're in discovery.

22              MR. LARKIN:  Yes.  I --

23              MR. RUDIN:  We're trying to collect the relevant

24     information and --

25              MR. LARKIN:  I --
```

85

```
1          MR. RUDIN:  -- that came -- you know, these kind of

2     issues are still in the case.

3          THE COURT:  All right.  So let me just ask.  What -

4     -

5          MR. LARKIN:  (Indiscernible).

6          THE COURT:  -- what --

7          MR. LARKIN:  I'm sorry.

8          THE COURT:  -- are there some things that you can

9     agree on?  Do we need to see what Mr. Rudin gets from counsel

10    on this case?

11         MR. LARKIN:  Yes.  Let's -- I would suggest that,

12    Your Honor, and let's see if --

13         MR. RUDIN:  Your Honor, we're not getting any new

14    materials from counsel that I'm discussing.  These are all

15    internal materials.

16         THE COURT:  Okay.

17         MR. LARKIN:  Well, I -- I -- Your Honor, my hands

18    are tied to some extent, because unless I get an unsealing

19    order or a release from Mr. Ranta, it's just going to be

20    difficult for us to turn anything over without some

21    direction, some order --

22         THE COURT:  Okay.

23         MR. LARKIN:  -- from the Court.

24         THE COURT:  So what do you need from the Court?  Do

25    you need an unsealing order?
```

86

1          MR. LARKIN:  I think so.  And I think it -- I think

2     in fairness, though --

3          THE COURT:  It goes to the state court.

4          MR. LARKIN:  -- Mr. Ranta don't want to be heard on

5     any of these applications.

6          THE COURT:  Yes.  I think so.

7          MR. LARKIN:  He might have a view about this.

8          THE COURT:  Exactly.

9          MR. LARKIN:  And he -- I think he's filed a notice

10    to claim.  Joel told me that.  I don't know if that's -- I

11    haven't seen a lawsuit come across my desk, but in the event

12    he does bring a lawsuit, it seems to me he would sign a

13    160.50 at that point.  So --

14         MR. RUDIN:  Last week, there was -- there were

15    articles in the news media that he served his notice of

16    claim.

17         THE COURT:  All right.  So do you want to follow up

18    on that?  Because I do think that he needs to have notice.

19    If he consents, then I don't think we have a problem.  In

20    fact, he might even give you the unsealing waiver.

21         So why don't you follow up on that and get back to

22    me.

23         MR. RUDIN:  Your Honor, I would ask that -- I will

24    endeavor to get the unsealing waiver, the 160.50.  But in the

25    meantime, if I can't get it, I'm going to press the issue and

1    ask to have an unsealing order either from this court or the

2    state court.

3              Would Your Honor at least direct the defendant to

4    gather the materials so we don't have further delay?

5              THE COURT:  Mr. Larkin, can you do that in the

6    absence of an order?

7              MR. LARKIN:  We're talking about transcripts?

8              THE COURT:  Mm-hmm.

9              MR. RUDIN:  Well, no.

10             MR. LARKIN:  I know.

11             MR. RUDIN:  We're talking about the internal

12   materials that are detailed in my letter of April 11th to the

13   Court and the underlying discovery request.

14             MR. LARKIN:  And, Joel, you know what?  I don't

15   have that in front of me.  Okay.  So I will take a look at

16   it.  And, you know, again, we may have a privilege issue, in

17   which case --

18             THE COURT:  In which case, you know where to go.

19             MR. LARKIN:  I -- we know what to do.

20             THE COURT:  Okay.  So why -- why don't you get as

21   far as you can together and then when you need me, get to me

22   as soon as you can.

23             MR. LARKIN:  Okay.  Thank you, Your Honor.

24             THE COURT:  Mm-hmm.

25             MR. RUDIN:  All right.  Julio Hassaveo (phonetic)

1      is a case where we learned about it recently in the news

2      media, because <u>Julio Hassaveo</u> got arrested in a new case and

3      he explained the reason why he didn't turn himself in was

4      because he had already -- he didn't believe he could get a

5      fair shake because he had already been falsely convicted due

6      to a <u>Brady</u> violation.

7              So we went back, and sure enough in 1997, I think

8      it was, Justice Anne Feldman vacated his conviction based

9      upon -- a truly egregious <u>Brady</u> violation where the DA's

10     Office was aware of a cooperating withes who testified in

11     later trials in a way that exculpated <u>Hassaveo</u> and

12     contradicted their position in the <u>Hassaveo</u> trial, and they

13     never disclosed that to the Defense.

14             So we have a copy of the underlying 440 motion

15     papers, but we don't have the exculpatory witness's statement

16     to the DA's Office.  To the transcripts of his -- I mean, to

17     the 440 transcripts where Justice Feldman was considering

18     this issue.

19             We have not been able to figure -- to determine

20     from the court file whether or not she issued a written

21     decision or there was only an oral decision on the record.

22     And we don't know who the -- we don't have the assigned ADAs

23     personnel and disciplinary records.

24             MR. LARKIN:  Your Honor, I think we have an issue

25     with this case, because I don't agree with the

1   characterization.  My understanding, from looking through the

2   inmate, state inmate lookup databases is that Hassaveo's

3   conviction was not vacated.

4           THE COURT:  Huh.

5           MR. LARKIN:  For whatever reason, he was locked up

6   for I believe it was either manslaughter or second degree

7   murder for a significant period of time.

8           MR. RUDIN:  I can -- Mr. Larkin, I can explain what

9   happened, or what happened.

10          His conviction was vacated by Justice Feldman.  He

11  was released, and then he got arrested for a new crime, and

12  he ended up making a plea bargain that disclosed both cases.

13  So that's why his case was never fully dismissed and sealed,

14  but the conviction was vacated due to the Brady violation

15  that she found.

16          MR. LARKIN:  Okay.  So the conviction was vacated,

17  but he later pled to a crime in connection with the

18  indictment, with the underlying indictment.  So there's

19  absolutely no reason -- there's no -- I haven't seen anything

20  suggesting to me that there was any notice to the DA that

21  anything -- that anyone did anything wrong in this case.

22          MR. RUDIN:  No, no, no, no, no.

23          MR. LARKIN:  If plaintiff has -- excuse me.  I'm

24  sorry.  If plaintiff has a copy of a court decision, I'd

25  appreciate seeing it so that I can understand how the case is

1    relevant to these claims, the claims here, so we can go back

2    -- I can go back to my client and discuss with them what

3    position to take.

4          I -- this is what -- it's one thing to talk about

5    the cases in the abstract, but it's another when you get down

6    to the nuts and bolts seeing exactly what it is that we're

7    talking about and what it is that might be relevant here.

8          So I don't have any reason to think that anybody at

9    the Kings County DA's did anything wrong in connection with

10   that prosecution.

11         MR. RUDIN:  Your Honor, the judge -- the judge

12   granted a 440 motion and vacated the conviction, but the

13   court file does not have any written decision that she issued

14   and doesn't have the transcript of what occurred.  And we're

15   just asking whether the DA's Office has that.

16         THE COURT:  All right.  When did this happen?  When

17   was it vacated?

18         MR. RUDIN:  1997.  And he was convicted of murder

19   in 1990.  There was subsequent trials of co-conspirators or

20   co-defendants, separate trials.  His defense was duress, that

21   he had been forced to participate in the murder.

22         THE COURT:  No.  I understand.  Is she still

23   sitting, the judge?

24         MR. RUDIN:  No.  Justice Feldman is retired.

25         THE COURT:  Okay.

1          MR. RUDIN:  And during the subsequent trials, they

2     presented a cooperating witness who testified that, in fact,

3     there had been duress, and they never disclosed that to the

4     Defense.

5          And later on, the Defense, the defendant finally

6     found out about it, and moved to make a conviction for the

7     DA's misconduct in not disclosing that, either -- either at

8     his trial or after his conviction, and taking a contrary

9     position in later trials about what happened.  And that was

10    misconduct and the conviction was vacated, but as I just

11    explained, what happened was that while he was -- after he

12    was released --

13         THE COURT:  No.  I understand what happened.

14         MR. LARKIN:  Your Honor, can I ask plaintiff to

15    provide us with all the sources of this information that he

16    claims he knows about this case?  Because from what I saw

17    from public sources it did not suggest to me the scenario

18    that the plaintiff is describing.  And this guy Hassaveo was

19    locked up fro a long time for this stuff.

20         So I -- you know, if I could ask for that, we could

21    have a discussion.  Again, these requests were served April

22    8th.  Our responses are due in two days, and we're already

23    talking about, you know, motions to compel here, and I'd like

24    to know a little more about the case.

25         THE COURT:  Okay.  Mr. Rudin, can you provide some

```
1    of that information so Mr. Larkin can be on the same page you

2    are?

3              MR. RUDIN:  Yeah.  I'll provide whatever I have,

4    and all I would -- and this is not a sealed file.  So I would

5    just ask that Mr. Larkin begin the process of obtaining the -

6    - of having the district attorney obtain his file from

7    archives, if that's where it is, and then we can try to hash

8    out these issues.  But at least if we can start the process.

9              MR. LARKIN:  I will do that.

10             THE COURT:  Okay.  Great.

11             MR. RUDIN:  All right.  Derrick Hamilton, I'm

12   willing to defer that request at this time.

13             THE COURT:  Okay.

14             MR. RUDIN:  Okay.  If I think I need the

15   information, I'll bring it up again with Mr. Larkin first.

16             THE COURT:  Okay.

17             MR. RUDIN:  All right.  Next one is C, additional

18   motion, papers and briefs for DA misconduct cases.  The

19   appellate decisions, the appellate briefs we've already

20   discussed.  Those are those four cases.

21             The other request in this category are lower court

22   decisions where we wanted to see the motion papers that led

23   to those decisions.

24             But in view of Mr. Larkin's position that all this

25   is burdensome and because we don't know at this point whether
```

1      or not there's going to be any claim that -- a defense that

2      goes to -- that makes these papers relevant, we're willing to

3      defer that request.

4                    THE COURT:  Okay.

5                    MR. LARKIN:  Okay.

6                    MR. RUDIN:  The next one D, is materials requested

7      in our first document request.  In the one -- number one, the

8      significant item here is emails and text messages.

9                    The issue that I think we need to confront and must

10     come up, Your Honor, in many civil cases is how to make --

11     how can plaintiff make sure that everything that's relevant

12     is being obtained and either turned over or at least made the

13     subject of a privilege log, where we don't know what's being

14     searched.  We don't know how it's being searched for, what

15     protocols are being used, what search terms.

16                   We just have no way of being, up to now, of being

17     assured that everything that's there is being accessed and

18     viewed by Defense counsel.

19                   Maybe Mr. Larkin can explain how they're going

20     about searching for emails and text messages, but my

21     understanding is normally there's an agreement about the

22     search protocol so that both sides can be comfortable that

23     everything that's relevant is being accessed.

24                   THE COURT:  You're talking about electronically

25     stored information?

1              MR. RUDIN:  Yes, Your Honor.

2              THE COURT:  And have the two of you discussed that

3       already, protocols and --

4              MR. RUDIN:  We -- we have not been able to discuss

5       it since our -- we had a discussion about in March during our

6       meet and confer, and we have not by our efforts been able to

7       have a follow-up discussion.

8              I understood that Mr. Larkin was going to follow up

9       with his client and then be prepared to discuss it in more

10      detail.  But we've been unable to have that meet -- second

11      meet and confer.

12             THE COURT:  So that's what you're requesting now is

13      a second meet and confer?

14             MR. RUDIN:  Your Honor, we're requesting the Court

15      to -- because Defense counsel hasn't cooperated in scheduling

16      another meet and confer.

17             THE COURT:  All right.  Let me hear from Mr.

18      Larkin.

19             MR. LARKIN:  Your Honor, I've -- we've -- I've

20      asked my client to gather, if possible, gather to the extent

21      that they still exist, archived emails and old emails

22      concerning this case, and we have a chunk of stuff, a stack

23      of printed-out emails that -- when are we going to produce

24      that (indiscernible)?  A week from today?

25             MS. ROSENBLATT:  (Indiscernible).

95

```
 1            MR. LARKIN:  Speak to the --

 2            MS. ROSENBLATT:  Before, Your Honor, we have the

 3     emails broken down by the different witnesses.  So Ms.

 4     Ferrell's deposition is the one that's coming up next, so

 5     we'll definitely get her stuff out first.

 6            We can probably get all emails produced by the end

 7     of next week.

 8            THE COURT:  Okay.  Thank you.

 9            MR. LARKIN:  Thank you very much.

10            MR. RUDIN:  Your Honor, I just would appreciate if

11     we could have some disclosure of how -- of how the emails are

12     being searched for.  I mean, how do we know that emails are

13     being -- are being searched for in all the right places?

14            MR. LARKIN:  Look, you know what?  If counsel wants

15     to ask witnesses at depositions, he can do that, and I can

16     tell him that I've conferred with our contact person at the

17     DA's Office and explained what we need to get.

18            I've explained the goal here, which is to gather up

19     the emails that went around among the participants who were

20     involved in this case.

21            And, you know, 1994, you're not going to find

22     anything, but certainly with respect to the habeas petition,

23     there are substantial number of emails like that, and we're

24     looking through them.  Whether there is going to be any

25     privilege assertion, I'm not sure right now, but as the Court
```

1    knows, we're trying to be conservative with that sort of

2    thing.

3            So hopefully we're going to be -- we're going to be

4    able to get them produced this week.

5            MR. RUDIN:  Is there anyone -- is there anyone

6    perhaps we could have a direct conversation or interview,

7    whoever is at the DA's Office is doing -- is coordinating the

8    search so that we can meet with that person, with Mr. Larkin

9    and Ms. Krasnow so we can have an understanding of what's

10   being searched?

11           MR. LARKIN:  Well, I'm not sure I agree with that,

12   that that's necessary here.  Why is that necessary here?

13           MR. RUDIN:  Because we don't -- we don't know how

14   the search is being conducted.  Whether the computers of

15   individual ADAs are being conducted.  Whether there's a

16   central repository.  What search terms are being used.

17           If the search -- what time periods are being

18   searched for.  Unless we know that, it could be that there

19   are whole categories of materials that are going to slip

20   through the cracks.  You may not realize that yourself.

21           MR. LARKIN:  All right.  I will inquire, I will

22   make sure that the client is aware that we need all the

23   electronic communications concerning this case, so that we

24   can either produce them or assert privilege if we need to do

25   that.

97

1        And I will leave it to them to do the homework to

2   get -- you know, I'm not going to micro-manage this.  It just

3   doesn't seem necessary here.

4        I don't know what plaintiff thinks he's going to

5   find in an email communication, but there's going to be a lot

6   of emails produced and we're going to give them up this, you

7   know, this week.

8        MR. RUDIN:  Your Honor, this is --

9        MR. LARKIN:  What more?

10       MR. RUDIN:  -- this is a case where we're alleging,

11  I think with good reason, that material was withheld from

12  Jabbar Collins for 15 or 16 years.  The best example is the

13  material witness order that was withheld for 15 years and it

14  came out through a FOIL request at the clerk's office, and

15  that's how we finally learned that there was this material

16  witness order.

17       So if -- if the district attorney -- let's assume

18  for the moment that we're right and the District Attorney's

19  Office has acted in bad faith and that various individuals

20  have been involved in that over a 15 year period.  Why should

21  we be -- (indiscernible) accepting that a search for emails,

22  which may be very revealing, is being done in a way that will

23  uncover all the relevant emails, all right, when the search

24  is being conducted by some unnamed person in the DA's Office,

25  where they're not disclosing to us how the search is being

98

1    performed, what the search terms are?

2            I mean, this is routine in civil litigation that

3    the parties get together and they have an understanding about

4    how an electronic search is going to be conducted, and we

5    have no idea how this is being conducted.  And Mr. Larkin --

6    I'm sure is acting totally in good faith.  He's saying that

7    whatever is produced to him will be -- will be scrutinized

8    and handled properly.

9            But it may be that there are documents here that

10   Mr. Larkin doesn't know about and there may be documents that

11   he's not even -- that he's not aware are not being -- hello?

12           THE COURT:  Hello.  We lost you.

13           MR. RUDIN:  We're here.

14           THE COURT:  Okay.  Aware that are not being -- not

15   being searched for.  Okay.

16           So, look, I think there are two ways to deal with

17   it.  I mean, one is you can sit down and try to talk this out

18   and do the electronic -- electronically stored information.

19   I'm just looking through the rules now.  The (indiscernible)

20   information agreements that you need.

21           Because so many of the documents predate the

22   widespread use of email and text messaging, you're probably

23   going to be focusing on more recent documents.

24           The second thing that you could do, which probably

25   is the only thing that will ultimately satisfy your concerns

1     if you're worried, Mr. Rudin, that the DA's Office may not be

2     entirely candid with you, is take a 30(b)(6) deposition of

3     the custodian of documents or records, the person who is

4     doing the records, and just find out what kind of a search

5     they made.

6              I don't know if you have an electronic documents

7     expert that you want to have with you during that deposition

8     or that you want to have talk to their expert.  But those are

9     the two possibilities.  Either conference with the expert or

10    take a deposition.

11             MR. RUDIN:  Well, it seems to me that that can be

12    avoided.  I mean, if I have to do it, we'll do it, but it

13    seems to me that can be avoided just by having a discussion

14    between counsel about how the search is being conducted, what

15    the search terms are, and what the locations are, and the

16    time period.

17             THE COURT:  Well, usually -- usually counsel know

18    less than the people who are actually conducting the search.

19    So --

20             MR. RUDIN:  That is often true.

21             THE COURT:  Yes.  And so I found it especially in

22    criminal cases where it's just become almost an impossible

23    burden on Defense counsel to get all the electronic

24    information that the government produces.  I find that it's

25    been very helpful to have their expert just talk to counsel

```
1     or just sit in on the phone and you could probably accomplish

2     this in five minutes.

3               MR. RUDIN:  I thought you were -- Your Honor,

4     that's what I'm proposing that we, that we have a meeting or

5     a telephone call where everyone can talk this out.

6               THE COURT:  Mr. Larkin, I think that might

7     alleviate the burden on you and alleviate any questions in

8     the future about what's happening with the electronic stored

9     information.

10              MR. LARKIN:  I'm certainly willing to discuss

11    whatever plaintiff wants to discuss, but I'm a little more

12    reluctant to have client representatives on call.  But I can

13    -- we can think about that.

14              THE COURT:  Okay.  And usually -- I'll just tell

15    you most of the civil cases I have where this is an issue --

16    I mean, I've had one with huge corporations.

17              MR. LARKIN:  Yeah.

18              THE COURT:  I've had criminal cases and civil

19    cases, and everyone finds that it just makes their life so

20    much easier to have whoever the expert is who is doing the

21    search just get on the phone and say to opposing counsel,

22    "You want A, B, C and D.  You're barking up the wrong tree.

23    The only way we can find it is by doing C, D, E and F.  And

24    we'll do that or we have done that."

25              MR. LARKIN:  That's -- I understand.  I remember
```

1    this from private practice, although it's been a long time,

2    and it's developed -- you know, this area has developed a lot

3    over the last several years.  So --

4              THE COURT:  I mean -- yes.

5              MR. LARKIN:  -- let -- okay.  Then let me reach out

6    to my client.  I'll flag this as one of the I guess growing

7    list of things that we need to go through with them.

8              THE COURT:  Mm-hmm.

9              MR. LARKIN:  And I'll get back to plaintiff on it.

10             THE COURT:  All right.  Just tell them that it

11   could be a way to avoid a lot more extra work.

12             MR. LARKIN:  I understand.  I think the Court is

13   right actually about that certainly.

14             THE COURT:  Okay.  Just tell them it worked for the

15   SEC, Aeropostale and the government very recently --

16             MR. LARKIN:  Oh, my God.

17             THE COURT:  -- in a very huge case.  So --

18             MR. LARKIN:  It wouldn't -- it wouldn't work for

19   us.

20             THE COURT:  It should work for you.  It will make

21   life a lot easier.  Okay.

22             MR. RUDIN:  All right.  We're almost finished, Your

23   Honor.

24             THE COURT:  False affidavits and affirmations of

25   Michael Vecchione.

1              MR. RUDIN:  Yeah.  So --

2              THE COURT:  Didn't we discuss that a little bit

3     already?

4              MR. RUDIN:  No.  This has to do with his apparent

5     practice of submitting affirmations and notarized affidavits

6     to courts.  And requesting court orders to take custody or

7     arrest witnesses where he had someone sign his name.  And

8     apparently it was done by Mr. Posner as well.  One of the

9     things we're trying to find out is how widespread this

10    practice was.

11             But with respect to Mr. Vecchione, we know of a

12    number of cases where he did it.  Obviously, submitting a

13    signed -- a notarized affidavit where you have someone else

14    in the office notarize your signature, except it's not your

15    signature, it's a signature by somebody else, such as your

16    paralegal, raises very serious questions.

17             It seems to me that submitting an affirmation that

18    purports to be under oath by a particular ADA, where the ADA

19    had someone sign for him also presents very serious

20    questions, because these are documents that are then relied

21    on by the Court to issue material witness orders or orders to

22    produce and take custody of incarcerated individuals.  It not

23    only involves their Fourth Amendment rights, but it also

24    involves abuse of process.

25             And so in any event, we don't expect Mr. -- Mr.

1    Vecchione cannot possibly -- even if he's testifying totally

2    in good faith could not possibly remember every case in which

3    he did this, and I don't expect Mr. Larkin or Ms. Krasnow to

4    -- to investigate every case that Mr. Vecchione ever handled

5    to figure out where else he did it.  I acknowledge that would

6    be burdensome.

7           So what we're asking is a compromise as if the

8    defendants can disclose whatever homicide cases Mr. Vecchione

9    handled that went to trial and then we'll take it upon

10   ourselves to pull the court files.

11          MR. LARKIN:  Well, I guess this is the first I'm

12   hearing of that compromise, but I -- cases in which Mike

13   Vecchione was lead prosecutor, is that what you're asking?

14          MR. RUDIN:  Well, yeah, I imagine any case he was

15   lead prosecutor, yes.  Any homicide case.

16          MR. LARKIN:  I don't know if we can -- I'll talk to

17   my client about it, I guess, see if they can find that

18   information easily, you know.  Maybe there's an easy way to

19   do it, but I'll speak to them.

20          MR. RUDIN:  All right.  Your Honor, the next --

21   most of the other items they've agreed.

22          THE COURT:  Okay.

23          MR. RUDIN:  I think the one that's left is the

24   Brooklyn DA materials.  That's on page 15, number 8, category

25   H.

1          THE COURT:  Okay.  I'm there.

2          MR. RUDIN:  All right.  So that's this six part

3    reality TV show that's about to air later this month on CBS.

4    And the reason it's significant is that according to the news

5    reports the person who is being held out as the -- sort of

6    the spokesperson and star of the Brooklyn DA's Office is

7    Michael Vecchione.

8          And that is just an example of Mr. Hynes and Mr.

9    Vecchione being tied at the hip, and Mr. Hynes continuing to

10    condone Mr. Vecchione's history of misconduct by hold -- by

11    allowing him to be the pic -- you know, the image of the DA's

12    Office in this way.

13          I think it's highly probative and we've asked for

14    whatever materials are in the custody, possession or control

15    of the DA's Office, or of Mr. Vecchione or Hynes, that relate

16    to this show, and relate to Mr. Vecchione's role in it.

17    We're not asking the City to produce documents they don't

18    have that would only be in the possession of CBS.

19          MR. LARKIN:  Well, Your Honor, the show is going to

20    air.  You're going to have some DVD recording, or whatever it

21    is of the show, and just as an aside, you know, Ms. Krasnow

22    and I both insisted that we also be permitted to appear and

23    make statements, but that was declined.  Just kidding

24    obviously.

25          THE COURT:  On the show?

1           MR. LARKIN:  Yes.  I'm obviously joking.

2           THE COURT:  And you didn't ask for me to be

3      included as well?

4           MR. LARKIN:  Well, you know, now that Your Honor

5      mentions it, I --

6           THE COURT:  All right.  I see we've been doing this

7      conference a little too long.  Go ahead.

8           MR. LARKIN:  But, you know, if the -- it's going to

9      be there.  He's going to -- if he wants to play the

10     recordings to the jury, I suppose we'll deal with that issue

11     at the appropriate time.  I don't -- I don't know what -- the

12     contract for instance.  You know --

13          MR. RUDIN:  Well, at least one of the -- one of the

14     issues that was in the news media was that the show

15     apparently is going to deal with the Jabbar Collins case.

16          So if there was a treatment or proposal for the

17     show, that in the possession of the DA's Office that either

18     references Mr. Vecchione's role in general or references the

19     Jabbar Collins case, or both or either, it seems to me that

20     that goes directly to the question of ratification.

21          That Mr. Hynes is negotiating for a TV program

22     where he's going to have Michael Vecchione play a starring

23     role and where the Jabbar Collins case is going to be

24     discussed.  It seems to me that's all relevant to the -- our

25     Monell claim.

1          I don't see what that's burdensome.  I don't know

2      why they're concerned about it.

3          MR. LARKIN:  Well, if there's anything -- if you

4      want to narrow the request to the Collins case, clearly -- if

5      there's anything in writing or any communications between the

6      DA's Office and CBS that relates to the Collins case, I would

7      agree that that's relevant.  So if you want to narrow it to

8      that sort of universe of material, I can ask about that.

9          MR. RUDIN:  This is -- this is what our letter

10     narrows it to.

11         THE COURT:  Okay.  Let me just jump in here.  It

12     seems that there are two issues that you're looking for.  One

13     is anything relating to Collins.  The second is anything from

14     the DA's Office relating to Vecchione.

15         MR. RUDIN:  Either to or from the DA's Office.

16         THE COURT:  To or from, right.  So as to Collins, I

17     think that's pretty clear.  I don't think anybody had

18     disagreed about that.

19         And the question really is as to Vecchione, and if

20     the -- again, I don't know if there's a stipulation that can

21     be made, but it just seems to me that the Vecchione materials

22     probably ought to be -- ought to be included, too, unless you

23     have a reason not to.

24         MR. RUDIN:  I think given the ratification

25     question that that's probably right, Your Honor.  I just

107

1       don't know if the district attorney wants to assert any kind

2       of a privilege of sorts with respect to these matters.   I

3       mean, we are -- our side, as the Court is probably aware,

4       the City was on the other side of this issue in the Central

5       Park jogger case.

6                   And Magistrate Judge Ellis ruled that it was a

7       privilege that protected out-takes, for example --

8                   THE COURT:  Right.

9                   MR. LARKIN:  -- of statements by some of the

10      plaintiffs --

11                  THE COURT:  Right.

12                  MR. LARKIN:  -- in that case.  And so that was a

13      subpoena to the news media.  That was a subpoena to the

14      media.  But -- and this is a request, document request to

15      us --

16                  THE COURT:  Okay.  So why don't we -- why don't we

17      leave it this way.  As to relevance, it's clearly relevant.

18      If you want to assert a privilege, why don't you take a

19      couple days and think about it, discuss it with your client.

20

21                  But it may be that the privilege isn't yours.  It

22      may be, as Mr. Rudin suggests, that the privilege may be the

23      media's.  But it's not a source.  So, again, I'm not sure --

24      I'm not sure the issue will even come up, so why don't you

25      take a couple days to explore it.

1          MR. LARKIN:  We will do that, Your Honor.

2          MR. RUDIN:  And we also may ask for any -- any

3    records of payments made directly or indirectly to Mr. Hynes

4    or Mr. Vecchione, or their agents or designees in connection

5    with the show.

6          It seems to me that if they're making money off

7    the show, that that is relevant to their credibility, at

8    least.

9          MR. LARKIN:  Oh, come on.  I mean, what do you

10   think -- well, you know, if CBS has to pay some sort of --

11   you know, I don't even know.  I don't know if there's

12   anything there.

13         I don't know if there's a transfer of money.  I

14   don't know if there's anything like that.  I mean, I can't

15   imagine CBS is going to pay these people, or they're going

16   to take money from CBS to get off -- to go on air and talk

17   about the Collins case.

18         I mean, I've been wrong about other things.  I

19   sure hope I'm not wrong about that.

20         THE COURT:  Isn't that the purpose of reality TV

21   to save money for the network?

22         MR. LARKIN:  I hope so.

23         THE COURT:  Well, anyway, so why don't you find

24   out and if there's an issue there, you can come back to me.

25         MR. LARKIN:  Yes, we will.

1          THE COURT:  Okay.

2          MR. LARKIN:  Thank you very much for all you time,

3    Your Honor.  We'll --

4          MR. RUDIN:  I guess the Court would want to

5    schedule another conference.

6          THE COURT:  Well, here's what I want to do.  Two

7    things.  One is I want to schedule a time to speak the City

8    about the privilege law again and the documents.

9          The second thing I want to do is I want to

10   schedule -- I want to just spend a minute talking to both

11   sides about this.  I would like to set a schedule so that

12   all discovery disputes are resolved by May 31st.  That's our

13   goal.

14         MR. LARKIN:  Okay.

15         THE COURT:  As you can see, we've now spent two

16   and a half hours today, but we've made a lot of progress.

17   So I would like -- you know, because my schedule isn't an

18   easy schedule and I'm not always going to be able to take

19   the 11 o'clock people and not have them start a revolution.

20         So what I have to do here is I really would like

21   to just schedule some time here and make it so that all of

22   your discovery disputes are going to be resolved by May

23   31st.  Can we -- is that feasible?

24         MR. LARKIN:  The only question -- the answer would

25   be, from our side, Your Honor, the defendants, I would say

110

1   absolutely.  The only concern is things that may come up at

2   deposition.

3              THE COURT:  Okay.

4              MR. LARKIN:  Because I'm sure that we will be

5   doing depositions after May 31st.  That's the only --

6              THE COURT:  Mm-hmm.

7              MR. LARKIN:  -- caveat.

8              THE COURT:  Oh, that's fine.  Mr. Rudin, what do

9   you think about that?

10             MR. RUDIN:  That's fine with us.

11             THE COURT:  Okay.  So are there other issues on

12  the horizon that we need to schedule a conference for, or

13  should we just have a check-in conference.  What -- Mr.

14  Rudin, why don't I start with you?  What -- what's going to

15  be needed between now and May 31st?

16             MR. RUDIN:  (Indiscernible) on all the issues we

17  talked about Friday and today.  The privilege objections

18  that the other side may have as to some of these related

19  cases.

20  And that's what I immediately see.

21             THE COURT:  Okay.  Mr. Larkin, do you agree, or is

22  there anything else --

23             MR. RUDIN:  And the other thing is that at some

24  point, probably in the middle of May, we'll be -- I mean,

25  after Monique Ferrell's deposition, May 16th, we'll probably

1      going to be -- want to address the issue of deposing Mr.

2      Vecchione and Mr. Hynes.

3                  MR. LARKIN:  Right.  The Hynes deposition, that's

4      another question, Your Honor, that I'm not sure will be

5      right by May 31st.  I -- and I realize that the Court had

6      some preliminary indication about its view on that.

7                  THE COURT:  Right.

8                  MR. RUDIN:  I -- you know, we're going to schedule

9      -- maybe the thing to do is we'll just notice it, and then

10     if Mr. Larkin wants to object, he can object.  Maybe that's

11     the best way to deal with it.

12                 THE COURT:  What do you think, Mr. Larkin?

13                 MR. LARKIN:  I -- if plaintiff wants to do that,

14     we can deal with it, yes.

15                 Serving up -- serve a Rule 30 notice and we'll

16     move for protective order and/or address it however we think

17     we have to.

18                 THE COURT:  Okay.

19                 MR. LARKIN:  I mean, one issue -- well, just

20     briefly, Your Honor.  We might agree to produce a witness

21     who can testify for the DA in his stead, if you will, and

22     bind the office.  That might be the counsel for the DA.  It

23     might be the chief assistant.

24                 And his testimony would have the same effect as

25     testimony by the district attorney himself.  We might be

```
1     able to agree to that.  And I think it should address

2     whatever needs there are in discovery to this case.

3                THE COURT:  All right.  So that's a topic that the

4     two of you will be discussing shortly I assume.

5                MR. RUDIN:  Yes.

6                THE COURT:  Okay.  So everybody has some work to

7     do in the next couple of weeks.

8                Today is May 6th.  Should we have a conference one

9     day next week?  Is that too soon?

10               MR. RUDIN:  Totally up to Mr. Larkin.  I mean,

11    that's fine with me.

12               THE COURT:  Towards the end of the week?  16th?

13               MR. RUDIN:  We have a deposition on the 16th, Your

14    Honor.  That's Ms. Ferrell.

15               THE COURT:  Mm-hmm.

16               MR. RUDIN:  And the 17th I'm -- I'm out.  However,

17    the next week, the 22nd, Wednesday, or the 24th, either of

18    those two days works for me.  Elizabeth.

19               MS. KRASNOW:  (Indiscernible).

20               THE COURT:  Neither of those days works for me.

21               MR. RUDIN:  Oh, gosh.

22               THE COURT:  Okay.  I can do the morning -- well, I

23    can do the morning of the 20th possibly, or else we have to

24    go to the following --

25               MR. LARKIN:  Then we're going to be running pretty
```

1    -- pretty close to the May 31st deadline.

2              THE COURT:  Yes.

3              MR. RUDIN:  We could -- let's see --

4              THE COURT:  We could do the end of the day on the

5    16th.

6              MR. LARKIN:  We may be too bloody at that point.

7              THE COURT:  Well --

8              UNIDENTIFIED FEMALE:  No.

9              MR. LARKIN:  What's that?  Yeah, I mean, I --

10   today isn't (indiscernible).  I mean -- let's see.  How

11   about --

12             THE COURT:  Is that too soon?

13             MR. LARKIN:  I can do the 23rd late in the day,

14   which is a Thursday.

15             THE COURT:  That week -- the week of the 20th just

16   doesn't work for me except the 20th.

17             MR. RUDIN:  I'm -- only Monday the 20th?

18             THE COURT:  Yes.  And only early in the morning.

19             MR. LARKIN:  On that day --

20             MR. RUDIN:  That's fine, Your Honor.

21             THE COURT:  Like about 10:00 or so.  But --

22             MR. LARKIN:  If we -- see, we have PLI, Your

23   Honor, but we can be late to PLI if --

24             THE COURT:  What about the end of the day on the

25   16th?  Is that -- is that just not good for you?

1           MR. RUDIN:  It depends how long we go with Ms.

2    Ferrell.  It's going to start at 10:00.  If we're done by

3    3:30 or 4:00, we could be in court by 5:00, I think.

4           THE COURT:  I would -- we could do it by phone.

5           MR. RUDIN:  Or by phone we could do it.

6           THE COURT:  From wherever you are.  Then we can do

7    it a 5:00.  If you want to do it at 5:00, that's fine.

8           MR. LARKIN:  Your Honor, maybe could just -- if

9    you're going to be -- maybe we could just do it after we

10   finish the deposition.  We will all be together.

11          THE COURT:  Right.  I have a fairness hearing at

12   2:00 that's probably going to last two hours, depending how

13   many people object.

14          But I should be -- and I have a 4 o'clock, which I

15   can move, if I need to, and a 4:30, which I can move.

16          So that's my schedule.  And I will commit to being

17   available after hours, if that's necessary.

18          MR. LARKIN:  Well, maybe we can just say 4:30.  I

19   mean, I don't know, Joel, if you think you're going to be

20   done with Monique by then.  But I -- 4:30 would be okay.  Do

21   it by telephone maybe.

22          THE COURT:  Yeah.  4:30, 4:45, 5:00, anywhere

23   around there, that's fine.

24          MR. RUDIN:  I think that she may go the whole day,

25   but if we -- if we interrupt her and then resume, I -- you

1    know, we could do that.

2              THE COURT:  That will be too hard.  It's too

3    difficult.  Do you want to say 5:00?

4              MR. RUDIN:  All right.  Why don't we say 5:00, and

5    Arthur, can we start at 9:30?

6              MR. LARKIN:  I think we can probably start 9:30.

7    Yeah, let me just double-check with the client.  But yes, we

8    can do that.

9              MR. RUDIN:  Okay.  So 5 o'clock.  And maybe if

10   we're all together and it's a little bit before 5:00, we'll

11   try to call the Court.

12             THE COURT:  Sure.  Absolutely.

13             MR. RUDIN:  But Ms. Ferrell's deposition may be a

14   contentious one, but maybe not.  We'll see.

15             MR. LARKIN:  I -- you know, honestly, I don't

16   think it's going to be contentious.  The depositions so far

17   have not been contentious, Your Honor, believe it or not.

18             THE COURT:  Mm-hmm.

19             MR. RUDIN:  True.

20             THE COURT:  Well, look.  You're all under a lot of

21   stress.  You've got a lot of hard work to do.  You all care

22   a lot about your case.  So I understand that, you know, from

23   time to time there are flare-ups.

24             But I have to say, I think you're working pretty

25   well together, and that's -- you know, one of my goals here

116

1    is to try to make sure that this case will move smoothly,

2    and I want to make sure that whenever there are disputes

3    that you all have that you end up being amicable at the end

4    of the conference and the end of the day.

5              And I have to say that I think you've all come a

6    long way and you're doing -- you're doing pretty well.

7              MR. LARKIN:  Well, appreciate -- we're trying --

8              THE COURT:  At least in front of me.

9              MR. LARKIN:  I know, it spills over sometimes.

10   You do get, you know, aggravated, and I do apologize if

11   earlier the tone -- if I took a tone that was not

12   appropriate, I apologize to everybody.

13             THE COURT:  Well, we do have a corner here in the

14   courtroom where people will be standing if that happens

15   again.

16             MR. LARKIN:  All right.  Put me there.

17             THE COURT:  Okay.  So I think we're set for 5

18   o'clock on the 18th?  Did I say the 18th?  16th.  16th.

19             THE CLERK:  16th.

20             THE COURT:  16th.

21             MR. LARKIN:  16th.

22             THE COURT:  Right.  That's Thursday.  Okay.  And

23   then the only other thing we have to do is schedule a time

24   to speak today, if you have time, about the privilege, the

25   in camera submissions.

1           MR. LARKIN:  Any time today?

2           UNIDENTIFIED FEMALE:  Yes.

3           MR. LARKIN:  Let's see.  Can we do a little later

4    this afternoon, Your Honor.  What time works for the Court?

5           THE COURT:  I have -- I think -- I have a 2:30, a

6    3:30, a 4:00 and a 4:30.  And the 4:30 is going to be a

7    settlement conference.  It could last awhile.

8           So the best time I think I have is somewhere 2:45,

9    3 o'clock.  Somewhere around there.

10          MR. LARKIN:  Three o'clock is fine with me.

11          THE COURT:  And I won't take too much of your

12    time.

13          MR. LARKIN:  That's fine.  Absolutely, Your Honor.

14    You can have whatever time the Court needs, and 2:45/3

15    o'clock is fine.  2:45.

16          THE COURT:  Whenever you want.

17          MR. LARKIN:  Okay.  What -- what --

18          THE COURT:  Sure.  Make it 3 o'clock.  Let's make

19    it 3 o'clock, because --

20          MR. LARKIN:  Three o'clock.

21          THE COURT:  -- the 2:30 people may be contentious.

22          MR. LARKIN:  Okay.  So not like us, right?

23          THE COURT:  Unlike you.

24          MR. LARKIN:  So 3 o'clock.  So should we call

25    chambers?

118

```
1              THE COURT:  Call chambers.

2              MR. LARKIN:  We will do that.

3              THE COURT:  Okay.

4              MR. LARKIN:  Thank you very much.

5              MR. RUDIN:  Thank you.

6              THE COURT:  Thank you.

7              MR. LARKIN:  Thank you, Your Honor.

8              THE COURT:  Bye.

9              (Proceedings concluded at 12:34 p.m.)

10             I, CHRISTINE FIORE, Certified Electronic Court

11     Reporter and Transcriber and court-approved transcriber,

12     certify that the foregoing is a correct transcript from the

13     official electronic sound recording of the proceedings in

14     the above-entitled matter.

15

16     *Christine Fiore*

17     _____          May 14, 2013

18             Christine Fiore, CERT

19

20

21

22

23

24
```