LAW OFFICES OF
# JOEL B. RUDIN

200 WEST 57TH STREET
SUITE 900
NEW YORK, NEW YORK 10019

TELEPHONE: (212) 752-7600
FACSIMILE: (212) 980-2968
E-MAIL: jbrudin@aol.com

JOEL B. RUDIN

TERRI S. ROSENBLATT
STEVEN R. AQUINO

JABBAR COLLINS
(Legal Analyst)

May 29, 2013

**ECF**

Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East, Room 1223S
Brooklyn, New York 11201

Re:   *Collins v. City of New York, et al.*
      Dkt. No. 11-cv-00766 (FB)(RML)

Dear Judge Levy:

Plaintiff respectfully submits this letter in opposition to Defendant City of New York's letter-motion dated May 24, 2013, seeking a protective order against the deposition of District Attorney Charles J. Hynes, noticed for June 18, 2013.

Glaringly absent from the defendant City's's letter is any contention that Mr. Hynes lacks personal knowledge or involvement in the subject matters Plaintiff has listed, in his letter of May 17, 2013 (attached to Defendant's papers), about which he intends to depose Mr. Hynes. The subjects include his personal involvement in Mr. Collins's own case, the reasons for his policies concerning his Office's compliance with disclosure obligations and compelling witnesses to testify, and the reasons for his policies regarding discipline for prosecutorial misconduct. Importantly, the City does not appear to dispute that, with regard to discipline, Mr. Hynes set up a process where he alone decided whether to investigate or discipline ADAs for prosecutorial misconduct, and then *never* did so (at least prior to 2010). They do not, and cannot, disagree that Mr. Hynes's knowledge of the improper practices we allege, and his reasons for permitting them, are at the heart of Plaintiff's *Monell* claim.

The defense contends that Plaintiff should be required to depose two individuals, proposed by the City, who in fact *lack* the personal knowledge that Mr. Hynes indisputably has. As my e-mail exchange with Mr. Larkin, which he has submitted to the Court, shows,

LAW OFFICES OF
# JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 2

he refused to explain the areas of knowledge of ADA Lance Ogiste, except to point out that he was "an executive ADA." However, he then provided a personnel record showing that Mr. Ogiste did not attain this position until 2006. Whatever Ogiste's knowledge of disciplinary procedures after that may be, his "knowledge" before that must be based upon hearsay – hardly a substitute for Mr. Hynes' *own personal knowledge* of *his* policymaking and *his* disciplinary decisions. The second proposed deponent, ADA Ng, would testify about training, but Defendant ignores what we have continually made clear: that our principal claim is not about lack of training, but about lack of *enforcement*.

Defense counsel's inaccurate and self-serving rendition of the "facts" surrounding Mr. Collins's prosecution for the murder of Rabbi Pollack bears no apparent relationship to the issue of whether Mr. Hynes may be deposed regarding Plaintiff's *Monell* claim. This Court is intimately familiar with the case facts, has access to Plaintiff's highly detailed Complaint, and obviously is not going to resolve now the question of whether Mr. Collins is innocent. We thus concentrate instead on the facts and circumstances relevant to the sole question before the Court: whether Plaintiff is entitled to take District Attorney Hynes's personal deposition, and its timing.

## UNDERLYING AND RELEVANT CASE FACTS

Plaintiff's Complaint alleges that police arrested him in 1994 without probable cause and based upon manufactured, false "evidence," that prosecutors achieved a conviction in 1995 by their misconduct at trial, and that various personnel thereafter covered up this misconduct, thereby prolonging Mr. Collins's imprisonment through 2010. The arrest, and the prosecution at trial, were based upon the claims of three witnesses: Angel Santos, Adrian Diaz, and Edwin Oliva.[1]

---

[1] Particularly shameful is the Defendants' insinuation once again that Edwin Oliva's 2006 affidavit supporting Collins's 440 motion was somehow bought by Collins when he paid a portion of the legal fees of attorney Roland Acevedo. Defense counsel knows, from document discovery, that Oliva wrote Collins *years before* Mr. Acevedo's involvement, recanting his testimony and attributing it to coercion by police and then prosecutors. Literally *everything* that Oliva wrote later was independently corroborated, most notably his pretrial recantation and his claim that he was going through drug withdrawal when Det. Gerecitano had him sign his original, "sworn" statement. Indeed, Gerecitano admitted this in his deposition; he also admitted he wasn't even sure Oliva read the statement before signing it.

Case 1:11-cv-00766-FB-RML   Document 120   Filed 05/29/13   Page 3 of 13 PageID #: 1504

LAW OFFICES OF
JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 3

      Following Collins's indictment, according to Michael Vecchione's CPL 440.10 affirmation dated November 3, 2006, *Hynes personally assigned* him as the lead prosecutor, he "alone determined the course of our investigation and the manner in which the trial was conducted," and neither of his far less-experienced colleagues, ADAs Charles Posner and Stacey Frascogna, acted without consulting him.

      Immediately before trial, Vecchione for the first time revealed the identities of the two identification witnesses, Santos and Diaz. On the first day of trial, he revealed Oliva's identity, then immediately put him on the witness stand. Vecchione carefully documented, in writing and in on-the-record verbal statements, his disclosure to the defense of discovery, *Rosario* material, and *Giglio* or impeachment material. His three principal witnesses testified consistently with his disclosures. During his summation, he ridiculed as "laughable" the notion that any of them had any reason to testify favorably for the People, besides simply telling the truth. "Oliva's motive is simple, just like all the rest of the witnesses," he declared. "[H]e saw something. He heard something. Someone asked him about it. And he is telling what he saw and he is telling what he heard. Nothing else."

      As Collins later established in state and federal collateral proceedings, and as the Complaint details, Vecchione and his colleagues abused court processes to coerce testimony from these witnesses when they were unwilling to testify voluntarily and then misrepresented that they were willing, civic-minded witnesses, withheld a slew of *Brady* and *Rosario* material affecting the credibility of each of these witnesses, and made false arguments in summation vouching for their truthfulness and lack of motive to lie.

      The Complaint contends that the City is liable for the above misconduct, which brought about Plaintiff's conviction, due to the managerial policies of Brooklyn District Attorney Hynes, as the policymaker for his Office for the City of New York. Specifically, Hynes' policies included deliberate indifference to ADAs who violated criminal defendants' constitutional rights by withholding *Brady* and *Rosario* material, by deliberately misleading courts and juries about the facts, or by abusing court processes in order to coerce favorable testimony from vulnerable witnesses. Despite dozens of court decisions finding such misconduct, as well as evidence that illegal practices were widespread, Hynes instituted no formal disciplinary standards, rules, or procedures, and disciplined no prosecutor, from 1990 through 2010, for such misconduct. To the contrary, he continually defended such misconduct, while praising and promoting the prosecutors implicated in it, most notably his close confidant and Plaintiff's own prosecutor, Vecchione, even though questions about

LAW OFFICES OF
# JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 4

Vecchione's conduct were continually raised by state and federal judges. Indeed, after Judge Irizarry castigated the D.A.'s Office for the misconduct in Collins's case, including Vecchione's, Hynes immediately announced he would conduct no investigation and has since continually defended Vecchione and his staff for doing nothing wrong.

## THE APPLICABLE LEGAL STANDARD

"An order precluding the deposition of a witness is of course the exception rather than the rule in federal court." *Martin v. Valley National Bank of Arizona*, 140 F.R.D. 291, 314 (S.D.N.Y. 1991). A municipal policymaker cannot avoid being deposed if he "has been personally involved in the events at issue in the case." *Toussie v. County of Suffolk*, 05 Civ. 1814 (JS) (ARL), 2006 WL 1982687, at *2 (E.D.N.Y. Jul. 13, 2006) (Lindsay, M.J.) (allowing the deposition of an official who personally directed a subordinate to engage in the complained-of conduct). Courts have defined personal involvement broadly, noting that an official has the requisite involvement where he has engaged in "conversations related directly to" the plaintiff's claim, *Pisani v. Westchester County Health Care Corp.*, 05 Civ. 7113 (WCC), 2007 WL 107747, at *3 (S.D.N.Y. Jan. 16, 2007) (Conner, D.J.), has been "directly involved in the investigation ... or disciplinary actions taken" regarding the claim, *Bey v. City of New York*, 99 Civ. 3873 (LMM) (RLE), 2007 WL 3010023, at *2 (S.D.N.Y. Oct. 15, 2007) (Ellis, M.J.), "reviewed" and made decisions concerning the case, *Atkinson v. Goord*, 01 Civ. 0761 (LAK) (HBP), 03 Civ. 7759 (LAK) (HBP), 2009 WL 890682, at *2 (S.D.N.Y. Apr. 2, 2009) (Pitman, M.J.), or made public statements "relate[d] to the present case," *Gibson v. Carmody*, 89 Civ. 5358 (LMM), 1991 WL 161087, at *1 (S.D.N.Y. Aug. 14, 1991) (McKenna, D.J.).

Thus, in *United States v. City of New York*, Judge Garaufis allowed the plaintiffs to depose Mayor Bloomberg after he publicly stated that he had "chosen to fight" a lawsuit filed against the City of New York. 2009 WL 2423307, at *2 (E.D.N.Y. Aug. 5, 2009). The court allowed the deposition because Bloomberg's comments – made before the United States Senate – "suggest[ed] his direct involvement in the events at issue in the case." *Id.* The court also noted Bloomberg had "unique personal knowledge" about the case because, among other things, he had once been forwarded a report about the issues in the case and participated in meetings relevant to the lawsuit. See *id.*, at *2 n.2.

In a *Monell* lawsuit, a plaintiff also is entitled to depose a high-ranking official or municipal policy maker where such individual has been personally involved in creating or

Case 1:11-cv-00766-FB-RML   Document 120   Filed 05/29/13   Page 5 of 13 PageID #: 1506

LAW OFFICES OF
JOEL B. RUDIN

implementing the policy, practice or procedure at issue. Under *Monell*, a plaintiff can establish the "policy" of an office in a number of ways, including showing that the policymaker was aware of a pattern of or accusations of wrongdoing but failed to take action – including investigations or discipline – in response, *see Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012), or ratifies a subordinate's unlawful decision "and the basis for it." *City of St. Louis v. Praptrotnik*, 485 U.S. 112, 127 (1988).

Thus, a policymaker will certainly be subject to deposition in a civil suit regarding a policy that he has "created." *Schiller v. City of New York*, 04 Civ. 7922 (KMK)(JCF), 04 Civ. 7921 (KMK)(JCF), 2006 WL 2708464, at *2 (S.D.N.Y. Sept. 20, 2006) (Francis, M.J.). In *Lederman v. Giuliani*, the plaintiffs alleged Mayor Giuliani selectively enforced the City's "anti-defacement provisions." 2002 WL 31357810, at *1 (S.D.N.Y. Oct. 17, 2002) (McKenna, D.J.). The court noted that allowing the deposition of Giuliani "only [made] sense as it is Giuliani who best knows whether he decided to selectively enforce the City's anti-defacement provisions against plaintiffs." *Id.*, at *2. Likewise, where the relevant policymaker has directed a subordinate to act in accordance with the challenged policy, "his deposition is required because he *may* possess particular information necessary to the development of the plaintiff's case." *Toussie*, 2006 WL 1982687, at *2 (emphasis added).

In *Sanstrom v. Rosa*, 93 Civ. 7146 (RLC), 1996 WL 469589 (S.D.N.Y. Aug. 16, 1996), Judge Francis held that former Governor Cuomo could be deposed about policies and practices under his administration in a discrimination lawsuit, where Cuomo had failed to submit an affidavit showing he was "too busy" – the court held that he would be required to be deposed even it were still governor considering that his reasons for failing to remedy problems in his administration were at the heart of the lawsuit. Similarly, as Judge Gorenstein pointed out in *General Star Indemnity Co. V. Platinum Indemnity Ltd.*, 210 F.RD. 80, 84 (S.D.N.Y. 2002): "As a matter of logic, a top executive who issues a corporate policy will likely have knowledge of the reasons for the issuance of the policy that a subordinate will not."

LAW OFFICES OF
JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 6

## DISCOVERY HAS REVEALED HYNES'S PERSONAL AND DIRECT INVOLVEMENT IN THE FACTS *AND* POLICY IN THIS CASE

Discovery has only reinforced the central, personal role of Mr. Hynes in the events that unfolded in Mr. Collins's case, as well as his role in the office as sole decision maker in formulating the policies, and in tolerating the unlawful customs and practices, which led to the 16-year violation of Collins' due process and fair trial rights.

We first discuss Hynes's personal involvement in the Collins prosecution, which alone is sufficient to allow Plaintiff to depose him. Next, we discuss Hynes's personal role in the *Monell*-related issues in this case and why it would be burdensome and wasteful to require Plaintiff to first have to take the deposition of any "substitute". We also discuss several other policy-related subjects about which we intend to question Hynes at any deposition, and for which Defendants have suggested *no* substitute, even though they are aware that Plaintiff seeks to question Hynes on these matters as well. Finally, contrary to the cases the City cites, Hynes's deposition here will not pose any undue burden on him.

### A.   Hynes's Personal Involvement In The Collins Case Itself

Mr. Hynes took a personal interest in Mr. Collins's case, involving the murder of an Orthodox rabbi, from the beginning, personally selecting Mr. Vecchione to head the prosecution team. When Collins, in his 2006 State collateral attack on his conviction, moved to disqualify the D.A.'s Office because no one in the Office could independently investigate the conduct of Hynes's most powerful aide, Vecchione, who was Chief of the Rackets Bureau and leading a highly-publicized investigation into the Brooklyn judiciary, and the motion was prominently reported in The New York Times, Hynes nevertheless assigned Vecchione's Rackets Bureau counsel and subordinate, Monique Ferrell, to handle the matter. When Judge Irizarry later disqualified Ms. Ferrell because she would have to testify concerning her alleged cover-up of the Office's misconduct, Hynes selected another of Vecchione's immediate subordinates, Kevin Richardson, to take over. Only Hynes can explain these personnel decisions.

While the allegations in the Collins case were pending in 2007, discovery shows, Hynes personally wrote to the New York City Bar Association to nominate Vecchione for

LAW OFFICES OF
## JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 7

a prestigious award, which he then received. Thereafter, Hynes continually praised Vecchione and gave him additional responsibilities. Only he can explain why he did so despite his knowledge of the allegations against him.

Even though the City's production of electronic discovery has been slow and incomplete and is the subject of ongoing litigation (*see* Plaintiff's separate letter-motion dated May 28, 2013, seeking to compel disclosure), e-mails the City has disclosed (*see* Exh. A) reveal the outlines of Hynes' close personal involvement in developing a strategy to keep Vecchione off the witness stand in federal court, the involvement of most of his chief aides in trying to implement that strategy, and Hynes' knowledge of the extent of the misconduct allegations against Vecchione.

Significant among these e-mails is one from May 20, 2010, in which Hynes's Chief Assistant, Amy Feinstein, warned him that Collins's counsel was trying to convince Judge Irizarry to hold a full-blown hearing on all of Vecchione's alleged misconduct notwithstanding the State's offer to vacate the conviction based upon solely the Oliva recantation and to re-try Collins in State court. Contrary to the public position the Office was taking (and the position the City has taken in this case), Ms. Feinstein warned Hynes that, according to Ferrell, "there would be a great deal of fodder for Mike to be cross examined" about the Jeffrey Marshall case and about his denial of any Oliva recantation for 4 ½ years. Hynes's response was to advise "Mike" to consult a good "liable [sic] lawyer." E-mails on May 24, 25 and 26 showed Hynes's preoccupation with the case and his concern that his strategy to keep Vecchione off the witness stand might not be working. Further e-mails from early June show him exulting ("great news") in a resolution under which all charges against Mr. Collins would be dismissed, with prejudice, and he would be immediately released from prison, but Vecchione would be relieved from having to testify.

Since Collins' release from prison, Hynes has not backed down from his support of Vecchione and his indifference to Vecchione's history of misconduct in this and other cases. Hynes has made numerous public statements concerning the Collins prosecution, continually insisting, despite his knowledge of the evidence in this case, that there was no misconduct by Vecchione at all, just a single failure by some other ADA to disclose a single statement by one witness. He announced that "no investigation" would be conducted, and wrote a letter to the editor of the Village Voice vociferously defending his Office's conduct. He has allowed Vecchione to negotiate a reality television series with CBS, in which Vecchione features himself as the face of the Office. Hynes cannot make public statements showing that

LAW OFFICES OF
# JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 8

he has intimate knowledge of, and involvement with, the key issues in this litigation, and continually praise and promote Vecchione, and then avoid having his support for Vecchione and his behavior probed at a deposition.

**B.     Hynes's Personal and Central Role In the Policy of Indifference To The Types Of Misconduct That Occurred In This Case**

Plaintiff's *Monell* claim alleges that the constitutional violations committed by Brooklyn ADAs and Detective Investigators in his criminal prosecution were caused by a policy of indifference to such misconduct by Hynes. While others may speculate as to Hynes's reasoning, only he knows why he did or did not take the actions that revealed and perpetuated his policy of deliberate indifference. The case law makes clear that under such circumstances, a plaintiff has an absolute right to depose the policymaker. We now discuss some of the areas of policy concerning which Hynes was personally involved and which directly relate to the issues in this case.

**1.     Hynes Alone Decided Whether to Investigate or Discipline Prosecutors For Misconduct, But Such Discipline Appears Never to Have Occurred From 1990-2010**

Present ADA Besunder, a deputy bureau chief of homicide since 1996 and before that a senior ADA for Hynes, testified he was unaware of any office manual or other document setting forth any disciplinary rules, standards, or procedures, and was unaware of *any* prosecutor ever being disciplined for misconduct in the handling of a criminal case under Mr. Hynes prior to 2010. Former ADA Stacey Frascogna Jamieson (Vecchione's co-counsel in the Collins case) gave similar testimony. No document referencing any disciplinary procedure or standards prior to 2012 has been produced in discovery.

Previously, in the *Zahrey* case, Counsel to the D.A. Dino Amoroso testified, in 2005, that there was no formal written disciplinary process, but an unwritten one. Tr. 91-92 (relevant excerpts attached as Exh. B). Amoroso testified that when a possible ethical violation was brought to the attention of himself or the First Assistant District Attorney (Amy Feinstein), they would bring it to Hynes' attention and *he alone* would decide whether to investigate, and then whether to impose discipline. Tr. 92-94, 107. However, he could not recall a single case in which an ADA had been disciplined for misconduct in the prosecution of a criminal case, from 1990 through 2005, when he was deposed. Defendant

LAW OFFICES OF
# JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 9

City has failed to disclose any evidence that the disciplinary policy, from 2005-2010, changed. Indeed, it has continually refused to comply with Plaintiff's interrogatory asking whether anyone other than Hynes himself had responsibility for discipline.

As the Court is aware, Plaintiff is awaiting production in discovery of personnel files for ADAs involved in 50 cases of alleged prosecutorial misconduct, to see whether any of them were disciplined or admonished, or rather praised and promoted. We already know that in many of those cases, Hynes was personally involved in condoning misbehavior. A few representative examples include the Waldbaum's Fire case, *People v. Jackson*, 162 A.D.2d 470 (2d Dep't 1990) (conviction vacated on *Rosario* grounds), *rev'd*, 78 N.Y.2d 638 (1991) (matter remanded for new hearing regarding prejudice), *vacatur reinstated*, 154 Misc.2d 718 (Sup. Ct. Kings Co. 1992) (finding numerous *Brady* and *Rosario* violations), *aff'd*, 198 A.D.2d 301 (2d Dep't 1993), in which Hynes wrote a letter of commendation to ADA Besunder, and continually promoted him, even though the trial court found that Besunder had withheld numerous documents showing that the defendant was innocent and testified evasively about his actions; the homicide prosecution of Sami Leka, in which Hynes personally vouched for the fairness of the prosecution, notwithstanding alleged *Brady* violations, and wrote that Leka should serve "every day" of his sentence, only to have the Second Circuit overturn the conviction for one of those same *Brady* violations, *see Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001), and the *Marshall* case, in which Hynes personally approved a time-served deal to resolve federal habeas proceedings alleging misconduct by Vecchione and then disciplined no one even though Vecchione and his underling failed to correct false testimony by a key witness and failed to disclose his cooperation agreement.

This case is unlike those cited by Defendants. The issue in *Gonzalez v. County of Suffolk*, 09-cv-1023 (TCP)(ETB), 2011 U.S. Dist. LEXIS 130390 (E.D.N.Y. Nov. 10, 2011), which Defendants here mainly focus on, was limited to whether the District Attorney had *personal* knowledge concerning the underlying facts of the case, *not* whether he was appropriately deposed concerning policy issues related to that plaintiff's *Monell* claim. Even there, Magistrate Judge Boyle did not issue a protective order, but merely ordered the parties to make a factual showing concerning the D.A.'s personal involvement where *none* had been made previously in the case. Here, we have shown *both* the D.A.'s personal involvement in the policy issues and the facts of the Plaintiff's own case.

In *New York v. Oneida Indian Nation*, the defendant seeking then-Governor Pataki's deposition was required to take a deposition of a substitute official who had "similar if not

LAW OFFICES OF
**JOEL B. RUDIN**

Honorable Robert M. Levy
May 29, 2013
Page 10

greater" knowledge than the governor on the intricacies of a particular agreement relating to the Oneida Indian tribe. But even there, the court held, Governor Pataki's deposition would be allowed if the defendant could show that Governor Pataki had "unique personal knowledge" of the policy ... *notwithstanding that he was a sitting governor.* 95-CV-0554, 2001 WL 1708804, *3 (N.D.N.Y. Nov. 9, 2001). Here, we already have established that Hynes has "unique personal knowledge" of the disciplinary policies at issue: not only were they *his* policies, but he reserved for himself the responsibility to enforce them. Moreover, as indicated in the e-mails between counsel that Mr. Larkin attached to his submission, defendants do not contend that ADA Ogiste has any "greater" knowledge than Mr. Hynes, but only that he will aggregate hearsay information collected from other members of the Office, which is certainly no substitute for the testimony of the actual policymaker about his reasons for his actions or inactions.

> 2. **Hynes Permitted His Prosecutors to Routinely Misuse Falsely Notarized and 'Sworn' Arrest Applications, and Illegal 'Office' Subpoenas, To Coerce Potentially False Testimony From Vulnerable Witnesses**

Extraordinary deposition testimony by the former supervising paralegal for Vecchione's Homicide Bureau, and Vecchione's direct subordinate, Liza Noonan Fitzpatrick, together with other documentary material, has revealed the extent of illegal, even criminal, behavior in Hynes's Office that he allowed to fester for many years. If they were not happening in Brooklyn, we would associate such practices with a police state. Only Mr. Hynes can explain what his knowledge was of these practices and why he permitted them.

Testifying in the presence of Hynes's top aide and legal counsel, Dino Amoroso, who has been monitoring all the District Attorney-related depositions, Ms. Fitzpatrick testified that she signed Vecchione's name to "sworn" affirmations and affidavits in this case, which Vecchione then submitted to the court to obtain the Santos and Diaz material witness warrants and an order to produce Oliva. Tr. 37-39, 44-46 (relevant excerpts of her deposition are attached as Exh. C). She testified that two of the Vecchione "affidavits" in this case were falsely notarized. Tr. 39-40, 44-46. She testified that using falsely "sworn" affirmations and falsely notarized "affidavits" to obtain material witness warrants and orders to take custody of witnesses (known as "Damiani orders") was Vecchione's, and the Office's, routine practice throughout the first seven years (1990-97) of Hynes's tenure, Tr. 40-50, 100-12,

LAW OFFICES OF
**JOEL B. RUDIN**

Honorable Robert M. Levy
May 29, 2013
Page 11

including during the Collins prosecution in 1994-95.[2] Prosecutors would then use these forged, falsely "sworn" applications to obtain orders with which to arrest and detain individuals who were nothing more than prospective witnesses.

This practice violated a broad range of criminal statutes, ranging from forgery, to false filing of an instrument, to fraud by a notary, and to aiding and abetting each of these crimes. It also violated the explicit language of the Fourth Amendment, which prohibits arrest warrants except upon probable cause, "supported by oath or affirmation." The District Attorney's Office itself has prosecuted exactly such criminal activity. *See* Collins Complaint, ¶ 4 & n.2; *see also People v. (Clarence) Norman,* 40 A.D.3d 1128 (2d Dep't 2007); *People v. Norman,* 40 A.D.3d 1130 (2d Dep't 2007) (convicting and imprisoning Brooklyn Democratic leader for false filings of public documents).

The practice was even worse when one considers how the witnesses were treated once the court orders were obtained. The evidence shows that the Office's custom was not to take such mere witnesses to court "forthwith," as required by law and by the terms of each material witness order, but to take them to the D.A.'s Office, where they were held, without any judicial oversight, for questioning. The depositions of a former Brooklyn detective-investigator, Christopher Salsarulo, who is now a DEA agent, taken in *Quezada v. Smith,* 08 Civ. 5088 (KAM), confirms that D.I's were trained to bring material witnesses directly to the D.A.'s Office, instead of to court, for investigative questioning, and they would later be held against their will at hotels. *See* attached excerpts, Exh. D. A "Custody" memorandum (see attached, Exh. E, ¶ 1) by Chief Investigator Albert A. Pica, dated May 12, 1993, instructed Hynes's detective-investigators on how to detain witnesses under armed guard at hotels: "In the case of a hostile witness or potential arrestee, Detectives will exercise sufficient control to guard against escape," wrote Pica. Hynes's Office was running a private jail system where witnesses were illegally interrogated and forcibly detained indefinitely.

This is not all that Ms. Fitzpatrick's extraordinary testimony revealed. She admitted that, in "hundreds" of instances, the Office subpoenaed witnesses, not to appear in court to give testimony, which is all that the subpoena power permits, but to the D.A.'s Office for potentially coercive questioning. Tr. 53-56. The New York Court of Appeals, in *People v.*

---

[2]Ms. Fitzpatrick testified the practice was in place when she began her job in 1985 and continued under Mr. Hynes through at least 1997. Tr. 110-12.

LAW OFFICES OF
# JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 12

*Natal*, 75 N.Y.2d 379, 385 (1990), and a Brooklyn Supreme Court Justice, in *People v. Neptune*, 161 Misc.2d 781 (Sup. Ct. Kings Co. 1994), a case involving Vecchione's Homicide Bureau, had directed that a practice of subpoenaing witnesses or evidence to the D.A.'s Office "should not be replicated." Various courts have held that evidence obtained through illegal "Office" subpoenas must be precluded or suppressed. *See, e.g., People v. Currier*, 221 A.D.2d 805, 806-07 (3d Dept. 1995); *People v. Woodson*, 165 Misc.2d 784, 791 (Sup. Ct., Queens Co. 1995); *People v. Warmus*, 148 Misc.2d 374 (County Ct. Westchester Co. 1990); *People v. Arocho*, 85 Misc.2d 116 (Sup. Ct., New York Co. 1976). Given that suppression of evidence or witness testimony was the established remedy for such abuses by 1995, the Office's failure, in this and other cases, to disclose its unlawful subpoena and material witness practices also violated defendants' rights to disclosure of favorable information under *Brady*. *See, e.g., People v. Geaslen*, 59 N.Y.2d 510, 514 (1981) (recognizing that *Brady* applies to information favorable to the defense in connection with a motion to suppress). Had the Office complied with its disclosure obligations here, the testimony of Santos and Oliva would have been subject to suppression.[3]

### 3. Hynes Was Indifferent to Specific Practices Fostering *Brady* Violations

The City's defense in this case is that neither Vecchione, nor any other "living" ADA, knowingly withheld the Oliva recantation or other *Brady* material, but does not contest that *someone* at the Office was responsible. However, even assuming Vecchione did not act wilfully, the City still would be liable if the non-disclosure resulted from Hynes's deliberate indifference. Plaintiff may proceed on either or both of two theories: one, indifference exhibited through lack of discipline, and two, indifference exhibited through an Office policy, presumably known to and tolerated by Hynes, to avoid creating written records of witness statements and to thereby frustrate *Brady*. Numerous witnesses, in this and in the *Zahrey* cases, have testified to their training to avoid recording witness statements and thereby avoid having to disclose *Rosario* material. None of them testified they were trained

---

[3]No wonder so many false convictions were obtained under Hynes's watch. The Office's police state tactics were most often used with drug addicts, petty street criminals, and prisoners, the most vulnerable of individuals and thus the most obviously susceptible to official pressure to testify favorably, and potentially falsely, for the District Attorney.

LAW OFFICES OF
## JOEL B. RUDIN

Honorable Robert M. Levy
May 29, 2013
Page 13

to somehow preserve and disclose such statements, where applicable, under *Brady*. There is no substitute for Hynes to explain why *he* permitted this practice to flourish.

### C. Any Minimal Burden Is Outweighed By The Necessity of Hynes's Testimony To The Litigation

There is no question that Hynes will have to testify, about numerous areas of policy and concerning his personal involvement in this and other cases. Chief Assistant Amy Feinstein, who runs the Office day to day, and the Office's large executive staff, can easily manage things while Hynes prepares for and attends his own deposition. Much of his job is ceremonial or involves public relations and self promotion anyway, such as attending community and school events, giving interviews, running for re-election, and overseeing the Office's foray into "reality" television ("Brooklyn D.A."). The City has made no showing that testifying would unduly burden Hynes, or that the burden would be any less if the testimony occurred later rather than now. Moreover, Hynes's "burden" would be far less than the burden his policies and the actions of his subordinates caused Mr. Collins: the loss of the best 16 years of his life to a prison sentence.

### CONCLUSION

Defendant's motion should be denied. Mr. Hynes should be required to testify, as noticed, on June 18.

Respectfully submitted,

Joel B. Rudin
*Attorney for Plaintiff*

JBR/tp
Encls.

cc: Arthur Larkin, Esq. (By ECF)
Elizabeth Krasnow, Esq. (By ECF)
Assistants Corporation Counsel