# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------x
JABBAR COLLINS,

                    Plaintiff,

                                      CIVIL ACTION
                    -against-         No. 11CV00766

THE CITY OF NEW YORK; MICHAEL F.
VECCHIONE, BRIAN MAHER, STEPHEN
BONDOR, SHOLOM TWERSKY, ANTHONY
D'ANGELO, MELANIE MARMER, MORGAN J.
DENNEHY, VIRGINIA C. MODEST, and
JODI MANDEL, as employees of the
Kings County District Attorney's
Office and Individually, and VINCENT
GERECITANO and JOSE R. HERNANDEZ,
Individually and as members of the
New York City Police Department,

                    Defendants.
---------------------------------x

                    May 10, 2013
                    2:13 p.m.


Deposition of LIZA FITZPATRICK, taken by

Plaintiff, at the Law Offices of Joel B.

Rudin, 200 West 57th Street, Suite 900, New

York, New York 10019, before Anneliese R.

Tursi, a Registered Professional Reporter and

Notary Public within and for the State of New

York.



STATE OF NEW YORK
COURT OF CLAIMS
---------------------------------x
JABBAR COLLINS,

                    Claimant,
                                          CLAIM NO.
        -against-                         119586

THE STATE OF NEW YORK,

                    Respondent.
---------------------------------x

                    May 10, 2013
                    2:13 p.m.


Deposition of LIZA FITZPATRICK, taken by

Plaintiff, at the Law Offices of Joel B.

Rudin, 200 West 57th Street, Suite 900, New

York, New York 10019, before Anneliese R.

Tursi, a Registered Professional Reporter and

Notary Public within and for the State of New

York.



A P P E A R A N C E S

LAW OFFICE OF JOEL B. RUDIN

Attorneys for Plaintiff

 200 West 57th Street, Suite 900

 New York, New York 10019

BY: JOEL B RUDIN, ESQ.
 TERRI S. ROSENBLATT, ESQ.
 212-752-7600
 jbr@rudinlaw.com


NEW YORK CITY LAW DEPARTMENT

OFFICE OF THE CORPORATION COUNSEL

Attorneys for Defendants

 100 Church Street

 New York, New York 10007

BY: ARTHUR LARKIN, ESQ.
 ELIZABETH KRASNOW, ESQ.
 212-788-0976
 ekrasnow@law.nyc.gov


CHARLES J. HYNES, DISTRICT ATTORNEY

OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY

 350 Jay Street

 Brooklyn, New York 11201-2908

BY: DINO G. AMOROSO, ESQ.
 DEPUTY DISTRICT ATTORNEY
 718-250-2211
 amorosod@brooklynda.org

ALSO PRESENT:

 JABBAR COLLINS



```
 1                    L. FITZPATRICK
 2                    (Plaintiff's Exhibits 81-120
 3               premarked for identification, as
 4               of this date.)
 5   L I Z A   F I T Z P A T R I C K,
 6          residing at 55 Queen Ann Drive,
 7          Shrewsbury, New Jersey 07702, having
 8          been first duly sworn/affirmed by the
 9          Notary Public (Anneliese R. Tursi), was
10          examined and testified as follows:
11   EXAMINATION BY MR. RUDIN:
12          Q.    Good afternoon, Ms. Fitzpatrick.
13          A.    Good afternoon.
14          Q.    My my name is Joel Rudin.  I
15   represent Jabbar Collins who is the plaintiff
16   in a civil rights action that is pending in
17   the federal court in Brooklyn and also a
18   claimant in an action that is pending in the
19   New York State Court of Claims.
20               MR. RUDIN:  This caption should
21          also reflect both captions.
22               MR. LARKIN:  That's fine with us.
23          I don't object to that.
24               MR. RUDIN:  We notified the
25          attorney for the state and she could not
```



```
 1                   L. FITZPATRICK
 2        A.    Yes.
 3        Q.    Do you know whose handwriting is
 4   on the upper left-hand corner of that page?
 5        A.    That would be mine.
 6        Q.    And it says fax number and then
 7   there is an 809 area code?
 8        A.    Yes.
 9        Q.    Was that a number that you faxed
10   this material to in Puerto Rico?
11        A.    I suppose so, yes.
12        Q.    Now I'm going to show you a
13   five-page document that is marked as
14   Plaintiff's 79.
15        A.    Okay.
16        Q.    Do you recognize that document as
17   the document that was faxed along with that
18   cover sheet?
19        A.    No.
20              MR. LARKIN:  Just a form
21        objection.  You can answer.
22        A.    No.
23        Q.    Well, what is the top page of that
24   document?
25        A.    It is from the DA's office.
```



```
 1                    L. FITZPATRICK
 2         Q.    Is it fair to say that is a letter
 3    from Mr. Posner to Mr. Vecchione?
 4         A.    Yes.
 5         Q.    Dated February 27, 1995?
 6         A.    Yes.
 7         Q.    Do you recognize Mr. Posner's
 8    signature?
 9         A.    No.
10         Q.    And the letter is directed to Mr.
11    Vecchione at the Holiday Inn Crowne Plaza
12    Hotel in San Juan?
13         A.    Yes.
14         Q.    Would you turn to the next page of
15    that document.
16         A.    Yes.
17         Q.    Do you recognize what kind of
18    document that is, what it calls itself?
19         A.    Material witness order.
20         Q.    And who is the witness that the
21    order is intended to produce?
22         A.    Adrian Diaz.
23         Q.    Now, would you turn to the last
24    page of that document.  Do you see that there
25    is a line under which it is typed in Michael
```

```
 1                    L. FITZPATRICK
 2    F. Vecchione?
 3          A.    Yes.
 4          Q.    Do you see that there is
 5    handwriting above that line?
 6          A.    That's my handwriting.
 7          Q.    Did anyone ask you to sign that
 8    document?
 9          A.    No.
10          Q.    Why did you sign that document in
11    the name of Michael Vecchione?
12          A.    That was pretty much common
13    practice.  If he was not around I would sign
14    it.
15          Q.    Now, do you see that at the bottom
16    of that page it says:  "Sworn to before me
17    this 24th day of February 1995" and then there
18    is a signature Margarita Colon?
19          A.    Yes.
20          Q.    Was that a notarization of a
21    signature?
22          A.    Yes.
23          Q.    Were you present when Margarita
24    Colon notarized this document?
25          A.    I don't know.
```



```
1                    L. FITZPATRICK
2        Q.    Did you know a Margarita Colon?
3        A.    Yes.
4        Q.    Who was she?
5        A.    She was a paralegal in homicide.
6        Q.    Did she work under your
7   supervision?
8        A.    Yes, she did.  But I would also
9   like to state that at times, this could be
10  sitting there, another order could be sitting
11  there, another order could be sitting there
12  whether I was in her presence or anybody was
13  in her presence when she did this, I can't
14  tell you.
15       Q.    Do I understand your testimony to
16  be that it was a common practice at that time
17  for you to sign Mr. Vecchione's name on
18  documents of this nature?
19            MR. LARKIN:  Form objection.
20       A.    If he was not available.
21       Q.    And did you also sign, was it also
22  the practice at that time for you to sign the
23  name of other prosecutors on similar documents
24  when they were not available?
25            MR. LARKIN:  Form objection.
```



```
 1                    L. FITZPATRICK

 2        A.    Yes.

 3        Q.    And did Mr. Vecchione know that

 4   that was the practice?

 5        A.    I believe.

 6        Q.    Did Mr. Posner know that that was

 7   the practice?

 8        A.    Yes.

 9        Q.    Did Mr. Hale know that that was

10   the practice?

11              MR. LARKIN:  Well, just objection

12        to form.  You can answer.

13        A.    I believe so.

14        Q.    Do you know whether or not that

15   was the practice outside the homicide bureau?

16              MR. LARKIN:  Objection:  form.

17        A.    Yes.

18        Q.    And what's the basis of your

19   knowledge of that?

20        A.    I did it before I went to

21   homicide, when I worked from 1985 on until at

22   some point in the office and I don't recall

23   when, we were told that we could not do that

24   and we had to do that backwards slash S

25   backwards slash and then sign the name.
```

```
 1                    L. FITZPATRICK
 2        Q.    And when were you told that?
 3        A.    I can't recall.  I know it was
 4   after, I think it is when I was working with
 5   Ken Taub.
 6        Q.    What were the kinds of documents
 7   that you would sign in the name of Mr.
 8   Vecchione or other ADAs?
 9        A.    Like the personal subpoenas we
10   would send out or material witness order, even
11   so much in ordering when you showed me the
12   Sprint, for a Sprint, I would sign it there.
13        Q.    Damiani order?
14        A.    Yes.
15        Q.    Affirmations in support of
16   motions?
17             MR. LARKIN:  Objection:  form.
18        A.    I don't know.
19        Q.    Or affirmations responding to
20   discovery demands, would you sign there?
21             MR. LARKIN:  Objection to form.
22        A.    I don't recall.
23        Q.    Now, this affidavit that's part of
24   Exhibit 79, do you see the last two pages?  It
25   says Affidavit on Application For Certificate.
```

```
 1                    L. FITZPATRICK
 2   Do you see --
 3         A.    Exhibit 91?
 4         Q.    Yes.  You are holding it.
 5         A.    Because it says 79.
 6         Q.    I'm sorry, 79.  Do you see Exhibit
 7   79?
 8         A.    Yes.
 9         Q.    Would you turn to the last two
10   pages.
11         A.    Yes.
12         Q.    Do you see where it says Affidavit
13   on Application For Certificate?
14         A.    Yes.
15         Q.    And then it says:  "Michael F.
16   Vecchione being duly sworn, deposes and says."
17         A.    Yes.
18         Q.    And then it is followed by a
19   number of paragraphs that contain information.
20         A.    Yes.
21         Q.    Do you know who actually typed out
22   this form, this affidavit?
23         A.    A secretary.
24         Q.    Do you have any knowledge about
25   who provided the secretary the information
```

```
 1                    L. FITZPATRICK

 2    that's in this document?

 3         A.    I would assume that Michael

 4    Vecchione did, or a combination.

 5         Q.    Of who?

 6         A.    I may have filled in some dates or

 7    stuff like that, but I did not write this

 8    document.

 9         Q.    I'm going to move onto another

10    document.  I'm going to ask you to look at

11    Plaintiff's 91.

12                    (Plaintiff's Exhibit 91,

13                    Material Witness Order.)

14         A.    Okay.

15         Q.    Do you recognize that document?

16         A.    It is a material witness order.

17         Q.    And do you see the name of the

18    witness that it pertains to?

19         A.    Angel Santos.

20         Q.    Now, do you see on the second page

21    of that document there is a signature line for

22    the judge, Egitto?

23         A.    Yes.

24         Q.    And underneath that there is a

25    signature line for Mr. Vecchione?
```



```
 1                    L. FITZPATRICK

 2         A.    Yes.

 3         Q.    And there is a signature there?

 4         A.    Yes.

 5         Q.    Do you recognize that as his

 6   signature?

 7         A.    I do.

 8         Q.    Would you turn to the last page of

 9   the document.  Do you see that there is a

10   signature line for Michael Vecchione?

11         A.    Yes.

12         Q.    And then the name Michael

13   Vecchione is written above that?

14         A.    Yes.

15         Q.    Do you recognize whose signature

16   that is?

17         A.    I do.

18         Q.    Whose is it?

19         A.    It's mine.

20         Q.    Do you see that there is a

21   notarization that appears below it?

22         A.    Yes.

23         Q.    "Sworn to before me this 23rd day

24   of February 1995."

25         A.    Yes.
```



```
 1                    L. FITZPATRICK
 2         Q.    And then there is a name Lori E.
 3   Katz
 4         A.    Okay.
 5         Q.    Is that the name?
 6         A.    I don't know.  It could also look
 7   like Lou.  I don't know who that person is or
 8   I don't recall.
 9         Q.    Do you recall anyone notarizing
10   that signature in your presence?
11         A.    No.
12         Q.    You don't know who that person is
13   who notarized it?
14         A.    No, I don't recall.
15         Q.    Now, this document that contains
16   your signature of the name Michael Vecchione,
17   that signature is on an affirmation in support
18   of people's motion for a material witness
19   order?
20         A.    Yes.
21         Q.    And do you see that it says
22   "Michael Vecchione being duly sworn, deposes
23   and says"?
24         A.    Yes, I do.
25         Q.    And then underneath that there are
```



```
 1                    L. FITZPATRICK
 2   a number of paragraphs containing information?
 3         A.    Yes.
 4         Q.    Do you know who prepared the body
 5   of the affirmation that contains the
 6   information?
 7         A.    No.
 8         Q.    Do you know who provided the
 9   information that is contained in the
10   affirmation?
11         A.    I may have.  Let me see.  Or
12   Detective Bondor or Mike himself.  I couldn't
13   tell you exactly.  But if it were Mike, he
14   would need to know all this information, he
15   would get that partially from me, perhaps from
16   the detectives.
17         Q.    And what was your understanding at
18   the time, of a material witness order or
19   warrant?
20         A.    My understanding of what it is?
21   That this witness is material to the case and
22   is not making himself available to come in to
23   testify after numerous attempts at trying to
24   get him in.
25         Q.    And did you understand at the time
```

```
 1                    L. FITZPATRICK
 2   that a material witness warrant would be
 3   issued by a judge?
 4        A.    Yes.
 5        Q.    And did you have any understanding
 6   about what the warrant entitled the office to
 7   do with respect to the individual who it
 8   pertained to?
 9              MR. LARKIN:  Form objection.
10        A.    Yes.
11        Q.    What was your understanding?
12        A.    My understanding was that it would
13   allow the detectives to arrest him on that
14   warrant and bring him in to testify or to at
15   least come into the office.
16        Q.    Now, was there a practice at that
17   time at the District Attorney's office
18   concerning where to first bring an individual
19   who was picked up on a material witness
20   warrant?
21              MR. LARKIN:  Just note the form
22        objection.
23              You can answer.
24              THE WITNESS:  Could you repeat
25        that?
```



```
 1                    L. FITZPATRICK
 2        Q.     Were you present at any point
 3   where Angel Santos was interviewed or
 4   questioned by any representative of the DA's
 5   office?
 6        A.     I don't remember.
 7        Q.     Do you recall any instance in
 8   which a witness in connection with the Jabbar
 9   Collins case was housed for a period of time
10   at the Bronx House of Detention?
11        A.     No, I don't remember.  I'm sorry.
12        Q.     Was there a practice in 1995 when
13   you were working for the homicide bureau to
14   issue subpoenas for witnesses to come to the
15   DA's office to be interviewed?
16            MR. LARKIN:  Objection.
17        A.     Yes.
18        Q.     And what was your understanding of
19   that practice?
20            MR. LARKIN:  Same objection.
21        A.     Quite often people needed
22   subpoenas for work.  Also we would send out
23   subpoenas, like if I had not heard from
24   someone contact-wise on the contact list, I
25   would send out a subpoena.  And then if that
```

```
 1                    L. FITZPATRICK
 2    was ignored, it is sort of setting up showing
 3    what I've done to get this person in.
 4         Q.    What do you mean if it was
 5    ignored?
 6         A.    If --
 7              MR. LARKIN:  Objection to this
 8         line of questions, the foundation.
 9              Go ahead, you can answer, I'm
10         sorry.
11         A.    If the date came and went and that
12    person did not show up, that's what I mean by
13    ignored.
14         Q.    Well, was it your practice in 1995
15    in the course of your duties as a paralegal in
16    the homicide bureau, to send out subpoenas to
17    witnesses directing them to report to the DA's
18    office?
19              MR. LARKIN:  Objection:  form.
20         A.    Yes.
21         Q.    And do you know whether or not
22    that was the practice of any other paralegals
23    or prosecutors at the DA's office at that
24    time?
25         A.    Yes.
```

```
 1                    L. FITZPATRICK
 2        Q.    Were those subpoenas in connection
 3   with trial preparation?
 4              MR. LARKIN:  Objection:  form.
 5              MR. RUDIN:  Withdrawn.
 6        Q.    What were those subpoenas in
 7   connection with.
 8              MR. LARKIN:  Same objection.  Go
 9        ahead.
10        A.    It could be hearings, trials.  If
11   after repeated attempts at trying to locate or
12   find or contact a witness, I would send out
13   the DIs with a personal subpoena for their
14   appearance.
15        Q.    Appearance where?
16        A.    To the DA's office.
17        Q.    Were witnesses sometimes brought
18   in by the detective investigators pursuant to
19   those subpoenas to meet with prosecutors at
20   the DA's office?
21              MR. LARKIN:  Objection:  form.
22        A.    Yes.
23        Q.    Were you trained or instructed by
24   anyone at the DA's office to issue those
25   subpoenas; that is, subpoenas directing
```



```
 1                    L. FITZPATRICK

 2    witnesses to report to the DA's office?

 3              MR. LARKIN:  Objection.

 4       A.    Yes.

 5       Q.    And who did you receive that

 6    training or instruction from?

 7       A.    Originally when I began work in

 8    the office, whoever trained me, that's where.

 9       Q.    Did you ever receive any

10    instruction or training from Mr. Vecchione to

11    issue subpoenas to witnesses to report to the

12    DA's office?

13       A.    Not training.  Instructions, yeah,

14    instructing me to, yes.

15       Q.    Do you have any way of estimating

16    how many subpoenas you had executed by

17    detective investigators at the homicide bureau

18    directing witnesses to report to the DA's

19    office?

20              MR. LARKIN:  Objection to form.

21       A.    No, I really can't.  A lot.

22       Q.    Hundreds?

23       A.    Oh, yeah.

24              MR. LARKIN:  Objection to form.

25       Q.    Your answer is "oh, yeah"?
```



```
 1                    L. FITZPATRICK
 2        A.    Oh, yeah.   Yes.
 3        Q.    How frequently were witnesses
 4   brought in by detective investigators on
 5   material witness warrants, brought directly to
 6   a hotel?
 7              MR. LARKIN:   Objection to the
 8         form.
 9        A.    Directly to the hotel?   I don't
10   know.
11        Q.    Well, was the practice to bring
12   material witnesses directly to the office or
13   directly to a hotel?
14              MR. LARKIN:   Objection to form.
15        A.    The practice?
16        Q.    What was the practice with
17   bringing in material witnesses?
18              MR. LARKIN:   Objection.
19        Q.    Pursuant to warrants, material
20   witness warrants.
21              MR. LARKIN:   Objection.   I think
22         it was asked and answered, but go ahead.
23        A.    I guess it would depend on the
24   circumstances.   I don't recall just going
25   directly to a hotel, but then, again, if it
```



```
 1                    L. FITZPATRICK

 2         A.    No.

 3         Q.    Do you see at the bottom it says

 4    "beeper check on numbers that came up that" --

 5         A.    "That day."

 6         Q.    "Detective notebook"?

 7         A.    Yes.

 8         Q.    Do you know what that means?

 9         A.    No.

10                    (Plaintiff's Exhibit 112,

11                    order to produce in People v.

12                    Johnny Williams dated March 8,

13                    1994.)

14         Q.    Now I'm going to show you a series

15    of exhibits and it is really very simple, I'm

16    just going to ask you if you recognize the

17    handwriting on it?

18         A.    Okay.

19         Q.    Plaintiff's 112, order to produce

20    in a case People against Johnny Williams for a

21    witness named Dana Everett?

22         A.    Yes.

23         Q.    And it is dated March 8, 1994?

24         A.    Yes.

25         Q.    And it says Mike Vecchione on the
```



```
 1                    L. FITZPATRICK
 2    bottom?
 3         A.    Yes.
 4         Q.    Is that your handwriting?
 5         A.    Yes.
 6                    (Plaintiff's Exhibit 113,
 7                    affirmation regarding a witness
 8                    named Joseph Stacione.)
 9         Q.    Plaintiff's 113 is an affirmation
10    regarding a witness named Joseph Stacione?
11         A.    Yes.
12         Q.    And do you see on the second page
13    there is a signature for Michael Vecchione?
14         A.    Yes.
15         Q.    Is that your handwriting?
16         A.    Yes.
17                    (Plaintiff's Exhibit 114,
18                    order to produce in People v.
19                    Saponaro and Stasio, dated June 29,
20                    1995.)
21         Q.    Plaintiff's 114 is an order to
22    produce in the case of People against Saponaro
23    and Stasio, dated June 29, 1995?
24         A.    Yes.
25         Q.    And at the bottom, the affirmation
```



Case 1:11-cv-00766-FB-RML   Document 120-3   Filed 05/29/13   Page 25 of 35 PageID #: 1558

```
 1              L. FITZPATRICK
 2   is signed in the name of Michael Vecchione?
 3        A.    Yes.
 4        Q.    Is that your signature?
 5        A.    It is.
 6                   (Plaintiff's Exhibit 115,
 7                   order to produce People against
 8                   Joseph Stasio, et al., dated
 9                   October 25, 1995.)
10        Q.    Plaintiff's 115 is an order to
11   produce in the case of People against Joseph
12   Stasio, et al.  This one is dated October 25,
13   1995.
14        A.    Yes.
15        Q.    There is an affirmation in the
16   name of Michael Vecchione?
17        A.    Yes.
18        Q.    Did you sign his name?
19        A.    Yes.
20        Q.    By the way, in connection with
21   these orders to produce where you signed Mr.
22   Vecchione's name, what was the practice with
23   respect to bringing those applications for
24   orders to produce to the court?  Who would do
25   that?
```

Case 1:11-cv-00766-FB-RML  Document 120-3  Filed 05/29/13  Page 26 of 35 PageID #: 1559

```
 1                    L. FITZPATRICK
 2        A.    Any number of people would do it.
 3   I could have done it.  If there were
 4   paralegals going over to court for other
 5   things, you would give them the order.  They
 6   will have the judge sign it.  Other attorneys
 7   could have brought the order over.  So any
 8   number of people.
 9        Q.    And did Mr. Vecchione sometimes
10   bring orders like this over?
11        A.    Yes.
12                    (Plaintiff's Exhibit 116,
13                    order to produce witness Marco
14                    Ingrao dated March 27th, 1996.)
15        Q.    Plaintiff's 116 is an order to
16   produce concerning a witness Marco Ingrao
17   dated March 27th, at least the affirmation is
18   dated March 27th, 1996.
19        A.    Yes.
20        Q.    Is that your signature of the
21   Michael Vecchione's name on the affirmation?
22        A.    Yes, it is.
23                    (Plaintiff's Exhibit 117,
24                    affirmation dated May 16, 1996
25                    concerning Michael Gattuso.)
```



```
 1                    L. FITZPATRICK
 2         Q.    Plaintiff's 117.  I'm sorry, can I
 3    have that back for a second?
 4         A.    Sure.
 5              MR. RUDIN:  I don't have extra
 6         copies of this, but I will have a copy
 7         made.
 8         Q.    Plaintiff's 117 is an affirmation
 9    dated May 16, 1996 concerning a Michael
10    Gattuso.  Is that right?
11         A.    Yes.
12         Q.    And who signed Mr. Vecchione's
13    name to the affirmation?
14         A.    I did.
15              MR. LARKIN:  Was Plaintiff's 117
16         produced to us?  Do you know?
17              MR. RUDIN:  I think so.
18              MR. LARKIN:  I just don't see a
19         number on it, that's why I'm asking.
20              MR. RUDIN:  It was appended to the
21         complaint.  It should have been
22         produced.  If it wasn't, it wasn't a
23         long list of affirmations.
24              MR. LARKIN:  This is 117 and for
25         the record dated, it looks like May 16,
```



```
 1                 L. FITZPATRICK
 2       1996.
 3              MR. RUDIN:  Yes.
 4       A.    Do you need that back?
 5              MR. LARKIN:  What was the name of
 6       that case, Joel?
 7              MR. RUDIN:  In the matter of an ex
 8       parte application by the Kings County
 9       District Attorney regarding a
10       confidential investigation Re: Michael
11       Gattuso.
12              MR. LARKIN:  Okay.
13              MR. RUDIN:  And we will make a
14       copy of that for you.
15              MR. LARKIN:  Gattuso.  Okay.
16                  (Plaintiff's Exhibit 118,
17                  affirmation in the matter of Marco
18                  Ingrao dated March 27, 1996 marked
19                  for identification, as of this
20                  date.)
21       Q.    This is Plaintiff's 118.  Take a
22       look at that.
23       A.    Yes.
24       Q.    That's an affirmation in the
25       matter of Marco Ingrao dated March 27, 1996.
```



```
 1                    L. FITZPATRICK
 2   Is that your signature at the bottom?
 3        A.    Yes.
 4        Q.    Plaintiff's 119.
 5                    (Plaintiff's Exhibit 119,
 6              affirmation regarding Marco Ingrao
 7              dated June 19, 1996.)
 8        Q.    Another affirmation regarding the
 9   same individual dated June 19, 1996.  Is that
10   your signature at the bottom?
11        A.    Yes.
12        Q.    In the name of Michael Vecchione?
13        A.    Yes.
14        Q.    You see at the bottom left-hand
15   side it says MV and then there is a colon and
16   then in small letters it is KLR?
17        A.    I don't know who they are.
18        Q.    Well, MV is Michael Vecchione?
19        A.    KLR.
20        Q.    Is KLR supposed to be the person
21   who prepared the document?  You don't know?
22        A.    I didn't ever type any of this,
23   so.
24                    (Plaintiff's Exhibit 120,
25              material witness application for
```



```
 1                   L. FITZPATRICK

 2                   People v. Schlomo Helbrans dated

 3                   October 21, 1994.)

 4          Q.    Plaintiff's 120 is a material

 5    witness application for People against Schlomo

 6    Helbrans who is the defendant for material

 7    witness Nissim Mizrachi.  Is that right?

 8          A.    Yes.

 9          Q.    And it is dated October 21, 1994.

10          A.    Yes.

11          Q.    And who signed Michael Vecchione's

12    name to it?

13          A.    I did.

14          Q.    Do you see at the bottom left

15    there is a notary stamp?

16          A.    Yes.

17          Q.    For Sheila D. Hoke?

18          A.    Yes.

19          Q.    Do you know who that is?

20          A.    No.

21          Q.    Was this notarized in your

22    presence?

23          A.    I don't recall.

24          Q.    Do you see it says "Sworn to

25    before me this 21st day of October 1994" at
```

```
 1                    L. FITZPATRICK
 2     the bottom of the second page of that
 3     document?
 4          A.    Yes.
 5          Q.    Did you take an oath that this
 6     document was truthful before a notary?
 7                MR. LARKIN:  Objection.
 8          A.    Did I take an oath?
 9          Q.    Yes.
10          A.    No.
11          Q.    Do you know whether Mr. Vecchione
12     took an oath that this document was truthful
13     in front of a notary?
14                MR. LARKIN:  Objection.
15          A.    No.
16          Q.    Did you understand while you were
17     employed at the Brooklyn District Attorney's
18     office what an affirmation is?
19          A.    An oath.
20          Q.    To tell the truth?
21          A.    Yes.
22          Q.    Did you understand at the time
23     that if someone took an oath in connection
24     with signing an affirmation that had factual
25     allegations in it, if it turned out that the
```

Case 1:11-cv-00766-FB-RML  Document 120-3  Filed 05/29/13  Page 32 of 35 PageID #: 1565

```
 1              L. FITZPATRICK
 2   factual allegations were false, that the
 3   person who took the oath was subject to
 4   prosecution for perjury?
 5              MR. LARKIN:  Objection.
 6        A.    I guess that I was not aware of
 7   that at the time.
 8        Q.    Did anyone explain to you while
 9   you were employed at the District Attorney's
10   office that there might be something wrong in
11   your signing the name of a prosecutor to an
12   affirmation or an affidavit in place of a
13   signature of that prosecutor?
14              MR. LARKIN:  Objection.  You can
15          answer.
16        A.    No.  And like I had said earlier,
17   it wasn't until, and I don't know the year,
18   but I believe it was under Ken Taub when we
19   were made aware and with the backwards slash S
20   backwards slash then you can sign.
21        Q.    And when did that happen in
22   relation to your employment at the office, how
23   soon before you left?
24        A.    A couple of years before I left.
25        Q.    What year did you leave again?
```



Case 1:11-cv-00766-FB-RML   Document 120-3   Filed 05/29/13   Page 33 of 35 PageID #: 1566

```
 1                    L. FITZPATRICK

 2         A.     '99.

 3         Q.     So how many years at the District

 4  Attorney's office was it the practice for

 5  paralegals to sign the names of assistant

 6  district attorney's to affirmations or

 7  affidavits?

 8              MR. LARKIN:  Objection to that.

 9       You can answer.

10         A.     Well, I started there either '85,

11  '86, left in '90, came back in '93, left in

12  '99, but prior to '99, maybe a couple of years

13  before that, so.

14         Q.     From the time you started until

15  two years before you left with the exception?

16         A.     Two or three years.

17         Q.     When you weren't there?

18         A.     Yes.

19         Q.     Let me just ask, let's do that

20  again because I'm not sure it is clear.

21         A.     Okay.

22         Q.     From the time you started until

23  the time you took a leave?

24         A.     Yes.

25         Q.     From the time you came back from
```



```
 1                   L. FITZPATRICK
 2   the leave until about two years before you
 3   left?
 4        A.    About two, three years, yeah.
 5        Q.    During that entire period until
 6   two or three years before you left, it was the
 7   practice to have paralegals sign the names of
 8   assistant district attorneys to affidavits or
 9   affirmations in connection with Damiani
10   orders, orders to produce and material witness
11   orders?
12              MR. LARKIN:  Form objection.  Go
13        ahead.
14        A.    I wouldn't say it is the practice.
15   I never had anyone say anything to me
16   otherwise.
17        Q.    Now, I showed you a number of
18   documents that were actually notarized, where
19   the signatures were notarized by notaries?
20        A.    Yes, you did.
21        Q.    Did anyone ever explain to you
22   while you were in the District Attorney's
23   office before Ken Taub put an end to the
24   practice, that there was anything wrong in
25   your signing a document for an assistant
```



```
 1              L. FITZPATRICK
 2  district attorney that was then notarized?
 3          MR. LARKIN:   Form objection.   Go
 4      ahead.
 5      A.    No.   And -- no.
 6      Q.    What did understand the purpose of
 7  a notarization to be?
 8      A.    That -- you know, honestly, at the
 9  time, I knew it was just part of the
10  procedure.   There were times when orders were
11  left to be notarized by the notary in the
12  office, but didn't mean that the person was
13  actually standing there before them signing in
14  front of her.
15      Q.    How often did that happen?
16      A.    I don't know.
17      Q.    Were you in the courtroom when the
18  verdict was returned in Mr. Collins' case?
19      A.    I don't remember.
20      Q.    Do you remember whether or not Mr.
21  Posner or Mr. Vecchione ever met with Mr.
22  Oliva, Edwin Oliva after the trial?
23      A.    I have no idea.
24      Q.    Did you learn at any point long
25  after the trial, that Mr. Collins had filed a
```

