# EXHIBIT D

1

2              IN THE UNITED STATES DISTRICT COURT

3              FOR THE EASTERN DISTRICT OF NEW YORK

4              Case No. 08-CV-5088 (KAM)(VVP)

5

6      ------------------------------------x

       RUDDY QUEZADA,

7

8                           Petitioner,

9          v.

10

11     WILLIAM BROWN, Superintendent,

12     Eastern NY Correctional Facility,

13

14                          Respondent.

       ------------------------------------x

15

16         DEPOSITION OF CHRISTOPHER SALSARULO

17            New York, New York

18            Thursday, January 19, 2012

19

20

21     Reported by:

       Amy A. Rivera, CSR, RPR, CLR

22     JOB NO.  45619

23

24

25

P-022412

1

2                        January 19, 2012

3                          1:13 p.m.

4

5           Deposition of CHRISTOPHER

6    SALSARULO held at the office of HUGHES,

7    HUBBARD, & REED, LLP, One Battery Park

8    Plaza, New York, New York, pursuant to

9    Notice, before Amy A. Rivera, Certified

10   Shorthand Reporter, Registered Professional

11   Reporter, Certified LiveNote Reporter, and a

12   Notary Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3    HUGHES HUBBARD & REED

4    Attorneys for Petitioner

5        One Battery Park Plaza

6        New York, New York 10004

7    BY:  DAVID B. SHANIES, ESQ.

8        GABRIELLE Y. VAZQUEZ, ESQ.

9

10

11   KINGS COUNTY DISTRICT ATTORNEY'S OFFICE

12   Attorneys for Respondent

13       Renaissance Plaza at

14       350 Jay Street

15       Brooklyn, New York 11201

16   BY:  PHYLLIS MINTZ, ESQ.

17       MARIE-CLAUDE WRENN, ESQ.

18   Assistant Executive District Attorneys

19

20

21

22

23

24

25

1       CHRISTOPHER SALSARULO

2  C H R I S T O P H E R   S A L S A R U L O, having

3  been duly sworn, testified as follows:

4  EXAMINATION

5    BY MR. SHANIES:

6      Q.    Good afternoon, sir.

7      A.    Good afternoon.

8      Q.    Just before we get into questions, I

9  just want to go over a couple preliminary things,

10 pretty standard requests for a deposition, just

11 that we try to not to talk over each other so that

12 the court reporter can take down both of our

13 statements.  And if you can, try to remember to

14 give verbal answers so that, again, for the court

15 reporter.

16      Other than that, if you don't

17 understand a question, please let me know and I'll

18 be happy to clarify.  And if you don't know the

19 answer, that's fine, too, just let me know.

20      Is that fair enough?

21      A.    That is fair.

22      Q.    Okay.  So, can you tell me, please,

23 where you're currently employed?

24      A.    Yes.  I'm a Special Agent with the

25 Drug Enforcement Administration in New Jersey.

1          CHRISTOPHER SALSARULO

2     Q.    And when did you begin that

3  employment?

4     A.    I believe it was around -- it was the

5  fall of 1995, around September, I believe.

6     Q.    And prior to that, where were you

7  employed?

8     A.    By the Kings County District

9  Attorney's office.

10    Q.    And when did you begin at the DA's

11 office?

12    A.    I'm not sure of the date.  I'm

13 thinking it was around 1992, or so.  Yeah, I think

14 1992.

15    Q.    Was that your first employment or were

16 you employed elsewhere before that?

17    A.    Well, I had jobs since I was 16, but

18 before that, out of college, I worked for --

19 actually, across the street, at Bear Stearns &

20 Company, 2 Broadway.

21    Q.    Maybe let's go in order.  So,

22 immediately before the DA's office in '92, Bear

23 Stearns was your job directly before that?

24    A.    No.  I left Bear Stearns and went to

25 work for the family business.  My family has a

1                CHRISTOPHER SALSARULO

2           Did you have a system for how you

3  recorded those different kinds of tasks?

4      A.    No.  No -- no system.

5      Q.    So, is it possible that Doreen was

6  being brought to court on a material witness order

7  as well?

8           MS. MINTZ:  Objection.  Speculative.

9      A.    Where there was -- if there was a

10  initial material witness order issued for Doreen,

11  I don't know.  It seems that we were taking her

12  back to court where I assumed she was prior to

13  this.

14      Q.    Okay.  But you're not sure what that

15  entry means --

16      A.    Correct.

17      Q.    -- in terms of whether there was a

18  material witness order?

19      A.    Correct.

20      Q.    I think we're done with the memo book

21  for right now, and I'd like to just talk about

22  material witness orders more generally, not this

23  one specifically.

24           Just starting with what your

25  understanding of what a material witness order is.

1                CHRISTOPHER SALSARULO

2        A.    My understanding is that when an

3   assistant district attorney needs to expand on his

4   or her case and there's a person out there that

5   was witness to some type of crime that was

6   committed.

7            So, we, as detective investigators,

8   are asked to go find this particular witness and

9   bring them back to either the -- the district

10  attorney's office.  I mean, that's it in a

11  nutshell.

12           And then the ADA would routinely speak

13  with this witness and determine what type of

14  testimony he or she can give pursuant to this

15  case, if it would affect it or not.  I'm assuming

16  that the ADA believes that this particular witness

17  has a good amount of knowledge of this case,

18  that's why we got the material witness order in

19  the first place.

20       Q.    Can you explain that a little bit, why

21  you make that assumption?

22       A.    No.  I mean, that's just because here

23  we have a document that says, this person we

24  believe knows a lot about this investigation and

25  we need to speak with him or her about it.

1               CHRISTOPHER SALSARULO

2        Q.    So, material witness orders usually

3  something that you obtained in a more serious

4  case?

5        A.    I don't remember.

6        Q.    Well, when you say that you assumed

7  that the person had a lot of knowledge about the

8  case, what about a material witness order makes

9  you think that?

10       A.    I don't know.  I don't know.  I mean,

11  I would be speculating.  It just seems that was

12  the procedure of the office at that time, that

13  when they said we have a material witness order

14  for someone, the ADA needed to speak to that

15  person, and it was just our job to go do our best

16  to go locate that person and bring him to the DA's

17  office.

18       Q.    What's the difference between a

19  material witness order and a subpoena?

20       A.    My understanding is that you can serve

21  someone a subpoena to come to court and that

22  person could go to court when the date on the

23  subpoena said.  Material witness order, they want

24  this person in court immediately.

25           So, as a subpoena, sometimes we would

1          ·              · CHRISTOPHER SALSARULO

2    just serve the person, they would make contact

3    with the ADA and come in.  With a material witness

4    order, if we located that person, we would have to

5    bring that person to the DA's office.

6          Q.     Immediately?

7          A.     Yes.

8          Q.     And you were talking about what your

9    understanding of a subpoena versus a material

10   witness order is.

11              Did you have the same or different

12   understanding in March of 1993?

13         A.     Could you repeat that, please?

14         Q.     I'm just wondering, is this your

15   understanding of what a material witness order was

16   back in March 1993 also?

17         A.     Yes, sir.

18         Q.     Did you get any other kind of formal

19   training about material witness orders?

20         A.     I don't believe there was any formal

21   training regarding material witness order.

22         Q.     What about the subpoenas?

23         A.     I don't believe there was any formal

24   training for that either.

25         Q.     Was it on-the-job formal training?

1              CHRISTOPHER SALSARULO

2        A.    I believe so.  I believe there was

3   something where -- yes, on-the-job training that

4   you would talk to your supervisor about and get

5   some guidance on what to do.

6        Q.    So, you observed other DIs serving

7   subpoenas, serving material witness orders, and

8   that's how you learned how to do it?

9        A.    Yes, sir.

10       Q.    Could you estimate how many subpoenas

11  you served while you were at the DA's office?

12       A.    I don't remember how many I served.

13       Q.    More than a hundred?

14       A.    I would say yes.

15       Q.    You were in the DA's office for about

16  three years, something like that.  Is that right?

17       A.    That is correct.

18       Q.    They were relatively common?

19       A.    Correct.

20       Q.    And what about material witness

21  orders?

22       A.    Definitely not as common, but I don't

23  recall how many material witness orders I

24  executed.

25       Q.    Was it more or less than a hundred, if

Page 63

CHRISTOPHER SALSARULO

1   to execute a material witness order?

2   A.    I don't know any guidelines.

3   Could you be more specific?

4   Q.    Did your office give you any

5   instructions on how you were supposed to handle a

6   material witness order?

7   A.    None other than to do your best to

8   find the material witness and bring her back to

9   the DA's office.

10   Q.    And did you have an understanding

11   of -- of -- strike that.

12   Before you went out with the material

13   witness order, were you told anything about who

14   this witness was in relation to the case?

15   A.    I believe so.  I believe sometimes

16   they may have spoken to us about the particular

17   witness.

18   Q.    Would you approach a witness

19   differently depending on what their relationship

20   was to the case?

21   A.    No.  I think, you know, we always

22   approach where safety first, just let them know

23   what's expected, and then bring them back to the

24   DA's office.

1                    CHRISTOPHER SALSARULO

2         Q.     Did anybody ever refuse to go?

3         A.     I believe that has happened to me.

4         Q.     And what did you do?

5         A.     We would have to physically put them

6    in handcuffs and transport them back to the DA's

7    office.

8         Q.     Do you recall how many times that

9    happened?

10        A.     I do not.

11        Q.     Was that common?

12        A.     No.

13        Q.     Was it very uncommon?

14        A.     That, I don't remember.

15        Q.     Do you recall what happened when you

16   brought that person to the DA's office?

17        A.     I'm trying to remember as best I can.

18               I don't recall a specific instance,

19   but I think if he was -- the person was

20   handcuffed, when he got back to the DA's office he

21   would remain handcuffed while the ADA spoke with

22   him and her.

23        Q.     Did you say you don't recall any

24   specific instance of doing this?

25        A.     I'm trying to remember.  I'm trying to

1             CHRISTOPHER SALSARULO

2     remember a specific instance.

3             Q.    But you're sure that it did happen,

4     that you handcuffed a witness?

5             A.    I'm sure I handcuffed a witness.

6             Q.    A witness who is the subject of a

7     material witness order?

8             A.    Yes.

9             Q.    And when a witness was unwilling to

10    come with you in a material witness order

11    situation, did you immediately handcuff that

12    person or did you try anything else first?

13            A.    Can you repeat that, please.

14            Q.    When a witness refused to come with

15    you or was unwilling to come with you, would you

16    just arrest the person or would you try anything

17    else firstly?

18            A.    If the person refused and -- what we

19    try to do, as best speak with them about, you

20    know, the judge ordered them to come into the DA's

21    office.  If that didn't work, then yes, we would

22    immediately have to put handcuffs on them and

23    bring them in.

24            Q.    Would you try to reason with the

25    person before you handcuffed them?

1          CHRISTOPHER SALSARULO

2      A.     I mean, I think in every material

3  witness order you reason why the person, say,

4  listen, the judge ordered you to come to court, so

5  there's always part of reasoning.

6          You would hope that most people would

7  be compliant and willingly come and be brought in.

8  There are circumstances where the person will say,

9  you know, I am not coming.  No way.  And then

10  you -- to be safe, we would immediately handcuff

11  them and take them away.

12          You know, there's been instances

13  where, you know, once they're handcuffed, they're

14  in their underwear and you speak to them a little

15  bit more, are you going to fight us?  You like

16  pants?  You know, if that's the case, if they're

17  compliant, we dress them and give them water,

18  whatever they need so they would be comfortable.

19          That's pretty much it.

20      Q.     So you would try to give them a chance

21  to cooperate?

22      A.     Well, for them to come and speak to

23  the assistant district attorney, yes.

24      Q.     Okay.  And did you understand that

25  many of these people were people who the DA also

Page 67

1                CHRISTOPHER SALSARULO
2    wanted to testify in their cases?
3         A.    I believe so.
4         Q.    And did that influence the way that
5    you talked to the -- talked to the witnesses at
6    all?
7         A.    No.
8         Q.    Was it your understanding that these
9    people didn't have a choice about whether they
10   were coming.  Is that right?
11        A.    Yes.
12        Q.    They had to come whether they wanted
13   to or not?
14        A.    Yes.
15        Q.    And if they refused, they were going
16   to be arrested?
17        A.    We would place them in handcuffs and
18   brought back to the district attorney's office.
19        Q.    Did you tell them that they had no
20   choice, that they had to come?
21        A.    Probably.
22        Q.    Did you also try to convince them that
23   it was in their best interests to come?
24        A.    I don't remember.  It was basically
25   just pretty much cut and dry where, listen, you

P-022478

1          CHRISTOPHER SALSARULO
2    need to come with us and, you know, you would just
3    hope that they would be compliant and come.
4          Q.    Right.  I understand that completely.
5    But I'm trying to understand, when a person didn't
6    want to come, which did happen from time to
7    time -- right?
8          A.    I believe so, yes.
9          Q.    -- how you would react to that
10   situation.
11              So, one of the possibilities is to
12   just handcuff the person and bring them to the
13   DA's office?
14         A.    Yes.
15         Q.    And sometimes you said that would
16   convince them to cooperate?
17         A.    Well, I don't know what happened with
18   their cooperation or not.  That wasn't my job.
19         Q.    I'm sorry, when I say, "cooperate," I
20   mean agree to come with you to the DA's office.
21         A.    Could you repeat that?
22         Q.    Sure.
23              Let me just refer to what I'm talking
24   about.
25              You gave this example of a person who

P-022479

1                    CHRISTOPHER SALSARULO

2    you handcuffed in their underwear.

3         A.    Yes.

4         Q.    And you said that that person then

5    calmed down and said, okay, I'll go with you.  Is

6    that right?

7         A.    Yes.

8         Q.    So then you took the handcuffs off?

9         A.    No.  We would probably -- once we put

10   the handcuffs on, I believe with would keep them

11   on.

12        Q.    Do you remember if a person who's

13   handcuffed subject to a material witness order

14   would be booked?

15        A.    That, I don't remember if that was the

16   case or not.  I believe that would be up to the

17   assistant district attorney.

18             Our job was to get the material

19   witness and bring them back.

20             MS. MINTZ:  Excuse me.  Is it possible

21        to take a little break?

22             MR. SHANIES:  Sure.

23             MS. MINTZ:  Is there much more?

24             MR. SHANIES:  We're getting pretty

25        close, I think.

1          CHRISTOPHER SALSARULO

2          MS. VAZQUEZ:  We can take a break.

3          MS. MINTZ:  Just take a stretch.

4          MR. SHANIES:  Do you want to take 5,

5     10 minutes.

6          MS. MINTZ:  Yes.

7          MR. SHANIES:  All right.

8          (Recess.)

9     BY MR. SHANIES:

10         Q.    Do you know someone named Tom Buda,

11    B-U-D-A?

12         A.    I don't believe I do.

13         Q.    Have you heard his name since you've

14    been contacted about this case?

15         A.    This morning ADA Mintz mentioned that

16    name and I said I didn't remember that name.

17         Q.    You don't recall whether -- or do you

18    recall -- let me start over and strike that.

19               Do you recall whether Tom Buda was

20    present on March 11th or March 12th, 1993?

21         A.    I do not recall.

22         Q.    Do you recall anything about that

23    detective?

24         A.    No.

25         Q.    When you executed material witness

1        CHRISTOPHER SALSARULO

2    orders, did you always keep the person in a hotel

3    or only some of the time?

4        A.    I don't remember if all material

5    witnesses were placed in a hotel or not.

6        Q.    That did happen sometimes though,

7    right?

8        A.    Yes.

9        Q.    And one of your jobs was to stay with

10   the person while they were in the hotel?

11       A.    Yes.

12       Q.    Do you recall whether you went to a

13   hotel on March 11th or 12th, 1993?

14       A.    I do not.

15       Q.    What would you typically do while you

16   were at a hotel with someone subject to a material

17   witness order?

18       A.    We would check into the hotel, get two

19   adjoining rooms, where you could pass through from

20   one room to the other.  The material witness would

21   then have free range of the room.

22            We would usually lock his door -- his

23   or her door to the outside so that person would

24   have a difficult time getting out.  If he or she

25   tried to get out, it would have to physically be

Page 72

1              CHRISTOPHER SALSARULO

2    through, you know, us to get out through our door.

3              Most of the time I remember everybody

4    watched TV, ordered some food, and then the

5    detective investigators would work a shift until

6    either that person, the material witness, would be

7    brought back to the DA's office or a couple other

8    DIs would come to relieve us.

9         Q.    And how did you lock the hotel door?

10        A.    We usually take a set of handcuffs and

11   secure it somehow so it would be very difficult

12   for the material witness to get out through that

13   door.

14        Q.    Did you ever have a material witness

15   try to get out.

16        A.    I don't believe so.  I don't remember

17   that happening to me.

18        Q.    Do you recall if Sixto tried to get

19   out?

20        A.    I do not remember.

21        Q.    Were both of the assigned detectives

22   required to be with the person in custody at all

23   times?

24        A.    Okay, to be more specific, during like

25   a custody in a hotel, yes, two people had to be

Page 73

1        CHRISTOPHER SALSARULO

2    present at all times.

3        Q.    So, in adjoining rooms, was the

4    connecting door always open?

5        A.    Yes.

6        Q.    And would the person in custody go to

7    sleep if they were there overnight?

8        A.    Probably.  I would say most of the

9    time.

10        Q.    Did you sleep also?

11        A.    Sometimes we would take naps, yes.

12        Q.    You would take turns?

13        A.    Yes.

14        Q.    And were they allowed to have visitors

15    while they were in custody?

16        A.    I don't believe so.

17        Q.    Were they allowed to make phone calls?

18        A.    I think that was dependent on

19    instructions by the ADA.

20        Q.    Do you remember whether Sixto made any

21    phone calls?

22        A.    I do not.

23        Q.    Do you recall -- do you recall a

24    logbook that you maintained regarding the

25    movements of the person in custody?

Page 78

1                    CHRISTOPHER SALSARULO

2          Q.     Do you know if you ever filled one of

3     those out?

4          A.     Possibly.

5          Q.     But you're not sure?

6          A.     I'm not sure.

7          Q.     Do you know if you ever saw one of

8     these before?

9          A.     It doesn't look familiar, but it's

10    possible that I could have filled something like

11    this out.

12         Q.     So the only one that definitely looks

13    familiar is Exhibit 6?

14         A.     Yes, sir.

15         Q.     Have you ever witnessed a material

16    witness proceeding in court?

17         A.     I don't remember if I have.

18         Q.     Did you ever speak to the subject of a

19    material witness order about a material witness

20    proceeding in court?

21         A.     I don't believe I would have.

22         Q.     Are you aware -- strike that.

23                In 1993, when it was -- it was your

24    job to execute material witness orders, were you

25    aware of the rights that a witness had in

P-022489

1                    CHRISTOPHER SALSARULO

2     connection with a material witness proceeding?

3          A.     No.

4          Q.     Did you receive any training on that?

5          A.     No.

6          Q.     Were you instructed to tell a

7     potential material witness that they had any

8     rights in connection with that proceeding?

9          A.     No, I don't remember being instructed

10    about anything like that.

11         Q.     Do you know whether a person in a

12    material witness proceeding has a right to an

13    attorney?

14         A.     I don't know if he does or doesn't.

15         Q.     Have you ever seen a material witness

16    order that did not include an order to arrest the

17    person?

18         A.     Honestly, I don't recall.  I don't

19    recall what was involved in the material witness

20    order.

21         Q.     Were you -- sorry, strike that.

22                Did you ever read a person Miranda

23    rights in -- a person who was subject to a

24    material witness order?

25         A.     I don't recall if I did.