1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

2

3  -----------------------------------X
                             :

4  JABBAR COLLINS,             :  11-CV-766 (FB)
                             :

5                Plaintiff,     :

6                  v.        :
                           :  Brooklyn, New York

7  THE CITY OF NEW YORK, et al.,   :  May 16, 2013

8                Defendants.    :
  -----------------------------------X

9

10       TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY DISPUTES
           BEFORE THE HONORABLE ROBERT M. LEVY

11            UNITED STATES MAGISTRATE JUDGE

12

  APPEARANCES:

13

For the Plaintiff:         JOEL B. RUDIN, ESQ.

14                     TERRI ROSENBLATT, ESQ.
                       Law Offices of Joel B. Rudin

15                     200 West 57th Street
                       New York, New York 10019

16

17  For the Defendants:       ARTHUR G. LARKIN, ESQ.
                       ELIZABETH KRASNOW, ESQ.

18                     New York City Law Department
                     100 Church Street

19                     New York, New York 10077

20

21

  Court Transcriber:        SHARI RIEMER

22                     TypeWrite Word Processing Service
                     211 N. Milton Road

23                     Saratoga Springs, New York  12866

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1  (Proceedings began at 5:01 p.m.)

2  (Conference recorded via telephone – some inaudibility.)

3           THE COURT: This is Docket Number 11-CV-766, <u>Collins</u>

4  <u>v. City of New York</u>.

5           Will counsel please state their appearances for the

6  record?

7           MR. RUDIN:  Plaintiff Joel Rudin and with me is

8  Terri Rosenblatt.  Good afternoon, Your Honor.

9           MS. ROSENBLATT: Good afternoon, Your Honor.

10           MR. LARKIN: And, Your Honor, for defendants Arthur

11  Larkin, L-A-R-K-I-N, City Law Department, and with me is

12  Elizabeth Krasnow, K-R-A-S-N-O-W.  Good afternoon.

13           THE COURT: Good afternoon.  So why don't we set an

14  agenda.

15           MR. RUDIN: Your Honor, did the Court receive our

16  letter earlier today?

17           THE COURT: I have it in front of me although I have

18  to say it's a busy day and I just finished lunch about two

19  minutes ago.

20           MR. RUDIN: Well, essentially it has three parts.

21  The first part is our setting forth what we understand the

22  defendants have agreed to produce.  Mr. Larkin has not had a

23  chance yet to respond to us, at least he didn't at the time

24  that we felt we had to send it to the Court.  So I was hoping

25  today that we'll know whether or not the defendants agree that

1   they're going to produce these materials and we're asking the

2   Court to order the production by a particular date so that we

3   have clarity about what the obligations are and when they have

4   to be complied with.

5         The second thing is we have a dispute about

6   electronically stored information [inaudible] emails that I

7   think we need to discuss with the Court.

8         The third thing is we received the redacted

9   privileged documents and we have some concerns about that we'd

10  like to discuss with the Court.

11        MR. LARKIN: Your Honor, if I may.  This is Arthur

12  Larkin for the City.  We've got a rather serious issue to

13  raise with the Court.  Apparently the plaintiff has been

14  pursuing FOIA requests which were forwarded directly to the

15  DA's Office including requests during the period of the

16  discovery stage of the Monell claims, not only requests to the

17  DA's Office but we just learned today from Mr. Rudin requests

18  that were made to other City agencies for other material.

19        We demanded in our discovery requests which were

20  served about 18 or 19 months ago that the plaintiff identify

21  all FOIA requests and responses made by the plaintiff or

22  anyone on the plaintiff's behalf concerning the claims in this

23  case and the response we got was that the plaintiff relies on

24  his prior disclosures pursuant to Rule 26(a) and the plaintiff

25  at no time supplemented his discovery responses and we just

4

1    found out by chance today because our client is a very big

2    agency and there are multiple -- the FOIA records officers may

3    not necessarily be communicating with the individuals who are

4    handling these litigations, we just found out today that the

5    DA has produced a substantial amount of material to Mr. Rudin

6    and Mr. Collins pursuant to those FOIA requests and that some

7    of them were made during -- again, during the period of the

8    Monell discovery stage.

9           Now, I haven't had an opportunity to figure out what

10   exactly was demanded through FOIA, what documents Mr. Rudin

11   has gotten through FOIA already, and I've got some pretty

12   serious concerns about the fact that there was no supplemental

13   disclosure made ever and that the only reason that plaintiff's

14   counsel decided to come clean and acknowledge that this is

15   what he's been doing for the past several months is that we

16   found out by chance from our client that requests were made

17   and then just today literally about an hour before the

18   conference Mr. Rudin says oh, yes, we even served a FOIA

19   request on other City agencies as well as the DA's Office.

20          So before we can assess what we're going to agree to

21   produce here, Your Honor, with respect I would suggest that

22   plaintiff be directed to send us all FOIA requests made to any

23   City agency at any time, all documents received in response so

24   we can see what's already been provided here that we didn't

25   know about until maybe an hour-and-a-half ago.  So I would

1   like to add that item to the agenda and I would suggest

2   respectfully, Your Honor, that we address that first.

3            MR. RUDIN: Your Honor, may I respond?

4            THE COURT: Yes.

5            MR. RUDIN: 2010 well before -- July of 2010

6   approximately one month after he was released from prison and

7   after he had begun working for my offices as a paralegal Mr.

8   Collins with my knowledge filed a FOIA request for the DA's

9   Office for a vast array of additional records.  When we re --

10  the first batch of records were received I believe it was

11  sometime in 2011.  This whole chronology has been sent to Mr.

12  Larkin.  Sometime in 2011 when we responded to defendant's

13  initial discovery requests in I believe it was February of

14  2012 during the period of the Monell and DA related stay,

15  there was a request in there for FOIA requests and documents

16  received pursuant to FOIA requests related to the plaintiff's

17  claims in the lawsuit.

18           Even though I construe that to mean claims -- the

19  FOIA requests that were made as part of the pattern of

20  requests that Mr. Collins made while he was in prison we

21  provided to the defendants the FOIA requests we had made of

22  the DA's Office and their additional response which was a

23  partial response and never heard another word about it from

24  the defendants.

25           During the summer of 2012 while the stay continued

6

1  we received a second response whether there was some

2  [inaudible] back and forth between Mr. Collins or our office

3  and the DA's Office concerning the sufficiency of the first

4  response and whether or not they owed any additional records

5  and in July of 2012 we received additional records.

6          Thereafter, the only thing that's happened between

7  us and the DA's Office has been correspondence from the DA's

8  Office offering to provide additional records if payment was

9  made and we sent payment and they declined to provide the

10  records because we sent them $2.00 too much and that's where

11  things stand with respect to the DA's Office.

12          Interestingly, the second response that we received

13  in July contains a number of emails on behalf of Mr. Hynes

14  after the conviction was vacated that we have not received

15  from the City in any of its responses to our request for

16  emails.  But be that as it may, we are -- we told Mr. Larkin

17  that we're going to provide that response that we received in

18  July to him and he'll have that -- we'll be sending that out

19  tomorrow.  I suppose that if his original document request

20  number 20 that deals with FOIA requesting productions includes

21  material that we requested since Mr. Collins was released from

22  prison in order to prepare or to prove the claims in this

23  litigation as opposed to the claims that he was making while

24  he was in prison that this would fall within that and

25  [inaudible] our original response we're prepared to submit

7

1    that -- to send that to the defendants, and certainly we never

2    would have relied on any of those documents at any deposition

3    or at trial without disclosing them.  So that's the first

4    category.

5           Secondly, the City has consistently opposed our

6    discovery requests on the grounds that they're burdensome,

7    they have [inaudible] additional material and not produced it.

8    This has been a very long process.  It's like litigating a

9    case in Bronx Supreme Court where every single time you want

10   to get anything you have to go to the judge and ask for an

11   order and then you have to go back and try to enforce the

12   order after the order has already been issued.

13          So one of the items that we attempted to get from

14   the City so obviously relevant to this case is the hearings

15   and the records Malin [Ph.] Commission.  The City said that

16   was too burdensome to produce.  So we then filed a -- we've

17   been filing FOIA requests in order to try to locate and obtain

18   the record of the Malin Commission hearings and fairly

19   recently we were able to obtain partial transcripts and we've

20   been trying to decide whether or not to try to get the rest of

21   it through subpoena, through discovery, to pursuing our rights

22   on the FOIA.  We haven't decided and we haven't yet decided

23   whether or not we're going to use that material but that was

24   another area.

25          And then the third area where we've been trying --

1   FOIA information is with respect to the Eleventh Amendment

2   defense that the City has implied they may raise in this case

3   that the activities of the DA's Office in connection with the

4   Collins prosecution were on behalf of the State of New York as

5   opposed to the City of New York which raises the question of

6   whether or not the DA's Office is a city or a state agency

7   particularly with respect to the functions that are issue with

8   this case.  Rather than make a discovery request of the

9   defendants and get the predictable response that it's too

10  burdensome we've attempted through FOIA to get that

11  information directly from the New York City Council and from

12  city agencies and thus far we haven't received anything except

13  that we did receive just within the last few days an email

14  response indicating that some of those materials are available

15  online.  We haven't been able to find that before and just

16  yesterday we were able to obtain the material online and we

17  have sent it to Mr. Larkin, in fact several thousand pages of

18  material.

19          Those are the three areas and I really don't

20  understand Mr. Larkin's outrage but in any event that's the

21  full disclosure and I did indicate to Mr. Larkin in an email

22  earlier today that in response to his request that we provide

23  him every FOIA request we've made and every response we

24  received that I wanted to consider the possibility that some

25  of that might be work product but I have not asserted a work

9

1    product privilege at this point and I may not.  I just want to

2    think about it a little bit and certainly I will not use

3    anything at any deposition or any trial that we haven't

4    provided to the defendants.

5         MR. LARKIN: Your Honor, that's totally

6    unsatisfactory from our point of view.  First of all, there's

7    no work product for a FOIA request to a public agency that's

8    disclosed to a public agency.  The notion that there could be

9    work product in such a request seems to me to be absurd.  I'm

10   not aware of any authority that would remotely support the

11   assertion of a work product privilege in that context.

12        Second of all, there was some suggestion that Mr.

13   Rudin has obtained emails already from the DA's Office.  I

14   mean we are attempting now with the DA and his IT people to

15   figure out how to go about getting or extracting all the

16   emails going back to 2006.  Now, if plaintiff already has some

17   of this material, if he's been able to get it somehow, isn't

18   it incumbent upon him to tell us what he has and where he got

19   it from and when he got it so we're not reinventing the wheel

20   here.  It turns out we do have -- we did obtain from the

21   District Attorney's Office emails from DA Hine.  We're in the

22   process of looking -- of producing them, looking through them

23   and producing them and we expect to make a production -- I'm

24   just going to ask my co-counsel -- probably tomorrow a

25   substantial number of emails that our IT people at the DA's

10

1    Office were able to extract.

2           So I mean to go about discovery this way whether

3    it's been a specific demand in a FOIA request to conceal them

4    and then say well, gee, I'm not going to use any of this stuff

5    at depositions when everybody knows that counsel is going to

6    read through whatever material he gets, ask questions of

7    witnesses without showing the witness the documents and then

8    take the position that the documents are impeaching and hand

9    them to the witness without showing them to us in advance.

10          MR. RUDIN: Your Honor --

11          MR. LARKIN: Excuse me, Counsel.  I'm not finished.

12   I just -- I think, Your Honor, that for Mr. Rudin to get on

13   his high horse complaining about being in Bronx Supreme Court

14   when he's been running around filing FOIA requests, not

15   disclosing to us either the request of what he's gotten in

16   response is just outrageous.  He's not being straight up with

17   us.

18          THE COURT: Let me just jump in here because we don't

19   have all evening to do this and I understand you've got a lot

20   on your minds.  Let me just start.  I think that we should

21   make this as a rule that in our arguments here before the

22   Court you will not use adjectives.

23          MR. LARKIN: I'm sorry, Your Honor.

24          THE COURT: Both sides.  Don't use adjectives.  As

25   [inaudible] said to get to the truth you delete the

11

 1  adjectives.  I just -- I think both of you just need to focus

 2  on what's necessary here.

 3          So, Mr. Rudin, I think what Mr. Larkin is saying is

 4  he wants number one, just to make sure that his burden is

 5  eased in de -- in trying to get you the documents you want

 6  and need.  You need to know what you have already.  Can you --

 7  do you have the FOIA documents that you received in --

 8  segregated in a way that he could actually come over and

 9  inspect them and see or you could find some other way to

10  disclose what he already -- what you already have?

11          MR. RUDIN: It's much easier than that.  There were

12  two masters of documents we received from the DA's Office

13  [inaudible] to him a year-and-a-half, two years ago and he

14  never raised an issue about it and the second one is the one

15  from July 2012 which I told him that he's -- we're sending out

16  tomorrow so we'll send it by FedEx.  He'll have it by Saturday

17  or Monday.  Then there are the materials we asked for from the

18  City Council.  We spent a great deal of time trying to locate

19  this material.  Rather than ask Mr. Larkin to produce it

20  because we're trying to reduce his burden and we've obtained

21  that material now from a website.  It's the hearing

22  transcripts from City Council hearings about funding the DA's

23  Offices for the last 13 years.  We today sent out a CD that

24  had eight or 9,000 pages of material that Mr. Larkin I believe

25  will have tomorrow because it was FedEx'd.  Terri, was it

12

1   FedEx'd?

2           MS. ROSENBLATT: It was sent by regular mail.

3           MR. RUDIN: It was sent by regular mail so they'll

4   have it by Monday if not tomorrow.

5           And the third item is the Malin Commission materials

6   where I believe we received a partial transcript of the Malin

7   Commission hearings.  The office where we obtained this from

8   after a tremendous amount -- and this is what we asked the

9   City to produce and they've declined -- after a tremendous

10  amount of digging we found out where it was and they permitted

11  us to copy of what's being transcribed.  Apparently the entire

12  proceeding was not transcribed back in 1994 when it was

13  conducted.  So there are tapes that are un-transcribed.  We

14  haven't figured out yet what to do about that and there are a

15  number of exhibits that have not been produced to us and we

16  haven't figured out what to do about that.

17          I will send to Mr. Larkin the transcript that we

18  received and any -- I don't think there are any other

19  materials.  Whatever we received concerning the Malin

20  Commission I'll send to Mr. Larkin.  I'll double check that we

21  haven't received any other responses in response to our FOIA

22  request and I'll certainly let Mr. Larkin know if there's any

23  issue.

24          THE COURT: So can we say the issue is closed, that

25  Mr. Rudin, you'll be providing all the FOIA documents to the

13

1  City?

2          MR. RUDIN: Yes.

3          MR. LARKIN:  The only concern that I have, Your

4  Honor, is that plaintiff takes the position that they produced

5  an initial set of documents when they provided responses to

6  our initial discovery demands.  It appears to be that those

7  documents were buried among a 20 or 30,000 page or 20,000 page

8  production and that the interrogatory responses did not

9  identify the documents.  Now, plaintiff is at the same time

10  taking the position that the City has the burden of searching

11  through its own production to identify certain documents that

12  we know we produced but that there's an equal burden on both

13  sides to go through the production and identify the documents.

14          So it seems to me that either both sides ought to

15  have the burden -- well, it seems to me, Your Honor, that

16  neither side ought to have the burden of going through a long

17  production, a big document production like the ones that we

18  have in this case and identifying documents for the other

19  side.  Plaintiff didn't want to do that with respect to this

20  FOIA request even though we served a written response.

21  There's no indication of a written response that documents

22  were produced although they advised us that they were

23  produced.

24          So it just seems to me that the burdens ought to be

25  fair on both sides and all I'm saying is I would prefer not to

1  have to search through our productions to identify documents

2  since it appears that plaintiff doesn't want to undertake that

3  burden either.

4          MR. RUDIN: Your Honor, when we [inaudible] our

5  initial discovery disclosures to the other side we provided a

6  detailed index of everything that we were providing and then

7  when they provided their 35,000 pages of discovery to us which

8  included about 25 to 30,000 pages of transcripts and motions

9  that we said we didn't want but they insisted on producing and

10 we asked them to specify where things were they refused.

11 Thereafter when we responded -- then when we responded to

12 their document demands we stopped doing what we had been doing

13 before but we did say that in answer to their interrogatory

14 number 20 that we relied on our prior disclosures pursuant to

15 Rule 26(a) as well as the material disclosed herein.

16          If they wanted us to specifically identify this

17 material or anything they could have asked and every time in

18 the course of this case when they've asked we complied with

19 that.  So I really don't understand what Mr. Larkin just said

20 but in any event earlier today when he raised this issue I

21 sent him an email that contains the specific pages of our

22 initial document production which has the FOIA material from

23 the DA's Office.

24          THE COURT: So let's talk about going forward.  How

25 do you want to handle this?  Will each side identify for the

1  other where the materials are in the voluminous requests or do

2  you want to or not?  Mr. Larkin, what do you say?

3          MR. LARKIN: My view is that if it can be easily done

4  without an undue burden then that's fine but if the burden is

5  going to be the same on both sides it seems to me that the

6  side that wants the documents ought to be the side that does

7  the searching.

8          THE COURT: Mr. Rudin.

9          MR. RUDIN: Your Honor, from the beginning of this

10  case we have been willing to do that and we're willing to do

11  it now.  I think now that the materials that are still at

12  issue are pretty -- are much more targeted and specific.  So I

13  don't really think it's going to be a problem but we're always

14  willing to do that.

15          THE COURT: So I think you can agree on that then.

16          I want to zoom down to your agreement, what you've

17  agreed to produce.  I guess that's item number one on Mr.

18  Rudin's letter today.  I don't know, Mr. Larkin, if you've had

19  an opportunity to read the letter.

20          MR. LARKIN: Okay.  I'm going to let Ms. Krasnow

21  address some of these matters.

22          THE COURT: Okay.

23          MS. KRASNOW: Your Honor, what we had agreed to

24  produce were the same items from the personnel file that we

25  had previously produced [inaudible] involved in [inaudible]

1   actual [inaudible].  So when it says complete personnel file

2   that's not entirely what we agreed to produce.  The personnel

3   file contains a lot of personal information such as somebody

4   went on medical leave.

5           THE COURT: Yes.

6           MS. KRASNOW: Items like that which we have been

7   pulling but we have been producing all the records that's in

8   the personnel files.  There are salaries, positions,

9   promotions, et cetera and plaintiff had no objection to the

10  items that we had previously [inaudible] operate under

11  [inaudible] those same items for the ADAs that I would extract

12  from their personnel records.

13          THE COURT: The last sentence of that paragraph says

14  plaintiff has agreed to reasonable redactions to protect

15  private [inaudible].

16          MS. KRASNOW: Exactly.  But I just didn't want there

17  to be any confusion [inaudible] complete personnel file but

18  there is a lot of medical information in the file.

19          THE COURT: So, Mr. Rudin, are we agreed on that?

20          MR. RUDIN: Your Honor, just to be clear.  The two

21  categories that Ms. Krasnow just mentioned I just want to make

22  sure that she's including one.  One is evaluations and the

23  other is letters of criticism or accommodation such as letters

24  from the District Attorney commending an employee.

25          MS. KRASNOW: Yes, I have included those in the past

17

1    and I will continue to include them.

2              MR. RUDIN: And you'll include the evaluations?

3              MS. KRASNOW: Of course.

4              MR. RUDIN: Then we're in agreement.

5              THE COURT: Those in fact were actually produced as

6    part of the in camera review and I believe even before the in

7    camera was refined onto the last few documents the City had

8    agreed to produce those documents.

9              MS. KRASNOW: That's correct.

10             THE COURT: Number two, materials from case files, is

11   that agreed?  If there's no dispute you can simply just say

12   yes, you agree to the paragraph.

13             MR. LARKIN:  Yes, Your Honor.  I think we are -- I

14   think we've asked for all of it but -- bear with me just a

15   moment.  I'm sorry.  I just want to make sure.  Grant and

16   Vecchio were sealed.  So right.  What the Court had directed

17   last time is once the plaintiff obtains the

18   release --

19             THE COURT: Right.

20             MR. LARKIN:  -- and we see what the scope of the

21   release is we can then take the release and move forward.

22   It's hard for us to do anything until we know what those

23   individuals are going to authorize.

24             THE COURT: Is that agreed?  Mr. Rudin, do you agree?

25             MR. RUDIN: Yes.  I don't want to fight over this if

 1   I can get the releases.  If I can't get the releases then
 2   we'll have to deal with it but hopefully we'll have the
 3   releases.
 4          THE COURT: Good.  Number three, grand jury minutes.
 5          MR. LARKIN:  Yes, Your Honor.  We've produced the
 6   minutes that we have in our file.  I would take one more quick
 7   run through to see if there's anything else.  If there's
 8   nothing else then we don't have any other minutes that exist
 9   as of today.  One of the -- I suppose one could order them
10   from the reporters if we could identify the reporters but I
11   don't know if we can at this point because it's a grand jury
12   proceeding from 1994.
13          MR. RUDIN:  One or two of the transcripts, Your
14   Honor, broke off in the middle and it's clear that something
15   was left out.  They may not have --
16          MR. LARKIN:  I can represent, Your Honor, that we
17   have in our office here at 100 Church Street every page of
18   material that the DA has in its files or had in its files.  So
19   to the extent that they had grand jury minutes we have them
20   and as I say I'll take one more quick run through and see if
21   there's any other sort of stray pages or any other minutes
22   that are in there but they were all in one place and I did
23   produce everything that was there.  So it looks as though
24   everything that the DA has the plaintiffs have.
25          THE COURT: All right. [Inaudible] ADAs, agreed?

19

1          MR. LARKIN: Yes, Your Honor.

2          THE COURT: Casey DAO printing materials, any

3   dispute?

4          MS. KRASNOW: No.

5          THE COURT: How about the next page, any dispute on

6   the page over 1, 2, 3, 4?

7          MS. KRASNOW: With respect to 1, Your Honor, I think

8   that's one of those items where it's included in our

9   production but then the issue is who's going to be doing the

10  search for it.

11         MR. RUDIN: Well, we believe we've searched for it

12  carefully through their production and we only received DI

13  logs I believe -- Terri, maybe --

14         MS. ROSENBLATT: Your Honor, we received in discovery

15  both [inaudible - fire engines] production of it was

16  [inaudible] in July of 1993 but the entries that seem to

17  correspond with that book begin after March 1st of 1995.  So

18  we're just asking that the defendants go back to that book

19  [inaudible] produce January 1st through I guess the end of

20  February of 1995.

21         MR. LARKIN: I suppose we could look through the

22  books and see if there are any entries related to this case.

23  I don't know that there are any.  I think the rationale for

24  gathering starting with the March 1 date is that most likely

25  when DI's got involved in the case.

1        MR. RUDIN: Mr. Larkin, that's just not true.  The

2   DI's [inaudible] beginning of at least January 26, 1995 when

3   they were trying to bring in Mr. O'Lever for the interview.

4   Then they were involved after February trying to bringing him

5   in.  They were involved in bringing in Mr. Santos and

6   supposedly Santos was subpoenaed by the office.  Mayor and

7   Bonder are two of the original defendants in this case brought

8   Santos to the office where he met with -- indisputably he met

9   with Mr. Vecchione on February 23rd of '95 and then Vecchione

10  obtained a material witness order at which point they were

11  transported to a jail and then they were brought back and they

12  were held in a hotel custody.

13        MR. LARKIN: That's the March 1st.

14        MR. RUDIN: No, no.  Well, [inaudible] custody was

15  March 2nd but everything else happened in February.  The trip

16  to Puerto Rico and the efforts to locate Diaz before the trip

17  occurred in February.

18        There's also a broader issue which is that we would

19  like all the memo book entries -- I take that back.  This

20  request related to the [inaudible] prosecution.  So basically

21  very significant activity happened in January or February

22  which goes directly to the issue of whether or not the DA's

23  Office was aware beyond the deceased ADA Posner was aware that

24  Oliva had recanted, was not cooperating and issues relating to

25  Diaz and Santos as well.  The critical issue [inaudible].

1          MR. LARKIN: Your Honor, there's no question that

2    legal wasn't cooperating.  Vecchione made that representation

3    in open court the date that Oliva testify but in any event we

4    will -- there's no disagreement about 1.  I'm sorry to belabor

5    this.  We will look for the book.  If they still have the book

6    by all means we'll produce any entries relate to this case.

7          THE COURT: Got it.

8          MR. RUDIN: Your Honor, I misspoke.  Number 1 is not

9    limited to this case.  It's number 2 that's limited to this

10   case.  Number 1 is significant because besides this case the

11   detective investigators were involved in illegally bringing in

12   witnesses on material witness orders to the DA's Office or

13   bringing them to hotels to be held in custody we think

14   illegally and we would just -- we would just like to see the

15   log entries for this limited time period, January to March,

16   not only for the Collins case but also because it may have

17   leads to other information that may be relevant to the case.

18         Number 2 we limit it to memo book entries.  We limit

19   it to this prosecution.

20         THE COURT: I think Mr. Larkin said he didn't

21   disagree on number 1.

22         MR. LARKIN: I mean we'll look and see.  We will

23   retrieve the book, Your Honor, and look and see what the

24   entries show.  I assume that these are all business related

25   tasks that the DI's were performing.  So --

1          THE COURT: 2, no problem?

2          MS. KRASNOW: With respect to number 2, Your Honor, I

3    believe Mr. Min was informed during [inaudible] that these

4    investigators did not keep memo books but we will go back and

5    verify that.

6          MR. RUDIN: No, Your Honor.  They definitely kept

7    memo books.  Whether or not the memo books still exist it

8    was -- I've been involved with this issue with the Brooklyn

9    DA's Office for 15 years and I litigated a case in 1990s, the

10   Brian Boch case where the DI's, several DI's testified and

11   they produced their memo books which -- and I've seen

12   references to memo books in deposition testimony of other

13   DI's.

14         THE COURT: Well, I think Ms. Krasnow said they'll

15   check again.

16         MR. LARKIN:  The reference -- in this instance we

17   don't have the memo books.  We've already searched for them

18   and the representations made in habeas proceedings that they

19   don't exist any more.  So whether or not other DI's kept memo

20   books in other cases if that may be the case but here we don't

21   have -- there's nothing to produce in response to number 2.

22   So that's the response.

23         MR. RUDIN: The practice in the office sometimes was

24   the DI's could take the memo books home and keep them at home.

25   There's been testimony to that effect.  So at least with

1 respect to the Mayor and Bonder who are both going to be

2 deposed I would ask that they be asked whether or not they

3 have their memo books at home if they're not in the office.

4          MR. LARKIN: Certainly.  No objection doing that,

5 Your Honor.

6          MR. RUDIN: Okay.  We're in agreement.

7          THE COURT: Okay.

8          MR. LARKIN: We will ask the individuals if they

9 happen to have their memo books and I doubt they do but we

10 will ask.

11          THE COURT: Number 3, agreed?

12          MS. KRASNOW: Yes.

13          MR. LARKIN: Number 3 is agreed, Your Honor, yes.

14          THE COURT: Number 4.

15          MR. LARKIN: Number 4 is not agreed to.  We can't

16 turn over the names of individuals that were in protective

17 custody or the underlying records.  It's just -- the reason

18 that these individuals were in protective custody was for

19 their own safety and I realize that it is a long time ago but

20 the client has some serious concerns about this.  We did,

21 however, learn from the client the number of witnesses who

22 were subject to material witness orders going back to '92,

23 '93, '94 and '95 and we're going to supply that information.

24 So I do know that if, for example -- I believe there were four

25 in 1995 -- I'm sorry.  I don't remember the numbers.  We'll

1   supply the number of individuals in an interrogatory response.

2   The identities and the underlying records is a major issue

3   here.

4               THE COURT: Mr. Rudin, will that work at least for

5   now?

6               MR. RUDIN: Not really.  I understand the concern.

7   On the other hand the issue here is whether or not there was a

8   custom or practice to hold material witnesses and other

9   witnesses illegally in the arms -- under the -- the custody of

10  detective investigators at the DA's Office they had a formal

11  custody hotel program and I did see a memorandum which I

12  provided to defendants from 1993 from the chief investigator,

13  the office about holding individuals in voluntary or

14  involuntary custody and we're very concerned -- we need to

15  prove that the practice was to hold a witness against their

16  will and my understanding is that their position has been or

17  may be that when they held witnesses in a hotel under armed

18  guard and were there voluntarily and in order to refute that

19  we may need to interview some of these individuals and produce

20  evidence that that was not the case.  I don't know how to get

21  at that unless we have the information about which individuals

22  were held in hotel custody.

23              If they have -- if they'll acknowledge that they had

24  a practice of holding some individuals against their will in

25  hotels then the issue -- then I guess we won't have a proof

1  problem but I don't know what their position is going to be

2  about that.

3          MR. LARKIN: Clearly we're not going to agree that we

4  held -- that the DA had a practice of holding individuals

5  against their will.  I mean that's not what the used material

6  witness warrant for.  The number -- I'm sorry.

7          THE COURT: I was going to say I've signed material

8  witness forms here where people were held against their will.

9          MR. LARKIN: I mean if the Court signs an order that

10  allows the DA to take custody of an individual -- I guess it

11  authorizes the arrest of an individual who has information

12  about a case and who is unwilling to testify.  So by its very

13  nature there's some compulsion with respect to the material

14  witness -- an issuance of a material witness warrant.  So I

15  mean if a judge -- as a matter of law, Your Honor, if a judge

16  signs an order that allows the district attorney to take

17  custody of an individual or commits that person to civil jail

18  that's the end of it.  There's nothing unlawful about the way

19  that -- there's nothing unlawful about that practice.

20          THE COURT: Right.  But the reason I said what I said

21  was perhaps that's a way to get at this without getting at the

22  names at least on level one.  Is there a way to disclose the

23  number of people that were held as material witnesses in hotel

24  custody and number two, whether or not there were court orders

25  authorizing that?

1          MR. RUDIN:  I think we determined that.  If we know

2  the number of people that were held in protective custody.

3  Now that's not the problem because see, what you're referring

4  to as protective custody we see differently.  At least in some

5  of those cases that -- the district attorney classified it as

6  protective custody when in fact they were averted from court

7  or they were held involun -- they were basically told you are

8  going to go to jail or we're going to hold you in a hotel and

9  they chose the hotel and then once they went to the hotel they

10  weren't allowed phone calls and weren't allowed visits and

11  they were in prison until they testified.  We have a different

12  view of what that means.  I don't know how to get at that

13  unless we were able to speak to some of those people.

14          MR. LARKIN: Well, Your Honor, in each of those cases

15  though if the courts signed orders that permitted detective

16  investigators to take custody of individuals and individuals

17  were then produced in court and testified as witnesses in some

18  of these cases, the court presumably authorized whatever

19  conduct or whatever -- authorized whatever procedures were

20  then used to make the witness available to testify.  So what's

21  the -- I don't understand.

22          THE COURT: That's what I'm saying.  That's what I'm

23  saying.  Can you disclose since you have the number of people

24  that were kept in court protective custody --

25          MR. LARKIN: Yes, Your Honor.

1          THE COURT: Can you disclose how -- the number for

2    whom there were actually court orders and then we can see

3    whether that's the entire universe or whether there's just a

4    small number and then we can deal with that?

5          MR. LARKIN: Yes, Your Honor.  We'll make a further

6    inquiry of our client and find out if we can get that

7    information.

8          THE COURT: Because I think that goes towards what

9    Mr. Rudin is looking for and then perhaps we can find a way to

10   deal with it.

11         MR. RUDIN:  There's clearly a distinction between a

12   material witness order that results in somebody being brought

13   to court and then having the court order the person jailed in

14   a jail for being recalcitrant versus a material witness order

15   that results in detectives picking a person up, bringing him

16   to the DA's Office and then having him held against -- held in

17   a hotel under armed guard not being permitted to leave.

18   That's what we're interested in.  Not the former but the

19   latter.

20         THE COURT: But the latter actually I've seen the

21   latter happen through court order as well.  So I know you're

22   looking at it happening without a court order but I think --

23         MR. RUDIN: A court order allowing someone to be held

24   in a --

25         THE COURT: In a hotel.

1          MR. RUDIN:  -- [inaudible] DA's Office.

2          THE COURT: No, not the DA's Office.  The U.S.

3   Attorney's Office or the FBI.

4          MR. RUDIN: That's exactly right.  The Court is

5   correct.   You don't need me to say that but obviously what

6   happens is sometimes they go out and find these guys at two,

7   three in the morning and there's no judge available to hear

8   any application that that individual might want to make.  So

9   of course they're taken into custody but the order authorizes

10  that.

11         MR. LARKIN: The additional order that individual to

12  be held --

13         THE COURT: Anyway.

14         MR. RUDIN:  -- [inaudible] in a hotel I wonder about

15  the legality of that under state law but at least there's a

16  court order.  I'm looking principally at cases where the court

17  order is to bring the individual forthwith to court where he

18  has a full range of rights under the material witness statute

19  [inaudible] -- they're actually a lot broader than the federal

20  court.

21         THE COURT: Probably.

22         MR. RUDIN: [Inaudible] person ends up being held in

23  a hotel as a prisoner and [inaudible] district attorney's

24  office running a private jail.  That's our concern.

25         THE COURT: I understand what the point is.  So can

1  we start at least just by having defendants disclose how many

2  were held pursuant to a court order --

3          MR. RUDIN: Yes, Your Honor.

4          THE COURT:  -- and then work from there?

5          MR. RUDIN: Yes, Your Honor.

6          THE COURT: Documents to be produced on or before

7  June 28th, number one, is that okay?

8          MR. LARKIN: Yes, we agreed to that.

9          THE COURT: Electronically stored information.

10         MR. LARKIN: All right.  Here's the concern that we

11 have.  What we've learned, Your Honor -- let me back up.  What

12 we have ready to produce to plaintiff are a substantial number

13 of emails from various individuals at the DA's Office for the

14 period during which the habeas proceeding took place which is

15 May, June of 2010 and we also have additional emails from Lee

16 Farrell from a period April 2010.  So those emails were easy

17 to locate and to extract because I believe that the same

18 system that the DA uses now they were using at that time.

19         But plaintiff has asked for emails that go back to

20 2006 and I believe has narrowed the request somewhat but in

21 the course of narrowing it -- narrowing the time frame

22 plaintiff has expanded a number of people whose emails he

23 wanted searched.  So the problem we have is that if you look

24 at just the old requests before it was narrowed down and -- I

25 guess now we're [inaudible].  The old requests in the document

1  demand -- we did confer with our client [inaudible] about that

2  and it's going to require about 200 man hours at least, about

3  200 man hours to just extract the material and convert it into

4  some format in which it needs to be reviewed and produced.

5  It's going to take an individual, an IT person overtime to do

6  this because they would be taken away from their entire --

7  from their regular job duties for a period of several weeks

8  otherwise and the district attorney needs these folks to help

9  the office run.

10           So it would have to be done on overtime.  It would

11  probably take about, I don't know, 13 weeks, 13 to 15 weeks

12  because three hours of overtime a day which is a concern

13  [inaudible] according to the information that we got and the

14  terminology is [inaudible] restored, a restored [inaudible] go

15  back, look at all the old stuff, extract it and then restore

16  it into some form in which it can be reviewed and then

17  produced.  So it is a burdensome task.

18           We're trying based on the narrowing of the request I

19  guess in some sense to get some more information as to how

20  burdensome this is going to be but just to give the Court a

21  sense of what we're looking at it's -- this is not an easy

22  task.  I mean the overtime costs are going to be significant

23  and the burden is significant.  The drain on the office is

24  significant.  I don't know if they can find an IT person to do

25  this for three hours a day for 10, 12 or 13 straight weeks to

1    extract all this stuff.  So we've given the emails over for

2    the recent time period.  Our view at this point is that the

3    burden of this discovery is going to outweigh the benefit it

4    seems.

5             MR. RUDIN: Your Honor, may I -- are you finished,

6    Mr. Larkin?

7             MR. LARKIN: Yes.

8             MR. RUDIN: Your Honor, may I respond?

9             THE COURT: Yes.

10            MR. RUDIN: We made our initial document demand in --

11   let me just get the date here.  In August 2, 2011 and request

12   number 2 is for emails for 19 or 20 individuals.  19

13   individuals plus their public information and press office

14   going back to the beginning of Mr. Collins' case in 1994 until

15   the present.  Then in February after Judge Block's order on

16   the motion to dismiss we -- in our second document request we

17   asked for compliance with the request for emails as well as

18   other items that we had asked for a year-and-a-half earlier

19   where the compliance had been stayed because of the stay that

20   was in place.

21            We then had a number of conversations with defense

22   counsel where we raised the issue of emails and we continually

23   asked if we could have a conversation with their IT specialist

24   in order to try to narrow the request if we could and to

25   obtain compliance in the most economically feasible and time

1   feasible way possible and that was always declined.

2          Then several weeks ago defense counsel began to say

3   that they would comply with the email requests and that we

4   would have compliance shortly and that we would have

5   compliance at least as to Ms. Farrell before our deposition we

6   had been scheduled for today but has been postponed.  Only --

7   I believe it was [inaudible] evening or yesterday -- I think

8   was Tuesday evening did we learn for the first time that there

9   was this issue and that -- and then we learned that for some

10  reason that the defense narrowed their compliance without

11  telling us concerning emails generally in the DA's Office to

12  May and June of 2010 which is about a year-and-a-half after

13  the habeas proceeding was filed and several months after Judge

14  Irizarry had a telephone conference where she made clear that

15  there was going to be a hearing.  There would have to be

16  discovery and the DA's Office at that point have to start

17  collecting material, disclosing material that they had refused

18  to disclose four years earlier [inaudible] litigation.  So

19  they -- generally speaking they decided to only disclose

20  material from May until I believe the middle of June of 2010

21  and as for Ms. Farrell for some reason they artificially

22  limited what they were going to disclose to April of 2010 I

23  gather to some point in June without telling us.  We only find

24  this out late Tuesday or early Wednesday.

25          So to say -- I understand -- so then we continued --

1   as late as yesterday we continued to propose that we meet in

2   an informal off the record conversation with their IT person

3   to try to get a sense of what it is that's so burdensome and

4   see if we can narrow our request in a way that will actually

5   help him or her and that request we made for a conference has

6   repeatedly been refused.  So yesterday in an effort to try to

7   help this process we attempted to narrow what we were

8   requesting both as to time and as to number of people and it's

9   not correct that we've expanded the number of people.

10              We resisted from 1994 and [inaudible] start at March

11   15, 2006 which is the day that we filed Mr. Collins' 440

12   motion.  It continued to January 10, 2007 which is when Ms.

13   Farrell submitted her last formal response to the court except

14   that in reviewing discovery in preparation for her deposition

15   I saw that she -- there was a lot of activity through late

16   January into February.  So I'd like to modify that and make it

17   March 15, 2006 until March -- I'm sorry.  March 15, 2006 until

18   March 31, 2007, about one year, and then from November 25,

19   2009 which is when Judge Irizarry -- which was when we filed

20   our motion to amend the habeas petition after we obtained --

21   after Mr. Collins obtained through a FOIA request a material

22   witness order of Mr. Santos which -- so we filed a motion to

23   amend the petition.  It was after that that things heated up

24   and we had a lot of proceedings in court with Judge Irizarry.

25   So from November 25th 2009 to the present as to certain

1  individuals.  The number of -- we gave different lists of

2  individuals for the first time period and the second and each

3  one of them is about six or seven individuals at the most.  So

4  we've cut out a lot of people who we think would be relevant

5  but we're trying to be pragmatic.  We're still -- I think it

6  would make sense to meet with their IT person because maybe

7  he'll explain that there's a better way to limit the search

8  that would make it more efficient so that we can hone in on

9  what seems -- and prioritize.

10         But for the other side to say that someone that we

11  put this huge burden on them and that they don't have time at

12  this point --

13         THE COURT: Okay.  That's an adjective.  Let's see

14  what we can do about this.  My practice in most of these cases

15  is to get the IT people just to sit together and see if they

16  can figure out a way to work it out.

17         Mr. Larkin, is that something that could work?

18         MR. LARKIN: Well, what I would like to do first

19  maybe is get -- I have the dates now that the plaintiff wants.

20  Maybe I should reach out first and have a discussion with our

21  client directly and at least cut out the middle man and the IT

22  people there and find out how burdensome this would be and how

23  much time it would take.  Maybe that -- if we go from '06 to

24  '07 and then we go from '09 -- I think plaintiff had '09 to

25  the present but I would object to anything after the habeas is

1  concluded.  That's the end of the criminal proceeding.  The

2  emails, current emails that concern this case are clearly

3  communications about any litigation.  That's privileged it

4  seems to me.  I wouldn't produce any of that stuff any more

5  than I would expect Mr. Rudin to produce his communications

6  with his client to us.

7          MR. RUDIN: I'm not asking for anything between Mr.

8  Hynes and Mr. Larkin.  I'm asking for communications between

9  Mr. Hynes and third parties that concern Mr. Vecchione.  I

10 mean that's principally what we're interested in, the

11 continual support from Mr. Vecchione and the communications

12 with public relations people concerning Mr. Vecchione.  This

13 stuff was directly related to Judge Block emphasized in his

14 decision on ratification.

15         MR. LARKIN: Up until the time -- Jabbar Collins has

16 no claims for damages after he gets out of prison.  He's no

17 longer in custody.  So the claim ends, the relevance ends in

18 June -- I think it's -- whatever the date of the -- yes, 2010,

19 whatever the date that the order was issued.

20         We're not asking for [inaudible].  Your Honor, if I

21 can -- I'm sorry.  I would like to have that discussion first

22 if I could.  I will suggest to our client that we get all of

23 us on the phone and put our heads together and try to figure

24 this out.  I will tell my client honestly that Your Honor's

25 inclination would be to direct it.  So maybe that will help

1  speed things up.

2          THE COURT: Further you can tell them that I did it

3  recently in a criminal case and it worked.  Ultimately see

4  what happens.

5          The next issue?

6          MR. RUDIN: Your Honor, in response to what Mr.

7  Larkin said.  We're not claiming damages for incarceration

8  after the point that Mr. Collins was released.  We're seeking

9  evidence to prove his underlying claims and I think that

10 that's --

11         THE COURT: I understand your position.

12         MR. RUDIN: The other thing -- part of what we want

13 to discuss -- sorry.  May I have one moment, Your Honor?

14         THE COURT: Sure.

15                    [Pause in proceedings.]

16         MR. RUDIN: Your Honor, are you going to order that

17 the District Attorney's Office that their IT person meets with

18 all counsel so we can work this out?

19         THE COURT: I think the better way to do it is the

20 way Mr. Larkin suggested because Mr. Larkin knows that I'm

21 going to direct it eventually.  So I think you might do better

22 by just --

23         MR. RUDIN: Exactly.

24         THE COURT: a-- persuading his client.

25         MR. LARKIN:  That's what I'll suggest to the client

1   so they understand.  Let's try to get it done here.

2           So I guess the next category, Your Honor, would be

3   the public statements.  Your Honor, my clear understanding is

4   that all the press releases were disclosed, all of them.  So I

5   don't -- I mean I can confirm that one last time which I will

6   do but I don't think that --

7           THE COURT: Okay.

8           MR. LARKIN:  I don't think there's anything missing

9   and then with respect to the privileged documents I believe

10  that Ms. Krasnow can address that directly.

11          MR. RUDIN: Before we get to the privileged

12  documents, just -- I mean we -- I'm not expecting Your Honor

13  to share this view but we operate from the view that it's not

14  in the interest of the District Attorney's Office considering

15  the history of this case and the interests in this litigation

16  to disclose certain material.  So we're just trying to be

17  careful and make sure that they do what they're not terribly

18  anxious to do.  So, for example, what we did receive in

19  response to our FOIA request and what I'm going to disclose to

20  Mr. Larkin, send it out tomorrow, is a number of emails from

21  the public relations, deputy director of public relations from

22  Mr. Hynes' office to various representatives of the news media

23  sending out on behalf of Mr. Hynes statements about support

24  for Mr. Vecchione and statements that actually nothing was

25  done or wrong in the office and we haven't gotten that.  We

1    haven't gotten that in our request for emails.  We haven't

2    gotten that in our request to the DA's Office as public

3    statements.  There's been a continual barrage of statements

4    from the DA's Office and particularly now that there's a

5    political campaign concerning the Jabbar Collins case,

6    concerning -- there was an article about how -- a 48 Hours

7    special is going to contain comments by Mr. Vecchione on the

8    Jabbar Collins case. I don't know if that came from their

9    office or where but there have been all sorts of things in the

10   press about it and it's hard to believe that there haven't

11   been emails and there haven't been statements released to the

12   media by the public relations office or the district attorney

13   concerning the Jabbar Collins case.

14           MR. LARKIN: Your Honor, when I asked for public

15   statements what we got was a stack of press releases from the

16   public relations office, official press releases and we

17   produced all of them.  If the plaintiff is aware through his

18   own FOIA request of specific emails from specific people it

19   would help.  For instance, tell us who they are, what the

20   statements were because I'll go back to my client and say

21   please check with these people or please check with these

22   other individuals and don't limit the request to just the

23   official press releases but maybe there was an email or two

24   sent by an individual.  I haven't seen these emails and I

25   don't know what's in them.  Maybe they mirror the public --

1  the official press releases.  I don't know but a little bit

2  more cooperation would have helped in this area.

3          So I appreciate that counsel is going to send me

4  that stuff and I'll go back to my client again and we'll have

5  a further discussion.  Absolutely.

6          MR. RUDIN: Your Honor, that's why we specifically

7  asked for the emails from various -- from the two people from

8  their press office relating to Jabbar Collins.  We haven't

9  gotten a single one.

10          THE COURT: Well, I think now that you've gotten some

11  information through the FOIA request it will help Mr. Larkin

12  to get some leverage at this time.

13          MR. RUDIN: Thank you, Your Honor.  I hope so.

14          THE COURT: So the last thing is the privileged

15  documents.  I guess, Ms. Krasnow, you can start but I think

16  the ball is probably in my court too; right?

17          MS. KRASNOW: I [inaudible] everything that I picked

18  up from Your Honor yesterday morning that was highlighted in

19  yellow.  That was all produced yesterday.

20          THE COURT: Right.  I noticed as you told my law

21  clerk that where you had any doubt you produced it.

22          MS. KRASNOW: Yes.

23          THE COURT: There was one -- the highlighted document

24  that had an X in it turned out to be a letter from Mr. Rudin.

25  So I didn't think that that necessarily had to be produced.

1           Mr. Rudin, what are your questions?  Because I can

2    run up and get the file and I understand you want to see the

3    more refined privilege log.  I suppose that Ms. Krasnow and

4    Mr. Larkin can explain to you what that looked like.  They

5    were going to talk to the DA's Office as to whether or not

6    that was something they could disclose but I can give you a

7    little bit more of my reasoning and what was there and tell

8    you what you've got and what you didn't get.  I think you'll

9    find that everything that you want you got without any real

10   objection from the defendants. I don't think the defendants

11   were attempting to withhold anything that I reasonably thought

12   that you needed to get but if you want a little more

13   specificity I can run upstairs and grab the folder.  Is that

14   what you'd like?

15           MR. RUDIN: I don't know whether it's more efficient

16   to do it that way or for me to express the concern I have

17   about certain documents.

18           THE COURT: Well, I might want to have the documents

19   with me but -- let me just say generally, and I think

20   defendant's counsel can fill in the gaps where if my memory

21   isn't strong enough but I bumped through these documents

22   several times and several occasions I've had discussions with

23   defendant's counsel and defendant's counsel decided to -- they

24   wanted to release other documents to you.  So what was here --

25   what was produced most recently was the -- were the documents

1  that the defendants thought were at the core of their

2  privilege request.  There were many of those documents were

3  things that you would not be interested in and that you

4  wouldn't be entitled to.  So, for example, questions to prep

5  witnesses at a trial or memos about what to do in response to

6  a judge's ruling or notes in the margins on a brief about

7  legal theories that have nothing to do really with what's

8  going on in these proceedings here today.  There was a lot of

9  that.

10       There were, however, some documents that you might

11  want to ask questions about so before I get into anything else

12  why don't you tell me what it is that you're concerned about

13  and I'll try to tell you what you got.  I suppose before I do

14  that anything that was at all relevant to Oliva and Santos and

15  Diaz you got.

16       MR. RUDIN: The first thing you said was questions to

17  prepare witnesses.  It seems to me that any questions to

18  prepare Oliva, Santos or Diaz given that --

19       THE COURT: You got it all.  If there was anything

20  there relating to them you got it.

21       MR. RUDIN: Then the first --

22       THE COURT: Let me just make sure.  Ms. Krasnow, is

23  that correct?

24       MS. KRASNOW: That's my understanding.  I [inaudible]

25  produced Anything Your Honor [inaudible].

1        THE COURT: I don't think I missed anything relating

2   to [inaudible].

3        MS. KRASNOW: No.

4        MR. RUDIN: All right. So then the first document

5   involving the Marshal case, there's a, on the first page,

6   there's a discussion by Ms. Dornhauser [Ph.] to Dino Amoroso,

7   the first Assistant DA.

8        THE COURT: Yes.

9        MR. RUDIN: The context of the Marshal case and then

10  there's a bit that's redacted, and then it says, "The judge

11  stated that he would like to know about our decision as soon

12  as possible." Was there anything redacted that had to do with

13  what Judge Korman said to the DA's Office about the status of

14  the case? That would seem to me to be directly relevant to

15  why they eventually essentially caved in.

16       THE COURT: Well, I can go up and go look at the

17  memo again.

18       MR. RUDIN: I mean it seems to me anything that

19  Judge Korman to the District Attorney's Office about his

20  concerns about the case would be highly germane. And then on

21  the next page it says, "Pro plea arguments," and then it's all

22  totally redacted except --

23       THE COURT: Right.

24       MR. RUDIN: -- a sentence having to do with concern

25  about the press [indiscernible] trampling on the defendants'

43

1    rights, et cetera.  But --

2              THE COURT:  Okay.  All right.  This particular

3    document was a document for which there were two kinds of

4    privileges asserted and that goes to the heart of what

5    attorneys do.  And that document had to do with the pros and

6    cons of a plea arrangement and were reflecting the internal

7    deliberations in the office, but not in a way that I think is

8    going to help you in the litigation the way you explained it.

9    However, the part that I did not redact I found did not

10   constitute the core of what an attorney does as far as work

11   product goes, so that was out.  And also because it dealt with

12   the press I know that's something that you were interested in.

13             MR. RUDIN:  Your Honor, what comes after that

14   presumably was anti-plea arguments and if there's a discussion

15   there about what a heinous criminal Jeffrey Marshal was, since

16   I understand he was suspected in about 15 murders and was

17   tried in Kings County for three separate murders and one in

18   Nassau County, and that they think he's a heinous criminal but

19   they're going to let him out of jail essentially because they

20   don't want a negative ruling by Judge Korman finding

21   misconduct Michael Vecchione, then that's directly relevant to

22   our claim.  So if that's in there, and I suspect it is, then I

23   think that should be disclosed.

24             MR. LARKIN:  Your Honor, can I just --

25             THE COURT:  Yes.

1          MR. LARKIN:  I'm not sure about --

2          THE COURT:  Go ahead.

3          MR. LARKIN:  I don't have it in front of me, but I

4    don't even think that's relevant.  I mean the issue is whether

5    there's a practice of allegedly unlawful conduct and who the

6    defendant is really doesn't matter with respect to that

7    argument.  You know, the issue is what did the DA's Office do

8    in prior cases and does it exhibit, you know, does it exhibit

9    deliberate indifference to constitutional violation?  It

10   doesn't matter whether they think the defendant is a good guy,

11   a bad guy, or a mediocre guy.  But it doesn't appear relevant

12   at all.

13         THE COURT:  All right.  Since we're talking about

14   this document, let me just run up to my chambers and grab the

15   document and then we'll see if there's anything more.  But Mr.

16   Larkin, I think you might also want to explain there was

17   another part of our discussion there that might be relevant at

18   this point, that there might be alternative means to obtain

19   some of this information.

20         MR. LARKIN:  Right.  I mean, right.  If Mr. Rudin

21   wants to depose Ms. Dornhauser [Ph.], who's the person who

22   offered the memo, then he can serve a Rule 30 deposition

23   notice and we'll produce her.

24         MR. RUDIN:  Your Honor, we're already taking a great

25   number of depositions and the City and the defendants have

45

1   opposed the number of depositions we're taking.  And now

2   because they don't want to disclose a couple of paragraphs in

3   this letter we have to go to the expense of taking her

4   deposition to ask her essentially what was in this document?

5         THE COURT:  Well, Mr. Rudin, actually that's -- let

6   me tell you where that came from.  If a document is found to

7   be work product and it's core work product from attorneys'

8   mental impressions, which I found it was, there then is a

9   question of whether or not there's a compelling or substantial

10  need and whether the information is available by alternative.

11  It was my suggestion that if there were alternative means to

12  producing that document that that might satisfy your needs, as

13  well as, or even better than, what that memo is going to

14  provide because I do think the memo is protected.  And I think

15  the law requires that I find that there are no alternative

16  means for you to obtain the information.

17        MR. RUDIN:  Respectfully, Your Honor, I don't think

18  there are because Ms. Dornhauser was involved with the other

19  members of the -- the high level members of the office in

20  preparing opposition to Mr. Collins' 440 motion and his habeas

21  petition.  So she has an interest on the other side and we're

22  not going to be able to confront her with any statements in

23  this document that may be inconsistent with her recollection

24  which may be consciously or unconsciously self-serving.

25        THE COURT:  Well, she might refresh her recollection

46

1  before she's deposed as well.

2          MR. RUDIN:  No, but then we should get the document

3  on that basis.  I mean I don't understand why this document

4  would be --

5          THE COURT:  All right.  Let me get the document.

6                  [Pause in proceedings.]

7          MS. ROSENBLATT:  Hi Arthur, this is Terri.  Can I

8  ask a quick question?

9          MR. RUDIN:  Are we still on the record?

10          MR. LARKIN:  Sure.  What's up?

11          MS. ROSENBLATT:  So I see that there's --

12          MR. RUDIN:  We may still be on the record.

13          MS. ROSENBLATT:  That's okay.  I think this is not

14  confidential.

15          MR. RUDIN:  Okay.

16          MS. ROSENBLATT:  I see that there are Bates numbers

17  on the bottom of the privileged documents that you produced.

18  Do those numbers correspond with the privilege log or are

19  those new Bates numbers?

20          MR. LARKIN:  Those are new Bates numbers.

21          MS. ROSENBLATT:  All right.  Thank you.

22          MR. LARKIN:  I'll have Elizabeth confirm that.

23  She's going to come right back in.

24          MS. ROSENBLATT:  Okay.

25                  [Pause in proceedings.]

47

```
 1              THE COURT:  All right.  I'm back.  All right.  So
 2   now, Mr. Rudin, let me just start by saying I spent a long
 3   time on this particular memorandum.  It's my ruling that it is
 4   core to your work product and may well be part of the
 5   deliberative process of privilege.  It reflects internal
 6   deliberations about the hearing that is ongoing and about a
 7   decision that the office had to make.  As you had probably
 8   guessed, where there are arguments pro and con for doing
 9   something, the arguments contain speculation as to what a
10   judge is doing.  Much of it is speculation.  Much of it is a
11   what if.  Much of it is well, the argument on the one hand we
12   should do this, on the other hand we should do that.  A lot of
13   that also has to do with strategy and assessment of the
14   strength and weakness of, you know, the opposing side.
15              So now tell me what it is that you think that you
16   should get that you haven't gotten.
17              MR. RUDIN:  Well, first of all, if there's any
18   expression as a con for agreeing to a deal that Jeffrey
19   Marshal [inaudible] --
20              THE COURT:  I'm sorry?  Jeffrey Marshal's?
21              MR. RUDIN:  Is a really bad guy, I think that that
22   should be disclosed because that would show the extent that
23   the lawyer could go to protect Mr. Vecchione of any
24   consequence for his misconduct.  I mean here on the one hand
25   they're acknowledging that a potential public relations
```

48

1   debacle trampling on the defendant's rights will be

2   castigated.  And having defendant plead guilty may short

3   circuit any negative publicity.  But on the other hand,

4   they're aware that -- the office at least believes that this

5   is a really, really bad criminal who's a multi murderer.  And

6   if they're willing to agree to this deal, to essentially a

7   time served plea, then I think that speaks volumes about the

8   extent to which Mr. Hynes and his executive staff are willing

9   to go to protect Mr. Vecchione from the consequences of his

10  actions, and that's exactly what they then did Jabbar Collins

11  case.  And the fact that they all knew that the office was

12  willing to go to this length to protect Mr. Vecchione is

13  evidence of the atmosphere of tolerance of his misconduct and

14  his conduct generally that we're seeking to prove.  I think

15  it's critical.

16          THE COURT:  All right.  Well, the defendant was

17  found guilty, correct?

18          MR. LARKIN:  Yes, Your Honor.

19          THE COURT:  So there was a habeas decision, correct?

20          MR. LARKIN:  Yes, Your Honor.

21          THE COURT:  And at the habeas petition the DA's

22  Office was defending him because they thought he was guilty,

23  correct?

24          MR. LARKIN:  Yes.  That's correct.

25          MR. RUDIN:  The DA's Office, yes, was trying to

49

1   defend the conviction.

2          THE COURT:  Yes, defend, right, defending against

3   his habeas to defend the conviction.  That's all it says.  In

4   other words, I mean if there's something in there that says we

5   think he's guilty and that's a con for accepting the plea

6   agreement --

7          MR. RUDIN:  I mean that's self-evident.  I don't

8   mean to interrupt Your Honor.

9          THE COURT:  Yes.  I mean that's what --

10          MR. RUDIN:  That's what it is.

11          THE COURT:  That's what it says.

12          MR. RUDIN:  He was convicted of a crime.  He was

13   given a sentence.  We defended the conviction because we

14   believed that he was guilty.  There's no question about that.

15          THE COURT:  It doesn't say this is a heinous

16   criminal, this is Jeffrey Dahmer again, you know, he's the

17   second coming of Adolf Hitler.  It doesn't say anything like

18   that.  It simply says, you know, on the one hand, the guy's

19   guilty and, you know, should we do this?  Will we win, will we

20   lose, are we better off by going through his hearing?  And if

21   we win, then we win, if we lose, then we have an appeal.  Are

22   we going to do it in the circuit.  That's the kind of analysis

23   that they have and that I don't think that you're entitled to.

24   It doesn't really say that this guy is really terrible and it

25   just makes our skin crawl just to even think about given a

1  plea deal.  It doesn't get into that kind of terms.  Basically

2  just self-evident kind of statement that you just heard.

3         MR. RUDIN:  Right.  And the other thing is on the

4  pro plea argument, is there any discussion -- it seems to me

5  it would be relevant if there's a -- and important to us if

6  there's a discussion about the likelihood that they are going

7  to lose because they've taken the position throughout the

8  Collins litigation that Judge Korman never said anything

9  negative about Mr. Vecchione's testimony and didn't put any --

10  they never felt any pressure to make a deal and never

11  understood why the deal happened, but in light of that, you

12  know -- if they make any comment about the weakness of -- the

13  problems with Mr. Vecchione's testimony or comments that Judge

14  Korman made or their concern about any other witness's

15  testimony tending to show that Mr. Vecchione was not to be

16  believed, I think that would be highly relevant.

17         THE COURT:  If there were any comment about Mr.

18  Vecchione, you know that you would have gotten it.

19         MR. RUDIN:  Thank you.

20         THE COURT:  You know, the comments that the Court

21  make about what will happen, you know, the speculation, it's

22  not clear to me from reading this how Judge Korman was going

23  to rule.  I think there were some questions about what he was

24  going to do, but it's not clear to me how he was going to

25  rule.  There were some ifs about what would happen, and if the

1  ifs happened one way, that would be good.  On the other hand,

2  there are some things in this memo that I didn't produce that

3  would not help you.

4          MR. RUDIN:  Well, then I assume that the other

5  side's not going to rely on it either.

6          THE COURT:  Well, that's the point.  If the other

7  side relies on it, then it has to be disclosed.

8          MR. LARKIN:  As of now, Your Honor, what we've done

9  is we produced what the Court directed us to produce and the

10  rest of it is redacted and we don't intend to use it.

11         THE COURT:  I mean Mr. Larkin, look at Paragraph 2

12  of the pro plea arguments.

13         MR. LARKIN:  Yes.

14         THE COURT:  Is there anything you -- if I suggest

15  rather than quote what's there, perhaps that might help Mr.

16  Rudin a little bit to understand the relatively innocuous

17  nature of most of the argument?

18         MR. LARKIN:  Yes, sure.  Yes, Your Honor.

19         THE COURT:  Okay.  So number two, which I didn't

20  give you, but not because it wasn't -- only because of what I

21  said.  It said that the -- to the extent it talked about how

22  much of his time the defendant had already served and how much

23  of that was his present minimum sentence, and to the extent

24  that he may have served must, if not all, of his present

25  minimum sentence, would that go in the pro column?  That's the

52

1   kind of thing that's in this memo.

2              MR. RUDIN:  I understand.  Okay.

3              THE COURT:  Okay?

4              MR. RUDIN:  If we could move on?

5              THE COURT:  Yes, we can move on.

6              MR. RUDIN:  On Page 4912, Page 5 of the overall --

7              THE COURT:  All right.  Let me just say that I don't

8   have the entire production with me because my secretary is

9   more efficient than I am and she's actually filed it in the

10  place that I can't find for things that she didn't think we

11  were going to need for a little while.  So since she leaves at

12  5 and she has never seen me before with in camera reviews

13  actually go over the in camera review afterwards with the

14  parties, she didn't expect that I would need it.  So if you

15  could tell me what it is, I'll try to remember.

16             MR. RUDIN:  Analogy of the Jeffrey Marshal time

17  line.  I don't know whether this was part of the --

18             THE COURT:  Oh yes, I have that.

19             MR. RUDIN:  I don't know if that's part of the

20  Amoroso memorandum or a separate document.

21             THE COURT:  I could tell you that it was produced

22  interspersed with it.  It didn't make a whole lot of sense but

23  actually it went one page of the Amoroso memorandum, and then

24  there was the Jeffrey Marshal time line, and then the second

25  page of the memorandum, and then came the other time line.

1          MR. RUDIN:  On the last page of the time line

2    someone wrote in Vecchione's opinion, in handwriting,

3    "Vecchione's opinion about importance of Murphy to jury not

4    relevant."  I don't know who wrote that.

5          THE COURT:  I don't either.

6          MR. RUDIN:  Then underneath that there's something

7    redacted.  I'm assuming that what's redacted doesn't give any

8    more [inaudible].

9          THE COURT:  Correct.  I mean if defense counsel

10   knows who wrote that, let me know.  I can only guess.

11         MR. RUDIN:  That's a problem with a lot of this.

12   And as we go through it, that's going to be a recurring theme

13   that we have little -- sometimes we have little words here and

14   there and we don't know who the author is.

15         THE COURT:  And we discussed that a little bit, but

16   I think that when you can pick up the phone and call counsel

17   and just ask them if they know.

18         MR. RUDIN:  Well, all right.  Maybe we can discuss

19   that today.  But one other overall issue before I do some more

20   on the specific documents, that is that if these documents

21   have been newly Bates stamp and we don't have any way of

22   matching them up to the privilege log.

23         MR. LARKIN:  Well, I think the log -- I mean can we

24   match them up?  Is there a way to do that?  Can we have a

25   paralegal do that?

54

1          MS. KRASNOW:  I mean we can.  It's going to take a

2     while.  They were originally identified by their document ID

3     in our system.

4          MR. LARKIN:  Right.

5          MS. KRASNOW:  They had never been given a Bates

6     number.  So when I produced them, I gave them Bates numbers.

7     In order to match them up, it's going to take a lot of time.

8          MR. LARKIN:  There's a few paralegals here in the

9     room a little busy on some other things, but I mean is there -

10    -

11         MR. RUDIN:  Arthur, can we try to work that out

12    between ourselves?

13         MR. LARKIN:  Sure, let's work it out.

14         MR. RUDIN:  All right.

15         MR. LARKIN:  That's fine.

16         MR. RUDIN:  All right.  So anyway, then there's a

17    document that says at the top, Boyle time line.  And then it's

18    totally redacted except for the handwriting withhold, it looks

19    like MTW is the term.  Maybe that's -- I don't know what those

20    are.

21         THE COURT:  It might be MVD.

22         MR. RUDIN:  M -- I'm sorry?

23         THE COURT:  I don't have it in front of me.  Is it -

24    - Ms. Krasnow, do you remember is it MVD?

25         MS. KRASNOW:  I know the document that Mr. Rudin is

1  referring to but I can't remember what the three letters were.

2          THE COURT:  Yes, I can't either.

3          MR. RUDIN:  It looks like it may be MW, material

4  witness, and then -- or material -- I don't know.

5          MS. KRASNOW:  I couldn't read the handwriting and it

6  was highlighted and I produced it, but I don't have it in

7  front of me, unfortunately.

8          THE COURT:  Yes.  And I couldn't understand what it

9  was or read it, but since it looked to be related to something

10 that you were very interested in and it seemed appropriate to

11 give it to you, so I gave it to you.

12         MR. RUDIN:  I appreciate that, but no context, I

13 have no idea what it means absent any context.

14         THE COURT:  Same.

15         MR. RUDIN:  I don't even know who wrote it.

16         THE COURT:  Same.  I have the same problem.

17         MR. RUDIN:  Maybe I could figure it out if I could

18 see that paragraph.  Is there a particular reason why the

19 defendants don't want to disclose that paragraph?

20         THE COURT:  I don't have it in front of me.  Ms.

21 Krasnow, do you remember?

22         MS. KRASNOW:  I'm very sorry, I don't.  I just went

23 to go try get everything and my computer is giving me a lot of

24 problems so I couldn't.  I don't have it in front of me right

25 now.  I can't remember what the surrounding notes were.

1          THE COURT:  I can see it in my mind but I just can't

2    remember.  I really don't think there was anything else there

3    that would even be helpful to you.

4          MS. KRASNOW:  That was my recollection as well, but

5    unfortunately I can't get it to print right now.

6          THE COURT:  So much of these documents were just

7    little random notes that people really scribble off at the

8    last minute.  Most of them were -- many of them were

9    illegible.  Some of them didn't seem to be relevant to

10   anything that you were looking for.

11         MR. RUDIN:  We can't even present this to a witness

12   and ask if they can identify the handwriting because it's just

13   a few isolated words.  I mean it's --

14         THE COURT:  So call, just call counsel tomorrow and

15   see if they can figure it out.  That's the best that I can do.

16         MR. LARKIN:  Yeah, I mean we do the best we can.

17         THE COURT:  You know, some of them it was easier

18   because after a while you could recognize people's handwriting

19   but generally not.  So what's the next one?

20         MR. RUDIN:  A handwritten note that says, "Thursday,

21   review Oliva phone records," and everything else is redacted.

22         THE COURT:  Nothing else was relevant and I just

23   gave it to you because it said Oliva.

24         MR. RUDIN:  I don't know who that is but I'll ask

25   Mr. Larkin.  There's a document -- well, there's an email by

57

1   Marie [indiscernible], then on the other side of it there's a

2   hand -- this is 40935.  There's handwriting not redacted.  It

3   says CPL 440.10 motion, and then there's a big chunk redacted,

4   and then it says Oliva recanted [inaudible].  I don't know

5   whether that's a reference to what's alleged in the motion or

6   to some knowledge that they have.

7          MS. KRASNOW:  Could you just repeat that last, Oliva

8   recanted what?  Something.  I'm sorry, I couldn't hear you.

9          MR. RUDIN:  It looks like "Oliva - recanted.  Is

10  this in the record?"

11         THE COURT:  Yes.  That's the handwritten very black

12  scribbling, right?

13         MR. RUDIN:  Yes.

14         THE COURT:  And what do you want to know about it?

15  Who wrote it?  When?

16         MR. RUDIN:  Well, yeah, but also is there anything

17  that gives any more context to this?

18         THE COURT:  No.

19         MS. KRASNOW:  No.

20         THE COURT:  No, there's nothing.  There's really --

21  believe me, if there were, you'd have it.

22         MR. RUDIN:  Well, again, if I'm going to show this

23  document to someone to see if it refreshes their recollection

24  about what they meant by it, assuming we can identify the

25  author, it's a little hard to do after the document's

1  redacted.  I mean that's just the underlying problem we have.

2          THE COURT:  I'm not sure if you say any more that it

3  would help you any more.  It doesn't tell you what the -- I

4  have no idea what the document was.  Ms. Krasnow, do you know

5  what the document was?

6          MS. KRASNOW:  This is difficult for me because I

7  couldn't print it, but I remember that document and no, I mean

8  I don't think there was anything in the words around it that

9  were going to, you know, give any more information either.

10          THE COURT:  It doesn't say memo from someone to

11  someone.  It's just -- it looks as though it's just someone's

12  notepad and some notes taken off that pad.

13          MR. RUDIN:  Okay.

14          THE COURT:  My guess is, if I were to guess, it's

15  probably someone working on a legal document who's trying to

16  figure out what happened in the case.

17          MS. KRASNOW:  That was my impression also.

18          THE COURT:  You know, maybe somebody working on a

19  brief or looking at a memo and they just wrote notes to

20  themself to try to check things out.

21          MR. RUDIN:  All right.  Then there's an email from

22  Marie [indiscernible] to Joseph Ponzi [Ph.], re: possible

23  additional logs.  Defendant Jabbar Collins and it gives the

24  indictment number.  "We're interested in checking the custody

25  logs for the following people," and then there are names of

1    witnesses.  And then underneath that there's a big chunk

2    that's redacted and I thought maybe that's a responsive email

3    --

4              THE COURT:  No.

5              MR. RUDIN:  -- from Ponzi to [indiscernible] that

6    might be significant.

7              THE COURT:  Not that I recall.  Ms. Krasnow, do you

8    have that in front of you by chance?

9              MS. KRASNOW:  No.  I'm sorry.

10             THE COURT:  You can't print anything.

11             MS. KRASNOW:  [Inaudible] and I can't.  My computer

12   is not working right now.

13             MR. RUDIN:  There's a district attorney memorandum

14   to FOIL file from Jonathan Aker dated April 1, 1997, "Response

15   to [indiscernible] decision of Jabbar Collins, Article 78

16   FOIL."  And then there's a section, "Records previously

17   claimed not to be in the possession of the DA's Office."  And

18   it notes that the DA's previous responses to FOIL has

19   consistently been "that certain documents are not in our

20   possession and that certain documents were then found and made

21   available to defendants."  And then there was the letter to

22   the probation office from Vecchione concerning Diaz is going

23   to Puerto Rico.  And then there's a huge chunk that's

24   redacted.  It just seems to me that that's more discussion

25   about Diaz.

60

1        THE COURT:  No.

2        MR. RUDIN:  No?

3        THE COURT:  No.

4        MR. RUDIN:  All right.

5        THE COURT:  If it had been, you would have had it.

6   Or Ms. Krasnow, if I missed something and it is about Diaz,

7   let me know.

8        MS. KRASNOW:  I will.  I'll write down the document

9   number.

10        THE COURT:  I looked at these several times and no,

11   they're just random thoughts that are interspersed between

12   other things that have nothing to do with what you need or

13   should have.

14        MR. RUDIN:  All right.  Then I guess with the same -

15   - there's a note from Tuesday, 3/7/95, which is the day that

16   Oliva testified, "Malicious fax of planning session.  Expect

17   we will point out Mr. Collins," strike that.  "Witness will

18   point out Mr. Collins."

19        THE COURT:  Right.

20        MR. RUDIN:  Then there's a big chunk that's

21   redacted.  That didn't have to do with Oliva or --

22        THE COURT:  No.  That was the only part about Oliva.

23        MR. RUDIN:  See, this is a potentially very

24   significant document because my understanding is that Mr.

25   Vecchione has taken the position in the past, the defense may

1   take the position now that there was certain information that

2   he disclosed to defense counsel that wasn't on the record

3   anywhere.  And this seems to be a handwritten record of

4   information that was turned over because right underneath that

5   there's Rosario turned over and put on the record, Jilio [Ph.]

6   re Angel Santos, Edwin, which is Oliva, sent a letter to the

7   parole board detailing cooperation in an attempt to relocate

8   him.  And then there's another big chunk that's redacted.  So

9   without the redaction it's hard to question the author of this

10  document about whether or not it was an effort to note what

11  the disclosures were so that we could then argue from the lack

12  of notes here that full disclosures are in fact not made.

13          THE COURT:  What page number is that?

14          MR. RUDIN:  4958.

15          THE COURT:  4958.  I'll look at it again but I don't

16  recall that there was anything else.  You got everything

17  related to what you were just discussing.

18          MR. RUDIN:  I'm going to be questioning -- if the

19  witness appears to be going through -- making an effort to

20  make a contemporaneous record of what's being disclosed, I

21  don't see how we can fully examine that witness about that

22  process if we have to work with a document that's so heavily

23  redacted.  I would ask whether or not there's any interest of

24  the defendants that's so compelling to not disclose this

25  information even though technically it might be considered

1  attorney work product.

2        THE COURT:  And that's the question that I'll be

3  asking to Ms. Krasnow and Mr. Larkin as well.  If you don't

4  see any harm in turning that page over, just turn it over

5  completely un-redacted.

6        MS. KRASNOW:  Your Honor, I think what might be

7  productive is if Mr. Rudin continues to have specific issues

8  with documents like this, if he were to send a letter to

9  Arthur and I so then we can sit down and review the documents.

10  And it may be the fact that, you know, we agree that we're

11  fine removing some of the redactions.

12        THE COURT:  Yes.  That might be the best way to

13  proceed.  Keep going.  I mean so I'm urging, I'll just urge

14  defendants' counsel if there's no need to redact the rest of

15  it, just give it all to you.

16        MS. KRASNOW:  Yes.

17        MR. RUDIN:  If they do that, that's fine.  But if

18  they don't do that, I would ask if Your Honor could take

19  another look at that document.  I don't know what argument I

20  could make that I didn't just make.

21        THE COURT:  Well, I'll take another look at it but

22  let me know first whether you agree on it.

23        MR. RUDIN:  All right.  Then there are what appear

24  to be notes of Vecchione.   It's 40969970 which seems to be

25  explaining events that happened at trial so he's looking

1   backwards in time.  "And then I'm sure that we used Oliva

2   first because he was uncooperative until that night before he

3   testified and we --" I can't read what it says here.

4   Something about -- oh, he was concerned of the risk that he'd

5   go uncooperative again.  That's why they used him first.

6              THE COURT:  Right.

7              MR. RUDIN:  Then there's a big chunk that's

8   redacted.  This appears to be Mr. Vecchione.  It seems to me

9   that that might be highly relevant.

10             THE COURT:  I don't think there was anything else

11  about Oliva there.

12             MR. RUDIN:  Your Honor, may I put this on hold just

13  for a moment to confer with Ms. Rosenblatt?

14             THE COURT:  Sure.

15                      [Pause in proceedings.]

16             MR. RUDIN:  Your Honor?

17             THE COURT:  Yes.

18             MR. RUDIN:  Yeah, in the original handwritten -- I'm

19  sorry, in the original privilege log, item 37, undated

20  handwritten notes by Kings County Assistant DA regarding Oliva

21  as witness and people against Collins.  And then there are

22  three pages noted.  And one of them is 21102.  I have that

23  document.  Your Honor ordered it disclosed.  21329, that's the

24  one that I just referred to that has a chunk that's blacked

25  out.  And 21410, which I don't believe has been disclosed.

64

1          THE COURT:  21410?  I'm not sure I even know where

2  that is because I just don't have the file in front of me, so

3  I'm not sure what it refers to.

4          MR. RUDIN:  That's also referenced in the subsequent

5  privilege log again in Item 14.

6          MR. LARKIN:  Your Honor, this is Arthur Larkin.

7  Maybe I could just make a suggestion.  I think it would make

8  sense for us to try to confer about these things rather than

9  going document by document at this point with the Court.  It's

10  just, you know, it's just -- it would be a better use of

11  everyone's time --

12          THE COURT:  I agree.

13          MR. LARKIN:  -- if counsel would try to do it first

14  and then we can bring anything that's left to the Court's

15  attention.

16          THE COURT:  Yes.  And since two of the three of us

17  don't have the documents in front of us, we can't get much

18  done tonight.

19          MR. RUDIN:  That gives me an advantage.

20          THE COURT:  Well, actually having more information

21  is sometimes not a good thing.  Sometimes too much information

22  is harmful.  All right.  So why don't you do that?  How soon

23  are you going to do that?

24          MR. RUDIN:  We can send a letter to -- well, we can

25  call Mr. Larkin and Ms. Krasnow tomorrow with our concerns and

1   discuss it and then -- or just send them a letter, one of

2   those two, by tomorrow.

3              THE COURT:  Okay.  Again, I think what I was trying

4   to do, and I think defense counsel as well were trying to put

5   ourselves in your shoes to figure out what it was that you had

6   a compelling need for.  And obviously, you know, it looks

7   different from your shoes than it does from mine.  So if there

8   is something there that I overlooked, I'm happy to reconsider.

9              MR. RUDIN:  Thank you, Your Honor.  So Your Honor,

10  just to be clear, are defendants agreeing to the -- as to the

11  documents that they're agreeing to produce, are they agreeing

12  to the deadlines that are in my letter?

13             THE COURT:  Mr. Larkin?

14             MS. KRASNOW:  Your Honor, I think for the majority

15  of the documents, yes.  I can sense there's going to be an

16  issue with the personnel files though given the fact that

17  there's 50 of them.  I can just tell the court and plaintiffs'

18  counsel that some of the ones I've already reviewed were

19  extremely voluminous because of wholly unrelated records,

20  medical records, that are included and some were up to 350

21  pages.  So I don't think that it's going to be possible to get

22  into other documents we've agreed to produce as well for me to

23  turn around 50 personnel files by June 1st.  I think an end of

24  June deadline is much more realistic for those.

25             MR. RUDIN:  But Your Honor, Mr. Hynes' deposition is

1  noticed for June 18th which is five weeks from now and we need

2  these documents before his deposition and we've been trying to

3  get them since February.

4          MS. KRASNOW:  Your Honor, we have been -- I have

5  been doing the best I can to get documents to plaintiffs'

6  counsel on a rolling basis as soon as I get them, but 50

7  personnel files is a very tall order.  And I will do my best,

8  but I cannot turn them around by June 1st especially while

9  continuing to follow up with the multiple other items that

10  plaintiffs did request.

11          MR. LARKIN:  Your Honor, this is Mr. Larkin.  I

12  think we're going to have litigation over Mr. Hynes'

13  deposition anyway and it may have to just get moved until July

14  so we can put the documents -- produce all the documents.  But

15  300 plus pages, 50 files is 15,000 pages of stuff that we need

16  people to review and look through.  So June 1st is really not -

17  - it's just not reasonable, but the end of June is.

18          MR. RUDIN:  That was the date that Mr. Larkin agreed

19  to a week ago.

20          MR. LARKIN:  I don't ever recall agreeing

21  specifically to that date for all those personnel files.

22          MR. RUDIN:  Had that conversation --

23          MR. LARKIN:  You know --

24          MR. RUDIN:  -- memorialized in a letter.

25          THE COURT:  Well, whatever, at this point it sounds

67

1   as though it's going to be difficult to do.  I believe just

2   listening to you and hearing all the things that you've done

3   and reading what you've done, and just doing the small amount

4   of work that I've done in this case in the last couple of

5   weeks, that you've all been working really hard.  So I don't

6   think anyone can fault you for not trying to get things done

7   as quickly as possible.  It just may be that you will have to,

8   and a judge shouldn't be saying this, but that you will have

9   to extend a couple of the deadlines.

10          MR. RUDIN:  Well, you know, Your Honor, the concern

11  that we have is that, you know, we've been trying to press

12  this since February and it seems that only recently that the

13  District Attorney's Office in any event has started the wheels

14  in motion.  So I mean we've been trying to do this for a long

15  time.

16          THE COURT:  I know.

17          MR. RUDIN:  And it's very frustrating.

18          THE COURT:  Right.  But you've got everyone's

19  attention now and as you can see, you wrote a letter this

20  morning and we dealt with everything in that letter today.  So

21  I think I'm convinced that at least everyone on this phone

22  call is doing their best to try to get as much information out

23  as quickly as possible.  And I think we can only do what's

24  humanly possible.  It's a lot of work for -- I understand.  I

25  know it's a lot of work for you and I think it's a lot of work

68

1  for defendants' counsel.  So yes, we'll try to do it.  Mr.

2  Krasnow, you'll do your best but if it can't be done by then,

3  it wouldn't be a bad idea to find an alternative date for Mr.

4  Hynes' deposition particularly because there's going to be

5  some litigation over when it should be taken.

6          MS. KRASNOW:  Your Honor, one more suggestion.  If

7  plaintiff's counsel wants to prioritize the personnel files

8  out of the 50, I'm happy to produce them on a rolling basis

9  and to start reviewing the ones that he finds the most

10 important.  But I just don't see how I can turn around all 50

11 by June 1st.

12         MR. RUDIN:  Well, I --

13         MS. KRASNOW:  With also providing him with the other

14 documents that he wants related to other requests.

15         MR. RUDIN:  I appreciate that suggestion.  That's a

16 good idea and I will do that.

17         THE COURT:  So is the next big issue that's going to

18 come up the Hynes deposition?

19         MR. LARKIN:  I think so, Your Honor.  And what I'd

20 like to do is have a discussion with plaintiff about witnesses

21 who we can produce either in lieu of DA Hynes or prior to DA

22 Hynes' deposition and maybe we'll have some success in

23 resolving the issue, or maybe not.  But I think we ought to at

24 least exhaust those possibilities before we file any motions.

25         THE COURT:  Yes, I'd like you to do that sooner

69

1  rather than later so that I can get an idea of what your

2  positions are and try to work it out before, you know, before

3  the deposition.

4          MR. LARKIN:  No, no, of course.  Why don't -- let's

5  see.  I think certainly by -- well, how about if we intend to

6  move for a protective order if we cannot resolve that issue,

7  could we file that motion by May 31st?  And I realize that Your

8  Honor had strongly suggested that we resolve all discovery

9  disputes by May 31st.

10         THE COURT:  Yes.

11         MR. LARKIN:  With this one, it might be a little bit

12  more difficult because I'd like to really sit down with the

13  folks over there and figure out who we can produce that will

14  have the information that's going to bind the city and bind

15  the city for purposes of the Monell claim and that may

16  actually be sufficient in the circumstances here.  So I would

17  like to do that and it may take a little bit of time.  Maybe,

18  you know, May 15th.  Certainly by May 31st we'll know whether we

19  agree or don't agree and we can make a motion by then if

20  that's acceptable.

21         MR. RUDIN:  Your Honor, we sort of talked of that

22  before.  My Hynes is an essential witness in so many different

23  ways.  We're not just talking about, although it's a very

24  major point, the issue of discipline, of personnel.  But

25  that's, I mean not to start with that.  He's the policy maker.

1   Only he can explain why he had certain policies over a 20 year

2   period.  Not only specific cases but generally why he didn't

3   have certain procedures in place.  And then he was personally

4   involved at various points in the Collins litigation.  He's

5   personally involved with Mr. Vecchione at many points.  There

6   are a number of cases that Mr. Vecchione prosecuted where Mr.

7   Hynes was personally involved and we believe was indifferent

8   to misconduct.  There are a whole series of cases in the early

9   1990's where Mr. Hynes was personally involved including the

10  Leaker [Ph.] case where he personally ratified that everything

11  that was done was fine and Mr. Leaker should serve every day

12  of his prison sentence when he had before him a series of

13  Brady violations that the Second Circuit ultimately found and

14  overturned a conviction.  There's just so many ways in which

15  his personal testimony is necessary.

16          And I understand that a number of points Mr. Larkin

17  has indicated that the city may not dispute that various ADAs

18  who may have committed misconduct were not disciplined, but

19  the key issue is going to be why?  And the decision has to be

20  -- ultimately it's the policy maker who makes that decision.

21  I mean Dino Amoroso as counsel testified that the informal

22  practice was to go to Mr. Hynes anytime anyone at a high level

23  thought that there might be a need for an investigation about

24  misconduct by an ADA.  Mr. Hynes would personally decide

25  whether or not there should be an investigation and then he

1   would personally decide on whether or not there should be any

2   discipline so that Hynes is directly involved.  And there's

3   just no way that we're going to agree to voluntarily to accept

4   the testimony of some lower level person instead of that of

5   Mr. Hynes.  It goes far beyond a discipline issue, although

6   even as a discipline issue, we would want Mr. Hynes.  So

7   there's no -- we've discussed this at length.  Mr. Larkin and

8   I have discussed it.  We've discussed it in a previous

9   conference with the Court.  And I just think that if they're

10  going to move to preclude his deposition, then they should

11  just move.  There's no way that we're going to agree on that.

12  It's too fundamental.

13          THE COURT:  What about, I'm sorry, what about the

14  scope?  Is there any possibility of negotiating the scope of

15  his deposition?

16          MR. LARKIN:  The answer to that clearly, Your Honor,

17  is if we produce a series of witnesses before Mr. Hynes is

18  deposed and, for example, the chief assistant or the counsel

19  for the DA and [indiscernible] who's name has been suggested

20  by my client at least to me, you know, these people can answer

21  a lot of questions that could substantially shorten the

22  deposition.  And we suggested that plaintiff ought to take

23  those depositions first, and then to the extent there are

24  areas left over where only the district attorney can answer

25  the question, maybe we have to produce him at that point, but

1  it doesn't make -- what plaintiff has done is he served

2  notices for a couple of individual fact witnesses and then ADA

3  Vecchione and DA Hynes before requesting any other policy

4  maker.  So the record as it stands now is plaintiff wants DA

5  Hynes before he takes anybody else about any policies or

6  practices at the DA's Office.  And I think that that's the

7  case as counsel -- directly the opposite approach where

8  whenever a policy maker is sought to be deposed, you get his

9  staff first.  Then to the extent there are matters left over,

10  you get the policy maker.  And there's plenty of case law on

11  that.

12        MR. RUDIN:  But I just explained that I already took

13  Gino Amoroso's deposition in another case.  He said that he

14  knew of every instance in which there was any discipline or

15  investigation of discipline between 1990 and 2005 and that the

16  informal practice was for Mr. Hynes to decide in every case

17  whether or not to look into or to impose discipline.

18        MR. LARKIN:  So you have the answer.

19        MR. RUDIN:  No, I don't have the answers on why Mr.

20  Hynes didn't look into certain cases where he was personally

21  familiar and aware from questions in the office or appellate

22  decisions.  I don't have an answer.  Only --

23        MR. LARKIN:  If Mr. Amoroso -- first of all, I don't

24  have Mr. Amoroso's deposition in front of me, but presumably

25  he would know the reasons why because they were communicated

1  to him.  If they were, then perhaps that witness or another

2  witness can explain what the reasons were, and that's the end

3  of it to have the information you need.  You don't need to

4  embarrass the district attorney, or try to embarrass him.

5  That's what's really going on here.

6          MR. RUDIN:  Oh, please.

7          MR. LARKIN:  No, please Joel, please.  You know,

8  that's the reason why plaintiff has noticed the district

9  attorney first without even asking for any other witness.

10          MR. RUDIN:  He'll be about the tenth or eleventh

11  witness.

12          THE COURT:  All right.  Let me just jump in here

13  because it is getting late.  It sounds to me -- now, I'm not

14  making any rulings at this point, but having dealt with other

15  -- going back to Giuliani and up through Spitzer, I've dealt

16  with issues like this before and I'm sure you all have.  The

17  way it usually shakes out is what you both are saying.

18  Usually you try to see what's necessary to be proven through

19  this particular witness and then whether or not there are any

20  alternative witnesses who can limit the scope beforehand, or

21  at least provide some kind of context before taking that

22  decision maker's deposition.  If that's going to be the way

23  this is going to shake out, and Mr. Hynes is going to have to

24  be deposed at some point, it seems to me the issue will likely

25  be what the scope of his deposition should be and whether or

74

1   not there are other witnesses who ought to be deposed

2   beforehand.  Is that something that is worth your spending,

3   you know, 20 minutes talking about tomorrow before you brief

4   the issues?

5          MR. RUDIN:  Well, I'm happy to talk to Mr. Larkin

6   and go through that process and maybe after speaking to his

7   clients his present a perspective that hasn't been presented

8   before that will open my eyes to it.  But based on the

9   extensive discovery that I conducted in the [indiscernible]

10  litigation, I also took the deposition of the chief of

11  investigation, Dennis Hawkins.  I took Amoroso.  I got

12  document discovery.  With respect to discipline, that the

13  entire process centered around the district attorney

14  personally.  And I don't see how we could be required to

15  accept hearsay from Dino Amoroso or any other witness about

16  what he was told by Mr. Hynes about why Mr. Hynes was not

17  going to look into a particular case.

18         THE COURT:  But that's not what I'm saying actually

19  though.  It's saying that is it possible that assuming that

20  the ruling will likely be, or may well be, that you're

21  entitled to depose the district attorney, that you could

22  depose others first before you depose him and then that would

23  help determine the scope of his deposition, not that it

24  necessarily would obviate the need to ask him questions about

25  hearsay statements, but that it would at least provide a

1    context and help focus the questions and minimize the time he

2    would have to devote.

3           MR. RUDIN:  I could respond to that in two ways,

4    Your Honor.  First of all, we've been trying to get in

5    discovery the identity of any individuals who were responsible

6    for the disciplinary process, if one existed, at the DA's

7    Office between 1990 and 2010 concerning ADAs suspected of

8    having been involved in misconduct in prosecuting criminal

9    cases, and we don't have a response to that yet.  I can't

10   recall now whether defense counsel's agreed to provide it.  I

11   want to believe so.

12          And the second thing is that I had a discussion the

13   other day with Mr. Larkin where he explained that there's now

14   a process where there are a group of people, eight or nine

15   people on a committee, that reviews potential disciplinary

16   issues regarding ADAs.  And my recollection is that that

17   committee was not publicly announced in that forum until 2011

18   after we filed this lawsuit.  And Mr. Larkin suggested that we

19   might depose individuals on that committee.  And maybe he

20   wasn't aware at the time when this committee was formed, but

21   obviously our deposing individuals on some committee that was

22   formed after the fact is not a substitute to taking the

23   district attorney's deposition.

24          MR. LARKIN:  Your Honor?

25          THE COURT:  Yes.

1          MR. LARKIN:  I think the Court is right.  I think at

2    this point it's already ten to 7.  We've been on the phone for

3    two hours.  I think that plaintiff ought to spell out very

4    clearly and specifically what areas he intends to cover with

5    the district attorney or with our office and what areas

6    witnesses are needed for, and we will find the appropriate

7    people to testify about the information so the plaintiff has

8    what he needs to prove a case or not prove a case.  And to the

9    extent there are areas left over, we'll either agree to

10   produce the DA or we'll make a motion.  But I think if all the

11   cases say the same thing that the Court is saying, you usually

12   exhaust the alternatives before you get the policy maker in a

13   case like this.  And we're willing to have that discussion but

14   I just need to know what areas counsel wants to cover, and I

15   can speak to my client about it.

16          So what I'm saying, I guess, Your Honor, look, I

17   mean I don't think it would be unreasonable for us to make a

18   motion on or before the 31st.  I think that's -- it would give

19   us time to explore this.  And I think that's what the Court is

20   suggesting that we do.

21          THE COURT:  Mr. Rudin, would that be helpful?

22          MR. RUDIN:  I don't think it's going to be -- I

23   don't think it'll be a helpful process because they want us to

24   take depositions from people that we don't want to depose.

25   You know, I don't have any interest in deposing someone who

1   doesn't have knowledge about why Mr. -- I mean doesn't have

2   Mr. Hynes' own knowledge about why he did or did not do

3   certain things.  It's hearsay.  And after that we're going to

4   need Mr. Hynes anyway.

5        THE COURT:  All right.  So you're saying that only

6   Mr. Hynes can discuss these decisions because he's the final

7   decision maker, everybody went to him?

8        MR. RUDIN:  That's right.  That was their informal

9   procedure.  But on top of that, he was personally involved in

10  so many of these cases involving Vecchione and involving other

11  findings of misconduct by courts.  There were all sorts of

12  practices and procedures that we've been questioning witnesses

13  about concerning misuse of material witness orders, misuse of

14  the subpoena process, coercion of witnesses that we need to

15  question Mr. Hynes about.

16       MR. LARKIN:  Your Honor, I'll give the Court an

17  example.  With respect to the Leaker case, obviously DA Hynes

18  did not personally interview witnesses, personally review the

19  file, and personally sit down with all the individuals who

20  gave information to the DA's Office.  He had a staff to do

21  that for him, and the staff did it, prepared the letter, and

22  the district attorney, after meeting with his staff, his

23  senior staff, which signed the letter, okay, based on

24  information provided to him.  He's an elected official.  He

25  doesn't personally review cases in the way that Mr. Rudin is

78

1   suggesting that he does.  And so this is why I'm asking for a

2   little more information about what area, specific area now,

3   specific areas, specific cases that he wants to cover and we

4   can get the witnesses who have the information.  The fact that

5   Mr. Rudin is so, you know, anxious to depose the DA, it should

6   be obvious the reasons why.  Okay?  It has nothing to do with

7   the legitimate needs of the case.  The legitimate needs of the

8   case can be satisfied with other witnesses.  And I think we

9   ought to explore those alternatives in good faith before we

10  litigate this issue.

11          THE COURT:  Mr. Rudin, why don't you -- it's going

12  to be necessary for the briefing anyway, so why don't you --

13  can you provide a list of the areas that you want to go into

14  with the district attorney?  And then Mr. Larkin will have the

15  opportunity to present to you before he presents it in a

16  brief, and you'll know what his arguments are, the other

17  individuals he believes would be worthwhile to depose before

18  or in lieu of Mr. Hynes, and then you all can brief the issue.

19          MR. RUDIN:  That's fine, Your Honor.

20          THE COURT:  Okay.  At least that way it'll refine

21  the issue before you get to me.

22          Is there any way to get a brief on this say by the

23  end of next week or the beginning of the following week?

24          MR. LARKIN:  Your Honor, the only concern -- I've

25  got reply papers on another motion --

79

1          THE COURT:  Okay.

2          MR. LARKIN:  -- due on the 28th.  It's a summary

3  judgment motion.  That's one of the reasons I suggested the

4  end of the week, the 31st.

5          THE COURT:  The 31st.  Okay.  All right.  I don't

6  think it's going to be a complicated motion ultimately but you

7  never know.

8          MR. LARKIN:  Let me see if I can get a little more

9  time on the reply papers.

10          THE COURT:  Okay.

11          MR. LARKIN:  Maybe I could file -- we could file our

12  motion on the 24th.

13          THE COURT:  Okay.  That would be great.  I just

14  would love to keep to that May 31st deadline.  I think it would

15  really be helpful.

16          MR. LARKIN:  All right, Your Honor.  So then permit

17  me to contact my opposing counsel in the other case.  It's

18  actually Ted Thompson's office who is --

19          THE COURT:  Okay.

20          MR. LARKIN:  -- running against DA Hynes in the

21  primary, so --

22          THE COURT:  Don't tell him why you're doing it.

23          MR. LARKIN:  I better not tell him the reason.

24          THE COURT:  Okay.

25          MR. LARKIN:  I'll get a no.

80

1          THE COURT:  Okay.  Remember, you're on the record

2   here.

3          MR. LARKIN:  Yes, exactly.

4          THE COURT:  Okay.

5          MR. LARKIN:  We'll seal that part of the transcript

6   anyway.  No.  Let me see if I can do that.

7          THE COURT:  Okay.  So we're going to aim for the 24th

8   for that brief if possible.

9          MR. LARKIN:  Yes, Your Honor, but we need that list

10  from Mr. Rudin as soon as possible, so maybe we can get that

11  by Monday morning?

12         THE COURT:  Monday.  Yes, Monday.

13         MR. LARKIN:  Thank you.

14         THE COURT:  And earlier if you can do it, but I

15  think Monday is about all we can ask reasonably.  All right.

16  So Mr. Rudin, have we dealt with all your issues today except

17  -- well everything, we haven't resolved everything but we've

18  at least addressed them?

19         MR. RUDIN:  We haven't talked about the Knicks.

20         THE COURT:  That is a subject that I'd rather not

21  discuss.

22         MR. RUDIN:  Okay.  Yes, Your Honor.

23         THE COURT:  Okay.

24         MR. LARKIN:  Okay.  I'm sorry, Your Honor, I think

25  my co-counsel has one more --

1          MS. KRASNOW:  I just have one more thing that's very

2    brief, Your Honor.

3          THE COURT:  Okay.

4          MS. KRASNOW:  I had agreed previously to produce the

5    emails by tomorrow for the other individuals for whom the DA's

6    Office has collected email I understand including DA Hynes.

7    But now I understand from plaintiff's counsel that he's

8    providing us with emails he received in response to his FOIL

9    request and that they've been placed in the mail.  So I would

10   just ask until Monday to do that so that I can --

11         THE COURT:  Yes.

12         MS. KRASNOW:  -- see what he already has --

13         THE COURT:  Right.

14         MS. KRASNOW:  -- so I'm not doubling my efforts

15   here.

16         THE COURT:  That sounds reasonable.  Any objection,

17   Mr. Rudin?

18         MR. RUDIN:  Well, it's about six or seven emails

19   where the deputy chief of public information is sending around

20   statements on behalf of Mr. Hynes.  I don't understand what

21   the downside is.  If they were already prepared to produce it,

22   why they can't just produce it?

23         MR. LARKIN:  I thought I understood plaintiff to say

24   he had emails from DA Hynes earlier in the call.  That was the

25   representation that was made.

1        MR. RUDIN:  I could be wrong, but I think they're

2   emails from the public information office setting forth Mr.

3   Hynes' position about matters relating to --

4        MS. KRASNOW:  I'm just asking to see what you

5   already have before I go through the extra effort of briefing

6   it.  That's all I'm asking.  And so if it's already been

7   placed in the mail, then I'll get it on Saturday and then I

8   can compare on Monday just to make sure.

9        THE COURT:  Okay.  And what you're also saying is

10  that will help you get those personnel files faster.

11       MR. LARKIN:  Exactly.

12       THE COURT:  Okay.  So what do we need to do next as

13  far as the court conferences?  I'll hear from you on the

14  privilege logs if there's still a problem.

15       MR. LARKIN:  Right.  And I think, Your Honor, maybe

16  -- I don't know if the Court wants to set a date for any

17  argument on a protective order concerning the district

18  attorney.

19       THE COURT:  Sure.  Mr. Rudin, if you get the brief

20  on the 24th, letter brief, when can you turn it around by?

21       MR. RUDIN:  Probably a week.

22       THE COURT:  I think you know what it's going to say.

23       MR. RUDIN:  I guess by the 29th?

24       THE COURT:  Okay.  All right.

25       MR. RUDIN:  The close of, you know, the end of the

83

1   29th.

2            THE COURT:  Sure.  Do you need a reply, Mr. Larkin?

3            MR. LARKIN:  I'd like an opportunity, Your Honor,

4   yes.  Right.  We have two depositions on the 30th and 31st so

5   how about June 3rd?  Excuse me, June 5th.  That's a Wednesday.

6            THE COURT:  That seems to take it way too far.

7            MR. LARKIN:  Maybe Monday, June 3rd?

8            THE COURT:  If you can do that, that would be great.

9            MR. LARKIN:  How about -- that's right, Elizabeth is

10  on vacation that whole week, my co-counsel is.  So I'm going

11  to be wandering around.

12           THE COURT:  The week of the 3rd or the week before?

13           MS. KRASNOW:  The week of the 3rd, Your Honor, I'm

14  out of the office and we also now I believe have another

15  deposition scheduled that week.

16           MR. LARKIN:  Yeah, maybe Tuesday the 4th, Your Honor?

17           THE COURT:  Okay.

18           MR. LARKIN:  Okay.

19           THE COURT:  So then the argument, I wonder can we do

20  -- I don't know how fast that can turn it around, but we can

21  shoot for the 7th and we're only a week behind schedule.

22           MR. LARKIN:  Yeah, Elizabeth won't be there but

23  that's okay.

24           THE COURT:  Do you need to be there?  Do you want to

25  be there?

84

1          MR. LARKIN:  Yes, Your Honor, I can be there.

2          THE COURT:  Well --

3          MR. LARKIN:  Elizabeth wants to be there.  She's

4  heavily invested in this case, believe me.  I mean maybe the

5  10th.  Does Monday the 10th work?

6          MS. KRASNOW:  Yes.

7          MR. LARKIN:  Monday the 10th works, Your Honor.

8          MR. RUDIN:  I won't be here on Monday the 10th.

9          MS. KRASNOW:  Your Honor --

10          MR. RUDIN:  A hearing in court on the 11th.

11          THE COURT:  I have arraignments after that.  June is

12  impossible for me.  You're not going to see much of me in

13  June, so --

14          MR. RUDIN:  With all due respect, I don't understand

15  why Mr. Larkin can't argue this himself.  I know Ms. Krasnow

16  adds to the team but if Ms. Rosenblatt wasn't here, I wouldn't

17  not argue the case because --

18          THE COURT:  Yes, I understand what you're saying.

19          MR. LARKIN:  If June 7th is the only date that works,

20  Your Honor, then we'll make it work.

21          THE COURT:  Yes.  And Mr. Rudin, you're definitely

22  out on the 10th?

23          MR. RUDIN:  Yes, I have to be out of town with my

24  son.

25          THE COURT:  Okay.  All right.  So we'll do it for

85

1  the 7th.

2         MR. LARKIN:  I mean --

3         MR. RUDIN:  Are we doing that in court?

4         THE COURT:  Would you rather do it by phone?

5         MR. RUDIN:  Sort of rather do it in court.  I think

6  it's going to be --

7         THE COURT:  I think so too.

8         MR. LARKIN:  Your Honor, how about the following

9  week?  I mean I don't want to belabor this.  You know, I

10  understand Mr. Rudin has got personal obligations.  We all do.

11  But my co-counsel is going to be out that whole week.  She's

12  got longstanding vacation plans.  You know, I mean is there

13  any day, the 12th, 13th -- well, the 13th is no good for me, but

14  the 14th --

15         THE COURT:  The 14th is no good.

16         MR. LARKIN:  -- 12th?

17         THE COURT:  I could possibly do the 12th.

18         MR. LARKIN:  The 12th, the whole day is open for us.

19         MS. KRASNOW:  Yes.

20         MR. RUDIN:  Judge, it's up to you.  I mean it seems

21  to me that there's no good reason not to do this on the 7th and

22  it's just more delay, but --

23         MR. LARKIN:  There is a good reason.  My co-counsel

24  can't be there.  With respect, Your Honor, I just suggest that

25  that is a good reason.  You know, the whole day the 12th is

1   good for us, whole day.

2            THE COURT:  Right.  I'm just trying to find a time

3   when I can actually do it.  I've already got lunch filled.

4   Let's see, possibly -- all right, I'll squeeze you in at 2:15.

5            MS. KRASNOW:  Thank you very much, Your Honor.

6            THE COURT:  You're welcome.

7            MR. LARKIN:  Your Honor, thank you very much.

8            THE COURT:  It may be that there's not much --

9            MR. LARKIN:  I do appreciate it.

10           THE COURT:  Sure.

11           MR. LARKIN:  Thank you very much.

12           THE COURT:  I'm happy to do it.  All right.  So it

13  may be that your papers will say everything and you won't

14  really need to say much more on the argument.  Have confidence

15  of what you write.

16           MR. LARKIN:  It may be.

17           THE COURT:  Okay.  Mr. Rudin, anything else we

18  haven't discussed?

19           MR. RUDIN:  Your Honor, I appreciate you staying so

20  late.

21           THE COURT:  And Mr. Larkin, anything else?

22           MR. LARKIN:  No, Your Honor.  Thank you very much

23  for your time and thank you --

24           MS. KRASNOW:  Thank you, Your Honor.

25           THE COURT:  All right.  So just to be clear on this,

87

1  other than this one issue and what we've talked about here

2  today, there are no other outstanding disputes now that you

3  could think of or that you're expecting on the horizon?

4       MR. RUDIN:  Well, the only thing that seems to me is

5  on the horizon is privilege objections on the other side.  As

6  we get into production of additional emails or --

7       THE COURT:  Okay.

8       MR. RUDIN:  -- production of materials and other

9  case files, they may have privilege objections.

10       THE COURT:  But again, we don't know yet.  All

11  right.  So that's it then.  All right.  Thank you very much.

12  Have a nice evening.

13       MR. RUDIN:  Thank you, Your Honor.  Thank you.

14  [Proceedings ended at 7:02 p.m.]

15                    *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

88

1          I certify that the foregoing is a court transcript from

2      an electronic sound recording of the proceedings in the above-

3      entitled matter.

4

5                              _____

6                                       Shari Riemer

7      Dated:  June 5, 2013