1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
2

3 ------------------------------------X
             :
4 COLLINS,        :
            : 11-CV-00766 (FB)
5      Plaintiff, :
            :
6     v.     :
            : 225 Cadman Plaza East
7 THE CITY OF NEW YORK, et al., : Brooklyn, New York
            :
8      Defendants. : June 12, 2013
 ------------------------------------X

9

10     TRANSCRIPT OF CIVIL CAUSE FOR HEARING
     BEFORE THE HONORABLE ROBERT M. LEVY
11     UNITED STATES MAGISTRATE JUDGE

12 APPEARANCES:

13 For the Plaintiff:   JOEL B. RUDIN, ESQ.
          TERRI ROSENBLATT, ESQ.
14         STEVEN AQUINO, ESQ.
          Law offices of Joel B. Rudin
15         200 West 57th Street, Suite 900
          New York, NY 10019
16

17 For the Defendants:  ARTHUR LARKIN, ESQ.
          ELIZABETH N. KRASNOW, ESQ.
18         The City of Yew York Law Department
          100 Church Street, Rm. 3-177
19         New York, NY 10007

20

21

22 Court Transcriber:   MARY GRECO
          TypeWrite Word Processing Service
23         211 N. Milton Road
          Saratoga Springs, New York  12866

24

25

 Proceedings recorded by electronic sound recording, transcript
 produced by transcription service

2

1   [Proceedings began at 2:20 p.m.]

2          THE COURT:  Sorry, the day's gotten away.  I've been

3   on the bench I think since 10.  Okay.  So we have a lot of

4   issues here today and it's possible that I may have to weave

5   you in between other conferences if it takes longer than

6   thought.  But why don't we start with the issue about the

7   deposition of the Kings County District Attorney.

8          MR. LARKIN:  Your Honor --

9          THE COURT:  Assume I've read all your papers.

10          MR. LARKIN:  Yes, Your Honor.

11          MR. RUDIN:  Your Honor, it's our motion.

12          MR. LARKIN:  I know, before we do that, Your Honor,

13   might I just explain?  It seems to me that --

14          THE COURT:  Oh, I'm sorry.  Are all your appearances

15   -- have we taken your appearances yet?

16          MR. RUDIN:  We haven't done them.

17          THE COURT:  Okay.  So let's start.  This is docket

18   number 11-CV-766, Collins v. The City of New York.  Will

19   counsel please state their appearances for the record?

20          MR. RUDIN:  For plaintiff, Joel Rudin, and with me

21   is Terri Rosenblatt, Steven Aquino, and Jabbar Collins.

22          MR. LARKIN:  And good afternoon, Your Honor.  For

23   the City and the individual defendants Gerecitano and

24   Hernandez, it's Arthur Larkin, L-A-R-K-I-N, New York City Law

25   Department.

3

1          MS. KRASNOW:  [Inaudible] N-O-W, New York City Law

2   Department.

3          MR. RUDIN:  Good afternoon, Your Honor.  Your Honor,

4   I was just going to make a suggestion and you're obviously the

5   boss here, so if you don't think it makes sense you'll say no.

6   But it seems to me that it might make sense to deal with some

7   of the other issues, including document discovery, first

8   because when Mr. Hynes should be deposed in part relates to

9   when we have some of the document discovery that we had

10  anticipated we'd have by now and which we don't.  And some of

11  the deposition issues in terms of scheduling I think are much

12  more simple issues and will take much less time.

13         THE COURT:  Okay.

14         MR. RUDIN:  So that was just a proposal but if you -

15  -

16         THE COURT:  All right.  Let's start with the

17  Vecchione deposition then.

18         MR. RUDIN:  Okay.  Your Honor, Mr. Larkin indicated

19  in an email that he attached to his papers last night, this is

20  his original email to me, that Mr. Vecchione would be on trial

21  the week of June 10th and then we exchanged subsequent emails

22  and I indicated a willingness to consent to a short

23  adjournment, but not to July 31st which is Mr. Larkin

24  requested.  Mr. Larkin then indicated in his letter of

25  yesterday that Mr. Vecchione was going to be trying a case,

4

1    People v. Forester and Boyd, which was the first time we were

2    provided with any case information about the trial that

3    supposedly presents a competing consideration.

4           Mr. Aquino from my office went to court this

5    morning, attended the calendar call on People v. Forester and

6    Boyd, and the case was adjourned until June 25th.  Mr.

7    Vecchione's name was not mentioned.  We actually asked defense

8    counsel if Mr. Vecchione is involved in the case and who was

9    involved in the case and he was not aware of anyone being

10   involved in the case besides the ADA, other ADAs.  Now, maybe

11   Mr. Vecchione is going to make a surprise appearance, and

12   that's his right, but the fact is that the trial's not

13   starting until at the earliest June 25th.  So we subpoenaed him

14   on May 10th for June 14th.  I've indicated to Mr. Larkin as a

15   courtesy to Mr. Larkin and to Mr. Vecchione that if they need

16   a short adjournment to prepare, or for whatever reason, I'll

17   consent to it but I don't see why we cannot finish Mr.

18   Vecchione's deposition by next week.  And it's important in

19   terms of case development that we have his deposition because

20   depending upon what his testimony is or whether or not he

21   acknowledges certain behavior and knowledge or disputes it,

22   whether he acknowledges the existence of certain customs or

23   practices or disputes it, that'll determine how many more

24   depositions we have to take.

25           MR. LARKIN:  Your Honor, may I respond briefly?

1           THE COURT:  Yes, of course.

2           MR. LARKIN:  First of all, Mr. Vecchione is a

3    supervising prosecutor in the office and I've been advised

4    that he is intimately involved in that trial.  I don't know

5    whether he's made any court appearances and so I can't state

6    one way or the other specifically what his role in the case

7    is.  But I have to expect and assume that if I'm advised by my

8    client, the DA's Office, that Mr. Vecchione needs to be

9    present and needs to be available to deal with the case, then

10   I have to assume that that's accurate regardless of whether we

11   happen to be in court today and regardless of whether Mr.

12   Rudin says that somebody told him that somebody else told him

13   that Mr. Vecchione isn't involved in the case.

14          THE COURT:  So we'll assume he's unavailable from

15   the 25th on.

16          MR. LARKIN:  Yes.  I think that's a fair assumption.

17   And Your Honor, what I wanted to address at the outset, and

18   forgive me for backtracking just a bit, is the schedule in the

19   case is somewhat up in the air because we don't have a firm

20   trial date other than an order from Judge Block indicating

21   that we could expect a trial date sometime in the fall.  We

22   don't have a firm date and we have, it seems to me, a

23   substantial amount of discovery to do.  And I just think that

24   to be fair to everyone here, we ought to come up, or try to

25   come up -- I think the parties in the first instance ought to

6

1    try to confer and come up with some reasonable schedule to

2    finish discovery and a reasonable expectation as to when we

3    can file a motion and expect a trial.

4              You know, we've had some -- in addition to all the

5    work that needs to be done in discovery, we're getting a

6    multitude of letters, a barrage of letters.  It seems our

7    office is getting press inquiries every day that something

8    gets filed by the plaintiff, and that, given the importance of

9    this case, you know, that's to be expected.  But one concern,

10   official concern we have is the letters that have been filed

11   are making statements about the case that are simply not true

12   and there are a substantial number of letters like that with

13   representations that are getting printed in the papers.  And

14   the concern we have is that the jury pool is going to be

15   biased and swayed.  And this is not an insignificant concern

16   in this case.  And I bring it up because of the amount of time

17   that we have to invest, that our office has to invest

18   addressing inquiries from the various news outlets about this

19   case.  You know, it takes up more time.  I don't know whether

20   Your Honor shares that view that there should be some sort of

21   extension here and perhaps a revised schedule presented to the

22   district judge, but I put it out there as a significant

23   potential issue because I think if we could get sort of enough

24   time to sit down and go through step by step in a systematic

25   way what's outstanding, what needs to be done, what can we

1  reasonably accomplish in the next say six months, I think we

2  could make a lot more progress than we are making by filing

3  letter after letter with the Court raising these issues

4  piecemeal and taking up more of Your Honor's time than is

5  necessary.  So I'm putting that out there at the outset.  I'm

6  suggesting even perhaps that counsel ought to sit down in the

7  jury room, I'm willing to do it today, to go through what's

8  outstanding and what we can reasonably accomplish in say the

9  next six months.

10       MR. RUDIN:  Your Honor, may I respond to that very

11  briefly?

12       THE COURT:  Briefly, yes.

13       MR. RUDIN:  First of all, it's hilarious for Mr.

14  Larkin to --

15       THE COURT:  Wait, I'm sorry.  I'm going to just see

16  if we can set some ground rules here.  I think we should not

17  use adjectives in discussing.  Let's just stick to the facts

18  on both sides.

19       MR. RUDIN:  Yes, Your Honor.  With the CBS show

20  "Brooklyn DA" underway where Mr. Vecchione is the star in

21  every show and where justice comes out of his mouth every

22  other word, for Mr. Larkin to suggest that he's concerned

23  about influencing the jury pool is just a little bit strange.

24       But the reason that we have put in exhibits in

25  support of our various motion papers, which we've had to file

8

1  in this case because we have not been getting discovery, is to

2  show the Court the support for the illegal policies that we

3  want to question Mr. Hynes about because we anticipated that

4  Mr. Larkin would do as he's doing which is to deny them.  He

5  has his role on behalf of his client.  The documents we filed

6  show this Court for the position we've taken and the reason

7  why we need to depose Mr. Hynes as well as certain other

8  individuals.

9          In terms of scheduling, when Judge Block issued his

10  decision in the middle of February, we immediately filed a

11  document demand on the Monell.  We began a series of

12  conferences with Your Honor.  It was agreed that the

13  depositions of Detective Investigators Maher, Bondor will be

14  completed by the end of April and ADAs Dennehy and Mandel, the

15  FOIL ADAs, who are in the Appeals Bureau, and Mr. Larkin

16  indicated they'd be available so he could just propose dates,

17  it wouldn't be a problem.  We didn't get dates from Mr. Larkin

18  for any of those depositions.  I didn't get a date for Dennehy

19  and Mandel until last week after we filed our motion.  Maher

20  and Bondor, I ended up having to serve subpoenas for May 22nd

21  and May 23rd.  Mr. Larkin indicated they were not available on

22  those dates.  We agreed to put one of them over to the week of

23  June 3rd, which was the only week he was going to be available.

24  I proposed June 5th.  Mr. Larkin then indicated he was in some

25  sort of training session or some work related program and

9

1   wasn't available that week at all.  We never got another date.

2         So then we filed our motion on May 28th, and then Mr.

3   Larkin about a week later sent me an email which he attached

4   to his papers indicating that that ADA would be -- I think it

5   was that detective investigator, would be available no earlier

6   than July 30th, and we still haven't gotten a date for the

7   other one.

8         So as I said before, it's important for the progress

9   of this case that we get the depositions done of the fact

10  witnesses who have knowledge about the Jabbar Collins case,

11  and Maher and Bondor would certainly have knowledge about the

12  programs that Mr. Larkin and District Attorney Hynes have been

13  denying existed like the hotel custody program, the jail, the

14  private jail program, the illegal practice of bringing

15  material witnesses all the time to the DA's Office rather than

16  to court, the practice which Mr. Vecchione's paralegal

17  acknowledged --

18         THE COURT:  I'm familiar with everything that's been

19  in your papers.

20         MR. RUDIN:  All right.  So we need to get these

21  depositions done.  Until we get these depositions done, we

22  don't know fully the scope of the Monell discovery that has to

23  be done because as I said before, if we can establish -- if we

24  can get acknowledgments of the existence of certain customs or

25  practices, then we don't need to put on evidence from other

 1  ADAs and other knowledgeable sources about the customs or

 2  practices.  For example, there's an ADA --

 3          THE COURT:  Yes, I think I know where you're going.

 4  But it seems to me that the principal then is that if we stage

 5  the depositions properly and we make them court ordered dates

 6  that both sides can agree to then the discovery will actually,

 7  may move more smoothly.

 8          MR. RUDIN:  Yes, Your Honor.

 9          THE COURT:  And I think both sides could agree with

10  that, right?

11          MR. RUDIN:  Yes, Your Honor.

12          THE COURT:  Okay.  So why don't we make that our

13  first priority then?

14          MR. RUDIN:  Exactly.

15          THE COURT:  Okay.  So let's figure out how we can do

16  that now.

17          MR. RUDIN:  Your Honor, I would propose that we do

18  Detective Investigators Maher, Bondor, the two FOIL ADAs

19  Dennehy and Mandel --

20          THE COURT:  Okay.  Slow down.  Maher, Bondor,

21  Dennehy and Mandel.

22          MR. RUDIN:  Mr. Vecchione and Ms. Wrenn, ADA Wrenn,

23  the one that --

24          THE COURT:  Right.

25          MR. RUDIN:  -- was supposed to go the other week, by

1 the end of June.  And Mr. Larkin indicates that Mr. Vecchione

2 will be involved in the trial of that case that begins June

3 25th, we have two weeks to take his deposition before June 25th.

4          THE COURT:  Is that the order of the depositions?

5          MR. RUDIN:  No, as to those --

6          THE COURT:  Doesn't matter.

7          MR. RUDIN:  -- six depositions, the order is not

8 that important, Judge.  It's at Mr. Larkin and his clients'

9 convenience as long as they get done.  And considering that

10 we've been trying to schedule these depositions since March, I

11 think that's ample time.

12          MR. LARKIN:  Your Honor, I just -- forgive me, Your

13 Honor, I'm sorry.  There's one thing I do want to respond to

14 that Mr. Rudin said and I'll move right into this deposition

15 scheduling question.  Mr. Rudin again mentioned the private

16 prison system.  It's fascinating he's the only person who

17 seems to know about it.  For 23 years apparently, according to

18 Mr. Rudin --

19          THE COURT:  Okay, really I --

20          MR. LARKIN:  -- the District Attorney of Kings

21 County has been running a private jail system.

22          THE COURT:  Okay.

23          MR. LARKIN:  He's the only one who knows about it.

24          THE COURT:  Mr. Larkin --

25          MR. LARKIN:  Blew the lid right off the story.

1          THE COURT:  -- Mr. Larkin --

2          MR. LARKIN:  I'm sorry, Judge.  I just -- it's

3    comical.

4          THE COURT:  I understand everybody feels strongly

5    about this and you can discuss all these issues, you know,

6    outside but at this point I'm just interested in scheduling

7    and the disputes that you have.

8          MR. LARKIN:  I understand.  I'm sorry, Your Honor.

9    With regards to the two detective investigators, these are

10   retired employees and we have offered dates.  In fact, I

11   offered dates I believe -- I know we've offered dates in the

12   past and for one reason or another the depositions didn't

13   happen on the dates that we had originally offered up.  I

14   believe we have currently a date for Mr. Maher and we're

15   awaiting confirmation for which date plaintiff wants to take

16   the deposition.  Mr. Bondor --

17         THE COURT:  I'm sorry, so give me the date for Maher

18   that you have right now.

19         MR. LARKIN:  Bear with me one moment, Your Honor.

20         MR. RUDIN:  Your Honor, they are under subpoena.

21   They were subpoenaed for May 22nd and 23rd and --

22         THE COURT:  I know.  We're just looking for a date

23   right now.

24         MR. RUDIN:  I understand.

25         MR. LARKIN:  Your Honor, the dates that we have, I

 1  have, are July 30th and 31st or August 5th, 6th, 7th, or 8th.

 2          THE COURT:  All right.  Can we do them sooner?

 3  We're looking to do them in June and July.

 4          MR. LARKIN:  This is the availability that I have

 5  fore them.  If you want to say July 30th --

 6          THE COURT:  That's too late.  We shouldn't have to

 7  wait 60 days to depose all these witnesses.  If we can come up

 8  with a rational schedule --

 9          MR. RUDIN:  Your Honor, we served those notices in

10  April.  So I understand the Court is trying to bend over

11  backwards to accommodate everybody but it really isn't fair to

12  us when we're trying to develop our case to have the

13  defendants adjourn the deposition, not supply a date, wait

14  until now, and then claim that the witness is not available to

15  the end of July.  It's just not right.  They should be able to

16  do it in June.

17          MR. LARKIN:  Please spare me.  These are retired --

18  I'm sorry, Your Honor, to interrupt but these are --

19          THE COURT:  Let's not talk about who they are and

20  let's just get the date.  Okay.  I would like to see as many

21  depositions in June as possible, June and July.

22          MR. LARKIN:  What I will do then --

23          THE COURT:  Where's Mr. Maher right now?

24          MR. LARKIN:  I'm sorry, Your Honor, he's -- I have

25  not spoken directly with him.  He's a former employee with the

14

1   DA's Office and our contacts at the DA's Office have spoken

2   with him.  I will -- when we -- I can even do this on a break

3   if the Court would like.  I will call, find out either direct

4   contact information for him so we can speak with him directly,

5   or in the alternative, have our contacts at the DA's Office

6   reach out to him and find out his availability in the next 30

7   days.  I'm happy to do that, Your Honor.

8              THE COURT:  Good.  Thank you.

9              MR. LARKIN:  The other DI is Mr. Bondor.  Now, we

10  understand he's retired and he travels a lot.  He is, well

11  he's traveling to the end of June my co-counsel, Ms. Krasnow,

12  has just informed me.  So I don't believe we're going to be

13  able to get in touch with him until the end of June.  But when

14  he's back, we can certainly reach out to him that first week

15  in July and supply dates at the earliest opportunity.  And I

16  believe this is the witness for whom we did have dates and for

17  one reason or another we supplied the dates and the

18  depositions didn't happen on the days that we offered them up,

19  offered him up.

20             MR. RUDIN:  They were not --

21             MR. LARKIN:  So we will certainly, that first week

22  in July, Your Honor, reach out to him and find out his

23  schedule.

24             THE COURT:  All right.  What I'm going to ask is

25  that if someone could contact him by mail or email or however

15

1 he's contactable, and get dates for as soon as possible after

2 his return.

3          MS. KRASNOW:  Your Honor, I've been in contact with

4 him and he is traveling through the end of June, but I can be

5 in touch with him before he gets back.

6          THE COURT:  Great.

7          MS. KRASNOW:  So I can try to get a date as soon as

8 he gets back in early July.  And if he's back in town for a

9 part of June, I could also try to work that as well, but I

10 don't want to guarantee that because I'm not 100% sure.

11          THE COURT:  All right.  That sounds reasonable.

12          MR. RUDIN:  And Mr. Vecchione?

13          MR. LARKIN:  Your Honor, with regards to Ms. Mandel

14 and Morgan Dennehy, depositions that probably could be

15 conducted in half a day, at least according to the last

16 representation that Mr. Rudin made.  I'm not sure what he's

17 going to say today.  I offered up dates for them next week.

18 Ms. Mandel Monday or Tuesday, Mr. Dennehy Monday the 17th or

19 July 1st, 8th, 10th, or the 18th, or the 22nd and I haven't gotten

20 a response.  And that was an email I sent last week.  So those

21 depositions -- we could have had dates by now if Mr. --

22          THE COURT:  Okay.  Let's get to them now.

23          MR. LARKIN:  Absolutely.  It's up to plaintiff.

24 What dates does he want?

25          MR. RUDIN:  You said the 19th?

16

1          MR. LARKIN:  No, I didn't say the 19th.

2          MR. RUDIN:  I'm sorry, you said the 17th?

3          MR. LARKIN:  Why don't you take a look at the email

4  I sent you.

5          THE COURT:  I think the 17th and 18th is what I heard.

6          MR. LARKIN:  The 17th or the 18th would have worked

7  for Ms. Mandel as of last Tuesday.  For Mr. Dennehy we've got

8  June 17th or July 1st, 8th, July 10th, July 18th, or July 22nd.  At

9  this point I might suggest that we pick a July date for Mr.

10 Dennehy and I can get some other dates for Ms. Mandel because

11 we're going to have to have some time to meet and to prepare

12 her.  And at this point, given the fact we've got only two

13 business days left this week, it might make more sense to have

14 some alternate dates.

15         MR. RUDIN:  The 17th is fine.  If that's too little

16 time, then I'm sure we can work out another date as long as we

17 understand that it will be done by July 1st you said.

18         THE COURT:  No, let's work out the other date now.

19         MR. RUDIN:  Okay.  Well, I'm available June 17th.

20 Can Mr. Larkin tell me other dates in June?

21         MR. LARKIN:  Well, if you had told us last -- if

22 counsel had told us last week, Your Honor, we could have

23 produced her on Monday but now it's already the 12th and we've

24 got, as I just said, two business days left in this week.  And

25 so to meet with her and prepare is going to be tight.  We've

17

1  got some authority to actually hire another attorney to assist

2  us on this case given the burdens of discovery, and we're

3  going to be conducting interviews this Friday.  So you know,

4  we blocked out a chunk of time on Friday for that.  I was not

5  planning to be in tomorrow.  So I mean it's just -- it would

6  make more sense if we nail down a date for Mr. Dennehy in

7  July, the 1st, the 8th, the 10th, the 18th or the 22nd and we

8  could then pick a date for Ms. Mandel hopefully the same day

9  if it works, if it would work.

10             MR. RUDIN:  July 1st is fine.

11             THE COURT:  For Dennehy and Mandel?

12             MR. LARKIN:  It should work -- I know it's going to

13  work for Mr. Dennehy.  I was informed he's available that day.

14             THE COURT:  Okay.

15             MR. LARKIN:  I will inquire as to Ms. Mandel, Your

16  Honor.

17             THE COURT:  Good.

18             MR. LARKIN:  And if that date does not work, we'll

19  pick a date in that time frame.

20             THE COURT:  Vecchione?

21             MR. LARKIN:  Well, the trial is starting on the 25th,

22  Your Honor.  We did offer up July 30th and 31st and August 5th,

23  6th, and 7th.  And the reason, Your Honor, one of the reasons

24  for pushing the date out for his deposition is he's a key

25  witness in the case.  He's going to be questioned about not

18

1   only the Collins prosecution but others, as the Court knows,

2   which took place 20 years ago, 15 or 20 years ago.  And it

3   just seems that he's going to need -- we're going to need some

4   time to prepare him and he's going to need some time to

5   refresh his memory about the events about which he's going to

6   be questioned in this case.  And so I appreciate and

7   understand that there's a need to set discovery dates

8   particularly with regards to these depositions, but I would

9   ask the Court's indulgence to give us some time, reasonable

10  time, to prepare Mr. Vecchione and let him prepare.  And July

11  30th and 31st both work.  That's a Tuesday and a Wednesday.

12  There's three days the following week that also would work.

13          MR. RUDIN:  Your Honor, he was subpoenaed on May

14  10th.  The complaint makes very clear what the other cases are

15  where we believe that there were allegations or reality of

16  misconduct.  I'm happy to let Mr. Larkin know shortly about

17  any, within a few days, about any of the cases we wish to

18  question Mr. Vecchione about in addition to the Collins case

19  so that he knows what has to be prepared.  But 90% of the

20  deposition is going to be about the Collins case and about the

21  practices that went on in the Collins case.  The idea that he

22  can't be prepared in the next -- give a deposition sometime in

23  the next two weeks just is not -- I don't think is candid.

24          MR. LARKIN:  Well, with respect, counsel, he's in

25  the midst of trying a --

19

1          MR. RUDIN:  He's in the midst of a TV program.

2          THE COURT:  Gentlemen, please.

3          MR. LARKIN:  I'm sorry, Your Honor.

4          THE COURT:  All right.  So I think I understand both

5    of your concerns.  We don't have any other depositions before

6    the end of June though, do we at this point?  Have we

7    scheduled anybody?

8          MR. LARKIN:  We're taking -- Your Honor, we do.  We

9    have Jabbar Collins' deposition set for June 20th which the

10   plaintiff wants to move to the late July, July 23rd and 24th

11   which I said I was perfectly willing to do in order to

12   accommodate the concern that Mr. Collins not appear twice and

13   be deposed twice because he has two lawsuits pending in

14   addition to this case, and he has a case in the Court of

15   Claims.  And we noticed Mr. Collins' deposition for June 20th.

16   Plaintiff indicates he wants to move that to July 23rd or 24th

17   and we are amenable to doing that so that he doesn't have to

18   appear twice for both cases.  So the suggestion that July 30th

19   is too late for ADA Vecchione's deposition doesn't seem to

20   make much sense.  I mean if Mr. Vecchione has to appear in the

21   next two weeks, it seems to me we ought to stick to Mr.

22   Collins' deposition dated June 20th.

23         MR. RUDIN:  Your Honor, that's just an astonishing

24   statement.

25         THE COURT:  Okay.  Well --

1          MR. RUDIN:  It's just so untrue because we had an

2    agreement, Your Honor, the entire discovery process.  Your

3    Honor will remember for two years we've had an understanding -

4    -

5          THE COURT:  Right.

6          MR. RUDIN:  -- that depositions will be done

7    jointly.  So Mr. Larkin sent me an email when he wanted to

8    schedule Mr. Collins' deposition that he insists on doing it

9    only for this case.  He doesn't want the State Attorney

10   General involved.  We then had further conversation because I

11   pointed out that what's good for the goose is good for the

12   gander, so we'll do Mr. Vecchione on two days, two separate

13   days.  So then Mr. Larkin agreed to discuss trying to do Mr.

14   Collins in a more sensible way.  And the problem was that the

15   State Attorney General indicated that she is not available

16   until July 15th.

17          So then Mr. Larkin suggested July 23rd and 24th and

18   was pressing me to agree on those dates, and I indicated back

19   that I thought it would be presumptuous to agree on any dates

20   well into July until we understood what Your Honor's

21   parameters were for discovery and for the dates when discovery

22   should be completed.  I think it makes sense to do Mr. Collins

23   together with the state and the city cases.  If it takes more

24   than a day, we'll agree to have it take more than a day.  I

25   don't think it need be July 23rd and 24th.  I prefer that it be

21

1  sooner.

2          MR. LARKIN:  It has to be July 23rd and 24th because

3  the State Attorney General is not available then.

4          THE COURT:  Yes. I understand.  Okay.

5          MR. LARKIN:  And that's the reason why I agreed to

6  adjourn the deposition.

7          THE COURT:  Right.  All right.  Gentlemen, Mr.

8  Larkin, okay.

9          MR. LARKIN:  I guess I'm --

10         THE COURT:  I understand this is a high pressure

11 case and there's a lot going on in this case.  Here's how

12 we're going to conduct this conference.  We're not going to

13 spend five minutes over every single deposition.  I think

14 maybe the best way to do it is we're going to come up with an

15 end date when all the depositions will be completed and then

16 we're going to figure out how to do it and we'll work

17 backwards from that end date so that you won't have to worry

18 that each single deposition that's being scheduled is somehow

19 going to push back the end date.  That's all we really care

20 about is when the end date is.

21         MR. LARKIN:  Yes, Your Honor.

22         THE COURT:  All right.  So that's why I wanted to

23 start with the Hynes deposition and the other depositions

24 because I think there are going to be questions about which is

25 going to be first and which is going to be second.  Why don't

22

1  we just pick a date right now that's going to be the end date

2  for all these depositions so then you can work comfortably

3  with in that parameter and you don't have to worry about me

4  forcing you to depose people on days you don't want.

5          MR. LARKIN:  I appreciate it.  Your Honor, could I

6  suggest September 30th as an end date for the depositions and

7  for the fact discovery phase of the case?  I think that is

8  fair and reasonable and I think it gives everybody enough

9  time, it gives all of us enough time to deal with the number

10  of privilege issues that may come up because we haven't talked

11  about that yet.  And it gives us time to deal with the likely

12  depositions of other witnesses before DA Hynes is deposed.  Of

13  course, that depends on what Your Honor's view is of that

14  issue, and we've raised that issue.  I think it just gives --

15  it's enough time so that we can comfortably and fairly, it

16  seems to me, deal with the complexities of the case and the

17  sheer number of documents and the number of witnesses that we

18  need to depose here.

19          MR. RUDIN:  I mean that's why we haven't had any

20  meet and confers on emails.  That's why I've had to file all

21  these motions and gotten no progress with discovery until I

22  file motions.  The whole point here has been to push this case

23  back as far as possible.  I think that's completely

24  unreasonable.  There's no reason we have to go to September

25  30th.  Judge Block indicated initially that he wanted --

23

1          THE COURT:  What's your proposal?

2          MR. RUDIN:  August 15.

3          MR. LARKIN:  Your Honor, August 15th?  I just don't

4    think that's realistic.  I think a September 30th cutoff is

5    much more reasonable in light of all the circumstances here.

6    You've got additional witnesses to depose, a significant

7    number of witnesses.  We've got document issues that remain

8    unresolved.  We have all these emails, searches for emails

9    that the plaintiff wants us to conduct which if the Court

10   directs us to do it, we're going to have to have some time to

11   do those searches as well as allocate the cost because over

12   time it's going to be an issue with regards to those

13   documents.

14         MR. RUDIN:  Why hasn't that started?

15         MR. LARKIN:  We've got -- may I?  I'm sorry.  I

16   apologize.  You know, September 30th, for a case like this to

17   have discovery be conducted between say -- Judge Block's order

18   I believe was in February so a discovery period from March to

19   September was about six months, six to seven months.  On most

20   1983 cases, six to seven months would be a pretty fast

21   discovery track.  And in this case, the issues are, it seems

22   to me, much more complicated.  They involve many more

23   documents.  To have a discovery period from say March 1

24   through September 30 would be fast.  But I think in the

25   circumstances given where we are, September 30 is just not an

24

1 unreasonable cutoff date.  I mean Your Honor knows from all

2 the 1983 cases that are in this courthouse six to seven months

3 for discovery is atypical.  It's very, very short even for a

4 garden variety case involving one plaintiff and a few

5 defendant police officers.  Here you've got -- we've got

6 litigation going back to the --

7           THE COURT:  I understand.

8           MR. LARKIN:  -- 1970s and 1980s.  I'm sorry.

9           MR. RUDIN:  Your Honor, discovery began in 2011.

10          THE COURT:  My question was how long it would --

11 when shall we complete all of the depositions and not really

12 when all fact discovery will be completed.  I think that may

13 be a slightly different issue and there may be more follow up

14 and whatever.  I think a time in August would make sense.  I

15 think the end of August.

16          MR. LARKIN:  Thank you, Your Honor.

17          THE COURT:  Now, because lawyers do deserve to have

18 a life, I'm going to make it August 27th.  All right.  Now,

19 should I just let both of you, or many of you, just come up

20 with the dates or do we need to set those dates right now and

21 that's --

22          MR. RUDIN:  I think we need to set a date for Mr.

23 Vecchione because I'm not going to agree to go beyond June

24 25th.

25          MR. LARKIN:  Well, that doesn't make sense.  Your

25

1  Honor, if I can just offer up a suggestion.  I think that

2  given the fact that we have a firm end date, I think that we

3  can work to get the dates.  And the reason I suggested that is

4  that we're at a slight disadvantage today because we need to

5  confer with our witnesses and figure out firm dates for their

6  availability, and we've done that in part but I guess because

7  plaintiff was too busy to get back to us last week we lost a

8  few dates for next week.  And now that we've got the firm

9  cutoff date, we will be able to speak with our client, get the

10 dates we need, clients and witnesses, get the dates we need.

11 And I think it just makes more sense to do that in a

12 reasonable way rather than be hamstrung with court ordered

13 dates that I may not be able to confirm today because we need

14 to speak to our witnesses.

15         Most of our discovery is non-party discovery except

16 for Mr. Collins.  He's the only party we need to depose.  The

17 other witnesses are all our witnesses, and so it's our burden

18 to produce them.  And we're going to need to speak with them

19 to really get a sense of their schedules.

20         THE COURT:  But we're only talking about Mr.

21 Vecchione at this point, and the question really is why can't

22 he appear on the 21st and the 24th for deposition?  That would

23 be, you know, close to 13 days to --

24         MR. LARKIN:  June 21st?

25         THE COURT:  June 21st.  Nine days to prepare, and

26

1  then the 24th, and that would allow him to have his trial on

2  the 25th.

3          MR. LARKIN:  Well, he would only be deposed for one

4  day, seven hours.  I mean --

5          THE COURT:  One day of seven hours.  Okay.  So the

6  24th then?

7          MR. LARKIN:  Right.  Yeah, the -- I think it's the

8  24th or 25th we have Mr. Collins' defense counsel, Michael

9  Harrison, we're taking his deposition.

10          THE COURT:  Okay.  So the 25th is out --

11          MR. LARKIN:  The 25th --

12          THE COURT:  -- because that's the first day of the

13  trial.

14          MR. LARKIN:  The 25th would not work.  The 24th is the

15  day before the trial.  He has to --

16          THE COURT:  Then we can do it the 21st.

17          MR. LARKIN:  I've got to assume that he's occupied

18  that day and the same for the 21st.  If the Court is going to

19  allow us an August 27th date to complete depositions, which I

20  think is still very tight, it seems to me -- and if the Court

21  is going to permit Mr. Collins' deposition to be moved to

22  July, an arrangement that we do not object to in the

23  circumstances, then July 30th is not an unreasonable date for

24  Mr. Vecchione given his other obligations, his other

25  professional obligations.

1          MR. RUDIN:  He's the lynchpin of our discovery.  We

2     have to take him soon, otherwise it just disrupts the

3     preparation of our case and figuring out who else has to be

4     deposed.  And I can only say again that we subpoenaed him on

5     May 10th.  This is not a surprise.  He's not even counsel of

6     record in this case.  He's apparently intending to become

7     involved but he has other lawyers who've been developing the

8     case and handling it up until now.  And he's a highly

9     experienced prosecutor.  He's tried dozens and dozens of

10    complex and serious cases.  And the idea that he cannot put

11    aside one day before June 25th to give a deposition just

12    doesn't make sense.

13         THE COURT:  When is the trial scheduled?  And do you

14    know if it's going to be over mid to late July?

15         MR. LARKIN:  I'm told mid to late July, yes, Your

16    Honor, mid July, a couple of weeks for that trial.  So, you

17    know, if we're not going to depose Mr. Collins until the 23rd,

18    it seems to me that deposing Mr. Vecchione on the 30th or the

19    31st is not a heavy burden.

20         THE COURT:  I think it's apples and oranges though

21    because I think what --

22         MR. LARKIN:  I think -- I'm sorry.

23         THE COURT:  -- counsel is saying is that it's

24    necessary to have Mr. Vecchione's deposition before some of

25    the others are taken.  It'll also help to narrow discovery or

1   broaden discovery.  And I think we need it sooner rather than

2   later.

3          MR. LARKIN:  Your Honor, I --

4          THE COURT:  Nothing I can do about his trial, but I

5   do think that we need to get his deposition earlier --

6          MR. LARKIN:  Your Honor --

7          THE COURT:  -- otherwise these schedules won't work.

8          MR. RUDIN:  And Your Honor --

9          MR. LARKIN:  It's not -- I mean there's been a

10  statement or various statements made that Mr. Vecchione's

11  deposition is necessary before others are taken but you know,

12  counsel said the same things about DA Hynes' deposition.  I

13  don't necessarily see the logic of that at all.  He is a key

14  witness in the case.  There's no question about that.  But his

15  testimony is going to be what it is.  It's not going to --

16  other discovery it seems to me is not going to depend on what

17  ADA Vecchione says happened in the Collins case.  There's

18  already an extensive record about what has happened, what

19  representations were made, you know, threats that were made to

20  ADA  -- excuse me, to one of the witness's families by Mr.

21  Collins or by people working with him, the requests that those

22  family members made for protection.  You know, there's already

23  an extensive record there.  I don't see how that other

24  discovery will depend on that deposition even though that

25  representation has been made.  Perhaps there can be some

1  discussion here about the specifics and about other ways we

2  can address whatever counsel's concerns are instead of

3  insisting upon a court ordered date for a senior prosecutor

4  who's involved in a major trial.  That's my only concern.

5          And there's been a complete absence of conferral in

6  this whole situation, and you know, I suggested yesterday that

7  counsel and I would at least talk about the schedule before we

8  came in today, and I didn't get any phone calls.  So --

9          THE COURT:  Wait, let me just ask --

10          MR. LARKIN:  -- and I understand he was busy --

11          THE COURT:  --Mr. Rudin a question here.

12          MR. LARKIN:  I'm sorry.

13          THE COURT:  Mr. Rudin, is it the deposition as to

14  the Collins case or is it as to the Monell issues that is most

15  critical for you at this point that it be done before the

16  other depositions?

17          MR. RUDIN:  It's both because --

18          THE COURT:  But you only have one.

19          MR. RUDIN:  The Collins case.  I mean --

20          THE COURT:  Okay.  So why don't we -- one thing we

21  can do we can shorten your preparation time if he only has to

22  focus on the Collins case for this particular deposition.  He

23  will be deposed on the 21st about the Collins and then as to

24  the other Monell issues, he can be deposed later.

25          MR. RUDIN:  The only thing I would ask Your Honor is

30

1   that certain of the practices that we allege happened in the

2   Collins case such as the manner in which witnesses were

3   subpoenaed or held pursuant to material witness orders we

4   would like to ask him, after we ask him about what happened in

5   the Collins case and his knowledge, we would like to ask him

6   whether or not -- about his knowledge of customs or practices

7   in the office with regard to those issues.  It seems to me --

8   because that --

9            THE COURT:  You can ask in the office but not about

10  specific cases.

11           MR. RUDIN:  That's fine.

12           THE COURT:  You can ask about that.

13           MR. RUDIN:  And Your Honor --

14           THE COURT:  If the point is that he needs time to

15  prepare and he's going to have to prepare on other cases that

16  he's not familiar with and hasn't seen for 20 years, I'll

17  defer that part of the deposition and he will be deposed on

18  the Collins case on the 21st.

19           MR. RUDIN:  Only on practices in the office.

20           MR. LARKIN:  Your Honor, may I just ask one

21  question?  Could I please speak to ADA Vecchione?  And perhaps

22  there's another date --

23           THE COURT:  Sure.

24           MR. LARKIN:  -- between now and the --

25           THE COURT:  Absolutely.

```
1              MR. LARKIN:  Whatever date is best for him.

2              THE COURT:  Of course.

3              MR. LARKIN:  I would just ask for that opportunity.

4    Thank you, Your Honor.

5              THE COURT:  Well, now that we finished the easy

6    issues --

7              MR. RUDIN:  We need one for ADA Wrenn.

8              THE COURT:  I know.  Well, you can do that in July

9    sometime, can't you?  Or in June?  Whatever is --

10             MR. LARKIN:  May I confer with my co-counsel about

11   one issue?  Forgive me.  I apologize.  I'm sorry.

12                        [Pause in proceedings.]

13             MR. LARKIN:  I'm sorry, Your Honor.  Go ahead.  I

14   apologize.

15             THE COURT:  Okay.  I'm not sure that you need a

16   court ordered date on that.  If you want one, we can come up

17   with one right now.

18             MR. RUDIN:  I'd like one, Your Honor, because that

19   was supposed to be done last week and two days before it was

20   going to be done we had an issue.  So once that issue is

21   resolved, I don't know why we can't take it.

22             MR. LARKIN:  Well, I need to --

23             THE COURT:  All right.  So --

24             MR. LARKIN:  I'm sorry, I need to confer with the

25   witness and find out dates.  I just don't know what her
```

1   availability is in the next couple of weeks.  Certainly, we

2   can confer and agree on a date.  I can't agree to a date here

3   today because I just don't have access to the witness.

4              MR. RUDIN:  That's fine.

5              MR. LARKIN:  She's not here as you can see.

6              THE COURT:  So how about by June 28th, or June --

7              MR. LARKIN:  I assume that that should be okay but

8   I'll just --

9              THE COURT:  Sure.

10              MR. LARKIN:  -- I'll get her schedule, Your Honor.

11              THE COURT:  By June 28th and if that's not good,

12   you'll let me know tomorrow.

13              MR. LARKIN:  Yes, Your Honor.  Thank you.  And

14   that's for ADA Wrenn.

15              THE COURT:  That's right.

16              THE COURT:  Okay.  So are we set on those

17   depositions?

18              MR. RUDIN:  Yes, Your Honor.

19              MR. LARKIN:  Yes, Your Honor.

20              THE COURT:  All right.

21              MR. RUDIN:  Your Honor, again, I'm just going to

22   make a suggestion, but it seems to me that before we talk

23   about when we're going to do Mr. Hynes, if and when we're

24   going to do Mr. Hynes that it might be helpful to focus on the

25   outstanding document issues because some of the document

33

1  demands may affect when it's optimal to take his deposition.

2  THE COURT:  Okay.  Are we talking about the emails

3  or we're talking about other issues.

4  MR. RUDIN:  Well yeah, emails and the personnel

5  records and disciplinary records if there are any.

6  MR. LARKIN:  Your Honor, I was just going to say

7  before we even do that, did the Court want to address our

8  motion with regard to the Quezada case in connection with the

9  Wrenn deposition?  I think that's a discrete issue.  I'm not

10  sure if Your Honor wants to deal with that right now.

11  THE COURT:  Well, my inkling -- well, my inclination

12  on it is at this point not to allow questioning on that at

13  this point.  However, if there is a decision on the Quezada

14  case and there is a finding of some kind of misconduct there,

15  then I believe that the plaintiff would be entitled to depose

16  her on that.

17  MR. LARKIN:  So would it make sense then -- I mean I

18  don't want to produce the witness twice.  I'm happy to produce

19  the witness whenever the Court directs, but it seems to me

20  that --

21  THE COURT:  You may have to produce her twice

22  because we don't when the Quezada case will be resolved.

23  MR. LARKIN:  Would it make sense to move that

24  deposition closer to the end of discovery?  Because as I

25  understood, the main purpose of counsel's deposition notice of

34

1   Ms. Wrenn was to ask her about the Quezada case.  I could be

2   wrong.  If he wants to focus on the Collins case, you know, in

3   which case it wouldn't really matter.  Would it make sense to

4   move that deposition till later in the process here?  Because

5   if we do get a decision from Judge Matsumoto, maybe we could

6   only produce her once if needed.

7            MR. RUDIN:  Your Honor, whether Judge Matsumoto

8   finds that there's a basis to grant habeas relief or to grant

9   an evidentiary hearing given the restrictions of the habeas

10  statute is a far different question than what gives us the

11  opportunity to develop our case here.  We already know in the

12  Quezada case that Ms. Wrenn submitted a response to a 440

13  motion which she swore under oath that there was no material

14  witness order.  We now know that after discovery was granted

15  in federal court that the order appeared.  And we know that

16  the 440 judge was led to deny the motion because the DA's

17  Office took the position that there had been no material

18  witness order, there had been no --

19           MR. LARKIN:  I only asked about the schedule for Ms.

20  Wrenn.

21           MR. RUDIN:  No, but I'm --

22           MR. LARKIN:  I think that we can produce her before

23  the -- we can produce her before the 28th and the question will

24  be limited to the Collins case as Your Honor just directed,

25  and --

1          THE COURT:  Well, no, I didn't say to the Collins

2    case.  What I said is not into the Quezada case.

3          MR. LARKIN:  I apologize.

4          THE COURT:  But again, the broader question that Mr.

5    Rudin asked about other witnesses he can still ask as to

6    practices in the office.  And on Page 5 of your June 7th letter

7    you talked about how Ms. Wrenn responded to Judge Matsumoto

8    that picking up Mr. Salcedo and keeping him in a hotel till he

9    had to testify was a normal procedure on a material witness

10   warrant.  I think you could ask about what the normal

11   procedures were on the material witness warrants.  You can ask

12   that question.  I just don't want you to go into detail on the

13   Quezada case --

14         MR. RUDIN:  But the only thing --

15         THE COURT:  -- for two reasons.  One reason because

16   I don't want it to be a back door way to get around Judge

17   Pohorelsky's ruling, not that that's what you're intending to

18   do, but it would end up having that effect.  And number two,

19   that there hasn't been a finding of misconduct there.

20   However, you are entitled to question about practices and

21   specifically question about practices having to do with

22   material witnesses.

23         MR. RUDIN:  Your Honor, we don't know --

24         MR. LARKIN:  What would typically happen with regard

25   to those material --

1          THE COURT:  Let him finish.

2          MR. LARKIN:  I'm sorry, Your Honor.

3          THE COURT:  Excuse me.  We don't have no idea -- the

4   issue that's in front of Judge Matsumoto right now is whether

5   or not under the habeas corpus, extremely stringent rules for

6   habeas corpus the defense is entitled to -- I mean the

7   petitioner is entitled to develop the evidentiary record.  And

8   Your Honor I'm sure is very familiar with habeas as I'm sure

9   you deal with it all the time.  So that's a -- she may not

10  even reach the issue of whether or not there was misconduct.

11  She may defer to the findings of the state court.

12          And furthermore, we're not a party to that action.

13  Regardless of what Judge Matsumoto decides, we're entitled to

14  show in our case that this was part of a -- this is evidence

15  of customer practice, that the DA's Office acted in bad faith.

16  We're not trying to bring out any information about the

17  underlying criminal prosecution, about the facts of the case,

18  about any witnesses who haven't been revealed, about any

19  police reports that were never disclosed.  All we want to find

20  out is why the district attorney, ADAs Shaban and Wrenn

21  represented to a state court judge that there was no material

22  witness order and then it came out years later, and how that

23  happened, and whether or not there was any disciplinary

24  inquiry in the office about it, whether there was any concern

25  in the office that an individual has been kept in prison for

1    all these additional years after a representation to a state

2    court judge that turned out not to be true, which happens to

3    be exactly what happened in Jabbar Collins' case.  It's

4    identical.  For years they denied that there was a material

5    witness order or that any witness had to be pressured or

6    coerced into testifying, and then it turned out that not only

7    was there a material witness order that they have been denying

8    for 15 years, but the witness spent a week in jail before

9    spending a week under armed guard in a hotel.

10            MR. LARKIN:  And the reason for that was the witness

11   --

12            MR. RUDIN:  It's exactly the same scenario.  And ADA

13   Wrenn happens to have been the person who was selected by the

14   Rackets Bureau of the DA's Office to be involved with Monique

15   Ferrell in investigating the Jabbar Collins case when we filed

16   a motion in 2006 which was exactly the same time that she was

17   representing that there was no material witness order in the

18   Quezada case.  I mean the cases duck tail so closely.

19            All I want to ask is what she knew in 2006, what she

20   found out from ADA Shaban about his knowledge, why she

21   represented that ADA Shaban did not know about a material

22   witness order, and when they learned about the order, and why

23   didn't they turn it over until lightening struck and the

24   Second Circuit granted a second habeas petition which it does

25   about once a year?  Also exactly like the Collins case.  If

38

1    not for the fact that Judge Irizarry granted a federal

2    evidentiary hearing, most of the information we now have, a

3    lot of the information we now have never would have come out.

4            MR. LARKIN:  Please, Your Honor, I can't sit and

5    listen to this anymore without -- really, I'm sorry.  But

6    there were a series of conferences in the Quezada case,

7    lengthy conferences.  There was one on December 22, 2011.

8    There was another one in January.  There was another one I

9    believe in March of that year in which Judge Pohorelsky heard

10   both sides and heard ADA Wrenn explain how it is that she

11   found out about the material witness order in that case.  It

12   involved a lot of digging through old logbooks before she was

13   able to uncover the evidence concerning that material witness

14   warrant.  And when she did uncover it, of course it was

15   promptly -- the existence of the warrant I believe was

16   promptly disclosed.

17           The point is there's already a complete record of

18   the circumstances that led the DA's Office to locate the

19   warrant in that particular case.  If counsel wants to use that

20   case at trial in this case, the record is there.  He can make

21   whatever arguments he needs to make to Judge Block.  It seems

22   to me -- and then Judge Block would decide, the district

23   court, or if he refers it to Your Honor, Your Honor would

24   decide in limine what counsel could use at trial.  The concern

25   we have is further development of a record, further

1   development in a situation where it's not really appropriate

2   where Judge Pohorelsky has limited discovery in the case and

3   where the rules on habeas also limit discovery.  And it seems

4   to allow a litigant in a separate civil case to start prying

5   around into matters that are the subject of a current pending

6   habeas petition, it's just not the way that the discovery

7   rules are supposed to work here.

8              MR. RUDIN:  Your Honor, Mr. Larkin just --

9              THE COURT:  Hold on one second.  What I'm

10  permitting, and perhaps we need to refine this a little bit,

11  but what I'm permitting is Monell discovery.

12             MR. LARKIN:  Yes, Your Honor.

13             THE COURT:  Okay.  So the Monell discovery is

14  whether or not there's a normal procedure, pattern, practice,

15  whatever, in the office concerning material witnesses.  Now,

16  in gross what I'm not permitting is discovery in the Quezada

17  case.  Now, it may be that there's some overlap, as Rudin's

18  saying and maybe Mr. Larkin is saying, between what's the

19  general pattern or practice in the office and what happened in

20  the Quezada case.  Mr. Rudin can ask questions about what the

21  normal procedure is on a material witness warrant, whether

22  that -- and I suppose whether that's in fact what happened in

23  the Quezada case, whether what happened in that case was part

24  of the normal procedure.  But I don't want you to go into

25  other facts dealing with the Quezada case because that's not

40

1  before the Court.  The issue before the Court is whether or

2  not there is a normal procedure under a material witness

3  warrant which I think you believe is to deceive or mislead

4  state court judges into deciding warrants and then not

5  disclose to defendant's counsel that the witnesses are being

6  kept against their will in custody somewhere.

7  　　　　　MR. RUDIN:  Well, that judges are being deceived

8  with falsely notarized or falsely sworn applications and that

9  contrary to the orders requiring that the witnesses be brought

10  forthwith to court, they're instead brought to the DA's Office

11  to be interrogated and some of them then end up in hotels

12  being held against their will.  Others of them end up in jail

13  and --

14  　　　　　MR. LARKIN:  What happens, Your Honor --

15  　　　　　MR. RUDIN:  May I please --

16  　　　　　MR. LARKIN:  What happens --

17  　　　　　THE COURT:  Wait.  We're not getting into what the

18  practice is, we're just getting into the questions.

19  　　　　　MR. LARKIN:  Your Honor --

20  　　　　　THE COURT:  The question that you can ask is when

21  she said this is a normal procedure on a material witness

22  warrant, you can ask her what she meant by that and then you

23  can ask whether it is a normal procedure to do the things that

24  you mention or not.

25  　　　　　MR. RUDIN:  Your Honor, Mr. Larkin --

41

1          THE COURT:  Did that in fact -- and is what happened

2    in the Quezada case the normal procedure?

3          MR. RUDIN:  But Mr. Larkin a moment ago said that

4    Ms. Wrenn has already spoken extensively on the record about

5    when she discovered the order, how she discovered it, and why

6    she did or did not disclose it at various times.  That's all I

7    want to ask her about.  She's already gone on the record about

8    it, so why can't I ask about it?  I'm not asking for any

9    information that she hasn't already fully discussed.

10          THE COURT:  You don't want to go beyond the record?

11          MR. RUDIN:  I'm sorry?

12          THE COURT:  You don't want to go beyond the record?

13          MR. LARKIN:  The concern, Your Honor --

14          MR. RUDIN:  I just want to go under oath --

15          MR. LARKIN:  Absolutely [inaudible]-

16          MR. RUDIN:  -- and ask her the questions that she's

17    already talked about on the record in front of a magistrate

18    judge who didn't have her under oath and didn't have perhaps

19    the same incentive that I have to ask ethical questions.

20          MR. LARKIN:  That's the concern --

21          THE COURT:  So if counsel, I'm sorry, so if counsel

22    were to stipulate that her statement is -- if she were to

23    swear that the statements that she made before Judge

24    Pohorelsky under oath -- not under oath, at the oral argument

25    in the habeas petition, is that what you're looking for?

1          MR. RUDIN:  No, but I want to be able to challenge

2    her.  I want to be able to cross examine, to ask her more

3    skeptical questions.  I'm also willing to do it under seal.

4    If Your Honor's concerned that the information I'm obtaining

5    will be shared with counsel on the other case, then as to that

6    portion of her deposition where I go beyond what she's --

7    whatever part Your Honor thinks should be under seal, I'll be

8    willing to keep under seal until further order of the Court.

9          MR. LARKIN:  Your Honor -

10          THE COURT:  But again, the parameters that I'm

11    talking about would be what's the [inaudible] here?  What is

12    the pattern and practice or normal procedure on a material

13    witness warrant?  Did that happen in the Quezada case or

14    didn't it?  That's essentially what we're talking about,

15    correct?

16          MR. RUDIN:  Well, what --

17          THE COURT:  And how did you discover it?

18          MR. LARKIN:  Your Honor, [inaudible]--

19          MR. RUDIN:  How did they discover it and the final

20    thing is why didn't you disclose earlier?  An explanation of

21    why she didn't disclose earlier and why she made the

22    representations that she made to the Court.

23          MR. LARKIN:  Your Honor, none of that should be

24    permitted I think because, you know, first of all I am sure

25    that ADA Wrenn would be willing to stipulate that the

43

1   statements that she made to Judge Pohorelsky in the

2   conferences in the Quezada case were accurate.  We would

3   stipulate to that, that they're accurate to the best of her

4   knowledge.  There's no question.  I don't think there's any

5   question about that.  So that should cut out any questioning

6   about what's in that record in terms of what she learned and

7   when she learned it.

8           As far as a sealing order, I don't think that that's

9   adequate protection here.  It's the whole point of having

10  limited discovery and habeas proceedings and that's what

11  congress has mandated.  And to allow further cross

12  examination, skeptical questioning as counsel puts it,

13  somebody who hasn't got an incentive to make the District

14  Attorney's Office look as bad as possible and embarrass Ms.

15  Wrenn, which is part of the reason why I'm sure Mr. Rudin

16  wants the deposition -- you know, and I apologize for phrasing

17  it that way, but that's what's going one here.  You know, it

18  just is not adequate.  I think the Court's instinct initially

19  was to allow questioning about the general practices.  Whether

20  or not it was followed in the Quezada case cross over into

21  another area that is not relevant, it seems to me, to this

22  case.  There's been no finding of misconduct, certainly no

23  finding of misconduct in the Quezada case.  Mr. Quezada's

24  conviction stands today.  Judge Matsumoto has a significant

25  serious responsibility.  She's got to consider whether there

44

1   ought to be an evidentiary hearing.  And you know, I think the

2   Court's instinct is correct.  If counsel wants to ask about

3   practices generally, that is okay.  What the witness will say

4   is that the DIs appear usually with a material witness

5   warrant.  They approach the witness, they explain

6   circumstances.  They tell the witness that they have an order

7   authorizing the arrest of that witness, which is what a

8   material witness order is.  And the witnesses nine times out

9   of ten say, "Look, don't take me into custody, don't arrest

10  me.  I will come with you.  I will speak to the DA."  And

11  that's what happened in the Quezada case.  That's exactly what

12  happened.  What happened is the Dis' memo book entries from

13  that time from that case show that he and another detective

14  investigator approach Mr. Quezada, they explained that they

15  had a material witness warrant and he came with them

16  voluntarily.

17          THE COURT:  Mr. Salcedo.

18          MR. LARKIN:  Excuse me.  Forgive me.  Mr. Salcedo,

19  the witness.  I'm sorry, Your Honor.  And the witness came

20  with them voluntarily.  He did not need to be taken into

21  custody.  And Judge Pohorelsky acknowledged during one of

22  those conferences that frequently that is what happens.  He

23  also acknowledged that it wouldn't make much sense for a

24  defense lawyer to cross examine a witness about a material

25  witness order because the witnesses, like the witnesses in

45

1   this case, were afraid of the defendant.  Mr. Santos was

2   afraid of Mr. Collins.  He saw Mr. Collins, he all but saw him

3   shoot and kill an innocent civilian and then flee the scene.

4           THE COURT:  All right.

5           MR. LARKIN:  He was scared.  That's what happened in

6   this case.

7           THE COURT:  All right.  But we're looking at pattern

8   and practices.

9           MR. LARKIN:  Yes.

10           THE COURT:  And that's all we're looking at.  And

11   the question is to what extent did there have to be some

12   detail about what happened in the Quezada case in order to

13   have legitimate Monell discovery?  And I think the answer is

14   number one, that there has to be a question as to whether what

15   happened in the Quezada case complies with the office practice

16   and procedures, and Mr. Rudin can certainly ask that question,

17   and if the answer is no it didn't in some ways, then he can

18   ask in what ways did it not comply and was anything done about

19   it?  And that's really it.  And if it did comply with the

20   procedures, then I assume she will explain what those

21   procedures are.

22           MR. RUDIN:  Your Honor, one of the concerns --

23           MR. LARKIN:  The concern though, Your Honor, I'm

24   sorry, the concern, Your Honor, is that I think the Court is

25   permitting questioning about the specifics of that case, that

1  would not be consistent with -- I mean we were seeking a

2  protective order preventing that and I think the Court ought

3  to -- I don't think there ought to be questioning in that

4  area.  I think that questioning -- the Court's initial

5  suggestion is that questioning about general policies would be

6  appropriate and ADA Wrenn has indicated some knowledge of

7  those general policies and she can be questioned about them.

8  But to be asked specifically whether they were followed in the

9  Quezada case or what happened in the Quezada case, again, I am

10 sure that ADA Wrenn would agree and we would stipulate that

11 her statements to Magistrate Judge Pohorelsky were accurate to

12 the best of her knowledge when she made them.  And you know,

13 that should take care of any question about what happened in

14 that particular case.  There shouldn't be further deposition

15 questioning, it seems to me, Your Honor, as to the specifics

16 of that case.  The policies I can understand testimony on

17 that.

18          THE COURT:  All right.  Well, my ruling is that he

19 can inquire into the policies and if -- there are two

20 different kinds of cases, ones a habeas case and ours is a

21 Monell claim.  And in order to adequately depose the witness

22 I'm now convinced that Mr. Rudin is going to have to ask the

23 witness questions about whether what happened in that case did

24 or did not comply with the policy.  If it complied with the

25 policy, then it's right on all fours with what's happening in

1   this case.  If it didn't comply with the policy, then it would

2   illuminate what that policy was, and I think he has a right to

3   find that out.

4           MR. LARKIN:  But I think, Your Honor, it appears --

5   well, I mean we certainly don't accept Mr. Rudin's description

6   of what the policy was.  The policy wasn't to take witnesses

7   and lock them up in hotel rooms.  The policy was to explain to

8   the witness that there was a material witness order

9   authorizing that witness's arrest and giving the witness an

10  opportunity to voluntarily come with the investigator so that

11  they would not have to be placed under arrest.  And nine times

12  out of ten witnesses agreed to do that.

13          THE COURT:  Okay, so if that's the policy --

14          MR. LARKIN:  They weren't locked in hotels.

15          THE COURT:  I'm sorry to interrupt.  But if that's

16  the policy, if that's in fact the policy, that's what she'll

17  say.  And if what happened in the Quezada case complied with

18  that policy, then she'll say that.  If it didn't comply with

19  that policy, she'll say that it didn't and Mr. Rudin will ask

20  whether there was any discipline, because I believe he's got a

21  discipline claim there, and then we'll move on.

22          MR. LARKIN:  But Your Honor, the witness --

23          THE COURT:  Look, I think we've belabored this

24  enough.  I understand what your position is but I think the

25  only interest -- if this were normal discovery we would simply

48

1  say it's relevant in terms of the federal rules then it's

2  reasonably calculated to lead to the discovery of admissible

3  evidence.  The only reason that you're asking that it not be

4  permitted is that another judge has ruled that in the context

5  of a habeas proceeding it's inappropriate.  And I agree that

6  there should not be back door discovery that would benefit

7  anyone in any habeas proceeding where another judge has ruled.

8  It's not appropriate for me to overrule another judge's

9  decision or comment on it.

10          So what I'm trying to lead as best I can the path

11  that Mr. Rudin has to take.  However, to the extent that it's

12  difficult to draw a bright line, I think his suggestion of

13  sealing is good.  And to the extent you think it goes over the

14  line, you can ask me to strike it from the deposition of

15  course.

16          MR. LARKIN:  Okay.  So just that so we're clear

17  then, the deposition of Ms. Wrenn to the extent it involves

18  questioning about policies concerning material witness orders

19  and the Quezada case is to be sealed?

20          THE COURT:  Yes.

21          MR. LARKIN:  And Mr. Rudin is to follow that sealing

22  order and not release the deposition to anybody associated

23  with the Quezada case.

24          MR. RUDIN:  Your Honor, I thought you said as to the

25  Quezada case but the questions about --

49

1          THE COURT:  As to the Quezada case.

2          MR. RUDIN:  -- policies apart from the Quezada case

3    is --

4          THE COURT:  Is not sealed.  Right.  Just the Quezada

5    case.

6          MR. LARKIN:  The policies generally don't -- I'm

7    sorry.  The policies generally would not be sealed --

8          THE COURT:  Right.

9          MR. LARKIN:  -- but anything concerning the Quezada

10   case would be sealed?

11         THE COURT:  That's right, because that's your

12   legitimate interest.

13         MR. LARKIN:  Thank you, Your Honor.  I appreciate

14   that.

15         MR. RUDIN:  And Your Honor, may I ask her, just to

16   be clear, may I ask her about why the -- her knowledge about

17   why the material witness order and related circumstances were

18   not disclosed until whenever they were disclosed?  Because

19   that is part of our Brady pattern and practice claim.

20         THE COURT:  Yes, because that's part of is it the

21   practice not to.

22         MR. RUDIN:  Yes, Your Honor.  Thank you.  Why, she's

23   going to say she didn't know about it, obviously she didn't

24   know about it.  Why?

25         THE COURT:  Then he's wasting his money.

50

1        MR. RUDIN:  I mean that's the obvious question and

2   answer?

3        THE COURT:  Okay.

4        MR. RUDIN:  We're not wasting our money.

5        MR. LARKIN:  Not for the first time.  Sorry.

6        THE COURT:  It may be the outcome but you have to

7   live together for the next 12 months.  Okay.

8        MR. RUDIN:  So Your Honor, that deposition is by

9   June 28th as I understand it.

10        THE COURT:  Yes.

11        MR. RUDIN:  So should we turn to the documents now?

12        THE COURT:  All right.  Is anybody here on another

13   case?  I just want to make sure that there's no -- we did have

14   another case.  Okay.  Next?

15        MR. RUDIN:  Your Honor, our proposal we take up the

16   emails last.  Why don't we deal with the documents because I

17   think that's the most complicated.

18        THE COURT:  Okay.  Mr. Larkin, do you agree?

19        MR. LARKIN:  Oh yes, that's certainly reasonable,

20   Your Honor, yes.

21        MR. RUDIN:  All right.  Then as to the personnel

22   records, I know Ms. Krasnow just gave us two additional

23   records today so we received by my count 19 out of 50 and we

24   would like to get the other 31 or so as soon as possible.

25   Again, this is something we requested several months ago and I

51

1  have no idea what resources the District Attorney's Office is

2  devoting to finding and copying these records, but I just

3  don't understand.  There's been no showing why it's so

4  difficult to find the personnel records of 50 ADAs and to go

5  through them and photocopy them.  But you know, whatever

6  defendants have to say about that, fine, but I just think we

7  should have a deadline and get that done because it's a

8  predicate to some of the other depositions.

9              THE COURT:  Mr. Larkin, what's a reasonable

10 deadline?  Ms. Krasnow?

11             MR. LARKIN:  Co-counsel can address that.  I'm

12 getting tired, Your Honor.  Sorry.

13             MS. KRASNOW:  I just wanted to --

14             THE COURT:  Would you like to take a break?

15             MS. KRASNOW:  I just wanted to address one thing,

16 that it's not delay on the part of the DA's Office.  The

17 difficulty is once I get the files, they're extremely

18 voluminous, so it's extracting the relevant documents and then

19 making redactions.  So that's the issue.  I've already

20 produced 19 files.  Each file that I produce is about 100

21 pages.  So it's not a small task.  And with respect to the

22 remaining files, I would ask for two or three weeks to finish

23 the production.  I think that's a reasonable amount of time.

24             THE COURT:  So we're looking at the end of June

25 essentially.  Is that like three weeks.

52

1          MS. KRASNOW:  And if you -- well, two to three weeks

2     from today --

3          THE COURT:  Two weeks is the 26th, three weeks is

4     July 3rd.  Mr. Rudin?

5          MS. KRASNOW:  I would ask for the 3rd, Your Honor.

6          THE COURT:  Mr. Rudin, is the 3rd okay?

7          MR. RUDIN:  July 3rd?

8          THE COURT:  Yes.

9          MR. RUDIN:  That's fine.

10         THE COURT:  Okay.

11         MR. RUDIN:  Your Honor, as a firm deadline, Your

12    Honor.

13         THE COURT:  Yes.

14         MR. LARKIN:  Your Honor, I think we're working on

15    the assumption that our client has all of them gathered by

16    now, and these are personnel files that go back 30 years in

17    some cases and prior to even 1980, so we're doing our best to

18    gather them.  I believe that our client has them all.  If

19    that's not correct and we're running into difficulty with a

20    few files because of their age, we'll let counsel know and

21    we'll let the Court know.  But I think the July 3rd deadline is

22    reasonable, Your Honor.

23         THE COURT:  I'm hoping to avoid problems.  You

24    should ask your client as soon as possible whether there are

25    any files that haven't been located and tell Mr. Rudin right

53

1    away.

2              MS. KRASNOW:  Yes.

3              THE COURT:  Okay.

4              MR. RUDIN:  All right.  Your Honor, the defendants

5    had agreed to provide by June 1st whether or not they are going

6    to contend that any ADAs have been disciplined under Mr.

7    Hynes' tenure for misconduct in the prosecution of a criminal

8    case.  Mr. Larkin has made certain statements about that but I

9    don't know whether he intended to be bound or he meant that

10   that was his initial supposition, so I'm not going to repeat

11   the statements.  But it seems to me that we should have a firm

12   deadline because we need to plan discovery around what the

13   answer is.

14             MR. LARKIN:  Your Honor, the plaintiff is going to

15   have an ample opportunity to depose witnesses about

16   discipline, it seems to me.  I'm not prepared today to say

17   that -- to give names or to give specifics about who was

18   disciplined and what we're going to contend at trial.  I mean

19   we do have a little bit of time.  We've got to the end of

20   August to finish depositions.  It seems to me that if we were

21   to take -- once we identify or explain how many ADAs or which

22   ADAs were disciplined for certain types of misconduct that

23   there might be followup discovery and that plaintiff would be

24   entitled to take some followup discovery if it were necessary.

25   It seems to me this is a 26(a) type issue and the 26(a)

54

1  obligation is ongoing throughout the case.  So I mean end of

2  July doesn't seem unreasonable for us to sort through all the

3  records that we have and take a position one way or the other

4  as to how many ADAs were disciplined, why were they

5  disciplined.

6           THE COURT:  Okay.  Before we make a decision, or

7  before I make a decision on this, let's go through the other

8  issues because it sounds as though we need t prioritize the

9  discovery because I understand you're increasing by a third

10  starting next week.  You're going to have one more person

11  working on the case.

12          MR. LARKIN:  We hope so, Your Honor.  We're

13  interviewing Friday and we hope the person can start as soon

14  as possible.

15          THE COURT:  Okay.  All right.  So the resources that

16  counsel have ought to be prioritized.  And so let's just see

17  what you want to get first and then we'll have some

18  discussions of the emails.  Is there any one of the documents

19  that you want to talk about?

20          MR. RUDIN:  Well yes, Your Honor.  There were

21  records, hotel custody records, detective investigator logs --

22          THE COURT:  Right.

23          MR. RUDIN:  -- and memo books, the field and vehicle

24  logs, particularly as to the Detective Investigators Maher and

25  Bondor who we'll be deposing but more generally.  We haven't

55

1  gotten any of that.

2          THE COURT:  Has that been located?  Is there a

3  response from the City I should be looking for?

4          MR. LARKIN:  Your Honor, I think with regards to the

5  logs and the memo books, you know, there are so many -- I mean

6  I'm not sure if counsel's talking about logs concerning this

7  case, the Collins case, and memo book entries from the DIs who

8  were involved in this case.  We have no objection producing

9  those memo books if they still exist.  I highly doubt that

10 they still do exist.  But I'm just not clear on exactly what

11 it is we're talking about here.

12         THE COURT:  Mr. Rudin?

13         MR. RUDIN:  Ms. Rosenblatt is --

14         THE COURT:  Ms. Rosenblatt.

15         MR. RUDIN:  -- going to handle that issue.

16         MS. ROSENBLATT:  As to the logs, the field logs

17 we're interested in do pertain to the Collins case, at least

18 the ones that we think should be the easiest to locate, and

19 those are the ones that we've identified by Bates number in a

20 previous letter and in a conference too, but I can do it

21 again.  And that's the logbook where it shows that it was

22 opened in 1993 but then the first period that we receive

23 entries for I believe is March of 1995 and we wanted the,

24 because they're relevant to Mr. Collins' case, we wanted the

25 entries going back to January of 1995.  So we think that that

1  should be all within the books that indicates it was opened in

2  1993.

3        MR. LARKIN:  I'm pretty sure that that book is

4  missing either in whole or in part because I recall a

5  discussion with the client about this.  However, if you would

6  send me those -- if counsel could send me those Bates numbers,

7  I mean this is something that we should be able to nail down

8  pretty quickly.  Where are we today?  June 12th.  I think end

9  of June is fair for us to nail down what exists and what we

10 can produce, Your Honor.  And forgive me for losing track of

11 this issue with regards to this one segment of the discovery.

12       MR. RUDIN:  Your Honor, I understand that the

13 limited discovery that we received from that logbook, which

14 just happens to be outside the time period of most interest,

15 was turned over by the city in 2011, so I don't understand how

16 that logbook could be lost if we received discovery from that

17 logbook during the course of this lawsuit.  If it's lost, we

18 would request an affidavit from a knowledgeable party about

19 what happened to it.

20       MR. LARKIN:  Those parts of the file that were

21 produced in 2011 were created and put in the file either

22 during the 440 motion period or the habeas in 2010 or 2006.

23 It wasn't just searched for and located in 2011.  It had

24 previously been located as part of litigating the post

25 conviction proceeding.  So --

57

1          THE COURT:  That might be a question for the

2     depositions as well.

3          MR. RUDIN:  Well, we don't know who had that

4     responsibility.  That's why we'd like some disclosure of who

5     handled that logbook when it was last seen.  If it was for the

6     440 or the federal habeas proceedings then we don't know who

7     to depose.  It's awfully concerning to us that at a time when

8     we were contending that witness Oliva was produced to the DA's

9     Office and recanted in January or February and there are a

10    series of records indicating circumstantially that that

11    happened at the end of January, early February and they have a

12    logbook, and then they only produce what happened in March,

13    it's very troubling.  So --

14         MR. LARKIN:  What the records show is that there

15    were efforts made to contact Mr. Oliva but that Mr. Oliva did

16    not show up for the meeting.  They did schedule a meeting but

17    he didn't show up.  That's what the records show.

18         In any event, Your Honor, I understand the relevance

19    of the logbook and, you know, this is something that we can

20    nail down and will now -- by setting these priorities I think

21    it's very helpful for us because we can sit down with our

22    client and block out the time we need to sit down with them

23    and go through step by step what the specifics are of what

24    remains outstanding and this appears to be one of them.  So if

25    counsel would send us those Bates numbers we will absolutely

58

1    do that in the next say two weeks.  I think that's reasonable.

2         MS. ROSENBLATT:  And there are just two other

3    categories of logbooks and we also have provided the Bates

4    numbers and I'm happy to do it again, and that's the sign-in

5    logs and the vehicle logs.  And it's the same issue.  They're

6    just different kinds of logbooks.

7         MR. LARKIN:  I understand the relevance of those

8    materials.  I think that's -- I think we can do this in two

9    weeks, Your Honor.

10        THE COURT:  Okay.  Good.

11        MS. ROSENBLATT:  And then so the next thing is the

12   memo books.  And I understand that there's an issue with whet

13   the memo books are in the possession of the DIs or if they're

14   in the DA's file, but we don't know the answer to that.  And

15   obviously, the memo books that we're asking for are relevant.

16   So I believe that Mr. Larkin suggested that we should wait

17   until the deposition to get those but that's not workable.

18        MR. LARKIN:  Let me cut through it, Your Honor.  The

19   DA's file does not have the memo books.  That representation

20   was made in the habeas proceeding or in the 440 as Mr. Rudin

21   knows because he handled both of those proceedings.  So he

22   knows that the DA does not have those memo books.  The only

23   question is whether the DIs individually kept their own memo

24   books and some do and some don't.  So we will absolutely find

25   out whether the detective investigators have them.  If they

1  do, then we'll make the entries available, we'll produce them.

2  If they don't, we'll inform counsel.

3         THE COURT:  And the same date here?

4         MR. LARKIN:  I beg your pardon?

5         THE COURT:  June 28th, the end of the month?

6         MR. LARKIN:  We just need to get in touch with them

7  between now and then.  Are we going to be able to do that?

8  Okay.  I think we should be able to do that.  The only concern

9  I have is with Maher.  I know that DI Bondor has been in touch

10 with my co-counsel.

11        THE COURT:  Okay.

12        MR. LARKIN:  We'll absolutely make an effort to do

13 that.  If we run into difficulty we'll promptly notify counsel

14 and we'll notify the Court.

15        THE COURT:  Okay.

16        MS. ROSENBLATT:  Just to be clear, it's not -- Maher

17 and Bondor weren't the only two DIs who were involved in the

18 Collins case.  There were I believe a total of 12 and we have

19 provided those names.  So it seems to me that it's a simple as

20 a phone call.  I don't know how many steps you need to get the

21 phone number, but --

22        MR. LARKIN:  Well, DIs -- and I mean I'm not aware

23 of 12 detective investigators being involved in this case or

24 involved with any of the witnesses in ways that it's worth it

25 for us to chase them down to find the memo books.  So if we

1   need to have that discussion, we can have it.  If we need to

2   move for relief, we can move for relief.  But calling 12 Dis

3   because their names might appear on a piece of paper someplace

4   doesn't really seem to be all that productive.  I mean the

5   allegation in the case is that Maher and Bondor were involved

6   with getting the three witnesses either to court or to testify

7   and I believe one or both of them went to Puerto Rico to look

8   for Adrian Diaz.  So there's no allegation that any other

9   detective investigator was involved in any sort of purported

10  misconduct if you will with respect to those witnesses.  So

11  I'm not sure why 12 DIs are even relevant.

12          THE COURT:  Well, one question would be whether

13  their memo books are in the DA's files.  If they're in the

14  DA's files then your life is easy.

15          MR. LARKIN:  We've produced everything in the DA's

16  file.

17          THE COURT:  Produced everything?  Okay.

18          MR. LARKIN:  Everything.  So to the extent there's a

19  memo book of any detective investigator, it's got to be in

20  there.

21          MR. RUDIN:  I have seen a number of depositions

22  where the indication is that for some reason detective

23  investigators from the DA's Office would take their memo books

24  with them.  So Mr. Larkin's probably right.  I mean there's a

25  chance that they're there but he's probably right.  But just

61

1   to respond to what he just said, for example, Mr. Oliva was

2   brought to the DA's Office on at least one occasion before he

3   testified after refusing in writing to go voluntarily and they

4   took him anyway.  That day he was not taken by Maher and

5   Bondor.  There are other detective investigators who are

6   listed as having taken him.

7           In addition, Mr. Santos, who was held first in jail

8   and then a hotel, we have received discovery of the names of

9   detective investigators who guarded Mr. Santos.  I know from

10  other cases that detective investigators would note in their

11  memo books and sometimes in logbooks which we've also asked

12  for, problems with witnesses, a witness being impaired, a

13  witness refusing to cooperate, a witness making a statement

14  that's relevant.  So we don't know what we're going to get but

15  we're entitled to look.  It could be something --

16          THE COURT:  You're looking for Brady material.

17          MR. RUDIN:  I'm sorry?

18          THE COURT:  You're looking for Brady material or

19  other kinds of --

20          MR. RUDIN:  Well, Brady material or indications the

21  witness was not --

22          THE COURT:  Cooperative.

23          MR. RUDIN:  -- cooperative the way they were

24  portrayed.

25          MR. LARKIN:  With respect to the --

62

1          MR. RUDIN:  Or coerced.

2          MR. LARKIN:  With respect to the two main DIs I

3   think June 28th is realistic.  With respect to the others, if

4   they still work at the DA's Office, then we could probably

5   find out whether they still have their memo books within the

6   next two weeks.  But if they're retired, it's going to be a

7   lot harder to track them down.  We'll absolutely do our best I

8   suppose but I guess we'll look at the list of 12 and see what

9   role they play in the case and make an effort to find out

10  where they are now.

11         MR. RUDIN:  There may be less than 12.  We'll try to

12  narrow it down.

13         THE COURT:  Okay.  Try to narrow it down.  And I

14  think the principle is if they in fact did control, hold in

15  custody, or drive, or transport any of the material witnesses

16  then they would be relevant.

17         MR. LARKIN:  Then they would be relevant, yes, Your

18  Honor.

19         THE COURT:  Okay.

20         MR. RUDIN:  Your Honor, there were case materials in

21  four cases that make up our evidence of customer practice and

22  failure to discipline, the Marshal case, the Hamilton case,

23  the Acevedo case and the Quezada case where the City agreed to

24  provide the materials that we requested in our discovery

25  demand and they haven't been provided.

1          MS. KRASNOW:  We have already received some of the

2   materials for a few of those cases but I think this is part of

3   the issue of we can only do so many things at once.  So I've

4   been focusing on the personnel file production.  So I haven't

5   yet been able to turn to the production of those other

6   materials.  I think a reasonable date for that would be 30

7   days from now to get all those materials produced.

8          THE COURT:  Sold.  July 12th, which is a Friday.

9   Okay.

10         MR. RUDIN:  All right.  So I think now we're left

11  with the discipline question which I'm not sure Your Honor

12  wanted to deal with today and, you know, the disclosure by

13  some deadline of whether any ADAs were disciplined and the

14  emails.  Oh yes, one other thing, the hotel custody records.

15  We have made a request for hotel custody records.  They have

16  logs that list the indictment number, the name of the

17  defendant, the name of the witness, the reason why the person

18  was kept at the hotel, whether the person was kept at the

19  hotel as a mere witness for protective custody under material

20  witness order.

21         THE COURT:  And you need those?

22         MR. RUDIN:  Yes.  We have one page that includes the

23  dates around when Angel Santos was kept as a material witness

24  in a hotel.

25         THE COURT:  And you're just looking for the Collins

64

1  case or you're looking for something --

2          MR. RUDIN:  Well no, we were looking more broadly,

3  but Your Honor made a preliminary ruling that at least for now

4  they needed to disclose statistical information about during a

5  five-year period how many times witnesses who were the subject

6  of material witness orders were held in hotels, and that has

7  not been responded to.  And then we were going to address

8  whether or not to seek any additional discovery after we

9  received that response.

10          MR. LARKIN:  I believe --

11          THE COURT:  Go ahead.

12          MR. LARKIN:  I'm sorry.  I believe that we disclosed

13  numbers, a number of witnesses -- okay, we disclosed a number

14  of witnesses I believe for whom material witness warrants were

15  obtained, and then there was a followup.  There was a -- Your

16  Honor had suggested that we turn over -- again, this is the

17  problem of trying to keep track of so many different balls in

18  the air, Your Honor, so I appreciate the Court's indulgence

19  and the Court's patience.  I believe the Court had suggested,

20  had directed us to turn over or to reveal and disclose the

21  number of those individuals, the subset that were kept in

22  hotels.  Am I remembering that consistent with your

23  recollection, counsel?  I'm sorry.

24          MR. RUDIN:  I've checked with everyone at this

25  table.  I don't think we received it as material witnesses.  I

65

1  think you may have supplied something as to some other

2  category, not material witnesses.  But if I'm wrong and you've

3  complied, then all you need to do is the second part which you

4  just described.

5          THE COURT:  Okay.

6          MR. LARKIN:  I think the concern --

7          THE COURT:  Can I just stop you both for a second?

8          MR. LARKIN:  Yes.  I apologize.

9          THE COURT:  I think the burden is on the plaintiff

10  at this point to say whether or not you did receive that

11  information.

12          MR. RUDIN:  I don't believe we have, Your Honor.  I

13  don't recall receiving it.  No one else at this table recalls

14  receiving it.  We've all been reviewing discovery.

15          MR. LARKIN:  I know we sent out -- a number of

16  individuals who were subject to material witness orders was

17  provided.

18          THE COURT:  By email?  By letter?

19          MR. LARKIN:  It was a document that our client

20  actually created after reviewing its own records and we did

21  supply -- I can supply again or I can supply the Bates number.

22  I'm happy to do that, Your Honor, if need be.

23          THE COURT:  Just supply them again.  You know, it'll

24  be a lot easier.

25          MR. LARKIN:  Yes, yes.

1          THE COURT:  Thank you.

2          MR. LARKIN:  But there has been a concern with

3    regards to the specifics of the material witnesses only

4    because these individuals are in protective custody for their

5    own protection.  And so I don't know that we've honed it down

6    enough where we're at the point where counsel wants names or

7    dates or locations for specific witnesses.  So I guess --

8          THE COURT:  Can you come up with a protocol?  I'm

9    sorry to interrupt you, but can you come up with a protocol,

10   the three of you, for how you want to deal with that?

11         MR. LARKIN:  I think so.  I think we need to do

12   that.  I'll confer with --

13         THE COURT:  Yes. You have enough private information

14   here, you know, in the case that's sensitive that I think you

15   can just come up with a general protective order.

16         MR. RUDIN:  All right.  Your Honor, can we have a

17   deadline for the conferral?  Every other time we've had a

18   discussion of the conferral I have not been able to bring

19   about the conferral with the one exception of March 22nd and

20   23rd we conferred and that's the last time I've been able to

21   arrange a conferral so --

22         THE COURT:  Okay.  When --

23         MR. LARKIN:  I guess we share the frustration, Your

24   Honor.  So what I will do is supply the Bates number of that

25   document by the end of this week and then next week by next

67

1   Friday, the 21st of June.  Am I correct?  June 14th, this

2   Friday, June 21st we'll have our conferral.

3            THE COURT:  So are you going to provide the Bates

4   number or the actual document?

5            MR. RUDIN:  Either one.

6            MR. LARKIN:   I'll supply them with another copy of

7   the document.  Sure.  No problem.

8            THE COURT:  Okay.  Easier.

9            MR. RUDIN:  And Your Honor, there's statistical

10  information which doesn't involve a privacy concern.  Are we

11  going to receive that?  About how many of those witnesses

12  ended up in hotels.  That was the second part of Your Honor's

13  order.

14           MR. LARKIN:  The first part that the plaintiff says

15  he didn't get is the document showing the number of

16  individuals that were subject to material witness orders.  It

17  was not very high.  It was lower than -- it was something like

18  18.  It was something like literally four one year, it was ten

19  another year, 12 another year.  It was not a lot of --

20           THE COURT:  That's why we get the sample.

21           MR. LARKIN:  Exactly.

22           MR. RUDIN:  Mr. Larkin is mistaken because I

23  received a document that on one page of a log had at least

24  seven or eight material witness orders in a one or two week

25  period.  That's the paper that they've supplied with Angel

68

1    Santos.   So I think Mr. Larkin must be referring to --

2                 MR. LARKIN:   By 1995 the number was higher.   There

3    were about 40 material witness orders in 1995.   Prior to that

4    time the numbers appear to be lower.   And so that's the

5    information that I got.   I'll supply it and we'll go from

6    there.

7                 THE COURT:   This is why you're conferring on the

8    21st.

9                 MR. LARKIN:   Yes, Your Honor.

10               THE COURT:   All right.   Are we done with the

11   documents?

12               MR. RUDIN:   Except for the emails and --

13               THE COURT:   Right.   And the disciplinary records.

14               MR. RUDIN:   Well, one other thing.   The privileged

15   documents that Your Honor ruled on before, we had a further

16   conversation.   Following Your Honor's suggestion, I sent a

17   detailed letter to Mr. Larkin asking for more information

18   about some of the documents that have been withheld on

19   privilege grounds.   Some of the ones that we discussed briefly

20   by telephone and then additional documents, just one example

21   that comes to mind, there were 350 pages of notes apparently

22   from the trial and it seemed to me that some of those notes,

23   for example, what kinds of questions to ask Oliva, there's

24   been a lot of controversy with the Brooklyn DA's Office where

25   the practice was in the 1990s to take notes in form of

69

1  questions so that there wouldn't be a Rosario obligation.  And

2  ultimately the Appellate Division ruled that in some cases

3  that's a skirting of the Rosario obligation and have to turn

4  over the questions.  And that ruling came in the mid 1990s.

5  So it's possible here that they interviewed a witness like

6  Oliva or a witness like Santos and took notes in the form of

7  questions and then didn't turn them over as Rosario.  And

8  those notes might contain Brady material.

9           THE COURT:  So you're saying that what I thought

10  were notes taken during the trial were in fact possibly

11  interview notes?

12          MR. RUDIN:  Yes.  And I --

13          THE COURT:  So how would I know that?  Or how could

14  one know that from looking at the records?

15          MR. RUDIN:  Well, because we asked defense counsel

16  for more information about what those 350 pages are and we

17  wrote a very specific letter with specific questions and we

18  didn't receive a response.  That was one of the things that we

19  were supposed to confer about and we were never able to

20  confer.  So I would just ask that defense counsel respond to

21  my letter and that we confer.  And then if we aren't able to

22  work it out then we can bring it to Your Honor's attention for

23  more torture of the Court.

24          MR. LARKIN:  Yeah, I mean you know, we went through

25  a detailed process where we submitted a significant amount of

70

1  material to the Court and the Court spent a lot of time

2  looking at it closely.  Plaintiff then decided to send us

3  another four page single spaced letter complaining about every

4  nit and every, you know, pencil mark on every piece of paper

5  including, you know, identify the author of this, you know,

6  PostIt that appears on Bates number 36221.  You know, come on,

7  it's just -- at some point it does become a bit cumbersome.

8  Okay?

9          THE COURT:  I understand you're frustrated, but --

10         MR. LARKIN:  All I would ask is if we could have

11  until a week from Friday, June 21st.  I'll respond to Mr.

12  Rudin, I'll respond directly to his letter to every matter

13  that he's raised, and if he wants to bring further motion

14  practice, I guess that's his right.  But it seems to me that's

15  going backward revisiting issues that the Court has already

16  looked at, is going backward, and is not really productive.

17  But if counsel wants to do it, that's the way I would request

18  the opportunity to do it that way.

19         THE COURT:  Here's my ruling on that.  You'll meet

20  and confer on that on the 21st.  You'll send him a letter

21  before the 21st.  And then to the extent that there's a

22  legitimate dispute that ought to be brought to the Court, I'll

23  entertain it understanding that it would only be on the basis

24  of established law on motions for reconsideration which will

25  be that there's something that's brought to the Court's

1   attention that the Court didn't understand before.  So for

2   example, if the Court -- if I thought that these were trial

3   notes and in fact they were notes of witnesses, that would be

4   something that I would have understood.  So that's the kind of

5   thing you can come back and ask about.  Otherwise, the time to

6   reconsider is past.

7            MR. RUDIN:  Yes, Your Honor.

8            MR. LARKIN:  Thank you, Your Honor.

9            MR. RUDIN:  All right.  So then turning to the

10  emails?

11           THE COURT:  Yes.

12           MR. RUDIN:  So we have tried for a number of months

13  now to arrange a meet and confer with the IT person from the

14  DA's Office so that we can understand what the problems are

15  and whether or not there's a way consistent with our real

16  interest here to narrow down the request.  We need to have an

17  understanding of what part of our request presents a problem

18  in terms of the number of hours that are necessary by an

19  expert to retrieve the emails.  I assume, for example, that

20  emails that we're seeking from 2006 that maybe have not been

21  saved in the same manner as emails from 2010 may be more

22  difficult.  If someone would explain to us what the practical

23  problems are.  We have an interest in moving the case forward

24  so we'll try to be as reasonable as we can but we haven't been

25  able to have that conferral.

1          THE COURT:  Okay.  And your letter and I think our

2    mutual discussions at the last conference suggest that your IT

3    people should all just get together and try to figure this

4    out.  Now, if that's unrealistic given -- if it's unrealistic

5    for some reason, let me know.

6          MR. RUDIN:  We don't have an IT person.

7          MR. LARKIN:  I guess the costs and the burden, Your

8    Honor, of just looking for one person's emails going back to

9    2006 was vast.  I was told that it would take hundreds of

10   hours of restore sessions to get the old data back from that

11   time period.  Now, if I'm hearing that a limitation, say

12   starting with 2010, which is when the habeas proceedings

13   heated up, I think that would be much more manageable and

14   doable.  And I can -- I mean that, it seems to me given the

15   time left for discovery, is a realistic reasonable

16   conversation.  If we're talking about emails for eight or nine

17   individuals that go all the way back to 2006 and 7, that's

18   just going to be an extremely costly time consuming

19   undertaking based on what I've learned from the client.  But

20   2010 is a significant difference in terms of the cutoff.

21         THE COURT:  And you've spoken to the IT people?

22         MR. LARKIN:  I've spoken to my contacts at the

23   client who have had the detailed discussions with the IT

24   people and I'm confident that I've got good information

25   because I got a lot of specifics on that, Your Honor.  So if

73

1   2010 is the cutoff, we could probably cut through that a lot

2   quicker.

3          MR. RUDIN:  Well, then I guess they should have done

4   2010 by now and it wouldn't have been that difficult and we

5   could be struggling with 2006, but we don't even have most of

6   2010.

7          MR. LARKIN:  Well, that's not really fair.

8          THE COURT:  Okay.  Gentlemen --

9          MR. LARKIN:  Sorry.

10         THE COURT:  The principle that's involved here is a

11  burden benefit analysis.  All right?  And so that's what the

12  Court is -- the Court has to look at that.  So --

13         MR. RUDIN:  We haven't been able to meet with their

14  person.  I don't know when -- this is all third hand.

15         THE COURT:  Okay.

16         MR. RUDIN:  Mr. Larkin's understanding from the DA's

17  Office, which also represented that there were no emails in

18  the CBS "Brooklyn DA" series involving Vecchione and there

19  were.

20         MR. LARKIN:  Come on.  We never said that there were

21  no emails.  That's silly.

22         THE COURT:  Okay.  So gentlemen, okay, let's --

23         MR. LARKIN:  My goodness.

24         THE COURT:  Let's just keep it --

25         MR. LARKIN:  I just can't --

1           THE COURT:  Mr. Larkin --

2           MR. RUDIN:  They did make the representation that --

3           MR. LARKIN:  False statement.  We never said --

4           THE COURT:  Mr. Larkin --

5           MR. LARKIN:  -- that there were no emails.

6           THE COURT:  -- Mr. Larkin --

7           MR. LARKIN:  I'm sorry.  I just can't allow

8  misrepresentation.

9           THE COURT:  Well, you say you're sorry but then you

10 keep talking.  I do the same thing but -- okay.

11          MR. LARKIN:  You're the judge.

12          THE COURT:  Here's what I'd like you to do.  All

13 right.  Could you let Mr. Rudin speak to your IT person with

14 you on the phone and just let him assess what the burden

15 benefit analysis would be?  Because ultimately that's the

16 decision I'm going to have to make.  I want Mr. Rudin to

17 understand the burden or benefit and then both of you can

18 argue from the same page.  That's what I need.

19          MR. LARKIN:  Can we have until the 28th of June to

20 arrange that?  Because I'll reach out to the client.  I'll

21 find a convenient date and time when we can all get on the

22 phone and confer and we'll set up a conference call, Your

23 Honor.

24          MR. RUDIN:  That pushes us back two weeks before we

25 even begin to have the processing of the emails.  I'm just

75

1    concerned with the overall schedule that then they're going to

2    say they need a lot of time to actually retrieve the emails

3    and everything could be thrown out of whack.  So why can't we

4    have that conferral sooner.  We're just talking about a

5    telephone conferral.

6                MR. LARKIN:  Well, we have to prepare ADA Vecchione.

7    He's got to be deposed sometime before June 25th.  If counsel

8    wants to move the deposition -- I mean on top of that we've

9    got the personnel files to look at.

10               THE COURT:  Right.

11               MR. LARKIN:  We've got all the other documents to

12   produce.  We've got our own discovery to do in the case.

13               THE COURT:  Right.

14               MR. LARKIN:  You know, something has to give at some

15   point.  I've only got two hands and Ms. Krasnow has got two

16   hands I think.  One and two.  So --

17               THE COURT:  So that's why we're doing the

18   prioritizing.  That's why I wanted to go through everything.

19   We've got all the dates and the numbers here.  So what we need

20   to do here is figure out what the priority is.  June 28th seems

21   to be reasonable given all the things that the defendants have

22   to do in this case.

23               MR. LARKIN:  I'll accept that, Your Honor.  I don't

24   want to belabor it.  If that's --

25               THE COURT:  Yes.  You know, and part of the problem

76

1   is Monell things are very difficult and involves a huge amount

2   of discovery.  It's a burden on plaintiff, it's a burden on

3   defendants, it's a burden on the Court, but it's important.

4   So we want to do it right and we'll just continue to

5   prioritize it.

6               MR. RUDIN:  Your Honor --

7               THE COURT:  Hold on.

8               MR. RUDIN:  Your Honor --

9               THE COURT:  Is Mr. Retco [Ph.] here?

10              THE CLERK:  No.

11              THE COURT:  Mr. Retco has nothing to do with this

12  case.

13              MR. LARKIN:  Lucky him.

14              THE COURT:  Come on in.  We'll take you back to the

15  jury room.  Rachel will be back in a couple of minutes.

16              MR. RUDIN:  Your Honor, that brings us to the issue

17  of --

18              MR. LARKIN:  Your Honor, I'm sorry, my co-counsel

19  just reminded me that we've got a couple of deadlines of June

20  21st and we also have ADA Vecchione's deposition to be done

21  either by the 21st, on the 21st, or on the 24th of June.  It

22  does not seem possible.  Really, I know Your Honor just ruled

23  on this but --

24              THE COURT:  Just tell me what you'd like.

25              MR. LARKIN:  Would it be possible to make that

1  deposition sometime in the dates that we proposed, either July

2  30th or July 31st, or August 6th or 7th so that we can -- and it

3  may make sense particularly in light of the emails that will

4  be produced.  I expect that some additional emails will be

5  produced and some of them may relate to ADA Vecchione's

6  deposition.  So --

7           THE COURT:  It's a tradeoff for you, Mr. Rudin.  You

8  have to decide whether or not the emails are important enough

9  that you'd like to have them all before you have the Vecchione

10  deposition.

11          MR. RUDIN:  I'd like Mr. Vecchione's deposition.

12  That's a priority.

13          THE COURT:  Okay.  So we'll push back the emails a

14  little bit.

15          MR. LARKIN:  All right.  So then I think also some

16  of the other conferrals that we have to have about -- I'll let

17  my co-counsel address it.  She's got the --

18          THE COURT:  I mean we've got all the meet and

19  confers on the 21st and we have the Vecchione deposition.

20          MS. KRASNOW:  All the meet and confers are on the

21  21st plus responding to the letter with other privileged

22  documents.  And then we're taking a deposition early the next

23  week.  So it's just -- I don't see how we can get all that

24  done.

25          THE COURT:  So what do you propose?  That's why

78

1   we're doing this in the list.

2          MS. KRASNOW:  To move either Mr. Vecchione's

3   deposition or to move the conferrals back on those topics.

4          THE COURT:  The conferral and the Vecchione

5   deposition are pretty much on the same date, so we need to

6   move -- I think we may need to move the conferral if you don't

7   want to move the Vecchione deposition.

8          MR. RUDIN:  So let's move the conferrals to a date

9   soon after the Vecchione deposition.

10         THE COURT:  Let's make it a reasonable time for the

11  defense.

12         MR. RUDIN:  Let's make it -- I would suggest, Your

13  Honor -- yeah, that's not going to be enough time.  Maybe July

14  3rd, on or before July 3rd.  I mean you've got the three-day

15  weekend there.  I think actually the first or second week in

16  July makes a lot more sense for all that stuff because we're

17  going to need to confer with our client and find out what they

18  have and where it is.  And with respect to emails, it's going

19  to be somewhat involved.  So maybe the week of July --

20         THE COURT:  Let's start with July 3rd.  How does July

21  3rd work for you?

22         MR. LARKIN:  Not very well.  I have a brief due in

23  the Second Circuit on July 5th in a case where they just

24  granted in bank review.

25         THE COURT:  Okay.  So when do you want to do it?

1          MR. RUDIN:  We're talking about a telephone call.  I

2  don't understand why we can't do it the week before.

3          MR. LARKIN:  Well, we're pushing off all this

4  discovery.

5          THE COURT:  If the telephone call goes the way this

6  conference goes --

7          MR. LARKIN:  It's the week of -- it would be the

8  week of July 8th, Your Honor.  Maybe by Friday the 12th?  That's

9  only 30 days from today to work out a significant number of

10  discovery issues.  I mean if we can do it sooner, we'll be

11  happy to do it sooner.  But if counsel wants ADA Vecchione,

12  that's --

13          THE COURT:  Well, that's a trade off.

14          MR. RUDIN:  That's, as Your Honor said, apples and

15  oranges.  I mean if you're carrying one witness to testify,

16  that should mean that they can't find out from their client

17  what documents they have and then have a telephone

18  conversation about how they should be provided and under what

19  protections of the rights of innocent third party witnesses --

20  whereas to the emails, why we can't have a telephone

21  conversation with their IT person that we've been trying to

22  set up for three months, I don't understand why --

23          MR. LARKIN:  I mean, you know, I can't --

24          THE COURT:  Okay.  But let's just talk about the IT

25  person.

80

1          MR. LARKIN:  Yes, Your Honor.

2          THE COURT:  I think we have a better chance of

3    getting the IT person the week before the Fourth of July.  So

4    if we can do that --

5          MR. RUDIN:  By the 28th?

6          THE COURT:  Yes.

7          MR. RUDIN:  Okay.

8          MR. LARKIN:  I mean that's probably -- if we isolate

9    that one piece and set it up for sometime prior to June 28th --

10          THE COURT:  Okay.  So we'll move on?

11          MR. RUDIN:  Yes, Your Honor.

12          MR. LARKIN:  But I think, Your Honor, the conferral

13    about the other issues, the other document issues are still --

14    I mean we still have personnel records to produce.  We have

15    all these logs that have been requested.  And, you know, we

16    aren't going to be able -- it just seems it's going to be

17    extremely difficult for us to get all of that done --

18          THE COURT:  You have by the 28th.

19          MR. LARKIN:  -- prior to the 21st.

20          THE COURT:  28th.  [Inaudible] the 28th.  The Marshal

21    -- all the case [inaudible] are the 12th of July.  The other

22    DIs are the 15th of July.  Now, the hotel custody records,

23    well, that's [inaudible] just going to --

24          MR. LARKIN:  We're going to have to confer and speak

25    about that.

81

1           THE COURT:  That's not going to take very long.

2   That's the [inaudible].  So I think we're okay.  If you want

3   to change the 21st to the 28th for the meet and confer, we can

4   do that.  That work?

5           MR. LARKIN:  I think we'll have to.

6           THE COURT:  All right.  Mr. Rudin, so it's not the

7   3rd, it's the 28th.  That'll take the burden off you as well.

8           MR. RUDIN:  Thank you.  All right.  So now there's a

9   sealing issue and then there's the question of the timing and

10  the scope of Mr. Hynes' deposition.

11          THE COURT:  Okay.  Now, here's what we need to do.

12  We need to take a short break because I have another case that

13  I have to dial into.  We're going to take a couple of minutes

14  and then I'll be back?

15          MR. RUDIN:  May we leave our material here on the

16  table?

17          THE COURT:  It's fine.  Leave everything right

18  there.

19          MR. RUDIN:  Thank you, Your Honor.

20          THE COURT:  Can you just turn the record off?

21  Thanks.

22                      [Off the record.]

23          MR. RUDIN:  Your Honor, are we back on the record?

24          THE COURT:  We will be in one second.

25          THE CLERK:  We're back.

82

1          THE COURT:  We're back on the record.

2          MR. RUDIN:  Your Honor, Ms. Rosenblatt reminded me

3    that I forgot to bring up the CBS emails.  There was a

4    disagreement.  I believe that Mr. Larkin is agreeable in

5    principle to providing some of those emails.  CBS had

6    indicated when it made the limited disclosure that it made in

7    the Abe George case that they were only disclosing emails that

8    they, in their judgment, did not believe were protected by

9    some sort of journalist privilege.  So there appear to be

10   additional emails that may involve Mr. Vecchione.  I don't

11   know if any of them also involve Jabbar Collins.  But Mr.

12   Larkin indicated in an email to me that he thought that the

13   emails -- that there shouldn't be -- he did not want to make

14   disclosure beyond I think it was February of 2013 and our

15   position is that there should be no artificial cutoff, that

16   the show has been in production for a number of months.  And I

17   understand from whatever what I've read in the news media and

18   from a direct conversation with a producer who called me that

19   they may very well go into the Jabbar Collins case.  And I

20   also understand that they're beginning to go into some of Mr.

21   Vecchione's previous prosecutions and he continues to be the

22   star of the show.  And any emails that reflect his role,

23   possibly any editorial influence or control that he may have,

24   the district attorney's involvement, and the discussion of the

25   Jabbar Collins case -- when I say the district attorney's

83

 1  involvement I mean emails are relevant because Mr. Vecchione

 2  it seems to us is being held out as the face of the office and

 3  that's significant given what we intend to prove about Mr.

 4  Hynes' knowledge of alleged misconduct on Mr. Vecchione.  So

 5  that's why we want the emails.  And I don't see why I should

 6  be artificially limited to February.

 7          MR. LARKIN:  I guess the reason why I suggested that

 8  limit cutoff, Your Honor, is that my understanding is that

 9  emails after that only concern scheduling such as items such

10  as when and where can we shoot the first episode and who's

11  going to be available and when.  There was nothing of

12  substance.  I think that the program, the relevance of the

13  program, as I understand it, is that -- putting aside the

14  Collins case for a moment, which has not been the subject of

15  any of the episodes of the program, the plaintiff's theory

16  will be that the district attorney continues to have

17  confidence in ADA Vecchione and allows him to act as one of

18  the senior players in the office on the program.  And the

19  program is public.  It's aired, it's out there.  We aren't

20  going to dispute that, any of those facts.  So these emails

21  have tangential relevance to the extent that they don't

22  concern the Collins case.  If counsel wants all the emails

23  that relate to the program, it seems to the extent that they

24  mention the Collins case at all, there could be -- it seems to

25  me that there is relevance there and that they should be

1   discoverable.  But to the extent that they don't, they're not

2   even discoverable here.  They don't relate to anything that's

3   material to this case it seems to me, and there is a burden

4   searching for old email.  So if the plaintiff wants all of the

5   emails concerning a program, relating to the program that

6   mention the Collins case, that's a fair discovery demand and

7   we can incorporate the discussion with the IT person.  We can

8   incorporate that issue into that discussion.  But to produce

9   all the emails related to the entire program concerning things

10  like where to have lunch or where a shoot should take place

11  seems to be burdensome given the fact that there is a public

12  program where ADA Vecchione appears.

13          THE COURT:  Okay.

14          MR. LARKIN:  And there's no question that the DA is

15  -- that's done with the DA's approval.  There's no question

16  about that.

17          MR. RUDIN:  Your Honor --

18          THE COURT:  So let's just narrow down what's

19  requested.  No dispute over Collins without a date, so emails

20  re Collins.  The only other thing that I heard a request for

21  was Vecchione.

22          MR. RUDIN:  That's right.  Any email that he's a

23  party to or that mentions him.  And the reason why that's

24  important is I know Mr. Larkin previously has characterized

25  the emails that we did get through the CBS litigation as not

1   significant because they're really about scheduling, but in

2   fact, what they show is Mr. Vecchione and Jerry Schmetterer,

3   who's the public relations person from the DA's Office, were

4   the two people who conducted all the negotiations.  And there

5   was an email where they talked about selling the idea to the

6   district attorney or getting his approval.  And the emails

7   show that Mr. Vecchione is there setting the whole thing up.

8   He's the architect of it for the DA's Office.  And I, you know

9   --

10          THE COURT:  Can't you just stipulate to that? I mean

11  does anybody disagree about that?

12          MR. LARKIN:  Well, the fact that ADA Vecchione is

13  the architect of it?  That's not true.  I mean --

14          THE COURT:  Okay.  They disagree.

15          MR. LARKIN:  The producer at CBS contacted the DA's

16  press spokesman, somebody with whom she had a previous

17  business relationship and suggested doing the program, and

18  they agreed to do it.  And there's no question that ADA

19  Vecchione was involved to some extent in discussions with the

20  district attorney, but counsel can depose ADA Vecchione and

21  ask him those questions.  If he wants to depose the spokesman

22  on it, I don't really see what's to be gained from that.  But

23  emails concerning Vecchione and the program, the television

24  program, aren't relevant to this case.  The program is the

25  program.  It's public.  It's aired.  ADA Vecchione, he does a

86

1   voice over, he appears, a number of his cases are discussed.

2   We aren't going to dispute those facts.  It's there.

3           MR. RUDIN:  Your Honor, how much of a burden would

4   it be to search for?  These are current emails in the year

5   2013 that involve Mr. Vecchione, or that he's a -- I'm even

6   willing to limit it further, that he's a party to.  To or from

7   Mr. Vecchione.  That's a very simple search and it won't take

8   them very long.

9           THE COURT:  To and from Mr. Vecchione and --

10          MR. RUDIN:  And concerning the CBS program.

11          THE COURT:  And CBS or concerning the CBS program?

12          MR. RUDIN:  Concerning the CBS program, to or from -

13  -

14          THE COURT:  Even internal?

15          MR. RUDIN:  Yes, especially internal.  But if there

16  was some way to weed out emails that are truly unimportant and

17  extraneous, then of course I'd want to do that.  But the

18  problem is that the side doing the weeding out has an interest

19  in the litigation, so it seems to me that the most

20  straightforward way to accomplish this is just have them

21  provide all those emails.  It can't possibly take very long to

22  search current computer records for those emails.

23          MR. LARKIN:  Your Honor, all this takes additional

24  time.  You know, we're talking about a significant number of

25  depositions, a significant number of documents, a complicated

1   case --

2           THE COURT:  I think I have a thought on this.  Why

3   not just between Mr. Vecchione and the district attorney?

4   Because the idea is that the district attorney was the person

5   who designated Mr. Vecchione, or had to be persuaded to use

6   Mr. Vecchione and the question is whether or not despite what

7   plaintiff believes is Mr. Vecchione's poor behavior or

8   misconduct, the district attorney still wanted to use him as

9   the face of the office.  We can certainly start with that.

10          MR. LARKIN:  So it would be, Your Honor, emails, any

11  emails about the program concerning the Collins case, if they

12  exist, and any emails between the district attorney, Charles

13  Hynes, and Mike Vecchione concerning the program?

14          THE COURT:  Right.

15          MR. RUDIN:  Well then, Your Honor, I would also ask

16  for any emails between Mr. Vecchione and CBS because Mr.

17  Vecchione may have attempted to influence the content of the

18  program and --

19          THE COURT:  But why does that matter at this point

20  whether he influenced the content?

21          MR. RUDIN:  Because he's acting as the

22  representative of the DA's Office influencing the content of

23  the program.  He's doing that on behalf of Mr. Hynes.  I just

24  think that's significant.

25          THE DEFENDANT:  But how does it relate to the Monell

88

1    claim, to the pattern and practice?

2              MR. RUDIN:  Because the idea that Mr. Hynes would

3    allow Mr. Vecchione to do that when he's on notice about the

4    misconduct that occurred in this and other cases is an

5    indication to everyone in the office of his indifference to

6    that misconduct.  That's our theory.  Obviously, Mr. Larkin

7    would dispute it, but that's our theory.  And it's not a

8    burden to search for those emails.  It's a very simple word

9    search.

10             MR. LARKIN:  Of course it's a burden, Your Honor.  I

11   mean first of all, the suggestion that anyone at the DA's

12   Office influenced the content of the program is not correct.

13   CBS doesn't allow anybody to exercise editorial --

14             THE COURT:  Let me just cut you off for a second.

15             MR. LARKIN:  I'm sorry.

16             THE COURT:  Right now you can have the emails

17   between Mr. Vecchione and the district attorney.  You can

18   depose Mr. Vecchione about what he wanted to do with CBS.  And

19   if you find something there that would require followup

20   through emails or whatever else, then you can pursue that.

21             MR. RUDIN:  Right.  May I --

22             THE COURT:  But I need to have a demonstration of

23   relevance.

24             MR. RUDIN:  May I do that part of the questioning at

25   the first deposition or would you prefer that I wait for the

89

1  second part on Vecchione?

2        THE COURT:  Does it matter?  It really has to do

3  with your preparation.

4        MR. LARKIN:  We have no objection to questions about

5  the program at the first deposition.

6        THE COURT:  The first deposition.  Okay.

7        MR. RUDIN:  Okay.  That's fine.

8        THE COURT:  Great.

9        MR. RUDIN:  All right.  So --

10        THE COURT:  Are we done with emails?

11        MR. RUDIN:  Yes, Your Honor.

12        THE COURT:  Okay.  So it would be --

13        MR. LARKIN:  Can I raise one question, Your Honor?

14  With regards to ADA Vecchione's deposition, if we're going to

15  split it up, counsel gets one day of seven hours.  If we're

16  splitting it up, it seems to me the seven hour limitation

17  should apply.  And let's say it goes six hours the first day,

18  and since counsel made the representation earlier that 90% of

19  the deposition, 90% in counsel's statement concerns the

20  Collins case, it seems to me you go the first day say six

21  hours and that leaves an hour for whatever other questions are

22  left.  So it would appear to me that the seven hour limitation

23  should apply.

24        THE COURT:  Well, it's a presumptive limitation so

25  unless there's good cause to go beyond it, but I'm not going

90

1   to tell Mr. Rudin how many hours he has to spend at the first

2   deposition or the second.  We all know how to add.

3          MR. LARKIN:  Okay.  Fair enough.

4          MR. RUDIN:  Your Honor, given his role, it may very

5   well be that I'll make an application for more time but it's

6   hard to know whether that'll be necessary until I do the first

7   day.  And I will certainly, with the Monell part of it,

8   provide notice to the other side of the cases I want to

9   question him about and make sure that they have the documents

10  as Mr. Larkin as been requesting so that we can save time in

11  reviewing documents during the deposition.

12         THE COURT:  And also, if you've taken other

13  depositions in the meantime you may not need Mr. Vecchione on

14  some of these issues.

15         MR. RUDIN:  That's possible.

16         THE COURT:  Okay.  Next?

17         MR. RUDIN:  All right.  So we're up to I think the

18  sealing issue.  There are -- first, preliminarily, there are

19  some emails that the defense counsel has that they declined to

20  provide unless we, immediately prior to the Monique Ferrell

21  deposition unless we agree for them to be sealed, and I think

22  that there's a privilege log that was prepared in connection

23  with those emails that we haven't seen because the defense

24  position was we should agree that the privilege log should be

25  sealed.  So we --

91

1              MR. LARKIN:  We're going to withdraw that.  I'm

2     sorry to interrupt.  Excuse.  We're going to withdraw our

3     request for sealing of those particular matters, Your Honor.

4              THE COURT:  Okay.

5              MR. LARKIN:  Excuse me.  I'm sorry.  We're going to

6     produce the emails and we're going to produce the privilege

7     log.  There are some emails as to which we are going to

8     litigate the, excuse me, I'm sorry, the work product --

9              THE COURT:  Do you need some water?  There might be

10    some there.

11             MR. RUDIN:  No, I'm okay.  Throat's getting dry from

12    all the talking here.  Forgive me, Judge.

13             THE COURT:  Just keep your powder dry.

14             MR. LARKIN:  No powder.  No powder on this side.

15    There are going to be some emails that we think are pretty

16    much core work product or deliberative process and I expect

17    that counsel will ask that we submit them in camera.  So we'll

18    serve the log, we'll serve the emails on plaintiff probably

19    tomorrow and we can go from there.  But we're not insisting on

20    sealing for any of that material.

21             THE COURT:  Okay.  So just for the record and to be

22    sure I know what you're talking about, we're talking about Mr.

23    Rudin's letter of June 4th, Page 3, the new sealing dispute?

24    Is that what we're talking about?  The deposition of Monique

25    Ferrell?  Is that --

1              MR. LARKIN:  We have not yet seen the transcript for

2  the Monique Ferrell deposition, Your Honor, but I'm inclined

3  to withdraw that designation --

4              THE COURT:  Okay.

5              MR. LARKIN:  -- with respect to that transcript.

6              THE COURT:  So that's off?

7              MR. LARKIN:  Yes.  I would like to just see the

8  transcript but I'm pretty sure that we're going to withdraw

9  any request to have that material treated as under seal.

10             THE COURT:  Are there any other sealing issues that

11 we need to address other than the question of access, you

12 know, to the Hynes' deposition?

13             MR. RUDIN:  Well, there's the principle I guess, or

14 the mode of procedure as to whether or not the defense

15 believes that questioning of witnesses or questioning of Mr.

16 Hynes concerning his involvement and his communications about

17 the Jabbar Collins case should be sealed.  I don't know if Mr.

18 Larkin is -- whether his view right now is to withdraw that or

19 if he's just doing it as to Ms. Ferrell.

20             MR. LARKIN:  I'm not sure, Your Honor.  It may

21 depend on what the scope of DA Hynes' deposition is.

22             THE COURT:  Okay.

23             MR. LARKIN:  And we need to I think address that

24 first.

25             THE COURT:  All right.  So let's address that.

1          MR. RUDIN:  All right.  So Your Honor, there are a

2    number of aspects that -- a number of issues we would like to

3    depose Mr. Hynes about and I have submitted a very lengthy

4    letter --

5          THE COURT:  Yes, you have.

6          MR. RUDIN:  -- which is one of many.  And I don't

7    know how much Your Honor would like me to get into that now.

8          THE COURT:  Well, is there anything you agree on?

9          MR. RUDIN:  Well, Mr. Larkin will speak to this.  It

10   seems to me that from the defendant's letter they were not

11   disputing that aside from the Monell issue and Mr. Hynes'

12   knowledge or role with respect to a number of practices,

13   customs and practices that we're alleging, that aside from

14   that they don't object to his deposition.  At least there was

15   no argument in their letter objecting to his deposition about,

16   for example, his knowledge of the Jabbar Collins case, his

17   involvement in the Jabbar Collins case, his relationship with

18   Mr. Vecchione.  I didn't see any objection.  So, but Mr.

19   Larkin I'm sure will speak for himself.

20         MR. LARKIN:  Just to be clear, Your Honor, that's

21   not quite accurate.  Our view is that before you even get to

22   a discussion about the elected official's deposition you need

23   to depose others who have knowledge about the issues as to

24   which there is collective knowledge.  And it seems to me that

25   every area that the plaintiff wants to get into --

94

1          THE COURT:  Excuse me.  We'll just stop for one

2     second.

3                    [Pause in proceedings.]

4          THE COURT:  Okay.  Go ahead.  Sorry.

5          MR. LARKIN:  As to an area, Your Honor, where

6     there's shared knowledge, what the cases typically say is you

7     take depositions of others who have that knowledge first.

8     Now, there was a letter setting forth the general areas that

9     plaintiff wanted to explore with the district attorney.  When

10    we fleshed out a little bit more and thought it through a

11    little bit more, I mean really what you're left with here is

12    you have general policies and practices which clearly other

13    witnesses can testify about because policies and practices are

14    arrived at with the DA's approval clearly, but with the input

15    and the involvement of senior staff.  It seems to me that's

16    clear.  So as to general policies and practices, other senior

17    officials can provide the information.

18          And with respect to specific cases, we're going back

19    now 25 and 30 years.  And so any witness, whether it's

20    District Attorney Hynes or it's someone who's testifying in

21    his place on behalf of the office, any witness is going to

22    have to go back, look through files, look at decisions and

23    figure out why no discipline was imposed for instance in a

24    particular case involving a Brady violation.  And that's true

25    for any witness.  And so what the cases say is not only do you

95

1   typically go to the senior people first before you get the

2   elected official, but the deposition has to be done in such a

3   way so that it does not interfere with the elected official

4   duties.  And if we take an elected official and ask that

5   person to set aside a full week so that he can sit down and

6   review old files to sort of recreate thought processes as to

7   why, for instance, discipline was not imposed, you know,

8   following a 1996 Brady decision from the Second Department,

9   any witness it seems to me can do that.  And the cases

10  strongly suggest that other witnesses ought to be deposed

11  first in that kind of circumstance so that you minimize the

12  inconvenience of the elected official.

13          And once you've exhausted those areas and the

14  testimony as the record is being created, you know, it may be

15  that there are areas left that only the district attorney can

16  testify about and he has to appear to testify about those

17  areas.  But we aren't there yet because we haven't really

18  explored, you know, we just haven't gotten that far.

19  Plaintiff it seems wants to take the DA's deposition first

20  before taking anybody else's and that's not the way the cases

21  say you should proceed.  So I think it's premature to

22  determine whether we object to questions in any specific area

23  being posed to DA Hynes at a deposition.  We need to exhaust

24  the other opportunities first and then see what areas are left

25  and whether or not it's necessary for the district attorney to

96

1    appear.  That would be our position, Your Honor, in a long-

2    winded way.  Forgive me.

3                MR. RUDIN:  Your Honor asked whether or not we had

4    any areas of agreement and I gather from Mr. Larkin's answer

5    is that we don't because he seems to be saying that we have to

6    depose other people who know, for example, what was discussed

7    in Mr. Hynes' presence about the Jabbar Collins case.  We

8    can't ask Mr. Hynes what was discussed and what his thought

9    process was?  That doesn't make sense to me.  I mean the issue

10   in this case apart from whether or not there was misconduct

11   that caused Mr. Collins to be damaged is whether or not the

12   district attorney was deliberately indifferent to customs,

13   practices, or policies that led to Mr. Collins being damaged

14   and whether or not that can be established from among other

15   things, how he acted or didn't act when he became aware of

16   misconduct not only in the Collins case but in other cases.

17               Of course, Judge Block relied very heavily in his

18   decision on the concept of condemnation or ratification.  And

19   here you have a situation where when we filed a 440 motion in

20   2006 it was publically reported.  We moved to disqualify the

21   DA's Office because we took the position that Mr. Vecchione --

22   no one in the DA's Office could objectively investigate Mr.

23   Vecchione, yet the counsel for the Rackets Bureau ended up

24   being assigned.  She gave an explanation in her deposition

25   based on her knowledge of who assigned her, but she doesn't

1    know what happened above her.

2          And so then when Judge Irizarry indicated that she

3    would have to testify in the habeas, the other lawyer in the

4    office who together with Mr. Vecchione handled a whole series

5    of high profile cases, Kevin Richardson, is appointed.  And we

6    know from the emails that Mr. Richardson is reporting directly

7    back to Ann [sic] Feinstein, who's the Chief Assistant

8    District Attorney who's reporting directly back to Mr. Hynes

9    that they're all meeting as a group, that this went on for

10   weeks.  Mr. Hynes appeared to be orchestrating or directing

11   how the case was handled, and that specific allegations that

12   had been made in the case about misconduct by Mr. Vecchione

13   and other prosecutors were brought to Mr. Hynes' attention.

14   But we don't have a lot of -- we don't have more substantive

15   emails but we have enough to know that specific matters were

16   brought to his attention and that he ultimately approved the

17   resolution which was to dismiss all charges against a person

18   who he continues to publically say was guilty of murder.  And

19   then there's an email where he expresses his state of mind

20   about that and appears to be happy that Michael Vecchione will

21   not have to testify.  There won't be a hearing at least.  Then

22   the immediately through spokespeople distributes statements

23   saying that nothing wrong was done by anyone in the office, at

24   least anyone who's alive.  And for the last three years has

25   been making public statements about the case including a

98

1  statement to Michael Pell of the New York Times which was

2  reported in a column that he wrote several months ago that Mr.

3  Hynes continues to believe that Jabbar Collins is guilty.

4  He's made all sorts of statements that I outlined in our

5  letter and I included the attachments about there having been

6  no misconduct in the Jabbar Collins case.  He's made public

7  statements that none of the other things that we have alleged,

8  the other policies that we've alleged, including how witnesses

9  were treated are true.  I mean he has been -- even if there

10  was some -- I mean it's just so clear that the case comes down

11  to Charles Hynes as policy maker for the District Attorney's

12  Office, whether or not he was deliberately indifferent over

13  the last 20 some odd years to the kinds of misconduct that we

14  believe was going on in the office and we intend to prove.

15  And he's so deeply involved in the Jabbar Collins case that I

16  don't see how anyone could possibly say that his deposition is

17  not essential.

18          The question I suppose is the timing of it.  And if

19  we depose him and he acknowledges what we think he should

20  acknowledge if he testifies truthfully, and we assume he'll

21  testify truthfully, then we may not have to take other

22  depositions from people who were present at meetings with him

23  where the Collins case was discussed.  But if it turns out

24  that he does, then we may have to take other depositions.

25          But if we did as Mr. Larkin suggested and took other

99

1   depositions first, it would still leave the question of what

2   Mr. Hynes was thinking.  He has to -- if he, for example,

3   became aware of certain allegations of misconduct in the

4   Collins case such as there's an email reminding him that Angel

5   Santos is the witness who was locked in jail for a week and

6   was the subject of a material witness order and gave the

7   testimony that was contradicted by the absence of his voice on

8   a 911 tape.  So if Mr. Hynes ultimately decides that Michael

9   Vecchione or other prosecutors did nothing wrong, how did he

10  reach that decision?  What was his thought process?  How does

11  he justify it in light of the information that he had.  And of

12  course, we have to establish the information that he had.

13          But going back to these other cases, I submitted to

14  the Court the testimony of Dino Amoroso, the chief counsel

15  through 2005 who I understand is his chief counsel again.

16  He's been sitting in on all the depositions indicating that

17  Mr. Hynes would personally decide in each case where there was

18  a court decision or a complaint about prosecutorial misconduct

19  whether or not to authorize a preliminary investigation and

20  then ultimately to decide whether there should be any

21  discipline.

22          Mr. Hynes alone decided whether there should be any

23  more -- what procedure should be used for disciplining ADAs,

24  at least theoretically.  He decided not to include --

25          MR. LARKIN:  I'm sorry, I don't mean to interrupt.

1  I've got to -- I just got to cut some of this off.  I mean --

2          MR. RUDIN:  Your Honor, may I finish?

3          MR. LARKIN:  -- we've heard this --

4          THE COURT:  Hold on.

5          MR. LARKIN:  Your Honor, we've heard all this

6  before.  None of it alters the analysis.  Of course DA Hynes

7  did not alone decide what to do in any case.  He does so in

8  consultation with others.  And every --

9          THE COURT:  Okay.  Let me just interrupt you too.

10          MR. LARKIN:  I'm sorry.

11          THE COURT:  I think that I do understand both sides'

12  papers.  I was trying to give you both an opportunity just to

13  speak because it's a matter of public importance and I thought

14  that each one of you ought to have the opportunity to be heard

15  because I think there is some interest in what's happening

16  here.

17          Look, let me just tell you the Court's perspective,

18  and I don't think I'm doing anything that's different from

19  what the case law requires or what other courts have done.

20  This is a Monell case.  It's different from a lot of other

21  cases where depositions are required.  The plaintiff in a

22  Monell case is entitled to depose a high ranking official or a

23  municipal policy maker whether the individual has been either

24  personally involved in creating or implementing the policy,

25  practice, or procedure at issue.  Or if there's a policy where

1   the policy maker was aware of a pattern of, or accusations of

2   wrongdoing but failed to take action including investigations

3   or discipline in response, or ratified his subordinate's

4   unlawful decision and the basis for it.

5         Plaintiff alleges that this happened.  Defendants

6   contend that it didn't happen.  The Court is not here to

7   decide who's right or who's wrong with respect to those

8   contentions but merely to make sure that discovery is

9   permitted so that the issues can be fully aired and ultimately

10   presented to the fact finder in a way that's important.

11         The policy maker is -- I mean it's black letter law

12   that a policy maker is subject to a deposition in a civil suit

13   regarding a policy that the policy maker has created.  And I

14   think what's happening here so far is we have two prongs.  One

15   is which policies the district attorney created himself and

16   which policies he either ratified or was indifferent to.

17   That's basically what the claims are about.  And I think it's

18   going to be very difficult for either side to proceed without

19   a deposition of the district attorney to think clearly which

20   policies he in fact created and which policies he was aware of

21   and what decisions he was aware of or not.

22         So as far as I see it, the question here is one of

23   timing rather than one of necessity.  It's not unheard of in

24   Monell cases to stage discovery.  But at the same time, we

25   want to it efficiently.  So one of the reasons why all of us

1    spent as long as we have here today trying to come up with a

2    schedule for the production of discovery is that much of that

3    discovery may well be needed for the deposition of Mr. Hynes.

4    And if we look at whether or not plaintiff is entitled to

5    depose Mr. Hynes and to depose Mr. Hynes right away or not, in

6    a vacuum that question really begs the issue which is when

7    would be the most efficient time to do this?

8             So I have a list of 13 things that the City is going

9    to be working on diligently for over the next month or six

10   weeks.  Some of those I assume would be relevant to the

11   district attorney's deposition.  And since I think it's

12   inevitable that his deposition is going to have to be taken,

13   the question is do you want, or does it make sense to take

14   that deposition before you get the emails, for example, you

15   resolve the email issue, before you've seen the field logs,

16   before the hotel custody records?  I mean ultimately I'm

17   guessing that plaintiff and defendants will probably want the

18   district attorney to -- want to have all that discovery out

19   and available so that questions can be posed in a meaningful

20   way.  That's my guess just from sitting here.  So it seems to

21   me that taking his deposition next week or the week after

22   probably wouldn't make any sense.  And the question is does he

23   have to take -- does the plaintiff have to take depositions of

24   deputies and administrators before then?  I think the answer

25   is no.  I don't think that you do have to do that because he

1   is ultimately the chief policy maker, he's ultimately the

2   person who decides on discipline.  And as I'm sure he would

3   say, that he takes responsibility for what happens in his

4   office.

5           MR. LARKIN:  But Your Honor, can I ask one question?

6   I'm sorry, did I --

7           THE COURT:  Go ahead.

8           MR. LARKIN:  -- did I interrupt?  I apologize.

9           THE COURT:  Go ahead.

10          MR. LARKIN:  Your Honor, I was only going to ask to

11  see how this would play out in practice you've got 50 some odd

12  cases that were decided since the 1980s, 1990s up until

13  recently.  Is it going to be expected that the district

14  attorney would have to be able to explain the decision making

15  process with regards to each and every one of those cases and

16  each and every one of the assistants involved?  I mean if so,

17  any witness it seems to me could do that.  And shouldn't we

18  have that deposition before DA Hynes is called upon to spend

19  time away from his duties running that office, running his

20  office?

21          THE COURT:  Yes, I'm going to interrupt you too for

22  a second.

23          MR. LARKIN:  I'm sorry, Judge.

24          THE COURT:  It seems to me that there are two kinds

25  of -- two premises and two kinds of questioning that will be

1   asked here.  If DA Hynes were a 30(b)(6) witness and he was

2   responsible for explaining all the policies in the office,

3   then he would have to do all his homework and understand

4   everything that happened.  What the other aspect is of the

5   deposition is what did he know and what is his sense of his

6   policies in the office?  To what extent was he a Monell policy

7   maker?  To what extent did discipline take place or not take

8   place because of what he -- of decisions he made.  And I'm

9   sure if you depose the President of the United States and ask

10  the President of the United States, you know, what the

11  Secretary of Homeland Security thought of a particular issue

12  and the decision that was made, I'm sure the president would

13  say, "You know, I might have known that at one time but I have

14  a big job and I can't do everything."  So I'm guessing that

15  the district attorney's deposition may include statements of,

16  "I don't know, I don't remember the answer to that, it's been

17  a long time ago."  Now again, that's up to you how to decide

18  that.  But there have been many depositions of commissioners

19  where the commissioners say, "Well, I delegated this to

20  someone else, but the ultimate policy was mine."  Again, I

21  don't want to go into great detail on this because I don't

22  know how the District Attorney's Office was run, but he is not

23  expected to be a 30(b)(6) witness where he's expected to know

24  the answer to every single question.  He is the chief policy

25  maker and the district attorney and he will be deposed as to

1  his role in a Monell case.  Isn't that what you're looking

2  for, Mr. Rudin?

3          MR. RUDIN:  Yes, Your Honor.

4          MR. LARKIN:  If that's the case though, I mean those

5  kinds of questions, Your Honor, I'm concerned that those kinds

6  of questions, while it's understandable here in this courtroom

7  that the district attorney isn't going to know, for instance,

8  exactly, or be able to recall exactly what his thought process

9  was about a 1992 case or a 1995 case, those kinds of questions

10  and answers will be used to embarrass him by Mr. Rudin.  And I

11  believe that to be the case.  I believe that that's what

12  counsel intends to do with the deposition, and that's my

13  concern about having the district attorney testify first

14  whereas others who may testify beforehand can answer some of

15  those questions and the district attorney can then defer to

16  the answers given previously.

17          And so I think there's got to be some mechanism in

18  place to protect the office and the individual from that kind

19  of misuse of questions and answers.  The Court's perfectly

20  right that any commissioner or any agency head is likely to

21  say in response to a question about a case that occurred 15 or

22  20 years ago, "Gosh, I don't recall the specifics, I just

23  don't recall them.  Ultimately the decision was we did not

24  discipline this particular assistant, we didn't fire him.  But

25  I just can't remember the specifics."  That may be a perfectly

106

 1  legitimate reasonable answer as Your Honor says, but that's --
 2  what counsel will do with that answer is try to embarrass him,
 3  and that's what I'm concerned about.  I think it's a realistic
 4  concern in this case.  And I just don't know how to protect
 5  against that.
 6        One thought that I had is that others ought to be
 7  deposed first.  Another thought is to keep the deposition
 8  confidential.  But quite honestly, this is a case of public
 9  importance.  I agree.  It's a case of importance.  We have
10  someone who we believe shot and killed an innocent person who
11  got a get out of jail free card, and I realize that that may
12  sound -- counsel, plaintiff may not like the sound of that,
13  but that's the way we see the case.  And for that reason, this
14  case is one of great public importance to us and to the
15  district attorney as well.
16        And to ask an elected official who's been serving
17  faithfully for 23 years to appear in these circumstances and
18  to be expected to know the answers to those kinds of questions
19  isn't fair.  Perhaps the deposition could have been limited,
20  Your Honor, to general policies and then maybe others can be
21  deposed about specific cases.  Maybe that's the best way to do
22  it.  I think the considerations that Your Honor is
23  articulating are that the DA knows what policies he
24  implemented and maybe the deposition ought to be limited to
25  those general policies and he can testify about them.

1          THE COURT:  Well, I don't think the case law would

2   support that but --

3          MR. LARKIN:  Your Honor, my --

4          THE COURT:  -- the right of free speech and the

5   right of the access for the public to know what's happening in

6   an important public office, it's the First Amendment.  It's

7   the first thing that the founders put in the Bill of Rights.

8   It's absolutely key.

9          MR. LARKIN:  I want to make very clear we agree.

10         THE COURT:  And you've emphasized that.

11         MR. LARKIN:  We agree.

12         THE COURT:  And just the way you and your client are

13  entitled to express publically in a lawsuit and otherwise your

14  opinion about the guilt or innocence of an individual, in this

15  case I believe that the plaintiff is entitled to express his

16  opinion about the propriety of the actions of the people who

17  prosecuted him.  That's just how the system works.  And I

18  don't think the Court is here to protect one side or the other

19  from those comments.  You know, I certainly wouldn't stop you

20  from saying what you said, you know, about the district

21  attorney's belief about the merits of the underlying criminal

22  action, just as I wouldn't stop plaintiff's counsel from

23  saying whatever he believes is appropriate about an elected

24  official's conduct there.  That's how our democracy works.

25         MR. LARKIN:  Your Honor, shouldn't there be some --

1    I guess the concern I'm articulating is that as Your Honor

2    said, no elected official can be expected to remember the

3    details and the specifics of every decision that that official

4    has made over the past --

5            THE COURT:  He may remember many, and that's what

6    counsel is entitled to probe.  And it may well be that Mr.

7    Hynes has a very good memory.  I just think that public

8    officials can explain well what they do and how their office

9    works and they can defer before someone else's deposition or

10   after someone else's deposition to that person's knowledge of

11   the information and that either will -- and both sides can do

12   with it as they wish.  But I just don't think it's the Court's

13   role to stifle speech in that way.

14           MR. LARKIN:  I'm not suggesting that the Court

15   stifle speech at all.  Just, in fact, just the opposite, Your

16   Honor.  I'm asking for some protection here whether it be

17   other witnesses testifying first about specifics, which is

18   what all the cases contemplate.  You know, one of the requests

19   I've made is that the exhibits be identified in advance

20   whether it be for DA Hynes or for other witnesses who may

21   testify prior to DA Hynes' deposition.  If the Court is going

22   to permit the district attorney to be deposed first, then I

23   really think there's an increased need to identify in advance

24   the specific exhibits that the plaintiff intends to use so

25   that there can be some meaningful preparation so that the

109

1   official can refresh his memory about decisions that may have

2   been made a long time ago.

3          THE COURT:  Well also, you know --

4          MR. LARKIN:  And so maybe that's a reasonable

5   request to make.  Sorry.

6          THE COURT:  Hold on one second.  You know, Mr.

7   Vecchione is going to be deposed first before him.

8          MR. LARKIN:  Yes, it would appear that way.

9          THE COURT:  And I would assume that many of the

10  questions that he's asked will be similar to the kinds of

11  questions to higher officials, no?

12         MR. LARKIN:  Not at all, not at all.  I think that

13  ADA Vecchione --

14         THE COURT:  Well, that's true, he's only going to be

15  talking about Collins case.

16         MR. LARKIN:  He's only going to be talking about the

17  Collins case but even so, you know, ADA Vecchione was involved

18  in a few other cases, the Marshal case and a couple of others

19  whereas plaintiff has compiled a list of 50 cases that he

20  claims are going to support a Monell claim.

21         THE COURT:  No, that's fair enough.  So Mr. Rudin,

22  in terms of exhibits, do you have any problem disclosing the

23  kinds of -- or the area of questioning for the district

24  attorney?

25         MR. RUDIN:  I have no problem disclosing the cases

1   that I'm going to be inquiring about.  I've already disclosed

2   a great deal of material about those cases, a lot more than

3   I've gotten from the other side.  If I'm going to be

4   questioning Mr. Hynes about any particular document, I will

5   make sure that that document with respect to those 50 cases or

6   whatever has been disclosed.  But I'm not required to identify

7   the specific exhibits that I intend to question about and just

8   telegraph in that way exactly how I'm going to conduct my

9   deposition.

10          And also, Your Honor, I really need to respond.  I

11  mean for Mr. Larkin to accuse me of somehow embarrassing the

12  district attorney merely because he can't remember something

13  about a case that happened 20 years ago, and then to make the

14  speech that he just made accusing Jabbar Collins of being a

15  murderer when he knows that the District Attorney's Office

16  dismissed the case without any retrial and Mr. Hynes said that

17  was great news in an email, it's just outrageous.  The

18  District Attorney's Office admitted that there was a Brady

19  violation that occurred, that a key witness had recanted his

20  statement and it wasn't disclosed, and that as a result of

21  that Jabbar Collins did not get a fair trial.  That's what

22  they stipulated to.

23          THE COURT:  I think --

24          MR. RUDIN:  And then, Your Honor --

25          THE COURT:  Hold on just one second.  I think you

1  both have exercised your free speech rights pretty well.  I

2  understand each of your respective positions on that and I

3  just would like to focus on Mr. Hynes.  I know you disagree

4  and you stated it very clearly.

5          MR. LARKIN:  Your Honor --

6          MR. RUDIN:  But the point is that this case --

7          MR. LARKIN:  -- the concern that we have --

8          MR. RUDIN:  -- this case is about --

9          MR. LARKIN:  -- Your Honor is that --

10         THE COURT:  Hold on, hold on.  Mr. Larkin, hold on.

11         MR. LARKIN:  -- the exhibit, I thought Your Honor

12  had --

13         THE COURT:  Let me hear Mr. Rudin.  He hadn't

14  finished.

15         MR. LARKIN:  I'm sorry.

16         MR. RUDIN:  This case, as Mr. Larkin well knows and

17  as I know the Court knows, is a civil rights case that

18  involves whether or not under Section 1983 my client's

19  constitutional rights were violated and he was harmed.  The

20  case is not about whether or not Mr. Collins did or did not

21  commit the crime, although certainly he did not commit the

22  crime.  And if that is any way litigated, it'll probably be in

23  relation to damages.  It's not going to be in relation to what

24  we're talking about today which is whether there were

25  constitutional violations going on at the Brooklyn District

1   Attorney's Office and whether or not they led to Mr. Collins

2   being convicted.  So for Mr. Larkin to make that kind of

3   statement knowing that there are members of the media here is

4   so transparent, border on contemptible.

5            MR. LARKIN:  I mean really --

6            THE COURT:  All right.  No, Mr. Larkin, I don't

7   think we need to talk about this anymore, but I think what

8   this demonstrates is that each side is making statements about

9   the other side that they wish to make but that the other side

10  wishes to prevent.  And the Court's not here to say that the

11  District Attorney's Office can't say what it wants to about

12  Mr. Collins and that Mr. Rudin can't say what it wants to

13  about the district attorney.  That's how our democracy works

14  and that's how it will continue to work at least in this

15  courtroom.

16           MR. LARKIN:  Your Honor, with regards to the

17  exhibits, I do think there's a compelling need that the

18  exhibits be identified otherwise you've got -- we have,

19  rather, a 30 or a 40,000 page record that no public official

20  can possibly review and understand as well as a lawyer who's

21  been, you know, preparing for this case for the last 15 years

22  can.  It's just not possible.  And so the rules do

23  contemplate, the Advisory Committee notes do contemplate that

24  in certain types of cases subject to the Court's discretion,

25  identification of deposition exhibits is advantageous and it's

1   appropriate.  And I think that out of respect for the district

2   attorney's role, I think that to be fair to him, I just think

3   that identification of the exhibits, this deposition is tailor

4   made for that kind of procedure, Your Honor.

5         MR. RUDIN:  Your Honor, I indicted I would provide

6   notice of the cases that I'm going to ask Mr. Hynes about.  I

7   will make sure that we've provided full discovery of the

8   materials that relate to those cases that I might possibly use

9   to question him about.  They'll have every opportunity to

10  prepare Mr. Hynes and I don't think the rules require me to do

11  anything more.  I mean it's in my interest to have Mr. Hynes

12  review any documents to save time at the deposition so that I

13  can get through what I want to get through.  So if I don't get

14  through it, then I'm sure Mr. Larkin will take the position

15  that we should be cut off and --

16        THE COURT:  Now, with respect to the deposition and

17  exhibits, certainly with respect to the Collins case there

18  would be no need to pre-disclose those exhibits.  I think what

19  you're talking about is the burden of a large number of other

20  cases that you would have to go through, figure out for

21  yourselves how to prepare your witness, and then Mr. Hynes

22  would have to prepare himself.

23        So the question then to Mr. Rudin is given that you

24  don't have to disclose any of your exhibits for the Collins

25  matter but only for the Monell claim, what do you propose to

114

1    ease the burden of preparation on a public official and on the

2    Law Department at this point?  I understand you will be

3    designating the cases that you -- do you plan on using 50

4    cases?  Will there be a smaller number?  That might help me

5    figure it out.  And then how would you propose easing the

6    burden?  Because that is something that I do want to take into

7    consideration.

8              MR. RUDIN:  I would think it's in my interest not to

9    question him about 50 cases because I don't think I'd complete

10   the process in the time allotted and some cases are more

11   significant than other cases.  And probably his answers about

12   his thought process, about which kinds of cases are

13   theoretically deserving of discipline and which are not will

14   also cause me not to go into certain cases that fall on one

15   side of the line.  But it's a little difficult to know for

16   sure before the deposition what I'm going to get into.  I mean

17   to be safe, of course, I could give them a great number of

18   documents and then not use some of them, but that doesn't

19   really help them.

20             THE COURT:  Right.

21             MR. RUDIN:  So I'll do the best I can consistent

22   with the interests of my client.  It's in my client's interest

23   to save time at the deposition and not have Mr. Hynes sit

24   there for 45 minutes reading old briefs and using up all the

25   time.

1          THE COURT:  Right.  But you're looking at the use

2    side.  In other words, which documents you'll be using at the

3    deposition.  I'm looking at the preparation side as well

4    because that's going to be something that will take a lot of

5    time for the district attorney and for the Law Department.  If

6    you can figure out before the deposition, reasonably before

7    the deposition that you will be focusing on a certain number

8    of, you know, X number of cases or there are certain cases you

9    will not be focusing on, that's what I'm looking at.  I'm not

10   looking at any other part of this deposition to deal with.

11   But it doesn't seem unreasonable to ask that if you're going

12   to, consistent with your interest and making sure that the

13   district attorney is informed and gives informative answers,

14   if you're going to ask questions about older cases, that he be

15   given an opportunity to look at them, but not look at all of

16   them.

17          MR. RUDIN:  I understand what you're saying.  I mean

18   I think what Your Honor is saying is sincerely and not do a

19   feint.

20          THE COURT:  Right.

21          MR. RUDIN:  To sincerely tell them about the cases

22   I'm interested in, not tell them about cases I'm interested in

23   when I really am not.

24          THE COURT:  Right.

25          MR. RUDIN:  And I understand that.  I will do the

 1  best I can.  But to mark exhibits is another story.  I think

 2  that's -- to tell them exactly which documents I'm going to

 3  use in the course of the examination, it's sort of obvious.  I

 4  mean --

 5       THE COURT:  Well, I'm not asking you to do that at

 6  this point.  What I'd really like you to do is say, "There are

 7  X number of cases that I'm going to focus on in the

 8  deposition.  These are those cases.  I've given you this

 9  information and what I'm focusing on is the kinds of

10  information that I described in the questioning that I

11  outlined in my letter."  I mean that's pretty much what you're

12  going to do, isn't it?

13       MR. RUDIN:  Well, with respect to the case decisions

14  that we contend provided notice and then there was a failure

15  to discipline, I would provide notice of the specific cases

16  and they have the court decisions.  If I'm going to question

17  him about any brief that was filed in his name, I'll provide

18  notice of that.  I'm not going to do that that much because I

19  know the district attorney doesn't sit there writing briefs,

20  but in some cases he may approve them or they're done with his

21  knowledge.  So it's a judgment call.  About other policies and

22  practices, let's say the hotel custody program, for example, I

23  don't know at this point what I'd be prepared to tell them

24  about but I understand in general it's in my interest to have

25  him fully informed about the areas that we're going to be

1   questioning him about so that we don't take a lot of time with

2   the deposition having him review documents and refresh his

3   recollection and that kind of thing.  I understand what you're

4   saying and what Mr. Larkin is saying and I think it's in our

5   interest to do that as much as we can.  But on the other hand,

6   there may be certain times when from a point of view of an

7   examiner I don't want to tell him every exhibit I'm going to

8   use.  And to some extent it may depend upon what his answers

9   are.  But I don't think you need to mark all the exhibits but

10  as I think about it, he's not a 30(b)(6) witness but he has

11  the knowledge of a 30(b)(6) witness.  In other words, he's not

12  there to know everything about what happened in the

13  department, but as a policy maker he knows some things but not

14  other things.  And in order to prepare him for his deposition

15  properly, I think you do need to notify him of the categories

16  of questions that you're going to ask which I think you've

17  done in broad outlines in your letters.

18          MR. RUDIN:  Yes.

19          THE COURT:  But also of the cases that you're going

20  to bring out and just enough so that they could have guidance

21  in how to prepare him because I think that's what a public

22  official deserves and I think that's what your adversaries

23  deserve when he's expected to have the breadth of knowledge of

24  a 30(b)(6) witness but isn't really one.

25          MR. LARKIN:  And Your Honor, I think also if there

118

1  are any individual ADAs whose employment history, for

2  instance, counsel might want to ask the district attorney

3  about, I think it's fair that those individuals ought to be

4  identified as well because otherwise we've got 50 individuals

5  who conceivably could be the subject of questions.  And so to

6  identify them it seems to me it's the same principle as

7  identifying the cases.

8          THE COURT:  I think it is.  And it's in your mutual

9  interest to do that.

10         MR. RUDIN:  Yes.  I mean if I'm going to ask him

11 about personnel records, for example, I will provide those in

12 advance.

13         THE COURT:  Okay.  So you will -- right.  And the

14 same thing if there are ADAs.  I think we all know the ADAs

15 that you're planning on asking about, so I don't think it's a

16 surprise, but I think you can certainly list the names of the

17 ADAs that you'll be asking about.

18         MR. RUDIN:  And I'm also wanting to take a

19 deposition at the convenience of Mr. Hynes in terms of

20 location.

21         MR. LARKIN:  Wherever you want it to be held, that's

22 fine.

23         THE COURT:  Okay.  Now in terms of the timing, what

24 do you need before --

25         MR. LARKIN:  There's one -- I'm sorry, Your Honor, I

1   think my co-counsel had one issue.

2             MS. KRASNOW:  Just one other --

3             MR. LARKIN:  -- she wants to raise.

4             MR. KRASNOW:  -- issue about the exhibits.  So we've

5   already had a bunch of exhibits introduced in prior

6   depositions and I would just ask that if there's going to be

7   another exhibit from the Collins file which is 35,000 pages

8   that hasn't already been used that that piece of paper be

9   identified to us before DA Hynes' deposition.

10            THE COURT:  Hard to imagine that there would be any

11  other exhibit that hasn't been used, but I suppose it's

12  possible.

13            MS. KRASNOW:  I agree, but just because of the size

14  of the file I would ask that if there's going to be another

15  exhibit used that hasn't been used in a prior deposition from

16  that DA's file that we be notified of the Bates number.

17            MR. RUDIN:  I think it seems like 95% or more of the

18  documents have already been used, but -- and I haven't

19  prepared his deposition yet, but it could be that there's some

20  document in the file that from a tactical point of view I

21  don't want to provide.  If it's something that's 30 or 40

22  pages long then it might be silly for me not to provide it

23  because of the amount of time it'll take him to review it.

24  But if it's something that's one or two or three pages long it

25  might be different.  So you know, I'm accepting everything

120

1   that Your Honor is saying --

2           THE COURT:  Okay.

3           MR. RUDIN:  -- but I think --

4           THE COURT:  I think that's fair.

5           MR. RUDIN:  -- I'm entitled to a little latitude.

6           THE COURT:  Yes.  I'm not going to require you to do

7   that extra step.

8           MR. RUDIN:  Your Honor, I would like to take --

9           THE COURT:  But he can also take a recess and take a

10  look at the documents if he needs to.

11          MR. RUDIN:  I would like to take the deposition --

12          THE COURT:  You can talk to him.

13          MR. RUDIN:  --  I'm sorry, before the end of July

14  because it is possible that -- I mean it's more than possible,

15  it's almost certain that that will affect what, if any,

16  depositions I need to take afterwards and it may eliminate the

17  need to take certain depositions.

18          THE COURT:  Okay.

19          MR. RUDIN:  And with the discovery deadline being

20  August 27th --

21          THE COURT:  All right.  If you're going to do that -

22  -

23          MR. LARKIN:  Your Honor --

24          THE COURT:  -- then --

25          MR. LARKIN:  Your Honor, I'm sorry, that's not going

121

1  to work.  That's just -- let me respectfully request that the

2  Court not direct that because we have our discovery to do, we

3  have Mr. Collins' deposition to take which is going to be very

4  important.  We have a number of non-party witnesses that we

5  need to track down and get their depositions taken, Mr. Oliva,

6  potentially Mr. Santos, Mr. Diaz who lives in Massachusetts.

7  We also have ADA Vecchione's deposition which it looks like is

8  going to be broken up into two parts.

9          THE COURT:  It's a lot of work.  I understand.

10         MR. LARKIN:  To get all that done the right way by

11  the end of July just does not seem quite fair.  I mean --

12         THE COURT:  I want to be here when you're doing his

13  deposition in case there are some questions that come up, and

14  I will tell you my schedule so this will help you a little

15  bit.

16         MR. LARKIN:  Yes, Your Honor.

17         THE COURT:  I will not be here the week -- I have to

18  be at a - I have to teach at a workshop on the week of the 29th

19  and then I'll be gone the week -- this is July.

20         MR. LARKIN:  Week of 7/29?  I'm sorry.

21         THE COURT:  Right.  And I will not be here on the

22  week of August 5th.  I will be back August 12th.  Oh no, I teach

23  another workshop.  Okay.  Starting -- so I will be around from

24  August 15th for the duration or in July before then.  I mean

25  obviously I'm available if you need me otherwise, but --

122

1          MR. RUDIN:  Well then --

2          THE COURT:  -- I have to conduct a new judge

3  training for a couple of days one week and a few other things

4  I have to do, so --

5          MR. RUDIN:  Then Your Honor, I know Mr. Larkin is

6  not going to like this, but I would propose July 26.

7          MR. LARKIN:  It's just not going to work.  Just is

8  not going to work.  I'm not in that day.  That's a Friday.

9  I'm not in that day.  I've got longstanding plans for that

10  entire weekend so --

11          THE COURT:  How about any time the 22nd through the

12  25th?  Would that work?

13          MR. LARKIN:  It's just not -- we have Jabbar

14  Collins' deposition the 23rd and 24th that week.

15          THE COURT:  Okay.

16          MR. LARKIN:  And that's an important deposition for

17  us.

18          MR. RUDIN:  But that deposition --

19          MR. LARKIN:  And we also --

20          THE COURT:  Are you worried that this is going to

21  not give you enough time to decide which other witnesses to

22  depose at the end of the discovery period?

23          MR. RUDIN:  Well, that's what I'm concerned about.

24          THE COURT:  Yes.  Well, I would certainly -- if that

25  becomes a concern, I would certainly extend your time, you

1  know, just your time to conduct depositions additional.

2          MR. RUDIN:  Well, if that's the case, then I guess

3  we could do August 15th or 16th after you get back.

4          THE COURT:  Okay.

5          MR. LARKIN:  I'm going to need to confer to find out

6  what specific dates are going to work.  The district attorney

7  obviously has a calendar and a very busy schedule, so I need

8  to --

9          MR. RUDIN:  So do I.

10          MR. LARKIN:  -- get dates from him.  We need to do

11  that.

12          THE COURT:  Do you want to just tentatively just

13  pencil in the 15th and 16th of August?

14          MR. LARKIN:  Well, it's going to be a one day

15  deposition --

16          THE COURT:  We don't know which date it'll be.

17          MR. LARKIN:  -- it seems to me, and I just don't --

18  I need to talk to him to find out what sort of -- what his

19  vacation plans are, if any, and what -- you know, he's

20  obviously very busy.

21          THE COURT:  Obviously.  But do you want to just --

22          MR. LARKIN:  I just can't commit to a date.

23          THE COURT:  -- get back to the Court?  I mean just

24  the two of you work it out and then just get back to me so

25  that I make sure that I know when he's going to be deposed.

1          MR. LARKIN:  Yes, Your Honor.

2          THE COURT:  And I don't, you know, I don't schedule

3     something that's going to be an all day affair like this.

4          MR. LARKIN:  We will do that, Your Honor.

5          MR. RUDIN:  Your Honor, that'll be a court ordered

6     deposition date so that it won't be changed unless there's

7     some compelling reason?

8          THE COURT:  Unless there's good cause, right.

9     That's how it works.  But things do happen sometimes.  All

10    right.  So we're looking at the 15th and the 16th and in case

11    those days aren't good, the 19th or the 20th.  You know, I mean

12    we can go into the following week, any time that following

13    week.

14         MR. LARKIN:  Yeah, the 19th and the 20th, I'm out that

15    week, the week of the 17th.  Excuse me --

16         THE COURT:  Are you here the 19th?

17         MR. LARKIN:  I'm sorry, I'm out I believe the week

18    of the 10th, the 17th.  Those seven days.  So the 15th and 16th

19    are probably not going to work, Your Honor.

20         THE COURT:  Okay.  So the week of the 19th.  We'll

21    shoot for the week of the 19th.  Okay.  All right.  So are we

22    concluded?  5:20?

23         MR. RUDIN:  Doesn't that make you sad?

24         THE COURT:  Well, I've got eight people waiting for

25    me in the jury room for dark court, so --

125

1          MR. RUDIN:  Thank you very much, sir.  Thank you.

2          THE COURT:  All right.

3          MR. LARKIN:  Thank you for your time, Your Honor.

4 Thank you.

5          THE COURT:  Thank you.  All right.  So should we

6 schedule another conference just in case, just to make sure

7 that -- just in case you might have any disputes?

8          MR. LARKIN:  I think so.  I think a July date would

9 be good.

10          THE COURT:  Okay.  I can't imagine there could be

11 any problem.  Let's do it July 16th.  Is that far enough along

12 that it would be worthwhile?

13          MR. RUDIN:  It almost seems too far.

14          THE COURT:  All right.  Do you want to go the week

15 before?

16          MR. RUDIN:  I'd prefer the week before, the 9th, 10th

17 or 11th if you have it.

18          THE COURT:  The 9th.  Is the 9th too early?

19          MR. LARKIN:  Your Honor, any day that week is okay

20 except for the Friday, the 12th.  I mean Monday the 15th is also

21 good for us.

22          THE COURT:  I'm selecting a jury that day in a

23 criminal case.

24          MR. LARKIN:  The 16th we have another deposition in

25 this case actually.

1            THE COURT:  Yes.

2            MR. LARKIN:  The 17th is okay for us.

3            THE COURT:  Let's do the week of the 8th.  I'd rather

4   do it sooner rather than later.

5            MR. LARKIN:  8th is okay, 9th, 10th.

6            THE COURT:  8th is okay?  I've got cases all the way

7   up to 5:30 on the 8th.  So if I take it at the end of the day

8   it might be shorter, so why don't we say the 9th.  I think the

9   9th.  I can do the 9th at the end of the day or the 11th at the

10  end of the day.

11           MR. LARKIN:  Is that 4:30 or 5 or --

12           THE COURT:  It's 5.

13           MR. RUDIN:  Arthur, whatever is better for you.

14           MR. LARKIN:  Either day works for us.

15           THE COURT:  Okay.  Let's say the 9th.

16           MR. LARKIN:  The 9th at 5 p.m., Your Honor?

17           THE COURT:  Yes.

18           MR. LARKIN:  Is that by telephone?

19           THE COURT:  I think it's a little better to get you

20  here so you talk over each other.

21           MR. RUDIN:  Or talk over each other a little less.

22           MR. LARKIN:  I see Your Honor's incentive.  The

23  later the conference, the shorter it'll be.

24           THE COURT:  Well, next time I'll actually give you a

25  deadline.  It's only going to last X amount of time and then

127

1  we're done.  But I think this was really productive because I

2  think we do have a schedule.  And I want to just emphasize we

3  do have the schedule and I know it's going to be hard to

4  comply with, but we really need to.  So unless there's good

5  cause, this is the schedule.

6            MR. LARKIN:  I understand, Your Honor.

7            THE COURT:  Okay?

8            MR. RUDIN:  Thank you.

9            MR. LARKIN:  Thank you.

10           THE COURT:  All right.

11           MR. LARKIN:  Thank you for your time.

12           MR. RUDIN:  Take care.

13           THE COURT:  All right.  And so I'm not going to

14 write up all the thousands of rulings here.  You'll just look

15 at the transcript, okay?

16           MR. LARKIN:  We'll get the transcript.  Thank you,

17 Your Honor.

18 [Proceedings ended at 5:19 p.m.]

19                      *  *  *  *  *  *

20

21

22

23

24

25

128

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                          Mary Greco

7  Dated:  June 20, 2013

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25