1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    COLLINS,                           :
                                        :  11-CV-00766 (FB)
5              Plaintiff,               :
                                        :
6              v.                       :
                                        :  225 Cadman Plaza East
7    THE CITY OF NEW YORK, et al.,      :  Brooklyn, New York
                                        :
8              Defendants.    :  July 9, 2013
     ------------------------------------X
9

10          TRANSCRIPT OF CIVIL CAUSE FOR HEARING
           BEFORE THE HONORABLE ROBERT M. LEVY
11              UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13

     For the Plaintiff:      JOEL B. RUDIN, ESQ.
14                           TERRI ROSENBLATT, ESQ.
                             Law offices of Joel B. Rudin
15                           200 West 57th Street, Suite 900
                             New York, NY 10019
16
     For the Defendants:     ARTHUR LARKIN, ESQ.
17                           ELIZABETH N. KRASNOW, ESQ.
                             ANGHARAD WILSON, ESQ.
18                           The City of Yew York Law Department
                             100 Church Street, Rm. 3-177
19                           New York, NY 10007

20

21

22   Court Transcriber:      SHARI RIEMER
                             TypeWrite Word Processing Service
23                           211 N. Milton Road
                             Saratoga Springs, New York  12866
24

25

     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service

2

1   (Proceedings began at 5:17 p.m.)

2           MR. RUDIN:  Before we begin, are we on tape or are

3   we -- should we state our appearances?

4           THE COURT: Yes, hold on a minute.  I just wanted to

5   do the preliminary stuff but you have -- at least from the

6   letter --

7                    [Off the record.]

8           THE COURT: 11-CV-766.  Would counsel please state

9   their appearances for the record?

10          MR. RUDIN:  For plaintiff, Joel Rudin and with me is

11  Terri Rosenblatt.

12          THE COURT: Good afternoon.

13          MR. LARKIN:  And for the defendants Arthur Larkin,

14  L-A-R-K-I-N and with me is Elizabeth Krasnow, K-R-A-S-N-O-W,

15  and also a new member of our team Angharad Wilson, A-N-G-H-A-

16  R-A-D, Wilson just like it sounds.  Good afternoon, Your

17  Honor.

18          THE COURT: So I guess I should start with Mr. Rudin

19  because your motion at least was the first chronology and set

20  off a chain of events.

21          MR. RUDIN: As usually happens.  Your Honor, first I

22  just wanted to say that this motion was prepared somewhat in a

23  rushed manner because the July 4th weekend was coming up and I

24  wanted to get it out as quickly as I could and I got it out on

25  Tuesday.  I don't know if that made defense counsel's job any

3

1  easier.  It probably didn't but I just thought it was

2  important that the issues that seemed to be outstanding

3  [inaudible] if not ourselves then with the help of the Court.

4           One other thing I wanted to say which is that Your

5  Honor's order that came down a few days ago about scheduling

6  the --

7           THE COURT: Are we having trouble with the mics?  Is

8  your mic working?  Tap the mic.

9                    [Pause in proceedings.]

10          THE COURT: Mr. Rudin, try it again.

11          THE CLERK: Sorry.

12          THE COURT:  No, it's good.  I'm glad you caught it.

13          MR. RUDIN: Should I start again?

14          THE CLERK: No, we're good.

15          MR. RUDIN: So anyway just to complete that thought,

16  I mean I think it's clear that defense counsel as to some of

17  our requests had very little time to consider them and I

18  apologize for that but I just thought that it was important

19  that the issues be raised given the schedule that we're on.

20          THE COURT: So since you mentioned that, a persistent

21  theme in defendant's responses was that you had not given them

22  the opportunity to meet and confer on some of those issues.

23  Was that because of the shortness of time or do you just

24  disagree that you hadn't met and conferred?

25          MR. RUDIN: No, I think -- well, we didn't physically

1   meet.  I think that I raised each of the issues.  If I missed

2   one I apologize but I believe I raised each of the issues but

3   some of them I only raised within a day of my submission of

4   the letter.  So that's why I'm saying in fairness to defense

5   counsel they didn't have very much time to consider several of

6   the requests although these were issues that have been sort of

7   on the table, most of them for a while.  But I did it that way

8   because we had this conference on the 9th and I just thought

9   that it was important that the issues be on the table and if

10  some of them could be resolved before this conference that

11  would be great and if some of them couldn't be at least they'd

12  be there for us to try to resolve with the help of the Court.

13          But I did send emails as to virtually every one of

14  the issues and some of the issues that we had raised earlier I

15  believe the defense didn't respond to.  So when Mr. Larkin

16  says we didn't confer I'm not sure that's quite fair.  I mean

17  I did raise the issue.  For example, the timing of disclosure

18  of email evidence we sent a letter towards the end of June

19  which defense counsel didn't respond to.  So I'm not sure it's

20  fair to say that we didn't confer.

21          THE COURT: So I don't want to go into whether or not

22  you did or didn't confer because I know that you disagree

23  about this and it's not going to be productive to do that.

24  But I think that it would be helpful to set up a protocol for

25  the future because we're going to have more issues and I think

5

1    that it's going to be something that would help both sides.

2              So here's my suggestion.  That before the letters go

3    out to the Court on discovery issues that we establish a

4    notice period.  In other words, that X number of days before

5    the letter goes out, we could say 48 hours, 72 hours --

6              MR. LARKIN:  I think, Your Honor, three business

7    days is certainly reasonable.

8              THE COURT: 72 hours.

9              MR. LARKIN:  I think that's minimal.  I would

10   probably something like three to five business days but three

11   business days is probably fair.

12             THE COURT: What do you think, Mr. Rudin?

13             MR. RUDIN: That's fine.

14             THE COURT: Three, five?

15             MR. LARKIN:  Five is better.  Five business days is

16   reasonable.  It gives us a chance to confer with our clients

17   about any issues and it would give -- likewise it would give

18   plaintiff a chance to consider any issues that he may have.

19             THE COURT: So five if possible and then three if

20   you're really tight.

21             MR. RUDIN: That's fine, Judge.

22             THE COURT: So it would just be a bullet -- you would

23   just list these are the issues that I plan to raise with the

24   Court, this is when I raised them with you before, and this is

25   the last response I received from you.

6

1          MR. LARKIN: That's fine.

2          THE COURT: I think if we have that protocol I think

3    you'll all be able to [inaudible].

4          MR. RUDIN:  The other thing is that when we had a

5    document inspection in the Corporation Counsel's Office and

6    Ms. Krasnow supervised it for the most part and she asked me

7    for a week to produce some of the personnel records I

8    immediately agreed and apparently she determined that she

9    needed an additional two days and sent me an email that I

10   couldn't respond to by the deadline of noon that they set

11   because I was traveling and I didn't know about it.  So then a

12   letter was written to the Court and I had the feeling the

13   Court was irritated that we didn't work that out and I would

14   have consented but --

15         THE COURT: Really I don't get irritated very easily

16   I just want you to know.

17         MR. RUDIN: Okay.

18         THE COURT: What I was really trying to do was just

19   to prevent another run of letters from going out.

20         MR. RUDIN: I understand.  But I just wanted the

21   Court to understand of course I would have agreed to two more

22   days.  I agreed to the week that she asked for and I would

23   have agreed to two more days and they obviously weren't aware

24   that I didn't get the email.

25          So turning to the items in my letter, my original

7

1   letter, I thought it might be useful to first deal with the

2   physical discovery and then deal with the depositions if

3   that's okay.

4        MR. LARKIN: Your Honor, even before we do that with

5   respect to the Court's suggestion of a protocol, may I just

6   raise one other brief --

7        THE COURT: Sure.

8        MR. LARKIN: Issue briefly.  The rules generally

9   provide that discovery letters ought to be three pages in

10  length.  I think that with respect to any further applications

11  there's no reason why that limitation should not apply.  It

12  takes us hours to address all of the matters raised in a ten-

13  page limit and it's hours taken away from witness preparation,

14  preparation for our own discovery and other things, and I just

15  ask that it be understood that in the future all letters to

16  Your Honor should be no more than three pages in length.  I

17  think that's fair in this case.

18       THE COURT: Would three pages work in this case?  I'm

19  not sure three pages will work but we might come up with a

20  different limit.

21       MR. LARKIN:  I mean five should be sufficient.

22       THE COURT: I think five can do it.

23       MR. RUDIN: Your Honor, I raised nine or ten issues.

24  Sometimes it depends on the number of issues.  Each of the

25  submissions that I've made that have been lengthy maybe with

8

1    one or two exceptions has involved a multitude of issues and I

2    try to write succinctly and spend a lot of care trying to

3    write succinctly but to raise nine or ten issues in a

4    meaningful way sometimes it's hard to do it in five pages but

5    I'll be guided by whatever Your Honor prefers.  If you prefer

6    that we just basically list the issues and develop them during

7    a meeting with the Court.  If that's more useful to the Court

8    I'm happy to do it that way but I just thought that maybe this

9    was more useful just to lay everything out.

10          THE COURT: Well --

11          MR. RUDIN: But whatever Your Honor prefers

12   obviously --

13          THE COURT: Let me say what doesn't make sense.  It

14   doesn't make sense to submit two five page letters because

15   that's [inaudible].  But what I think is in some of these

16   letters, and know it's difficult for both sides is a lot of

17   extraneous material.  There's important material and there's

18   extraneous material and the extraneous material has to do with

19   they did this, they didn't do that and I really -- for some

20   reason my mind just doesn't read or react to statements about

21   how one side is misbehaving or the other side is misbehaving.

22          So I think if you took out adjectives that describe

23   the outrageousness of the other side's conduct I think that

24   would probably make it easier and then both sides were to

25   lessen -- this is for both sides.  Both sides would lessen the

9

1  expenditure of valuable emotional resources.  I just don't

2  read that. My mind just --

3  　　　　　MR. LARKIN:  I understand.  Your Honor has an

4  extraordinary level of patience and it's been on display on

5  this case.  It really has and everyone certainly on our side

6  appreciates it.  The concern that we have is that matters,

7  extraneous matters that don't even require the Court's

8  attention are often included in the plaintiff's letters and

9  one perfect example is this question concerning written

10  deposition questions to Monique Ferrell.  We said several

11  times in writing to counsel serve us the questions.

12  　　　　　THE COURT: The protocol will hopefully deal with

13  that.  That's why we're doing the protocol.  Hopefully that

14  will deal with that and I understand why Mr. Rudin feels that

15  he's got pressure to get these issues resolved because we've

16  got a deadline and he's got a lot of work to do and you have a

17  lot of work to do and I think it's the pressure of a big case

18  that's important that has a lot of issues that makes your

19  lives difficult.  So what I want to do is try to make your

20  lives a little easier and I think that will help make my life

21  a little easier as well.  So we'll see if this protocol works.

22  If it doesn't work then you get back to me and we'll figure

23  something else out.

24  　　　　　MR. LARKIN: Thank you.  Five pages then going

25  forward for discovery disputes?

1          THE COURT: Right.

2          MR. LARKIN: Thank you.

3          MR. RUDIN:  What happens if there are ten issues the

4  way there are this time?  You would like us just to list the

5  issues essentially and then develop them during the oral

6  argument?

7          THE COURT: I'm hoping there won't be ten issues

8  because --

9          MR. RUDIN: I hope so too but it keeps happening.

10         THE COURT:  -- if you list them to counsel before

11 and not to me that they'll say okay, look, we're meeting and

12 conferring on this, it's premature to raise this, why don't

13 you raise this a little bit later.  We're still working on it

14 like the electronic discovery or the Ferrell questions or

15 whatever.  We'll get back to you on that or the email that you

16 never received.  I'm hoping that will help take care of it and

17 you won't need to write so much.  If it doesn't work then

18 we'll go back to something else.

19         Now, the [inaudible] to all of this is that there's

20 supposed to be no replies as well and both sides [inaudible].

21 Now, sometimes it would probably makes sense because it helps

22 me understand what you're saying at oral argument.  I don't

23 want to hear your arguments for the first time in oral

24 argument.  I'd rather hear it beforehand.  So I'm not going to

25 hold you to the no reply rule but I do want you to exercise

11

1   your discretion.  Does that work?

2          MR. RUDIN:  Yes.  Thank you, Your Honor.

3          Your Honor, I wanted to turn to the first to the

4   hotel custody records if I may.  We were permitted to inspect

5   hotel custody logbooks and some detective investigator

6   logbooks and indicated by -- well, we marked some of what we

7   wanted photocopied while we were and then I sent a

8   comprehensive email to Ms. Krasnow indicating the documents

9   that we wish to have photocopied and I believe defense counsel

10  is agreeing to photocopy those documents but then Mr. Larkin

11  said something about a Rule 34 discovery demand and that left

12  me somewhat confused.  So perhaps he can clarify his position.

13         MR. LARKIN: We said in our letter very clearly that

14  we will make every effort to make sense of the email and copy

15  the documents that were requested.  So I don't see any dispute

16  at this point.

17         MR. RUDIN: Okay.  What I suggested is going forward

18  if there were further discovery demands it would be easier for

19  us if we get them as a Rule 34 request so that we know exactly

20  what it is that's being requested and what we have to do.

21  It's just more difficult to keep track of emails that are sort

22  of non sequential that concern different discovery areas.

23  That was my only concern.

24         MR. LARKIN: Your Honor, may we have a deadline for

25  that to be complied with because these are very important

12

1   records and I -- whatever is reasonable but I just think to

2   indicate their position.

3          MS. KRASNOW: Given the deposition schedule that we

4   have coming up I think that we'll need two and a half weeks to

5   copy the logbooks.  One of the items that Mr. Rudin selected

6   is actually almost the entire logbook.  So it's going to be a

7   very extensive process to have those copied and given the

8   schedule that we already have I think two and a half weeks

9   will be needed.

10         MR. RUDIN: Your Honor --

11         THE COURT: Would an inspection help you before

12   they're copied?

13         MR. RUDIN: No.  That's the inspected we had and I

14   indicated what we needed and --

15         THE COURT: In other words, a second inspection, that

16   won't help?

17         MR. RUDIN: No.  But, Your Honor, I can't imagine

18   this would take more than three or four hours for someone to

19   photocopy.  It's 100 pages, 150 pages.

20         MR. LARKIN: Your Honor, these are logbooks that have

21   to be manually by hand placed on a copy machine.  Someone has

22   to press copy.  I mean you've got to go page by page.  You've

23   got to turn them upside down in order to get them -- the

24   copies done the right way, to make sure you get everything on

25   it.  In addition, we're going to have to do some redactions

13

1  because there are names of individuals who were placed in

2  protective custody for their own safety during this --

3           THE COURT: You're going to do a review.  I

4  understand.  You need some time to review.

5           MR. LARKIN: So we're going to have to do some

6  review.  So between the copying, the scanning and the

7  reviewing I don't think two plus weeks is out of line at all.

8           THE COURT: We're going to have a number of deadlines

9  that we're going to set.  So let's just start by listing them

10 and then at the end of the conference we'll figure out what's

11 reasonable.

12          MR. RUDIN:  I'd be happy to provide someone from my

13 office if that would be of assistance at the photocopy

14 machine.

15          MR. LARKIN: We do not want someone.  The other thing

16 is that I also agreed that with respect to the names of

17 witnesses that I would agree to a protective order that they

18 be kept confidential unless the Court -- unless we apply to

19 the Court and the Court ordered otherwise in a specific case.

20 So it seems to me that should eliminate the problem but we

21 don't quite agree that that would be appropriate.  I think

22 that if individuals were placed into protective custody

23 there's a real concern for their safety even now, even many

24 years later.  I appreciate the offer to keep the names

25 confidential but I think redactions are much more prudent in a

14

1   situation like this.

2           THE COURT: So are defendants proposing July 26th

3   for -- what is plaintiff proposing?

4           MR. RUDIN: The 19th.

5           THE COURT: So we'll table this and see where we are

6   with the next set of issues.

7           MR. RUDIN:  Then I indicated in my letter that --

8   well, first of all, the issue is whether or not the District

9   Attorney's Office at least during that time period in the

10  1990s -- I don't know about today but during the 1990s had a

11  custom or practice to hold some witnesses against their will.

12  The District Attorney and defense counsel have denied that.

13  It seems to us pretty apparent that there was something of

14  that nature going on because they're pasted at the front of

15  each of the logbooks is a memorandum from the Chief Detective

16  Investigator Albert Pica  indicating -- giving instructions to

17  DI about how to guard against escape that some of the

18  witnesses being held were arrestees or potential arrestees and

19  then there's an exhibit attached to my letter, Exhibit D which

20  is a remarkable form where -- a printed form that has a space

21  to indicate whether or not the witness in hotel custody is

22  being held as a prisoner.

23          Defense suggested, made a suggestion about how to

24  explain the yes with respect to Angel Santos.  I don't accept

25  their explanation.  Two sides can disagree but in terms of our

1  obligation under Monel to prove custom and practice it's

2  imperative that we obtain these forms as well as the material

3  witness applications and orders for the same witnesses in

4  order to see whether there's a pattern of witnesses apparently

5  being held as prisoners.  So we've asked -- we would like to

6  have the hotel custody files produced and they have discrete

7  files for each witness.  Each one has a number.  They're

8  sequentially numbered and the hotel custody log had the names

9  of most of the witnesses but also had the number.  So would

10  make a request by number and I thought that rather than ask

11  for 150, 200 which obviously the defense would complain about

12  I thought maybe we can start with 50 and perhaps the way to do

13  it would be an inspection like the last time and we could

14  determine whether there are documents in there that we would

15  like to have copied or we could ask initially that that form

16  that has the indication that someone was or was not held as a

17  prisoner as well as the material witness application an order

18  for each such witness be produced but I would prefer to do the

19  inspection because there may be other documents in there that

20  are indicative of whether or not the person was being held

21  against their will.

22          I indicated in my letter the terms that were used in

23  these hotel custody logs and I'm prepared to give Mr. Larkin

24  the number, the prisoner number -- the witness number with a

25  custody number for each witness who I quoted.  In his letter

1   he expressed skepticism that those terms like prisoner,

2   shackles, leg irons are really in the records.  I'd be happy

3   to provide Mr. Larkin with the custody numbers that correspond

4   to each of the quotes in my letter but overall it's clear that

5   there's a basis for us to believe that this was a practice.

6   The defense may have an explanation for it but we're entitled

7   to discovery to be able to prove our case.

8           THE COURT: So just to be clear, you're referring on

9   Page 4 and Page 5 of your July 2, 2013 letter docket entry 132

10  to the two hotel custody logbooks numbers 2 and 3 covering the

11  period 1993 to 1994.

12          MR. RUDIN: The two logbooks are the ones that we've

13  inspected.  What I'm referring is -- and those are the ones

14  that they're copying and there's just an issue about how much

15  time they need.  But I'm referring to --

16          THE COURT: The files.

17          MR. RUDIN: -- the files.  It's the last paragraph

18  of that category on page 5.

19          THE COURT: Right.  But the way you get those files

20  will be that you will correlate individuals who are listed in

21  the logbook based on these flags that you've essentially

22  raised, secured, chained, handcuffed, remanded, et cetera.

23          MR. RUDIN: Yes.

24          THE COURT: And that's -- you get that information

25  initially from the logbooks and then you're requesting files

17

1  of people who are listed in those logbooks and you want to do

2  an inspection of those logbooks.

3        MR. RUDIN: Yes.  But in addition there's at least

4  one logbook that's missing and it happens to be the logbook

5  that corres -- that would have entries for witnesses in this

6  case and there are other custody files around the same time

7  period that probably would have been in that log that are

8  missing.  So it may be that we also ask for some numbers where

9  we don't have any indication -- where there isn't -- we

10  haven't been able to inspect the logbook but we would like to

11  see -- to inspect the witness files that are chronologically

12  close in time to the witness files in our case in order just

13  to see whether any of those files have these form indicating

14  the witness was held as a prisoner and -- some of the logbooks

15  also indicated in quite a few instances that the witness was

16  taken apparently directly to a hotel, held overnight and then

17  brought to court the next day and that also supports our

18  thesis that on many occasions material witnesses were being

19  brought directly to the DA's office and then to a hotel before

20  they were brought to court.

21        But that's far more serious it seems to us for our

22  claim is the apparent custom and practice of witnesses being

23  held whether they go to court or not.  Ultimately being held

24  against their will by the DA's office in hotels.

25        THE COURT: I'm just looking at Exhibit D which is

1   the exhibit that I think you get the numbers from; correct?

2          MR. RUDIN: Yes, Your Honor.

3          THE COURT: Who would like to respond?

4          MR. LARKIN:  Yes, Your Honor, we have a number of

5   significant concerns about this.  First of all, I don't have

6   Judge Block's decision in front of me but I don't recall that

7   any such claim concerning the alleged misuse of material

8   witness orders is part of this case or is part of the Monel

9   claim that the judge found had been adequately pleaded.

10          Whether or not in any given case a witness was

11   lawfully taken into custody and perhaps held for a period of

12   time before being brought before a judge it's not going to

13   affect the criminal defendant's constitutional rights

14   unless -- arguably unless there was non disclosure of those

15   facts and unless that witness was actually coerced.  Actually

16   coerced into giving false testimony.

17          The simple fact of a witness being held in custody

18   doesn't really it seems to me doesn't prove anything.  In

19   addition, even if the Court were to conclude that this is an

20   adequately pleaded claim that can be pursued in discovery it

21   seems to me by allowing this kind of exploration of individual

22   custody files it's going to put us in a position now of having

23   to produce not only just the 50 that the plaintiff wants but

24   we're going to have to produce all the files for that time

25   period because we may need to use them it seems to me in

1    our -- in the defense of our case.

2            I'm thinking out loud as to how this would logically

3    proceed.  We would have to then review each and every

4    individual case and see if adequate disclosures were made and

5    see if there's any evidence or any allegation that a witness

6    was coerced or threatened into giving false testimony.  That's

7    the claim here.  As we don't think that claim has any merit

8    for a variety of reasons in this case because the witnesses

9    were taken into custody because they were afraid of Jabbar

10   Collins because of threats that Mr. Collins made to them and

11   to their families.  So there isn't any substance to the claim

12   that Collins' rights were violated in this case.

13           But for purposes of Monel discovery you've got a

14   couple of different issues and I'm not sure the best way --

15   what the best way to address them is.  Maybe we need to take

16   another look at Judge Block's order and file a motion for a

17   protective order which we can do relatively quickly and if the

18   Court were to conclude, if Your Honor were to conclude that

19   this is a pleaded claim in this case then we're going to have

20   to figure out how to go about getting the relevant evidence

21   and really hone in and refine what exactly is the claim here.

22   If the claim is that -- if the claim is that a witness was

23   coerced into giving false testimony it seems to me you've got

24   to find evidence of other cases where that -- evidence of

25   other cases where that happened.  The simple fact that a

1   witness was taken into custody pursuant to a material witness

2   order doesn't establish that fact.   You'd have to go, it seems

3   to me, to the underlying file of that indictment and see what

4   other evidence is there to support a claim of witness

5   coercion.   I don't think that there's anything to it but the

6   burden of doing that exercise is going to be quite substantial

7   and my recollection is that Judge Block upheld a claim,

8   essentially a Brady claim and a prosecutorial misconduct

9   claim, allegations that there were other judicial findings of

10  misconduct allegedly at -- or judicial findings that the

11  plaintiff says constituted misconduct and that's the alleged

12  pattern and the vast majority of those cases involve things

13  like comments in summation or Brady disclosures.   This whole

14  question of material witness warrants was not part of the

15  decision was I recall.

16          So I think what -- we'd like an opportunity to brief

17  this a little bit further and in some greater detail perhaps

18  before we have to undertake this kind of burdensome discovery,

19  Your Honor.

20          MR. RUDIN: Your Honor, may I respond to that?

21          THE COURT: Just a minute.   I'm just trying to get my

22  computer to work.

23                    [Pause in proceedings.]

24          THE COURT: We have a limited amount of time to

25  accomplish what we need to today.   It sounds though the

21

1  defendants need some time -- both sides.  I've got the

2  decision in front of me.  It's not a short decision.  I think

3  I understand the decision but I'd like to hear both of your

4  understanding of the decision and how each one of you believes

5  that this fits in.  I think in five pages or less each of you

6  could explain to me why this is or is not a relevant root of

7  inquiry and whether the benefits would outweigh the burdens.

8          MR. RUDIN: Okay.  Do you want -- should we submit

9  them by this Friday?  Maybe plaintiff goes first and we

10  respond or -- do you want to do it that way?  What do you

11  think?

12          MR. RUDIN: Simultaneous so that there isn't a reply,

13  an urge to reply.

14          THE COURT: Well, the problem is that each one of you

15  is going to do -- if it were simultaneous you would each

16  reply.

17          MR. LARKIN: If plaintiff goes first -- if plaintiff

18  goes first we can go next and we won't reply.  We won't file

19  anything else.

20          THE COURT: I think the burden is on the plaintiff to

21  show that it's relevant under Rule 26.  So if you'd like --

22  when can you submit yours?

23          MR. RUDIN: [Inaudible] from Monday.  We have

24  depositions Wednesday and Thursday -- Thursday and Friday and

25  I have an argument in a very complicated case tomorrow in a

1   criminal case.  By the end of business on Monday.

2           THE COURT: And the opposition?

3           MS. KRASNOW: On Friday the 19th.

4           THE COURT: Okay.  We'll call this the material

5   witness logs or the hotel custody logs.

6           MR. LARKIN:  Hotel custody files.

7           MS. KRASNOW: Hotel custody files.

8           THE COURT: Files, not logs.  I'm putting that also

9   on my list of dates.  7/15 and 7/19.

10          Next.

11          MR. RUDIN:  Then there's the ADA discipline issue.

12  Originally the defense agreed to provide us with any instances

13  where they were going to claim that a prosecutor was

14  disciplined by June 1st but then indicated they needed more

15  time and the date that Mr. Larkin has most recently mentioned

16  is July 31st.  At the same time the defense would like us to

17  indicate which cases where courts found possible misconduct.

18  I would like to question Mr. Hines about it at his deposition

19  and this has been pressing for early notice.  My response has

20  been that since I'm going to have limited presumptively to

21  seven hours and I have to make choices about what to ask him

22  about it it would be helpful if we had disclosure of any

23  discipline that occurred sooner rather than later.

24          If the defense is going to contend that there were

25  prosecutors who were disciplined in some way and that if --

1    then as to those prosecutors and if any of them are

2    prosecutors where we do not have their personnel records we

3    would like to have the personnel records so we have some

4    context and any other records that indicate that there has

5    been some form of discipline.  If there's just verbal notice

6    but we don't have the records then that obviously doesn't give

7    us what we need to prepare and to challenge the contention.

8            So if this as difficult an undertaking as the

9    defense has indicated then I don't have a problem if they

10   really need all the time to July 31st but by the same token it

11   makes it impossible for me to provide earlier notice about

12   which cases I'm intending to really go into with Mr. Hines.

13   So it's really -- it seems to me out of fairness the ball is

14   in their court.  If they can do this sooner I can give the

15   notice that they're asking for sooner.

16           MR. LARKIN: I think, Your Honor, that the two issues

17   are not related.  Mr. Rudin already has a list of 50 plus or

18   50 some odd cases that he knows is going to form the basis or

19   he believes is going to form the basis of his Monel claim. He

20   can certainly call from that list the number of individual

21   cases about which he intends to question the District

22   Attorney.  Now, if it turns out that when we turn over our

23   discipline records that counsel wants to add individual ADA's

24   to the list of ADA's to question the DA about, that does not

25   seem unreasonable to us and we don't object to -- would not

24

1    object to that.

2            If, for example, the name of an Assistant DA was

3    first disclosed on that list and plaintiff wants to question

4    the DA about that particular Assistant as to whom discipline

5    was imposed and he wants to add that name and let's say within

6    a week after our disclosure he can give us that name there

7    would be no objection to it.  But in terms of the individual

8    cases it seems to me plaintiff has done an extensive amount of

9    research already into what cases constitute the Monel claim

10   and he ought to be able to identify them by July 19th which is

11   the suggested -- the deadline that we had suggested.

12           I will also say, Your Honor, that the information

13   that we plan to disclose about ADA discipline is going to

14   include things like negative evaluations, demotions and

15   terminations and each from what I understand we will be

16   getting a printout that will give us the basic information as

17   to what -- sort of what level of discipline if you will was

18   imposed on the particular Assistant at issue, was it just a

19   negative evaluation, was it --

20           THE COURT: I understand.

21           MR. LARKIN: Right.  So that document would

22   constitute a summary it seems to me of other information in

23   the files and I think I'm sure the Court is aware the rule

24   typically is that if you produce a summary and the other side

25   wants to see the underlying data that -- the underlying

1   materials that form the basis of the summary that they're

2   entitled to see that.  So we would not object to getting

3   whatever underlying documentation the plaintiff wants.

4          But, again, I don't know how we're going to do all

5   of that by an August date for the District Attorney's

6   deposition.  I mean if plaintiff wants to go forward with the

7   deposition using just the printouts that we provide then it

8   seems to me he would be welcome to do so but why -- there's

9   just no way that we could then go back to old personnel files

10  given the time period that's covered by the document request

11  and request for this kind of information.  For us to go back

12  to all of those personnel files and find all of those

13  evaluations it just can't be done within two or three weeks.

14         So, again, like much of the discovery in the case it

15  seems to me the plaintiff has to make choices.  If they want

16  to go forward with the deposition then they've got to

17  compromise on what documents are available beforehand.  It's

18  just -- there's just no other way to go about this.

19         THE COURT: That's why we're taking the Hines

20  deposition last.

21         MR. LARKIN: I appreciate --

22         THE COURT: I'm making a list of all the --

23         MR. LARKIN: I appreciate that, Your Honor, and with

24  respect to the cases I don't see a connection necessarily

25  between the cases that the plaintiff already knows about and

26

1  the Assistants who may received negative performance reviews

2  or may have received transfers, demotions or may have been

3  asked to resign.  There just is no reason why we can't get the

4  case names sooner it seems to me as well as the ADA's that he

5  already knows about.  He already knows, for example -- counsel

6  already knows that there are 50 some odd ADA's who were

7  involved in those cases.

8          THE COURT: The way I'm thinking of this is not an

9  [inaudible] date like July 19th or July 31st but X dates before

10  the deposition since we haven't decided on the deposition

11  date.

12          MR. LARKIN: All right.

13          THE COURT: I think that probably will make sense

14  because we're talking about how much time each side needs to

15  have these materials in order to prepare for whatever --

16  either prepare for the deposition --

17          MR. LARKIN: Yes, Your Honor.

18          THE COURT: So I would assume, Mr. Rudin, you would

19  need a certain amount of time before you depose the District

20  Attorney.  You need to have this disciplinary information and

21  you need to have summaries of -- you need whatever you need in

22  order to prepare.  So what I need to know is how much time you

23  need before their deposition to do that.

24          MR. RUDIN: Your Honor, this is why we've been trying

25  to get this discovery since February and only now this is

1   being put together.  So we're being squeezed and this is -- I

2   know Your Honor doesn't like adjectives but this is not an

3   accident that's happening this way because the other side

4   wants to delay the deposition of Mr. Hines -- a date that

5   everyone in the room knows about.

6              MR. LARKIN:  So that's outrageous.  That's just

7   outrageous.  I'm sorry, Your Honor, but that's --

8              THE COURT: I can turn the mic up.

9              MR. RUDIN: So that's why we started in February

10  and -- so if it -- some of the personnel -- we received some

11  additional personnel records today.  We're only owed a few but

12  we have to go through them.  We've gotten a whole bunch in the

13  last week and now there's an indication that there may be some

14  discipline of ADA's that maybe our ADA's other than the ones

15  who handle these 50 cases in which case it would be helpful if

16  we knew what cases they were disciplined for.  I know from,

17  for example, the Bronx DA's case that I handled, the Ramos

18  case, there was an instance where somebody was suspended for I

19  think it was -- it was either two weeks or two months and then

20  that -- if that's all that was provided that would look like

21  something fairly significant but then what happened was that

22  after the ADA was reinstated he got a step increase, a merit

23  bonus and a promotion.  So that's why you need all the

24  personnel records just to be able to evaluate the context as

25  well as a letter to the grievance committee saying we've taken

28

1    care of this problem so please don't discipline him.

2              So that's why we sort of --

3              THE COURT: So I think you both have a similar

4    interest in doing this thoroughly and doing it well.  That's

5    what I think.  So let me just tell you.  I've been listening

6    to both sides' interest in making sure you have the

7    information you want and making sure you have the time to do

8    what you want.  The Court is upholding the interest of

9    injustice really and to make sure that when this trial is held

10   that this -- that it's going to be held on the merits and that

11   the information will be fully developed, fully exposed because

12   to bring a case as important as all of you believe this case

13   and know this case to be, to bring it and not have an adequate

14   time to prepare for it and not have full information before

15   you would not serve anyone's interest and certainly not the

16   Court's interest.

17             So my duty here to the public and to the Court and

18   to all of you is to make sure after I've heard what can and

19   can't be done and what needs to be done, to make sure that

20   there's sufficient time to develop the case properly.  Now,

21   that doesn't mean to not to put people's feet to the fire but

22   it does mean to make sure that the deadlines are realistic and

23   that's what I'm going to make sure happens.

24             MR. RUDIN:  Can I ask does defense counsel have any

25   idea how many instances are involved?

1            MR. LARKIN: We don't have a specific number but it's

2  going to be much more than I thought I have to say because

3  when you include negative evaluations and the motions and some

4  of them may not be for one case.  It may be for overall

5  performance, overall job performance where it's hard to

6  pinpoint one specific case but it will be substantially more

7  than I thought.  I don't know what the number is.  I need to

8  confer with my clients about that.

9            THE COURT: When will you know?

10           MR. LARKIN: If the Court would give me a moment I

11 can speak to Mr. Amoroso who happens to be here and maybe he's

12 got the information.

13           THE COURT: You can sit at counsel table if you'd

14 like.  Would that make life easier?

15           MR. LARKIN: He doesn't want to accept it.  He

16 declines the invitation I'm afraid but he'll speak through

17 counsel.

18                      [Pause in proceedings.]

19           MR. LARKIN: It would be in excess of 200

20 individuals.

21           THE COURT: And that's over what period of time?

22           MR. LARKIN: 24 years.  I guess that's 1990 to

23 present.

24           THE COURT: Have those personnel files been

25 segregated yet or is that --

1          MR. AMOROSO:  At this time, Your Honor, it's the

2   [inaudible] we've only [inaudible] first [inaudible].

3          THE COURT: See that mic right there.  Just push the

4   green button.

5          MR. AMOROSO: This endeavor has been occurring since

6   the first week of May since we've been noticed by defense

7   counsel and we dutifully given him those files that he's

8   already received in that short period of time.  Towards that

9   end he's also asked for disciplinary records.  We have in

10  excess of 200 that cover a period of 24 years.  We're in the

11  middle of that process trying to get and navigate the

12  information as to what occurred resulting in the discipline

13  that was imposed for that particular individual.  Be it as Mr.

14  Larkin said, a suspension, a demotion, a leave of absence, a

15  reduction in salary, a request for resignation or an outright

16  termination.

17          So there are different gradations of discipline that

18  was taken, some of which were unrelated as counsel has

19  suggested incorrectly related to specific cases.  They may in

20  fact not be related to specific cases.  It may have to do with

21  conduct and may have to do with behavior.  It may have to do

22  with professionalism.  Not specific to what counsel is trying

23  to establish that it was specific to a particular case.  So we

24  have to go through that process of the 200 some odd cases and

25  give him what he's seeking.

1           MR. RUDIN: Your Honor, this is ironic because I took

2   Mr. Amoroso's deposition in the Zarri case in 2005 and he

3   testified that between 1990 and 2005 although he was aware of

4   any ADA who was disciplined for misconduct relating to Brady

5   violations, summation misconduct or misconduct in the handling

6   of a criminal prosecution, he was not aware of anyone who had

7   been disciplined during that period.

8           I'm not asking for records of individuals who were

9   disciplined for private matters or for matters that don't

10  involve the issues in this case.  So I don't know -- I don't

11  quite understand what's going on here but the notion that

12  there are 200 individuals who were disciplined for misconduct

13  in the prosecution of a criminal case and Mr. Amoroso didn't

14  know about any of them in 2005 when he was counsel to the DA

15  and he had responsibility in that area it just -- the whole

16  thing is strange.  I don't --

17          MR. AMOROSO: All I can say, Your Honor, is that --

18          THE COURT: I don't want to turn this into a mini

19  trial on that issue.  I don't have the transcript of the

20  deposition before me and I don't want to get into that issue

21  but what I would like to do at this point is just determine

22  because I've heard that the District Attorney's Office is

23  making a good faith effort to try to find as many disciplinary

24  files as possible to produce to the plaintiff I'd like to know

25  how long it will take and then if you find that the production

32

1   is insufficient or otherwise lacking you'll come back to me.

2            MR. RUDIN:  Your Honor, is the defense indicating

3   that there are disciplinary files apart from personnel files

4   or that there are mattes within personnel files that they're

5   going to indicate reflect some form of discipline?  Again, I'm

6   not looking for some -- for documents that don't relate to the

7   claims we're making.  I don't think that they are helpful to

8   the other side either.  The issue is whether or not individual

9   shave been disciplined for matters relating to how --- for --

10  issues relating to how cases were prosecuted and whether there

11  was misconduct in the prosecution of criminal cases and -- but

12  let me ask that question.  Are the disciplinary files apart

13  from personnel files or are we talking about excerpts from

14  personnel files?

15           MR. LARKIN: It doesn't really matter.  I mean the

16  point is the plaintiff has asked for us to identify by a date

17  certain documents or information that we may use in our

18  defense in this case.  So while the plaintiff may want to

19  limit the discipline to only certain categories of alleged

20  misconduct for us to demonstrate good management of the office

21  we may want to show the jury that there's been discipline in

22  other -- in many other areas as well and general

23  professionalism, misconduct off the job as well as allegations

24  or claims of prosecutorial misconduct.

25           So we can't artificially limit the universe the way

33

1   the plaintiff suggests it seems to me and I -- whether the

2   documents exist in personnel files or separate files I just

3   don't know right now but it doesn't really seem to matter

4   because either way if the plaintiff wants them before the

5   deposition then we're going to have to find the time to gather

6   them, review them and get them produced.  So --

7            THE COURT: Well, let me just jump in here.

8            MR. LARKIN: Yes.

9            THE COURT: I think that you're talking about two

10  different categories of documents.  One would be the documents

11  that Mr. Rudin has requested and those would be your first

12  priority and then the next one is going to be documents that

13  you believe would help you in the defense of the case.  As I

14  understood Mr. Amoroso he would have -- it sounds as though

15  the District Attorney's Office would have to go through all

16  the disciplinary files to separate one from the other.

17           MR. LARKIN: Yes.  That's correct.

18           THE COURT: But I think what the [inaudible] here is

19  that once that separation has been made that you go through

20  the ones Mr. Rudin has requested first and then provide him

21  what's appropriate.

22           MR. LARKIN: One way to do this, Your Honor, might be

23  for us to provide the general list first which contains an

24  indication of what the -- as I understand it, what the

25  discipline was and what the reason was and then the plaintiff

34

1  could cull from that list which underlying documents or files

2  he would want to see.  So --

3          THE COURT: Mr. Rudin, does that make sense to you?

4          MR. RUDIN: Yes, except for the timing.  I mean I

5  don't know how much time the other side will need to produce

6  the documents once I indicate which ones I would like to see.

7          MR. LARKIN: Forgive me.  I had misunderstood

8  something.  I had misunderstood something.  The reason --

9  apparently the list doesn't include the reason for the

10 discipline.  So I apologize for that.  It would include though

11 the nature of the discipline.

12         THE COURT: But I think the key issue is the reason.

13         MR. RUDIN:  So we're basically -- we're going to be

14 given a list of approximately 200 instances in which ADA's

15 over 24 years were disciplined for something that could be

16 lateness, absence, insubordination, stealing, negligence --

17         THE COURT: No, I don't think that that's what

18 they're going to do.  I think they're going to -- as I

19 understood it the defendants will separate -- they will first

20 make a search of all files for DA's, ADA's that have been

21 disciplined and then separate those who have been disciplined

22 for the reasons that you've requested.

23         MR. RUDIN: That's not what Mr. Larkin just said if I

24 heard him correctly.

25         THE COURT: No, but I think that's what Mr. Amoroso

35

1   just said.  Did I misunderstand?

2           MR. AMOROSO:  If that's what we -- we need to do.

3   Can I -- please.  I'm sorry.  The answer is yes.  That's

4   the -- that would ultimately have to be the process and we

5   would -- it seems to me that we would likely turn the list

6   over in advance anyway just because we could generate that

7   more quickly and then from using that list go to the source

8   documents to find out what the reasons were for the discipline

9   and then turn over the relevant documents to the plaintiff.

10          THE COURT: But to expedite matters I assume you will

11  not only have the list but you'll also have the underlying

12  files.

13          MR. AMOROSO: We'll have to gather all the underlying

14  files and I just -- I can't know how long that will take

15  because this is a list that goes back 24 years and you're

16  talking about 200 individuals.  So some of those individuals

17  their files may have already been produced among the 50 or so

18  that are going to be produced in the case.  Some of them I am

19  sure will not have been and we have to find those files and

20  look through them and I just -- it's hard to know how long

21  it's going to take until we get -- until we see what we're

22  dealing with and how many documents, how many documents are

23  there and how many individuals were actually disciplined for

24  things like Brady issues, summation, misconduct in court.

25          THE COURT: Are you saying -- I'm sorry, are you

36

1    saying you can generate the list without looking at the files

2    or without actually having the files in your possession?

3              MR. AMOROSO: One moment.  May I just -- let me just

4    confer with my client.  One moment.

5                        [Pause in proceedings.]

6              MR. AMOROSO: Your Honor, it's going to take us -- I

7    mean the July 31st deadline is the realistic deadline for

8    generating all this information for generating a list.  It

9    isn't just a matter of point and click.  It's from what I

10   understand from speaking to my client that involves some level

11   of research.  The records are old and the system, the computer

12   system that was used back in 1990 is also old and it's just

13   not doable any faster.

14             MR. RUDIN: Your Honor --

15             THE COURT: I was just trying to understand the facts

16   better than how long it will take.  In order to generate the

17   list do you need to look at files?  Do you need to pull up

18   files or in some cases yes or in some cases no?  What's the

19   nitty gritty of how you find -- what you have to do?

20             MR. AMOROSO: First query what's occurred to these

21   employees who are no longer with us.  Second inquiry, what

22   happened to them.  Third inquiry, what happened to them and

23   then what was the result of that.  Next inquiry then you have

24   to go into separate files to figure out the reasons those

25   people are no longer there.  As an example, a resignation was

37

1  requested.  That's the simple term.  We then have to delve

2  into that personnel file to find out why that person's

3  resignation was requested.  Was it as Mr. Rudin is suggesting

4  because of professional misconduct or was it because of

5  substandard performance.  There is a gradation, five or six

6  different levels of gradation.  We would have to -- we have

7  endeavored already to start that process to generate the list

8  and we have to find out the categories that fit the reasons

9  why those people are no longer with us.  Is that clear?

10             MR. RUDIN: Your Honor, the --

11             THE COURT: I'm sorry.  Do you also need to -- would

12  it make sense for counsel to confer with each other as to what

13  categories to look for?  Are you clear as to what the

14  categories are that Mr. Rudin is looking for and that you're

15  looking for so that your inquiry can be pointed and

16  [inaudible]?

17             MR. RUDIN:  Your Honor, the problem is Mr. Amoroso

18  indicated that in the beginning of May he began to look for

19  instances where ADA's were disciplined in some way.  I haven't

20  heard anyone say that they have disciplinary records.  They

21  have personnel records and the personnel records can be 50 or

22  100 pages and for some ADA's they have a series of

23  evaluations.  Sometimes there -- because we received -- we've

24  gone through about 20 of them so far.  Sometimes there are

25  letters from a supervisor or from the District Attorney

1    himself commending the ADA for his or her performance.  There
2    may be salary and promotional records.  Their job
3    applications.  We haven't seen any indication in the 20 or so
4    files that we've analyzed already of anyone being disciplined
5    in any respect or even criticized for anything having to do
6    with how a criminal case was prosecuted.  That doesn't mean
7    there aren't some instances but the idea that they've been
8    going through these files for nearly two and a half months
9    and they haven't made any effort to note where an ADA was
10   disciplined for some matter that related to the prosecution of
11   a case and what the ADA did, and then they're only at the
12   point now of providing a list of 200 ADAs who over 24 years
13   were disciplined for something and now we're going to have to
14   wait beyond July 31st to find out what the something was, and
15   then I'm going to have to ask for the records when we've been
16   asking for this since February.

17           I mean it's so obvious but, you know, it just seems
18   to me that if they're going to be providing a list, then that
19   list is meaningless unless they indicate for each ADA what the
20   claim is that the ADA was disciplined for, when it happened,
21   and what happened, what was the discipline.  And then if there
22   are any records that back it up, they should be disclosed.
23   And if they're really going to contend -- if they're really
24   intending to rely on any of these instances of discipline at
25   trial, then it seems to me they should provide the full

39

1   personnel record so we can review the context.

2          We've identified about 50 cases which were culled

3   from a larger group where courts appear to criticize the

4   conduct of ADAs in ways that we think meaningfully relate to

5   what happened in this case.  If there are additional instances

6   besides those 50 where they say ADAs were disciplined for how

7   they prosecuted an individual case, it shouldn't be very

8   difficult to give the reason for the discipline and the kind

9   of details that I just mentioned.  And why after two months

10  hey haven't done that, I don't understand.  But it seems to me

11  that at the very minimum they should be required to indicate

12  what the ADA was disciplined for, what had happened, and what

13  the discipline was.  And since obviously in any case where

14  that happened where the claim is that it was for a Brady

15  violation, for giving a false or misleading summation, for

16  coercing a witness or abusive process, these are the claims

17  we're making in our case, then they should provide all of the

18  relevant records.

19         MR. LARKIN:  Your Honor, I don't think there's any

20  dispute about this.  We have --

21         THE COURT:  I don't think so either.

22         MR. LARKIN:  I'm sorry?

23         THE COURT:  I said I don't think that there's a

24  dispute either.

25         MR. LARKIN:  There's no dispute.

40

1          THE COURT:  And you said by July 31st you'll be

2     providing -- what is it you'll provide by July 31st?

3          MR. LARKIN:  My expectation was that we could

4     provide a basic list of the 200 individuals with the

5     discipline imposed, a description of discipline imposed.  And

6     I think as Mr. Amoroso has described, that requires a manual

7     search to be done of former employees, that is individuals who

8     used to work at the DA's Office who don't work there anymore

9     and looking through the records of their employment there.

10    And it's not something that can be done just point, click and

11    okay, give me all the discipline cases.

12         THE COURT:  No, I hear you.  So you're saying by

13    July 31st there'll be a list of the individuals --

14         MR. LARKIN:  Yes.

15         THE COURT:  -- and discipline imposed, but there'll

16    also be a list of the alleged misconduct.  I think that's the

17    key.

18         MR. LARKIN:  I don't know that we can get the

19    alleged misconduct by that time.  Oh, okay, I believe my

20    client indicates that we can.

21         THE COURT:  Great.  Okay.  Because I think that's

22    the key because otherwise it's not relevant to the case.

23         MR. RUDIN:  Your Honor, when there's an indication

24    of alleged misconduct may we have the individual case where

25    the misconduct occurred, or cases?

41

1          MR. LARKIN:  Sure.  If it's related to a case, I
2    think we can supply that.
3          THE COURT:  Okay.  Great.  Okay.  So July 31st, list
4    of disciplined ADAs.  And we're clear on the time period,
5    correct?
6          MR. LARKIN:  It's 1990 to the present.  My
7    understanding is it's 23, 24 years.  It's since Mr. Hynes was
8    elected.
9          THE COURT:  Alleged misconduct case if relevant,
10   discipline imposed.
11         MR. LARKIN:  Your Honor, we just have one additional
12   request and that is could we redact --
13         THE COURT:  The names?
14         MR. LARKIN:  -- the names and maybe just include the
15   first initial or first and last initial or something like that
16   --
17         MR. RUDIN:  How can I possibly --
18         MR. LARKIN:  -- until we figure out who the, I guess
19   who the individuals -- whose records are going to be at issue.
20   I mean these are -- you know, these people do have a privacy
21   interest, Your Honor.  I mean the issue is numbers it seems to
22   me.
23         MR. RUDIN:  The issue is not the numbers.  The issue
24   is the bona fides.  I mean we've already gotten nearly -- we
25   will have nearly 50 personnel files.  We have the names,

42

1  obviously.  How can you evaluate the claim that an individual

2  was disciplined if you don't even know the name of the

3  prosecutor?  It's meaningless nonsense if we don't have the

4  names of the prosecutors.

5        MR. LARKIN:  You're going to have an indication as

6  to why the person was disciplined and the name of a case.

7        MR. RUDIN:  Your Honor --

8        MR. LARKIN:  Now, to the extent that that's public,

9  it's public.  It is what it is.  We can't do anything about

10 it.  But some of them on this list of 200 plus people may or

11 may not require further disclosure other than a simple

12 statement of, you know, name, discipline imposed, and reasons

13 for discipline.

14       THE COURT:  Right.  Let me make this suggestion, and

15 I think you can bring the issue to me when it comes up, but I

16 would think certainly for Brady violations, because those

17 would be public and that's their constitutional issues there,

18 their names need not be withheld.  It would be in the Law

19 Journal anyway, hopefully, if there were some Appellate

20 decision.  What else did we have there?  Brady violations --

21       MR. RUDIN:  Summation misconduct, false and --

22       THE COURT:  Summation misconduct, abuse of process,

23 coercing witnesses.  For those particular claims, which are

24 the most relevant in this case, those names should be released

25 subject to a very -- through a protective order at this point

43

1  and then I'll decide later how to do it.

2            As to the others though, anyone who does not have

3  what would have been a publicly known due process related or

4  constitutional related violation, their disciplinary records

5  would be sealed unless a party came to me or to Judge Block

6  asking that it be released for some purpose.  That make sense,

7  Mr. Rudin?

8            MR. RUDIN:  I don't quite understand.

9            THE COURT:  I mean for example, excessive lateness,

10 for example.  You don't need the names of -- you don't need to

11 know that Jane Doe was disciplined for excessive lateness and

12 have that in the Law Journal.

13           MR. RUDIN:  So when you say sealed you mean they

14 don't have to provide the names?

15           THE COURT:  Confidential, right.  They don't have to

16 provide the names.  They'll provide some identifying

17 information and then if you believe that it's relevant, you

18 can come to me and if -- and it needs to be released either in

19 a pleading or publicly revealed in some way, it can't be done

20 without the Court's approval.

21           MR. RUDIN:  All right.  And is the nature -- is the

22 reason for the discipline going to be provided in the list?

23           THE COURT:  Yes.

24           MR. RUDIN:  Okay.

25           THE COURT:  Oh, absolutely.  It would just say A1,

44

1    lateness, excessive lateness; A2, profanity; A3, didn't dress

2    properly, something like that.  I just don't think that the

3    public needs to know that.  But if, you know, A4 had a Brady

4    violation and was cited for a Brady violation, that's a matter

5    of public importance.

6            MR. RUDIN:  So that the names will not be sealed of

7    those individuals?

8            THE COURT:  Right.

9            MR. RUDIN:  Okay.

10           THE COURT:  But I don't know what kind of a

11   confidentiality order you have, but I assume that if there's

12   someone for whom this initial ruling would be unfair and

13   either the District Attorney's Office or the defendants

14   believe that it would be unfair, the proper procedure would be

15   to identify that person by initials or by a number and then

16   ask Mr. Rudin whether or not he would consent to withholding

17   that person's name.  And if there's a disagreement, you can

18   come to me to resolve it.

19           MR. RUDIN:  That's fine.

20           MR. LARKIN:  Yes, Your Honor.

21           MR. RUDIN:  I would think that as to any ADA who has

22   been disciplined for any of those four categories that

23   obviously we're going to want the complete personnel file as

24   well as any other documents indicating discipline and the

25   names of the cases.

1            THE COURT:  Right.  And that's all been agreed to.

2            MR. LARKIN:  We agree to that.  The question though

3  is timing.  I just don't know how many there are going to be

4  and how long it's going to take us to get those files.  But

5  there's certainly no disagreement to that.

6            THE COURT:  Right.

7            MR. LARKIN:  We would produce them.

8            MR. RUDIN:  But I would --

9            THE COURT:  I heard July 31st that you thought you

10 could do that.

11           MR. RUDIN:  I would ask the underlying files --

12           THE COURT:  No, not the files.  Not the personnel

13 files.

14           MR. LARKIN:  Right, right.

15           THE COURT:  The list.

16           MR. LARKIN:  Yes.

17           MR. RUDIN:  The list, the list, okay.

18           THE COURT:  Not the personnel files.

19           MR. RUDIN:  But Your Honor, I'm surely going to want

20 the personnel files for those ADAs, and there may not be that

21 many.  I mean again, I know that --

22           THE COURT:  It'll be easier to figure out when it's

23 not hypothetical, when it's concrete.  So what if it's only

24 five files?  Then, you know, you can probably get that within

25 a day or two.  Well, I mean --

46

```
1           MR. LARKIN:  It depends how old --

2           MR. RUDIN:  That's what I would say.  Mr. Larkin

3   might disagree with that.

4           MR. LARKIN:  It depends how old they are.  We are

5   going back 20 some odd years, and so some of them are in

6   storage and I --

7           MR. RUDIN:  But they don't know if any --

8           MR. LARKIN:  -- I can't make them appear, you know,

9   magically if they're in a -- there's a huge record warehouse

10  in Queens, for instance, and I've been out there looking for

11  stuff and it is vast.  I mean they have little carts they ride

12  around in to look for stuff, so --

13          MR. RUDIN:  But Your Honor, they don't have

14  disciplinary files, unless there's something new, that didn't

15  come out on the Zarry [Ph.] case and that has not come out

16  until now.  They don't have disciplinary files, they have

17  personnel files.  So if they can tell from a personnel file

18  that someone was disciplined for misconduct that relates to

19  this, the claims in this case and they have the personnel

20  file, so all they have to do is reproduce it and turn it over

21  and we eliminate as step, because I know I'm going to want it.

22  So if --

23          MR. LARKIN:  Well look, I'm trying to understand

24  what the problem is here.  I've agreed to turn over the

25  personnel files.  I don't agree with Mr. Rudin's
```

47

1  characterization that -- forgive me if this has not been made

2  clear.  I don't agree with the characterization that from 1990

3  to 2005 there are going to be zero personnel files.  I don't

4  have the Zarry transcript in front of me, although counsel did

5  provide it at one point.  And you know, taking a fresh look --

6           THE COURT:  Okay.  But I don't think we need to

7  speculate on what's going to happen.  I think the way to

8  understand it is the District Attorney's Office is going to

9  provide you with this list that we've just described and what

10  it's going to say on the list.  And at the same time that it

11  compiles the list, it will request, search for, and locate to

12  the best it can as quickly as it can, the underlying personnel

13  file.

14           MR. LARKIN:  Yes.

15           THE COURT:  So hopefully those personnel files will

16  be in defendant counsel's custody.  And then at that point if

17  we're talking about five files and it takes a day to produce

18  them or two days or whatever, they'll tell me that.  Maybe

19  they'll be able to produce them all at the same time.  Maybe

20  there won't be a lag.  I don't know.  Maybe you'll be able to

21  come over and inspect them.  But I think we need to take it a

22  step at a time.

23           MR. RUDIN:  Your Honor, the discipline is based --

24  the claim of discipline will be based upon the personnel

25  files.  They took a long time to produce the first batch of

1  personnel files and each new batch takes a certain amount of

2  time.  I'm not on their side of the fence so I don't know what

3  goes into it.  Ms. Krasnow obviously is working hard on it and

4  it takes her a certain amount of time.  So the idea that on

5  July 31st we're going to get this list and we're going to

6  indicate five or ten or 15 files that we want and we're going

7  to get them within a day or two, I don't think that's the

8  pattern in this case so I don't see any reason to think it's

9  going to happen then.  That's why we have really three weeks

10  to work with.  Why can't they reproduce the personnel files

11  where discipline was allegedly imposed in those areas and just

12  produce them?  Of course I'm going to be asking for them.

13  That's the heart of the Monell part of the case.

14          MR. LARKIN:  Your Honor, we still --

15          MR. RUDIN:  Otherwise, the deposition of Mr. Hynes

16  will be delayed long past August and that's what I thought we

17  were trying to avoid with the schedule that we had.

18          THE COURT:  We're trying to avoid that and what

19  we're trying to do is to have defense counsel work diligently

20  on those personnel files.  I just don't know how realistic it

21  is to assume that they'll be available on the 31st.  But if

22  they request those files at the same time that they make the

23  list and they start going through those files as they have to,

24  I don't know what needs to be redacted and what doesn't.

25  Perhaps you can inspect the files and designate what you want

49

1   from them.  That might be a way.  You might be able to work

2   out a protocol that will alleviate the work load of

3   defendant's counsel.

4           MR. LARKIN:  We can certainly try to do that, Your

5   Honor, but look, since the Court's decision, Judge Block's

6   decision, we've produced what, nine or 10,000 pages of

7   documents.  We've produced 40 plus personnel files.  Plaintiff

8   has gone through only 20 of them.  So the review has taken a

9   fair amount of time on the plaintiff's end, just to illustrate

10  how complex and how difficult the project is.  It's not just a

11  matter, given the scope of discovery in the case, of snapping

12  your fingers and making things appear or point and click.

13  There's just much more to it.  I just have -- we have no

14  control over that.

15          THE COURT:  Okay.  Well, I don't think that we're

16  going to decide anything more here today.  The ruling is that

17  on the 31st this list will be provided, that the defendants

18  will have the personnel files that correspond to that list,

19  that they will have done their best to try to go through those

20  personnel files and to produce those documents that clearly

21  the defendants [indiscernible] for.  And if there is a way to

22  do it by having plaintiff's counsel actually inspect the

23  records and designate what you want from the files, if that

24  will expedite things, maybe that's a way to do it or even to

25  help prepare for the depositions that way.  And if it's not

50

1  working out, you'll let me know.

2          MR. LARKIN:  We'll do our very best, Your Honor.

3  And certainly the --

4          THE COURT:  I mean if I say all the personnel files

5  have to be provided by a week afterwards --

6          MR. LARKIN:  I mean we can put the request --

7          THE COURT:  -- [inaudible] we can -- go ahead.

8          MR. LARKIN:  Forgive me.  I'm sorry, Your Honor.  I

9  just want to make sure I understand.  The 31st certainly the

10  deadline for the list that we just discussed.  In terms of the

11  actual files, we can go about requesting them on a rolling

12  basis starting now as we start to generate --

13          THE COURT:  Right.

14          MR. LARKIN:  -- as the client starts to generate the

15  list.  And as the files come in, we can on a rolling basis

16  again, you know, load them into our system and start looking

17  at redactions that need to be made and reviewing them.  But I

18  couldn't guarantee that by the 31st we would have all the

19  rolling files to produce so that we would necessarily even

20  have all of them in our possession.  We'll make every effort

21  to do that, Your Honor, but because some of these files go

22  back a long ways, I just don't know how long it's going to

23  take to get them, retrieve them, copy them --

24          THE COURT:  I understand what you're saying.  So it

25  may be that some files will be easier than others and you'll

51

1  tell me why you couldn't produce those files.

2          MR. LARKIN:  Yes.  Yes, Your Honor.

3          THE COURT:  But presumptively, I would like to see

4  all those files produced by the 6th of August if you can do

5  that.

6                  [Pause in proceedings.]

7          THE COURT:  Okay.  Moving right along.

8          MR. RUDIN:  Your Honor, the Brady Rosario training

9  materials, I questioned Mr. Vecchione about information I

10 received that there was a training session involving Lauren

11 Hirsch who left the office I believe it was in 2012 after

12 there were allegations of a Brady violation in the Sex

13 Trafficking Bureau which is under the supervision of Mr.

14 Vecchione and that there was a training session in the spring

15 of 2012 where Ms. Hirsch and Mr. Vecchione instructed ADAs

16 about how not to take notes to avoid disclosing as Brady

17 material the prior inconsistent statements of sex crime

18 alleged victims who sometimes initially deny abuse and later

19 on claim abuse.

20         THE COURT:  Right.  And you want the audio or

21 videotape if there is such.

22         MR. RUDIN:  Audio or videotape of that and any other

23 training sessions where Mr. Vecchione participated in the

24 training about Brady or Rosario or note taking.  But that one

25 in particular because I understand what happened is quite

52

1  dramatic and resulted in a great deal of turmoil in the office

2  and Mr. Vecchione testified that he didn't remember anything

3  about it, and I don't think that that's credible if the

4  information I received is accurate.  So yes, we'd like the

5  video or audiotape of that session in particular.

6          MS. KRASNOW:  I'm not sure what led Mr. Rudin to

7  think that it was recorded, but based on our preliminary

8  investigation, that particular training session was not

9  recorded.  So I don't know the basis for his belief that it

10 was.

11         MR. RUDIN:  The basis is a number of different

12 individuals who have provided the information that seems to be

13 quite credible, but I can't say who they are.

14         THE COURT:  Do you know whether any of those

15 individuals have actually seen or heard an audio or video

16 recording?

17         MR. RUDIN:  I believe the individuals -- I mean this

18 is double hearsay.  I believe there are individuals inside the

19 office who know that it was videotaped and indicated that to

20 other individuals who brought it to my attention.  There also

21 should have been a CLE sign in sheet for that session.  I

22 understand that those CLE programs, and this was a CLE

23 program, were regularly videotaped so it's rather strange that

24 that one would not have been.  But this is something -- I mean

25 this also leads into the Monique Ferrell issue because I

1   believe she was present and very involved in the controversy

2   that resulted from the improper training that was given and

3   she probably knows that it was videotaped.  But in any event,

4   if the defense indicates that it's not videotaped, then I'm

5   stuck with that except to inquire of witnesses in depositions

6   to see whether or not it's really true.  I mean I don't know

7   if Krasnow knows that definitively or that's her initial

8   indication.

9          MS. KRASNOW:  I do know that definitively and I

10  would like to know Mr. Rudin's sources for thinking that it

11  was taped.

12         MR. RUDIN:  Well, I indicated what my sources are.

13  I mean they're not --

14         MS. KRASNOW:  In the absence of any suggestion that

15  anyone has seen a copy of the tape, I mean I'm telling you

16  that it was not taped.

17         THE COURT:  To the best of your knowledge and --

18         MS. KRASNOW:  To the best of my knowledge.

19         THE COURT:  And there's been a diligent search to

20  see whether it was?

21         MS. KRASNOW:  Yes.

22         THE COURT:  Is there a videographer who typically

23  would be taping or audiographing these?

24         MS. KRASNOW:  It's my understanding that there are

25  certain CLE sessions that would be videotaped but that this

54

 1  was not one of them.

 2          MR. RUDIN:  Is there an individual at the DA's

 3  Office who has knowledge about that?

 4          MS. KRASNOW:  Our client has done a search and there

 5  is no videotape.  I don't know what you -- unless you're

 6  telling me you've spoken to somebody who --

 7          MR. RUDIN:  No, I'm not telling you that.

 8          MS. KRASNOW:  -- who's claiming that it was

 9  videotaped, then I don't know what else to say.

10          THE COURT:  Okay.  All right.  So we'll move along.

11  You know, anything further develops on either side, you'll

12  raise it again.

13          MR. RUDIN:  Yes, Your Honor.  I understand though

14  there was a CLE sign in sheet for that session and it was

15  approximately April or May of 2012, the Sex Trafficking Bureau

16  or Rackets Bureau training session that was given by Ms.

17  Hirsch and to a lesser extent by Mr. Vecchione.

18          MS. KRASNOW:  How is the sign in sheet relevant to

19  the Monell claim?

20          MR. RUDIN:  Because it will identify people who are

21  witnesses to it.

22          MR. LARKIN:  This is a 2012 training session, just

23  two years after Mr. Collins was released.  I mean it was two

24  or three years after he was released.  I mean it's not even a

25  post conviction pre-release training session, so how could it

1    possibly be relevant?

2            MR. RUDIN:  It's relevant in two ways.  First of all

3    defense is indicating that instances of discipline of ADAs to

4    the present are being made part of a list because that's going

5    to be part of their defense.  Whether or not those instances

6    are relevant we can discuss later, but that's part of their

7    defense.

8            MR. LARKIN:  It's not part -- well --

9            MR. RUDIN:  No I asked for -- that's not what I

10   demanded.

11           MR. LARKIN:  Well, if you're only going to go up to

12   2010, maybe we'll only go up to 2010.  I don't know.  But this

13   is the sort of thing that conferral might sort of save a

14   little bit of time.  Instead of us talking here in front of

15   the Court, we could be doing it --

16           MR. RUDIN:  And the second thing, Your Honor, is

17   that apparently their defense is that Mr. Vecchione in

18   particular did not knowingly withhold, for example, the Oliva

19   recantation, that that happened -- that if that happened,

20   because the implications that maybe Detective Gerecitano

21   reported it in 2010 was somehow not telling the truth or was

22   mistaken.  But assuming that it happened, it was not recorded

23   anywhere and there's a great deal of evidence of training at

24   the Brooklyn DA's Office not to take notes when witnesses are

25   interviewed.  This training session goes a step further and

56

1  talks about -- as I understand what happened, it was

2  instruction about not taking notes and not turning it over to

3  the defense that alleged sex crime victims denied that

4  anything happened, which is quite analogous to when an

5  eyewitness like Oliva recanting a statement that he claimed

6  had been coerced from him.  And the idea that --

7        THE COURT:  Well, you explained that in your letter.

8  I understand.

9        MR. RUDIN:  Yeah.  So it seems to me that if there

10  were such a training session, we should be able to explore it

11  because if in 2012 such training sessions are still occurring

12  and Mr. Vecchione participated in it and shortly after that --

13  I mean it's continued to be defended by the DA and then went

14  on this CBS program as the face of the office, was on five of

15  the six programs, that that indicates an acceptance by the DA

16  of that kind of misconduct.  Otherwise, probably events that

17  came after 2010 would be a lot less relevant.  But that one in

18  particular is quite relevant if it happened the way I've been

19  led to believe it happened.

20        MR. LARKIN:  Your Honor, maybe we could, on a

21  related matter, if Mr. Rudin could disclose to us the names of

22  the persons who are giving him this information because we may

23  want to depose these people.  If counsel is going to claim in

24  good faith that this sort of training was given, I'd just like

25  to know who is it that informed him of these things.  So we

57

1    can serve a demand for that or we can just have an

2    understanding that we'll get it.  I mean I'm not sure what

3    more there is to say about this.  There's no video.  I suppose

4    if there's a sign in sheet we can see --

5            THE COURT:  If there's a sign in sheet, you can

6    produce the sign in sheet.

7            MR. LARKIN:  -- see if we have one.  Sure.  And

8    could we get a statement from counsel on the record as to who

9    the persons are or should we serve a demand for that?  I could

10   serve a demand for it if counsel wants it.

11           MR. RUDIN:  They can serve a demand.  I'm not going

12   to provide it unless I'm required to provide it.

13           MR. LARKIN:  So then we have a live issue.  Perhaps

14   the Court can -- I would like to take a deposition of a

15   witness who claims to have been present at this training

16   session where this directive or this instruction was allegedly

17   given to assistant Das.

18           MR. RUDIN:  Your Honor, I indicated I hadn't spoken

19   to anyone who was present, but I understand Monique Ferrell

20   was present and very involved in the controversy.

21           MR. LARKIN:  I don't understand that.

22           THE COURT:  I think that's something you should meet

23   and confer about at this point.

24           MR. LARKIN:  We will do that.

25           THE COURT:  Electronically stored information?

58

1          MR. LARKIN:  Yeah, it seems that --

2          THE COURT:  Is that resolved now, the email issue?

3          MR. LARKIN:  No, it's not, Your Honor.  It may be

4  partially resolved.

5          MR. RUDIN:  Well, I understood from Mr. Larkin's

6  letter that the City was agreeing to our timetable for emails

7  through the end of June of 2010.  In that timetable -- do you

8  have that, Terry?  The dates?  Your Honor, this is the letter

9  of June 28th.  It was attached as Exhibit G to our --

10          THE COURT:  Right.  I got it.

11          MR. RUDIN:  Right.  So the first stage, stage one,

12  that's emails that are still in the mailboxes of the

13  individuals.  That will be produced by July 12th except I

14  understand Mr. Larkin is objecting to producing them because

15  they're after the end of June of 2010.  The second, stage two,

16  that also includes the CVS emails which we discussed at the

17  last conference.  Stage two would be emails between November

18  25, 2009 and June 15, 2010 for a number of individuals.  It

19  would be due July 19th and is 21 days from the date of my

20  letter.  Stage three are the older emails which I understand

21  are somewhat harder to access.  We substantially cut back on

22  the time period and eliminated some of the names and the

23  deadline for that would be July 31st.

24          Where we have a disagreement -- are we agreed about

25  that, Mr. Larkin?  I just want to make sure we're on the same

1   page.

2          MS. KRASNOW:  We're agreed that we're going to get

3   the emails from our client by all of those deadlines but we

4   don't know yet how many emails that there will be, so we're

5   going to have to review them.  And without knowing how many

6   emails that will be responsive to each of the three

7   categories, I can't say how much time I'll need to review them

8   but I'll do my best to get them to you as soon as possible.

9          MR. RUDIN:  Well, Your Honor, I would just ask for

10  some deadline that appears reasonable to the Court.

11         MS. KRASNOW:  I don't know how many emails --

12         THE COURT:  Well, why don't we set a deadline and if

13  you come back and say it's too burdensome and can demonstrate

14  to me that that's true, or to Mr. Rudin, I'm sure that

15  there'll be some modification.

16         MS. KRASNOW:  So then we'd ask for a week after each

17  of the deadlines for the production.  And obviously if I can

18  do it in under a week, I will.  And then if I need more time

19  I'll write to the Court.

20         THE COURT:  Okay.

21         MR. RUDIN:  Your Honor, where we seem to have a

22  disagreement is emails that were generated after June 30,

23  2010.  We've asked for the emails to be produced with respect

24  to Mr. Hynes, Amy Feinstein who was his chief assistant, Mr.

25  Vecchione, and then two individuals from the public relations

1   office, Schmetterer and Bruno from the period of June 15, 2010

2   until March 15th -- I'm sorry, June 15, 2010 to July 30, 2010

3   on the theory that that's within a reasonable period from when

4   the habeas corpus situation sort of exploded.  November 15,

5   2012 until December 15, 2012 which is the immediate period

6   after Judge Block's -- I'm sorry, the appearance before Judge

7   Block that occurred in the middle of November of 2012 and that

8   got a great deal of public attention.  And then February 15,

9   2013 through March 15, 2013 which is the month after Judge

10  Block's written decision which also got a great deal of

11  attention.  So we assume that during those periods there may

12  have bee a lot more meaningful email traffic that relate to

13  the Collins case and Mr. Vecchione's role in it and Mr. Hynes'

14  view of it, and that's why we focused in on those areas.

15          MR. LARKIN:  Well, these are all -- I mean this is

16  all post release communication, some of which may relate to

17  the pending litigation which in and of themselves might not

18  make them privileged, but the privileged question has been

19  complicated because they refer to communications between the

20  lawyers or communications between -- if they are

21  communications within the office that refer to communications

22  with our office, seems to be some of them are going to be

23  privileged.  I guess apart from privilege, though, we have to

24  get to address relevance first.  I mean how is any of this

25  relevant to Mr. Collins' claims in the case that his

61

1   constitutional rights were supposedly violated in 1994 and

2   then he says continuing up to, you know, 2010.  Certainly

3   there's no claim that after 2010 his rights were violated at

4   that point.  He was released in June of 2010.  I mean at some

5   point there has to be some reasonable cutoff and some analysis

6   of burden and benefit, Your Honor, and I think that a cutoff

7   of June of 2010, particularly when we're being asked to go

8   back as far as -- what's the earliest date?  2006.  Which is

9   going to take significantly more time is not unreasonable.

10          MR. RUDIN:  It goes to condonation and ratification

11  which was the heart of Judge Block's decision.

12          MR. LARKIN:  Well, at that point though the

13  ratification can't possibly cause a violation by any

14  definition because at that point I mean --

15          MR. RUDIN:  It's indicative of --

16          MR. LARKIN:  -- at that point, Mr. Collins is

17  already released.  Mr. Vecchione remains employed as chief of

18  the Rackets Division.  There isn't any question about that.

19  When asked at deposition whether Mr. Hynes continues to

20  support Mr. Vecchione, I strongly suspect he will say, "I

21  certainly do.  That's why he's the chief of my rackets

22  division today."  For us to do an additional search for emails

23  on that theory doesn't seem to add very much to discovery in

24  the case particularly in light of all the other burdens that

25  we are shouldering here in connection with the document

1   discovery, Your Honor.

2           THE COURT:  Mr. Rudin, if you could write an email

3   that would help your case the most for condonation and

4   ratification post 2010, what would it say?

5           MR. RUDIN:  I guess it would be authored by Mr.

6   Hynes or on his behalf by one of his public relations people

7   and it would express -- it would deny any misconduct and

8   express support for him.  And notwithstanding, according to

9   Mr. Vecchione, Mr. Hynes never asked him about any allegations

10  in the case.  So it's just a continuing support over a several

11  year period for him without apparently any inquiry or

12  investigation of the allegations that were made against him up

13  until the point that he's allowed to negotiate with CBS a

14  program where he has continually gone on national television

15  denying any misconduct, including the Jabbar Collins case.  I

16  think it was the fifth show out of the six.

17          THE COURT:  So the email would say, "Good job.  I'm

18  still behind you even though the habeas was granted and you're

19  going to remain chief of my Rackets Bureau and I have full

20  confidence in you."

21          MR. RUDIN:  And, "I'm authorizing you to go on

22  national television and be the star of the show and talk about

23  how all you care about is truth and justice and --"

24          THE COURT:  Okay.  But I think you'll get that from

25  Mr. Hynes' deposition and it sounds as though he's going to

63

1    say that.  So I think the benefit -- it sounds like you've

2    already got it.  And nobody's denying it.

3            MR. LARKIN:  The show is public.  It's been aired

4    and Mr. Vecchione was --

5            THE COURT:  Okay.  All right.  So --

6            MR. LARKIN:  -- was on it.

7            THE COURT:  So I think even the best email you could

8    get from that would probably not advance your case more than

9    what you have already.

10           MR. RUDIN:  All right.  I'll accept that, Your

11   Honor.  But I still would like the CBS emails that were

12   ordered at the last conference.

13           THE COURT:  We already dealt with that before.

14           MR. RUDIN:  I haven't received them yet but I assume

15   --

16           MR. LARKIN:  We don't have any objection producing

17   them.  I think we're --

18           THE COURT:  They're working on it.

19           MR. LARKIN:  Yes, Your Honor.  Yes, we are.

20           THE COURT:  Okay.  So next?

21           MS. KRASNOW:  Sorry, Your Honor.  Before we move on

22   I just wanted to clarify one issue.  In Mr. Rudin's June 28th

23   letter with the three stages of email production, it was not

24   clear if the two final stages sought emails only related to

25   Collins' case or just all emails from the particular user.  So

64

1   we just want to be clear that the search that's going to be

2   conducted is for emails related to Collins' case across the

3   three categories.

4               THE COURT:  Didn't Mr. Rudin's latest letter say --

5               MS. KRASNOW:  I'm sorry if that's been clarified.

6               MR. RUDIN:  That's right.

7               THE COURT:  I think he said he clarified that.

8               MS. KRASNOW:  I'm sorry.  I just want to be sure.

9               THE COURT:  Good question.  It's clarified.

10              MR. RUDIN:  Your Honor, the next issue is the

11  privilege issue.

12              THE COURT:  Is that the one that you're going to be

13  giving me some in camera documents or is that a different

14  issue?

15              MR. RUDIN:  Part of it is -- the second part of it

16  is that the defendants have agreed as to their latest

17  privilege log to provide the documents to Your Honor.  That's

18  obviously acceptable to me.  So there's agreement there.

19              MR. RUDIN:  I mean it's acceptable to the Court.  I

20  know we've imposed --

21              THE COURT:  I've been just waiting for another

22  privilege review.

23              MR. LARKIN:  I'm sure.  Do we have those?

24              MS. KRASNOW:  We have them.  They're with us today.

25              THE COURT:  Okay.

65

1          MR. RUDIN:  All right.  Then as to my Exhibit H, my

2  letter of May 6 --

3          THE COURT:  I think you can keep them.

4          MR. RUDIN:  I'm sorry, Your Honor.

5          THE COURT:  That's all right.  I'll look at them

6  afterwards.  Okay.  So Mr. Rudin, when do you need -- are

7  these documents -- obviously they're important for

8  depositions.  When do you need them?

9          MR. RUDIN:  Well, we have depositions coming up.  I

10  don't know if any of them pertain to Marie Cordren [Ph.].

11          MS. KRASNOW:  I don't think so.  I'm not 100% but

12  99% sure no.

13          THE COURT:  Is it going to be clear to me what the

14  issues are when I look at this?

15          MS. KRASNOW:  I think so.

16          THE COURT:  Or am I just going to see a bunch of

17  documents and try to figure out what --

18          MS. KRASNOW:  Oh no, no, I think this will be clear.

19          THE COURT:  Okay.

20          MS. KRASNOW:  They're all emails.

21          MR. LARKIN:  And I think they're legible and they're

22  all typed, so it's not like the Court will be having to

23  decipher handwriting.  And so I think that we'd assert a

24  privilege.

25          THE COURT:  It's not a question of whether there's

66

1    somebody's direct testimony or -

2            MS. KRASNOW:  No.

3            THE COURT:  Nothing like that.

4            MS. KRASNOW:  No, nothing like that.

5            THE COURT:  It's clear what it is.  It's an email

6    from one person to another.

7            MR. LARKIN:  Yes, it is.

8            THE COURT:  The privilege log identifies who it is.

9    Right.  Okay.  What the basis for the privilege is.

10           MS. KRASNOW:  The privilege log is not included in

11   that file, but I will have it sent over tomorrow morning.

12           THE COURT:  Okay.  And --

13           MR. LARKIN:  Can we submit the privilege log by ECF

14   maybe later tonight?

15           THE COURT:  Yes.  And if Mr. Rudin hasn't seen it,

16   that would be the proper way to do it anyway.

17           MR. LARKIN:  Well, I think we --

18           MS. KRASNOW:  He has it.

19           MR. LARKIN:  Yes.

20           THE COURT:  Oh, he has it.

21           MS. KRASNOW:  Yes.

22           THE COURT:  Okay.  And then with respect to the

23   documents themselves, to the extent that some of the

24   documents, some portion of the document is privileged and some

25   portion is not, have you highlighted the parts that you --

67

1          MS. KRASNOW:  Yes.

2          THE COURT:  Okay.  Perfect.  So the understanding we

3   had at the last review.

4          MS. KRASNOW:  Mm hm [positive inflection].

5          THE COURT:  Great.  Thank you.

6          MR. RUDIN:  Okay.  And just to provide a little

7   context, I think these emails are from 2010 --

8          THE COURT:  Okay.

9          MR. RUDIN:  -- around the time when the habeas

10  proceedings heated up until the time that they concluded.  I

11  mean it's our theory that Mr. Hynes agreed to a complete

12  dismissal in order to protect Mr. Vecchione and other

13  individuals in the office from having to testify.  And the

14  extent to which information was brought to Mr. Hynes'

15  attention about the underlying allegations is highly

16  significant because as I indicated before, Mr. Vecchione

17  testified that neither Mr. Hynes nor anyone else at an

18  executive level in the DA's Office ever asked him to explain

19  the allegations against him or to defend himself against those

20  allegations.  So the extent to which Mr. Hynes was made aware

21  of the underlying allegations is quite critical and the

22  motivation for agreeing to the extraordinary relief of a

23  dismissal with prejudice, an unconditional grant of habeas is

24  highly significant to our case.

25          THE COURT:  Okay.  So just tell me again what should

68

1  I be looking for?

2          MR. RUDIN:  Whether there was information brought to

3  Mr. Hynes' attention about the nature or the substance of the

4  allegations of misconduct that had been made against Mr.

5  Vecchione.

6          THE COURT:  Okay.

7          MR. RUDIN:  And also the reason why Mr. Hynes

8  ultimately approved an unconditional grant of habeas relief

9  including dismissal with prejudice of the underlying state

10 murder indictment.

11         THE COURT:  Okay.  And the basis for privilege is

12 clearly articulated, correct?

13         MS. KRASNOW:  Yes.

14         MR. LARKIN:  Yes, Your Honor.  It's work product and

15 some of it -- is any of it pre-decision?  It's work product

16 mostly.

17         THE COURT:  All right.  And when is the first

18 deposition that you're going to need this for?

19         MS. KRASNOW:  The next deposition is Friday but I do

20 not recall any emails pertaining to that witness.

21         THE COURT:  It would be a little difficult to do it

22 by Friday I think.

23         MR. LARKIN:  It doesn't appear to be an issue.

24         THE COURT:  Okay.  And then the next deposition

25 after that?

69

1          MR. RUDIN:  There's a deposition I think on the 17th

2     of one of the detective investigators.

3          MS. KRASNOW:  Again, I don't think that relates to

4     the emails.

5          THE COURT:  Okay.

6          MS. KRASNOW:  The emails have no relation to that.

7          MR. RUDIN:  I assume that none of the emails would

8     relate -- would any of the emails relate to the deposition

9     that you're going to take of either Mr. Harrison or Mr.

10    Collins?

11         MR. LARKIN:  We're not going to use them at the

12    deposition.  Put it that way.  Right.  And we're not going to

13    mark them as exhibits.  So we're asserting a privilege as to

14    the documents.  Yeah, it does not -- no.

15         MR. RUDIN:  Apparently, there was re-investigation

16    of the underlying evidence in the murder case that occurred as

17    part of the process leading to the dismissal of the charges.

18    And if there's any emails that contain any information

19    relating to Mr. Collins, then that's information that they

20    have that we don't.  So it seems to me that might be relevant

21    to the deposition of Mr. Collins.

22         THE COURT:  The re-investigation of the murder?

23         MR. RUDIN:  The underlying evidence in the murder.

24         THE COURT:  The underlying evidence.  Okay.  Is that

25    included?

1           MR. LARKIN:  I don't know but I mean I --

2           MS. KRASNOW:  To the extent there's a discussion of

3   any evidence, it's in the trial record.  So I'm not really

4   sure what Mr. Rudin is referring to.

5           MR. RUDIN:  Well, if that's all there is, then it's

6   probably not a problem.

7           THE COURT:  Okay.  Well, if it turns out that

8   there's something that's released that I find is not

9   privileged and that you didn't see and you took a deposition

10  already and you could convince me that it was important to

11  reopen the deposition or just submit a question --

12          MR. RUDIN:  Well, I'm talking about defending a

13  deposition.

14          THE COURT:  Or defending a deposition of Mr.

15  Collins.

16          MR. RUDIN:  But it seems unlikely after all this

17  time that the information --

18          MR. LARKIN:  Well, if Mr. Rudin is going to give us

19  every single document and the name of every single witness and

20  every piece of information that he's going to use for his

21  depositions, I suppose we can do the same for him, but that's

22  not really the way --

23          THE COURT:  I don't think he's asking for that.

24          MR. LARKIN:  -- discovery goes.

25          MR. RUDIN:  All right.  The next issue is the

1   Farrell deposition.  As my letter indicates, we received an

2   email initially redacted and then during Mr. Vecchione's

3   deposition we received the un-redacted email that contains the

4   statement that she believed that another ADA who was the ADA

5   who apparently originally approved the arrest of Mr. Collins

6   and who we deposed and claimed to have no memory of his role

7   in the habeas proceedings or in the 440 investigation that

8   occurred four years before that this ADA apparently had not

9   been truthful to her.  She used the term lied.  And we

10  attempted to question Mr. Vecchione about that and he had been

11  cc'd on the email, and he denied any knowledge or recollection

12  of what that was in reference to.  This seems to us to

13  potentially be highly relevant because it seemed like Ms.

14  Ferrell was blaming this ADA for the officer's failure perhaps

15  to have disclosed certain information earlier.  We don't know.

16  It just seems that it's potentially quite significant and we

17  would -- originally I thought we would try to avoid having her

18  be deposed and just submit written deposition questions, but

19  then the other issue came up which is that as I understand it,

20  she was present and played a significant role with respect to

21  that training session that occurred last year that Mr. Larkin

22  wants my sources for, and I would like to question her about

23  both issues.  If the Court would prefer that the questioning

24  initially be in writing to avoid inconvenience of another

25  deposition, then I would attempt to propound questions in

72

1   writing and see what happens.

2          THE COURT:  Right.  And I think in Mr. Larkin's

3   letter, Page 8, he requested that you submit the written

4   questions to him first, and if he has any objections, he'll

5   let you know.  But it sounds as though -- first of all, the

6   question were you present at this training session, that seems

7   like an appropriate question.  I think she can certainly

8   answer that and I would prefer that she answer it in writing

9   rather than inconvenience her if she says she wasn't present.

10  And I think questions as to that email would certainly be

11  appropriate as well.

12         MR. RUDIN:  But Your Honor, might I also propound

13  questions about the substance of what happened at the training

14  session?

15         THE COURT:  Yes, of course.  Only with respect to

16  the Brady issue.

17         MR. RUDIN:  Yeah, and it's the issue of not

18  recording exculpatory statements and not turning them over.

19         THE COURT:  Right.  That narrow issue that you

20  described in your letter.

21         MR. RUDIN:  Yes.  And then may I ask her what role -

22  - you know, what happened after the session because I

23  understand that there were ramifications after the session,

24  and also whether it was videotaped.

25         THE COURT:  When you say what happened -- well,

1    whether it was videotaped, yes, of course you can ask her that

2    because that's an issue that's been before the Court.  What

3    were the ramifications afterwards?  What do you mean?  How

4    would you pose that?  In other words, did --

5            MR. RUDIN:  Well, I guess it would be what happened

6    during the session in this particular area, what Mr.

7    Vecchione's role was, if any.

8            THE COURT:  Yes.

9            MR. RUDIN:  And I understand that there was some

10   sort of remedial session where the whole thing was -- where

11   there was an effort to undo the damage that had been done in

12   terms of the training, that there were complaints.

13           THE COURT:  That's the Brady.

14           MR. RUDIN:  Yeah.  That there were complaints and

15   ultimately Ms. Hirsch left the DA's Office.  The circumstances

16   are a little murky.  Maybe they're going to claim that that's

17   one of the instances of discipline, although what was reported

18   in the news media is that she resigned and Mr. Vecchione was

19   involved in investigating her performance and recommended

20   against any discipline.  That may not be accurate, but that's

21   what's been in the news media.

22           MR. LARKIN:  Don't believe everything you read in

23   the papers, with due respect to everybody here.  But if I can

24   add one or two things, Your Honor.  You know, Mr. Rudin had

25   all this information about the training session by the time of

74

1  Mr. Vecchione's deposition which just a couple of weeks after

2  Ms. Ferrell's deposition.  It's unclear to me why he didn't

3  ask Ms. Ferrell the questions --

4           MR. RUDIN:  I didn't have --

5           MR. LARKIN:  -- the same questions.

6           MR. RUDIN:  I didn't have it during Ms. Ferrell's

7  deposition.

8           MR. LARKIN:  Well, we need to know that before we

9  can determine whether it's justified that she should now be --

10 the imposition should now be made on her where she's got to

11 answer questions after having appeared once already.  So in

12 order to justify that burden, we need to know when it is he

13 learned this information, why it wasn't used the first time.

14          MR. RUDIN:  I'd like to know.  Yeah, I think it's

15 appropriate.  I mean I want to depose a witness who is going

16 to say that they're aware of allegedly improper training.  I

17 just don't think --

18          THE COURT:  Okay.  I think Mr. Rudin was about to

19 say that he learned this information after Ms. Ferrell's

20 deposition.

21          MR. RUDIN:  That's correct.

22          MR. LARKIN:  Well, I can't accept that.  I need to

23 know from whom and when and in what manner, and I just --

24          THE COURT:  I think that's a separate issue.  As an

25 officer of the court are you telling me that you did not know?

75

1   You didn't have this information before Ms. Ferrell's

2   deposition?

3              MR. RUDIN:  That's correct.

4              THE COURT:  Okay.  I'll accept that.

5              MR. RUDIN:  And the information I have is not

6   directly from anyone who's employed by the DA's Office but

7   from individuals who tell me that they've spoken to

8   individuals employed at the DA's Office and they have asked to

9   remain confidential.

10             THE COURT:  But if that information proves to be

11  wrong, or if Ms. Ferrell says it didn't happen or I wasn't

12  there, that's the end of it --

13             MR. RUDIN:  That's right.

14             THE COURT:  -- with respect to her.

15             MR. RUDIN:  Yes.

16             THE COURT:  Okay.

17             MR. RUDIN:  All right.  So what's left is the

18  Vecchione deposition and the Hynes deposition.

19             THE COURT:  Any other issue for the defendants

20  before we get to those?

21             MR. LARKIN:  The one issue, Your Honor, is the

22  disclosure of the cases which -- and the ADAs which I don't

23  think was resolved and I think I guess we're going to be

24  working backward from whatever date --

25             THE COURT:  Yes.

1           MR. LARKIN:  -- we select for Mr. Hynes' deposition.

2           THE COURT:  Okay.  All right.  So the Vecchione

3  deposition, let me see if I understand it properly.  For a

4  variety of reasons, Mr. Rudin believes that he would like to

5  continue Mr. Vecchione's deposition for another three hours.

6  For a variety of reasons, defendants believe that that is

7  inappropriate.

8           MR. LARKIN:  He wants to continue it for another

9  four hours and I think we went five hours and 23 minutes the

10  first time.  Five hours and maybe 17 minutes, or something

11  like that.  Let's just say it was 5:15 the first time.  It's

12  in the record, Your Honor, and I'll find it.  So that would

13  mean that plaintiff, as I understand it, wants another four

14  hours and 45 minutes to continue the questioning.

15           MR. RUDIN:  In total.

16           MR. LARKIN:  For a total of ten hours.

17           MR. RUDIN:  That's correct.

18           THE COURT:  Oh, you want another -- so in other

19  words, you want three hours over the seven hours.

20           MR. RUDIN:  Yes, Your Honor.

21           THE COURT:  But in other words, you want ten hours

22  total.

23           MR. RUDIN:  Total.

24           THE COURT:  Okay.

25           MR. LARKIN:  Ten hours total.

77

1          THE COURT:  How long are you going to be deposing

2   Mr. Collins for?

3          MR. LARKIN:  Seven hours.  I do not anticipate going

4   over seven hours.  And I'm certainly willing to stipulate to

5   the seven hour limit for all of the witnesses in the case, and

6   that's what the rule says.  You know, the plaintiff

7   represented at the last conference that 90% of the deposition

8   was going to be about the Collins case and he wanted the

9   deposition before June 25th.  We produced the witness on June

10  21st as the Court directed.  We've gone now five hours and X

11  minutes and counsel essentially after doing what he

12  represented was going to be 90% of the deposition, he now

13  wants to double the time essentially.  There isn't any cause

14  for that here.  You know, in many instances the questions were

15  repetitive.  There were circumstances where the witness asked

16  to see documents and plaintiff didn't want to show the witness

17  the documents.  I suppose that's his right to do the

18  deposition that way but everyone is cognizant of the time

19  limits.  The seven hour rule is there for a reason.  And to

20  allow ten hours in this case with this witness just doesn't,

21  it doesn't seem necessary.

22          MR. RUDIN:  Your Honor, first of all, I don't know

23  how much -- if Your Honor has had the chance to review the

24  deposition transcript at all, but it was an extraordinarily

25  tedious deposition because the witness claimed not to remember

1  anything about anything and I had to pin him down question by

2  question to make a proper record. I did not ask him anywhere

3  near all the questions I wanted to ask him about the Collins

4  case because I was cognizant of the time issue. I didn't ask

5  him, for example, about whether or not various items that he

6  said he -- he implied that he hadn't turned over because he

7  said whatever was turned over was in the record of the case.

8  I didn't ask him, with one or two exceptions, to explain why

9  they were or were not Brady material. I didn't ask him about

10  some of the testimony, the direct testimony of Mr. Oliva where

11  he denied certain interaction with the DA's Office where there

12  were documents that appeared inconsistent. I didn't ask him

13  about why those documents weren't turned over, whether they

14  should have been turned over. I didn't ask him about his

15  summation where he made comments that we contend were false

16  and misleading and ask him to acknowledge whether or not the

17  documents that were inconsistent with those comments should

18  have been turned over. I made a decision not to go into any

19  of that because it seemed like the kind of questioning that

20  was likely to be more contentious and difficult and I just

21  concentrated on trying to pin him down on the specifics of

22  what he did or did not turn over and signatures, whether

23  they're his signatures or not, and that kind of thing. There

24  was the area with the 911 tape where I couldn't get a straight

25  answer out of him. It went on for 15 pages where he

79

1  continually referred to a seven year old affidavit.  I

2  couldn't get his present recollection.  And --

3          THE COURT:  I'm familiar with what --

4          MR. RUDIN:  Yeah, this is different than the

5  plaintiff.  The plaintiff's role is what happened leading up

6  to the crime.  I'm sure he'll be very closely questioned about

7  what his activities were.  He'll be questioned about what

8  happened at the trial perhaps.  He'll be questioned about his

9  efforts after he was convicted to overturn his conviction.

10         THE COURT:  No, I understand.

11         MR. RUDIN:  Mr. Vecchione is a 16 year involvement

12  and he's so deeply involved in all these issues.  I did say

13  90% that was hyperbole.  I should have not said 90%.  Mr.

14  Larkin is trying to hold me to it.  The majority, yes.

15         MR. LARKIN:  I'm going to hold you to

16  representations you make in court.  I don't think that's

17  unreasonable.

18         MR. RUDIN:  Well --

19         MR. LARKIN:  Forgive me for interrupting, but that's

20  --

21         THE COURT:  All right.  So let me just tell you my

22  view of this.  My view of this is we've spent almost three

23  hours here today.  Three hours in the life of this case is not

24  a huge amount of time.  This is -- well, we've been here two

25  hours.  We're getting close.

80

```
 1          MR. RUDIN:  It feels like three hours.
 2          THE COURT:  We're getting close to three.  But Mr.
 3   Vecchione is an important witness.  I know that defendants
 4   don't want to bring him back for that long but I don't think
 5   ten hours for a key witness in a Monell claim case is that
 6   much.  I mean look at all the time that defendant's counsel is
 7   spending, you know, going through emails and whatever.
 8   Plaintiff's counsel as well.  So I think that that's -- it's
 9   not unreasonable.  I'll permit that.  And my ruling would hold
10   for, you know, for the defendants.  Again, I'm not saying that
11   -- I'm not inviting you to depose any witnesses longer than
12   seven hours, but the point of this case is that we're all
13   spending a lot of time trying to get this right so when it's
14   tried, justice is done.  And if it takes an extra couple of
15   hours to do that, I don't think, three hours, I don't think
16   that that's unreasonable, so I will permit that.
17          MR. RUDIN:  Thank you, Your Honor.
18          MR. LARKIN:  So that would be ten hours for Mr.
19   Vecchione and the city would have ten hours with Mr. Collins
20   if needed?
21          THE COURT:  If needed.  Absolutely.
22          MR. LARKIN:  All right.
23          MR. RUDIN:  Your Honor, I --
24          THE COURT:  Probably won't be needed but --
25          MR. RUDIN:  Yeah.  I mean the attorney general, it
```

81

1  was arranged back to back the two probably day long sessions

2  where Mr. Larkin will be present at both dates and, you know,

3  if he has redirect after the attorney general asks questions

4  to clarify something, that's fair.  But it seems to me he

5  should try to do it in the seven hours if he --

6          THE COURT:  Absolutely, and I think he will.  I

7  think he will.  But I'm just saying that if there were a

8  reason -- an addition three hours is not an excessive burden

9  on anyone in this case given the extraordinary burdens you're

10 all under.  So therefore, that's it --

11         MR. LARKIN:  Understood.

12         THE COURT:  -- on the three hours.

13         MR. LARKIN:  Your Honor, may I just ask one

14 clarifying question with regards to -- as my co-counsel just

15 properly pointed out, the scope of the second day of ADA

16 Vecchione's deposition may be an issue.

17         MS. KRASNOW:  It was represented to us by Mr. Rudin

18 that the first deposition would be with respect to the Collins

19 case.  And then when Mr. Vecchione appeared for a second time

20 that the questioning would be with respect to the other cases

21 that are part of Mr. Rudin's Monell claim that Mr. Vecchione

22 had been involved with.  So I just want to be clear what Mr.

23 Rudin plans for this second deposition.

24         MR. RUDIN:  Predominantly it'll be the Monell claim

25 but I have some questions about the Collins case.  I reserved

82

1   the room with the New York City Bar Association for the

2   deposition.  We only had until 5 o'clock.  We went to 5

3   o'clock.  And I would like to ask the additional questions

4   that relate to the Collins case.

5          MR. LARKIN:  But Your Honor, that wouldn't justify

6   the additional three hours.  I don't want to nitpick but the

7   representation that's been made is that 90% would be the

8   Collins case that we've now spent five plus hours on the

9   Collins case and that the additional time is needed for the

10  other Monell cases because now the preparation becomes that

11  much more complicated.  Now we have to go back and revisit the

12  matters concerning the Collins case about which Mr. Vecchione

13  is going to be questioned for another five hours

14  approximately.  So wouldn't it be fair that if Your Honor is

15  going to give the additional time that at least it be limited

16  to the other cases, the Monell cases because --

17         THE COURT:  What additionally with respect to the

18  Collins case do you want to ask Mr. Vecchione about without,

19  you know, prejudicing your deposition?

20         MR. RUDIN:  I would like to ask him a lot more

21  detail about his Brady training, his understanding of what

22  Brady and to a lesser extent Rosario require.

23         THE COURT:  All right.  That's Monell.

24         MR. RUDIN:  Yeah.  And then to show him the

25  documents and the information that appears not to have been

1  disclosed to the defense and ask him why that wasn't disclosed

2  and to explain how it was or was not Brady or Rosario.

3         THE COURT:  All right.  So that's Monell and Collins

4  both.

5         MR. RUDIN:  Yes.

6         THE COURT:  It bleeds over.

7         MR. LARKIN:  Could plaintiff identify for us what

8  documents he's going to show Mr. Vecchione in that connection

9  so that we can structure the preparation because we're going

10  to be preparing him not only about the Collins case but also

11  about the Jeff Marshall case and about potentially other cases

12  --

13         MR. RUDIN:  I have no problem with that.  I'll do

14  that.

15         MR. LARKIN:  Okay.

16         THE COURT:  That's very reasonable.  Okay?  We're

17  all set on the Vecchione deposition?

18         MR. RUDIN:  The only thing is the issue about the

19  911 tape and Santos where I would like -- I'm asking the Court

20  to direct that Mr. Vecchione answer questions about his

21  present recollection as opposed to continually saying, "Well

22  you have my affidavit from 2006," which if Your Honor's had

23  the chance to read it is an artfully worded statement that

24  doesn't give a clear answer even then about what he did or did

25  not turn over.  I'm entitled to know now whether or not he's

84

1   going to claim at trial any recollection of turning over the

2   911 tape or of telling defense counsel that Mr. Santos' voice

3   was not on it.  If he wants to then testify about what his

4   practice was, that's another issue, but I think I'm entitled

5   to pin him down to whether or not he has a recollection of

6   having disclosed that information or that evidence.  And I was

7   unable to do that because he continually said, "Well, I stand

8   by my affidavit from 2006," which doesn't answer either

9   question.

10          THE COURT:  And your question is do you have a

11  present recollection of --

12          MR. RUDIN:  Yes.

13          MR. LARKIN:  Your Honor, on Page 130 of the

14  transcript, Line 17, the question is asked, "Did you disclose

15  to Mr. Collins' attorney at any point before the verdict a

16  copy of the 911 tape relating to the shooting?"  And the

17  answer is, "My recollection regarding the 911 tape is that I

18  turned over a 911 printout, a Sprint report, and therefore, I

19  would necessarily have turned over the tape, but I don't have

20  any recollection of that.  If counsel would have given me a

21  blank tape to make a copy, or as I said in my affirmation, I

22  would have told him that his voice was not on the tape and he

23  may not very well have asked me for it.  So that's my answer

24  as I answered in the affirmation."  So he specifically says,

25  "I don't have any recollection on that.  I would have

85

1  necessarily turned over the tape but I don't have any

2  recollection of that."  So he stated his practice would have

3  been to turn the tape over but he doesn't have any present

4  recollection sitting there right then of having done so.

5        MR. RUDIN:  I don't think that's at all clear, Your

6  Honor.  Then the followup questions was, "Mr. Vecchione, do

7  you have any recollection as you sit here now of providing a

8  copy of a 911 tape concerning the shooting of Rabbi Pollack to

9  defense counsel?"  And then he said, "My answer is what's in

10  my affirmation."  I'm entitled to break down the question --

11        THE COURT:  But he answered it in the question

12  before, didn't he, that he had no present recollection --

13        MR. RUDIN:  No --

14        THE COURT:  -- and his only recollection he has is

15  in the affidavit.  Am I missing --

16        MR. LARKIN:  This is why the deposition is going to

17  take ten hours because 15 pages are wasted on a question that

18  the witness answered specifically.  Page 130, Your Honor, Line

19  21 is where the answer begins.

20        MR. RUDIN:  It's a garbled --

21        MR. LARKIN:  "I don't have any recollection."  He

22  says, "I would necessarily have turned over the tape but I

23  don't have any recollection of that."

24        MR. RUDIN:  No, I don't --

25        MR. LARKIN:  "If counsel would have given me a blank

86

1  tape to make a copy."

2          MR. RUDIN:  I don't have any --

3          MR. LARKIN:  So what he's saying is if counsel gave

4  --

5          THE COURT:  I understand what you're saying.

6          MR. LARKIN:  I'm sorry.

7          THE COURT:  Mr. Rudin?

8          MR. RUDIN:  That is a garbled answer.  "I don't have

9  any recollection of that.  If counsel would have given me a

10  blank tape to make a copy."  Well, did counsel give him a

11  blank tape?  Did he offer to turn over the tape if he was

12  given a blank tape?  Does he have any recollection of that

13  happening?  Did he make the offer at a time when the witness's

14  name was redacted and it wasn't even clear to the defense who

15  this witness was or what he was going to testify to?  Did it

16  come up at the trial?

17          MR. LARKIN:  I guess now Mr. Rudin wants to ask this

18  whole series of different questions that he should have asked

19  on the first day that he didn't ask.

20          MR. RUDIN:  Every time --

21          MR. LARKIN:  This is why the deposition takes five

22  hours because he's repeating the same question over and over

23  and over after the witness gave the answer.

24          MR. RUDIN:  Your Honor, this was a very --

25          MR. LARKIN:  This is not fair.  This is harassing.

87

1          THE COURT:  Gentlemen, gentlemen.

2          MR. LARKIN:  I'm sorry.

3          THE COURT:  Okay.  So I wasn't at the deposition, I

4   haven't memorized the transcript.  My understanding of what

5   the witness said is, "I don't have a present recollection."

6   But you have whatever time is remaining to you up to ten

7   hours.  You can choose how you want to use that with respect

8   to Collins.  I think defendant's counsel are on notice as to

9   the documents, or will be on notice as to what documents

10  you're going to show and what questions you're going to ask,

11  and certainly on notice that you may follow up on this issue

12  if you wish to.  But the question I think is if you ask him,

13  "Did I ask you this question?  Remember this question and did

14  you give this answer?"  And then you ask him, "Are you in fact

15  stating that you have no present recollection of such and

16  such?"  He has to answer that question and I think I'm hearing

17  from defendant's counsel that he will.

18          MR. RUDIN:  Well, that's what I was trying to do

19  over the 15 pages.

20          THE COURT:  Yes.  All right.

21          MR. RUDIN:  That's fine.

22          THE COURT:   So I'm just clarifying that.

23          MR. RUDIN:  That's fine.

24          THE COURT:  I think you can do that in two questions

25  and I think we'll get it resolved.

1          MR. RUDIN:  I agree.

2          THE COURT:  Okay.

3          MR. RUDIN:  Okay.  Then the other issue is the

4    waiver of attorney-client privilege.  I think we have a valid

5    argument there but I think that given the lateness of the hour

6    and the fact that if we were to prevail that undoubtedly the

7    City would appeal and it would delay the whole case.  I don't

8    think it's worth pressing.  I'll accept -- I mean I'm prepared

9    to press it but, you know, Mr. Larkin --

10         MR. LARKIN:  I had to spend time, our time,

11   researching this issue and I knew this was going to happen.

12   The plaintiff in a sort of offhand backhanded way says, "Gee,

13   let's pierce the attorney-client privilege.  Now I've got to

14   have an attorney do extensive research and prepare a written

15   submission on this.  This is not right.  This is really

16   unfair.  And this is why I asked for sanctions.  I'm sorry.  I

17   hate to even use that word, I hate to bring it up.  Just

18   really, it isn't right.  You know, this is an application that

19   never should have been made.  There was no basis for it in the

20   first place.  Counsel was aware of it.  He didn't do the

21   research he should have done so we did it for him.  Now he

22   comes into court and he says, "Oh gee, I guess you're right.

23   I shouldn't have made that application."

24         THE COURT:  He didn't say that.  He said he's not

25   going to press it.  But let me tell you what I do in

89

1   complicated cases where there's a lot of anxiety and emotion.
2   I reserve the sanctions issue to the end of discovery because
3   at that point we'll know exactly how many sanctions motions
4   there'll be and how many there are on each side and then we'll
5   just deal with it.  I don't want to get us bogged down on
6   sanctions issue at this point.  I want to get this case
7   moving.  I've done it in other cases that are even more
8   intense than this one, believe it or not, and it's worked.
9             MR. LARKIN:  I appreciate that.
10            THE COURT:  Sanctions issue, I'm going to defer it.
11  If you wish to raise it again at the close of discovery, you
12  can raise it and then we'll deal with it.
13            MR. LARKIN:  I doubt we will, but if the application
14  is withdrawn, then we will not raise that issue.
15            MR. RUDIN:  And if Mr. Larkin wants me to argue it,
16  I will.  I'm perfectly prepared to argue it.
17            THE COURT:  No, no, he doesn't.
18                       [Laughter.]
19            THE COURT:  He said if it's withdrawn --
20            MR. LARKIN:  I don't think --
21            THE COURT:  You're both gracefully retreating, so
22  why don't we move on?
23            MR. LARKIN:  Okay.  I don't think it's worth it.
24            THE COURT:  And so do we have one other issue left?
25  Is that --

90

1              MS. KRASNOW:  Yes.

2              MR. LARKIN:  The date of the Hynes' deposition.

3              THE COURT:  Okay.  All right.  So I have a number of

4      dates here and deadlines.  Let's talk about vacation

5      schedules.  Each one of you has -- I don't know, Ms. Krasnow,

6      do you have a vacation schedule as well?  You don't?

7              MS. KRASNOW:  No.  I'm the only one that's going to

8      be here.

9              MR. LARKIN:  She deserves one more than anybody.

10             THE COURT:  Is it only the men that get -- Ms.

11     Rosenblatt, you get a vacation but it doesn't really sound

12     like one.

13             MS. ROSENBLATT:  I object to the characterization.

14                             [Laughter.]

15             MS. ROSENBLATT:  I will be away in August.

16             THE COURT:  Yes.  All right.  But seriously, I think

17     it would not be a bad thing for both of the lead counsel in

18     this case to take a week off.

19                             [Laughter.]

20             MR. LARKIN:  Together?

21                             [Laughter.]

22             THE COURT:  Well, I said -- didn't I use the

23     terrible analogy of the odd couple that you are basically

24     bound to each other, married to each other until the case is

25     over?  So yes, actually in chambers we toyed with the idea of

91

1    having you both go on a retreat somewhere.

2                        [Laughter.]

3            MR. RUDIN:  A zen retreat of sorts, right?

4            THE COURT:  Zen retreat, right.  And then this case

5    will be resolved and you'll all be happy.  No, but seriously,

6    I do think you're all working really hard, you've got a lot to

7    do, there are tense issues.  I mean you've all generated a lot

8    of work and, you know, you're all doing an excellent job.  So

9    I do think that -- well, what I would like to do is to set up

10   a reasonable schedule that will not destroy either one of your

11   vacations.  So how do we do that?  I'm going to put it on --

12   start with Mr. Rudin.  How can we do that and still get

13   everything done?

14           MR. RUDIN:  By?

15           THE COURT:  By whatever day.  Look, the important

16   thing, I'm just going to stress this again, the important

17   thing is that we do this case right and that we get everything

18   done so that both sides can present their case fully and

19   thoughtfully and that the jury can decide it.  That's the

20   important thing to do.  So if that's a goal rather than an

21   artificial deadline that will coincide with each one of your

22   vacations, perhaps we can come up with something that will

23   work for everybody.  I don't know if you're married or perhaps

24   your wives would like to come in and answer that question.

25           MR. LARKIN:  I mean I don't want to impose on

92

 1   someone else's vacation any more than I want my vacation

 2   imposed on.  I don't know what else to say.  It makes it

 3   difficult to prepare and do the deposition between now and

 4   Labor Day.  I just -- it's just the way it is.

 5            MR. RUDIN:  Your Honor, I would suggest perhaps that

 6   we set a tentative date in August the way we originally

 7   planned and then we can take another look at it on July 31st.

 8   And when we see what's produced and whether or not it really

 9   is going to involve a great deal of additional work, and

10   whether it's realistic to take the deposition in August.  I

11   mean I've taken very seriously ever since we appeared in front

12   of Judge Block moving this case, and obviously plaintiff has

13   an interest -- plaintiffs generally have an interest in moving

14   cases forward and defense counsel may or may not have the same

15   interest.  I'm sure Mr. Larkin would say that he does.  But we

16   have an interest in moving it forward.  And I hear what Your

17   Honor is saying.  Part of my frustration has been that I

18   thought that a lot of this should have been done earlier, but

19   maybe, you know, I'm not sitting where they're sitting

20   producing all this discovery.  So I mean my inclination is to

21   be gracious about it but at the same time I think it's in my

22   client's interest to move the case.  And Judge Block gave an

23   initial indication of when he wanted to try it, and I've been

24   trying to comply with that.

25            So I guess I'm suggesting either we set a date and

93

1   then see if it turns out to be realistic, or revisit it, or

2   discuss the issue in early August.  But you know, I guess Mr.

3   Hynes should know that he has to have, you know, a date

4   available in case the Court wants him to go forward, in case

5   we would like to go forward and the Court agrees with us that

6   there should be a date when he would be available.

7        MR. LARKIN:  Your Honor, it's going to be difficult

8   to pick a tentative date for something like this because we

9   are talking about an elected official who has public

10  responsibilities.  We're also talking about certain things

11  that we know are going to have to be done between now and mid

12  to late August including not only production of discovery and

13  documents related to Mr. Hynes' deposition as well as

14  information we need before Mr. Hynes' deposition and that the

15  Court has ruled that we're entitled to have before the

16  deposition, but other discovery that we need to do in the case

17  including take the plaintiff.  Mr. Rudin just informed me

18  before today's conference that Mr. Collins had a death in the

19  family, close relative.  I mean I don't want to reveal

20  anything that's in confidence, but it was a death in the

21  family, it was a close relative, and he's been out for a

22  period of time and there may be a need to move his deposition.

23  I'm not going to object to that obviously.  If the

24  circumstances warrant an adjustment in the schedule, then

25  we'll agree to it.  I'm not going to -- I'm certainly not

94

 1  going to make an issue of that.  But it is going to or may

 2  affect other deadlines and other discovery that we're

 3  attempting to do because there are witnesses who we need to

 4  depose including Oliva, including Mr. Santos.  We're trying to

 5  find Mr. Diaz.  We have Mr. Acevedo's deposition on July 16th.

 6  We have a deposition this Thursday of defense counsel Mr.

 7  Harrison.  Mr. Harrison informed me he has some health issues

 8  and I have to -- I mean he's an older gentleman and he's been

 9  retired for a while and I don't think he's in great shape, and

10  I need to talk to him.  Again, tomorrow I'm going to do that.

11        But I mean I'm out the week of the 12th to the 16th

12  with my family.  Mr. Rudin is evidently going to be out the

13  week of the -- I think it was --

14        MR. RUDIN:  For Labor Day.

15        MR. LARKIN:  -- the 26th to the 30th which is with his

16  family as well.

17        THE COURT:  It really doesn't leave anybody any time

18  in August, frankly.

19        MR. LARKIN:  I mean I don't, you know, I don't want

20  to affect his vacation and I'm sure counsel doesn't want to

21  disrupt my vacation.  This is just where we are.

22        THE COURT:  All right.  Let me tell you how I'm

23  seeing it at this point.  You all have been very good about

24  attending conferences regularly and really working hard on

25  this case.  And I don't think that Judge Block, if that's what

1  you're worried about, that Judge Block is going to think that

2  the plaintiff isn't being diligent or that defendants aren't

3  being diligent.  I think everybody is working hard.  Both

4  sides may wish that the other side had worked a little harder,

5  but I think both sides are working hard just in my experience

6  as a judge for a long time.  I think the deadline -- I think

7  trying to do it in August is unrealistic, frankly, because if

8  you're going to have Mr. Larkin out the week -- I believe you

9  said the 12th?

10          MR. LARKIN:  The 12th through the 16th.

11          THE COURT:  12th through the 16th, and you're going

12 to take two or three days to prepare Mr. Hynes the next week

13 or have his deposition the next week, I think that's going to

14 be tough.  I think it's going to be tough to do but especially

15 since we've got all these -- we've got the DIN Hotel custody

16 materials, we have the custody files, hotel custody files, we

17 have the disciplinary lists and files, personnel files for the

18 ADAs, we have the ESI materials, we've got the privilege.

19 Hopefully, the privilege won't be such a long and arduous task

20 that's more for me to do.  But we have a number of things that

21 have to be done in that time.

22          Mr. Rudin, do you think if this went -- if you had

23 enough time to get all these materials together and then took

24 Mr. Hynes' deposition in September that would really be a

25 loss, or could you rationalize to yourself that in fact you

96

1   were proceeding with the documents and getting full control of

2   the documents and making sure they were all produced without

3   having to come back to court and waste time every, you know,

4   every couple of weeks?  And then really be prepared for Mr.

5   Hynes' deposition.  I mean would that really be a loss?  It

6   doesn't seem to me that it would be when you think about how

7   much really has to be done between now and then.

8              MR. RUDIN:  May I have a moment to speak to my co-

9   counsel?

10             THE COURT:  Of course.  I know you do have a time

11  line with Ms. Rosenblatt and I really don't want to encroach

12  on your time line either.

13                      [Pause in proceedings.]

14             MR. RUDIN:  Your Honor, I'll acquiesce in whatever

15  the Court thinks is most reasonable.

16             THE COURT:  I think it's reasonable to do it in

17  September.  But the rationale for that is is that all these

18  documents that need to be prepared, you know, that the

19  defendants have to have that will be produced so that the

20  plaintiff's counsel will have an opportunity to really know

21  them, understand them, and whatever.

22             So do we know when Mr. Hynes is available in

23  September?

24             MR. LARKIN:  Can I just have a moment?  I'm not sure

25  if --

97

1          THE CLERK:  The primaries.

2          THE COURT:  What?

3

4          THE CLERK:  They primaries are September 12th.

5          THE COURT:  Oh, the primaries are September 12th.

6          THE CLERK:  No, no, it's around then.

7          THE COURT:  I was just informed that the primaries

8  are September 12, so --

9          THE CLERK:  No --

10          THE COURT:  Is that wrong?

11          MR. RUDIN:  It's a Tuesday.

12          THE CLERK:  September 10th.

13          THE COURT:  September 10th.  Okay.

14          MR. RUDIN:  9/10 is the primary, so --

15          THE COURT:  All right.  So you probably want to do

16  it after the primary I guess, right?

17          MR. LARKIN:  I think that's right.  Yes, Your Honor.

18          THE COURT:  Could we do it the following week?  Mr.

19  Rudin, I don't know if anybody has any holidays that they're

20  worried about in September.  You might want to just --

21          MR. RUDIN:  Well, as long as we're going into

22  September, then I guess I'd rather do it with enough time for

23  Ms. Rosenblatt to get back up to speed.  She'll be back in

24  early September.

25          THE COURT:  I'm impressed.

98

1          MR. RUDIN:  That's because I'm not giving her enough

2    maternity leave.

3          THE COURT:  The FMLA case will be my next case.

4          MR. RUDIN:  Sorry?

5          THE COURT:  The FMLA case will be my next case.

6                        [Laughter.]

7          THE COURT:  Okay.

8          MR. RUDIN:  So it will be the week of September 23rd?

9          THE COURT:  Whenever you want to pick it.  If you're

10   thinking the week of September 23rd makes the most sense for

11   everyone to do it, that's fine with me.

12         MR. RUDIN:  September --

13         THE COURT:  That will give Mr. Hynes an opportunity

14   to not be pressured before the primary.  It'll give Ms.

15   Rosenblatt a chance to come back and everyone a chance to get

16   these documents.  Take a little pressure off everybody.

17         MR. LARKIN:  Sure.

18         MS. KRASNOW:  Yes.

19         MR. LARKIN:  All right.  I believe Ms. Krasnow has

20   the audacity to be taking a September vacation but assures me

21   that late September, that is okay.

22         THE COURT:  When's your vacation?

23         MS. KRASNOW:  I have not bought a plane ticket yet,

24   so it's still flexible.  It'll be fine.

25         THE COURT:  All right.  So the week of the 23rd would

99

1    probably not be a problem?

2            MS. KRASNOW:  I will make sure that it's not a

3    problem.

4            THE COURT:  Okay.  But that's subject to the

5    district attorney's availability.

6            MR. RUDIN:  Your Honor, I'm sorry, I have an oral

7    argument in the Second Circuit [indiscernible] on September

8    25th.  That's a huge and complex argument, so actually I'd

9    prefer to go to the next week as long as we're into September.

10           THE COURT:  Fine.  The week of the 30th.

11           MR. RUDIN:  Does that work with your schedule?

12           THE COURT:  Even better probably, right?  Because it

13   gives -- that'll work with yours for sure, right?

14           MR. LARKIN:  Are you sure?

15           MS. KRASNOW:  We'll find out quickly.

16           THE COURT:  Okay.  But with your schedule does that

17   work, Ms. Krasnow?

18           MS. KRASNOW:  It's okay.  I'll figure it out.

19           THE COURT:  Okay.

20           MR. RUDIN:  Now that we're beyond the issue of the

21   primary, I'm sure we can work out a date.

22           THE COURT:  Yes.

23           MR. RUDIN:  All right.

24           THE COURT:  Okay.  That's fair.  All right.  So

25   anything else?

100

1          MR. RUDIN:  No, Your Honor.

2          MR. LARKIN:  I don't think so.  I think we're in

3    good shape.

4          MS. KRASNOW:  We didn't pick dates for anything.

5          MR. LARKIN:  Oh, we didn't?  We did pick dates,

6    didn't we?

7          MS. KRASNOW:  There were a couple of things I'm not

8    sure if you were going to go back and assign dates to.  For

9    example, the hotel custody log.  I don't know if you want to

10   address --

11         THE COURT:  Well, now that I'm thinking that -- yes,

12   we can be a little more relaxed about those dates, the hotel

13   custody logs.  It's up to you.  The proposal is the plaintiff

14   wants them on the 19th, the defendants will do it on the 26th.

15   26th okay?

16         MR. RUDIN:  The 26th is fine, Your Honor.

17         MS. KRASNOW:  Okay.

18         THE COURT:  Okay.  Are there any other things, other

19   dates we need to fill in?

20         MS. KRASNOW:  I think that was it.

21         THE COURT:  All right.  Just think how fresh you'll

22   be in September, everyone.  All right.  Thank you for your

23   patience.

24         MR. RUDIN:  Thank you, Judge.

25         MR. LARKIN:  Thank you for your time and your

101

1    patience, Your Honor.   Thank you.

2                          *  *  *  *  *  *

102

1       I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                                    Shari Riemer

7  Dated:   July 24, 2013

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25