1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK

2

3  ------------------------------------X
                           :

4  COLLINS,                   :
                          :  11-CV-00766 (FB)

5              Plaintiff,   :
                          :

6           v.            :
                          :  225 Cadman Plaza East

7  THE CITY OF NEW YORK, et al.,  :  Brooklyn, New York
                          :

8           Defendants.  :  July 25, 2013
  ------------------------------------X

9

10      TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONIC HEARING
        BEFORE THE HONORABLE ROBERT M. LEVY

11          UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13

14  For the Plaintiff:     JOEL B. RUDIN, ESQ.
                       Law offices of Joel B. Rudin
                       200 West 57th Street, Suite 900

15                     New York, NY 10019

16

17  For the Defendants:    ARTHUR LARKIN, ESQ.
                       ELIZABETH N. KRASNOW, ESQ.

18                    ANGHARAD WILSON, ESQ.
                       The City of Yew York Law Department

19                    100 Church Street, Rm. 3-177
                     New York, NY 10007

20

21

22  Court Transcriber:     SHARI RIEMER
                       TypeWrite Word Processing Service

23                    211 N. Milton Road
                     Saratoga Springs, New York  12866

24

25

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

2

1   (Proceedings began at 2:03 p.m.)

2          THE COURT: I think the record is working.

3          Docket 11-CV-766, Collins v. The City of New York.

4          Counsel, please state your appearances for the

5   record.

6          MR. RUDIN: For plaintiff, Joel Rudin.  Good

7   afternoon, Your Honor.

8          THE COURT: Good afternoon.

9          MR. LARKIN:  Good afternoon, Your Honor.  For City

10  defendants Arthur Larkin, L-A-R-K-I-N, and with me is my co-

11  counsel Elizabeth Krasnow, K-R-A-S-N-O-W and Angharad Wilson,

12  W-I-L-S-O-N.  Good afternoon.

13         THE COURT: How do you spell the first name?

14         MR. LARKIN: A-N-G-H-A-R-A-D.

15         THE COURT: Thank you.  So why don't we start with

16  the hotel logs.  I think there are two pending issues before

17  the Court.  There's the in camera review and there's the hotel

18  log issue.  I've received I think all of -- I've received

19  three sets of letters, three submissions.  So I think the

20  briefing is complete on that.

21         Mr. Rudin, do you want to go first on that?

22         MR. RUDIN: Sure.  I think I laid out our position

23  completely in the letters.  I don't think that the City has in

24  its letter really made any effort to contradict what I wrote

25  in the initial letter that the issues that the hotel custody

3

1    files relate to are in the case.  I thought that they were

2    addressed more to the issue of whether or not we should

3    provide the 50 files that we proposed as the initial files

4    that we would inspect.  I addressed that in the letter.  It

5    seems to me that the 50 will comprise -- a lot of them will be

6    the files that where we've reviewed the logs.  We're waiting

7    for the copies but after we get the copies I would designate

8    which of those files we're most interested in and then in

9    addition there would be -- each custody file has a number so I

10   would indicate the numbers that probably would be closest

11   chronologically to the witnesses from the Collins case.  Some

12   of the files may be missing.  So if any are missing I would

13   ask that the additional files that are close chronologically

14   that we be able to inspect them.

15          The reason is that I think that those files will

16   contain additional information about the circumstances under

17   which those witnesses were -- wound up in hotels and the

18   conditions under which they were held.  In particular we would

19   like to see whether that printed form that -- where there's a

20   designation of whether the witness is being held as a prisoner

21   we'd like to see whether those forms are there.  So that's the

22   first issue.

23          The second issue -- I don't think there's been any

24   contention that there's any real burden.  I addressed that in

25   my letter.

4

1          The third thing is the City makes an arguments about

2    the merits of our claims to which the hotel custody files

3    relate and I responded to some of the factual allegations that

4    they made but it seemed to me what they were really doing was

5    rearguing the motion to dismiss or making a [inaudible]

6    summary judgment motion and I didn't think that -- I didn't

7    think it was appropriate for me to respond fully to their

8    argument unless Your Honor wanted me to.

9          THE COURT: Well, I didn't think you could have

10   within the page limits anyway.

11         MR. RUDIN: That's true.

12         THE COURT: So that's fine.  Mr. Larkin.

13         MR. LARKIN: Yes, Your Honor.  If you look at Judge

14   Block's decision he -- in the February 13th decision he

15   concludes that the plaintiff has a claim or has pleaded a

16   Monel claim for basically ratification of misconduct by

17   Vecchione and then he -- the court further says that the

18   theory hinged solely on Hine's response to an isolated

19   incident but says he further alleges that despite scores of

20   cases involving Brady violations and other misconduct Hines

21   has never disciplined an assistant.  We went back and looked

22   closely at what those 50 cases are, what those cases are as

23   been cited and what we see -- and I don't know if we spelled

24   this out in this particular letter to Your Honor.  We really

25   didn't but as to sort of flush out our argument I wanted to

5

1  add some of these points.  Only two decisions that we can see

2  appear to relate in any way to the use of subpoenas or

3  warrants, most importantly material witness warrants.  There's

4  really only one decision that relates to the material witness

5  part and in that case the Rust, People v. Rust, the alleged

6  misconduct had nothing to do with the issuance of the warrant

7  in that case.

8            Here, the record is extensively developed already as

9  to what happened in connection with Santos.  There's no claim

10  that there was ever a warrant used or executed with respect to

11  Diaz.  That didn't happen.  With respect to Santos, there was

12  a warrant issued signed by a judge where Santos was brought to

13  civil jail and the state courts -- the state courts have said

14  in a line of cases that the defendant -- the [inaudible]

15  defendant doesn't have any rights in that connection, in

16  connection that is with the issuance of a material witness

17  warrant.

18            So there's no constitutional violation here.

19  There's no pleaded pattern of cases concerning the alleged

20  misuse of material witness warrant. Judge Block never said I

21  his decision that there was a claim or that there was an

22  alleged practice of material witness warrants.  I mean the

23  closest the court ever came to saying that is noting that

24  there were scores of cases according to the complaint

25  regarding Brady violations and other prosecutorial misconduct.

6

1   To the extent that there are such cases they're tied to or

2   related to the ratification claim.

3           I think at this stage of the case the court is

4   entitled to look a little bit at what the record shows when

5   the plaintiff is asking for 50 custody files, 50 files of

6   individuals who were put into protective custody for their own

7   safety.  It's clear that nothing went on with respect to

8   Santos that violated Mr. Collins' rights.  So I think at some

9   point, Your Honor, that the court ought to draw a line about

10  where the burdens are and where the [inaudible] of all this

11  discovery that the plaintiff wants.

12          There's still going to be extensive depositions and

13  other discovery about other cases involving disclosure, non

14  disclosure of material facts and it seems to me that's where

15  the constitutional claim if any lies, not in whether or not

16  witnesses were put in hotels in other cases.  I guess our view

17  is given the very limited relevance of the discovery it seems

18  that it -- the burden of producing the discovery outweighs its

19  value in this case.

20          MR. RUDIN: Your Honor, may I briefly respond?

21          THE COURT: Yes.

22          MR. RUDIN: Of course the -- this is a 106 page

23  complaint and I put in as much detail as I did and as much

24  evidence because of my uncertainty about how the Supreme Court

25  decisions about pleading would be applied.  But clearly the

1   standard is plausibility and there's no question that we

2   pleaded abuse of process, coercion of witnesses.  Specifically

3   we talked about misuse of the material witness process.  I

4   cited testimony from a criminal case where the ADA testified

5   that the office practice was to pick people up on material

6   witness warrants and bring them back to the office.  We cited

7   Santos' testimony about how he was held in a jail and then

8   held in a hotel against his will and Judge Block found the --

9   noted that we had witness coercion and abuse of process

10  claims.

11          He then found that we were entitled to receive

12  discovery about all the claims.  He said that -- he talked

13  about the lack of any corrective action might also reflect a

14  passive policy on Hines' part to condone whatever subordinates

15  deemed necessary to secure a conviction and then he talked

16  about Brady violations and other prosecutorial misconduct.

17  Misconduct by Vecchione, underhanded tactics.  I mean these

18  are -- this is the language that Judge Block used.  He didn't

19  limit it to a Brady claim.  He took note of all the claims.

20  He did not dismiss any of the claims and allowed discovery to

21  proceed.

22          So for us to be limited to the specific cases of

23  misconduct and failure to discipline that we knew about and

24  put in the complaint without being allowed to -- now that the

25  motion to dismiss has been denied then we're not allowed to

8

1  fully develop those facts I don't think is the way that the

2  procedure is supposed to work or the Supreme Court had in mind

3  or all of a sudden what Judge Block had in mind.

4      The second thing is that we spent a great deal of

5  time trying to develop these claims in depositions.  I spent a

6  great deal of time investigating other cases to show -- and

7  one of them of course is the Cassada [Ph.] case where the very

8  [inaudible] process occurred we believe but the other side

9  disputes that and everything that we've been trying to show in

10  developing the facts relating to some other cases which the

11  other side disputes -- but here we have a form that they use,

12  their printed form that refers to people as prisoners.  We

13  have their memorandum that refers to holding people, to guard

14  them against escape and we have these hotel custody logs which

15  make reference to prisoners, to shackles, to doors being

16  locked, people being -- rooms being secured which completely

17  coincides with Santos' account of how his door was shackled

18  and he wasn't allowed to leave.

19      So it seems to me that these records may shortcut

20  the discovery process and make our case much simpler.  If

21  there are records that on their face acknowledge that

22  witnesses were being held prisoner or being held against their

23  will or their rooms were shackled, they weren't allowed to

24  leave, if there are records that show that witnesses were

25  being picked up with material witness warrants and taken to

1   hotels and held overnight until they testified the next day

2   without being brought to court or even if there are records

3   that help us show that some witnesses maybe were brought to

4   court and the material witness orders maybe were vacated and

5   they were -- the District Attorney took custody of them and

6   then they were held against their will in rooms that were

7   locked -- some of them may have gone "voluntarily" after they

8   were picked up on a material witness warrant, they could have

9   changed their mind.  They might have wanted to leave but their

10  rooms were locked.

11          There's nothing I've seen in any other jurisdiction.

12  Your Honor of course is familiar with federal witness

13  protection -- witnesses are guarded, sometimes they're kept in

14  hotels but they're allowed to leave.  So this is an

15  extraordinary situation and I think that this proves that

16  we're trying to get -- may greatly simplify the case because

17  it's documents that will directly show a pattern and a custom

18  and a practice that Mr. Hines it's hard to believe was unaware

19  of and of course I would depose him about his awareness of it

20  and his toleration of it.

21          So it seems to me this is very relevant to a

22  significant part of our case and of course it also relates to

23  Brady because in many instances we believe that where

24  witnesses were held against their will or as prisoners in

25  hotels that [inaudible] Collins case and the Cassada case it

1    wasn't disclosed to defense counsel under Brady.  We can't

2    really develop that unless we have the evidence that the

3    witnesses were held against their will.  We need to know the

4    specific cases and then we can recess the transcripts and

5    potentially with the permission of the court because I did

6    indicate to Mr. Larkin that we would seek that permission

7    first, attempt to interview some of the defense lawyers

8    particularly in the cases where the witness' identities are

9    already known because they testified publicly.  All

10   [inaudible] would have to be that they testified because only

11   then would it be relevant to Brady.

12           So I just think that this is going to greatly short

13   circuit the case.  It would make it much simpler and it will

14   make it less necessary to try to reinvestigate individual

15   cases and take testimony from various witnesses about what

16   happened when it's going to be right there I the DA's own

17   files.

18           Regarding Diaz, I mean this -- there was a material

19   witness order for Diaz.  The City's position is that Diaz came

20   back "voluntarily" and I believe Vecchione -- I mean he had a

21   failure of recollection to a great extent.  I don't remember

22   now whether he testified that he -- he testified that he

23   didn't ever see the order after it was obtained and wasn't

24   aware that someone had signed it and notarized his signature

25   but we still have to depose the detective investigators about

1   how -- who received that order and how it was used.  I mean

2   was it Fed Ex'd to Mr. Vecchione.  Either it was faxed to Mr.

3   Vecchione and we -- Diaz may be deposed as well.  So it may

4   very well be that it was made known to him that there was an

5   order and that he was either going to come back in shackles

6   under that order or he was going to come back so-called

7   voluntarily and it seems to me that it's a peril situation

8   although I don't have any evidence that he was held against

9   his will in contrast to Santos.

10          THE COURT: Okay.

11          MR. RUDIN: Just one other thing.  I'm sorry.  Your

12   Honor, may I add one other thing?

13          THE COURT: Yes.

14          MR. RUDIN: The material witness, they cite cases in

15   which some intermediate state appellate court have held that a

16   defendant doesn't have a right to be -- a criminal defendant

17   does not have a right to be present in a state material

18   witness proceeding but that's a very different issue from

19   whether or not the District Attorney can [inaudible] the

20   material witness process in a way that we allege happened here

21   as a matter of custom and policy or withhold disclosure to the

22   defense under Brady.

23          THE COURT: Mr. Larkin, could you address the issue

24   of burden for me, please?

25          MR. LARKIN: Sure.  We're talking about -- I don't

1  know how long it's going to take to gather the 50 files, get

2  them copied and produced but I think -- I'll get that

3  information from our client but I think that what plaintiff --

4  in terms of burden what plaintiff is contemplating is a

5  substantial and apparently exponential increase in the work

6  that's going to have to be done in the case if counsel wants

7  to then make -- wants to then determine whether or not

8  disclosure of witness arrangements or witness hotel

9  arrangements were made in specific cases.  I suppose depending

10 on the facts of the case that information might constitute

11 Brady but there's going to be a huge associated burden now

12 with going back to looking for old files, old cases, more old

13 cases, some of which may be sealed to determine whether

14 disclosures were made and then to argue the legal point

15 whether or not the disclosures we [inaudible] under Brady when

16 in most of these cases almost every one of these cases the

17 witness is the one who's afraid and won't come forward to

18 testify and that's why you need to get the material witness

19 order in the first place.

20         I think Judge Pohorelsky made that issue -- made

21 that clear during one of the hearings in the Cassada case.  So

22 it really -- it contemplates a much greater burden on us not

23 just in looking for those specific old files which I don't

24 know -- I don't know where they are kept.  I don't know if

25 they're kept in one place or if they're kept with each

13

1   particular case file.

2          In this instance, Your Honor, I do know that the

3   witness [inaudible], there were five or six of them were kept

4   with the DA's main file.  So if it's a matter of going to one

5   place and pulling say 50 files that are in one place that's

6   not a heavy burden I would concede.  On the other hand, if the

7   witness files are located in other -- if they're in their

8   individual -- if they're in the case files associated with the

9   case that they testified in then it's a matter of going

10  through 50 individual cases and pulling those files.

11         So I confess, Your Honor, I do not have the answer

12  to that question, that specific question.

13         THE COURT: So let me just give you my take on this.

14  My take on this is number one, that the difficult truth I

15  think for all of us is that Monel claims are incredibly labor

16  intensive for the parties and for the court and that any --

17  I'm sure we discussed this many times before but that any time

18  there's a Monel claim that's allowed to go forward that Monel

19  claim involves discovery that cuts across time lines and

20  sometimes burdensome, sometimes not, but generally increases

21  the burden exponentially for all the parties, and I think

22  that's just a given in this case.  Because Judge Block has

23  authorized the Monel claims to go forward there is that burden

24  that we've all been experiencing.

25         With respect to the hotel log, my reading of Judge

1    Block's decision and I think the uncontradicted argument by

2    the plaintiff is that the court allowed this type of -- let me

3    just get to the exact quote here.  The allegations that the

4    District Attorney was indifferent from the abuse of lawful

5    process to gain custody or [inaudible] witnesses.  Just the --

6    the decision itself is not limited to Brady I don't think with

7    respect to Monel but even if it were I think that these issues

8    would and could be explored.

9           The problem that I think we're all having here is

10   that there's a distinction between relevance and merits and

11   sometimes that distinction gets blurred because the burden

12   benefit analysis often depends on how strong the merits are.

13   What I don't want to do is have a mini trial or a mini summary

14   judgment motion on the merits of the arguments and whether

15   Santos is telling the truth or not and on the legality of some

16   of the practices.

17          I think what I'd like to do is take it step by step

18   at this point.  I'd like to -- I think the plaintiff is

19   entitled to explore the hospital log -- the hotel logs and

20   50 -- if the files are located in an area that's reasonably

21   simple to search then I think 50 wouldn't be burdensome.  If

22   the defendants come back and show me that the burden is really

23   exceptional then I would reconsider the number of files and

24   perhaps reduce the number to something that's a little more

25   manageable.  But my guess is that it may not be as difficult

1   for you to find.  I think that the challenge for all of us is

2   how to keep this litigation on track and not let this turn

3   into a satellite litigation with all kinds of explorations of

4   Brady issues and basically retrying or briefing each one of

5   the cases that opens up.

6              I just want to say that at this point I'm not

7   contemplating that that's something that we would do.  I don't

8   see that it would be in any parties interests or appropriate

9   to go into vast discovery on each one of these cases.  I

10  think, Mr. Rudin, you're not looking to do that either, are

11  you?

12             MR. RUDIN: No, I would very much like to avoid it.

13             THE COURT: Because it would prevent your case from

14  getting to trial when it should.

15             MR. RUDIN: Well, also it would make the trial very

16  [inaudible].

17             THE COURT: Exactly.  I think the jury for both sides

18  would lose their patience.

19             So if we go ahead with the 50 and they tend not to

20  be burdensome that is going to -- is not going to lead to

21  broad discovery.  It's going to -- there's going to be limited

22  discovery to the extent that I can reasonably do that.

23             MR. LARKIN: Your Honor, this is Arthur Larkin

24  speaking.  A question for the court.  I don't know exactly

25  which 50 files we're talking about.

1           THE COURT: Right.  Right.

2           MR. RUDIN: I'll -- I'm sorry, I don't mean to

3    interrupt.

4           THE COURT: Go ahead.

5           MR. RUDIN: I thought I could answer your question

6    but if you want to continue.

7           MR. LARKIN: I just want to continue with one other

8    point.  I understand fully what Your Honor is saying.  I

9    thought that the fact of Santos was unequivocal in that he was

10   not gorged and that he told the truth suggests that really

11   wasn't any violation of Mr. Collins' rights in this case.  I

12   do understand what Your Honor is saying about [inaudible]

13   merits with the relevance of discovery and I understand the

14   court's ruling.  I don't want to revisit it.  I just wasn't --

15   Santos' statement under oath in a proceeding in which Collins

16   himself took the testimony through his counsel where he

17   unequivocally said I had told the truth and no one told me to

18   lie and they told me to say the truth and that's what I did.

19   I think that really ought to count for something significant

20   here in terms of managing discovery.

21           THE COURT: Well, but then Mr. Rudin comes back and

22   says that Judge Irizarry elicited from Santos that I think

23   they took me straight to jail, I think they did, he never went

24   to -- before a judge, et cetera, et cetera.  Reportedly --

25   there just seems to be enough of a factual dispute here that

17

1   it would not be proper for me to cut off -- to make a ruling

2   as to his credibility and cut off discovery.

3          MR. LARKIN: I understand.  I understand, Your Honor.

4   So I guess the next step would be if plaintiff could identify

5   the files we'll then take that back to our client and find out

6   how they're kept and if they're in one place where they can

7   easily search then that makes it a lot easier and if not we'll

8   inform the plaintiffs and we'll inform the court.

9          And I just wanted to ask one more question if I

10  could, Your Honor.

11         THE COURT: Sure.

12         MR. LARKIN: That is could we -- could these

13  documents be kept for now at least under a protective order?

14         THE COURT: Yes.

15         MR. LARKIN: We -- thank you.  Thank you very much.

16  We will be submitting for the court's consideration a proposed

17  protective order which we provided a copy to plaintiff and

18  plaintiff had objections to some of the provisions.  We're

19  going to submit a revised draft for the court's consideration

20  and hopefully once it's acceptable to Your Honor it could be

21  entered and then it would govern discovery going forward.

22         But for this particular area with these custody

23  files I would ask for a confidential treatment for now.

24         MR. RUDIN: I would agree to that.

25         THE COURT: I'm hoping that you'll be able to agree

1   to the protective order, both sides on that, because I think

2   it's critical.  My concern -- I understand the City's concern

3   and if some of the information is not publicly available

4   particularly the identities of the witnesses the court would

5   understand an attorney's eyes only.

6          MR. RUDIN:  I received an initial draft.  I had

7   quite a few objections to it.  If there's a revised draft,

8   Arthur, you might want to submit -- let me review that.  Maybe

9   we can --

10          MR. LARKIN: We will do that.

11          MR. RUDIN:  -- narrow the issues to just a few.

12          As far as the 50 files, I believe July 26th is when

13   the City is supposed to provide to plaintiff copies of the

14   hotel custody logs that we reviewed and then after I receive

15   that material I can designate the 50 files.  A lot of the

16   files will be the files that we reviewed the logs and then we

17   want the actual witness files.  Then there will be some

18   additional ones I indicated before that probably will be

19   selected somewhat arbitrarily based upon chronological

20   closeness to the events in our case.  If any of the files that

21   we designate prove to be a problem because the defendant was

22   acquitted or the case was dismissed and the witness -- and the

23   files were sealed I guess we would just ask that other files

24   be made available for inspection which I guess we would -- we

25   will figure out some order perhaps and then they can just go

1  down the list.  Of course I wouldn't want the defendants to

2  select the additional files.  I'd rather select them and then

3  we can figure out which 50 [inaudible] problem.

4         Also, to try to make this a little easier, I

5  indicated that we would be willing to inspect rather than have

6  everything copied unless defendants think that that doesn't

7  help them.

8         But the other thing is that I think in the Collins

9  case at least based on the testimony we received so far and we

10  reviewed in discovery, the witness custody files were not with

11  the case file until after the -- either after there was a FOIA

12  request at some point or perhaps even after the 440 motion was

13  filed and I think the usual practice is that they're kept in a

14  separate place under the control either of the witness

15  relocation unit or the detective investigators.  I saw some

16  reference to the Chief Deputy Investigator Ponzi being asked

17  during the 440 motion to retrieve files of this nature and

18  there was some back and forth.  So I don't know [inaudible]

19  but I think that it's very unlikely that as a matter of

20  routine that these files are with the case files.

21         MR. LARKIN: We'll definitely check.  If they're not

22  then it will make it a lot easier I think.

23         THE COURT: If for some reason it does -- you believe

24  it is burdensome try and meet and confer on that to see if you

25  can designate other files.  Otherwise bring it to me.

20

1          MR. RUDIN: Sure.

2          MR. LARKIN: Yes, we will, Your Honor.

3          THE COURT: Now let's go to the in camera review.

4     The ruling comes in two parts.  The first part has to do with

5     the partially redacted documents.  I find that all the partial

6     redactions are appropriate.  There's nothing in there that

7     meets the standard for core attorney work product and nothing

8     that would help the plaintiff on the issues that he

9     [inaudible] for me.

10          With respect to the other documents, what I'm

11    focusing on at this point is whether or not the information is

12    available from other sources.  My conclusion at this point is

13    that it is available from other sources specifically through

14    the depositions that you haven't completed yet and that what

15    I'm going to ask you all to do, and I'm going to keep these

16    documents because I'm going to ask you to take those

17    depositions asking the questions that have been flagged for me

18    and if the answers are not sufficient then, Mr. Rudin, you can

19    come back to me and I'll consider whether or not that

20    information was in fact available from other sources but I do

21    believe that that information was -- will be available --

22    pretty much everything that's in these emails will likely be

23    available through depositions.

24          MR. RUDIN: Okay.  Your Honor, there is one other

25    issue [inaudible].

1          THE COURT: Sure.

2          MR. RUDIN: I've had discussions with Mr. Larkin

3   about this and I think we're in agreement that given the

4   amount of document discovery that still has to occur and the

5   possibility that there will be some further issues that will

6   have to be resolved and given the vacation schedules that we

7   cannot possibly complete discovery by the end of August.  Of

8   course Mr. Hines is now going to be at some point late in

9   September approximately.  So Mr. Watkins indicated that he's

10  interested right now in taking about eight depositions.  Maybe

11  that will grow and contract and we have quite a few to take

12  and a lot of them will depend upon what discovery we get

13  concerning discipline as well as the witness protection issue.

14         So we're in agreement that it would make sense to

15  push back the deposition like to the end of October if that's

16  acceptable to the court.

17         THE COURT: All right.  I would say that no one can

18  accuse you of not working hard on this case on both sides.

19         MR. RUDIN: Thank you.  I think it's been quite a

20  [inaudible].

21         THE COURT: Yes, the end of October is fine.

22         MR. RUDIN: I still would like to depose Mr. Hines

23  towards the end of September because I'm quite confident there

24  will be some additional depositions I want to take after.  So

25  I wouldn't want to be at the end of October and then we have

1   to go beyond October.  If it turns out that there's some

2   reason we have to go beyond October then I'm sure we can

3   address it but I think both sides would like to finish by the

4   end of October and from our point of view that would mean

5   doing Mr. Hines at some point during the end of September.

6           MR. LARKIN: Well, Your Honor, my co-counsel

7   Elizabeth Krasnow is going to be on vacation September --

8           MS. KRASNOW: Your Honor, this is Elizabeth Krasnow.

9   I was waiting to plan it because of the depositions that have

10  already been kind of up in the air with the parties' recent

11  discussions.  I think it's going to end up being the week of

12  September 30th.  So to the extent plaintiff is going to be

13  inflexible about DA Hines' deposition then we might have an

14  issue.

15          MR. RUDIN: I'm not going to be inflexible.  I would

16  like to do it the last week of September.  If that for some

17  reason really can't be done then we can do it after you get

18  back.

19          MS. KRASNOW: All right.

20          MR. RUDIN: Then I may have to schedule some other

21  depositions fairly quickly to be able to finish by the end of

22  October.  So if it's at all possible to do it --

23          MR. LARKIN: If counsel wants other witnesses --

24          MR. RUDIN: I understand.

25          MR. LARKIN: This is the issue that we had raised

1  with the court is that the whole point of a policy maker

2  deposition is that you get what you need -- you're supposed to

3  get what you need from other witnesses first and then if you

4  can't then you do the policy maker last.  I don't know why

5  we're having a discussion now about doing the policy maker

6  first and doing other witnesses after that.

7          THE COURT: Let me see if I can help you all out on

8  this.

9          MR. LARKIN: Yes, Your Honor.

10          THE COURT: Ms. Krasnow, you're just going to be gone

11  the week of September 30th?

12          MS. KRASNOW: That's the plan, Your Honor.  Before I

13  thought the DA's deposition would be the week before but

14  now --

15          THE COURT: I understand.

16          MR. RUDIN: That's what we're talking about.

17          MS. KRASNOW: Right.

18          MR. RUDIN: So there's no issue.

19          THE COURT: I just want to be sure that I'm not the

20  only one who doesn't understand.  So the DA's deposition is

21  going to be the week of the 23rd of September?

22          MS. KRASNOW: No.  At the last conference, Your

23  Honor, I believe the DA's deposition would be the week of

24  September 30th.

25          THE COURT: Right.  So I'm hearing now --

1          MS. KRASNOW: Now I'm just thinking that now that we

2   have a discussion about a little bit more flexibility with

3   deposition dates that I was hoping [inaudible] and I just

4   wanted to make everyone aware that it would be that week.

5          THE COURT: You're getting a vacation.  It can be

6   that week.  I just wanted to see if I understood that Mr.

7   Rudin whether he's changed his mind and the week of the 23rd

8   would work for him.  If not --

9          MR. RUDIN: No, I got confused.  The 25th is when I

10  have that oral argument in the Second Circuit --

11         THE COURT: That's right.

12         MR. RUDIN:  -- in the [inaudible] case.

13         THE COURT: So the discovery deadline is not October

14  31st.  It's November 8th.

15         MR. RUDIN: That's fine.

16         MS. KRASNOW: Thank you, Your Honor.

17         MR. RUDIN: I didn't mean to conflict with vacation.

18         THE COURT: Are we all set?  Our next conference is

19  October 8th.  If you need one before that which I'm hoping you

20  don't but if you do you know where to find me.

21         MR. RUDIN: Do we have a time on October 8th?

22         THE COURT: Yes, we do.  Let me see.  It is at 3:00.

23         MR. RUDIN: Okay, great.  Thank you very much, Your

24  Honor.

25         THE COURT: Thank you.

25

1          MR. RUDIN: Thank you.

2          THE COURT: If I don't speak to you have great

3    vacations and don't think about the case.

4          MR. RUDIN: Arthur and I are going on a retreat

5    together.

6    (Proceedings concluded at 2:38 p.m.)

7                          *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1          I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5    _____

6                    Shari Riemer

7    Dated:  August 2, 2013